**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF THE CASE AND FACTS RELEVANT TO THE MOTION ........................1

PLAINTIFFS' NON-FLSA CAUSES OF ACTION MEET THE REQUIREMENTS FOR CLASS CERTIFICATION ....................................................................10

I. LEGAL STANDARD ....................................................................................10

II. PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a). ....................................................................................................11

A. Plaintiffs' Class Satisfies the Numerosity Requirement of Rule 23(a)(1). .......11

B. Plaintiffs' Class Satisfies the Commonality Requirement of Rule 23(a)(2). ....12

C. Plaintiffs' Class Satisfies the Typicality Requirement of Rule 23(a)(3)..........12

D. Plaintiffs' Class Satisfies the Adequafcy Requirement of Rule 23(a)(4).........13

III. PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3). ....................................................................................................14

A. Class Membership Is Ascertainable ..........................................................15

B. Common Issues Predominate ....................................................................15

1. Count Two: Iowa Minimum Wage Violations ..........................................16

2. Count Three: CRST's Unlawful Deductions From Plaintiffs' Wages.............17

3. Count Four: Unjust Enrichment of CRST By Plaintiffs .............................18

4. Count Five: Fraud About the Lease Purchase Program ..............................22

5. Count Six: Truth In Leasing Act Violations.............................................28

C. Class Action Resolution of the Non-FLSA Causes of Action is Superior........30

CONCLUSION......................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpern v. UtiliCorp United, Inc.*,
84 F.3d 1525 (8th Cir. 1996) ....................13

*Am. Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974) ....................11

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ....................14, 15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................16, 24, 25

*Boswell v. Panera Bread Co.*,
311 F.R.D. 515 (E.D. Mo. 2015), *aff'd*, 879 F.3d 296 (8th Cir. 2018) ....................28

*Bouaphakeo v. Tyson Foods, Inc.*,
564 F. Supp. 2d 870 (N.D. Iowa 2008) ....................30

*Brown v. Precythe*,
2018 WL 3118185 (W.D. Mo. June 25, 2018) ....................13, 14

*C & J Vantage Leasing Co. v. Wolfe*,
795 N.W.2d 65 (Iowa 2011) ....................18, 19

*Cruz v. TMI Hosp., Inc.*,
2015 WL 6671334 (D. Minn. Oct. 30, 2015) ....................12

*Davis v. Colonial Freight Sys., Inc.*,
2018 WL 11225871 (E.D. Tenn. Mar. 2, 2018) ....................29

*Day v. Celadon Trucking Servs., Inc.*,
827 F.3d 817 (8th Cir. 2016) ....................11

*Elmy v. W. Express, Inc.*,
2021 WL 3172311 (M.D. Tenn. July 27, 2021) ....................20, 21, 27, 28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ....................16

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ....................24

*Fogie v. Rent-A-Ctr., Inc.*,
867 F. Supp. 1398 (D. Minn. 1993) ........................................................................20

*Frazier v. PJ Iowa, L.C.*,
337 F. Supp. 3d 848 (S.D. Iowa 2018)....................................................................12

*Fritz v. Corizon Health, Inc.*,
2021 WL 3883643 (W.D. Mo. Aug. 30, 2021)........................................................21

*Gilkey v. Cent. Clearing Co.*,
202 F.R.D. 515 (E.D. Mich. 2001)..........................................................................25

*Gries v. Standard Ready Mix Concrete LLC*,
07-cv-4013-MWB, 2009 WL 427281 (N.D. Iowa Feb. 20, 2009) ...........................12, 15

*Guy v. Ford Storage & Moving Co.*,
No. 4:18-cv-216-JAJ-RAW, 2019 WL 4804644 (S.D. Iowa Aug. 9, 2019)..........................11

*Hale v. Wal-Mart Stores, Inc.*,
231 S.W.3d 215 (Mo. Ct. App. 2007) ......................................................................21

*Huddleston v. John Christner Trucking, LLC*,
2020 WL 489181 (N.D. Okla. Jan. 30, 2020), *amended in part on recons.*,
2020 WL 6375163 (N.D. Okla. Oct. 26, 2020) ..........................................................26, 27

*J.S.X. Through Next Friend D.S.X. v. Foxhoven*,
330 F.R.D. 197 (S.D. Iowa 2019) ............................................................................15

*Karg v. Transamerica Corp.*,
No. 18-cv-134-CJW-KEM, 2020 WL 3400199 (N.D. Iowa Mar. 25, 2020) ...................13, 14

*Klay v. Humana*,
382 F.3d 1241 (11th Cir. 2004)................................................................................27

*In re Marriage of Shanks*,
758 N.W.2d 506 (Iowa 2008) ...............................................................................18, 19

*Marshall v. SF of Ohio, Inc.*,
1981 WL 2309 (S.D. Ohio Jan. 1, 1981)...................................................................18

*Martin v. Dahlberg, Inc.*,
156 F.R.D. 207 (N.D. Cal. 1994)..............................................................................22

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) ...................................................................................15

*Montoya v. CRST Expedited, Inc.*,
404 F. Supp. 3d 364 (D. Mass. Sept. 6, 2019)..........................................................17

*Murphy v. Gospel for Asia, Inc.*,
327 F.R.D. 227 (W.D. Ark. 2018) ....................................................................27

*In re Nat'l Prescription Opiate Litig.*,
976 F.3d 664 (6th Cir. 2020) ..........................................................................24

*Owner Operator Indep. Drivers Assoc. Inc. v. Arctic Express Inc.*,
2001 WL 34366624 (S.D. Ohio Sept. 4, 2001) ...............................................28

*Owner-Operator Indep. Drivers Ass'n, v. United Van Lines, LLC*,
556 F.3d 690 (8th Cir. 2009) ..........................................................................12

*State ex rel. Palmer v. Unisys Corp.*,
637 N.W.2d 142 (Iowa 2001) .........................................................................19

*Peterson v. H & R Block Tax Servs., Inc.*,
174 F.R.D. 78 (N.D. Ill. 1997)........................................................................22

*Pierson v. Source Perrier, S.A.*,
848 F. Supp. 1186 (E.D. Pa. 1994) ................................................................22

*Postawko v. Mo. Dep't of Corr.*,
910 F.3d 1030 (8th Cir. 2018) .............................................................. 10, 11, 12

*Rivera v. Brickman Grp., Ltd.*,
2008 WL 81570 (E.D. Pa. Jan. 7, 2008)..........................................................17

*Roberts v. C.R. England, Inc.*,
318 F.R.D. 457 (D. Utah 2017)............................................................ 22, 23, 26, 27

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ....................................................................12, 15

*Slater v. Terril Tel. Co.*,
662 N.W.2d 372 (Iowa App. 2003)...................................................................26

*Smith v. MCI Telecomm. Corp.*,
124 F.R.D. 665 (D. Kan. 1989)........................................................................26

*Spreitzer v. Hawkeye State Bank*,
779 N.W.2d 726 (Iowa 2009) ..........................................................................22

*In re St. Jude Med., Inc.*,
522 F.3d 836 (8th Cir. 2008) ..........................................................................24

*Stuart v. State Farm Fire & Cas. Co.*,
910 F.3d 371 (8th Cir. 2018) ....................................................................16, 30

*Tegtmeier v. PJ Iowa, L.C.*,
208 F. Supp. 3d 1012 (S.D. Iowa 2016) ........................................................................18

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ........................................................................27

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ........................................................................16

**Statutes**

29 U.S.C. § 203(r)(1) ........................................................................2

Iowa Code Ann. § 614.1(4) ........................................................................12

Iowa Code § 91D.1 ........................................................................16

Iowa Code §§ 91D.6 and 91A ........................................................................16

Iowa Wage Payment Collection Act, Iowa Code § 91A.1, *et seq.* ........................................17

Truth In Leasing Act, 49 U.S.C. § 14704........................................................................28

**Other Authorities**

49 C.F.R. § 376.12 ........................................................................28, 29

Rule 23 ........................................................................*passim*

Rule 23(a) ........................................................................10, 11, 12, 13

Rule 23(b) ........................................................................*passim*

Rule 23(c) ........................................................................31

## INTRODUCTION

Named Plaintiffs Anthony Cervantes and Mike Cross, along with the Opt-In Plaintiffs, move this Court to certify Plaintiffs' non-FLSA causes of action as Rule 23(b)(3) class actions on behalf of the following class:

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST during the applicable limitations period, subject to any equitable tolling and equitable estoppel.[1][2]

This case is in response to CRST's continued attempt to exploit class members (hereafter "Lease Operators") who participated in CRST's "Lease Purchase" program. Defendants designed that program to evade state and federal labor laws intended to protect employees by misclassifying Lease Operators as independent contractors. Plaintiffs' non-FLSA causes of action present questions capable of class resolution as they focus on whether Defendants' uniform employment policies, practices, contracts, and representations violated the federal and state statutes alleged in the Third Amended Complaint ("TAC"). Doc. 108.

## STATEMENT OF THE CASE AND FACTS RELEVANT TO THE MOTION

On January 2, 2021, Defendant CRST International, Inc. merged into Defendant CRST Expedited, Inc., and they now operate as a single company, CRST Expedited, Inc. d/b/a The Transportation Solution, Inc. (hereafter "Defendants" or "CRST"). Doc. 155 ¶3. Prior to the merger, Defendants were private companies that had common control and a common business

---

[1] Plaintiffs sought equitable tolling of limitations as a consequence of paragraphs 7(E) and 9(F) of the ICOAs. *See* Doc. 111-1 at 17-24. While the Court did not grant tolling, it concluded that, "[i]f the Court later finds equitable estoppel proper after further discovery, plaintiffs can argue for expansion of the class at that time." Doc. 147 at 9.

[2] Plaintiffs note that the proposed Rule 23 Class Definition is narrower than the FLSA class definition defined in Doc. 157.

purpose: transportation of freight for CRST customers. TAC ¶3. Both pre- and post-merger, CRST operated as a single enterprise, within the meaning of 29 U.S.C. § 203(r)(1). TAC ¶41.

As one of the largest transportation companies in the United States, CRST relied on thousands of long-haul, interstate truck drivers to deliver freight for its customers across the country. Doc. 155 ¶4. CRST used drivers it classified as employees ("Employee Drivers") and the putative class of Lease Operators, which CRST misclassified as independent contractors. TAC ¶5. For over 35 years, CRST has paid the misclassified drivers in its Lease Purchase Program less than the minimum wage required by federal and Iowa law; shifted CRST's business expenses and risk to the Lease Operators; defeated all federal and state protections for employees, including wage protection statutes such as the FLSA and similar state statutes; and shifted its employee tax burden, *e.g.*, social security and federal unemployment taxes, onto the Lease Operators. TAC ¶¶8, 9.

To lure drivers into its Lease Purchase Program, CRST engaged in a centrally coordinated recruitment program that repeated common representations regarding the weekly take-home pay Lease Operators could anticipate, the number of miles Lease Operators could expect to be offered on a weekly basis, and the pay Lease Operators would receive per mile.[3] Cervantes Decl. ¶5; Cross

---

[3] The promises made were of similar character. For instance, Defendants' recruitment materials that made the following promises:

- Ex. 1, Lease Purchase Ad Copy ("[M]ost of our fleet averages $1.60 per mile . . . ."); *see also* Ex. 2 (CRST's website) ("Most of our fleet averages $1.60 per mile. Share your experience training student drivers and you could net over $2,000 a week."); Ex. 3 (ad copy) ("Currently the fleet is earning on average $1.60+ per mile to the contractor. . . . CRST lease purchase drivers are netting up to $2000+ per week.); Ex. 4 (ad copy) ("[Y]ou could net over $2,000 a week!"); Ex. 5 (ad copy) (same); Ex. 6 (screenshot of CRST's website) ("[G]et the chance to earn $2,000 a week.").
- Ex. 7 (screenshot of ad) ("[T]eams can expect to receive 5,000 miles per week plus.").
- Ex. 8 (screenshot of ad) ("Average $1.82 CPM"); Ex. 9 (automated email) (same); Ex. 10 (automated email) (same).

Although there was some variation in the recruitment promises, they were largely consistent and none of them was remotely accurate. Leases Operators rarely or, in many cases, never averaged

Decl. ¶¶5, 9; Fink Decl. ¶¶6, 8, 11; Fisher Decl. ¶9; Gravelle Decl. ¶9; Shines Decl. ¶¶5, 10. Defendants made these representations in their recruiting materials, advertisements, and job postings that they widely dispersed to the entire class. Drivers saw these recruitment materials in emails from Defendants, in Qualcomm messages to Employee Drivers, on job hunting sites like Craigslist, as pop-up ads online, at truck stops and terminals, and promoted on their website, among others. *See* Ex. 1; Ex. 2; Ex. 3; Ex. 4; Cross Decl. ¶4 (received email); Shines Decl. ¶4 (saw ad posted on Craigslist); Fink Decl. ¶¶ 5, 8 (received Qualcomm message; saw ads at truck stops).

Defendants' advertising materials directed drivers interested in becoming Lease Operators to call CRST's "recruiters" who repeated substantially the same promises about earnings. *See* Ex. 11 (Lease Purchase Information Packet) at CRST004245 ("For more information, or to ask questions, call Jon Brown . . . ."); Ex. 3 ("Call today/work tomorrow!); Ex. 4 ("Call one of our Lease Purchase Specialists to learn more!"); Shine Decl. ¶6. CRST recruiters guided prospective Lease Operators using oral representations and specifically designed recruiting materials. CRST recruiters used "hard-sell" tactics to recruit prospective Lease Operators. Ex. 12 (recruiter call flow-chart) ("If they are not interested, find out why. GIVE THEM A <u>REBUTTAL</u>") (emphasis in original). The recruiters arranged for those who expressed interest in the program and met CRST's qualifications to enroll, free of charge, in Defendants' three-to-four-day orientation at Defendants' corporate headquarters in Cedar Rapids, Iowa. TAC ¶139; Ex. 11 at CRST004242; Cervantes Decl. ¶6; Cross Decl. ¶6; Fink Decl. ¶9; Fisher Decl. ¶6; Gravelle Decl. ¶6; Shines Decl. ¶7. Participation in the orientation program was mandatory to enroll in the Lease Purchase Program. Cervantes Decl. ¶7; Cross Decl. ¶7; Fink Decl. ¶10; Fisher Decl. ¶7; Gravelle Decl. ¶7;

---

the amounts promised in the recruitment materials. Cervantes Decl. ¶37; Cross Decl. ¶41; Fink Decl. ¶44; Fisher Decl. ¶41; Gravelle Decl. ¶38; Shines Decl. ¶37.

Shines Decl. ¶8. CRST arranged for prospective Lease Operators' transportation to the orientation and paid for their travel to orientation and for lodging and meals, intending for prospective Lease Operators to depart from orientation in their leased trucks. *See, e.g.*, Ex. 11 at CRST0004242; Ex. 13 (email to Cervantes regarding rental car) at PLT-AC-000106; Ex. 14 (orientation agenda) ("Prior to leaving Cedar Rapids: Find out exact location of truck . . ."); Cervantes Decl. ¶6; Cross Decl. ¶6; Fink Decl. ¶9; Fisher Decl. ¶6; Gravelle Decl. ¶6; Shines Decl. ¶7.

Lease Operators and Employee Drivers attended the same orientation during which CRST trained them in its policies, practices, and procedures. Doc. 113-5 ¶¶5-6; Doc. 113-8 ¶¶4-6; Doc. 113-9 ¶¶3-6; Cervantes Decl. ¶7; Cross Decl. ¶7; Fink Decl. ¶10; Fisher Decl. ¶7; Gravelle Decl. ¶7; Shines Decl. ¶8. CRST told Lease Operators that they must comply with CRST's handbook and policies, which were the same ones that applied to CRST's Employee Drivers. Doc. 113-5 ¶25; Doc. 113-8 ¶22; Doc. 113-9 ¶ 20-22; Cervantes Decl. ¶8; Cross Decl. ¶8; Fisher Decl. ¶8; Gravelle Decl. ¶8; Shines Decl. ¶9; *see also* Fink Decl. ¶10. During the orientation, Defendants' recruiters and representatives reiterated the promises about earnings made in the written advertisements, with particular focus on the potential earnings included in the CRST Contractor Weekly Net Income Sample ("Income Chart"), located in the Lease Purchase Information Packet. *See* Ex. 11 at CRST004247. Cervantes Decl. ¶9; Cross Decl. ¶9; Fink Decl. ¶11; Fisher Decl. ¶9; Gravelle Decl. ¶9; Shines Decl. ¶10. CRST's Income Chart provided "example Profit/Loss statements comparing the different driving positions vs. weekly miles." Ex. 11 at CRST004247. The material included six different charts, two charts for each of the different driving positions available to Lease Operators—Team Drivers, Lead Drivers, and Solo Drivers.[4] *Id*. Through this

[4] Lead Drivers are those whom CRST assigned to train its Student Employee Drivers. Ex. 11 at CRST004242. Team Drivers are those who hired a co-driver, subject to CRST's approval. Doc.

chart, CRST misrepresented to all prospective Lease Operators not only the number of miles Lease Operators could expect to drive per week, but also the rate per mile and weekly net income Lease Operators could expect.[5] *Id*. For example, the two charts for Lead Drivers reflected the weekly net income Lease Operators could expect depending on whether they drove 3500 miles per week ($1,856.72), or 5000 miles per week ($3,001.74), with an average Rate Per Loaded Mile "RPLM" of 70% of $1.65. Ex. 11 at CRST004247.

Earnings were a central concern of drivers considering the Lease Purchase Program, and Defendants made earnings the focal point of their recruiting efforts, intending Lease Operators to rely on statements regarding earnings as an inducement to sign up for the program. Drivers relied

---

113-6 ¶¶1(B), 4(D). Solo Drivers are those who hauled freight, as the name implies, without a co-driver or student.

[5] The figures listed in the Income Chart varied slightly, depending on the year CRST published the Income Chart; however, the promises made were of similar character. For instance, different versions of the Income Chart made the following promises:

- Ex. 15 (Feb. 2018 Information Packet) at CRST004258-61 (indicating Team Drivers could expect a weekly net income of $2,566.76 if they drive 4000 loaded miles, and $4,256.88 per week if they drive 6000 loaded miles; Lead Drivers could expect a weekly net income of $1,828.60 if they drive 3500 loaded miles, and $2,961.57 if they drive 5000 loaded miles).
- Ex. 16 (Aug. 2018 Information Packet) at CRST004267-70 (indicating Team Drivers could expect a weekly net income of $3122.84 if they drove 4000 loaded miles, and $5,175.75 if they drive 6000 loaded miles; Lead Drivers could expect a weekly net income of $2,210.61 if they drive 3500 loaded miles, and $3,507.29 if they drive 5000 loaded miles); Ex. 17 (Jan. 2019 Information Packet) at CRST004277-79 (same); Ex. 18 (Aug. 2019 Information Packet) at CRST004285-88 (same).
- Ex. 19 (Sept. 2019 Information Packet) CRST004294-97 (indicating Team Drivers could expect a weekly net income of $2,652.81 if they drive 3500 loaded miles, and $3,643.61 if they drive 4500 loaded miles; Lead Drivers could expect a weekly net income of $1,362.01 if they drive 2500 loaded miles, and $2,232.81 if they drive 3500 loaded miles); Ex. 20 (Jan. 2020 Information Packet) at CRST004303-05 (same); Ex. 21 (May 2020 Information Packet) at CRST004310-12 (same).
- Ex. 22 (May 2021 Information Packet) CRST004318-20 (indicating Team Drivers could expect a weekly net income of $2,505.81 if they drive 3500 loaded miles, and $3,454.61 if they drive 4500 loaded miles; Lead Drivers could expect a weekly net income of $1,257.01 if they drive 2500 loaded miles, and $2,085.81 if they drive 3500 loaded miles).


Case 1:20-cv-00075-CJW-KEM Document 245-2 Filed 12/15/21 Page 11 of 38

on those representations, and the promised earnings was the most important reason that they entered into the agreement. *See* Cervantes Decl. ¶¶10, 36; Cross Decl. ¶¶10, 40, 45; Fink Decl. ¶¶12, 43, 48; Fisher Decl. ¶¶10, 40, 44; Gravelle Decl. ¶¶10, 37; Shines Decl. ¶¶11, 36, 40. Plaintiffs allege CRST's earnings representations were false. Regardless of whether Lease Operators hauled freight for CRST as a Lead Driver, Team Driver, or Solo Driver, they averaged substantially less than the net income per week that Defendants promised. Cervantes Decl. ¶37; Cross Decl. ¶41; Fink Decl. ¶44; Fisher Decl. ¶41; Gravelle Decl. ¶38; Shines Decl. ¶37.

On the last day of orientation, CRST presented prospective Lease Operators with two pre-printed and non-negotiable documents for signature to enter into the Lease Purchase Program: an "Equipment Lease" (hereafter "Lease"), by which Lease Operators leased a truck from CRST at no money down, and an "Independent Contractor Operating Agreement" (hereafter "Contract" or "ICOA"), by which Lease Operators re-leased their leased truck back to CRST, giving CRST "exclusive possession, control, and use" of the leased truck and agreeing to use it to haul goods for CRST. Doc. 113-5 ¶14; Doc. 113-8 ¶13-14; Doc. 113-9 ¶13; Cervantes Decl. ¶¶10-12; Cross Decl. ¶¶10-12; Fink Decl. ¶¶12-14; Fisher Decl. ¶¶10-12; Gravelle Decl. ¶¶10-12; Shines Decl. ¶11-13. CRST drafted the ICOA and Lease, which referenced each other and formed a single contractual agreement ("Agreement").[6] Cervantes Decl. ¶¶13, 14; Cross Decl. ¶¶13, 14; Fink Decl. ¶¶15, 16; Fisher Decl. ¶¶13, 14; Gravelle Decl. ¶¶13, 14; Shines Decl. ¶¶14, 15. The Agreement was nearly eighty pages in length, and CRST did not give the Drivers adequate time to review the Agreement; it provided only a limited oral description of the terms, and did not provide for a robust question-and-answer session. Cervantes Decl. ¶14; Cross Decl. ¶14; Fink Decl. ¶16; Fisher Decl.

[6] CRST used different versions of the ICOA and Lease throughout the class period; however, the versions are materially the same. *See* Doc. 110-1 at 11 ¶4.

¶14; Gravelle Decl. ¶14; Shines Decl. ¶15. Moreover, Defendants did not permit Lease Operators to seek legal advice before signing. Cross Decl. ¶ 47; Fink Decl. ¶50; Fisher Decl. ¶46; Gravelle Decl. ¶41; Shines Decl. ¶42. For all of these reasons, it was difficult, if not impossible, for prospective Lease Operators to fully understand the Agreement, particularly since many did not have much more than a high school education and were generally not sophisticated in understanding form contracts like the Agreement. Doc. 111-7; Ex. 23 (Cervantes' Lease); Cervantes Decl. ¶2; Cross Decl. ¶2; Fink Decl. ¶2; Fisher Decl. ¶2; Gravelle Decl. ¶2; Shines Decl. ¶2.

Individuals attending the orientation session who refused to sign the Agreement quickly learned that they would have to arrange and pay their own way home. Cross Decl. ¶16; Fink Decl. ¶18; Fisher Decl. ¶16; Gravelle Decl. ¶16; Shines Decl. ¶17. Because drivers' funds were often low, many individuals knew they would have trouble getting back home if they did not sign the Agreement. Cross Decl. ¶16; Shines Decl. ¶17. This added to the pressure that drivers felt to sign the Agreement. *Id*.

While the ICOA stated that Lease Operators are "independent contractors," Defendants exerted near complete control over Lease Operators' work and ensured they could not operate as independent businesses, but instead remained economically dependent on Defendants. Under the ICOA, Lease Operators agreed "to have the Equipment operated using two driver teams only" except temporarily for such things as dropping off or picking up a Team Driver. Doc. 113-6 ¶1(B). Lease Operators could comply with the requirement that they have a "two driver team" by agreeing to accept an inexperienced CRST Student Employee Driver and training the Student Employee Driver as a "Lead Driver," or use a co-driver subject to CRST's approval and operate as a "Team Driver." Doc. 113-6 ¶ 1(B), ¶4(D) (Lease Operator must authorize CRST to access driver files "as


Case 1:20-cv-00075-CJW-KEM Document 245-2 Filed 12/15/21 Page 13 of 38

part of the driver qualification process"); Doc. 113-5 ¶31 (CRST had to approve Team Driver); Doc. 113-8 ¶28 (same); Doc. 113-9 ¶26 (same); Fink Decl. ¶28; Fisher Decl. ¶25. CRST retained the right to disqualify any driver of the leased equipment, including the Lease Operator, CRST Student Employee drivers, and any other co-driver. Doc. 113-6 ¶4(D)(3). CRST required Lease Operators who hauled loads as Lead Drivers to train CRST's Student Employee Drivers in driving skills and CRST policies and procedures for 21 to 28 days. Doc. 113-5 ¶¶ 25, 30; Ex. 24 (CRST Information Packet) at CRST010038; Cervantes Decl. ¶20; Cross Decl. ¶23; Fink Decl. ¶26; Fisher Decl. ¶23; Gravelle Decl. ¶21; Shines Decl. ¶23. While training a Student Employee Driver, CRST required Lease Operators to pay approximately $0.09 to $0.15 per mile, regardless of whether the CRST Student Employee Driver or Lease Operator drove, and even though Lease Operators were training CRST's employees. Ex. 11 at CRST01004242; Cervantes Decl. ¶21; Cross Decl. ¶24; Fink Decl. ¶27; Fisher Decl. ¶24; Gravelle Decl. ¶22; Shines Decl. ¶24.[7]

Defendants also controlled Lease Operators' work schedules by requiring them to work exclusively for CRST. Despite the provisions set forth in ¶¶1(D) and (E), indicating that Lease Operators could receive CRST's prior written consent to haul loads for another motor carrier, during orientation CRST told Lease Operators that they were not permitted to drive for other carriers. Ex. 25 (ICOA Summary Review) at CRST005012 ("CRST does not generally allow you to sublease your truck. . . ."); Doc. 113-5 ¶23; Doc. 113-8 ¶21; Doc. 113-5 ¶23; Cross Decl. ¶22; Fink Decl. ¶25; Fisher Decl. ¶22; Shines Decl. ¶22.

Furthermore, CRST monitored Lease Operators' location, speed, control of the truck, route, estimated arrival time, rest time, driving time, and other aspects of job performance by an

[7] According to CRST, a Lease Operator hauling loads as a Lead Driver can train about nine to ten Student Employee Drivers per year. Ex. 24 at CRST010038; Cervantes Decl. ¶20; Cross Decl. ¶23; Fink Decl. ¶26; Fisher Decl. ¶23; Gravelle Decl. ¶21; Shines Decl. ¶23.

on-board computerized communications and electronic recorder system that CRST required Lease Operators to install. (Omnitracs system). Doc. 113-6 ¶4(C)(3); Cervantes Decl. ¶18; Cross Decl. ¶¶18, 20; Fink Decl. ¶¶20, 22, 24; Fisher Decl. ¶¶18, 20; Gravelle Decl. ¶¶18, 20; Shines Decl. ¶20. Lease Operators received communications and instructions daily or near-daily from their "driver managers" regarding driving speed, arrival times, rest times, etc. Doc. 113- 5 ¶¶27, 29; Doc 113-9 ¶¶22, 24; Doc. 113-8 ¶¶24, 26.

In providing transportation services for CRST, the Agreement required Lease Operators to pay for a wide variety of expenses and costs that were primarily for CRST's own benefit. Lease Operators were responsible for all operating expenses including, but not limited to: fuel, fuel and road taxes, maintenance, base plates, permits, insurance, and charges for use of CRST's trailers. Doc. 113-6 ¶¶5(F), (G), (H); Cervantes Decl. ¶29; Cross Decl. ¶33; Fink Decl. ¶36; Fisher Decl. ¶33; Gravelle Decl. ¶30; Shines Decl. ¶29. CRST offered to advance operating expenses on behalf of Lease Operators and facilitate the purchases of and advance these costs, subject to recoupment through deductions from the Lease Operators' weekly settlement payments. Doc. 113-6 ¶6, Appx. A; Cervantes Decl. ¶¶17, 27, 29; Cross Decl. ¶¶19, 30, 33; Fink Decl. ¶¶21, 33, 36; Fisher Decl. ¶¶19, 30, 33; Gravelle Decl. ¶¶19, 27, 30; Shines Decl. ¶¶19, 27, 29. Additionally, CRST required Lease Operators to fund and maintain a mandatory $2,000 general escrow fund through deductions from weekly settlements. Doc. 113-6 ¶8(A)(1), Appx. A #8(A); Cervantes Decl. ¶29; Cross Decl. ¶33; Fink Decl. ¶36; Fisher Decl. ¶33; Gravelle Decl. ¶30; Shines Decl. ¶29. CRST controlled these escrow funds and could use them to satisfy any operating cost advances or other charges owed to it. Doc. 113-6 ¶8(B)(1), Appx. A #4. Defendants deducted expenses and costs from Lease Operators regardless of how many loads CRST assigned them in any given workweek, which could be none at all. Cervantes Decl. ¶32; Cross Decl. ¶36; Fink Decl. ¶32; Fisher Decl. ¶36; Gravelle

Decl. ¶33; Shines Decl. ¶32. That is, the Lease did not obligate Defendants to give Lease Operators any specific amount of work while they had continuing obligations to CRST.

The Lease also provided that if Lease Operators failed to meet any of the numerous obligations under the ICOA or failed to pay any of the numerous fees/deductions set forth in the ICOA, Defendants could place Lease Operators into default of the Lease. Ex. 23 at CRST000134-5 ¶12. The Lease subjected Lease Operators who were placed into default of their Lease to having their truck repossessed and to having all their remaining lease payments accelerated and deemed due and owing, which could amount to tens of thousands of dollars. Ex. 23 at CRST000135 ¶13(b). CRST could deduct the amounts Lease Operators owed under the Lease from Lease Operators' paychecks and from mandatory "escrow" and "maintenance" funds. Ex. 23 CRST000135 ¶13(f); Cervantes Decl. ¶25; Cross Decl. ¶28; Fink Decl. ¶31; Fisher Decl. ¶28.

Plaintiffs brought suit to redress these violations on behalf of themselves and other Lease Operators. Their Third Amended Complaint alleges 6 counts: (1) Failure to Pay the Federal Minimum Wage; (2) Iowa Minimum Wage Violation; (3) Unlawful Deductions in Violation of Iowa Law; (4) Unjust Enrichment of Defendants by Plaintiffs; (5) Fraud; and (6) Truth in Leasing Act Violation. To date, approximately 631 individuals have filed consent to sue forms joining Plaintiffs' FLSA collective action. The putative class consists of at least 2000 individuals. Plaintiffs now move for Rule 23(b)(3) class certification of Counts 2, 3, 4, 5, and 6.

## PLAINTIFFS' NON-FLSA CAUSES OF ACTION MEET THE REQUIREMENTS FOR CLASS CERTIFICATION

## I. LEGAL STANDARD

"To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018). "When there are issues common to the class that predominate, 'the

action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* or some affirmative defenses peculiar to some individual class members.'" *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

Certifying Plaintiffs' claims as class actions on behalf of the putative class enables Plaintiffs to achieve "efficiency and economy of litigation[,] which is a principal purpose of the procedure." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). The Court's "primary task is not to determine the final disposition of a plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution." *Postawko*, 910 F.3d at 1037. Courts should not engage in "free-ranging" merits determinations at the certification stage. *Guy v. Ford Storage & Moving Co.*, No. 4:18-cv-216-JAJ-RAW, 2019 WL 4804644, at *8-9 (S.D. Iowa Aug. 9, 2019) (stating "Our primary task is not to determine the final disposition of a plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution") (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Merits questions may be considered only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## II. PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a).

### A. Plaintiffs' Class Satisfies the Numerosity Requirement of Rule 23(a)(1).

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. Fed. R. Civ. P 23(a)(1). Here, Plaintiffs reasonably estimate that there are in excess of 2000 class members based on the fact that the FLSA class list provided by Defendants contained over 2030 drivers. The actual class is larger than that because several of the non-FLSA claims that Plaintiffs seek to certify have longer statutes of limitations than the FLSA claim that

generated 2030 names.[8] "A class of [2000 persons] would make 'joinder of all members . . . impracticable.'" *Postawko*, 910 F.3d at 1037-38; *see also Gries v. Standard Ready Mix Concrete LLC*, 07-cv-4013-MWB, 2009 WL 427281, at *6 (N.D. Iowa Feb. 20, 2009) (finding class of 91 satisfies numerosity and citing cases). The impracticality of joining this many potential class members is further supported by the geographic dispersal of over-the-road truck drivers, the relatively small amounts of each individual's claims, and the judicial efficiency of trying these claims together. *See Frazier v. PJ Iowa, L.C.*, 337 F. Supp. 3d 848, 868 (S.D. Iowa 2018).

**B. Plaintiffs' Class Satisfies the Commonality Requirement of Rule 23(a)(2).**

Rule 23(a)(2) requires that there are questions of law or fact common to the class. Fed. R. Civ. P 23(a)(2). "The 'common contention' in Rule 23(a)(2) 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Because this requirement overlaps with and is subsumed by the requirement that common questions predominate in Rule 23(b)(3), Plaintiffs will address this issue in the discussion of predominance. *See Cruz v. TMI Hosp., Inc.*, 2015 WL 6671334, at *7 (D. Minn. Oct. 30, 2015) (addressing Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement together).

**C. Plaintiffs' Class Satisfies the Typicality Requirement of Rule 23(a)(3).**

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of

[8] A five-year statute of limitations applies to Plaintiffs' unjust enrichment and fraud claims. Iowa Code Ann. § 614.1(4). A four-year statute of limitations applies to Plaintiffs' Truth In Leasing Act claims. *See Owner-Operator Indep. Drivers Ass'n, v. United Van Lines, LLC*, 556 F.3d 690, 692 (8th Cir. 2009).

the claims or defenses of the class. Fed. R. Civ. P 23(a)(3). In assessing typicality, "courts consider whether the named plaintiff's claim 'arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.'" *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, the claims of the two Named Plaintiffs are the same as the claims of the putative class. The factual circumstances giving rise to the Plaintiffs' claims are the same as those giving rise to the class members' claims—i.e., Defendants misclassified the Plaintiffs and the other Lease Operators as independent contractors and applied the same work and pay policies and practices to them; CRST induced Plaintiffs and other Lease Operators to sign up for the Lease Purchase Program through the same misrepresentations regarding their compensation and the same hurried process; and CRST entered into substantively identical ICOAs with all Lease Operators, including Plaintiffs. *See Brown v. Precythe*, 2018 WL 3118185, at *7 (W.D. Mo. June 25, 2018) (finding typicality satisfied where plaintiffs' claims and those of the proposed class "arise from the same course of conduct: Defendants' policies, practices, and customs"). Because their factual circumstances are the same, the Named Plaintiffs and the class members "have the same or similar grievances" as the class members. *Karg v. Transamerica Corp.*, No. 18-cv-134-CJW-KEM, 2020 WL 3400199, at *3 (N.D. Iowa Mar. 25, 2020). Accordingly, Plaintiffs satisfy the typicality requirement of Rule 23(b)(3).

**D. Plaintiffs' Class Satisfies the Adequacy Requirement of Rule 23(a)(4).**

Rule 23(a)(4) requires that the representative parties and class counsel fairly and adequately protect the interests of the class. Fed. R. Civ. P 23(a)(4). "The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through

qualified counsel." *Karg*, 2020 WL 3400199, at *4 (quoting *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562–63 (8th Cir. 1982)). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, the Named Plaintiffs Cervantes and Cross are members of the class in that the "issues presented are the same for every potential plaintiff, so the [Named] Plaintiffs' interests are substantively identical to those of the other potential class members." *Brown*, 2018 WL 3118185, at *7 (citing *Wal-Mart*, 564 U.S. at 349 n.5 (noting that the requirements of typicality and adequacy "tend to merge")). There are no conflicts between the Named Plaintiffs and the class members that would preclude them from representing the class members. Over the course of this litigation, both Named Plaintiffs have demonstrated their commitment to vigorously prosecuting this action on behalf of the class. They have worked cooperatively with counsel, provided declarations in support of motions (*see, e.g.*, Doc. 111-6; Doc. 113-5; Doc. 113-8; Cervantes Decl.; Cross Decl.), responded to written discovery (40 Requests for Production; 8 Interrogatories; and 2 Requests for Admission), and each has sat for a full seven hours or more of deposition. Class Counsel also have demonstrated over the course of the litigation both the ability and the commitment to vigorously represent the interests of the class. As set forth in the declaration of Michael Sweeney, Class Counsel have substantial experience handling large employment class actions and have been found to be qualified class counsel in multiple prior actions. *See* Sweeney Decl. at ¶¶7, 16, 22.

## III. PLAINTIFFS' CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3).

Lease Operators seek certification of their claims under Rule 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting individual members, and that a class action is superior to other available methods for the

fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements can be referred to as the "predominance" and "superiority" requirements. *Gries*, 2009 WL 427281, at *8. The rule also contains an implicit requirement that a class "must be adequately defined and clearly ascertainable." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).

### A. Class Membership Is Ascertainable

The Eighth Circuit requires that a class "must be adequately defined and clearly ascertainable." *Sandusky Wellness*, 821 F.3d at 996. "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage*, 847 F.3d at 998 (citing *Sandusky Wellness*, 821 F.3d at 997-98). "Ascertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." *J.S.X. Through Next Friend D.S.X. v. Foxhoven*, 330 F.R.D. 197, 206 (S.D. Iowa 2019). The class definition, *supra* p. 1, makes the class ascertainable, as CRST identified the FLSA collective action members through its own records and should be able to do so for the Rule 23 class. Doc. 157. *See McKeage*, 847 F.3d at 999 (finding the proposed class ascertainable where "class members were identified by reviewing [the defendant]'s [] files according to objective criteria").

### B. Common Issues Predominate

Rule 23(b) requires a showing that the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence. . . . If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Sandusky Wellness*, 821 F.3d at 998 (alteration in original) (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir.

2010)); *see also In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) ("The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions.").

"Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.' []. What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc.*, 568 U.S. at 469 (emphasis and alterations in original) (quoting Fed. R Civ. P. 23(b)(3)); *see Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374–75 (8th Cir. 2018)) ("Certification is appropriate if 'the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" (quoting *Tyson Foods*, 577 U.S. at 453)). In assessing whether common issues predominate, courts look to the elements of each claim as defined by state law and the nature of the proof that will establish those elements. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

**1. Count Two: Iowa Minimum Wage Violations**

Plaintiffs bring claims for violations of Iowa Minimum Wage Law (IMWL) pursuant to Iowa Code §§ 91D.6 and 91A. The law provides that "[e]very employer, as defined in the [FLSA] . . . shall pay to each of the employer's employees, as defined in the [FLSA] . . . the state hourly wage," which currently is the same as the federal minimum wage, $7.25 per hour. Iowa Code § 91D.1.

Plaintiffs' IMWL claim mirrors Plaintiffs' FLSA minimum wage claim. The central issue common to all class members is whether CRST misclassified them. The Court has already found that issue to be common to the class in its Order certifying the FLSA collective because all class members signed materially similar ICOAs and CRST subjected them to the same work conditions.

Doc. 147 at 6-7. For the same reasons, the misclassification question with respect to Plaintiffs' IMWL claim also presents a common question.

Once it is determined that class members were employees, the extent to which CRST paid each putative class member less than minimum wage can be determined on a class-wide basis from CRST's records showing loads carried and amounts paid each week, and expert testimony regarding hours of work without the need for testimony from individual class members.

**2. Count Three: CRST's Unlawful Deductions From Plaintiffs' Wages**

Plaintiffs bring claims for unlawful deductions under the Iowa Wage Payment Collection Act, Iowa Code § 91A.1, *et seq.*, which bars employers from withholding or diverting any portion of employees' wages "for a lawful purpose accruing to the benefit of the employee."

To show CRST violated this provision, Plaintiffs must first show employee status, which, as discussed above, presents a common question. Second, Plaintiffs must show that the deductions at issue—the operating expenses for the trucks used by the Lease Operators including, *inter alia*, expenses they incurred repairing damaged trucks, insurance coverage, fuel, tolls, and trailers—were not expenses "accruing to the benefit to the employee," § 91A.5, but were instead Defendants' business expenses. That too presents a common question as the operating expenses paid by Lease Operators all served the same purpose—ensuring their ability to successfully haul loads for CRST in compliance with its policies. Whether such expenses are for the benefit of Defendants or Lease Operators, for purposes of § 91A.5 presents a legal question that is not dependent on individualized facts. *See, e.g.*, *Montoya v. CRST Expedited, Inc.*, 404 F. Supp. 3d 364, 391-92 (D. Mass. Sept. 6, 2019) (finding on a class-wide basis that defendant's wire charges for transmitting pay, drug test costs, map costs, and certain transportation costs are employer business expenses); *Rivera v. Brickman Grp., Ltd.*, 2008 WL 81570, at *8–9 (E.D. Pa. Jan. 7, 2008) (finding on class wide basis that transportation charges for foreign visa workers were for

the benefit of the employer not the employee); *Marshall v. SF of Ohio, Inc.*, 1981 WL 2309, at *1 (S.D. Ohio Jan. 1, 1981) (finding on a company-wide basis that uniforms constitute *de facto* deduction from wages). Accordingly, common questions predominate with respect to Plaintiffs' unlawful deduction claim. *Tegtmeier v. PJ Iowa, L.C.*, 208 F. Supp. 3d 1012, 1020 (S.D. Iowa 2016) (conditionally certifying plaintiffs' vehicle expense reimbursement claim where "[a]ll potential plaintiffs appear to have been subject to the same vehicle expense reimbursement policy"). Lastly, proof of the amount of the expenses can also be established on a class-wide basis as, in most if not all cases, CRST paid the expenses and then deducted them from Lease Operators' pay settlements creating a written record of the expenses at issue.

### 3. Count Four: Unjust Enrichment of CRST By Plaintiffs

Plaintiffs' claim for unjust enrichment stems from the procedurally and substantively unconscionable terms of the Agreement under which CRST charged Lease Operators fees and made deductions from Lease Operators' wages, thereby shifting to Lease Operators the costs of maintaining CRST's fleet and general business operations. Plaintiffs' claim for unjust enrichment first requires proof that CRST's form Agreement is void for unconscionability. Doc. 150 at 21.

An agreement is unconscionable "where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 80 (Iowa 2011); Doc. 150 at 21 (finding "plaintiffs' allegations on [unconscionability] sufficient [to defeat Defendant's motion to dismiss] in light of the intentional scheme they describe"). Several factors are considered to assess this standard, including: "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *Id.* (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975)). In Iowa, a contract may be found to be unconscionable as a result of procedural or substantive unfairness, or some combination of the two. *See In re Marriage of Shanks*, 758 N.W.2d

506, 516-18 (Iowa 2008) (analyzing as separate issues whether contract was substantively or procedurally unconscionable). "Procedural unconscionability involves an advantaged party's exploitation of a disadvantaged party's lack of understanding, unequal bargaining power between the parties, as well as the use of fine print and convoluted language. *Id.* at 515-17. Substantive unconscionability involves whether or not the substantive terms of the agreement are so harsh or oppressive that no person in his or her right senses would make it. *Id.* at 515–16." *C & J Vantage Leasing Co.*, 795 N.W.2d at 81. Unconscionability is determined at the time the agreement was entered. *Id.*

If Plaintiffs succeed on the threshold issue of unconscionability, then they must prove: "(1) defendant[s] w[ere] enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff[s]; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001); Doc. 150 at 18.[9] All of these elements present questions common to the class.

The facts Plaintiffs will rely upon to establish procedural unconscionability are common to the class, including, *inter alia*, that CRST lured drivers with the same marketing materials that required drivers to contact its recruiters and then commit to attend the required on-site orientation in person in Cedar Rapids; the Agreements were pre-printed forms, drafted by CRST and presented on a take-it-or leave it basis; that CRST did not give drivers adequate time to review the documents; and that CRST pressured drivers into signing by only offering one-way transportation to the place of signing. *See* Cross Decl. ¶¶6, 16; Fink Decl. ¶18; Fisher Decl. ¶¶6, 16; Gravelle

---

[9] The Court also indicated a requirement that Plaintiffs demonstrate that CRST's counter-performance under the ICOA does not bar their unjust enrichment claim (Doc. 150 at 20), which Plaintiffs understand to mean that CRST's counter-performance under the ICOA did not render CRST's enrichment *just*, as opposed to unjust. This consideration, therefore, is encapsulated by the analysis of the three elements of unjust enrichment set forth below.

Decl. ¶¶6, 16; Shines Decl. ¶¶7, 17. Because these facts turn on the nature CRST's uniform practices with respect to the presentation and signing of the Agreements, they are common to the class. As a result, the question whether those facts, alone or in combination with the substantively unfair aspects of the Agreement, render the Agreement unconscionable is a question that the Court can answer once for the class as a whole. *See Fogie v. Rent-A-Ctr., Inc.*, 867 F. Supp. 1398, 1406 (D. Minn. 1993), *certified question answered*, 518 N.W.2d 544 (Minn. 1994) (certifying unconscionability claims); *Elmy v. W. Express, Inc.*, 2021 WL 3172311, at *6 (M.D. Tenn. July 27, 2021) (certifying claim that driver operating agreement was unconscionable).

Plaintiffs allege that the Agreement was substantively unconscionable because it required Lease Operators to work exclusively for CRST while, at the same time, imposing no obligation on CRST to offer any minimum amount of work; gave CRST the right to terminate the contracts at-will which would automatically place a Driver in default of his or her Lease and impose all of the draconian financial consequences such default entails; made Lease Operators responsible for the costs of carrying and maintaining CRST's fleet; purported to alter the rights of Lease Operators under the FLSA in the event they are reclassified as employees, and purported to require Lease Operators to indemnify CRST for damages caused by CRST's misclassification of them. TAC ¶¶139-40. Whether these terms of the Agreement are substantively unconscionable or not need not be decided at this juncture. What matters for class certification is that all these terms were the same for all class members, so that the question of whether these terms are substantively unconscionable is common to the class and appropriately decided on a class-wide basis. If the Court finds the terms of Plaintiffs' Agreements are substantively unconscionable, the similar terms in the Agreements of the class members are equally unconscionable.

The elements of unjust enrichment are also susceptible to generalized class-wide proof. *See, e.g.*, *Fritz v. Corizon Health, Inc.*, 2021 WL 3883643, at *7 (W.D. Mo. Aug. 30, 2021) (certifying unjust enrichment claims and holding that "a classwide proceeding [on unjust enrichment] is capable of generating common answers apt to drive the resolution of the litigation"); *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 225 (Mo. Ct. App. 2007) (certifying unjust enrichment claims and citing cases).

The benefits conferred upon CRST pursuant to the Agreement—*i.e.*, shifting to Lease Operators all of the costs of operation and all risks of breakdowns and slow periods while simultaneously extracting labor from the Lease Operators as employees—were the same for each Driver and were conferred pursuant to the uniform Agreement signed by each class member. *See* TAC ¶¶139-40, 179-81. Because the Agreements were substantially the same for all class members, the question of whether the Lease Operators conferred a benefit upon CRST by way of the Agreement's terms is common to the class. Similarly, the question of whether CRST appreciated the benefits received by virtue of the Agreement it drafted, and whether it accepted those benefits under circumstances that make retention of the benefits unjust is also common to the class because it turns on CRST's knowledge and the circumstances surrounding its use of the Agreement. Thus, the question of whether CRST was unjustly enriched by its use of the Agreement is a question that can be, and ought to be, decided on a class-wide basis. *See, e.g.*, *Elmy*, 2021 WL 3172311, at *6 (certifying claim by truck drivers that company was unjustly enriched by unconscionable operating agreement).

Although not necessary for class certification, common questions predominate with respect to unjust enrichment damages. Plaintiffs allege that CRST benefitted by unlawfully shifting the same categories of operating expenses and fees onto Lease Operators. Those operating expenses

and fees are recorded in each Driver's weekly settlement, which will allow those deductions to be calculated using CRST's records without individual testimony from the class members. *See* Kandel Decl. ¶4. "Disgorgement of profits is an equitable remedy for unjust enrichment. Its main purpose is to ensure that those guilty of fraud do not profit from their ill-gotten gains." *Pierson v. Source Perrier, S.A.*, 848 F. Supp. 1186, 1188–89 (E.D. Pa. 1994) (citation omitted); *see also Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 522 (D. Utah 2017) ("[A] jury could find that the circumstances surrounding Defendants' successful use of the independent contractor program make retention of the attendant economic benefit unjust.").

### 4. Count Five: Fraud About the Lease Purchase Program

Plaintiffs' fraud claim is based on CRST's use of fraudulent misrepresentations to induce Lease Operators to enter into the Lease Purchase Program. Under Iowa law, fraudulent misrepresentation has eight elements:

> (1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . ., (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (citation omitted). The factfinder can assess each of these elements through common class-wide proof.

As to the first two elements, whether CRST made false representations regarding the amount Lease Operators would earn can be determined on a class-wide basis because CRST made essentially the same statements regarding the pay Lease Operators could expect through a "standardized sales pitch" made to all class members over the class period. *Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 215–16 (N.D. Cal. 1994) (finding predominance where representations were part of a "centrally coordinated strategy"); *cf. Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997) (finding predominance based on defendant's "uniform conduct in

allegedly deceiving class members into paying for a service they couldn't receive by way of standard documents presented to each member"); Cervantes Decl. ¶5; Cross Decl. ¶¶5, 9, 44; Fink Decl. ¶¶12, 48; Fisher Decl. ¶¶9, 43; Gravelle Decl. ¶9; Shines Decl. ¶¶5, 10, 39. CRST made these representations in their recruiting materials, advertisements, and job postings, which it widely dispersed to the entire class. Lease Operators saw these recruitment materials in emails from CRST, in Qualcomm messages from CRST to Employee Drivers, on job hunting sites like Craigslist, as pop-up ads online, posted at truck stops and terminals, and promoted online at CRST's website, among others. *See* Exs. 1-4; Cross Decl. ¶4 (received email regarding Lease Operator position); Shines Decl. ¶4 (saw ad posted on Craigslist); Fink Decl. ¶¶ 5, 8 (received Qualcomm message from CRST as an Employee Driver and saw ads at truck stops). In order to participate in the mandatory orientation program to become a Lease Operator, drivers had to call the number included in CRST's advertisement materials to speak with a recruiter who repeated substantially the same promises about earnings as those in the advertising materials. In addition, CRST made the same promises during the mandatory orientation and included those same promises in the Income Chart, located in the Lease Purchase Information Packet, which CRST distributed at the orientation. *See* Ex. 11 at CRST004247. Even the ICOA signed by every Lease Operator incorporated these promises.[10]

Courts have had little trouble finding that common questions predominate when fraud claims are based on such standardized sales pitches and advertisements. *See, e.g.*, *Roberts,* 318 F.R.D. at 519-21 (finding that common questions predominated in fraud claim based on

---

[10] *See* Doc. 113-6 at 25( "The gross compensation paid to Contractor is MORE than Carrier would pay an employee to perform professional driving services, which reflects the reality of the marketplace, in that Carrier cannot attract contractors willing to take the entrepreneurial risk of funding and running their own businesses by paying merely the personal-services wage that they could get as employees."); Doc. 113-7 at 25 (same).

standardized sales pitch to induce drivers to enter into an "owner operator" program and distinguishing *In re St. Jude Med., Inc.*, 522 F.3d 836, 839 (8th Cir. 2008), which did not involve uniform representations and in which there were serious questions whether class members even received the representation). Even where there may be some variation in the false representations made, courts have still found predominance where, as here, the statements are similar and reflect a centrally coordinated strategy. "The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims." *In re First All. Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006)); *see also In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 691 (6th Cir. 2020) (affirming finding of predominance because "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof") (citation omitted). If the factfinder finds the representations were too different to conclude that they were part of a class-wide false sales pitch, Plaintiffs will not succeed on their claims. But a factfinder could conclude that, despite slight variations, the statements promised the same discrete potential earnings, *e.g.*, $3,000 weekly net income—representations that were either true or not.

The second element, whether CRST's statements to lure Lease Operators into the program were false, is an issue that can be proven or disproven based on common evidence, as CRST's compensation records will show if the mileage and earnings statements were truthful.

The third element, materiality of the representations, also presents a common question. "Because materiality is judged according to an objective standard, the materiality of [Defendant's] alleged misrepresentations and omissions with respect to earnings is a question common to all members of the class[.]" *Amgen*, 568 U.S. at 459. As the Supreme Court further explained with respect to the predominance of the issue of materiality: "The alleged misrepresentations and

omissions, whether material or immaterial, would be so equally for all [plaintiffs]" and "the plaintiff class's inability to prove materiality would not result in individual questions predominating. Instead, a failure of proof on the issue of materiality would end the [claim]." *Id.* at 459-60.

The fourth and fifth elements of fraud, whether CRST knew of the falsity of its statements and intended Lease Operators to rely upon them, also present common questions since the answers to both questions turn on CRST's knowledge and intent, issues that are manifestly common to the class and require no testimony from individual class members. CRST's knowledge of the falsity of the statements may be determined by the factfinder from the information that was available to CRST from its own records at the time it, or from its representatives, made the representations regarding earnings and mileage. CRST's intent to induce reliance on the representations can be inferred by the jury from the central, and consistent placement of such promises in CRST's recruiting program and the commonsense recognition that earnings are a primary motivating factor in choosing a particular job. *Cf. Gilkey v. Cent. Clearing Co.*, 202 F.R.D. 515, 522 (E.D. Mich. 2001) (certifying class claims because "a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis under the Consumer Protection Act").

The very centrality of earnings information as an inducement to enter into the Lease Purchase Program also allows class-wide proof of the sixth and seventh elements, justifiable reliance and causation. The centrality of earnings information to drivers who signed up for the Lease Purchase Program provides commonsense circumstantial evidence from which a jury could conclude that the class as a whole relied on CRST's representations when they entered into the Lease Purchase Program. In *CGC Holding Co., LLC v. Broad & Cassel*, the Tenth Circuit held:

> where circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate and class treatment is

> valuable in order to take advantage of the efficiencies essential to class actions. [citation omitted] Under certain circumstances, therefore, it is beneficial to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question as required by Rule 23.

773 F.3d 1076, 1089–91 (10th Cir. 2014). In making its decision, the Tenth Circuit relied on examples from the Second Circuit, where the court found "circumstantial proof of classwide reliance" by applying a "reasonable inference" that customers would not have agreed to pay an inflated invoice unless they relied on the agreement's "implicit representation" that the amount was accurate, and Eleventh Circuit, where the court applied "an inference of reliance" due to the existence of "circumstantial evidence that can be used to show reliance is common to the whole class" and found that "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119-20 (2d Cir. 2013); *Klay v. Humana*, 382 F.3d 1241, 1259 (11th Cir. 2004)); *see also Slater v. Terril Tel. Co.*, 662 N.W.2d 372 (Iowa App. 2003) (finding circumstantial evidence of reliance sufficient to support a finding of classwide reliance where common sense dictates that the class acted based on the same representations); *cf. Smith v. MCI Telecomm. Corp.*, 124 F.R.D. 665, 679 (D. Kan. 1989) (inferring reliance where employer allegedly misrepresented compensation plans to induce the class members to work because "it is implausible that . . . the salespersons did not rely on the [misrepresentations]").

This same commonsense inference of class reliance has been applied repeatedly in cases involving schemes to get drivers to enter into operating agreements, like those at issue here, based on false promises of earnings. *See, e.g.*, *Roberts*, 318 F.R.D. at 514 (finding abundant circumstantial evidence of reliance where drivers relied on promises of economic opportunity); *Huddleston v. John Christner Trucking, LLC*, 2020 WL 489181, at *17 (N.D. Okla. Jan. 30, 2020),

*amended in part on recons.*, 2020 WL 6375163 (N.D. Okla. Oct. 26, 2020) (certifying class of Lease Drivers for fraud claims where "[c]lass members relied on uniform misrepresentations and omissions of material fact regarding the income Drivers would earn, the miles they would drive, and the nature of the economic opportunity [Defendant] was offering to them"); *Elmy*, 2021 WL 3172311, at *5 (finding fraud claim amenable to class certification where the misrepresentations driver class members relied on concerning average income and mileage opportunities were fundamentally the same); *see also Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 239-41 (W.D. Ark. 2018) (certifying a class for fraud, noting that "proof of reliance does not defeat predominance where the reliance could be proven by class-wide proof and where it was logical to infer that the class members relied on similar representations made by defendants[,]" and citing to *CGC Holding*, *Klay*, *Roberts*, and *In Re U.S. Foodservice Pricing* in support of its decision).

Like the courts in the Tenth, Second, and Eleventh circuits, the courts in *Roberts*, *Huddleston*, and *Elmy* recognized that promised earnings are the primary, if not the only reason drivers enter into operating agreements with carriers, thereby allowing a jury to make the commonsense inference that the class members relied on those representations when they entered into the operating agreement. *See Roberts*, 318 F.R.D. at 514 ("[C]ommon sense dictates that each class member's reason for [] joining the independent contractor program was the belief that Defendants offered an income and mileage opportunity that would support a career."). Here, too, a jury could find class-wide reliance from the common evidence of CRST's class wide scheme, the uniformity (and ubiquity) of the different representations, the purpose of that scheme, and the centrality of earnings to the decision to sign up for the program. *See* Fed. R. Civ. P. 23(b)(3) Advisory Committee Note ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite

the need, if liability is found, for separate determination of the damages suffered by individuals within the class."); *see also Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 531 (E.D. Mo. 2015), *aff'd*, 879 F.3d 296 (8th Cir. 2018) (holding that common questions predominated plaintiffs' fraud claims where "reliance may be shown by . . . . the fact that the class members signed the Agreements and accepted employment" based on uniform misrepresentations). The fraud claim in this case is indistinguishable from those cited above and, as in those cases, common questions predominate justifying class certification.

While not necessary, Plaintiffs can prove damages on a class-wide basis. CRST's pay records reflect the miles that Lease Operators drove each week and their weekly earnings so it is a simple mathematical computation to determine the difference between what CRST actually paid Lease Operators and what they would have earned at the averages promised by CRST. Thus, common questions and, more importantly, common answers predominate with respect to all eight elements of Plaintiffs' fraud claim.

**5. Count Six: Truth In Leasing Act Violations**

Under federal law and regulations, "authorized motor carriers" such as CRST may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in the federal Truth in Leasing Regulations. 49 C.F.R. § 376.12(a). The issue of whether the ICOA and Lease violate the Truth In Leasing Act, 49 U.S.C. § 14704 ("TILA"), is subject to generalized proof and applicable to the class as a whole because CRST entered into substantively identical Agreements with all Plaintiffs. *See Owner Operator Indep. Drivers Assoc. Inc. v. Arctic Express Inc.*, 2001 WL 34366624, at *8 (S.D. Ohio Sept. 4, 2001) ("[P]roof of violation of the Regulation will prove that violation for the entire class."); *see also Elmy*, 2021 WL 3172311, at *7 (finding common issues predominate for Plaintiffs' TILA claim). Thus, the factfinder can look at one Agreement and decide for the entire

class whether the Agreement violated the TILA. *See Davis v. Colonial Freight Sys., Inc.*, 2018 WL 11225871, at *10 (E.D. Tenn. Mar. 2, 2018) ("[T]he issue of whether the [Agreements] violate the [TILA] regulations is subject to generalized proof and applicable to the class as a whole. This generalized issue of liability predominates over issues subject to individualized proof.").

The factfinder also can determine whether CRST failed to comply with the Lease disclosures mandated by TILA on a class-wide basis by looking at CRST's uniform policies and practices. This issue is appropriate for class-wide adjudication because CRST applied these violative policies and practices to the class as a whole, not on an individual basis. For instance, Plaintiffs allege that CRST violated 49 C.F.R. § 376.12(g) by failing to provide Lease Operators with the rated freight bill or other documentation containing the same information appearing on the rated freight bill at or before the time of settlement, and violated 49 C.F.R. § 376.12(h) by failing to provide Lease Operators a copy of the documents necessary to determine the validity of charge-back items and the computation of those charges as specified in the ICOA. Here, the sole predominating question is whether CRST had a policy or practice of failing to provide Lease Operators with the required disclosures in violation of the regulation. This is a common legal question whose answer will determine liability on a common basis for all class members. Should Plaintiffs prevail, the tabulation of their damages—*i.e.*, amounts CRST underpaid Lease Operators but which Lease Operators were unable to correct due to CRST's failure to provide the required documentation—can be made using CRST's own records. And while the total damages owed to each class member will vary, the essential legal theory and damages formula will be uniform for all. Therefore, common questions predominate over those issues that are subject to only individualized proof.

### C. Class Action Resolution of the Non-FLSA Causes of Action is Superior

A class action must be superior to other available methods to achieve a fair and efficient resolution for the controversy. Rule 23 directs courts to consider the following factors in determining the superiority of a class action: (A) the class members' interests in individually controlling their claims; (B) the extent and nature of any litigation already begun by class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

As for the first two factors, there is no evidence that members of the putative class have an interest in individually controlling their cases as is evident from the number of FLSA opt-in consents that have been filed and the fact that Plaintiffs are unaware of any similar claims having been filed by members of the class against Defendants. That no class members have sought to pursue their claims individually is unsurprising given the risks and prohibitive costs associated with bringing individual claims, particularly in the context of wage litigation like the present action. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 909 (N.D. Iowa 2008).

This is an appropriate forum to concentrate the litigation of the class action claims because this case seeks redress under Iowa statutory and common law, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants' headquarters and primary place of business are located within this district. Manageability issues are unlikely to arise given the extent to which the relevant employment arrangement and claims are controlled by a written contract and lease common to the class.

Even damages present manageable common questions because they can be proven through CRST's records, as well as representative class member testimony. Moreover, as the Eighth Circuit

has recognized, if necessary, damages can be tried separately. *Stuart*, 910 F.3d at 374–75; *see also* Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (class certification can be appealing where numerous people are subject to the same fraud even if damages must be determined separately). In addition, as Plaintiffs seek both declaratory and injunctive relief regarding the class claims, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' non-FLSA claims satisfy the requirements of Rule 23(a) and Rule 23(b)(3). Accordingly, this Court should certify Counts 2, 3, 4, 5, and 6 as Rule 23(b)(3) class actions and authorize Rule 23(c) notice to the class members.

Dated: December 15, 2021

Respectfully Submitted,

*/s/ Michael J.D. Sweeney*

Michael J.D. Sweeney (*pro hac vice*)
Meagan M. Rafferty (*pro hac vice*)
Rebecca King (*pro hac vice*)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, New York 12401
Telephone: (845) 255-9370
Fax: (845) 255-8649
Email: msweeney@getmansweeney.com

Susan Martin *(pro hac vice)*
Dan Bonnett *(pro hac vice)*
Jennifer Kroll *(pro hac vice)*
MARTIN & BONNETT, P.L.L.C.
4647 N. 32nd St., Suite 185
Phoenix, AZ 85018
Telephone: (602) 240-6900
Facsimile: (602) 240-2345
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

Edward Tuddenham *(Pro Hac Vice)*
23 Rue Du Laos
Paris, France
33 684 79 89 30
etudden@prismnet.com

ATTORNEYS FOR PLAINTIFFS