IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

**DECLARATION OF ANTHONY CERVANTES**

I, ANTHONY CERVANTES, declare:

If called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am the Named Plaintiff in this case.
2. I currently reside in Wiggins, Colorado. The highest level of education I have is two years of college.
3. I drove for CRST as a "Lease Operator" on and off from January 2018 to February 2018, and again from March 2018 until August 2019 in a truck that I leased from CRST.
4. I first learned of CRST's Lease Purchase Program in or around 2016 or 2017 when a recruiter called me after I put my information on the job hiring website, HireRight.
5. I spoke with a couple different recruiters for CRST, including Matt Young. A recruiter sent me some materials by email, including a Lease Purchase Information Packet that contained an Income Chart, indicating that I would average over $3,001 per week and drive 5,000

loaded miles as a Lead Driver, and $1,800 per week if I drove solo. A recruiter also sent me a Lease Operator's settlement reflecting that the Lease Operator netted approximately $3,001 per week.

6. After my call with the recruiter, Matt Young, I attended the orientation for the Lease Purchase Program. CRST paid for my rental car to drive from Oklahoma to attend the four-day orientation at CRST's headquarters in Cedar Rapids, Iowa.

7. I had to attend CRST's orientation to become a Lease Operator. Approximately 20 other drivers attended the first three days of the orientation, including Lease Operators and Employee Drivers.

8. During the orientation, all the drivers in attendance, Employee Drivers and Lease Operators, received the CRST handbook and we were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, hazmat policies, pet policy, etc.

9. During the orientation, CRST representatives repeated similar promises as those that were in the Income Chart the recruiter sent me.

10. Based on the promises that were made to me by the recruiters, reflected in the Income Chart, and reiterated during the orientation, at the end of the orientation, I signed a pre-printed contract to lease a truck ("Lease") from CRST.

11. At the same time as signing the Lease, I also signed a pre-printed contract with CRST called an Independent Contractor Operating Agreement ("ICOA"). The ICOA stated that I was leasing the truck from CRST back to CRST as an independent contractor.

12. I signed my Lease and ICOA at the orientation with the other Lease Operators. I understood that they were the same standard form Lease and ICOA, with only our names,

trucks, and payment schedules being different, because we reviewed them together.

13. I understood that the Lease and ICOA were written by CRST. I was not involved in writing it.

14. The Lease and ICOA were offered to us together on a take-it-or-leave it basis. The CRST representatives at the orientation told us that we did not have any ability to negotiate any of the terms. They handed out the contract, briefly explained a few select items and told us where to sign. I had less than an hour to review it, which was not enough time. CRST did not answer questions in detail. When I pointed out that the language in the contract wasn't consistent from one page to another, I was told that I would have to talk with my driver manager at another time. When I signed my contract, I did not feel like all my questions had been answered. I felt like they wanted me to hurry up and sign the contract.

15. I was given a hard copy of the ICOA and Lease, but I could not fully read the ICOA until after orientation, and after I signed the ICOA and Lease, because CRST did not give us enough time to review it during orientation.

16. Although CRST and the ICOA I signed said I was an independent contractor, CRST treated me like an employee. I had previously worked as an Employee Driver for other companies, including Eagle 1 Transportation, Arnie Weber Trucking, and RMFX, doing the same thing I was doing for CRST. CRST exercised as much control over me as a Lease Operator as other companies did when I was an Employee Driver.

17. I was only able to work as a Lease Operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of the truck and operating it and then collected them back from me on a weekly basis.

18. CRST controlled my truck and my ability to make a living by telling me what loads I was eligible to take, when loads had to be picked up and delivered, and what equipment I was required to have on board.

19. As a practical matter, I had to buy fuel where CRST's fuel card designated. I could go to other fuel stations if I paid cash, but I rarely had enough cash to buy fuel. If I used CRST's fuel card, CRST advanced me the cost of the fuel.

20. While driving for CRST, it assigned me its Student Employee Drivers to train. During my tenure with CRST, I trained more than 12 CRST Student Employee Drivers.

21. While training Student Employee Drivers, I paid CRST between approximately $0.13 to $0.15 cents per mile, regardless of whether I or the Student Employee Driver was driving, and regardless of the fact that I was providing training services to CRST while the Student Employee Driver was driving.

22. I needed CRST's permission to have a team driver and its approval of any team driver I chose.

23. As a Lease Operator, I had to get CRST's approval for maintenance required for my truck, and I had to use a CRST-approved maintenance facility if CRST advanced the cost of the maintenance. Because of my financial situation, I was dependent on CRST advancing maintenance costs.

24. As a Lease Operator, I was not allowed to make any modifications to the truck without CRST's permission. CRST also required my truck to have the CRST company signage on it.

25. I had to follow all these rules or CRST could terminate my ICOA. I understood that if CRST terminated my ICOA, I would still owe lease payments and that money would be taken out of any escrow or maintenance accounts and settlement proceeds I would otherwise be owed,

and I would lose any equity I had in the truck.

26. CRST paid me a percentage of the revenue it received for loads that I hauled. CRST negotiated the load price with its customers, and I had no control over it. CRST can and did take loads away from me after I agreed to take them and began driving to the pick-up point. When that happened, I incurred time and expenses for the load but received no compensation for it.

27. I received my pay weekly in the form of a settlement. The settlement listed my revenue per load and then deducted the expenses and costs of running the truck that CRST had advanced to me.

28. CRST failed to provide me and other drivers with the rated freight bill or other documentation containing the same information appearing on the rated freight bill, so I could not verify whether CRST paid me the correct percentage of the revenue it received for loads that I hauled.

29. Each week, CRST made deductions from my settlements for the lease payment, several different insurance coverages that I was required to carry, fuel, tolls, trailers, and truck maintenance repairs, and other expenses. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

30. If I did not earn enough gross pay in a week to cover the expenses and costs, I received a negative settlement and did not receive any pay until I paid all outstanding expenses, past and present.

31. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were weeks in which I did not make the minimum wage for every hour I worked. In some weeks my expenses were more than my earnings and I received a negative

settlement; that is, I actually ended up owing CRST money despite having worked for CRST during the week. During my time working for CRST there were weeks when, despite working long hours, I received a negative settlement. For example, I received negative settlements for the pay periods ending April 12, April 19, and April 26, 2018, as well as for many other weeks.

32. As a Lease Operator, I incurred fixed weekly expenses even when I was not driving, so I had to take low-paying loads that I would not otherwise have taken, because not driving at all was not an option.

33. Due to these low-paying loads, I received negative settlements, and there were weeks when I received no pay.

34. Because I had to pay so much in weekly costs and expenses related to insuring, operating, and maintaining the truck, I could not afford to take time off, so I lived in my truck and rarely saw my family. I generally worked as many hours each week as I could.

35. As a result of the different loads CRST assigned me and the various deductions, my weekly pay fluctuated. Not only did I often not make the minimum wage, but I also rarely made the amount promised by CRST in their recruitment materials.

36. I would not have signed the ICOA and Lease had I known that I would not be compensated as promised in CRST's recruitment materials, including the Income Chart, and by the recruiter I spoke with, Matt Young. The amount I was told I would make was the single most important reason I decided to sign the ICOA and Lease. This factor was more important than any of the other promises CRST made in the recruitment materials.

37. Although CRST's Income Chart that I discussed with the recruiter, Matt Young, and was shown to us at orientation, promised that I would make an average net income of $3,001

per week as a Lead Driver, during my time driving for CRST, though I continued to work a full schedule, I rarely made a net income of $3,001 per week, and certainly did not average $3,001 per week.

I declare under penalty of perjury under the laws of the state of Iowa that the foregoing is true and correct.

Dated: Dec 13, 2021

Anthony Cervantes (Dec 13, 2021 12:23 EST)

Anthony Cervantes