IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

**DECLARATION OF CHRISTOPHER FINK**

I, CHRISTOPHER FINK, declare:

If called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am an opt-in plaintiff in this case.
2. I currently reside in Spring Hill, Florida. The highest level of education I have completed is a GED, and I have taken some courses to receive certification to be a process server and to be a Certified Nursing Assistant.
3. I first started driving for CRST as an Employee Driver in December 2014, during which time CRST classified me as an employee. All equipment I drove and used during the time I was an Employee Driver was owned and maintained by CRST. I was an Employee Driver for CRST for approximately 10 months, until October 2015, when I became a Lease Operator for CRST.
4. I drove for CRST as a "Lease Operator" during the period from approximately October

2015 until early 2020 in a truck that I leased from CRST.

5. I first learned of CRST's Lease Purchase Program in or around the summer of 2015, approximately six months after I started working for CRST as an Employee Driver. I learned about the Lease Purchase Program through Qualcomm communication I received from CRST. These Qualcomm communications encouraged me and other Employee Drivers to become CRST Lease Operators. I also saw advertisements for CRST's Lease Purchase Program at truck stops.

6. All of the advertisements I saw specifically promised that I would earn an average net income of $2,500 or more per week.

7. Based on the promises CRST made in the advertisements and the Qualcomm messages, including the expected weekly pay, I spoke with my Driver Manager at the time, Scott Kourt, and asked him to sign me up for the Lease Purchase program.

8. To my knowledge and belief, these advertisements were widely distributed to Drivers through Qualcomm messages and posted at the terminals, because I spoke with other drivers in the Lease Purchase Program who saw the same or substantially the same advertisements and received the same Qualcomm messages. We discussed the advertisements we saw, and they saw the same promises regarding the promised pay of $2,500 per week as a Lease Operator.

9. After I told Scott Kourt I wanted to join the Lease Purchase Program, he signed me up for the orientation in or around October 2015. Scott Kourt arranged for me to take a load to Cedar Rapids, Iowa, so I was there for the orientation at CRST's headquarters. CRST paid for my hotel and provided some meals while I was there for orientation.

10. I had to attend CRST's orientation to become a Lease Operator. I was told that the first two

days were for drivers new to CRST, both new Employee Drivers and new Lease Operators, but I did not have to attend those first two days because I had already been driving for CRST as an Employee Driver, and therefore was not new to CRST. I had attended an orientation for new CRST drivers when I started as an Employee Driver in December 2014.

11. During the Lease Purchase Program orientation, CRST representatives and managers repeated similar promises as those I saw in the advertisement materials. In particular, the CRST representatives reviewed an Income Chart with me and other Lease Operators, which indicated that I would make an average of at least about $2,500 per week.

12. Based on the promises that were made to me in CRST's advertisements and during the orientation, I signed a pre-printed contract to lease a truck ("Lease") from CRST at the end of the orientation.

13. At the same time I signed the Lease, I also signed a pre-printed contract with CRST called an Independent Contractor Operating Agreement ("ICOA"). The ICOA stated that I was leasing the truck from CRST back to CRST as an independent contractor.

14. I signed my Lease and ICOA at the orientation with the other Lease Operators. I understood everyone was signing the same standard form Lease and ICOA, with only our names, trucks, and payment schedules being different, because the CRST representatives discussed the documents with us as a group and referred to specific paragraphs and pages which were the same for everyone.

15. I understood the Lease and ICOA were written by CRST. I was not involved in writing it.

16. The Lease and ICOA were offered to us together, as a single package, on a take-it-or-leave it basis. The trainer at the orientation told us that we did not have any ability to negotiate any of the terms. They did not provide for any meaningful question and answer period.

When I signed my contract, I did not feel like all my questions had been answered. I felt like they wanted me to hurry up and sign the contract. I remember having some questions about the ICOA and was told to ask my Driver Manager, which I was not able to do until after I had signed the ICOA and Lease.

17. I believe I was given a hard copy of the ICOA and Lease, but I could not read the ICOA until after orientation, and after I signed the ICOA and Lease, because CRST did not give us enough time to review it during orientation.

18. I understood that if I didn't sign the ICOA and Lease, I would have to pay my own way home to Florida from orientation. The truck I leased was located in Pennsylvania, so after orientation, CRST paid for me to rent a car from Cedar Rapids to Pennsylvania, where my leased truck was located.

19. Although CRST and the ICOA I signed said I was an independent contractor, CRST treated me like an employee. My job was the same as a CRST Lease Operator as it was when I was a CRST Employee Driver, and CRST exercised as much control over me as a Lease Operator as it did when I was an Employee Driver.

20. Just like when I was an Employee Driver, CRST controlled the loads I got as a Lease Operator. Although I could turn down loads as a Lease Operator, I still had no control over the loads CRST assigned to me. As a Lease Operator, I had to follow the same CRST rules as Employee Drivers, and CRST governed my truck speed. I had to fill out the same paperwork, and I received the same CRST safety and policy messages as Employee Drivers received. In fact, there was no real difference in the work I performed as a Lease Operator and the work I performed as an Employee Driver.

21. As a Lease Operator for CRST, I was not in business for myself. I did not have any kind of

trucking business prior to driving as a Lease Operator for CRST, and I had never driven as an independent contractor before joining CRST's Lease Purchase program. I was able to work as a Lease Operator for CRST only because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST. I was able to afford to transition to a Lease Operator only because CRST advanced all the costs of the truck and operating it; CRST then collected the costs it advanced back from me on a weekly basis.

22. CRST controlled my truck and my ability to make a living by telling me what loads I was eligible to take, when loads had to be picked up and delivered, and what equipment I was required to have on board.

23. As a practical matter, I had to buy fuel where CRST's fuel card designated. I could go to other fuel stations if I paid cash, but I rarely if ever had enough cash to buy fuel. If I used CRST's fuel card, CRST advanced me the cost of the fuel.

24. As a practical matter, I had no meaningful choice about the routes I drove. Given the pick-up and delivery times set by CRST, and the need to be fuel-efficient, there were rarely any meaningfully alternative routes to take for an assigned load.

25. Neither I nor other Lease Operators were allowed to haul for a trucking company other than CRST while under contract with CRST. CRST representatives told us this during our orientation class.

26. While driving as a Lease Operator for CRST, it assigned me its Student Employee Drivers to train. As a Lease Operator for CRST, I trained approximately 40-50 CRST Student Employee Drivers for up to 4 weeks each.

27. While training Student Employee Drivers, I paid CRST $0.09-$0.12 per loaded mile,

regardless of whether the Student Employee Driver or I was driving, and regardless of the fact that I was providing training services to CRST while the Student Employee Driver was driving.

28. As a Lease Operator, I needed CRST's permission to have a team driver, and CRST had to approve any team driver I chose.

29. As a Lease Operator, I had to get CRST's approval for maintenance required for my truck, and I had to use a CRST-approved maintenance facility if CRST advanced the cost of the maintenance. Because of my financial situation, I was dependent on CRST advancing maintenance costs.

30. As a Lease Operator, I was not allowed to make any modifications to the truck without CRST's permission. CRST also required my truck to have the CRST company signage on it.

31. I had to follow all these rules or CRST could terminate my ICOA. I understood that if CRST terminated my ICOA, I would still owe Lease payments and that money would be taken out of any escrow or maintenance accounts and settlement proceeds I would otherwise be owed.

32. CRST paid me a percentage of the revenue it received for loads that I hauled. CRST negotiated the load price with its customers, and I had no control over the load price paid to CRST. CRST could and often did take loads away from me after I agreed to take them, even if I had begun driving to the pick-up point. When that happened, I incurred costs (time, money, opportunity) for the load, but received no compensation for it.

33. I received my pay once or twice weekly or in the form of a settlement. The settlement listed my revenue per load and then deducted the expenses and costs of running the truck that CRST had advanced to me.

34. CRST failed to provide me and other drivers with the rated freight bill or other

documentation containing the same information appearing on the rated freight bill, so I could not verify whether CRST paid me the correct percentage of the revenue it received for loads that I hauled.

35. When I asked about detention pay I was owed but CRST had failed to pay me, CRST often refused to provide documents or information as to whether CRST charged or collected payment for my detention from its customers. Other times, CRST would tell me to travel to its headquarters in Cedar Rapids, Iowa to view the invoice CRST submitted to its customers. I know from conversations with other Lease Operators that CRST treated other Lease Operators the same way.

36. Each week, CRST made deductions from my settlements for the lease payment, several different insurance coverages that I was required to carry, fuel, tolls, trailers, and truck maintenance repairs, and other expenses. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

37. If I did not earn enough gross pay in a week to cover the expenses and costs, I received a negative settlement and did not receive any pay until I paid all outstanding expenses, past and present.

38. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were weeks in which I did not make the minimum wage for every hour I worked. In some weeks my expenses were more than my earnings and I received a negative settlement; that is, I actually ended up owing money to CRST despite having worked for CRST during the week. During my time working for CRST there were weeks when, despite working long hours, I received a negative settlement. For example, I received negative settlements March 21, 23, 28, and 30 in 2017, and February 21, 26, 28 in 2019, among many

other weeks.

39. As a Lease Operator, I incurred fixed weekly expenses even when I was not driving, so I had to take low-paying loads that I would not otherwise have taken, because not driving at all was not an option.

40. Due to these low-paying loads, I received negative settlements, and there were weeks when I received no pay.

41. Because I had to pay so much in weekly costs and expenses related to insuring, operating, and maintaining the truck, I could not afford to take time off, so I lived in my truck and rarely saw my family. I generally worked as many hours each week as I could.

42. As a result of the different loads CRST assigned me and the various deductions, my weekly pay fluctuated. Not only did I often not make the minimum wage, but I also rarely made the amount CRST promised in their recruitment materials.

43. I would not have signed the ICOA and Lease had I known that I would not be compensated as promised in CRST's recruitment materials. The amount I was told I would make was the single most important reason I decided to sign the ICOA and Lease. This factor was more important than any of the other promises CRST made in the recruitment materials.

44. Although CRST's advertisements that I saw before and during orientation and when I signed my ICOA promised that I would make a minimum average of $2,500 in take-home pay per week, during my time driving for CRST, I rarely made $2,500 in a week, and I certainly did not average $2,500 per week.

45. I am familiar with many other Lease Operators who work for CRST. Many of them were in the same orientation class as me, others were Student Drivers who I trained. When I saw another CRST Lease Operator, and when we would talk on the phone, we frequently talked

about our work, how we were treated by CRST, what we were earning, and our problems with CRST. Based on those conversation I can say that:

46. The drivers I know who drive or have driven for CRST as Lease Operators saw advertisements and/or Income Charts posted by CRST and promoting the Lease Purchase Program that made the same or substantially the same promises about what we would earn.

47. Most, if not all the drivers I know who drive or have driven for CRST as Lease Operators spoke about the Lease Purchase Program with a recruiter who made the same or substantially the same promises as included in the advertisements and in the Income Chart shown to us at orientation.

48. The drivers I know who drive or have driven for CRST as Lease Operators signed the ICOA and Lease based on the promises about what we would earn included in those advertisements and the Income Chart.

49. The drivers I know who drive or have driven for CRST as Lease Operators signed ICOAs and Leases that were the same or similar to the one that I signed. I do not know of anyone who was permitted to negotiate any of the terms in those agreements.

50. The drivers I know who drive or have driven for CRST were presented the ICOAs and Leases on a "take it or leave it basis." I do not know of anyone who was permitted extra time to review the ICOA and Lease or given an opportunity to review it with a lawyer.

51. The drivers I know who drive or have driven for CRST as Lease Operators were subjected to the same control by CRST that I was.

52. The drivers I know who drive or have driven for CRST as Lease Operators had the costs of leasing and operating their trucked deducted from their pay.

53. The drivers I know who drive or have driven for CRST as Lease Operators did not earn the

amount promised by CRST in their recruitment materials.

I declare under penalty of perjury under the laws of the state of Iowa that the foregoing is true and correct.

Dated: Dec 15, 2021

Christopher Fink (Dec 15, 2021 10:04 CST)

Christopher Fink