IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

**DECLARATION OF RODERICK FISHER**

I, Roderick Fisher, declare:

If called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am an opt-in plaintiff in this case.
2. I currently reside in Spring, Texas. The highest level of education I have completed is some college.
3. I drove for CRST as a "Lease Operator" from approximately 2018 to June 2019 and again from January 2020 to May 2021 in a truck that I leased from CRST.
4. I first learned of CRST's Lease Purchase Program in or around 2017 from a friend.
5. I called and spoke with a recruiter. The recruiter's name was Matthew.
6. After my call with the recruiter, Matthew, I attended the approximately four-day orientation for the Lease Purchase Program at CRST's headquarters in Cedar Rapids, Iowa. The recruiter arranged for my transportation to orientation and CRST covered the costs for

the rental car for travelling to orientation from my home in Houston, Texas.

7. I had to attend CRST's orientation to become a Lease Operator. Approximately 40 other drivers attended the first two days of the orientation, including Lease Operators and Employee Drivers.

8. During the orientation, all the drivers in attendance, Employee Drivers and Lease Operators, received the CRST handbook and we were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, hazmat policies, pet policy, etc.

9. During the orientation, CRST representatives reviewed an Income Chart with me and other Lease Operators, indicating that I would drive 5,000 to 6,000 miles per week and make an average net income of $2,500 per week as a Lead Driver.

10. Based on the promises during the orientation, at the end of the orientation, I signed a pre-printed contract to lease a truck ("Lease") from CRST.

11. At the same time as signing the Lease, I also signed a pre-printed contract with CRST called an Independent Contractor Operating Agreement ("ICOA"). The ICOA stated that I was leasing the truck from CRST back to CRST as an independent contractor.

12. I signed my Lease and ICOA at the orientation with the other Lease Operators. I understood that we all signed the same standard form Lease and ICOA, with only our names, trucks, and payment schedules being different, because CRST's representatives reviewed the Leases and ICOAs with us all at once.

13. I understood that the Lease and ICOA were written by CRST. I was not involved in writing it.

14. The Lease and ICOA were offered to us as a single document on a take-it-or-leave it basis.

The CRST representative at the orientation told us that we did not have any ability to negotiate any of the terms. They went through the contract with me and the other drivers in about ten to twenty minutes. They did not provide for any meaningful question and answer period. When I signed my contract, I did not feel like all my questions had been answered. When I asked some questions, the trainer told me that I would have to speak with my Driver Manager. I felt like they wanted me to hurry up and sign the contract.

15. I was given a hard copy of the ICOA and Lease, but I could not read the ICOA until after orientation, and after I signed the ICOA and Lease, because CRST did not give us enough time to review it during orientation.

16. I understood that if I didn't sign the ICOA and Lease, I would have to pay my own way home to Houston, Texas from orientation. I saw other drivers refuse to sign the ICOA and Lease and they had to find their own way home.

17. Although CRST and the ICOA I signed said I was an independent contractor, CRST treated me like an employee. I have worked as an Employee Driver for CRST and CRST exercised as much control over me as when I was an independent contractor.

18. As a Lease Operator, CRST controlled the loads I got. I had to follow the same CRST rules as Employee Drivers, CRST governed my truck speed. I had to fill out the same paperwork, and received the same CRST safety and policy messages as Employee Drivers, etc. In fact, there was no real difference in the work I performed as a Lease Operator and the work I performed as an Employee Driver, besides training CRST's Student Employee Drivers when I was a Lease Operator.

19. As a Lease Operator, I was not in business for myself. I did not have any kind of trucking business prior to driving as a Lease Operator for CRST. I was only able to work as a Lease

Operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of the truck and operating it and then collected them back from me on a weekly basis.

20. CRST controlled my truck and my ability to make a living by telling me what loads I was eligible to take, when loads had to be picked up and delivered, and what equipment I was required to have on board.

21. I could only use CRST's fuel card where CRST designated. As a practical matter, I used CRST's fuel card, so I could only purchase fuel where CRST designated.

22. I and other Lease Operators are not allowed to haul for a trucking company other than CRST while under contract with CRST. CRST representatives told us this during our orientation class.

23. While driving for CRST, it assigned me its Student Employee Drivers to train. During my tenure with CRST, I trained more than 25 CRST Student Employee Drivers.

24. While training Student Employee Drivers, I paid CRST between $0.12 to $0.14 cents per mile, regardless of whether I or the Student Employee Driver was driving, and regardless of the fact that I was providing training services to CRST while the Student Employee Driver was driving.

25. I needed CRST's permission to have a team driver and its approval of any team driver I chose.

26. As a Lease Operator, I had to get CRST's approval for maintenance required for my truck, and I had to use a CRST-approved maintenance facility if CRST advanced the cost of the maintenance. Because of my financial situation, I was dependent on CRST advancing maintenance costs.

27. As a Lease Operator, I was not allowed to make any modifications to the truck without CRST's permission. CRST also required my truck to have the CRST company signage on it.

28. I had to follow all these rules or CRST could terminate my ICOA. I understood that if CRST terminated my ICOA, I would still owe lease payments and that money would be taken out of any escrow or maintenance accounts and settlement proceeds I would otherwise be owed, and I would lose any equity I had in the truck.

29. CRST paid me a percentage of the revenue it received for loads that I hauled. CRST negotiated the load price with its customers, and I had no control over it. CRST can and did take loads away from me after I agreed to take them and began driving to the pick-up point. When that happened, I incurred time and expenses for the load but received no compensation for it.

30. I received my pay weekly in the form of a settlement. The settlement listed my revenue per load and then deducted the expenses and costs of running the truck that CRST had advanced to me.

31. CRST failed to provide me and other drivers with the rated freight bill or other documentation containing the same information appearing on the rated freight bill, so I could not verify whether CRST paid me the correct percentage of the revenue it received for loads that I hauled.

32. When I asked CRST about detention pay or disputed CRST's failure to pay detention pay, CRST refused to provide documents or information as to whether CRST charged or collected payment from its customers. I know from conversations with other Lease Operators that they were treated the same way.

33. Each week, CRST made deductions from my settlements for the lease payment, several

different insurance coverages that I was required to carry, fuel, tolls, trailers, and truck maintenance repairs, and other expenses. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

34. If I did not earn enough gross pay in a week to cover the expenses and costs, I received a negative settlement and did not receive any pay until I paid all outstanding expenses, past and present.

35. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were weeks in which I did not make the minimum wage for every hour I worked. In some weeks my expenses were more than my earnings and I received a negative settlement; that is, I actually ended up owing CRST money despite having worked for CRST during the week. During my time working for CRST there were weeks when, despite working long hours, I received a negative settlement.

36. As a Lease Operator, I incurred fixed weekly expenses even when I was not driving, so I had to take low-paying loads that I would not otherwise have taken, because not driving at all was not an option. Every day I sat waiting for a load, I was losing money.

37. Due to these low-paying loads, I received negative settlements, and there were weeks when I received no pay.

38. Because I had to pay so much in weekly costs and expenses related to insuring, operating, and maintaining the truck, there were times I could not afford to take time off, so I lived in my truck and rarely saw my family. I generally worked as many hours each week as I could.

39. As a result of the different loads CRST assigned me and the various deductions, my weekly pay fluctuated. Not only did I often not make the minimum wage, but I also rarely made the $2,500 that CRST promised in the Income Chart I saw during orientation.

40. I would not have signed the ICOA and Lease had I known that I would not be compensated as promised during CRST's orientation program and reflected in the Income Chart. The amount I was told I would make was the single most important reason I decided to sign the ICOA and Lease. This factor was more important than any of the other promises CRST made during orientation.

41. Although the recruiter during the orientation program promised that I would make an average of $2,500 in take-home pay per week, during my time driving for CRST, though I continued to work a full schedule, I rarely made $2,500 per week.

42. I am familiar with many other Lease Operators who work for CRST. Many of them were in the same orientation class as me, others I met at terminals or at customers' loading docks. When I saw another CRST Lease Operator, we frequently talked about our work, how we were treated by CRST, what we were earning, and our problems with CRST. Based on those conversation I can say that:

43. The drivers I know who drive or have driven for CRST as Lease Operators saw advertisements or recruitment materials that made the same or substantially the same promises about what we would earn posted by CRST promoting the Lease Purchase Program.

44. The drivers I know who drive or have driven for CRST as Lease Operators signed the ICOA and Lease based on the promises about what we would earn included in CRST's recruitment materials, such as the Income Chart.

45. The drivers I know who drive or have driven for CRST as Lease Operators signed ICOAs and Leases that were the same or similar to the one that I signed. I do not know of anyone who was permitted to negotiate any of the terms.

46. The drivers I know who drive or have driven for CRST as Lease Operators were presented the ICOAs and Leases on a "take it or leave it basis." I do not know of anyone who was permitted extra time to review the ICOA and Lease or given an opportunity to review it with a lawyer.

47. The drivers I know who drive or have driven for CRST were subjected to the same control by CRST that I was.

48. The drivers I know who drive or have driven for CRST as Lease Operators had the costs of leasing and operating their trucks deducted from their pay.

49. The drivers I know who drive or have driven for CRST as Lease Operators did not earn the amount promised by CRST in their recruitment materials.

I declare under penalty of perjury under the laws of the state of Iowa that the foregoing is true and correct.

Dated: Dec 14, 2021

Roderick Fisher (Dec 14, 2021 11:56 CST)

Roderick Fisher