IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

**DECLARATION OF LINDA GRAVELLE**

I, LINDA GRAVELLE, declare:

If called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am an opt-in plaintiff in this case.
2. I currently reside in Wadsworth, Ohio. The highest level of education I have completed is ninth grade.
3. I drove for CRST as a "Lease Operator" on and off from May 2017 until November 2019 in a truck that I leased from CRST.
4. I first heard of CRST's Lease Purchase Program when I was an Employee Driver for CRST. Some years later, a friend called me to let me know he was interested in joining CRST's Lease Purchase Program.
5. I spoke with a recruiter, John Brown, to learn if I was qualified to be a Lease Operator. The recruiter told me that I had to attend orientation.

6. After my call with the recruiter, John Brown, I attended the orientation for the Lease Purchase Program. The recruiter offered for CRST to buy me for a bus ticket from my home in Seattle, Washington to attend the three-to-four-day orientation at CRST's headquarters in Cedar Rapids, Iowa. I decided to fly to orientation, and CRST agreed to reimburse me the cost of a bus ticket to offset my travel expenses.
7. I had to attend CRST's orientation to become a Lease Operator. Approximately 20 other drivers attended the first part of the orientation, including Lease Operators and Employee Drivers.
8. During the orientation, all the drivers in attendance, Employee Drivers and Lease Operators, received the CRST handbook and we were trained in CRST's policies, practices and procedures in areas such as sexual harassment, drug and alcohol policies, driving rules, safety, hazmat earnings, etc.
9. During the orientation, CRST representatives presented me with an Income Chart showing how much money I would make based on the number of miles I drove as a Lease Operator. CRST representatives reviewed an Income Chart with me and other Lease Operators, indicating that I would make an average net income of $3,000 per week as a Lead Driver.
10. Based on the promises that were made to me by CRST's representatives during orientation, at the end of the orientation, I signed a pre-printed contract to lease a truck ("Lease") from CRST.
11. At the same time as signing the Lease, I also signed a pre-printed contract with CRST called an Independent Contractor Operating Agreement ("ICOA"). The ICOA stated that I was leasing the truck from CRST back to CRST as an independent contractor.
12. I signed my Lease and ICOA at the orientation. Other Lease Operators and I walked over

to a desk, stood in a line, and a CRST employee told us where to sign.

13. I understood that the Lease and ICOA were written by CRST. I was not involved in writing it.

14. The Lease and ICOA were offered to us together on a take-it-or-leave it basis. The CRST representative at the orientation told us that we did not have any ability to negotiate any of the terms. We were not given time to review these documents before they were given to us to sign, and we did not have an opportunity to ask questions. They went through the contract with me in about five to ten minutes while I was standing at the desk. When I signed my contract, I did not feel like all my questions had been answered. I felt like they wanted me to hurry up and sign the contract

15. I was given a hard copy of the ICOA and Lease, but I could not read the ICOA until after orientation, and after I signed the ICOA and Lease, because CRST did not give us enough time to review it during orientation.

16. I understood that if I didn't sign the ICOA and Lease, I would have to pay my own way home to Seattle, Washington from orientation, because CRST did not reimburse me for the cost of a bus ticket to get to orientation, until after I signed the ICOA and Lease.

17. Although CRST and the ICOA I signed said I was an independent contractor, CRST treated me like an employee. I previously worked as an Employee Driver for CRST doing the same thing. As an independent contractor, CRST exercised as much control over me as it did when I was an Employee Driver. I knew and I spoke with other Employee Drivers, and we were treated the same by CRST.

18. CRST controlled the loads I got. I had to follow the same CRST rules as Employee Drivers, CRST governed my truck speed. I had to fill out the same paperwork and received the same

CRST safety and policy messages as employee drivers. In fact, there was no real difference in the work I performed as a Lease Operator and the work I performed as an Employee Driver.

19. I was only able to work as a Lease Operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of the truck and operating it and then collected them back from me on a weekly basis.

20. CRST controlled my truck and my ability to make a living by telling me what loads I was eligible to take, when loads had to be picked up and delivered, and what equipment I was required to have on board.

21. While driving for CRST, they assigned me their Student Employee Drivers to train. During my tenure with CRST, I trained more than 10 CRST Student Employee Drivers.

22. While training Student Employee Drivers, I paid CRST $0.12 to $0.15 cents per mile, regardless of whether I or the Student Employee Driver was driving, and regardless of the fact that I was providing training services to CRST for the Student Employee Driver.

23. I needed CRST's permission to have a team driver and its approval of any team driver I chose.

24. As a Lease Operator, I had to get CRST's approval for maintenance required for my truck. Despite paying into CRST's maintenance fund, I was still dependent on CRST advancing maintenance costs, so I had to use a CRST-approved maintenance facility.

25. As a Lease Operator, I was not allowed to make any modifications to the truck without CRST's permission. CRST also required my truck to have the CRST company signage on it.

26. CRST paid me a percentage of the revenue it received for loads that I hauled. CRST

negotiated the load price with its customers, and I had no control over it. CRST can and did take loads away from me after I agreed to take them and began driving to the pick-up point. When that happened, I incurred time and expenses for the load but received no compensation for it.

27. I received my pay in the form of a settlement, either weekly or bi-weekly, depending on the period of time. The settlement listed my revenue per load and then deducted the expenses and costs of running the truck that CRST had advanced to me.

28. CRST failed to provide me and other drivers with the rated freight bill or other documentation containing the same information appearing on the rated freight bill, so I could not verify whether CRST paid me the correct percentage of the revenue it received for loads that I hauled.

29. When I asked CRST about detention pay or disputed CRST's failure to pay detention pay, CRST refused to provide documents or information as to whether CRST charged or collected payment from its customers.

30. Each week, CRST made deductions from my settlements for the lease payment, several different insurance coverages that I was required to carry, fuel, trailers, and truck maintenance repairs, and other expenses. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

31. If I did not earn enough gross pay in a week to cover the expenses and costs, I received a negative settlement and did not receive any pay until I paid all outstanding expenses, past and present.

32. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were weeks in which I did not make the minimum wage for every hour I

worked. In some weeks my expenses were more than my earnings and I received a negative settlement; that is, I actually ended up owing CRST money despite having worked for CRST during the week. During my time working for CRST there were weeks when, despite working long hours, I received a negative settlement. For example, my settlements for the pay periods ending May 8, 2018, May 10, 2018, July 31, 2018, and August 2, 2018, were negative and there were many other weeks for which I received negative settlements.

33. As a Lease Operator, I incurred fixed weekly expenses even when I was not driving, so I had to take low-paying loads that I would not otherwise have taken, because not driving at all was not an option.

34. Due to these low-paying loads, I received negative settlements, and there were weeks when I received no pay.

35. Because I had to pay so much in weekly costs and expenses related to insuring, operating, and maintaining the truck, I could not afford to take time off, so I lived in my truck and rarely saw my family. I generally worked as many hours each week as I could.

36. As a result of the different loads CRST assigned me and the various deductions, my weekly pay fluctuated. Not only did I often not make the minimum wage, but I also rarely made the amount promised by CRST in their recruitment materials.

37. I would not have signed the ICOA and Lease had I known that I would not be compensated as promised in CRST's recruitment materials. The amount I was told I would make was the single most important reason I decided to sign the ICOA and Lease. This factor was more important than any of the other promises CRST made in the recruitment materials.

38. Although the Income Chart I saw during the orientation program promised that I would make an average of $3,000 in take-home pay per week as a lead driver, during my time

driving for CRST, though I continued to work a full schedule, I rarely averaged $3,000 a week.

39. I am familiar with many other Lease Operators who work for CRST, that I met at the driver's lounge at the Cedar Rapids and Riverside terminals and on CRST's Facebook forum. When I communicated with another CRST Lease Operator, we frequently talked about our work, how we were treated by CRST, what we were earning, and our problems with CRST. Based on those conversation I can say that:

40. The drivers I know who drive or have driven for CRST as Lease Operators signed ICOAs and Leases that were the same or similar to the one that I signed. I do not know of anyone who was permitted to negotiate any of the terms.

41. The drivers I know who drive or have driven for CRST as Lease Operators were presented the ICOAs and Leases on a "take it or leave it basis." I do not know of anyone who was permitted extra time to review the ICOA and Lease or given an opportunity to review it with a lawyer.

42. The drivers I know who drive or have driven for CRST as Lease Operators were subjected to the same control by CRST that I was.

43. The drivers I know who drive or have driven for CRST as Lease Operators had the costs of leasing and operating their trucks deducted from their pay.

44. The drivers I know who drive or have driven for CRST as Lease Operators had weeks when they had negative settlements.

I declare under penalty of perjury under the laws of the state of Iowa that the foregoing is true and correct.

Dated: Dec 13, 2021

Linda Gravelle
Linda Gravelle (Dec 13, 2021 10:36 EST)

Linda Gravelle