IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY COUNTS 2, 3, 4, 5, AND 6 AS RULE 23 (B)(3) CLASS ACTIONS |

**DECLARATION OF DARIUS SHINES**

I, DARIUS SHINES, declare:

If called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am an opt-in plaintiff in this case.
2. I currently reside in Plainfield, Illinois. The highest level of education I have completed is an associate degree from Universal Technical Institute.
3. I drove for CRST as a "Lease Operator" on and off from August 2018 to March 2020 in a truck that I leased from CRST.
4. I first learned of CRST's Lease Purchase Program in or around July 2018 through CRST's advertisement that I saw posted on Craigslist.
5. The advertisement I saw promised that I would earn an average net income of $2,000-$3,000 per week.
6. Based on the promises CRST made in the advertisement, including the expected weekly

pay, I called the number provided in the advertisement to speak with a recruiter to learn more about the program.

7. After my call with the recruiter, I attended the orientation for the Lease Purchase Program. The recruiter arranged for a rental car to transport me from my home in Illinois to attend the three-day orientation at CRST's headquarters in Cedar Rapids, Iowa.

8. I had to attend CRST's orientation to become a Lease Operator. Approximately 30-40 other drivers attended the first two days of the orientation, including Lease Operators and Employee Drivers.

9. During the orientation, all the drivers in attendance, Employee Drivers and Lease Operators, received the CRST handbook and we were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, hazmat policies, pet policy, etc. After the first two days of orientation, about 10 of us attended the session about becoming a Lease Operator.

10. During the orientation, CRST representatives, including Ben Lizer, repeated similar promises as those I saw in the advertisement materials. In particular, they showed us an Income Chart indicating that I would earn an average net income of $2,000-$3,000 per week.

11. Based on the promises that were made to me in CRST's advertisement and during the orientation, at the end of the orientation, I signed a pre-printed contract to lease a truck ("Lease") from CRST.

12. At the same time as signing the Lease, I also signed a pre-printed contract with CRST called an Independent Contractor Operating Agreement ("ICOA"). The ICOA stated that I was leasing the truck from CRST back to CRST as an independent contractor.

13. I signed my Lease and ICOA at the orientation with the other Lease Operators. I understood that we all signed the same standard form Lease and ICOA, with only our names, trucks, and payment schedules being different, because CRST's representatives reviewed the Leases and ICOAs with us all at once.

14. I understood that the Lease and ICOA were written by CRST. I was not involved in writing it.

15. The Lease and ICOA were offered to us together on a take-it-or-leave it basis. The CRST representatives at the orientation told us that we did not have any ability to negotiate any of the terms. There was another driver at my orientation who asked about negotiating some terms, but the representative told him that "it is what it is." They went through the contract with me and the other drivers in about 15-20 minutes. Although we were allowed to ask questions, CRST seemed to be trying to keep to a schedule. I felt like they wanted me to hurry up and sign the contract.

16. I was given a hard copy of the ICOA and Lease, which I was supposed to keep in the truck.

17. I understood that if I didn't sign the ICOA and Lease, I would have to pay my own way home to Illinois from orientation. Because my funds were low, I knew I might have trouble getting back home if I didn't sign the ICOA and Lease. The only way for me to get home from Cedar Rapids, Iowa was to sign the ICOA and Lease on the spot so that I could receive a truck. This was part of the reason why I agreed to sign the ICOA and Lease.

18. Although CRST and the ICOA I signed said I was an independent contractor, CRST treated me like an employee. I had previously worked as an Employee Driver for another trucking company. CRST exercised as much control over me as a Lease Operator as another company did when I was an Employee Driver.

19. As a Lease Operator for CRST, I was not in business for myself. I did not have any kind of trucking business prior to driving as a Lease Operator for CRST. I was only able to work as a Lease Operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of the truck and operating it and then collected them back from me on a weekly basis.

20. CRST controlled my truck and my ability to make a living by telling me what loads I was eligible to take, when loads had to be picked up and delivered, and what equipment I was required to have on board.

21. I could only use CRST's fuel card where CRST designated. As a practical matter, I used CRST's fuel card, so I could only purchase fuel where CRST designated.

22. I and other Lease Operators were not allowed to haul for a trucking company other than CRST while under contract with CRST. I tried to use my truck to haul for another trucking company and my driver manager told me that I was not able to.

23. While driving for CRST, it assigned me its Student Employee Drivers to train. During my tenure with CRST, I trained more than 40 CRST Student Employee Drivers for an average of 21 days each.

24. While training Student Employee Drivers, I paid CRST $0.09 to $0.13 cents per loaded mile, regardless of whether I or the Student Employee Driver was driving, and regardless of the fact that I was providing training services to CRST while the Student Employee Driver was driving.

25. As a Lease Operator, I was not allowed to make any modifications to the truck without CRST's permission. CRST also required my truck to have the CRST company signage on it.

26. CRST paid me a percentage of the revenue it received for loads that I hauled. CRST negotiated the load price with its customers, and I had no control over it. CRST can and did take loads away from me after I agreed to take them and began driving to the pick-up point. When that happened, I incurred time and expenses for the load but received no compensation for it.

27. I received my pay weekly in the form of a settlement. The settlement listed my revenue per load and then deducted the expenses and costs of running the truck that CRST had advanced to me.

28. CRST failed to provide me and other drivers with the rated freight bill or other documentation containing the same information appearing on the rated freight bill, so I could not verify whether CRST paid me the correct percentage of the revenue it received for loads that I hauled.

29. Each week, CRST made deductions from my settlements for the lease payment, several different insurance coverages that I was required to carry, fuel, tolls, trailers, and truck maintenance repairs, and other expenses. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

30. If I did not earn enough gross pay in a week to cover the expenses and costs, I received a negative settlement and did not receive any pay until I paid all outstanding expenses, past and present.

31. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were weeks in which I did not make the minimum wage for every hour I worked. In some weeks my expenses were more than my earnings and I received a negative settlement; that is, I actually ended up owing CRST money despite having worked for CRST

during the week. During my time working for CRST there were weeks when, despite working long hours, I received a negative settlement. Sometimes, even when I received good paying loads, I still had little to no pay, because of prior negative settlements.

32. As a Lease Operator, I incurred fixed weekly expenses even when I was not driving, so I had to take low-paying loads that I would not otherwise have taken, because not driving at all was not an option.

33. Due to these low-paying loads, I received negative settlements, and there were weeks when I received no pay. For example, I received negative settlements on January 3, 2020, and January 10, 2020.

34. Because I had to pay so much in weekly costs and expenses related to insuring, operating, and maintaining the truck, I could not afford to take time off, so I lived in my truck and rarely saw my family. I generally worked as many hours each week as I could.

35. As a result of the different loads CRST assigned me and the various deductions, my weekly pay fluctuated. Not only did I often not make the minimum wage, but I also rarely made the amount promised by CRST in their recruitment materials.

36. I would not have signed the ICOA and Lease had I known that I would not be compensated as promised in CRST's recruitment materials. The amount I was told I would make was the single most important reason I decided to sign the ICOA and Lease. This factor was more important than any of the other promises CRST made in the recruitment materials.

37. Although the CRST's advertisement and Income Chart that I saw promised that I would make an average net income of $2,000-$3,000 per week, during my time driving for CRST, though I continued to work a full schedule, I rarely made $2,000-$3,000 in net income per week and certainly did not average $2,000-$3,000 in net income per week.

38. I am familiar with many other Lease Operators who work for CRST. Many of them were in the same orientation class as me, others I met at terminals. When I saw another CRST Lease Operator, we frequently talked about our work, how we were treated by CRST, what we were earning, and our problems with CRST. Based on those conversation I can say:

39. The drivers I know who drive or have driven for CRST as Lease Operators saw advertisements or recruitment materials posted by CRST promoting the Lease Purchase Program that made the same or substantially the same promises about what we would earn.

40. The drivers I know who drive or have driven for CRST as Lease Operators signed the ICOA and Lease based on the promises about what we would earn included in similar recruitment materials to what I saw.

41. The drivers I know who drive or have driven for CRST as Lease Operators signed ICOAs and Leases that were the same or similar to the one that I signed. I do not know of anyone who was permitted to negotiate any of the terms.

42. The drivers I know who drive or have driven for CRST as Lease Operators were presented the ICOAs and Leases on a "take it or leave it basis." I do not know of anyone who was permitted extra time to review the ICOA and Lease or given an opportunity to review it with a lawyer.

43. The drivers I know who drive or have driven for CRST as Lease Operators were subjected to the same control by CRST that I was.

44. The drivers I know who drive or have driven for CRST as Lease Operators had the costs of leasing and operating their trucks deducted from their pay.

45. The drivers I know who drive or have driven for CRST as Lease Operators did not earn the amount promised by CRST in their recruitment materials.

I declare under penalty of perjury under the laws of the state of Iowa that the foregoing is true and correct.

Dated: Dec 10, 2021

Darius Shines (Dec 10, 2021 18:41 CST)

Darius Shines