THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>               v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>               Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY
COUNTS 2, 3, 4, 5 AND 6 AS RULE 23(B)(3) CLASS ACTIONS**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND FACTS .............................................................................................. 3

    A. CRST's Operations ........................................................................................... 3

    B. The ICOAs ......................................................................................................... 4

    C. CRST's Lease Purchase Program ....................................................................... 7

    D. Driver Qualifications and Orientation ................................................................ 8

    E. Dispatch and Routing......................................................................................... 9

III. ARGUMENT ............................................................................................................. 10

    A. The Court Should Not Certify Plaintiffs' Wage and Hour Claims ...................... 12

        1. Plaintiffs Offer No Common Proof Potential Class Members Were Misclassified as Independent Contractors ................................................. 12

        2. The IMWL and the IWPCA do not apply to work performed outside of Iowa. ...................................................................................................... 15

    B. Plaintiffs' Leasing Regulation Claims Require Individual Showings of Injury....................................................................................................................... 17

    C. Plaintiffs Fail to Meet Commonality, Predominance or Superiority Requirements of Rule 23(a)(2) & (b)(3) for Their Fraud Claim ........................ 20

        1. Plaintiffs offer no way to establish that CRST made a false representation to each putative class member Plaintiff............................ 20

        2. Plaintiffs cannot establish that each putative class member relied on any alleged misrepresentation.................................................................. 23

    D. Plaintiffs Cannot Satisfy Commonality, Predominance and Superiority Requirement for Their Unjust Enrichment Claim. ............................................. 27

        1. Plaintiffs have no method for demonstrating unconscionability for each class member. ................................................................................... 27

        2. Choice of law issues preclude certifying Plaintiffs' unjust enrichment claim.................................................................................... 29

Case 1:20-cv-00075-CJW-KEM   Document 257   Filed 02/04/22   Page 2 of 38

3.    The Court must examine the particular circumstances of each putative class member's situation in order to resolve Plaintiffs' unjust enrichment claims. ........................................................................ 30

IV.    CONCLUSION ............................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ..................................................................................................... 11

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) .................................................................................. 12, 21

*C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*,
   227 N.W.2d 169 (Iowa 1975) ..................................................................................... 28

*CGC Holding Co., LLC v. Broad & Cassel*,
   773 F.3d 1076 (10th Cir. 2014) .................................................................................. 27

*Coburn v. D&R Trucking, LLC*,
   3:09-CV-464, 2011 WL 73287 (M.D. Fla Jan. 10, 2011) ......................................... 19

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ..................................................................................................... 11

*Cruz v. Lawson Software, Inc.*,
   No. CIV 08-5900 MJD/JSM, 2010 WL 890038 (D. Minn. Jan. 5, 2010) ................. 29

*Daigle v. Ford Motor Co.*,
   CIV.A. 09-3214 MJD, 2012 WL 3113854 (D. Minn. July 31, 2012) ......................... 31

*Faber v. Menard, Inc.*,
   367 F.3d 1048 (8th Cir. 2004) .................................................................................... 28

*Fesler v. Whelen Eng'g Co.*,
   794 F. Supp. 2d 994 (S.D. Iowa 2011) ................................................................... 7, 13

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) ..................................................................................................... 11

*Home Federal Sav. & Loan Ass'n v. Campney*,
   357 N.W.2d 613 (Iowa 1984) ..................................................................................... 28

*Hudock v. LG Elecs. U.S.A., Inc.*,
   12 F.4th 773 (8th Cir. 2021) ........................................................................... 21, 23, 27

*In re St. Jude Med., Inc.*,
   522 F.3d 836 (8th Cir. 2008) ...................................................................................... 23

*Iowa Mut. Ins. Co. v. McCarthy*,
   572 N.W.2d 537 (Iowa 1997) ..................................................................................... 12

*Lockard v. Carson*,
   287 N.W.2d 871 (Iowa 1980) ..................................................................................... 26

*Maxwell v. Tyson Foods, Inc.*,
   No. 1:08CV00017-JAJ-TJS, 2012 WL 12541110 (S.D. Iowa July 19, 2012) ......... 30

*Miller v. Component Homes, Inc.*,
   356 N.W.2d 213 (Iowa 1984) ................................................................................ 12, 14

*Montoya v. CRST Expedited, Inc.*,
   311 F. Supp. 3d 411 (D. Mass. 2018) ................................................................... 16, 17

*Mooney v. Allianz Life Ins. Co. of N. Am.*,
   244 F.R.D. 531 (D. Minn. 2007) ................................................................................ 29

*Mujkic v. Lynx, Inc.*,
   863 N.W.2d 37, 2015 WL 1055307 (Iowa Ct. App. 2015) ....................................... 12

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ............................................................................ 11
*Owner-Operator Independent Drivers Assoc., Inc. v. Landstar System, Inc.*,
   622 F.3d 1307 (11th Cir. 2010) ....................................................................... 19
*Owner-Operator Independent Drivers Assoc., Inc. v. Mayflower Transit, Inc.*,
   Nos. IP 98-457-C-B, IP 98-458-C-B/S, 2005 WL 6957703 (S.D. Ind. Sept. 27, 2005)........... 18
*Owner-Operator Independent Drivers Assoc., Inc. v. New Prime, Inc.*,
   213 F.R.D. 537 (W.D. Mo. 2002) ................................................................ 17, 18
*Owner-Operator Independent Drivers Assoc., Inc. v. New Prime, Inc.*,
   339 F.3d 1001 (8th Cir. 2003) ................................................................... 17, 18
*Owner-Operator Independent Drivers Assoc., Inc. v. Swift Transp. Co.*,
   CV-02-1059-PHX-PGR, 2006 WL 2521183 (D. Ariz. Mar. 30, 2006) ................................. 19
*Perez v. CRST Int'l., Inc.*,
   355 F. Supp. 3d 765 (N.D. Iowa 2018) ............................................................ 13
*Quillion v. Tenet Health Sys. Philadelphia, Inc.*,
   673 F.3d 221 (3rd Cir. 2012) .................................................................... 28
*Rosen v. Bd. of Med. Examiners of Iowa*,
   539 N.W.2d 345 (Iowa 1995) ................................................................... 20, 23
*Runyon v. Kubota Tractor Corp.*,
   653 N.W.2d 582 (Iowa 2002) ................................................................... 16, 17
*Russell v. Citigroup, Inc.*,
   No. CV 12-16-DLB-JGW, 2015 WL 9424144 (E.D. Ky. Dec. 22, 2015) ............................... 30
*Scherrey v. A.G. Edwards & Sons, Inc.*, No. 02-2286,
   2003 U.S. Dist. LEXIS 11010, at *7-8 (W.D. Ark. Apr. 15, 2003) .............................. 29
*Spreitzer v. Hawkeye State Bank*,
   779 N.W.2d 726 (Iowa 2009) ..................................................................... 24
*State ex rel. Palmer v. Unisys Corp.*,
   637 N.W. 2d 142 (Iowa 2001) .................................................................... 30
*Thome v. Sayer L. Grp., P.C.*,
   No. 20-CV-3058-CJW-KEM, 2021 WL 6144666 (N.D. Iowa Nov. 16, 2021) .......... 11, 21, 27
*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ......................................................................... 11, 12
*Vega*,
   564 F.3d ....................................................................................... 31
*Vistein v. Am. Registry of Radiologic Technologists*,
   342 F. App'x 113 (6th Cir. 2009) ............................................................... 29
*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...................................................................... 11, 13, 29
*Walsh v. Principal Life Ins. Co.*,
   266 F.R.D. 232 (S.D. Iowa 2010) ................................................................ 11
*Wolfe*,
   795 N.W.2d .................................................................................... 28

**Statutes**

49 U.S.C. § 14704 ................................................................................ 18
49 U.S.C. § 14704(a)(2) ...................................................................... 17, 18

49 U.S.C. § 31502(b) ................................................................................................ 8

Iowa Code § 91A.2(3) ............................................................................................. 16

Iowa Code §§ 91A.2(3)(c), 85.61(11)(c)(2)-(3) ...................................................... 12

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... 23

Regulations

49 C.F.R. Part 376 ............................................................................................ 1, 17

49 C.F.R. Pt. 41 ....................................................................................................... 8

49 C.F.R. Pt. 390 ..................................................................................................... 4

49 C.F.R. Pt. 391 ..................................................................................................... 8

49 C.F.R. § 376.12(d) ...................................................................................... 17, 19

49 C.F.R. § 376.12(g) ............................................................................................ 17

49 C.F.R. § 376.12(h) ................................................................................. 17, 18, 19

49 C.F.R. § 376.12(i) ............................................................................................. 18

49 C.F.R. § 376.12(k) ............................................................................................ 18

# I.    INTRODUCTION

The transportation industry moves freight from its points of origin to destination. This process requires (1) a customer with freight it wants transported, (2) an entity with federal operating authority issued by the Federal Motor Carrier Safety Administration (FMCSA) to transport the freight (i.e., a motor carrier), (3) a truck capable of hauling the freight, and (4) a driver qualified to operate the truck. When the motor carrier (here CRST) owns the truck, all it need do is find a customer that needs freight transported in its truck and hire a driver to operate that truck. CRST transports some of its customer's freight in this manner. When it does so, CRST interviews and hires qualified drivers whom it pays, in accord with applicable wage and hour laws, for their labor alone. These individuals are CRST employees, commonly known as "company drivers."

When CRST transports freight in trucks that it does not own, it contracts with individuals or businesses that own or lease trucks (in this context, individuals who are leasing trucks are akin to people who are financing a car). In doing so, CRST must comply with the applicable federal disclosure regulations (*i.e.*, the Federal Leasing Regulations, 49 C.F.R. Part 376). Unlike company drivers, individuals who contract with CRST in this arrangement have the option of operating their truck personally, hiring a qualified driver to operate their truck, elect a combination of both (where the contracting party chooses to operate his truck some of the time and hires others to operate it when he does not want to), or lease multiple trucks to CRST. These individuals are commonly known as "owner-operators."

Owner-operators sign federally regulated contracts, which set forth, among other things, the compensation CRST will pay the owner-operators for the services they provide—the freight capacity the truck provides as well as a driver qualified under the Federal Motor Carrier Safety Regulations (FMCSRs) to operate that truck. Each of the named Plaintiffs and every member of the class they seek to certify elected to enter into these agreements with CRST, called Independent

1

Contractor Operating Agreements (ICOAs). Plaintiffs' artificially carve-out a subset of these owner-operators who not only signed an ICOA, but also (1) signed "an Equipment Lease to lease a truck" and (2) have not leased more than one truck at a time. ECF No. 247 at 7. Plaintiffs created this limitation because they know that some lease purchase operators lease fleets of trucks to CRST and employed qualified drivers to operate those trucks. *See generally Tromp Decl.* (Exhibit L).This memorandum will refer to individuals who participated in the lease purchase program and did not lease more than one truck to CRST as "lease purchase operators."

This regulatory scheme, and the class members freedom to operate within that market, leads to bottom up decision making that makes each of Plaintiffs' claims inappropriate for certification. For example, Plaintiffs will need to prove that CRST misclassified each class member as an independent contractor instead of an employee in order to pursue their Iowa state wage and hour claims. Despite the import of the misclassification determination on their ability to pursue their claims, Plaintiffs' Motion is functionally *silent* on how they will demonstrate that CRST misclassified each member of the proposed class. The record demonstrates no uniformity that would support a classwide misclassification determination. Without this evidence, none of Plaintiffs' Iowa wage and hour claims can be certified; each of those statutory schemes only applies to employees, not independent contractors. Even if that were not the case, Iowa's wage and hour laws only apply to work performed in Iowa; Plaintiffs have provided no way of demonstrating when class members worked in Iowa.

Similarly, the record demonstrates a near perfect disunity between Plaintiffs' "fraudulent inducement" and "unjust enrichment" theories and the experiences of the hand-picked declarants who Plaintiffs assert were fraudulently induced. The witnesses' testimony demonstrates that there is no uniformity as to whether putative class members heard, let alone relied upon, the allegedly false statements that Plaintiffs claim CRST used to deceive them. Finally, neither Plaintiffs'

Motion nor their witnesses who submitted supporting declarations could identify a single violation of the Federal Leasing Regulations, nor damages that resulted from a leasing regulations violation.

At bottom, Plaintiffs' entire Motion is premised on the assertion that CRST engaged in a decades long "scheme," predicated on uniform misrepresentations designed to steal money from unsuspecting individuals whom CRST misclassified as independent contractors. The experience of the putative class members who have testified are not uniform and do not track Plaintiffs' thematic landscape. Some did not base their decisions on CRST's marketing materials, choosing instead to rely on the experiences of other lease purchase operators, including lifelong friends, when making their decision. Others decided to contract with CRST based on the prior success they had at CRST as a lease purchase operator. Some decided to contract after seeing advertisements from CRST and talking to CRST recruiters about potential compensation; others never saw CRST's advertisements and did not have any conversation with CRST recruiters regarding compensation. And while Plaintiffs assert that CRST's "scheme" was intended to exploit and pass-off costs to putative class members, some testified that their time as a CRST lease purchase operator was the most profitable position they had in the transportation industry. Leaving aside their reasons for contracting with CRST, Plaintiffs' testimony demonstrates that CRST's lease purchase program provided individuals with an opportunity to provide transportation services unbounded by the limitation that attend being an employee driver. Some thrived in that environment, others did not. Regardless, the fact that each class member had a unique experience as a lease purchase operator makes class certification inappropriate as to each claim.

## II.   BACKGROUND FACTS

### A.   CRST's Operations

CRST is an interstate motor carrier headquartered in Cedar Rapids, Iowa, which provides transportation and logistics services to customers nationwide, as authorized by the Federal Motor

Carrier Safety Administration (FMCSA). *Declaration of Chad Brueck*, ¶¶ 3, 4 (Exhibit A) (*Brueck Decl.*).

CRST largely utilizes two-driver teams to provide expedited transportation services to its customers. *ICOA*, ¶ 1(B) (Exhibit B). Because federal law limits the number of hours an individual driver may be on-duty and driving (49 C.F.R. Pt. 390), two drivers can alternate time behind the wheel in order to minimize the amount of time needed to transport a load. *Cross Tr.* at 188:11-189:1, 220:16-221:2 (Exhibit E); *Fisher Tr.* at 130:16-132:1 (Exhibit G); *Meeks Tr.* at 29:25-32:21, 35:10-36:6 (Exhibit K). A lease purchase operator can form a team in two different ways: (i) she can hire and pay their own experienced driver so they can operate as a team, or, (ii) if she is not interested in hiring a second driver, she may elect to be part of CRST's Lead Driver Program, where teams consist of a lead driver and a student driver. *See Meeks Tr.* at 30:16-31:9; *Fisher Tr.* at 128:15-130:15; *ICOA,* § 1(B)(1). Lease purchase operators, not CRST, choose whether to operate as a solo driver, or to operate with team drivers to maximize the productivity (and attendant revenue) from their truck. *See Cervantes Tr.* at 154:16-20 (Exhibit D).

### B.    The ICOAs

Individuals learn about the opportunity and apply to become a lease purchase operator at CRST in varying ways. For example, Plaintiff Cervantes found CRST's online portal and then talked to a CRST recruiter who discussed potential compensation before he decided to apply. *Id.* at 105:11-107:11. Darius Shines saw online ads and decided to apply for the lease purchase program. *Shines Tr.* at 20:8-21. Roderick Fisher found out about CRST through a CRST lease purchase operator who had been his friend for 30 years. Before Fisher ever spoke to anyone at CRST, he had several discussions with his friend about his experience as a CRST lease purchase operator and watched several independent positive and negative YouTube testimonial videos of CRST lease purchase operators. *Fisher Tr.* at 45:24-47:14; *see also id.* at 35:3-58:15. He never

discussed compensation with any CRST recruiter and relied on his friend's experience in deciding to contract with CRST. *Id.* at 59:8-60:6, 61:1-11. He made that decision before attending orientation. *Id.* at 59:8-60:2 The same was true for Tabitha Meeks. *Meeks Tr.* at 52:3-55:11; 68:2-70:5.

Regardless of how they found CRST, all lease purchase operators sign federally-regulated ICOAs, pursuant to which they agree to provide CRST with a truck and a DOT-qualified driver. *See Brueck*, *Decl.* ¶¶ 5, 6; *ICOA*, § 1(A). In exchange, CRST agreed to pay compensation for the use of the truck and "for everything furnished, provided, done by, or required of Contractor" under the ICOA, including driving, pre-trip inspections, loading and unloading, fueling, repair and maintenance, and load paperwork. *Id.* § 2. Base compensation is calculated as a percentage of the Adjusted Gross Revenue for a particular shipment. *See id.* § 2, Appx. B, § 1(A).[1] CRST pays lease purchase operators additional compensation, including a percentage of fuel surcharges billed to the shipper and per-mile hazardous materials charges. *Id*. Appx. B, § 1(B).

In fulfilling their obligations under the ICOA, lease purchase operators agree to be responsible for the timely and safe delivery of all loads, subject only to "regulatory mandates, related [CRST] policies, and customer requirements." *Id.* § 5. They agree to pay for all operating expenses, including the truck, fuel, oil, tires, tolls, registration fees, licenses, insurance, and any workers' wages. *Id*. §§ 2, 5(A), 5(B), 5(F), 5(G). The federal regulations require CRST's ICOAs to specify the lease purchase operator's responsibility for the costs of operation and authorization for deductions from compensation. *Id*. §§ 5, 6, 10, Appx. A.[2] Plaintiff Cervantes described that he

---

[1] Section 376.12(d) requires the lease to specify the compensation "to be paid by the authorized carrier for equipment and driver's services." *Id*., § 376.12(d).

[2] The lease must also specify "the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items." *Id*., § 376.12(e). In addition, the lease must: identify "all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement,

was familiar with all of these expenses and none were surprising. *Cervantes Tr.* at 107:18-108:2.

Lease purchase operators have the option of having CRST (1) perform fuel and mileage tax reporting (*ICOA*, § 5(F)(2)(a), Appx. A, § 2(B)(2)) and (2) obtain license plates for the truck (*ICOA*. § 5(G); Appx. A, § 2(A)), along with authorizations for deductions relating to those services. Plaintiffs testified that they made these elections as a matter of convenience or because they did not know how to obtain these items on their own. *Cross Tr.* at 150:24-151:17; *Fapohunda Tr.* at 56:20-24 (Exhibit F); *Meeks Tr.* at 140:16-141:12. In addition to these services, lease purchase operators have the option of obtaining a communications and electronic onboard recorder (*ICOA* § 4(C)(3), Appx. A, § 3) and insurance (*id*. § 10(B), Appx. A, § 5) through CRST facilitated programs. *Fink Tr.* at 127:4-128:8. For all of these elections, lease purchase operators had the ability to shop for cheaper or better products to be procured at their own expense. *See Meeks Tr.* at 144:18-145:15, 148:14-149:5.

Some lease purchase operators executed multiple ICOAs, either as an addendum, in separate contract periods, or after returning to CRST after leaving to work with another motor carrier. Shines chose to sign three separate ICOAs during two different stints contracting with CRST. *Shines Tr.* at 48:23-49:12, 53:11-19, 84:12-21. He never read the entire agreements. *Id*. at 49:1-16. Fisher contracted with CRST on two separate occasions, signed two separate ICOAs, read the terms, and believed the contract terms were fair and reasonable. *Fisher Tr.* at 96:19-25, 97:15-20, 100:21-23, 112:23-113:2, 122:17-123:9. Meeks signed three addenda, one at the end of each year as a lease purchase operator. *Meeks Tr.* at 160:14-161:18. Fink contracted with CRST four or five times between 2015 and 2020, returning each time without investigating other driving opportunities. *Fink Tr.* at 149:14-151:6; 157:21-158:14; 163:16-170:3.

---

together with a recitation as to how the amount of each item is to be computed." *Id*., § 376.12(h).

## C.    CRST's Lease Purchase Program

Unlike company drivers who operate equipment owned by CRST, lease purchase operators agree to provide their own trucks to operate under CRST's motor carrier authority. Approximately seven percent of owner-operators who contract with CRST have title to their own trucks when they begin hauling for CRST. *Brueck Decl.* ¶ 7.[3] Owner-operators who do not have their own truck or who want an additional truck, have the option to lease a truck from Lincoln Sales or any other third-party. *Id.* ¶ 8; *Equipment Lease*, CRST000138 (lessees acknowledge that trucks are "AVAILABLE FOR PURCHASE OR LEASE FROM NUMEROUS COMPANIES OTHER THAN LESSOR") (emphasis in original). Owner-operators make their own decision on how to finance the purchase or lease of a truck. *Meeks Tr.* at 27:7-28:17. Some lease purchase operators, like David Tromp, lease fleets of trucks to CRST and hire qualified drivers to operate those trucks, including David Tromp. Tromp started by leasing (and ultimately purchasing) a single truck from Lincoln Sales and using that truck to contract with CRST to perform services. Tromp went on to lease as many as eight trucks to CRST at the same time. *See Tromp Decl.* at ¶¶ 5-10, 12-18.

An owner-operator who decides to lease a truck from Lincoln Sales is considered a participant in CRST's lease purchase program. Under the terms of that program, at the end of the lease, lease purchase operators may purchase their truck for a stipulated value. *See Brueck*, *Decl.* ¶ 9; *see also Meeks Tr.* at 157:6-159:9. They also have the option to surrender the truck and walk away from the lease if they no longer want to operate for CRST. *Shines Tr.* at 44:25-18 ("we could walk away from the lease, as long as we gave them, I believe it was two-week notice. And at the

---

[3] Plaintiffs' proposed class definition excludes lease purchase operators who obtained trucks from sources other than a lease with CRST Lincoln Sales, Inc. (Lincoln Sales) or who leased multiple trucks at the same time. The fact that lease purchase operators may bring their own trucks to the relationship with CRST or lease multiple trucks, as a significant percentage do, bears on the analysis of whether those individuals are independent contractors under Iowa law and is therefore relevant. *Fesler v. Whelen Eng'g Co.*, 794 F. Supp. 2d 994, 1008-09 (S.D. Iowa 2011), *aff'd*, 688 F.3d 439 (8th Cir. 2012).

end of that two weeks, that we didn't owe anything, we wouldn't have to owe any money."); *see also Cervantes Tr.* at 123:9-21; *Cross Tr.* at 168:19-20; *Fink Tr.* at 110:10-19.

Lease purchase operators have different reasons for leasing trucks through Lincoln Sales. Plaintiff Cervantes was attracted by the independence of owning his own truck and had a personal goal to operate his truck using his own motor carrier authority. *See Cervantes Tr.* at 148:7-24. In contrast, Fisher was not sure that he wanted to own his own truck and, as a result, valued the fact the walk-away lease. *Fisher Tr.* at 62:21-63:15. Like Fisher, Plaintiff Cross believed that the lease minimized his risk, allowing him to "walk away" from the lease rather than owing on a bank note. *See Cross Tr.* at 255:14-256:7. Fapohunda liked that the lease required no down payment, offering him the best lease-to-own opportunity. *Fapohunda Tr.* at 113:2-11.

As Plaintiffs hand-picked declarants testified, the lease-purchase program is easy to understand and gives lease purchase operators the flexibility to easily terminate their leases with Lincoln Sales and their ICOA with CRST without recourse. *Shines Tr.* at 44:21-45:18; *Fink Tr.* at 110:10-24. These individual experiences are supported by the fact that several of Plaintiffs' hand-picked declarants testified that they left CRST only to later decide that they wanted to re-enter the lease-purchase program. *Cross Tr.* at 193:19-194:10; *Shines Tr.* at 48:23-49:6, 84:12-21; *Fisher Tr.* at 112:23-113:2, 122:16-123:9.

### D. Driver Qualifications and Orientation

In addition to holding a commercial driver's license, all CRST drivers are qualified under the Federal Motor Carrier Safety Regulations (FMCSRs) to transport freight safely on interstate roads. *See* 49 C.F.R. Pt. 41 (drug and alcohol testing requirements); 49 C.F.R. Pt. 391 (minimum driver qualification requirements); *see also Cervantes Tr.* at 239:8-22. Those federal qualification requirements are designed to ensure the safe operation of the trucks. *See generally* 49 U.S.C. § 31502(b); *see also Cross Tr.* at 119:16-20.

8

CRST does not require the lease purchase operators to personally operate the truck or trucks they lease to CRST. Unlike a company driver who must personally drive a truck to receive pay from CRST, lease purchase operators can designate any qualified driver to operate the truck. *Shines Tr.* at 17:2-6. CRST also places no limitations on a lease purchase operators ability to work for another motor carrier. *Id.* at 107:17-20; *ICOA,* § 1(C).

After CRST fulfills its legal obligation to confirm that a driver is qualified under the FMCSRs, the driver attends a four-day to five-day orientation. Putative class members present varied testimony regarding what was presented at orientation. In the three orientations he attended, Shines recalls being shown examples of what past drivers had made, tips for saving expenses, examples of lucrative loads, but denies that CRST made any promises about compensation or the number of loads that he would be offered. *Shines Tr.* at 35:5-37:19, 42:5-12, 63:17-64:19, 80:18-82:19. In contrast, Fapohunda testified that "anyone doing the lease-purchase usually makes about 2,000 or so [ ] a week . . . that's what they can expect." *Fapohunda Tr.* at 84:18-85:5. Some putative class members received materials related to compensation either before or at orientation and reviewed those materials before deciding to contract with CRST. *Declaration of Mike Cross*, ¶¶ 40-41 (ECF No. 245-31); *Cervantes Tr.* at 120:2-21. Fapohunda testified that he did not receive, review, or recognize those same materials. *Fapohunda Tr.* at 91:10-21; *Fapohunda* Ex. 13 (attached to *Fapohunda Tr.* at *Exhibit M*).

### E.    Dispatch and Routing

CRST assigns its company drivers loads to haul and expects those drivers to accept and deliver those loads. *See Brueck Decl.* ¶ 11; *see also Cross Tr.* at 92:11-22. In contrast, CRST does not assign loads to lease purchase operators. Rather, CRST dispatchers notify lease purchase operators of load opportunities, and lease purchase operators are free to accept or reject those loads. *Brueck Decl.* ¶ 11; *Meeks Tr.* at 81:23-82:3; *Fisher Tr.* at 87:3-10; *Gravelle Tr.*, *Vol. II*, (Exhibit

I), at 17:7-13, 21:10-16; *Fink Tr.* at 99:24-100:1.

Lease purchase operators are not guaranteed a certain number of loads, miles, or compensation. *Shines Tr.* at 46:12-15; *Cross Tr.* at 138:7-13; *Meeks Tr.* at 81:18-22; *see also ICOA,* § 1(C). CRST explained this at orientation. *Fisher Tr.* at 88:23-89:4. CRST also explained to lease purchase operators that they may turn down loads for any reason, including if they are unprofitable, require tolls, or would cause delay in pick-up or delivery. *Cross Tr.* at 91:1-92:10, 130:25-131:8; *Gravelle Tr., Vol. II* at 25:3-26:15; *Fisher Tr.* at 38:21-38:25, *see also ICOA,* § 1(C). Because load rates varied between shipments, lease purchase operators testified that they sometimes choose to accept an inbound load with a lower rate or miles to secure an outbound load with a higher rate or more miles. *Cervantes Tr.* at 184:8-23; *Meeks Tr.* at 90:17-91:4. Fisher testified that he would determine whether to accept or reject a load based on a formula he created to meet his personal preference of making a certain amount a day. *Fisher Tr.* at 103:18-104:6.

Lease purchase operators also could determine the routes to complete the pick-up and delivery of their loads. Fisher testified that CRST recommended drivers use "main highways, and not the US highways" that "lead you somewhere where you shouldn't be;" however, he did not always follow that advice and planned his trip however he saw fit. *Id.* at 136:9-22. Plaintiff Cross described his preference to not take the same route each day. *Cross Tr.* at 260:18-261:3. And Plaintiff Gravelle described her route preference was not always the shortest route, but "depended on the time of year and the weather" since it is "better to go 60 miles out of route than be shut down for two days because of weather." *Gravelle Tr., Vol II,* at 23:25-24:20.

## III. ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotations omitted). As a consequence, a class action "may only be certified if the trial

court is satisfied, *after rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982) (emphasis added). Rule 23(a)'s four prerequisites are numerosity, commonality, typicality, and adequacy.

Plaintiffs must also establish "through evidentiary proof" that (1) questions of law or fact common to the members of the proposed class predominate over questions affecting individual class members alone, and (2) a class action is superior to other available methods to resolve the controversy. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). In other words, Plaintiffs must demonstrate that "individual questions do not overwhelm the questions common to the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013). Rule 23(b)(3)'s predominance inquiry is far more demanding than 23(a)'s commonality requirement. *See Thome v. Sayer L. Grp., P.C.,* No. 20-CV-3058-CJW-KEM, 2021 WL 6144666, at *11 (N.D. Iowa Nov. 16, 2021). "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. *Dukes*, 564 U.S. at 350 (citations omitted).

At class certification, Plaintiffs have the burden of demonstrating that the trier of fact can use common evidence to resolve each element of each claim. *See Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 240 n.7 (S.D. Iowa 2010) ); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."). This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a

common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.*, 577 U.S. at 453.

A. **The Court Should Not Certify Plaintiffs' Wage and Hour Claims**

1. **Plaintiffs Offer No Common Proof Potential Class Members Were Misclassified as Independent Contractors**

Neither the Iowa Minimum Wage Law nor the Iowa Wage Payment Collection Act apply to independent contractors. *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 216 (Iowa 1984); *Mujkic v. Lynx, Inc.*, 863 N.W.2d 37, 2015 WL 1055307, at *2 (Iowa Ct. App. 2015)) (unpublished table decision).[4] Under Iowa law, a putative employer's control over an individual's work determines if that person is an independent contractor or employee. *Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542 (Iowa 1997). Iowa courts consider the following factors when making that determination:

1.   who had the right to control the physical conduct of the work;
2.   whether the purported employee was on the employer's payroll;
3.   the method of payment, whether by time or by job;
4.   who provided the equipment to accomplish the work;
5.   the individual's obligation to furnish necessary tools, supplies, and materials;
6.   the existence of a contract for the performance of a certain kind of work at a fixed price;
7.   the independent nature of the individual's business;
8.   the individual's employment of assistants, with the right to supervise their activities;
9.   the time for which the individual is employed;
10.   whether the work is part of the regular business of the employer;
11.   the intent of the parties; and
12.   the right to control the progress of the work, except as to final results.

*Fesler*, 794 F. Supp. 2d 994, 1008-09 (S.D. Iowa 2011), *aff'd,* 688 F.3d 439 (8th Cir. 2012); *see also Perez v. CRST Int'l., Inc.*, 355 F. Supp. 3d 765, 771 (N.D. Iowa 2018). Plaintiffs' Motion is

---

[4] Effective July 1, 2020, the IWPCL was amended to explicitly exempt owner-operators of trucks, like Plaintiffs and the classes they seek to represent, from its coverage. Iowa Code §§ 91A.2(3)(c), 85.61(11)(c)(2)-(3).

quite literally *silent* on what evidence will apply to each class member, that will resolve *any of these factors*, and will do so without the participation of each class member. Instead , Plaintiffs' Motion offers a single non sequitur sentence: "The Court has already found that [the] issue [of misclassification is] common to the class in its Order certifying the FLSA collective because all class members signed materially similar ICOAs and CRST subjected them to the same work conditions." ECF No. 247 at 22.

No case has ever equated an FLSA collective conditional certification order with a determination that a plaintiff has satisfied Rule 23's commonality and/or predominance requirements. Of course, this Court acknowledged that its conditional certification order was not of the same ilk as the "rigorous analysis" required to certify a class under Rule 23. "This lenient [conditional certification] standard requires that a plaintiff merely provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." ECF No. 147 at 3 (internal quotation omitted), 4-5 (contrasting the low standard of conditional certification with the fact-intensive inquiry of final certification), and 6-7 (same). Because Plaintiffs did not make any showing that common evidence exists to resolve their state law misclassification claims, the Court should deny Plaintiffs' motion as to its state law claims. *Dukes*, 564 U.S. at 350.

Although it is not CRST's burden to disprove commonality or predominance, the record demonstrates that the evidence bearing on Plaintiffs' alleged misclassification varies not only among the witnesses who have been deposed, but also among the rest of the putative class:

▪ *Right to control varied among lease purchase operators*. Gravelle declined to accept loads in certain parts of the country, while Plaintiff Cross accepted "drop and hook" loads that did not require him to wait to load and unload a trailer. *Gravelle Tr.., Vol. II,* at 25:3-26:15; *Cross Tr.* at 130:25-131:8. And lease purchase operators make varied choices on how to value a load, as Meeks describing that she "set a pretty low bar for accepting loads" in order to give her Student Drivers

a good experience, *Meeks Tr.* at 91:5-92:4, while Cervantes said that he would wait for a "load that was profitable or at least appeared to be profitable." *Cervantes Tr.* at 144:10-15. Some class members dispute their independence, claiming that they were restricted in choosing their routes as there was a single stretch of highway in Colorado and could not perform U-turns, both for safety reasons. *Id.* at 230:12-231:18; *Cross Tr.* at 213:6-214:24-214:24.

- *Equipment and tools provided to complete work.* Lease purchase operators are contractually obligated to provide all equipment necessary to pick-up and deliver loads for CRST, but are provided the freedom to select and finance that equipment. *See ICOA,* §§ 1(A); *Meeks Tr.* at 27:23-28:17. They also can select their insurance, license base plates, tax reporting, and other support services. *See ICOA, Appx. A; Meeks Tr.* at 144:18-145:10, 148:14-149:5. But some putative class members testified that they had no choice in selecting trailers and the communications and electronic onboard recorder had to be compatible with CRST's dispatch system. *Fink Tr.* at 192:1-13; *Gravelle Tr.*, *Vol. I,* at 100:15-25; *Meeks Tr.* at 144:18-145:7.

- *Independence of business operations.* The cornerstone of the lease purchase operator relationship is independence. *See Cervantes Tr.* at 42:3-14; *Gravelle Tr.*, *Vol. I,* at 52:10-53:10. Lease purchase operators testified regarding the freedom to decide when to upgrade their trucks, to choose their loads and routes, and when to take home time. *Fapohunda Tr.* at 112:19-113:1; *Meeks Tr.* at 103:22-104:21; *Fisher Tr.* at 38:23-39:3, 87:3-17. In contrast, some lease purchase operators describe lack of independence regarding trailers leased from CRST, which caused delays and lost revenue. *Cervantes Tr.* at 195:21-196:21; *Gravelle Tr.*, *Vol. I,* at 95:14-96:14. Other lease purchase operators disagree about their freedom to perform maintenance on their trucks. Gravelle claimed that she "had no choice" and "CRST every time" made decisions on where her truck would be serviced. *Gravelle Tr.*, *Vol. II,* at 22:16-20. In contrast, Meeks testified that she "liked [CRST'S] guaranteed maintenance program," which she funded through a maintenance escrow account, and

was able make repairs to her truck that she eventually bought at the end of her lease. *See Meeks Tr.* at 57:2-58:6, 103:6-21, 158:10-15.

▪ *Employment of drivers and workers.* Lease purchase operators can and do hire drivers to operate their trucks. *Shines Tr.* at 107:6-20. But some insist that they were required to participate in the Lead Driver Program, training Student Drivers instead of hiring their own employees. *Cross Tr.* at 190:4-12; *Fisher Tr.* at 128:18-129:13. Some lease purchase operators, like David Tromp, started by leasing a single truck from Lincoln Sales and went on to contract as many as eight trucks to CRST at the same time. *See Tromp Decl.* ¶¶ 5-10, 12-18. Although Plaintiffs have excluded lease purchase operators who used the program to operate a fleet of trucks, Plaintiffs cannot wish away the fact that lease purchase operators could do so or the implications that the opportunity to do so has on their assertion that CRST was misclassifying lease purchase operators.

▪ *Intent to work as an independent contractor.* Some witnesses transitioned from employee drivers with CRST to lease purchase operators, as they wanted a greater opportunity for profitability, freedom to choose their loads, and an ability to lease-to-own their own truck. *Fapohunda Tr.* at 113:2-11; *Meeks Tr.* at 26:8-12. In contrast, Cross said that he knew "very little" about being a lease purchase operator, did no investigation, and decided to become a lease purchase operator "because I was told I could make $2,500 a week." *Cross Tr.* at 50:5-21.

Plaintiffs' Motion offers no method of reconciling this conflicting evidence to prove misclassification on a class wide basis.

### 2. The IMWL and the IWPCA do not apply to work performed outside of Iowa.

Misclassification aside, the Court should still deny Plaintiffs' motion as to their IMWL and IWPCA claims because individual issues related to if or when those laws apply to the putative class members will predominate over any alleged common question. The IMWL and the IWPCA

15

only apply when an employee is "employed in this state for wages by an employer." Iowa Code § 91A.2(3); *Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 585-86 (Iowa 2002). The Iowa Supreme Court has explained that these statutes focus "not on an individual employee's state of residence or an employer's home office," but whether an individual performs substantial work in state. *Id.* at 585. In *Runyon*, the Iowa Supreme Court determined that Iowa's wage laws only applied to employees that "transacted substantial business and routinely performed services . . . within Iowa's borders." *Id.*

When faced with the question whether to certify IMWL and IWPCA claims for interstate workers, courts have refused to do so because the analysis necessary to determine if the IMWL and the IWPCA applies is inherently individual. For example, in *Montoya*, the court declined to certify a class of over-the-road employee truck drivers seeking recovery under Iowa wage laws because "individual issues would overtake common ones" when it tried to determine whether Iowa wage laws applied to each truck driver. *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 423 (D. Mass. 2018). In coming to this determination, the *Montoya* court recognized that minimal contacts with Iowa, such as "pass[ing] through Iowa . . . during their coast to coast trips" or "interface[ing] with Iowa based dispatchers, human resources staff, and payroll departments in the normal course of business" is not enough to trigger the application of Iowa law under *Runyon*. *Id.*

Here, it is undisputed that Plaintiffs and the putative class members drove and operated throughout the country. There is no evidence that Plaintiffs or the putative class members regularly or routinely performed work in Iowa. Nor have Plaintiffs provided any evidence demonstrating whether or for how long Plaintiffs actually performed work in Iowa, let alone a method through which they could make that showing for each class member without having to analyze the work each putative class member performed in Iowa. Given that, individual questions of whether Iowa law will apply to a putative class member's claim will predominate.

The fact that Plaintiffs and the putative class members ICOAs contain an Iowa choice of law provision does not alter this conclusion. That provision simply provides that Iowa law will apply; it does nothing to alter how Iowa law will apply or whether Iowa law should apply to work performed outside of Iowa. That still turns on the nature and amount of work the individual performs in Iowa. *Runyon*, 653 N.W.2d at 585. As a result, Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement for their IMWL and IWPCA claims. *Montoya*, 311 F. Supp. 3d at 423.

## B. Plaintiffs' Leasing Regulation Claims Require Individual Showings of Injury

Plaintiffs seek class certification for claims under the Federal Leasing Regulations that govern the relationships between motor carriers like CRST and lease purchase operators like Plaintiffs, 49 C.F.R. Part 376. In particular, Plaintiffs claim CRST failed to compensate them as set out in their ICOAs in violation of 49 C.F.R. § 376.12(d), failed to give them copies of certain shipping documents at the time they were paid for their services in violation of § 376.12(g), and failed to provide them with copies of the documents necessary to determine the validity of amounts charged against their compensation for items advanced to them as elected in their contracts in violation of § 376.12(h). ECF No. 108, ¶ 193.

Plaintiffs seek to recover damages for these violations under 49 U.S.C. § 14704(a)(2). In the Eighth Circuit, Plaintiffs must demonstrate that each violation resulted in "actual damages" to do so. *Owner-Operator Independent Drivers Assoc., Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1007 (8th Cir. 2003), *cert. denied*, 541 U.S. 973, 124 S.Ct. 1878, 158 L.Ed.2d 467 (2004); *Owner-Operator Independent Drivers Assoc., Inc. v. New Prime, Inc.*, 213 F.R.D. 537, 547 (W.D. Mo. 2002).

In *New Prime*, the Eighth Circuit reviewed the denial of class certification by the district court under Rule 23(b)(3) where plaintiff owner-operators claimed escrow funds required under

Case 1:20-cv-00075-CJW-KEM   Document 257   Filed 02/04/22   Page 23 of 38

their contracts with New Prime violated the leasing regulations. In particular, the plaintiffs claimed that the withholding of funds from their settlements was improper because their contracts failed to identify and provide an accounting of charge-back items in violation of § 376.12(h), the deductions were unauthorized in violation of § 376.12(i), and withholding amounts from their escrow accounts violated § 376.12(k). *Id.* at 1004.

In determining that common questions of fact or law did not predominate, the district court examined § 14704(a)(2) and concluded that the "section gives only persons who have sustained damages as a result of a violation an action to recover from a carrier." *New Prime*, 213 F.R.D. at 547. The district court found that individual determinations would overwhelm any common questions of fact or law on the issue. The Eighth Circuit affirmed. First, it agreed that § 14704(a)(2) provides a right of recovery "only to persons who have sustained damages as a result of a carrier violation." *New Prime*, 339 F.3d at 1012. It then reasoned that "[t]o make such [damages] determinations, a court would be required to examine each individual class member's account, including offsets, advances, and other items. Recovery for any plaintiff would be based on individual, not common questions of fact." *Id.* As a result, the Eight Circuit "agree[d] that questions affecting individual class members would predominate over common questions of law or fact." *Id.*[5]

More recently, the Eleventh Circuit applied the same rationale to affirm decertification of a class of plaintiffs alleging violations of § 376.12(d) for failure to disclose reductions in shipping revenue before the calculation of settlement compensation and of § 376.12(h) for failure to disclose

---

[5] The Eighth Circuit's decision in *New Prime* was criticized by the U.S. District Court for the Southern District of Indiana in an unreported 2005 decision, *Owner-Operator Independent Drivers Assoc., Inc. v. Mayflower Transit, Inc.*, Nos. IP 98-457-C-B, IP 98-458-C-B/S, 2005 WL 6957703 (S.D. Ind. Sept. 27, 2005) (Mayflower). *Mayflower* is distinguishable on the grounds that the district court there was bound by Seventh Circuit precedent that relied upon non-Leasing Regulations cases to hold that damages calculations issues do not impede class certification. Here, injury under 49 U.S.C. § 14704 is an essential element of Plaintiffs' claim for liability and not merely an aspect of damages.

markups and profits related to chargebacks. *Owner-Operator Independent Drivers Assoc., Inc. v. Landstar System, Inc.*, 622 F.3d 1307, 1312 (11th Cir. 2010). The court affirmed decertification of the § 376.12(h) claim because actual damages, not the carrier's profits, was the proper measure of damages. *Id.* at 1326-27. "Thus, *each class member will have to offer evidence as to his or her actual damages*, offset against any counterclaims." *Id.* at 1326 (emphasis added); *see also*, *Owner-Operator Independent Drivers Assoc., Inc. v. Swift Transp. Co.*, CV-02-1059-PHX-PGR, 2006 WL 2521183, at *4 (D. Ariz. Mar. 30, 2006); *Coburn v. D&R Trucking, LLC*, 3:09-CV-464, 2011 WL 73287, at *2 (M.D. Fla Jan. 10, 2011).

Plaintiffs' Motion identifies the regulations it claims were violated, 376.12(g) and 376.12(h), but offers evidence that any class member sustained damages as a result of the alleged violations nor provides the Court with any method through which they could establish actual damages for each individual class member. For example, Plaintiffs' Motion asserts that CRST failed to provide them with rated freight bills, but never asserts that any Plaintiff was *in fact* paid less than they were promised. ECF No. 247 at 29. Apparently for good reason—witnesses testified that they were paid what they were promised. *Shines Tr.* at 101:15-103:5. And Plaintiffs ignore the lease purchase operators who never asked for rated freight bills, which were available upon request. *Cervantes Tr.* at 203:17-22; *Meeks Tr.* at 191:11-23; *ICOA,* § 3(B). Plaintiffs ignore that some lease purchase operators never asked for rated freight bills. *Cervantes Tr.* at 203:17-22; *Meeks Tr.* at 191:11-23; *ICOA* § 3(B). Similarly, Plaintiffs' Motion asserts that CRST failed to provide "documents necessary to determine the validity of the charge-back items," but does not offer any evidence that Plaintiffs were mischarged for the items they elected to obtain from CRST. ECF No. 247 at 29. Again, the evidence demonstrated that putative class members have not been improperly charged for items they elected to obtain through CRST. *See, e.g., Shines Tr.* at 74:21-75:21, 86:1-7; *Fisher Tr.* at 133:10-135:21.

Plaintiffs have engaged in significant discovery, but they have failed to demonstrate that any Plaintiff "sustained damages" as a result of an alleged leasing regulations violation or that they have any method of demonstrating each putative class member sustained actual damage from CRST's purported violation of the leasing regulations, Plaintiffs cannot certify a class to recover damages for those alleged violations.

### C. Plaintiffs Fail to Meet Commonality, Predominance or Superiority Requirements of Rule 23(a)(2) & (b)(3) for Their Fraud Claim

Plaintiffs premise their fraud claim on an allegation regarding "CRST's use of fraudulent misrepresentations to induce Lease Operators to enter into the Lease Purchase Program." ECF No. 247 at 28. To establish a fraud claim, a plaintiff must prove that CRST: (1) made a material misrepresentation of fact, (2) knew that the misrepresentation was false, (3) with intent to induce the plaintiff to enter into the lease purchase program, (4) the plaintiff justifiably relied on the misrepresentation, and (5) sustained damages as a result. *Rosen v. Bd. of Med. Examiners of Iowa*, 539 N.W.2d 345, 349 (Iowa 1995). Plaintiffs' Motion asserts that CRST uniformly misrepresented the amount of money owner-operators could make if they operated as an owner operator in CRST's lease purchase program. Plaintiffs also assert that every Plaintiff relied on those misrepresentations. ECF No. 247 at 29. Leaving aside the fact that Plaintiffs' Motion does not offer any basis for concluding that these representations *were false* or were actually made to each putative class member, their own testimony demonstrates the impropriety of certifying this claim on either ground.

### 1. Plaintiffs offer no way to establish that CRST made a false representation to each putative class member Plaintiff.

Plaintiffs have an evidentiary burden to satisfy "through evidentiary proof" compliance with Rule 23(b). *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775–76 (8th Cir. 2021). Practically speaking, this means Plaintiffs must present evidence that demonstrates to the Court

that they will be able to prove that CRST made a misrepresentation to *each* putative class member without having to call each one as a witness at the trial. *See Blades*, 400 F.3d at 575. If they cannot, then individual inquiries about whether a misrepresentation was made to an individual—a necessary element of any fraud claim—will overtake the trial. It is for this reason that the Eighth Circuit recently held that a district court abuses its discretion in certifying a class when it ignores evidence that class members "did not see . . . the alleged misrepresentations." *See Hudock*, 12 F.4th at 776; *see also Thome*, 2021 WL 6144666, at *11 (citations omitted).

Plaintiffs' Motion offers no basis on which to conclude that CRST made false statements to each putative class member. Instead, Plaintiffs ask the Court to certify their fraud claim based on three different forms of anecdote and speculation. First, Plaintiffs assert that the Court can infer that CRST made false statements to all putative class members because CRST's recruiters "made essentially the same statements regarding the pay Lease Operators could expect" through a "standardized sales pitch." ECF 247 at 28-29. However, the record reflects CRST recruiters did not uniformly discuss compensation with applicants. Cervantes testified CRST recruiters guaranteed the amount of money he would make. *See* ECF No. 245-30 ¶¶ 4-10 (declaring that statements related to per week compensation were a promise); *but see Cervantes Tr.* at 188:10-19 (testifying that he understood statements related to compensation were an estimation). Shines testified that his recruiter simply talked to him about the benefits of being a lease purchase driver but did not discuss anything specific about the compensation he could make. *Shines Tr.* at 30:18-31:8. Fisher and Meeks testified that CRST recruiters did not discuss compensation with them at all during their calls. *Fisher Tr.* at 57:7-13; *Meeks Tr.* at 68:2-20. Finally, when Shines re-applied with CRST after already operating as a lease purchase operator, he did not give the recruiter an opportunity to discuss compensation or mileage with him because he knew that information from

his prior experience. *Shines Tr.* at 62:8-63:12. This testimony dispels the assertion that there was a "standardized sales pitch" that CRST recruiters provided to applicants.

Second, Plaintiffs try to rely on CRST's recruiting materials to establish that each class member saw an alleged misrepresentation. Again, while some putative class members testified they saw CRST advertisements related to compensation, *see, e.g., id.* at 20:8-23:14, others testified that they did not see *any* CRST advertisements discussing compensation, *see, e.g., Fisher Tr.* at 49:9-11, 59:24-60:2. Some, like Gravelle, had a friend who "talked [her] into it," "didn't look any f[u]rther" than CRST, and didn't review any advertising material before she signed a lease "to get a truck." *Gravelle Tr.*, *Vol. I*, at 52:7-53:18, 72:5-73:23.

Finally, Plaintiffs attempt to rely on orientation materials, a document titled "Lease Information Packet," and alleged promises made at orientation to establish each CRST made misrepresentations to each class member. However, Plaintiffs have no evidence demonstrating what representations were made to individuals at each orientation during the class period. Similarly, they provide no support for their contention that an income chart was used at each orientation, that each putative class member received a Lease Information Packet with compensation and mileage information in it, or that each putative class member would have read the Lease Information Packet.[6] The record demonstrates that some did not receive it or review it. *Fapohunda Tr.* at 91:10-21 (testifying that he had not seen the CRST Lease Information Packet (Exhibit 11 to Plaintiffs' Motion)); *Fapohunda* Ex. 13; *Fink Tr.* at 133:24-134:19 (testifying that he had not seen the portion of the CRST Lease Information Packet at CRST004245); *Fink* Ex. 12.

---

[6] Some putative class members, like Mr. Fapohunda, testified CRST representatives told them they could "expect" $2,000 a week. *Fapohunda Tr.* at 85:15-21. Other putative class members, like Mr. Fisher, testified that they were not "guaranteed" a specific amount of compensation or miles to run and were explicitly told some contractors who ran less miles did not make as much money. *Fisher Tr.* at 88:23-91:13. Others, like Mr. Shines, testified that while CRST representatives showed them examples of contractors who had a gross revenue of over $190,000 while contracting with CRST, CRST did not promise them anything related to compensation, and told them that other contractors who did not perform well did not make money. *Shines Tr.* at 35:5-40:16.

One cannot serendipitously stumble into a fraud claim; each Plaintiff must have heard *and* relied on the alleged misrepresentation.

Plaintiffs have not identified any common evidence that shows each class member saw, let alone relied upon, any alleged misrepresentation. The varying testimony in the record demonstrates why this Court should not certify Plaintiffs' fraud class and distinguishes this case from cases Plaintiffs cite that apply an inference that each putative class member would have seen a misrepresentation. *See* ECF No. 245-2 at 29-30. Given the testimony here that some class members did not, the Court should not apply any inference to the contrary. *Hudock*, 12 F.4th at 776; *In re St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008).

### 2. Plaintiffs cannot establish that each putative class member relied on any alleged misrepresentation.

Justifiable reliance is a necessary element of a fraud claim under Iowa law. *Rosen*, 539 N.W.2d at 349. The Eighth Circuit has consistently concluded that fraud cases are unsuitable for class treatment "[b]ecause proof often varies among individuals concerning what representations were received, and the degree to which individual persons relied on the representations." *In re St. Jude Med., Inc.*, 522 F.3d at 838; *Hudock*, 12 F.4th at 777; *see also* Fed. R. Civ. P. 23, advisory committee's note to 1966 amendment (deeming a fraud claim unsuited for class action treatment. Courts in the Eighth Circuit consistently refuse to certify fraud classes when a defendant presents evidence that putative class members did not see a misrepresentation or did not rely on any representation. *In re St. Jude Med., Inc.*, 522 F.3d at 838; *Hudock*, 12 F.4th at 777.

However, it is not enough for Plaintiffs to demonstrate reliance; they must show that each putative class member's reliance is justified. The Iowa Supreme Court has explained that "the justified standard . . . means the reliance does not necessarily need to conform to the standard of a reasonably prudent person but depends on the qualities and characteristics of the particular plaintiff

and the specific surrounding circumstances." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009) (citations omitted). "The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." *Id.* Rather, "the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met." *Id.*

Here, the record reflects putative class members' different experiences regarding whether they relied on CRST representations and whether that reliance can be justified under Iowa law. For example, Cervantes claims he understood the representations that CRST made to him regarding income and mileage were promises of what he would receive, and he relied on those promises when contracting with CRST. ECF No. 245-30 ¶¶ 10-11. Fisher understood that the compensation information discussed at orientation were guidelines; he explained that no information provided to him was a promise or guarantee as to what he would earn as an owner operator. *Fisher Tr.* at 48:22-52:7 80:16-81:10; *see also Meeks Tr.* at 77:2-78:8.

Other class members had friends who were CRST lease purchase operators and who provided the putative class member with information on CRST's lease purchase program and/or validated the information CRST provided through discussing their own experiences. Gravelle testified that her friend who was a CRST lease purchase operator "talked [her] into" becoming a lease purchase operator and that she relied on her friends experience when making that decision. *See Gravelle Tr.*, *Vol. I*, at 52:4-53:18, 72:5-73:23. Fink stated that he opted for a second turn as a lease purchase operator "because [he] had friends there [at CRST]." *Fink Tr.* at 158:2-11.

Similarly, Fisher testified that he relied on information he obtained on current and former CRST lease purchase operators in deciding whether to contract with CRST, including information from his friend of 30 years who was a CRST lease purchase operator. Based on this investigation, he knew some lease purchase operators profited while others did not. *Fisher Tr.* at 31:7-34:24,

40:24-47:17. He also watched independent testimonial videos from prior lease purchase operators to assess whether he wanted to apply to CRST which provided him with positive and negative experiences former CRST lease purchase operators had related to available miles and compensation:

> Q.   And it's fair to say that before applying to CRST, you knew that some individuals did not make good money; is that correct? . . . .
> THE WITNESS:  Yes, sir.
> Q.   Okay.  And is it fair to say that before applying to CRST, you knew that some -- some lease purchase operators were happy with CRST's lease -- Lease Purchase Program, correct? . . . .
> THE WITNESS:  Yes, sir.
> Q.   Okay.  Is it fair to say that before you applied to CRST, you knew that certain lease operators were satis -- described being satisfied with their experience in the CRST Lease Operator Program, correct?
> A.   Yes, sir.
> Q.   Okay.  And it's fair to say that before applying to CRST, you knew that some lease operators were dissatisfied with their experience in CRST's Lease Purchase Program, correct?
> A.   Yes, sir.
> Q.   And that dissatisfaction related to the amount of miles they were getting, correct?
> A.   It was with the amount of miles and dispatchers.
> Q.   . . . . And that dissatisfaction also translates -- was related to not having enough compensation, correct?
> A.   Yes, sir.
> Q.   And you knew all of this before you talked to a CRST recruiter, correct?
> A.    Yes, sir.

*Id.* at 45:24-47:17; *see also id.* at 35:3-58:15. Fisher relied on the information from these videos and conversations to decide whether to contract with CRST before he even attended orientation. *Id.* at 59:8-60:2, 61:1-11.

Fisher also discussed the information that CRST provided him at orientation with his friend while he was at orientation; his friend validated all of the information based on his own then-current personal experience:

> Q.   What days did you call Mr. Porter?
> A.   I believe it was that third day and the last day [of orientation]. . . . .
> Q.   Okay.  Did -- did you discuss compensation with Mr. Porter?

25

A.   I believe we did talk about compensation.
Q.   And what did you discuss after the third day of orientation with Mr. Porter?
A.   About the 2,500 a week.
Q.   And what, specifically what did you ask Mr. Porter?
A.   Not so much as ask him; what I was telling him that they said:  If we run those 3,000 to 6,000, we can look forward to making that amount.  And as he stated, basically that's what he was pretty much profiting every week, as well.
Q.   So that was his experience as a lease purchase operator?
A.   Yes, sir.
Q.   All right.  Did that validate the information provided to you at orientation?
A.   To me, yes.
Q.   Okay.  Could you -- Mr. Porter is a trusted confidant of yours, correct, trusted friend?
A.   Yes, sir.
Q.   And the same thing with the mileage; is that correct, because I believe you said you talked to Mr. Porter both about the mileage and how much you can earn running those amount of miles?
A.   Yes, sir.
Q.   Okay.  And those miles -- those types of miles were available to Mr. Porter; is that correct?
A.   Yes, sir.

*Id.* at 83:23-85:12; *see also id* at 112:23-115:3 (explaining that he trusted and relied on his friends experience more than the CRST recruiter in determining to rejoin CRST). Fisher also relayed his own personal experience as a CRST owner operator to his orientation roommate when he contracted a second time. *Id.* at 117:10-119:5.

Finally, several owner-operators testified that they terminated their contracts with CRST, worked for another trucking company, and then independently decided to rejoin CRST. *Cross Tr.* at 193:19-194:10; *Shines* Tr. at 48:23-49:6, 84:12-21; *Fisher Tr*. at 112:23-113:2, 119:2-5, 122:16-123:9 ("Q. [A]t the second orientation, you [] didn't rely . . . on the chart that was presented to you? A. No, sir."). Their prior experiences with CRST, including with the mileage that is available to drivers and the compensation that CRST lease purchase operators receive, renders any reliance on representations unjustifiable. *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980) (citation omitted) (finding reliance would be unjustified "where a plaintiff has equal information of certain knowledge as the defendant, he has no right to rely upon defendant's statements.").

Plaintiffs have not shown any way they can demonstrate that each class member (i) saw a misrepresentation, (ii) relied on that misrepresentation, and (iii) prove that each class member's reliance was justified without having to call each class member at trial. Without this evidence, there is no basis on which to certify Plaintiffs' fraud claim. *Hudock*, 12 F.4th at 776; *see also Thome,* 2021 WL 6144666, at *11.

Plaintiffs' reliance on *CGC Holding Co., LLC v. Broad & Cassel,* 773 F.3d 1076 (10th Cir. 2014) and other cases applying a presumption of reliance, ECF No. 247 at 31-33, is misplaced and does not change this conclusion. Those cases hold that a class wide inference of causation or reliance is appropriate if (1) a defendant's uniform conduct is met by a uniform response from the class, and (2) "the class behavior cannot be explained in any way other than reliance upon the defendant's conduct." *CGC*, 773 F.3d at 1089-90. Here, Plaintiffs themselves attested to the varied reasons they decided to become a CRST lease purchase operator and what they relied on in doing so. These explanations, including testimony that denies relying on a CRST representation when deciding to contract with CRST, precludes any finding that "the class behavior cannot be explained in any way other than reliance upon the defendant's conduct." The Court should reject the application of any presumption and deny Plaintiffs' request to certify their fraud claim. *Hudock*, 12 F.4th at 776.

### D.      Plaintiffs Cannot Satisfy Commonality, Predominance and Superiority Requirement for Their Unjust Enrichment Claim.

#### 1.      Plaintiffs have no method for demonstrating unconscionability for each class member.

Plaintiffs concede that to recover for their unjust enrichment theory, they must void each class member's ICOA and Lease using the doctrine of unconscionability. ECF No. 247 at 24. Plaintiffs' Motion acknowledges that they must prove that the contract at issue is both procedurally and substantively unconscionable. *Id.* at 18. Plaintiffs also acknowledge that this means proving

that "no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *Id*. (quotations omitted). "The Iowa Supreme Court has established that [a court] should analyze the following factors of unconscionability: (1) assent; (2) unfair surprise; (3) notice; (4) disparity of bargaining power; and (5) substantive unfairness." *Faber v. Menard, Inc.*, 367 F.3d 1048, 1053 (8th Cir. 2004) (*citing Home Federal Sav. & Loan Ass'n v. Campney*, 357 N.W.2d 613, 618 (Iowa 1984)). Iowa courts determine whether a contract was unconscionable by analyzing the facts surrounding the contract "at the time it was entered." *Wolfe*, 795 N.W.2d at 80; *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co*., 227 N.W.2d 169, 181 (Iowa 1975).

Like their fraud claim, the record precludes a finding of unconscionability on a classwide basis. Specifically, several of Plaintiffs' witnesses testified that they chose to contract with CRST on *multiple occasions. Shines Tr*. at 48:23-49:6, 84:12-21; *Cross Tr*. at 193:21-194:10; *Fisher Tr*. at 112:23-113:2, 122:16-123:9; *Fink Tr*. at 124:2-8; 150:23-151:6. This undercuts any argument related to procedural or substantive unconscionability. *Quillion v. Tenet Health Sys. Philadelphia, Inc.*, 673 F.3d 221, 237 (3rd Cir. 2012) (finding no unconscionability where plaintiff "quit her employment. . . to work for another employer, and then chose to go back and work once again for [defendant], subject to the [terms in her prior agreement]."). Some of these individuals acknowledged that, at the time they signed their second agreement, they believed the terms were fair and reasonable:

> Q.    Okay.  Did you review it before you decided to contract with CRST again?
> A.    No.
> Q.    Why not?
> A.    I didn't have no need to.  I didn't think I needed to.
> Q.    You understood the terms of the agreement?
> A.    Pretty much, yes.
> Q.    Okay.  And you thought they were fair and reasonable?
> A.    At the time, yes.

*Fisher Tr.* at 122:24-123:9, 96:19-25. Indeed, Fisher testified that his contracts with CRST paid him more than he earned under similar contracts with different motor carriers. *Id.* at 112:19-22 When, as here, Plaintiffs' witnesses have voluntarily elected to contract with CRST on multiple occasions, there is no factual basis on which to conclude that "no person in his or her right senses would" enter into those contracts. *See Scherrey v. A.G. Edwards & Sons, Inc.*, No. 02-2286, 2003 U.S. Dist. LEXIS 11010, at *7-8 (W.D. Ark. Apr. 15, 2003); *see also Vistein v. Am. Registry of Radiologic Technologists,* 342 F. App'x 113, 122 (6th Cir. 2009).

> **2.      Choice of law issues preclude certifying Plaintiffs' unjust enrichment claim.**

Even if Plaintiffs could establish unconscionability on a classwide basis, the Court should still deny Plaintiffs motion because individual questions about which state's law would apply to each class member's claim would overwhelm the litigation. Plaintiffs seek to certify a nationwide class of lease purchase operators and apply Iowa's unjust enrichment law to their relationship with CRST. Because they will need to void their Agreements with CRST to pursue their unjust enrichment claim, Plaintiffs cannot rely on the choice of law provision in those Agreements to ensure Iowa law applies. When faced with such situations, Courts have determined that they "must conduct a choice of law analysis before simply applying [Iowa] law across the class." *See Cruz v. Lawson Software, Inc.*, No. CIV 08-5900 MJD/JSM, 2010 WL 890038, at *6 (D. Minn. Jan. 5, 2010); *Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 534 (D. Minn. 2007). Plaintiffs have provided no basis on which this Court could perform this analysis for each putative class member without offending Rule 23(b)(3)'s predominance and superiority requirements. This alone is insufficient to "affirmatively demonstrate [] compliance with" Rule 23. *Dukes*, 564 U.S. at 350.

3. **The Court must examine the particular circumstances of each putative class member's situation in order to resolve Plaintiffs' unjust enrichment claims.**

Finally, the Court should not certify Plaintiffs' unjust enrichment claims because individual issues related to whether putative class members performed work for which they were not compensated will overwhelm any common issues and will make any trial unmanageable. It is for this reason that courts find unjust enrichment claims are "rare[ly], if ever," suitable for class treatment. *Russell v. Citigroup, Inc.*, No. CV 12-16-DLB-JGW, 2015 WL 9424144, at *5 (E.D. Ky. Dec. 22, 2015)(citation omitted). "[W]hen evaluating unjust enrichment claims, courts 'must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist.'" *Id.* at *5; *see also Maxwell v. Tyson Foods, Inc*., No. 1:08CV00017-JAJ-TJS, 2012 WL 12541110, at *12 (S.D. Iowa July 19, 2012).

Plaintiffs unjust enrichment claim is premised entirely on the notion that deductions they incurred related to their lease and operation of their vehicle conferred a benefit on CRST for which they were not compensated. ECF No. 247 at 27-28; *State ex rel. Palmer v. Unisys Corp*., 637 N.W. 2d 142, 154-55 (Iowa 2001). However, determining whether Plaintiffs' services (on which the deductions are premised) conferred a benefit on CRST, and whether Plaintiffs were not compensated for that benefit, will necessarily require analyzing the relationship between CRST and each putative class member. CRST compensated each Plaintiff and putative class member for the use of their truck and "for everything furnished, provided, done by, or required of Contractor" under the ICOA. *ICOA,* § 2. To resolve this unjust enrichment claim, the Court will need to look at the benefit each putative class member conferred on CRST and then determine if the compensation CRST paid them was sufficient to compensate them for that benefit. Some putative class members, like Tabitha Meeks incurred deductions related to leasing her tractor. However, she used those deductions to build equity in the equipment and was able to purchase her tractor at

the end of the lease. *Meeks Tr.* at 157:6-159:9. Other putative class members, like Roderick Fisher, walked away from his lease before purchasing his truck at no cost; he viewed this as a benefit of CRST's lease purchase program. *Fisher Tr.* at 62:17-63:15. The Court will need to consider this factual context for each person in order to determine whether they conferred a benefit on CRST and to determine what CRST should have compensated them for that benefit. It is for this reason that courts consistently find that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *See Vega*, 564 F.3d at 1274; *Daigle v. Ford Motor Co.*, CIV.A. 09-3214 MJD, 2012 WL 3113854, at \*5 (D. Minn. July 31, 2012). The Court should reach the same conclusion here.

## IV.     CONCLUSION

Plaintiffs' claims represent their effort to transform CRST's lease purchase program from a federally recognized method of providing transportation services—into a scheme to foist the costs of operating trucks onto drivers. As demonstrated above, the experiences of the individuals who are bringing these claims do not mesh with their legal theories. Far from establishing that CRST misclassified Plaintiffs and the putative class, the record in this case demonstrates that the operational decisions in the lease purchase program were made from the bottom up. Plaintiffs, not CRST, made each critical decision regarding how they would provide transportation services.

Leaving aside the merits of Plaintiffs' misclassification assertion, they have also failed to provide any basis on which this Court could resolve their claim that they were misclassified on a classwide basis. Similarly, the testimony and choices Plaintiffs made preclude certification of their fraud and unjust enrichment claims. Finally, Plaintiffs' Motion offers no evidence of a leasing regulation violation, let alone that any Plaintiff sustained damages as a result of such a violation. Without these showings, none of Plaintiffs claims are suitable for classwide resolution.

Dated: February 4, 2022

Respectfully submitted,

/s/ James H. Hanson
James H. Hanson (admitted *pro hac vice*)
James T. Spolyar (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-492-9205
F: 317-687-2414
jhanson@scopelitis.com
jspolyar@scopelitis.com

Adam C. Smedstad (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
3214 West McGraw Street, Suite 301F
Seattle, WA 98199
P: 206-288-6192
F: 206-299-9375
asmedstad@scopelitis.com

Charles Andrewscavage (admitted *pro hac vice*)
Scopelitis, Garvin, Light, Hanson & Feary, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603-2427
P: 312-255-7200
F: 312-422-1224
candrewscavage@scopelitis.com

Emily A. Quillen
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
777 Main Street, Suite 3450
Fort Worth, TX 76102
T: (817) 869-1700
F: (817) 878-9472
equillen@scopelitis.com

4889-9285-6071, v. 31

/s/ Kevin J. Visser
Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
P: 319-366-7641
F: 319-366-1917
kvisser@spmblaw.com
Attorneys for Defendants,
CRST International, Inc. and CRST Expedited, Inc.