IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No. 1:20-cv-00075-CJW-KEM |
| v. | Honorable Judge C.J. Williams |
| CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC., | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

A. **CRST**

1. Defendants include CRST Expedited, Inc., a motor carrier registered with the U.S. Department of Transportation, and CRST International, Inc., which until January 2, 2021 was a separate entity and on January 2, 2021 merged into CRST Expedited Inc. d/b/a CRST The Transportation Solution, Inc. (CRST Expedited, Inc. and CRST International, Inc. are hereafter referred to collectively as CRST).

   Support: App. 2,4 (Doc 155 at ¶¶ 3, 32).

2. CRST Lincoln Sales, Inc. (d/b/a CRST Equipment Solutions), is owned by CRST International Holdings, LLC and leases trucks to CRST for its employee drivers and to lease operators.

   Support: App. 9-11 (Lincoln Sales 30(b)(6) Deposition, Michael Gannon,

1

(hereinafter "Lincoln Sales 30(b)(6)") Tr. 24:05-24:10 (testified that CRST International Holdings, LLC is the immediate parent company of Lincoln sales)); App. 9-10, 12 (Lincoln Sales 30(b)(6) Depo Tr. 32:06-32:18 (testified that Lincoln Sales provides tractors provides lease trucks to CRSTs' lease operators)); App. 27, 28, 55 (CRST 30(b)(6) Deposition of Chad Brueck (hereinafter "CRST 30(b)(6) Brueck"), Tr. 72:04-72:07 (CRST Lincoln Sales is referred to as CRST Equipment Solutions)).

3. CRST markets itself as operating the industry's largest fleet of team drivers enabling expedited delivery of freight.

Support: App. 27, 28, 85 (CRST 30(b)(6) Brueck, Tr. 231:10-16 (describing team driver model as part of sales approach)); App. 91 (CRST002031 (CRST Safety and Operations Handbook describing CRST as "the largest team carrier in America," and as "an industry leader in providing expedited transportation")).

4. The primary product marketed by CRST is dependable, speedy delivery of freight.

Support: App. 27-28, 85 (CRST 30(b)(6) Brueck, Tr. 231:10-16); App. 92 (CRST002042 ("The first thing a customer expects from CRST is that we arrive on time." "Being on time is your #1 responsibility after being safe.")).

5. CRST controls the advertising and solicitation of customers, and negotiates price, handling requirements, and pick-up and delivery schedules with its customers.

Support: *See* App. 93, 87 (Exhibit 2, "Independent Contractor Operating Agreement" (ICOA), to CRST 30(b)(6) Brueck (hereinafter "ICOA") at ¶

2

3(B) ("Carrier has the exclusive right to set the rates and amounts charged to Carrier's customers, shippers, consignors, or consignees, and nothing in this Agreement shall be construed to limit that right.")); App. 1, 6-7 (Doc 155 at ¶ 79 ("Defendants admit that Expedited negotiates rates with its customers for loads hauled by independent contractor drivers . . .")); App. 27-28, 35-36 (CRST 30(b)(6) Brueck, Tr. 28:19-29:08 (95% or more of CRST's loads are those where the price and pickup time are negotiated by CRST's sales team or customer service departments.)); App. 27-28, 32-33 (CRST 30(b)(6) Brueck, Tr. 22:23-23:25 (testifying that CRST's Sales Team, and the Customer Service Department to a lesser extent, negotiate the terms under which loads will be hauled, including "[p]rice . . . [and] on a small percentage of loads depending on the needs of the customer, we may have to negotiate a pickup or delivery time based on availability of capacity. I would say that volume sometimes is negotiated, number of loads we can accept.")); App. 93, 98 (ICOA at ¶ 4(B) ("At no time during this Agreement shall Contractor place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of Carrier, without Carriers' prior written consent pursuant to Section 1(E) of this Agreement (which consent shall not be unreasonably withheld).")).

6. CRST controls communications with its customers.

   Support: App. 27-28, 38-39 ((CRST 30(b)(6) Brueck, Tr. 31:02-32:15 ("I would say that contractors and drivers, most likely, do not understand our customers' requests and requirement as it relates to rescheduling or setting

3

delivery appointments, and so in order to provide good information to our customers and follow what they've asked us to do, generally, that communication should go through our Customer Service Team.")); App. 27-28, 38, 88-89 (CRST 30(b)(6) Brueck, Tr. 31:03-31:07, Brueck Errata Sheet ("[A]s a general rule of thumb, the driver [or] contractor would let the Customer Service Team know what time they would be there, and the Customer Service Team would work with the customer to set the delivery appointment.")).

7. CRST controls and is responsible for customer billing.

> Support: App. 129-130, 134 (Diane Lappe Deposition (hereinafter "Lappe Depo") Tr. 20:13-20:18 (a rated freight bill "is our invoice to our customer." )); App. 93, 97 (ICOA at ¶ 3(B)).

8. CRST hires thousands of long-haul, interstate truck drivers to deliver CRST's customers' freight.

> Support: App. 1, 3-4 (Doc 155 at ¶¶ 4, 7).

9. CRST hires both employee drivers ("employee drivers" or "company drivers") and drivers who enter into an "Independent Contractor Operating Agreement" (ICOA) who CRST classifies as independent contractors.

> Support: App. 142-145 (CRST Expedited's Supplemental Responses to Interrogatory Nos. 1(a) and (d), providing the number employee drivers who worked for CRST per year, and lease operators who hauled loads for CRST pursuant to ICOAs per year).

4

10. Among the drivers that enter into ICOAs with CRST are the class members in this case—
    i.e. Drivers who drove for CRST Expedited pursuant to an Equipment Lease to lease a
    truck from CRST Lincoln Sales, Inc. and an ICOA with CRST Expedited, and who have
    not leased more than one truck at a time to CRST Expedited (hereinafter "Lease
    Operators," "Drivers," or "class members").

    > Support: App. 161 (Doc 157 (Fair Labor Standards Act ("FLSA") class
    > Definition, which does not require Drivers to have signed an Equipment
    > Lease from CRST)); App. 487-489 (Doc 296 at 23 (amended Rule 23 class
    > definition)).

11. CRST planners assign loads to trucks without regard to whether the truck is driven by a
    company driver or a Lease Operator; rather loads are assigned based on a number of factors
    including truck availability, driver need, and the ability to meet customer requirements.

    > Support: App. 27-28, 42, 88, 89 (CRST 30(b)(6) Brueck, Tr. 36:12-22, Brueck
    > Errata Sheet (In offering a load to a particular truck, regional planners
    > consider "a combination of available capacity, number of loads needing
    > cover[ed] for customers, empty miles, tractor availability, driver need.
    > There's a myriad of different factors that go into planning an entire
    > region.")); App. 27-28, 45 (CRST 30(b)(6) Brueck, Tr. 39:16-39:18 ("I'd
    > say the ability to make the pickup on time, and the ability to make the
    > transit requirement on time.")); App. 27-28, 46 (CRST 30(b)(6) Brueck, Tr.
    > 40:04-40:13 (high value loads assigned to team drivers not solo drivers));
    > App. 27-28, 47 (CRST 30(b)(6) Brueck, 45:07-45:22 (unlikely that planners
    > can differentiate between lease operators and company drivers on their load

planning screen)); App. 162-163, 169-170 (Phil Klopp Deposition (hereinafter "Klopp Depo") Tr. 56:15-57:04 (planner's goal was to make sure CRST's customers freight was taken care of, "[s]o to them it did not make too much difference if it was a company driver or a lease-operator driver that was committed to taking care of the load")).

**B. Hiring of Lease Operators and Lease Operators' "Skill"**

12. CRST's employment application process was the same for experienced employee drivers and Lease Operators.

> Support: App. 196-200 (CRST 30(b)(6), Abernathy, Deposition (hereinafter "CRST 30(b)(6) Abernathy") Tr. 22:11-24:03 (employment history and application process are the same for Lease Operators and experienced employee drivers—those who do not require training)); App. 196-197, 205-206, 242 (CRST 30(b)(6) Abernathy, Tr. 48:24-49:14, Ex. 7 at pg. 4 (Referring to Exhibit 7 as a "handbook [] targeted around company recruitment, but this process would be very much the same for independent contractors")); App. 551 (CRST011260); App. 552 (CRST011267), App. 553 (CRST011275).

13. CRST applied the same qualifications to be an experienced employee driver and Lease Operator, except Lease Operators must have six months over-the-road driving experience.

> Support: App. 196-200, 218 (CRST 30(b)(6) Abernathy, Tr. 22:16-24:08, 77:15-77:23).

14. Lease Operators had to have the same commercial driver's license ("CDL") and pass the same road test as employee drivers. CRST applies the same review of Lease Operators' and employee drivers' prior moving violations and criminal offenses.

> Support: App. 196-197, 199-200, 205-206 (CRST 30(b)(6) Abernathy, Tr. 23:19-24:08, 48:24-49:14 (Referring to Exhibit 7, the process described in recruiter handbook for recruiting company drivers is "very much the same for independent contractors.")); App. 196-197, 207-208, 243-247 (CRST 30(b)(6) Abernathy, Tr. 53:05-54:04 (Referring to Exhibit 7 at pgs. 6-10, the same qualifications apply to Lease Operators and employee drivers, including the same moving violations and criminal offense considerations)); App. 196-197, 209, 218, 219, 248 (CRST 30(b)(6) Abernathy, Tr. 62:08-62:19, 77:15-77:23, 79:08-79:11 (Referring to Exhibit 8, CRST023119, same scorecard is used for the road test that Lease Operators and employees are required to take)).

15. CRST did not require Lease Operator applicants to demonstrate any kind of credit rating, business experience, or ability to operate a business.

> Support: App. 196-197, 216-217 (CRST 30(b)(6) Abernathy, Tr. 74:22-75:25 (CRST does not do a credit check on Lease Operators. CRST does not require Lease Operators to have prior experience as a lease operator or running a business)).

16. CRST recruiters assured Driver applicants that they could lease a truck from CRST Lincoln Sales, Inc. at no money down and that CRST would advance the Driver's lease payments and operating costs subject to repayment out of the Driver's earnings.

7

Support: App. 281-282 (Doc 113-05 ¶12); App. 285-287 (Doc 113-08 ¶¶ 10, 11, 15); App. 289-290 (Doc 113-9 ¶11); App. 296 (CRST004240 ("$0 money down and no credit check!")); App. 297 (CRST004247 (same)); App. 298 (CRST004254 (same)); App. 9-10, 14-15 (Lincoln Sales 30(b)(6), Tr. 58:22-59:05 (vast majority of leases have no money down requirement and the security deposit is zero)); App. 299-300, 312 (Lease Operator Delvin Cato Depo Tr. 149:22-149:24 (no security deposit when he received truck from CRST)); App. 490-491, 522 (Phil Reges Deposition ("hereinafter "Reges Depo") Tr. 177:04-177:12 (CRST pays all recurring deductions, except health insurance, and lease operator pays CRST back)); App. 313-314 (CRST004242-3 (listing weekly fixed costs/deductions for Lease Operators)); App. 27-28, 74-75 (CRST 30(b)(6) Brueck, Tr.168:25-169:14 (Lease Operators have advance card which is "like a very limited credit card, I guess, is what I would say that it has to be used to purchase this specific thing, which is fuel. And anything else that they want to purchase would need to be done in a cash transaction.")); App. 27-28, 72-73 (CRST 30(b)(6) Brueck, Tr. 153:20-154:02 (advance card offers Lease Operators a cents-off discount from the pump price. CRST provides Lease Operators with an attachment showing where they have the option to receive the discount)); App. 196-197, 236-240, 256-275 (CRST 30(b)(6) Abernathy Tr. 116:16-120:13, (referring to Exhibits 16 (CRST005039-48) and 17 (Appendix A), Annotated ICOAs used during orientation— Appendix A highlighting and the word "initial" next to each option that indicates CRST will provide the Lease Operator with the equipment/tool/insurance)); App. 299-300, 302-308 (Lease Operator Delvin Cato Depo Tr. 92:03-92:17, 95:04-95:15, 96:03-100:25 (Lease Operator Cato had CRST obtain and install the Qualcomm unit in his

8

truck, because he could not afford to do so himself. He chose to have CRST obtain required permit and perform the fuel tax reporting services, because he did not have the money to pay the up-front cost of obtaining the permit and could not afford to pay for certain types of required insurance, so he chose for CRST to facilitate obtaining the insurance and deducting it from his pay)).

17. Once CRST accepts a Lease Operator's application it requires the Lease Operator to attend a multi-day orientation attended by Lease Operators and Employee Drivers during which they are trained in CRST's policies, practices, and procedures in areas such as driving rules, handling loads, safety, pet policy etc.

> Support: App. 1, 3 (Doc 155 at ¶69); App. 281 (Doc 113-5 at ¶¶5-6); App. 285-286 (Doc 113-8 ¶4-6); App. 289-290 (Doc 113-9 ¶¶3-6); App. 196-197, 221 222, 250 (CRST 30(b)(6) Abernathy, Tr. 81:15-82:12, Exhibit 10 at CRST000404 (CRST provides employee drivers and Drivers with Hire Packet 2 on the first day of orientation and requires Drivers and employee drivers to acknowledge the alcohol policy, the dropped trailer authorization, the emergency response guidebook contained in Hire Packet 2); App. 196-197, 201-202 (CRST 30(b)(6), Abernathy, Tr. 27:12-28:12 (During the first day of orientation, Drivers and employee drivers take a medical test, road test, agility test, and attend Hours of Service ("HOS") training and testing.)); App. 196-197, 220 (Expedited 30(b)(6) Abernathy, Tr. 80:17-80:23 (Lease Operators and employee drivers fill out same hiring packet during the first day of orientation)).

18. Lincoln Sales provides the trucks driven by CRST employee drivers and those driven by Lease Operators.

> Support: App. 27-28, 83-84, 88-90 (CRST 30(b)(6) Brueck Tr. 226:11-227:06, Brueck Errata Sheet (CRST gets its trucks for employee drivers and the ones it leases to Lease Operators from Lincoln Sales. CRST provides employee drivers with new trucks and they run them in the company division for a couple of years before moving them to the lease purchase program.).

19. Prior to attending orientation, both employee drivers and Lease Operators were presented with the same job description and asked to check whether they were applying to be employee drivers or Lease Operators.

> Support: App. 315-316 (CRST004038-9 (describing "working conditions and the tasks that must be performed for this job" providing description and asking applicant to confirm whether they can perform the requirements of the job and asking applicants to choose what position they are applying for—Company Driver, Lease Purchase, or Owner Operator)); App. 196-197, 210-212, 249 (CRST 30(b)(6) Abernathy, Tr. 67:09-69:15 (Referring to Exhibit 8 at CRST023251 and explaining that employee driver applicants and Lease Operator applicants fill out the same driver application and the same job description is in the application for both, which is filled out prior to attending orientation.)).

20. Lease Operators were required to follow CRST's work rules and procedures taught during orientation and set forth in CRST's Handbook, which are the same ones applicable to employee drivers.

Support: App. 1, 8 (Doc 155 ¶107); App. 281, 282, 284 (Doc 113-5 ¶¶7,25); App. 285-286, 288 (Doc 113-8 ¶8-9, 22-24); App. 289-290 (Doc 113-9 ¶6); App. 196-197, 203-204 (CRST 30(b)(6) Abernathy, Tr. 45:21-46:11 (CRST handed out the Driver Handbook during orientation and instructed Lease Operators and employee drivers to read it)); App. 196-197, 210-212, 277-280 (CRST 30(b)(6) Abernathy, Tr. 67:09-69:15, Exhibit 8 at CRST023201, CRST023209, CRST023210, and CRST023211 (Employee drivers and Lease Operators receive and must sign that they received and read the CRST International positive work environment policy; Violation Policy, Driver Employee Handbook, and Handheld Mobile Phone Policy)); App. 196-197, 221-223, 250 (CRST 30(b)(6) Depo. Abernathy, Tr. 81:15-83:03, Exhibit 10 at CRST00404 (On the first day of orientation, employee drivers and Lease Operators receive and acknowledge the alcohol policy, the dropped trailer authorization, the emergency response guidebook, and proper backing and use of ground guides policy.)).

21. CRST's policies and procedures controlled such things as where Drivers could park their trucks, driving rules, prohibited routes, safety procedures.

Support: App. 281, 284 (Doc 113-5 ¶26); App. 285, 288 (Doc 113-8 ¶23); App. 289, 292 (Doc 113-9 ¶21); App. 196-197, 221-224, 251 (CRST 30(b)(6) Abernathy, Tr. 81:15-82:09, 85:14-85:20, Exhibit 10 at CRST00407 (CRST Violation Policy Acknowledgment addresses "CRST Expedited Company Policy pertaining to violations that include, but are not limited to, making U-turns, right turn on red, speeding; parking on the shoulder of

11

a public road, rear-end accident, and loss of control of vehicle.")); App. 490-491, 498-503, 546 (Reges Depo Tr. 87:21-88:06, 91:24-94:08, Exhibit 45 at Slide 5 (CRST restricts Drivers from driving on I-70 west of Denver. CRST shuts down roads for weather and these shutdowns apply to Drivers. CRST also prohibits drivers from taking a trailer with them without written permission to do so. If a Driver is "hauling a load that is deemed high value, they cannot go to their house or stop at their house," and CRST requests Drivers contact CRST when they stop while hauling a high value load)).

**C. The ICOA and Lease**

22. During the orientation, CRST presented Drivers with an ICOA and a CRST Lincoln Sales, Inc. Equipment Lease (With Maintenance)" (hereafter "Lease"), as a single package.

> Support: App. 317-318 (Doc 257-2 at ¶¶5, 8); App. 281-283 (Doc 113-5 at ¶¶9,10,13-15); App. 285-287 (Doc 113-8 ¶¶10-14); App. 289-291 (Doc 113-9 ¶¶8-10, 14); App. 196-197, 225-228 (CRST 30(b)(6) Abernathy Tr. 95:14-98:17 (During orientation, CRST presents Drivers with an ICOA and Lease)).

23. Both the Lease and the ICOA are pre-printed, non-negotiable form contracts drafted by CRST Lincoln Sales and CRST, respectively.

> Support: App. 281, 283 (Doc 113-5 ¶¶14, 15); App. 285-287 (Doc 113-8 ¶¶13-14); App. 289, 291 (Doc 113-9 ¶¶13-14); App. 27-28, 82 (CRST 30(b)(6) Brueck, Tr. 222:07-222:08 (The "ultimate responsibility for the content of the ICOA is [] on CRST."));  App. 9-10, 13, 319-341 (Lincoln Sales

30(b)(6)(6) Tr. 57:14-57:25, Exhibit 3 (hereinafter "Lease") (Testifying that Exhibit 3 is the standard Lease provided to Lease Operators. There have been no substantial changes to the lease since 2015.)).

24. The Lease and ICOA were materially the same for all Drivers.

Support: App. 281-283 (Doc 113-5 ¶13); App. 285-286 (Doc 113-8 ¶12); App. 289-291 (Doc 113-9 ¶12); App. 9-10, 13, 319-341 (Lincoln Sales 30(b)(6)(6) Tr. 57:14-57:25, Exhibit 3 (Exhibit 3 is the standard Lease provided to Lease Operators. There have been no substantial changes to the lease since 2015.)); App. 196-197, 235 (CRST 30(b)(6) Abernathy Tr. 114:10-114:20 (CRST reviews the ICOA and Lease with Lease Operators, before the specific information regarding the equipment receipt is filled out.)); App. 547 (Doc 276 at 24 ("It is established in the record that [Drivers] signed materially uniform contracts and adhered to materially uniform policies set by CRST.")).

25. The ICOA provided that the Driver would lease the truck that the Driver obtained from CRST Lincoln Sales back to CRST for CRST's "exclusive possession, control and use," provide "professional truck driving services" for the truck, and be responsible for all costs of operating the truck, including, *inter alia,* fuel, insurance and maintenance. costs. In exchange CRST promised to pay a fixed percentage of the load revenue to the Driver, which amount CRST could change on 20-days notice. The ICOA also provided that CRST "does not agree to make any minimum use of the Equipment at any particular time or location, or to furnish any specified number of loads or pounds of freight to the Contractor or to guarantee any amount of revenue to Contractor."

13

Support: App. 93-97, 122-125 (ICOA ¶¶ 1, 2, Appendix B).

26. Other provisions in the ICOA included:

a. Drivers must agree "to have the Equipment operated using two-driver teams only" except temporarily for such things as dropping off or picking up a team driver.

Support: App. 93-94 (ICOA ¶1(B)).

b. Drivers can comply with the requirement that they have a "team driver" by agreeing to accept an inexperienced CRST employee driver as their team driver, or hiring their own team driver subject to CRST's approval.

Support: App. 93-94, 99-100 (ICOA ¶1(B), ¶4(D) (Driver must authorize CRST to access driver files "as part of the driver qualification process")); App. 289, 292-293 (Doc 113-9 ¶¶25, 26).

c. CRST retains the right to disqualify any driver of the leased Equipment, including the ICOA Driver himself, CRST employee drivers acting as team drivers, and any other team driver.

Support: App. 93, 100 (ICOA ¶4(D)(3)).

d. Drivers were paid weekly through settlements that listed the gross compensation Drivers earned for completed loads and the deductions taken by CRST for lease payments, advances of costs of operation, and other monies advanced by CRST.

Support: App. 93, 97, 109-121 (ICOA ¶3, Appendix A (listing deductions)); App. 289, 293-294 (Doc 113-9 ¶32).

14

e. Drivers were required to install a communications and electronic onboard recorder system (Omnitracs system). Equipment leased from CRST Lincoln Sales had this equipment already installed in the vehicle. This system recorded and transmitted to CRST information regarding Drivers' duty status (i.e. on-duty, sleeper berth, driving; on-duty not driving; location of the Equipment; distance traveled and crossing of State lines; load information; fuel use; speed, and hard-breaking events).

> Support: App. 93, 99, 126-127 (ICOA ¶4(C)(3) and Appendix E).

f. Drivers were required to fund and maintain a mandatory $2,000 general escrow fund through deductions of $75/week from weekly settlements. These funds were controlled by CRST, which was authorized to use them to satisfy any operating cost advances or other charges owed to CRST.

> Support: App. 93, 103, 113, 119-120 (ICOA ¶8(A)(1), ¶8(B)(1), Appendix A ¶4, Appendix A ¶8(A)).

g. Drivers were required to fund and maintain a mandatory $250 maintenance reserve through settlement deductions at a rate of $.01 per mile.

> Support: App. 93, 103, 119 (ICOA ¶8(A)(2), Appendix A ¶8(B)).

h. The ICOA could be terminated without cause on 20-days notice or immediately for cause, including failure to comply with customer or CRST policies and procedures, or any other material breach of the ICOA.

> Support: App. 93, 108 (ICOA ¶14(C) (either party can terminate upon 20-day written notice)); App. 93, 108 ICOA ¶14(D) (listing reasons ICOA could be unilaterally terminated immediately including,

15

inter alia, Contractor's "violation of, or failure to fully adhere to and perform . . . Carrier Policies and Procedures"))); App.342 (CRST005033 (Termination can occur at any time for any reason upon 20-day written notice. Driver should continue to work during the 20-day notice, because weekly deductions will still occur)).

27. Equipment leases generally ran for more than a year.

> Support: App. 9-10, 17-18 (CRST Lincoln Sales 30(b)(6) Depo Tr. 73:16-74:7 (Referring to the length of a Lease Operators' Lease, "The range, we have sometimes done brand-new trucks, so that range might be, you know, over whatever weeks of 36 or 40 months is, into probably in the—a rough range would probably be 90 to 130, 140, outside of a brand-new truck, but I'm not certain about that. I'm giving you a rough range.")).

28. The Lease required the Driver to maintain an ICOA with a Motor Carrier, who was identified in the Lease as CRST.

> Support: App. 319, 328-329 (Lease ¶12.g); App. 319, 334 (Lease at CRST000140—Authorization and Assignment identifying CRST Expedited, Inc. as "Carrier")).

29. The Lease provided that the Lease could be declared in default, *inter alia*, if the ICOA with CRST were terminated by the Driver or CRST, or if the Driver failed to pay his lease payment within 10 days of the due date.

> Support: App. 319, 328-329 (Lease ¶12 (Events of Default)).

30. In the event of default, the Lease provided, *inter alia*, that CRST could immediately repossess the truck and accelerate all remaining Lease payments, and CRST may take the security deposit and/or any money in any escrow fund under the Lease Operator's ICOA to pay for,

16

*inter alia*, all accrued and unpaid lease payments owed for all periods prior to the termination and to repair the truck or replace items in the truck, to return the truck to the location designated in the event there is not enough funds to do so. *See* Lease ¶13(f) (remedies for default). CRST was also authorized to pursue "all available legal means, any additional amounts Lessee owes, or comes to owe, Lessor under this lease." *Id.*

> Support: App. 319, 329-330 (Lease ¶13(f)); App. 9-10, 22 (Lincoln Sales 30(b)(6) Tr. 99:09-99:22); App. 93, 102 (ICOA ¶6(A) (authorizing CRST to seek any debt through collections)); App. 343-346 (PLT-LM-00006-PLT-LM-00009 (Lease Operator who left CRST and returned asking why amount that he owed CRST when he first left is still appearing on his credit report since he established a payment plan with CRST and is currently paying off his old debt through his current settlement statements)); App. 548-549 (CRST009790-1 (collections agency letter seeking payment of $2,274.80 for Lease Operator's purported debt to CRST)).

31. CRST could terminate employee drivers at will.

> Support: App. 347 (CRST001983 ("All employment at the Company is 'at-will'")); App. 550 (CRST009978).

**D. Lease Operators' Compensation**

32. CRST generally paid Drivers at the rate of 70% of the linehaul revenue billed to the customer.

> Support: App. 27-28, 79 (CRST 30(b)(6) Brueck, Tr. 179:06-179:23); App. 129 130, 138 (Lappe Depo Tr. 24:19-24:22 (CRST paid Drivers 70% of the linehaul)).

17

33. Lease Operators had no ability to negotiate the percentage they were paid.

> Support: App. 27-28, 82 (CRST 30(b)(6) Brueck, Tr. 222:07-222:08); App. 162-163, 192-194 (Klopp Depo. Tr. 123:16-123:24, 124:22-125:03); App. 93-94, 121 (ICOA, Appendix B—Section 1(A)); App. 27-28, 79 (CRST 30(b)(6) Brueck, Tr. 179:06-179:23).

34. For the loads CRST offered Drivers, CRST sets the price it charged customers for loads, and CRST negotiates the handling requirements or pick-up and delivery times with its customers.

> Support: App. 1, 6-7 (Doc 155 at ¶ 79 ("Defendants admit that Expedited negotiates rates with its customers for loads hauled by independent contractor drivers . . . .")); App. 93, 97 (ICOA ¶ 3(B) ("Carrier has the exclusive right to set the rates and amounts charged to Carrier's customers, shippers, consignors, or consignees, and nothing in this Agreement shall be construed to limit that right.")); App. 27-28, 36-37 (CRST 30(b)(6) Brueck, Tr. 29:21-30:05 (Drivers do not negotiate prices for loads)); App. 490-491, 520 (Reges Depo Tr. 160:19-160:25 (Drivers do not have any role in determining the rate for loads CRST offers them)); App. 27-28, 34-36 (CRST 30(b)(6) Brueck, Tr. 27:25-29:08 (Deponent answered "Yes" to the question: "Leaving aside the load board loads that are brought to CRST Expedited, all the other loads, the 95-plus percent are loads where the price and pickup time, those sorts of issues are negotiated by CRST, sales or customer service, correct?")).

35. CRST unilaterally controlled the number and location of loads offered to Drivers, ICOA ¶1(C), and the rate paid for hauling those loads, ICOA ¶3(B), and decided whether a Lease Operator would receive pay for detention expenses and accessorial services through its exclusive right to decide whether to bill a customer for those items.

> Support: App. 93-94 (ICOA ¶ 1(C) (controlled loads offered)); App. 93, 97 (ICOA ¶3(B) (controlled rate)); App. 93, 101 (ICOA ¶5(F)(1) ("Contractor is responsible for detention expense and accessorial services expense except when Carrier, in its sole discretion, elects to bill and actually collects either type of expense from a customer, in which event Carrier shall pay Contractor the percentage of such amounts specified in Appendix B (Contractor Compensation)")).

36. CRST required Drivers to fund mandatory escrow and maintenance accounts under CRST's control and required Drivers make a written and oral request to CRST to spend money from these accounts.

> Support: App. 93, 103 (ICOA ¶¶8(A)(1), 8(A)(2), 8(B)); App. 9-10, 23-24 (Lincoln Sales 30(b)(6) Tr. 102:25-103:08).

37. CRST set the levels of insurance Drivers were required to maintain and the kind of companies from whom they could obtain insurance.

> Support: App. 93, 105-107 (ICOA ¶10(B) (requirements and policy limits for bobtail liability insurance, workers compensation, occupational accident coverage, passenger insurance, cargo loss, damage and delay insurance, and other insurance)); App. 93, 107 (ICOA ¶10(C) ("Contractor shall procure insurance policies providing the above-described required

coverages solely from properly-licensed insurance carriers that are A.M. Best 'A'-rated (or of equivalent financial strength in the commercially-reasonable judgment of Carrier), and Contractor shall not operate the Equipment under this Agreement unless and until Carrier has determined that the policies are acceptable (Carrier's approval shall not be unreasonably withheld).")).

38. CRST required Lease Operators to provide CRST with proof that they complied with their tax obligations.

   Support: App. 93, 105 (ICOA ¶9(E)(2)).

39. CRST employee drivers are generally paid by the mile.

   Support: App. 27-28, 77-78 (CRST 30(b)(6) Brueck Tr. 171:14-172:03 (CRST paid company drivers by the mile, except for some company drivers who CRST paid a flat weekly rate)).

40. Lease Operators were generally compelled to haul as many loads and miles as possible to make money and avoid falling into debt.

   Support: App. 348-351 (Lease Operator Michael Dosier Depo Tr. 29:24-30:08 ("I mean technically you're only getting paid if those wheels are moving. So the more miles you put on that truck, the more money you're going to make."); App. 352-355 (Named Plaintiff Anthony Cervantes Depo Tr. 144:20-145:02 ("Question: I mean, ultimately, that's what you want to do is go from one load to the next because that increases the amount that you earn on each settlement week, correct? Answer: Yes. Question: Is that what you tried to do is to keep the truck moving, delivering loads?

Answer: Yes.")); App. 356-357, 359 (Lease Operator Linda Gravelle
Depo, June 22, 2021, Tr. 68:02-68:15 (Explaining that she stopped
working as a Lease Operator for CRST, because "I'm not working just to
make truck payments– and to go into debt again.")); App. 364-366 (Lease
Operator Jacob Fapohunda Depo Tr. 71:16-71:25 ("[Y]ou know, sad to
say this, but it's the same thing as if—as if you were an employee driver.
If you don't drive, you don't get paid, and on top of that, I mean, if you
don't drive, you go into debt . . .")).

41. Lease Operators had weeks in which following CRST's  deductions, the Lease Operators
received no payments whatsoever and fell into debt to CRST.

> Support: App. 281, 284 (Doc 113-5 ¶24); App. 289, 292 (Doc. 113-9 ¶24); App.
> 364-365, 367 (Lease Operator Jacob Fapohunda Depo Tr. 132:16-132:21
> (So, you know, regardless of how much I wanted to work and how much I
> did work, there were times where, you know, I could end up with, like, a
> hundred dollars or - - I remember one time I ended up negative.")); App.
> 368-370 (Lease Operator Alissa Powers Depo Tr. 137:07-137:22
> (testifying that there were weeks that she owed CRST money despite
> having worked)); App. 371-373 (Lease Operator Sheddrick Miller Depo
> Tr. 115:10-115:24 (testifying that there were weeks he received a negative
> settlement, where his expenses were more than his revenue, after hauling a
> load for CRST)).

**E.  Driver Operations**

42. CRST controls the loads it offers to Lease Operators.

> Support: App. 27-28, 39 (CRST 30(B)(6) Brueck Tr. 32:21-32:23 ("I would say

that our Planning Team determines which loads to offer to which drivers and contractors")); App. 27-28, 42-46, 47, 88-90 (CRST 30(b)(6) Brueck, Tr. 36:12-40:13, 45:07-45:10, Brueck Errata Sheet (CRST's planners assign or offer loads to available trucks based on factors such as "available capacity, number of loads needing cover[ed] for customers, empty miles, tractor availability, driver need," ability to meet customer requirements, the ability to make the transit requirements regarding time, or whether it was a high-value load, and without regard to whether the truck is driven by a company driver or Lease Operator.)); App. 162-163, 169-170 (Klopp Depo Tr. 56:15-57:04 (planner's goal was to make sure CRST's customer's freight was taken care of, so "it did not make too much difference if it was a company driver or a lease-operator driver that was committed to taking care of the load")).

43. Prior to sometime in mid- 2022 or thereafter, CRST Lease Operators were generally offered one load at a time.

> Support: App. 162-163, 171 (Klopp Depo Tr. 66:02-66:05); App. 490-491, 496 (Reges Depo Tr. 75:04-75:08).

44. Occasionally, CRST offered successive loads to Lease Operators if a Lease Operator requested to be routed to try to get closer to home or if the Lease Operator was heading to an area where there was extra freight.

> Support: App. 27-28, 57-58 (CRST 30(b)(6) Brueck, Tr. 87:16-88:22 (CRST may offer multiple loads to a Driver if the Driver indicates for example, "'I want to go home in three days,' and rather than make them pay for their own fuel and deadhead, we may offer them a load to a location that's not their home followed up by a load that is—destined for their home.")).

45. Lease Operators who rejected loads had no way of knowing when CRST would offer another or what load would be offered, leaving them unable to determine whether rejecting a load would help or hurt them.

> Support: App. 162-163, 172-173 (Klopp Depo Tr. 69:06-70:05); App. 27-28, 59-60 (CRST 30(b)(6) Brueck, Tr. 90:21-91:19 ("I certainly think there has been times where we've asked the fleet manager to have more contextual conversation with the contractor in terms of what other freight is available, if there's freight available, what this load refusal may mean for the next load to give the full context of the decision-making to the contractor, but I would say in a vast, vast majority of those cases, the next line of communication, if no truck is available, is to the Customer Service Team to reschedule the load according to next available capacity.")); App. 299-300, 310-311 (Lease Operator Delvin Cato Depo Tr. 111:21-112:09 (testifying that when he spoke to his fleet manager about possibly rejecting a load, "She would be the one that told me, hey, this is all we got right now, so if you don't take this load, you know, all I can try to do is get you something else. But you never know how long that something else is going – that other load is going to take. It could be within the next hour; it could be a couple days before you get another load. Just sitting.")); App. 374-376 (Lease Operator Tabitha Meeks Depo Tr. 84:05-84:11 ("And I was going to say, I only rejected two loads, I think, the whole time I was there. But everybody that I know, they said the same thing. If they turned down a load, they would have to sit for a couple of days before they got anything else.")); App. 379-381 (Lease Operator Roderick Fisher Depo Tr. 152:03-152:14 (Explaining that as a Lease Operator, he sometimes chose to accept a load, because he could turned down a load "that you deem is not profitable, and you get another load that's even less profitable.")).

23

46. Drivers rarely rejected loads because of lease payment obligations and risk that next load may not be better or may be delayed.

> Support: App. 299-300, 310 (Lease Operator Delvin Cato Depo Tr. 111:03-111:19 ("For the most part, we pretty much ran whatever they gave us, because sometimes—it was a few times I tried to turn a load down because I was uncomfortable with taking a trainee in a certain weather situation, but they still, you know, I still ended up doing it because of the fact of, hey, if you don't take this load, you know, you may not be able to get any.")); App. 299-300, 311 (Lease Operator Delvin Cato Depo Tr. 112:12-112:24 (testifying that he rejected loads "maybe a couple of times. Once you do it so many times, you're not going to keep doing it. You are going to take whatever you can to keep your truck moving.")); App. 382-385 (Lease Operator James Edden Depo Tr. 42:13-43:02 (In response to question of how he decided whether to accept or reject a load, Lease Operator Edden testified in part, "I kind of took most of the loads they sent me, though, because I—you never knew when the next load was going to come to you."));App. 356-357, 358 (Lease Operator Linda Gravelle Depo, Volume I, Tr. 47:05-47:22 (Explaining that she could not refuse any load she wanted, [b]ecause on Friday afternoon, if you turn down a load, and they don't give you anything else, you're going to be sitting all weekend, and the payment is still due on Tuesday, regardless.")).

47. When Drivers reject loads, CRST had sole discretion as to whether, when and what load to next offer the Driver.

> Support: App. 27-28, 59-60 (CRST 30(b)(6) Brueck, Tr. 90:23-91:19); App. 386-389 (Lease Operator Whisenton Depo Tr. 95:14-96:20); App. 299-300, 311 (Lease Operator Delvin Cato Depo Tr. 112:12-112:24 (following

rejection of load, Driver was required to sit and wait for another load at which point "You are going to take whatever you can to keep your truck moving.")).

48. Drivers were fearful that turning down loads could displease dispatchers and adversely affect the loads CRST offered them.

> Support: App. 289, 295 (Doc. 113-9 ¶43 (CRST assigned Drivers loads that were not profitable, but if a Driver refused such a load, CRST could punish the Driver by requiring him or her to sit and wait before they assigned another load.)); App. 391-394 (Lease Operator Gabriel Placide Depo Tr. 109:22-110:07 ("They controlled my loads, basically. They, basically, controlled my loads. You could say I had the option, but if I didn't drive, I didn't pick that option, they'd advise you that your dispatcher could give – the planning team could get mad and mess up your potential earnings by, you know, turning down loads, so they'd precaution you that. So, you don't want to turn down loads around CRST or you'll get punished.")); App. 386-390 (Lease Operator Anthony Whisenton Depo Tr. 95:02-97:02 (Explaining that after rejecting a load he felt like he was spoken to "like I was some kind of bad guy or I don't know what's going on, and you doing something wrong by calling in and rejecting a load because I can only make the decision based on what information is presented to me. . . .")).

49. Until at least 2022, when CRST did not provide a Driver with a load to carry, Drivers had the ability to contact certain sources about available loads. If a load is available, the Driver can suggest that CRST handle the load by sending CRST's Customer Service Team the load tender, i.e., details regarding the load including the rate.

> Support: App. 27-28, 34 (Expedited 30(b)(6) Brueck, Depo Tr. 27:15-27:19 (Drivers can send CRST's Customer Service Team information about loads from brokers)); App. 490-491, 525-526 (Reges Depo Tr. 195:10-

25

196:07); App. 395-396, 408-411 (Lizer Depo Tr. 102:20-106:18
(Testifying that previously CRST did not allow Drivers to broker loads if
they rejected a CRST load, but CRST changed its policy in approximately
2022 and now permits Drivers to broker a load after rejecting a CRST
load)).

50. CRST provided Drivers with a list of brokers that they could contact for such purposes.

Support: App. 490-491, 526-528 (Reges Depo Tr. 196:12-198:04 (Referring to
Exhibit 24 as a document) CRST provides Lease Operators, which
includes a list of brokers.)); App. 395-396, 408-409 (Lizer Depo Tr.
102:20-103:19).

51. CRST exercised discretion as to whether to approve any load a Driver suggests.

Support: App. 490-491, 526-529 (Reges Depo Tr. 196:12-199:25 (Referring to
Exhibit 24 and explaining that CRST has the discretion to deny Drivers'
requests to haul a brokered load that contains violates any of the
provisions listed in Exhibit 24, or if CRST has "a surplus of loads sitting
in a location and the contractor wants to book their own, we do not do that
typically because of service to the customer)); App. 536 (Reges Depo
Exhibit 24 (Provides that Drivers cannot broker a load with the
following—temp control; freeze protection; non dry van trailers; plated
trailer; Anheuser Busch loads; loads that require you to haul over 45,000
lbs.; government facility loads for PU or Delivery; wet battery Loads;
commodity check- no paper rolls; no HV loads over $250,000 in value; no
driver assist loading/unloading; CRST deems non-haul.)); App. 490-491,
530 (Reges Depo Tr. 200:02-200:22 (explaining that a Driver must send
the load tender to CRST, because "[t]he load has to be entered into our
system before they should go and haul it."")).

52. Prior to 2022, if a Driver rejected a load CRST offered, CRST would not approve an alternative load suggested by the Driver.

> Support: App. 162-163, 176 (Klopp Depo Tr. 79:04-79:06 ("If CRST had freight available for the driver, they either took that freight or they took no freight.")); App. 395-396, 410 (Lizer Depo Tr. 104:03-104:14 (Until 2022, Lease Operators could not broker a load if they rejected a load that CRST offered.)); App. 360-361, 362-363 (Lease Operator Linda Gravelle Depo, 2nd Volume, Tr. 26:16-27:04 (After rejecting a load CRST offered, "I had no control over my pay at that time, and if they don't offer you a load and you tell them you want to look at the load board and find a load, they could reject any load that you sent in that you wanted to do. Because, when you find a load, they make it their load, and then they assign it to your truck.")).

53. When CRST agrees to haul a load that a Driver suggests, the load becomes a CRST load, and CRST processes the load in its system the same way that it processes an internal CRST load, in that CRST bills the customer, issues a freight bill, pays Drivers applying the same percentages in the ICOA, Appendix B and the same pay deductions it applies to any CRST load.

> Support: App. 27-28, 54 (Expedited 30(b)(6) Brueck, Tr. 70:15-70:18 (Once a brokered load is approved, CRST treats it the same as any other load "in terms of booking into our system and subsequently billing . . . ."); App. 490-491, 531 (Reges Depo Tr. 212:13-212:21 (CRST bills the customer and issues a freight bill to the customer)); App. 490-491, 532-533 (Reges Depo Tr. 213:15-214:12 (The Drivers' compensation for the brokered load is subject to the same compensation provisions in Appendix B of the ICOA.)).

27

54. Of the loads Drivers haul, a very small percentage of them are loads that Drivers suggested and CRST accepted.

> Support: App. 27-28, 34-35 (Expedited 30(b)(6) Brueck, Tr. 27:25-28:17 (Of the loads CRST carries, approximately 1 to 2 percent are trips that ICs bring to CRST from a load board.)); App. 162-163, 177-179 (Klopp Depo Tr. 81:12--83:13 (As a driver manager, deponent testified that Drivers in his fleet did not broker more than two loads per month, including when his fleet of Drivers were busy and hauled approximately 900 loads in a month.)).

55. Prior to 2019, "driver and fleet managers had the ability to enter . . . a rating from 1 to 6, which was, effectively, the transit capabilities of that particular [employee] driver or contractor." App. 27-28, 48-49 (CRST 30(b)(6) Brueck, Tr. 50:25-51:09). The rating system applied to both employee drivers and Lease Operators.

> Support: App. 27-28, 49 (CRST 30(b)(6) Brueck, Tr. 51:11-51:21 (Deponent explained that "transit capabilities" means, "So let's say I have a 2,000-mile load and the customer has allotted us 40 hours to get there. That's, effectively, a 50-mile-per-hour transit on average. If a driver or contractor has repeatedly shown that when offered and accepting those types of loads they deliver those late, we would indicate in the system that that driver does not have the capability or wherewithal to deliver that 50-mile-an-hour transit or greater. So in order to meet customer requirements, we would look for trucks coded as, call it, 50 miles per hour or greater.")); App. 27-28, 50 (CRST 30(b)(6) Brueck, Tr. 52:18-52:19 (concerning a drivers' rating, "95 percent of the determination was their ability to pick up and deliver freight on time.")); App. 27-28, 51-53 (CRST 30(b)(6) Brueck, Tr. Tr. 54:22-56:14 (The rating system applied to both employees drivers and independent contractors.)).

56. When CRST utilized the rating system prior to 2019, CRST's planners had visibility to Lease Operators' speed codes when deciding which loads to offer Lease Operators.

> Support: App. 27-28, 52-53 (CRST 30(b)(6) Brueck, Tr. 55:22-56:04 ("As a planner, if I had a customer that I knew we were having service issues with or I had a customer that had very high transit requirements, I certainly would prefer to utilize a team that was coded as a one-or two-speed team on that load.")); App. 27-28, 61 (CRST 30(b)(6) Brueck, Tr. 105:02-105:05 ("[W]hen that [rating] system existed, if a contractor or driver had shown repeated ability to service freight on time, that more freight options came available to them, potentially.")).

57. In July or August of 2022, CRST began offering Lease Operators who drove with a non-CRST employee co-driver access to CRST's load board, which "is a new technology we offer to our independent contractor partners that they can now see all the freight within our network and plan themselves on it." App. 396-396, 413 (Lizer Depo Tr. 126:12-126:20). As of a December 2022 deposition, the load board was not fully in effect; instead only a small portion of Lease Operators—those that operate as a team, and not those who drive with a student driver—had access to the load board and only if CRST authorized the particular Lease Operator to have access to the load board.

> Support: App. 395-396, 413-414, 417-418, 424-424, 425-426, 436 (Lizer Depo Tr. 126:12-126:20, 126:21-127:16, 130:17-131:13, 136:07-137:24, 138:17-139:02, Lizer Errata sheet at pg. 178); App. 490-491, 497 (Reges Depo Tr. 76:08-76:13).

58. The only loads available to Lease Operators with access to the load board are "loads that are not already committed or planned on another truck," including loads that CRST could have assigned to Company Drivers.

> Support: App. 395-396, 415-417 (Lizer Depo Tr. 128:24-130:14).

59. CRST no longer offers Lease Operators any freight when they start using CRST's load board.

> Support: App. 395-396, 417 (Lizer Depo Tr. 130:17-130:22).

60. CRST, in its sole discretion, controls which Lease Operators have access to the load board.

> Support: App. 395-396, 424 (Lizer Depo Tr. 137:19-137:24 (CRST can exercise discretion in allowing a Lease Operator to use CRST's load board)); App. 395-396, 425-426(Lizer Depo Tr. 138:17-139:02).

61. Lease Operators can lose access to the load board if CRST is dissatisfied with their performance including if the Lease Operator is late delivering or picking up freight.

> Support: App. 395-396, 420, 434 (Lizer Depo Tr. 133:02-133:15; Exhibit 58 to Lizer Depo at CRST050043 (CRST email stating that Lease Operators who "cannot perform on time per expectations, you will risk losing access to the load board to plan your own freight.")).

62. CRST instructed Lease Operators regarding the pick-up and delivery schedules.

> Support: App. 27-28, 35-36 (CRST 30(b)(6) Brueck, Tr. 28:19-29:08 (Answering "yes" to the question of whether "95-plus percent [of loads] are loads where the price and the pickup time, those sorts of issues are negotiated by CRST, sales or customer service . . .")); App. 162-163, 185 (Klopp Depo Tr. 99:12-99:20).

63. CRST generally does not permit Lease operators to contact customers to change drop off or pickup time and cannot negotiate changes in schedule; such communications were supposed to go through CRST's Customer Service Team.

> Support: App. 162-163, 189-190 (Klopp Depo Tr. 116:22-117:05 (responsibility of delivering and picking up the load on time "fell to CRST . . .")); App.

162-163, 190 (Klopp Depo Tr. 117:06-117:17); App. 437 (CRST004384 ("When your fleet manager gives you an appointment keep it! . . . You must immediately notify Operations at the first indication that a late delivery may occur. . . . Failure to communicate a late load to Dispatch will result in disciplinary action.")); App. 27-28, 38-39 (CRST 30(b)(6) Brueck, Tr. 31:24-32:15 (communications with customers as it relates to rescheduling or setting delivery appointments, "should go through [CRST's] Customer Service Team.")).

64. Lease Operators are required to notify CRST "when a shipment is picked up, delivery has been made and if there is going to be a delayed pickup or delivery."

> Support: App. 196-197, 253 CRST 30(b)(6) Abernathy Depo, Exhibit 16 at CRST005021; App. 196-197, 229-230 (CRST 30(b)(6) Abernathy Tr. 101:10-102:04 (Exhibit 16 provides speaking points as CRST reviews the ICOA with Lease Operators)); App. 101 (ICOA ¶ 5(C) (Lease Operator agrees to notify CRST "when delivery has been made or when delivery will be delayed for any reason.")).

65. CRST had the authority to prohibit Lease Operators from taking certain routes and used that authority.

> Support: App. 490-491, 501 (Reges Depo Tr. 92:04-92:12 (CRST prohibits all lease operators from driving on I-70 west of Denver)); App. 490-491, 501-502 (Reges Depo Tr. 92:18-93:02 (CRST prohibits Lease Operators and company drivers from driving on certain roads because of weather)); App. 395-396, 427-428, 430-431 (Lizer Depo Tr. 167:23-168:21, 171:22-172:02 (testifying that CRST has issued prohibitions for weather even

31

when the Department of Transportation has not issued one, and if a Lease

Operator drives in a weather shutdown zone, CRST's safety and

operations departments will receive an e-mail notification)).

66. CRST could terminate a Lease Operator's Lease if they repeatedly operated in CRST's

weather shutdown areas, or if they fail to be on time for pickup or delivery.

Support: App. 395-396, 426, 429, 436 (Lizer Depo Tr. 139:09-139:23,169:05

169:16, Lizer Errata Sheet at pg. 78.).

67. Drivers must follow CRST's customers' rules regarding process and behavior in their yard,

and CRST enforces Lease Operators' compliance with those rules.

Support: App. 162-163, 183-184 (Klopp Depo Tr. 97:21-98:05); App. 93, 97-100

(ICOA ¶ 4).

68. CRST had the right to re-power loads assigned to Lease Operators (i.e. re-assign the load to

a different driver).

Support: App. 162-163, 189 (Klopp Depo Tr. 116:02-116:21 (If a Lease Operator

is committed to a load, but something happens before the Lease Operator

is able to pick up the load, CRST would assign the load to another truck if

another truck could meet the pickup time. If a Lease Operator could not

deliver a load on time, CRST will assign the load to another truck if that

"is going to be the option that brings us closest to that delivery

window.")).

69. CRST requires Drivers to work in two-man teams unless they receive permission from

CRST to work alone.

Support: App. 93-94 (ICOA ¶1(B) (Drivers must agree "to have the Equipment

operated using two driver teams only" except temporarily for such things

as dropping off or picking up a team driver)); App. 196-197, App. 255

32

CRST 30(b)(6) Abernathy, Exhibit 17 ("To meet CRST's needs as a team carrier, you agree to operate the equipment and services are performed as a two-driver team unless permission is given otherwise."); App. 196-197, 229-230 (CRST 30(b)(6) Depo Abernathy, Tr. 101:14-103:22 (explaining that Exhibit 17 is used to review the ICOA during orientation at the time of the deposition)); App. 196-197, 229-230 (CRST 30(b)(6) Abernathy Tr. 101:14-102:20 (explaining that Exhibit 16 is the annotated ICOA that was used during orientation with Drivers between approximately 2017 to 2020)); App. 196-197, 252 (CRST 30(b)(6) Abernathy, Exhibit 16 at CRST005010 ("To meet CRST's customer's needs as a team carrier, you have entered into a lead driver addendum or are signing on as a team.")).

70. Lease Operators must obtain approval from CRST for any team driver.

> Support: App. 93-94, 100 (ICOA ¶¶ 1(B), 4(D) ("Contractor shall provide competent professional drivers who meet Carrier's minimum driver qualification standards . . .")); App. 9-10, 21 (Lincoln Sales 30(b)(6) Depo Tr. 92:17-92:22 (Paragraph 6(a) of the Lease provides that the Lease Operator must get written permission from CRST to substitute another driver)).

71. CRST reserves the right to disqualify any driver, including the ICOA signatory.

> Support: App. 93-94, 100 (ICOA ¶¶1B(8), 1(B)(10), 4(D)(3) (CRST retains the right to disqualify any driver of the leased Equipment including the lease operator himself, CRST employee drivers acting as team drivers, and any other team driver.)).

72. CRST Lease Operators who started out as CRST employee drivers experienced the same level of control by CRST as they did when they were employee drivers.

Support: App. 438-439, 440-441 (Lease Operator Barry Robinson Depo Tr. 101:16-102:05 ("If you're lease purchase or owner-operator, you're supposed to have more say-so than a company– company driver. I almost felt like I was still a company driver the way the loads was– I had to ask them for loads or give me a load or I had to sit at a particular place waiting on loads almost like one, two or three days. And it seemed like if I was a lease purchase owner-operator, they shouldn't have been treating me like that way. I should have been like top priority, try to get a– load out of that spot, but– made me feel like I was still part of– you know, working the company, I was a company driver.")); App. 442-443, 444 (Lease Operator Adam St. Amour Depo Tr. 28:06-28:17 (In response to question of how being a lease purchase driver is different from a company driver, deponent responded, "It's not any different because, there's– there's– it's not any different. When I refuse a load and I get the same one the following day or it's not advised of refusing a load, when I tried to plan for getting loads, like with C.H. Robinson several times, they were turned down because of CRST's matrix. That's not any different. I wasn't allowed any control.")).

## F. MONITORING

73. CRST collects extensive data on company drivers and Lease Operators including, *inter alia*, location, speed, braking and other driving behavior and events, and pickup and drop off times, all of which is tracked electronically and readily accessible to CRST.

Support: App. 490-491, 514 (Reges Depo Tr. 145:06-145:15 (CRST's trucks are monitored by GPS, allowing CRST to find out where a particular truck is at a particular time)); App. 27-28, 65 (CRST 30(b)(6) Brueck Tr. 112:13-

34

112:22 (CRST, including driver managers, fleet managers, and planners, have access to employee's and lease operators' truck's GPS at any time)); App. 490-492, 514, 516-517 (Reges Depo Tr. 145:16-145:21, 147:25-148:11 (same)); App. 162-163, 186-188 (Klopp Depo Tr. 103:13-105:01 (CRST monitored GPS data and hours of service data on Lease Operators' and employee drivers' trucks)); App. 162-163, 180-181 (Klopp Depo Tr. 93:10- 94:03 (CRST utilizes third party to track GPS data and report any speeding event of 11 mph over the limit to CRST)); App. 27-28, 62 (CRST 30(b)(6) Brueck Tr. 109:07-109:18 (all employee driver trucks and Lease Operator trucks from Lincoln Sales have an electronic logging devices on their trucks that are either Maven or Omnitracs, which provide GPS locations)); App. 518 (Reges Depo Tr. 150:11-150:17 (if a Lease Operator brings their own electronic logging device on the truck, then CRST syncs the device with their system)); App. 162-163, 195 (Klopp Depo Tr. 136:5-136:23 (CRST maintains electronic files that its driver managers can access that tracks issues pertaining to Lease Operators including "speeding events, behavioral conduct events, e-logs events, stuff like that.")); App. 490-491, 514 (Reges Depo Tr. 145:16-145:21 (CRST's dispatching software regularly keeps track of where trucks are and relays that information to CRST staff)); App. 490-491, 514-517 (Reges Depo Tr. 145:25-146:17, 147:25-148:15 (dispatching software information shows the location of trucks for both company drivers and Lease Operators and is available to CRST's safety department, planning, and customer service departments and available to CRST's fleet managers for Lease Operators)); App. 395-396, 399 (Lizer Depo Tr. 51:14-51:24 (CRST tracks whether Lease Operator is on time to pick up a load based on the

digital macro that the Lease Operator sends CRST or the GPS location of the truck)).

74. The data CRST collects includes data available from an Electronic On-Board Recorder (referred to as "Communication System/EOBR,") that CRST requires Drivers to have and which records and permits CRST to have unlimited access to the following categories of data during the period of the Lease and for a reasonable time thereafter:

     i. Name of the driver and any co-driver
    ii. HOS Duty Status
   iii. Date and time the Equipment is in operation
   iv. Location of Equipment
    v. Distance travelled, including when equipment crosses state lines
   vi. Name and US DOT number of carrier
   vii. 24-hour period starting time
  viii. Multiday basis used by Carrier to compute cumulative duty hours and driving time
   ix. Hours in each duty status for the 24-hour period, and total hours
    x. Equipment number
   xi. Load information
   xii. Fuel use, including when Equipment is refuel[]ed
  xiii. Speed of Equipment
  xiv. Hard-braking events
   xv. Power-on self-tests and diagnostic error codes.

Support: App. 93, 126-127 (ICOA, Appendix E); App. 93, 126. (ICOA, Appendix E—"Carrier does not collect or store the Electronic information, but has access to the electronic information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the EOBR installed operates under lease to Carrier, and for a reasonable time thereafter.").

75. CRST also tracks and monitors Lease Operators' electronic hours of service logs required under Department of Transportation regulations.

Support: App. 162-163, 182-183, 187 (Klopp Depo Tr. 96:20-97:07, 104:05-104:12 (CRST tracked both Lease Operators' and company drivers' hours

36

of service ("HOS")); App. 27-28, 63-64 (CRST 30(b)(6) Brueck Tr. 110:17-111:05 (electronic logging devices on trucks record hours of service for company drivers' and Lease Operators, and CRST can see remaining hours for employee and Lease Operators)); App. 27-28, 66 (CRST 30(b)(6) Brueck Tr. 113:11-113:18 (Planners and fleet/driver managers have access to the hours of service remaining for both company drivers and Lease Operators)).

76. CRST retains the right to use the extensive data it collects including the data set forth in Paragraphs 61, 62, and 63 for any purpose it deems advisable, including discipline.

> Support: App. 93, 126-127 (ICOA, Appendix E (Lease Operator, and any other driver employed by Lease Operator, authorize CRST at any time to "access applicable driver files, FMCSA Safety Measurement System ("SMS") safety scores and other data, and FMCSA's Pre-Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter.")); App. 98-99, 108 (ICOA ¶¶4(C)(2), 14(D)); App. 445 (CRST023209 (Violation Policy Acknowledgement)); App. 162-163, 182-183 (Klopp Depo Tr. 96:23-97:17 ("I would assume that after repeated violations [of the hours of service requirements], their lease would be terminated.")).

**G. CRST Controls Lease Operators' Equipment**

77. CRST monitors Lease Operators' maintenance of the trucks they lease and tracks whether Lease Operators have the required preventative maintenance completed on their trucks.

> Support: App. 395-396, 400-402 (Lizer Depo Tr. 62:25-64:05); App. 9-10, 19-20 (Lincoln Sales 30(b)(6) Depo Tr. 90:20-91:13 (Lincoln Sales monitors whether the Lease Operator has performed the required maintenance and 40,000-mile inspection.)).

37

78. CRST requires Lease Operators to make their equipment available for inspection whenever requested by CRST; and requires Lease Operators to have their equipment inspected at least annually by CRST or at a facility approved by CRST.

> Support: App. 93, 98 (ICOA ¶ 4(A) ("Contractor shall make the Equipment available for Inspection by Carrier, at Carrier's expense, at any time upon reasonable request by Carrier. Contractor also shall have the Equipment Inspected, at Carrier's expense, once annually . . . either at Carrier's maintenance facility or another maintenance facility that Carrier authorizes.")).

79. CRST's ICOA required Drivers to give CRST "the exclusive possession, control, and use of the [Driver's] Equipment for the duration of this Agreement."

> Support: App. 93-95 (ICOA at ¶1(D) ("Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement.")).

80. CRST informed Drivers during orientation that they cannot work for anyone other than CRST while their contracts are in effect.

> Support: *See* App. 446-447, 448-449 (Lease Operator Justin Lomax Depo Tr. 121:15-122:13 (in response to question if whether he was aware that he could drive for any other motor carrier while at CRST, stating, "No. I knew that we were only allowed to pull CRST loads.")); App. 374-375, 377-378 (Lease Operator Tabitha Meeks Depo Tr 173:22-174:10 (during CRST's orientation, drivers were "told we couldn't" use the tractor to operator for another motor carrier, and she is not aware of anyone else doing so)); App. 450-451, 452-453 (Lease Operator Opt-In Eugene Thompson Depo Tr. 183:25-184:5 (while driving for CRST he did not drive for any other motor carriers. "That was forbidden.")); App. 162-163, 174-175 (Klopp Depo Tr. 72:12-73:09. (If a Lease Operator requested to

drive for another carrier, "we specifically would tell them that if you do that you won't have a lease with us anymore.")).

81. The terms of the ICOA impose the following requirements, among others, on Drivers who want to drive for an outside carrier while their CRST ICOA is in effect: (i) written permission from CRST; (ii) a written sublease between CRST and the outside carrier, by which the outside carrier agreed to accept exclusive possession of the truck and accept complete responsibility for the operation of the equipment during the duration of the sublease; (iii) proof to CRST's satisfaction from the sub-lease carrier that it has insurance meet specific standards set by CRST; and (iv) the Lease Operator had to remove or cover CRST's identification on the equipment and display the sublease carrier's identification.

   Support: App. 93, 95 (ICOA ¶1(E) (describing subleases and other alternative uses of Equipment—each of which require CRST's approval. Lease operator can sublease truck to another carrier only if CRST approves and lease operator provides CRST with a sublease signed by the other carrier and proof of the other carrier's insurance coverage, can use the lease operators' own motor vehicle authority but must provide extensive details to CRST including details about the motor carrier authority and the planned trip and must obtain a release from CRST and display the release number on a trip sheet to CRST or submit proof of obtaining a valid DOT number and provide information of the planned trips)); App. 93, 96 (ICOA ¶1(E)(3)(b), 1(E)(5)(a); 1(D) ("Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. Contractor may operate the Equipment for another motor carrier during this Agreement only with Carrier's prior written consent (which shall not be unreasonably withheld) and only if done under a sublease between Carrier and the other authorized carrier . . .")); App. 454-455, 456-457

39

(Lease Operator Michael Noble Depo Tr. 131:14-132:13 (never hauled a load for a motor carrier other than CRST while with CRST)).

82. Although the sublease carrier is responsible for paying the Lease Operator, ICOA ¶1(E)(2), the Lease Operator still must submit his log books to CRST, as well as the sublease carrier, and submit vehicle inspection reports to CRST for the duration of the sublease.

Support: App. 93, 97 (ICOA ¶¶1(E)(8) & (9)).

83. In addition to the requirements in Paragraph 69 and 70, the ICOA also requires a Driver to pay an "Alternative-Use-Fee" of $150 to $250 to CRST for each trip made for a sublease carrier.

Support: App. 93, 95 (ICOA ¶1(E)(2)(b)); App. 110-111 (Appendix A at ¶4 "Deductions Table" ("For Exempt Motor Carriage, a $250-per-trip Alternative Use Fee. For all other Alternative Uses of Equipment, a $150-per-trip Alternative-Use- Fee.")).

84. CRST has no evidence of any Driver driving for another carrier pursuant to the provisions of ICOA ¶1(D) & (E).

Support: App. 146-147 (Plaintiffs' Interrogatory No. 9 requested CRST to, "Identify, and state whether they are currently employed by or under contract with Defendants, any Driver given the authority to drive for another trucking company, including pursuant to ¶1(E) under the ICOA, while under contract or lease with Defendants." CRST's Response to Interrogatory No. 9, "CRST has no central collection of records reflecting owner operator requests to perform transportation services for other motor carriers while under contract with CRST and the results of such requests and is therefore unable to identify any such owner-operators."); App. 148 (CRST's Supplemental Response to Interrogatory 12 ("[N]o Discovery

40

Opt-In Plaintiff received authority from CRST to haul freight for another motor carrier while being party to an ICOA with CRST.")). *See also* App. 149 (CRST's Response to Request for Admission 1 ("CRST admits it made no deductions from settlement payments made to Opt-In Drivers for Alternative Uses of Equipment Fees as described in paragraph 4 of Appendix A of the ICOAs . . .")); App. 150 (CRST's response to Request for Production 69 (no responsive documents response to request seeking "documents containing or concerning requests by Drivers to haul freight for a motor carrier or entity other than CRST[] using Equipment leased to CRST[] pursuant to the Driver's ICOA.")); *See also* App. 9-10, 19 (Lincoln Sales 30(b)(6) Depo Tr. 90:04-90:07 (no awareness of any Lease Operators who have requested written permission from Lincoln Sales to sublease); App. 162-163, 174-175 (Klopp Depo Tr. 72:12-73:09 (CRST driver manager testifying "it was pretty explicit that they were not allowed to," and that if a Lease Operator requested to drive for another carrier, "we specifically would tell them that if you do that you won't have a lease with us anymore.")); App. 162-163, 175 (Klopp Depo Tr. 73:10-73:25 ("It was pretty well understood by everyone that the lease-operator drivers drove for CRST, not for other companies.")); App. 196-197, 232-233, 253 (CRST 30(b)(6) Abernathy Tr. 108:14-109:06 (Referring to Exhibit 16, the notes on the ICOA are speaking points for the presenter. Exhibit 16 at CRST005012 states, "CRST does not generally allow you to sublease your truck. . . .")); App. 196-197, 234-235 (CRST 30(b)(6) Abernathy Tr.

41

113:19-114:07 (Referring to Exhibit 17, "CRST does not generally allow you to sublease your truck. . . .")).

85. CRST prohibits Drivers from advertising their services by placing any paint, artwork, logo, or other design on their Equipment without CRST's express permission.

   Support: App. 93, 98 (ICOA Paragraph 4(B) ("At no time during this Agreement shall Contractor place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of Carrier, without Carriers' prior written consent pursuant to Section 1(E) of this Agreement (which consent shall not be unreasonably withheld).")).

86. CRST reserved the right to require a driver to repaint or remark the Equipment or remove paint that CRST deems offensive.

   Support: App. 93, 98 (ICOA ¶ 4(B)).

**H. Lease Operators' Lack of Investment**

87. In its discretion, CRST also offers Drivers cash advances when needed.

   Support: App. 27-28, 76-77 (CRST 30(b)(6) Brueck, Tr. 170:11-171:12 (CRST managers have authority to approve a certain amount of daily cash advances, and cash advance requests beyond the limit are referred up the chain to the operations manager and Ben Lizer. The same approval process applies for employee drivers and Lease Operators, but the cash advance limits are traditionally higher for Lease Operators than employees)).

88. CRST had extensive investment in its terminals, trailers, trucks, and infrastructure.

   Support: App. 458 (CRST001979 ("We are proud to say that we have grown to be one of the largest transportation companies in the United States, with over

42

1,200 office employees, 4,000 Company drivers and 2,500 independent

contractors.")); App. 459 (CRST002038 ("Headquartered in Cedar Rapids,

Iowa and with offices across the United States . . .")); App. 9-10, 25-26

(Lincoln Sales 30(b)(6) Depo Tr. 109:10-110:07 (In 2021, CRST spent

$3.2 million on inside maintenance, which is maintenance done at a CRST

Lincoln Sales Shop. CRST spent $2,641,732 on outside maintenance,

which is any maintenance done not at a Lincoln Sales shop. Both the

inside and outside maintenance costs are covered by the maintenance

provisions of the lease and these figures exclude any costs for employee

trucks.)).

89. Lease Operator's lease payments do not result in equity in their trucks. Lease Operators

have the option of purchasing the truck at the end of the Lease for the stipulated loss value,

plus additional payments—i.e. the value of the truck at the time of purchase.

Support: App. 319, 331 (Lease ¶ 19 ("PURCHASE OF THE EQUIPMENT. IF

LESSEE IS NOT IN DEFAULT, LESSEE MAY PURCHASE THE

EQUIPMENT AT THE EXPIRATION OF THE LEASE TERM FOR

THE STIPULATED LOSS VALUE AT THE TIME, AS SHOWN ON

SCHEDULE A, WHICH VALUE INCLUDES ADMINISTRATIVE-

COST REIMBURSEMENTS AND MARKUPS BENEFITING LESSOR.

IN ADDITION, LESSEE MAY REQUEST TERMINATION OF THIS

LEASE IN ORDER TO PURCHASE THE EQUIPMENT AT ANY

TIME DURING THE LEASE. IF LESSOR, IN ITS SOLE DISCRETION,

SHOULD GRANT SUCH REQUEST, SUCH TERMINATION SHALL

43

BECOME EFFECTIVE, AND LESSEE SHALL RECEIVE TITLE TO THE EQUIPMENT, ONLY ON PAYMENT OF THE STIPULATED LOSS VALUE AT THE TIME AS SHOWN ON SCHEDULE A, WHICH VALUE INCLUDES ADMINISTRATIVE-COST REIMBURSEMENTS AND MARKUPS BENEFITING LESSOR, PLUS ALL ACCRUED AND UNPAID OVERALL LEASE PAYMENTS OWING FOR THE EQUIPMENT FOR ALL PERIODS COMMENCING PRIOR TO SUCH TERMINATION.")); App. 9-10, 16 (Lincoln Sales 30(b)(6) Depo Tr. 60:06-60:25 (Referring to Exhibit 3 at CRST000127 and testifying that after the Named Plaintiff finishes his lease payments, he can buy the leased truck for a balloon payment of $5,000—the net book value, which has dropped over the lease due depreciation and wear and tear, plus the markup.)).

90. Part of the standard pre-printed ICOA package offered by CRST was the option to sign up for American Truck Business Services (ATBS), a company that assists Drivers to comply with self-employment requirements.

       Support: App. 93, 110 (ICOA at Appendix A, ¶4); App. 93, 128 (ICOA at Addendum-American Truck Business Services); App. 285, 287 (Doc 113-8 ¶18).

91. CRST offers to advance the cost of ATBS business assistance subject to deductions from weekly wages.

       Support: App. 93, 110 (ICOA at Appendix A, ¶4); App. 93, 128 (ICOA at Addendum-American Truck Business Services).

**I. The Relative Permanence of Lease Operators' Employment with CRST**

92. Lease Operators' ICOAs expire on October 1 of each year and are routinely renewed on satisfactory performance.

> Support: App. 27-28, 71 (CRST 30(b)(6), Brueck Depo Tr. 145:03-145:21 (ICOA is for a fixed term of one year and "as standard course of business, yes, those ICOAs are renewed for another year. I believe the contractor has to sign something that indicates they would also like to renew it for another year.")); App. 490-491, 493-494 (Reges Depo Tr. 51:23-52:16 ("We renew the ICOA every year in my knowledge– to my knowledge at least.")); App. 490-491, 495 (Reges Depo Tr. 53:04-53:07, 53:16-53:18 (ICOA is "renewed every year," so a new addendum is issued each year and lease operators always sign the addendum extending their ICOA for another year)); App. 93, 108 (ICOA ¶ 14(A) ("Term. This Agreement shall begin on the Effective Date and end on the Termination Date in the 'In Witness Whereof' paragraph just above the signature block below.")); App. 460-461 (CRST003864-5 (extending term of ICOA with revision date of September 2015 to October 1, 2017)); App. 462-463 (CRST003918-9 (extending term of ICOA with revision date of September 1, 2016 to October 1, 2018)); App. 464-465 (*C*RST003972-3 (extending term of ICOA with revision date of September 1, 2017 to October 1, 2019)).

**J. Training of CRST Student Drivers**

93. CRST certifies both Lease Operators and company drivers to act as "lead drivers" or "mentors," CRST's terms for employee drivers and Lease Operators authorized to train CRST's student drivers.

> Support: App. 162-163, 164 (Klopp Depo Tr. 30:20-30:22 ("[I]n general our lease-operator drivers would be certified as lead drivers at the time of their

hiring.")); App. 27-28, 67-68 (CRST 30(b)(6) Brueck Tr. 126:25-127:12

(65% to 70% of the Lease Operator fleet act as mentors)); App. 142-145

(CRST's Supplemental Response to Plaintiffs' Interrogatory No. 1(b) and

1(c) (Revised) (setting forth numbers of company drivers who trained

CRST employee student drivers)).

94. CRST student drivers were recent graduates of a driving school who had a CDL but required

instruction and practical driving experience.

Support: App. 27-28, 86 (CRST 30(b)(6) Brueck Depo, Exhibit 30 at CRST4565

("As part of the Carrier [driver training program], certain new driver-

candidate employees who are holders of a valid Commercial Driver's

License ("Student Drivers") are required to drive with an experienced

driver for Carrier ("Lead Driver") for a required period of time."

Continuing to describe the "Lead Driver function," as "the function related

to training individuals to be employee truck drivers for Carrier.")); App.

490-492 (Reges Depo Tr. 41:12-41:16 ("A student driver is by definition

inexperienced.")); App. 27-28, 56 (CRST 30(b)(6) Brueck, Tr. 79:23-

79:24 (CRST uses the term "trainee" to refer to company student

drivers.)).

95. CRST considered its student drivers to be employees of CRST throughout their training with

a lead driver.

Support: App. 27-28, 30 (CRST 30(b)(6) Depo, Brueck, Tr. 17:03-17:04

("Trainees are company drivers. . .")); App. 27-28, 86 (CRST 30(b)(6)

Brueck Depo, Exhibit 30 at CRST4565).

96. Driving with a CRST student driver satisfied the ICOA's team driver requirement.

Support: App. 93, 94 (ICOA at ¶1(B)); App. 142-145 (CRST's Supplementary

Response to Plaintiffs' Interrogatory No. 1(b) and (c) (Revised)).

46

97. CRST eligibility requirements to be a Lead Driver are the same for company drivers and Lease Operators.

> Support: App. 504-505 (Reges Depo Tr. 114:24-115:02 (trainers needed six months of experience)); App. 505-506 (Reges Depo Tr. 115:10-116:09, 137:17-138:07 (referring to Exhibit 29, there is no distinction between requirements to be a lead driver between company drivers and Lease Operators)).

98. Lease Operators and company drivers cannot be trainers if CRST has placed them on a CRST "watch list" document within the prior six months; a "watch list" document is issued by CRST if a driver has a history of safety issues prior to operating under CRST's authority.

> Support: App. 466-467, 468, 469 (Pump Depo Tr. 61:13-61:22, 63:16-63:22).

99. Lease Operators and employee drivers had to complete the same CRST training in order to be Lead Drivers.

> Support: App. 27-28, 70 (CRST 30(b)(6), Brueck, Depo Tr. 130:04-130:25 (lead driver training is one 8-hour day after new driver orientation concludes)); App. 196-197, 201 (CRST 30(b)(6), Abernathy Depo Tr. 27:02-27:11 (employee drivers and independent contractors who want to be lead drivers attend the same class)).

100. CRST controls the assignment of student drivers to Lease Operator lead drivers; if a student or Lease Operator wants to work with a particular driver, they must ask and receive approval from CRST.

> Support: App. 162-163, 190-191 (Klopp Depo Tr. 117:18-118:17).

101. CRST requires Lease Operators and company drivers to train its trainees on the same topics.

> Support: App. 196-197, 201 (CRST 30(b)(6) Abernathy Tr. 27:02-27:11 (testifying that Lease Operators and employee drivers who want to be lead

47

drivers attend the same class on the third day of orientation)); App. 162-
163, 166 (Klopp Depo Tr. 42:09-42:12); App. 490-491, 507-508 (Reges
Depo Tr. 126:18-127:05, Exhibit 32 ("Lead and Student Compliance
Agreement" setting "minimum guidelines" for lead drivers)); App. 490-
491, 509, 512 (Reges Depo Tr. 130:08-130:11, 143:12-143:24).

102. The training which CRST student drivers received from the lead driver to whom they
were assigned typically consisted of 21-28 days and 10,000–12,000 miles of driving; lead
drivers were also supposed to train CRST student drivers in CRST's policies, paperwork
procedures, and preferred G.O.A.L. driving method.

Support: App. 162-163, 164-165 (Klopp Depo Tr. 30:20-31:8); App. 395-396,
403-404 (Lizer Depo Tr. 74:10-75:09 (training is generally a minimum of
21 days at a minimum and 12,000 miles)); App. 395-396, 405 (Lizer Depo
Tr. 80:11-80:21 (Exhibit 32 is the Lead and Student Compliance
Agreement that outlines the expectations for lead drivers training
students)); App. 395-396, 432 (Lizer Depo, Exhibit 32 at CRST04973
("The Lead and "Ground guides will be used when backing or during any
low speed maneuvers when possible and G.O.A.L. Get Out And Look"));
App. 395-396, 433 (Lizer Depo, Exhibit 32 at CRST04979 ("Student can
log own hours and understands what duty line to be logged for each
task")); App. 490-491, 537 (Reges Depo, Exhibit 31 at CRST04959
("Student taught all CRST paperwork and process;" and "Student taught to
follow all DOT and CRST policies.")); App. 299-300, 301 (Lease
Operator Delvin Cato Depo Tr. 77:17-77:24 (Lease Operator Delvin Cato
trained each student for three to four weeks)).

103. CRST required Lease Operators training CRST employee drivers "to monitor and guide
Student Drivers' performance, . . . furnish at their expense, all labor, materials, equipment,

permits, licenses, fees, transportation, repairs, taxes, insurance, etc. whatever is necessary to perform the Lead Driver Services and provide insurance coverage for the student."

> Support: App. 27-28, 86-87 (CRST 30(b)(6) Brueck Depo, Exhibit 30
> (CRST004565-6 at ¶¶ 1(C), 1(D), 4)).

104. Generally, after the first three to five days of training, the lead driver (whether Lease Operator or employee driver) and the CRST student driver would take turns driving the truck just like any other pair of team drivers.

> Support: App. 490-491, 538, 507-508 (Reges Depo, Ex. 31, Tr. 126:18-127:05
> (Exhibit 32 is the Lead and Student Compliance Agreement and "the
> purpose is to set minimum guidelines on what a lead driver should be
> doing")), App. 490-491, 545 (Reges Depo, Exhibit 32 at CRST04973
> ("The Lead Driver will be on 'On Duty Not Driving' (line 4) while student
> drives for a minimum of their first 3 days notifying their [fleet manager]
> ASAP if that will exceed 5 days.")); *Id.* ("The entry level driver will not
> drive between midnight and 5:00am during the first five days of training.
> This applies even if the entry level driver has been approved to proceed to
> Team Operation."); App. 162-163, 167-168 (Klopp Depo Tr. 45:16-46:04
> (After the first week of training, CRST generally expected that the student
> driver would be able to drive their own shift while the lead driver was in
> the sleeper berth.)).

105. CRST charges a Lease Operator a per-mile charge for having a trainee on his or her truck; in exchange, the Lease Operator keeps the pay for all loads carried regardless of whether the Lease Operator or student was driving.

> Support: App. 27-28, 69-70 (CRST 30(b)(6) Brueck, Tr. 129:23-130:07 (Exhibit
> 30 is presented to Lease Operators when they express interest in operating
> as a lead driver/driver mentor)); App. 27-28, 86-87 (CRST 30(b)(6)
> Brueck, Exhibit 30 at CRST004566 (Section 2(B)—"To help cover

49

Carrier's wage and related costs for the Student Driver, Contractor hereby authorizes Carrier to deduct, from Contractor's settlement compensation, twelve cents ($0.12) per mile for every loaded mile operated by the Equipment (whether driven by Contractor or the Student Driver) under Carrier dispatch (as specifically directed or authorized by Carrier) . . .")).

## K. ICOA Provisions on Driver Compensation

106. ICOA Appendix B provides that CRST will pay Drivers' Base Compensation, in the form of a percentage of the Adjusted Gross Revenue billed to a shipper for a load.

    Support: App. 93, 122 (ICOA, Appendix B, Contractor Compensation, ¶ 1(A)).

107. Adjusted Gross Revenue is derived from a load's Gross Revenue.

    Support: App. 93, 122 (ICOA, Appendix B, ¶¶ 1(A)(1)-1(A)(2)).

108. Gross Revenue means all revenue billed for mileage charges.

    Support: App. 93, 122 (ICOA, Appendix B, ¶ 1(A)(2)(a)).

109. Adjusted Gross Revenue is equal to the amount of Gross Revenue, reduced by: (1) any incentive discount, fee or commission CRST gives the customer on a particular load; (2) all amounts CRST paid to third parties in relation to the load if not covered by a charge separately stated on CRST's invoice to the Customer, including "amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment," and (3) certain specific charges separately stated on the freight bill.

    Support: App. 93, 122 (ICOA Appendix B, ¶ 1(A)(2)(b)(1)-(3)).

110. Adjusted Gross Revenue is commonly referred to by CRST as the Linehaul.

    Support: App. 93, 122 (ICOA Appendix B, ¶ 1(A)(2)(b)); App. 129-130, 132

        (Lappe Depo Tr. 17:05-17:19); App. 490-491, 519-520 (Reges Depo Tr.

159:22-160:02); App. 470-472, 476-477 (30(b)(6) Kilgore Depo Tr. 52:05-52:11 and Errata Sheet).

111. ICOA Appendix B provides that, when CRST provides the trailer, Drivers will receive 70% of the Adjusted Gross Revenue.

Support: App. 93, 122 (ICOA Appendix B, ¶ 1(A)(1)).

112. CRST provides the trailer for the vast majority of loads hauled by Drivers.

Support: App. 79 (CRST 30(b)(6) Brueck, Tr. 179:06-179:23).

113. Where Drivers haul the entire shipment from its origin to its destination ("single-trip loads"), the ICOA provides that Drivers will be paid 70% of the Linehaul.

Support: App. 93, 122 (ICOA Appendix B, ¶ 1(A)(1); 1(A)(2)).

114. Where Drivers haul a portion of a shipment ("multi-trip loads"), the ICOA provides that Drivers will be paid 70% of the Linehaul for their portion of the shipment.

Support: App. 93, 122 (ICOA Appendix B, ¶ 1(A)(1); 1(A)(2)(b); 1(A)(2)(b)(2)).

115. For multi-trip loads, CRST paid Drivers a percentage of a pro rata portion of the total Linehaul charged to the customer, based on the percentage of miles the Driver hauled, compared to the total load miles.

Support: App. 470-471, 473-475 (ESI 30(b)(6) Jerry Kilgore Depo, Tr. 145:24-147:18).

116. ICOA Appendix B provides that CRST will pay Drivers additional compensation derived from a percentage of Fuel-Related and Accessorial Charges.

Support: App. 93, 122 (ICOA Appendix B, ¶ 1(B) Additional Compensation; ¶¶ 1(B)(1); 1(B)(2) Accessorial Charges).

117. ICOA Appendix B provides that CRST will pay Drivers 97% of the fuel charges ("Fuel Surcharges") billed to the shipper for a shipment.

> Support: App. 93, 122 (ICOA Appendix B, ¶ 1(B) Additional Compensation; ¶ 1(B)(1) Fuel-Related); App. 26-27, 80-81 (CRST 30(b)(6) Brueck, Tr. 185:20-186:02).

118. ICOA Appendix B provides that CRST will pay Drivers 70% of "other" Accessorial charges ("Accessorial Charges") that CRST actually collects from the shipper for a shipment.

> Support: App. 93, 122 (ICOA Appendix B, ¶ 1(B)(2)(b), Other Charges (referring to 70% percentage in ¶ 1(A)(1))).

119. CRST was required to settle a percentage of Linehaul Charges, Fuel Surcharges and Accessorial Charges to Drivers.

> Support: App. 556 (ESI 30(b)(6) Depo, May 16, 2023, Gannon, Tr. 15:04; 17:16 17:20; 43:02-43:13); App. 555 (ESI 30(b)(6) Depo, May 16, 2023, Gannon, Exhibit 90, page 3).

**L. ICOA Provisions on Documentation Drivers Should Receive at Time of Settlement**

120. ICOA Section 3(B) provides that at the time of settlement, CRST will provide Drivers "a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill."

> Support: App. 93, 97 (ICOA, ¶ 3(B). Documentation).

**M. CRST's Issuance of Settlement Statements to Drivers**

121. ICOA Section 3(A) provides that CRST will furnish to Drivers a settlement statement "at each weekly settlement," detailing all credits and deductions made to the Driver.

>    Support: App. 93, 97 (ICOA ¶ 3(A). Settlement).

122. Settlement statements function as a paycheck.

>    Support: App. 490-491, 521 (Reges Depo, Tr. 166:19-166:23).

123. Settlement statements set forth Drivers' earnings for the loads Drivers moved.

>    Support: App. 129-130, 131-133 (Lappe Depo, Tr. 16:06-18:06).

124. For each of the charges that CRST settled to the Driver, CRST listed them on the settlement statement.

>    Support: App. 556 (ESI 30(b)(6) Depo, May 16, 2023, Gannon, Tr. 15:04; 17:16 17:20; 43:02-43:13); App. 555 (ESI 30(b)(6) Depo, May 16, 2023, Gannon, Exhibit 90, page 3); App. 129-130, 139-140  (Lappe Depo, Tr. 25:18-26:02).

**N. CRST's Issuance of Rated Freight Bills to Customers, and Contents of Freight Bills**

125. CRST issued freight bills as an invoice to their customers.

>    Support: App. 129-130, 134 (Lappe Depo, Tr. 20:13-20:18).

126. Freight bills included the Linehaul Charge, any Fuel Surcharges, and any Accessorial Charges billed to the customer.

>    Support: App. 129-130, 134-136 (Lappe Depo, Tr. 20:19-22:10); App. 157-158 (CRST's Response to Plaintiff's Third Set of Requests for Admission, Nos. 11 and 12).

127. Freight bills include the total miles billed to the customer for the Linehaul.

Support: App. 129-130, 134-136 (Lappe Depo, Tr. 20:19-22:10); App. 157-158

(CRST's Response to Plaintiff's Third Set of Requests for Admission,

Nos. 11 and 12).

**O. CRST's Failure to Provide Freight Bills or Freight Bill Information to Drivers on their Settlement Statement**

128. CRST did not provide freight bills to Drivers at the time of settlement.

Support: App. 27-28, 80 (CRST Expedited 30(b)(6) Brueck, Tr. 185:11-185:17);

App. 523-524 (Reges Depo, Tr. 178:19-179:03); App. 152-154 (CRST July

26, 2023 Amended Responses to Plaintiffs' Second Set of Requests for

Admission, Nos. 5, 7).

129. Section 3(B) of the ICOA requires Drivers to travel to CRST's main headquarters in Cedar

Rapids, Iowa during regular business hours if they wished to examine freight bills.

Support: App. 93, 97 (ICOA ¶ 3(B)).

130. The information contained on Drivers' settlement statements was not the same as the

information set forth in the freight bills CRST issued to customers.

Support: App. 155-158 (CRST's Response to Plaintiff's Third Set of Requests for

Admission, Nos. 9, 10, 11, and 12).

131. For example, settlement statements did not include the total miles billed to the customer.

Support: App. 155-156 CRST's Responses to Plaintiffs' Third Set of Requests for

Admission, Nos. 9, 10).

132. While settlement statements included the miles a Driver hauled for a load, they did not

include the total miles CRST billed the customer for the load.

Support: App. 155-156 (CRST's Responses to Plaintiffs' Third Set of Requests for

54

Admission, Nos. 9, 10).

133. Settlement statements did not include the full charge amount listed on the freight bill for Accessorial Charges. Instead, they showed only the amount paid to the Driver.

> Support: App. 155-158 (CRST's Responses to Plaintiffs' Third Set of Requests for Admission, Nos. 9, 10, 11, and 12; App. 129-130, 137 (Lappe Depo, Tr. 23:05-23:11)).

134. Settlement statements did not include the full charge amount listed on the freight bill for Fuel Surcharges. Instead, they showed only the amount paid to the Driver.

> Support: App. 155-158 (CRST's Responses to Plaintiffs' Third Set of Requests for Admission, Nos. 9, 10, 11, and 12).

**P. Drivers' Underpayments Shown in CRST's Data**

135. Dr. Brian Kriegler's analysis of CRST's data shows underpayments to Drivers for Linehaul, Accessorial, and Fuel Surcharge charges for a total of $5,140,008.85.

> Support: App. 478-480 (Reply Expert Report of Dr. Brian Kriegler, ¶¶ 6(d); 31).

136. Dr. Kriegler's methodology and analysis shows underpayments to Drivers for Linehaul Charges of $2,651,899, Accessorial Charges of $833,781 and Fuel Surcharge charges of $2,025,621.

> Support: App. 554 (Expert Rebuttal Report of Dr. Chen Song, ¶ 105 (Table 12)).

137. Dr. Chen Song's own analysis of CRST's data shows underpayments to Drivers for Linehaul, Accessorial, and Fuel Surcharge charges.

> Support: App. 554 (Expert Rebuttal Report of Dr. Chen Song, ¶¶ 105 (Table 12), 112 (Table 16); 128).

Respectfully submitted this 31st day of January, 2024.

By: */s/ Rebecca King*

GETMAN, SWEENEY & DUNN, PLLC
Rebecca King (*PHV*)
Michael J.D. Sweeney (*PHV*)
Anamaria Segura (*PHV*)
260 Fair Street
Kingston, NY 12401
(845) 255-9370
rking@getmansweeney.com
msweeney@getmansweeney.com
asegura@getmansweeney.com

MARTIN & BONNETT, P.L.L.C.
Dan Bonnett (*PHV*)
Susan Martin (*PHV*)
Jennifer Kroll (*PHV*)
Michael M. Licata (*PHV*)
4747 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
(602) 240-6900
dbonnett@martinbonnett.com
smartin@martinbonnett.com
jkroll@martinbonnett.com
mlicata@martinbonnett.com

Edward Tuddenham
23 Rue Du Laos
Paris, France
33 684 79 89 30
edwardtuddenham@gmail.com

ATTORNEYS FOR PLAINTIFFS