IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

Plaintiffs offer the following Appendix in Support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rules 56(a)(4) and 56(e):

**TABLE OF CONTENTS**


Docket No. 155 Excerpts ........................................ 1

Lincoln Sales 30(b)(6) Deposition, Michael Gannon Transcript Excerpts ........................................ 9

CRST 30(b)(6) Deposition of Chad Brueck Transcript Excerpts ........................................ 27

CRST002031 ........................................ 91

CRST002042 ........................................ 92

Independent Contractor Operating Agreement (ICOA) Excerpts ........................................ 93

CRST Expedited's Supplemental Responses to Interrogatory Nos. 1(a) and (d) ........................................ 141

CRST's Response to Plaintiffs' Interrogatory No. 9 ........................................ 146

CRST's Supplemental Response to Plaintiffs' Interrogatory No. 12 ........................................ 148

CRST's Response to Plaintiffs' Request for Admission No. 1 ........................................ 149

CRST's Responses to Plaintiffs' Fourth Set of Requests for Production ........................................ 150

Defendants' Responses to Plaintiffs' Third Set of Interrogatories ..................................151

CRST's Amended Responses to Plaintiffs' Second Set of Requests for Admission........152

CRST’s Response to Plaintiff’s Third Set of Requests for Admission, Nos. 9, 10, 11 and 12..........................................................................................................................155

Docket No. 157 Excerpts ..........................................................................................161

Phil Klopp Deposition Transcript Excerpts ...................................................................162

CRST 30(b)(6) Abernathy Deposition Transcript Excerpts ..........................................196

Doc 113-5 Excerpts.....................................................................................................281

Doc 113-8 Excerpts.....................................................................................................285

Doc 113-9 Excerpts.....................................................................................................289

CRST004240..............................................................................................................296

CRST004247..............................................................................................................297

CRST004254..............................................................................................................298

Lease Operator Delvin Cato Deposition Transcript Excerpts.........................................299

CRST004242-3 ...........................................................................................................313

CRST004038-9 ...........................................................................................................315

Docket No. 257-2........................................................................................................317

Lease ........................................................................................................................319

CRST005033..............................................................................................................342

PLT-LM-000006- PLT-LM-000009...............................................................................343

CRST001983..............................................................................................................347

Lease Operator Michael Dosier Deposition Transcript Excerpts ...................................348

Named Plaintiff Anthony Cervantes Deposition Transcript Excerpts............................352

Lease Operator Linda Gravelle Deposition Transcript Excerpts....................................356

Lease Operator Jacob Fapohunda Deposition Transcript Excerpts................................364

Lease Operator Alissa Powers Deposition Transcript Excerpts.....................................368

Lease Operator Sheddrick Miller Deposition Transcript Excerpts.................................371

Lease Operator Tabitha Meeks Deposition Transcript Excerpts....................................374

Lease Operator Roderick Fisher Deposition Transcript Excerpts..................................379

Lease Operator James Edden Deposition Transcript Excerpts.......................................382

Lease Operator Anthony Whisenton Deposition Transcript Excerpts............................386

Lease Operator Gabriel Placide Deposition Transcript Excerpts...................................391

Ben Lizer Deposition Transcript Excerpts......................................................................395

CRST004384.................................................................................................................437

Lease Operator Barry Robinson Deposition Transcript Excerpts..................................438

Lease Operator Adam St. Amour Deposition Transcript Excerpts................................442

CRST023209.................................................................................................................445

Lease Operator Justin Lomax Deposition Transcript Excerpts......................................446

Lease Operator Opt-In Eugene Thompson Deposition Transcript Excerpts..................450

Lease Operator Michael Noble Deposition Transcripts Excerpts..................................454

CRST001979.................................................................................................................458

CRST002038.................................................................................................................459

CRST003864-5.............................................................................................................460

CRST003918-9.............................................................................................................462

CRST003972-3.............................................................................................................464

Terry Pump Deposition Transcript Excerpts..................................................................466

CRST Expedited, Inc. ESI 30(b)(6) Jerry Kilgore Deposition Transcript Excerpts........470

Excerpts from Reply Expert Report of Brian Kriegler, Ph.D. ........................................478

Excerpts from Affirmative Expert Report of Steve Viscelli, Ph.D.................................481

Docket No. 296 ...........................................................................................................487

Phil Reges Deposition Transcript Excerpts ....................................................................490

Docket No. 276 ...........................................................................................................547

CRST009790.................................................................................................................548

CRST009978 (pending leave to file under seal).............................................................550

CRST011260 (pending leave to file under seal).............................................................551

CRST011267 (pending leave to file under seal)............................................................ 552

CRST011275 (pending leave to file under seal).............................................................553

Excerpts from the Expert Rebuttal Report of Dr. Chen Song (pending leave to file under seal) ..............................................................................................................554

Exhibit 90 from CRST Expedited, Inc. ESI 30(b)(6) Deposition of Michael Gannon, dated May 16, 2023 (pending leave to file under seal) ............................................................555

Excerpts from CRST Expedited, Inc ESI 30(b)(6) Deposition of Michael Gannon, dated May 16, 2023 (pending leave to file under seal) ............................................................556

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams<br><br>**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES** |

Defendants, CRST International, Inc. (International) and CRST Expedited, Inc. (Expedited), (collectively, Defendants), by their attorneys and in response to the Third Amended Complaint filed by Plaintiffs, Anthony Cervantes and Mike Cross (ECF No. 108) (the Complaint), deny every allegation of the Complaint, except those specifically admitted as being true. Defendants merged under the laws of Iowa effective January 2, 2021. Expedited is the surviving entity and does business as CRST The Transportation Solution, Inc. (Solution). This Answer and Affirmative Defenses is therefore made on behalf of the unified company, Expedited.

**I.**
**ANSWER**

**INTRODUCTION**

1. This lawsuit seeks redress for violations of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), the Iowa Wage Payment Collection Law, Iowa Code § 91A.1, et seq., and the Iowa Minimum Wage Law, Iowa Code § 91D.1, for failing to pay required minimum wages and unlawfully deducting amounts from the wages of drivers that Defendants misclassified as independent contractors.

**Response:** Defendants admit that Plaintiffs filed this lawsuit as a collective and class action alleging that they were misclassified as independent contractors and Defendants violated the FLSA and Iowa law but deny that the case is appropriate for collective or class action treatment and deny the remaining allegations contained in paragraph 1 of the Complaint.

2. Plaintiffs also seek redress for unjust enrichment and for violations of the Truth in Leasing Act ("TILA") and its implementing regulations.

**Response:** Defendants admit that Plaintiffs filed this lawsuit as a collective and class action alleging that they were misclassified as independent contractors and Defendants were unjustly enriched and violated the federal leasing requirements set forth in 49 C.F.R. § 376.12 but deny that this case is appropriate for collective action treatment or class certification and deny the remaining allegations contained in paragraph 2 of the Complaint.[1]

3. Defendants include privately owned companies CRST International, Inc. and CRST Expedited, Inc. (collectively, "CRST" or "Defendants") which are owned and operated by related individuals and entities for a common business purpose: transportation of freight for CRST customers.

**Response:** Defendants admit that until January 2, 2021, they were privately owned companies owned by the same parent company. Effective January 2, 2021, International has merged into Expedited. Defendants are now one legal entity, CRST Expedited, Inc. d/b/a CRST

[1] Plaintiffs fail to cite any statute titled "Truth in Leasing Act." Defendants therefore respond to Plaintiffs' allegation that they sustained damages as a result of alleged violations of the Federal Leasing Regulations located at 49 C.F.R. § 376.12.

The Transportation Solution, Inc. Defendants deny the remaining allegations contained in paragraph 3 of the Complaint.

4. To accomplish its business purpose, CRST relies on thousands of long-haul, interstate truck drivers to deliver freight for CRST's customers across the United States.

**Response:** Defendants admit the allegations contained in paragraph 4 of the Complaint.

5. CRST utilizes company drivers—i.e., drivers that CRST classifies as employees (hereafter "Employee Drivers")—and Drivers that CRST misclassifies as independent contractors (hereafter "Drivers").

**Response:** Expedited admits it employs drivers, but Defendants deny the remaining allegations contained in paragraph 5 of the Complaint.

6. According to its website, CRST "is one of the nation's largest transportation companies," provides "services to customers all over North America," has "annual revenues exceeding $1 billion," and has a fleet of "more than 4,500 trucks."

**Response:** Defendants deny the allegations contained in paragraph 6 of the Complaint.

7. According to the CRST website, CRST Expedited, Inc. has "more than 3,500 drivers on the road."

**Response:** Defendants admit that Expedited represented it had more than 3,500 drivers but deny the remaining allegations contained in paragraph 7 of the Complaint.

March 2018 until August 2019. Defendants deny the remaining allegations contained in paragraph 29 of the Complaint.

30. Although classified by CRST as an "independent contractor," Plaintiff Cross was, at all relevant times, an "employee" of Defendants under the Fair Labor Standards Act, the Iowa Wage Payment Collection Law, Iowa Code § 91A.1, et seq., and the Iowa Minimum Wage Law, Iowa Code § 91D.1.

**Response:** Defendants deny the allegations contained in paragraph 30 of the Complaint.

31. Defendants CRST International, Inc. and CRST Expedited, Inc. are corporations formed under the laws of Iowa.

**Response:** International admits it was a corporation formed under the laws of Iowa until January 2, 2021 but denies it remained such a corporation thereafter. Expedited admits the allegations contained in paragraph 31 of the Complaint.

32. Defendant CRST Expedited, Inc. is a motor carrier registered with the U.S. Department of Transportation.

**Response:** Defendants admits the allegations contained in paragraph 32 of the Complaint.

33. Defendants are related and integrated business corporations.

**Response:** Defendants admit that until January 2, 2021, they were owned by the same parent company but deny that they were integrated business corporations. Effective January 2, 2021, International has merged into Expedited. Defendants are now one legal entity, CRST Expedited, Inc. d/b/a CRST The Transportation Solution, Inc.

34. Each of the Defendants' principal corporate offices are located at 3930 16th Ave.

69. Drivers, including Plaintiffs, were provided a copy of the CRST Handbook, the same Handbook provided to Employee Drivers, and were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, pet policy, etc., along with Employee Drivers.

**Response:** Defendants admit the allegations contained in paragraph 69 of the Complaint.

70. The ICOA and Lease make the Driver liable for costs of operating the truck, including, inter alia, fuel, insurance, and maintenance.

**Response:** Defendants admit that, as owners of the equipment they leased to Expedited as independent contractors, individuals who signed ICOAs were responsible for the operating costs of their equipment but deny the remaining allegations contained in paragraph 70 of the Complaint.

71. While the ICOA states that Drivers are "independent contractors," Defendants retain the authority to exert near complete control over Drivers' work and ensure Drivers cannot operate as independent businesses, but instead must remain economically dependent on Defendants.

**Response:** Defendants deny the allegations contained in paragraph 71 of the Complaint.

72. Defendants control Drivers' work schedules through their exclusive control over the assignment of loads to Drivers and by requiring them to work exclusively for CRST.

**Response:** Defendants deny the allegations contained in paragraph 72 of the Complaint.

73. Defendants control when, where, and how Drivers deliver freight.

**Response:** Defendants deny the allegations contained in paragraph 73 of the Complaint.

74. Defendants dispatch Drivers to jobs that Defendants wish them to perform.

**Response:** Defendants deny the allegations contained in paragraph 74 of the Complaint.

75. Defendants monitor and control the time of Drivers' departure and the time of arrival.

**Response:** Defendants deny the allegations contained in paragraph 75 of the Complaint.

76. Defendants can dictate and monitor the route Drivers will travel.

**Response:** Defendants deny the allegations contained in paragraph 76 of the Complaint.

77. Defendants monitor Drivers' location, speed, control of the truck, route, estimated arrival time, rest time, driving time, and other aspects of job performance by an on-board computerized system.

**Response:** Defendants deny the allegations contained in paragraph 77 of the Complaint.

78. By way of example of the control exercised by Defendants over Drivers, Plaintiffs received communications and instructions on a daily or near daily basis by their "driver managers" regarding driving speed, arrival times, rest times, etc.

**Response:** Defendants deny the allegations contained in paragraph 78 of the Complaint.

79. Defendants control the amounts charged to the customers whose freight Drivers deliver.

**Response:** Defendants admit that Expedited negotiates rates with its customers for loads hauled by independent contractor drivers but denies the remaining allegations contained in paragraph 79 of the Complaint.

80. Drivers are paid by the load with the amount set and fixed by Defendants.

**Response:** Defendants admit that independent contractors under contract with Expedited are compensated on a per-load basis, but Defendants deny the remaining allegations contained in paragraph 80 of the Complaint.

81. Defendants dictate the means by which Drivers are to perform their job and require Drivers to adhere to Defendants' policies.

**Response:** Defendants deny the allegations contained in paragraph 81 of the Complaint.

82. For instance, except in limited circumstances, Defendants require Drivers to operate in two-person teams.

**Response:** Defendants admit that Expedited has independent contractors who elect to operate in two-driver teams, but deny the remaining allegations contained in paragraph 82 of the Complaint.

83. Drivers have no opportunity for profit and loss based on their entrepreneurial skill because CRST exercises exclusive control over their load assignments and compensation rates.

**Response:** Defendants deny the allegations contained in paragraph 83 of the Complaint.

84. The team driver requirement used by CRST allows it to ship goods across the

determining the freight that will be carried by Drivers, the terms and conditions under which that freight will be picked up and delivered, the rates that customers will be charged for the deliveries, employing dispatchers, assigning loads to Drivers, performing billing and payroll, and performing repair and maintenance services.

**Response:** Expedited admits that it employs dispatchers, but Defendants deny the remaining allegations contained in paragraph 106 of the Complaint.

107. The CRST driver Handbook provided to both Drivers and Employee Drivers sets forth policies of "the Company" (which is defined as "CRST International, Inc., and its subsidiary companies"), including, inter alia, the drug and alcohol policy, electronic communications and technology policy, equal employment opportunity policy, human rights policy and statement, outside employment policy, payroll and leave policy, personal appearance and dress code policy, safety policies, and "the Company's" Code of Business Conduct and Ethics.

**Response:** Defendants admit that the same driver and safety handbooks are distributed to both employee and independent contractor drivers. Defendants deny the remaining allegations contained in paragraph 107 of the Complaint.

108. The Handbook also states that "the Company ha[s] the right to terminate employment at any time, with or without notice and with or without cause."

**Response:** Defendants admit that the CRST Driver Employee Handbook contains the quoted language but deny that the language applied to Plaintiffs or the collective or class they seek to represent and deny the remaining allegations contained in paragraph 108 of the Complaint.

109. Through deductions from Drivers' paychecks, Defendants require Drivers to pay

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated Plaintiffs | ) |
| vs. | ) Case No. 1:20-cv-00075 -CJW-KEM |
| CRST INTERNATIONAL, et al., and CRST EXPEDITED, INC., Defendants. | ) |

REMOTE DEPOSITION OF

MICHAEL GANNON

Thursday, October 27, 2022

9:03 a.m.

Reporter: Barbara J. Carey, RPR
Job Number: 218556

# DIRECT EXAMINATION BY PLAINTIFFS

by Lincoln Sales, or is he, like you, employed by another CRST entity?

A. I'm not certain.

Q. Who owns CRST Lincoln Sales? Who's the immediate parent of it?

A. That would be -- we just went through a name change. Can I get a document from Ms. Stephenson?

Q. By all means, please do.

A. CRST International Holdings, LLC.

Q. CRST International Holdings, LLC.

MR. TUDDENHAM: Can we mark what you were just referring to as Exhibit 4? And if your attorney has any way of sending that to us, that would be handy.

MS. PAYNTER: I do. Do you want me to do it right now? Because if we do, I need you to stop examining him so I can send that to you.

MR. TUDDENHAM: Yeah, why don't we do it now because, otherwise, I'll forget and we'll have a mess on the record.

MS. PAYNTER: Let me get into my email real fast.

MR. TUDDENHAM: While we're at it, Mr. Gannon, are there other documents that you're likely to have to refer to during the course of this deposition

for what your assumption is, either, frankly.

MR. TUDDENHAM: Okay.

BY MR. TUDDENHAM:

Q. I'll rephrase the question, Mr. Gannon.

Does Lincoln Sales provide tractors and trailers for use by CRST employee drivers?

A. Yes.

Q. And does Lincoln Sales provide lease trucks to Expedited lease-operators?

A. Yes.

Q. Does Lincoln Sales lease trucks to non -- to lease-operators who are not driving for one of the many CRST entities?

A. No.

Q. So it only leases to CRST, essentially, employee drivers or lease-operators; correct?

A. Correct.

Q. Is there anybody else that Lincoln Sales provides trucks to other than those two categories?

A. I have to think about this. So I'm not certain. In some Dedicated applications, there may be a case. I'm just not certain about it. There may be a case where we're leasing the truck to the customer because that's what they want. I know we've done that in the

M. Gannon

(Whereupon, Exhibit 3, CRST Lincoln Sales, Inc. Equipment Lease, was marked.)

BY MR. TUDDENHAM:

Q. If you could look at what we've marked as Exhibit 3, find it here. That's the -- it's an equipment lease signed by the plaintiff in this case, Anthony Cervantes.

A. Yep.

Q. Let me know if you have that document.

A. I do.

Q. And it's Bates Stamped CRST 125 through 147.

A. Yes.

Q. Do you recognize this as a standard CRST Lincoln Sales lease for Expedited lease-operators?

A. Yes.

Q. Has the lease format changed since 2015?

A. I'm not certain that the format has changed, no.

Q. Have there been any substantial or substantive changes to the terms of the lease?

MS. PAYNTER: Objection to the extent it calls for a legal conclusion.

You can answer.

A. No, the -- no, nothing substantial.

BY MR. TUDDENHAM:

Q. Looking at the first page of this, I gather there is no rent payment due upon signing; correct?

A. Correct.

Q. So there's no money down that Mr. Cervantes has to pay to enter into this lease?

A. Right.

Q. Is that typical of Expedited lease-operator leases?

A. How do you mean, typical?

Q. Well, is it normal -- I mean, do you normally require some money down and Mr. Cervantes just got lucky, or do you normally not?

A. I -- no.

Q. No?

A. It is typical to not require down payment.

Q. The vast majority of them have?

A. I didn't know, for instance, Cervantes versus the general population.

Q. No, no, no.

The general population, the vast majority of leases have no money down requirement; correct?

A. Right.

Q. And if you look -- the security deposit is

zero.

Is that also typical of Expedited lease-operator leases?

A. Correct.

Q. The base rent is $449 a week; is that correct?

A. Correct.

Q. And there are 131 weeks of rent payments due?

A. Correct.

Q. How is the payment amount and the number of weeks determined?

A. So it can vary by year, depending on a couple of factors, but we will -- Lincoln Sales will be the one to establish the price of the truck, and so they'll establish that and a recommended markup to the truck. Today, currently, that markup is $10,000, and then that's imputed against -- I'm sorry, $10,000 over the net book value, and the net book value, and certainly today, Lincoln says -- well, two things.

Lincoln Sales will set the net -- or the purchase price of the truck as a net book value plus something, try very hard never to exceed the fair market value of the truck, and then, in today's world, probably a good bit under the fair market value of the truck.

But right now, Lincoln Sales today sets --

takes the net book value of the truck, so what the truck is on Lincoln Sales' books for at $10,000, and that's where you come up with this. I don't know what it was at this time in 2018.

Q. If you look on page 2, my understanding which is the stipulated loss value schedule?

A. Yes, sir.

Q. So this indicates that at the time of the first week, the stipulated loss value was $55,561.

A. Correct.

Q. Now, am I understanding you, that would be the net book value plus $10,000 or some markup?

A. Correct. Yes, sir.

Q. And as it is used over the 131 weeks that it's leased to Mr. Cervantes, the net book value drops because of depreciation and wear and tear?

A. Correct.

Q. So that at the time he gets to his last payment, the net book value plus whatever the markup is, is 5,000?

A. Correct.

Q. And at that point, he can buy the truck for the 5,000?

A. Correct.

believe -- I believe it reconciles to the 24,000, not the 2,880. But I'm not certain.

Q. 2,880 is just a little misleading.

Oh, if I could go back, this particular lease has a 137-week term.

Is that typical of most of the Expedited lease-operator leases?

MS. PAYNTER: Mr. Tuddenham, where are you looking?

MR. TUDDENHAM: It's on page 1. It's 131 weeks, I misspoke.

MS. PAYNTER: Okay. Can you ask your question again? I apologize.

BY MR. TUDDENHAM:

Q. So the term of this lease is 131 weeks.

Is that a fairly typical term for an Expedited lease-operator lease?

A. I don't know that I'd say fairly typical. Again, it depends on the availability of trucks and what age they are and everything, but I would say it is -- I don't even know that I want to say typical without --

Q. Well, let's -- let me ask it this way:

What's the range, the typical range, if you can give me that?

A. The range, we have sometimes done brand-new trucks, so that range might be, you know, over whatever weeks of 36 or 40 months is, into probably in the -- a rough range would probably be 90 to 130, 140, outside of a brand-new truck, but I'm not certain about that. I'm giving you a rough range.

Q. That gives me an idea.

Do Expedited lease-operators get new trucks frequently?

A. No.

Q. Is there some special occasion why someone would get -- why a lease-operator would get a brand-new truck?

A. We've tried it. It's more testing it. It's in the places where we have done it, it's usually with someone who has already run a truck, purchased it, taken that truck. Several guys I know for 20, 30 years -- I don't know which one specifically -- but some of those guys would be the ones. So it isn't typical. I would say mixed reaction from them that they like the new, they don't like the longer term on the lease, so it --

Q. But this was --

A. It's appropriate to say it's close to rare.

Q. Right. And this would be something that

but that's --

A. Correct. Yes, sir.

Q. Are you aware of any drivers -- any lease-operators for Expedited who have requested written permission from Lincoln Sales to sublease?

A. I am not, no.

Q. It is Expedited that's responsible for deducting the rent and the additional rent and the security deposit, if there is one, from the driver's weekly earnings and remitting that to Lincoln Sales; correct?

A. Correct.

Q. Does Lincoln Sales send a bill to the -- to Expedited?

A. For what you just talked about?

Q. Yes.

A. I don't believe so, no.

Q. And they don't send a bill to the driver, either; do they?

A. Not to the -- not to the driver, no.

Q. There are various provisions in the lease paragraph 6 on page 130. 6 (a), the use of the equipment and compliance with law; 6 (b), he's required to perform required maintenance, is required to maintain insurance

M. Gannon

under paragraph 10. There are various other things that the driver is required to do during the course of the lease.

And my question is, is it Expedited that monitors that and ensures that the driver is in compliance with the lease, or does Lincoln Sales have its own monitoring process?

A. So Lincoln Sales would monitor the maintenance and repairs. So the inspection of 40,000-mile inspection that we talked about, they would inspect the truck then. The insurance -- specific to your question, the insurance would be monitored by Expedited.

Q. Basically, Lincoln Sales does the maintenance, so it monitors compliance with that aspect, but all the other requirements of driving in compliance with law, maintaining insurance, those sorts of things would -- Expedited would pay attention to that and make sure the driver is in compliance with the lease?

A. I believe so. I don't have the whole exhaustive list in front of me, but yes, generally.

Q. Well, other than monitoring the compliance with the maintenance requirements, can you think of anything else that Lincoln Sales, itself, does to ensure that the driver is in compliance with its lease during the

pendency of the lease?
A. Give me one second.
Technical, but it goes to -- title of the lease is within Lincoln, but nothing else, no.
Q. Okay. In paragraph 6(a) on 130, it provides that the driver shall be the driver assigned to the equipment, and if he's ill, disabled, or otherwise wants a substitute, he has to submit a written request to Lincoln Sales.
I'm wondering, does a driver have to submit a written request for approval of a team driver or a student as he's assigned by CRST Expedited?
A. The second driver?
Q. Yeah.
A. No. I don't believe so.
Q. So this paragraph 6(a), its discussion of getting written permission for a substitute driver, would it be fair to say that's referring to situations where the signer of the lease is staying home, and he's having somebody else drive his truck and train a student?
A. That would be my understanding.
Q. Are you aware of any driver having asked for written permission from Lincoln Sales to do that?
A. I'm not aware of any specific driver. I know

M. Gannon

Q. So as a practical matter, you treat it like a walk-away lease.
Are you familiar with that term?
A. I'm vaguely familiar with that term. I wouldn't want to comment on what is and isn't a walk-away lease. I'm sorry, I just -- but --
Q. But as a --
A. As a practical matter, if they can turn in the truck and the -- what would be owed would be damages to the equipment, or if they did modifications to the equipment, that they didn't get permission for that kind of stuff.
Q. And any past rent or past amounts that they would have been late paying or hadn't paid?
A. Would be due; correct.
Q. But future lease payments would not be demanded by Lincoln Sales?
A. Correct.
Q. Has that been true for the whole period 2015 to present?
A. I believe so.
Q. But you would agree with me that paragraph 13 of the lease actually says something different. Paragraph 13 --

got to -- I got to think about the accounting because Expedited, I believe, would still be making that -- I know making that payment to Lincoln Sales even if the contractor didn't.

Q. Right.

A. But I don't know how that transaction works, to be honest.

Q. Okay. What happens -- I did see in the lease where it says the driver's supposed to give 60 to 90 days' advance notice of return of the equipment?

A. Yeah, the practical matter is the ICOA says 20 days, and 20 days is the practical solution. And I'll say this: Somebody has a death in the family and they say, "Hey, I just can't do this anymore," and they give us two days' notice, we're not -- you know, we'll say, "Give us written 20 days," and we'll do it 20 days.

Q. Right. My question is going to be, you know, if a driver fails to give you the advanced notice that they're going to turn the truck in, whether it's 60 days or 20 days, whatever it is, if they fail to do that, is there a penalty that Lincoln imposes?

A. I don't know. I'd have to dive back into the lease. I'm not certain.

Q. The operating agreement has provisions that

the lease-operator has to maintain a maintenance account, a certain amount is deducted every week to cover maintenance.

That's a separate maintenance account from the 15 cents a mile that the driver pays under the lease; correct?

A. Correct.

Q. And I had some numbers questions:

If this -- if the answer to these numbers are on Exhibit 5 or 6, just tell me that. You don't have to read them.

Do you know the number --

A. Can I stop you for one second?

Q. Sure.

A. I want -- that last question you asked, I just want to verify one thing because of something I thought I read, but give me just one second. Never mind. I think I answered the question correctly. Thank you.

Q. Do you know how many drivers -- how many lease-operators who obtained a truck through Lincoln Sales each year from 2015 to the present? Is that --

A. Do I know how many?

Q. Yeah. In other words, how many leases did Lincoln Sales enter into with Expedited lease-operators

Lincoln Sales it provides to employees, lease-operators to use, and whatever the terms under which it allows employees or lease-operators to use, those terms are set by Expedited, not by Lincoln Sales?

A. Correct.

Q. Can you look at Exhibit 6, which is one of the sheets you had?

A. Yes.

Q. I now have Exhibit 6 in front of me. And can you explain to me what this is?

A. So this is -- there was a question in Exhibit 1 that asks specifically what I interpreted to be this information. So this is the inside and outside maintenance spend by year. And so, in 2021, there was $2,641,732 spent outside and $3.2 million spent inside.

Q. Okay. It's been a long morning.

Can you remind me, what is inside maintenance versus outside maintenance?

A. Internal would be done at a CRST Lincoln Sales shop. Everything else is outside.

Q. But both the inside and the outside, these are maintenance costs covered by the maintenance provisions of the lease?

A. Correct.

M. Gannon

Q. Do these include inside and outside maintenance costs for Lincoln Sales trucks being utilized by Expedited employees?

A. No.

Q. This is just lease-operator expenses?

A. Right. Correct.

Q. Very good. With that I think I have no --

A. If you don't mind, I do want to, I guess, clarify one statement I made. I asked -- at the last break, I asked Lisa.

So you had asked if there had been any substantial changes in the lease, and I just debated at the time, you might have seen me hesitate whether substantial or not.

So on page 128, the additional rent that we talked about, there is an addendum in the new lease.

Q. Yes.

A. And the 18 percent is no longer charged because we now have the wherewithal to get the hub miles direct from the truck into our operating system, and so there's an addendum that says that 18 percent no longer applies, and so it's just paid as you go, so...

Q. And there's no need for quarterly reconciliation then because --

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| ANTHONY CERVANTES, et al., | ) | |
| Plaintiffs | ) | |
| vs. | ) | Case No. 120-cv-00075-CJW-KEM |
| CRST INTERNATIONAL, et al., | ) | |
| Defendants. | ) | |

DEPOSITION OF

CHAD BRUECK

Wednesday, November 2, 2022

9:46 a.m.

Reporter: Barbara J. Carey, RPR
Job Number: 218558

# DIRECT EXAMINATION BY PLAINTIFFS

A. I would say I took notes in the deposition prep that I had with counsel.

Q. Now, I'm asking about these meetings with Mr. Hines, Ms. Abernathy, Mr. Lizer to gather information so you can answer the questions on behalf of Expedited today.

A. I don't remember taking notes in those meetings.

Q. CRST Expedited operates with employee drivers and what you referred to as independent contractor drivers; is that correct?

A. That's correct.

Q. Are there any other kind of drivers other than employees and what you call independent contractors?

A. No.

Q. And approximately, currently, what's the rough percentage breakdown between the number of employee drivers and the number of independent contractor drivers?

A. I would say we are 35 percent independent contractor, 65 percent company driver.

Q. Now, in giving me that approximation, are you including trainee drivers in those percentages, or is this just -- are you excluding the trainees?

MR. SMEDSTAD: Object to the form.

C. Brueck

Go ahead and answer.

A. Trainees are company drivers, so I'm including those in that count.

BY MR. TUDDENHAM:

Q. Okay. If you exclude the trainees and just give me a breakdown between non-trainee employee drivers and independent contractors, how does that change the percentage?

A. Trainees currently make up about 10 percent of our total driving fleet, so...

Q. So it would --

A. Of our total fleet, so...

Q. Then you would have about 35 percent independent contractors and 55 percent employees other than trainees?

A. Yes, that seems reasonable.

Q. Okay. And has that been more or less consistent since 2015 or is it changing?

A. I would say that is different than what it's been since 2015. I'd say the ratio of company drivers has continued to decline since 2015.

Q. What was it, again, just approximately in 2015?

A. It was probably 25 percent independent

contractor, 75 percent company would be my best guess.

Q. Okay. And focusing on the independent contractors, I believe you submitted a declaration in this case indicating that 7 percent of the independent contractors have their own trucks.

Does that sound right?

A. Are you asking if the number sounds right or if I submitted the declaration as to such?

Q. If the number sounds right.

A. It does. It sounds close, yes.

Q. Okay. And of the 7 percent, approximately, that had their own truck, that would be people who own their truck and people who lease from somebody other than Lincoln Sales?

MR. SMEDSTAD: Object to the form; foundation, beyond the scope of designation.

Go ahead and answer.

A. Generally, we would classify that as somebody who has either completed their lease and paid their truck off or brought a truck from outside of Equipment Solutions.

BY MR. TUDDENHAM:

Q. Right. So the 7 percent that you mentioned in your declaration, that would include people who own their

Operations Department, and our Retention Department and --

BY MR. TUDDENHAM:

Q. What was that last department?

A. Retention, and our Network Performance vice president oversees our Load Planning and Customer Service Departments.

Q. And is the Customer Service Department the department that advertises for or solicits for loads for CRST to carry?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. We don't advertise for loads, but the Customer Service Department is the group that has communication with customers to get orders into the system.

BY MR. TUDDENHAM:

Q. Okay. And the Customer Service Department, does it make an effort to increase the volume of loads that CRST hauls?

A. I would say yes, the customer service department's primary function is to increase volume.

Q. And does the Customer Service Department negotiate the terms under which loads will be hauled, the price, any other -- any other terms?

C. Brueck

MR. SMEDSTAD: Object to the form.
Go ahead and answer.
A. There's a number of different factors that are negotiated when it comes to hauling loads. I would say that the things you've described are negotiated by the Customer Service Department on a very small percentage. A majority of those terms are negotiated by our Sales Team.
BY MR. TUDDENHAM:
Q. And the Sales Team falls under what department?
A. They are an enterprise-wide organization that do not have a direct line of contact to Expedited.
Q. They're the Sales Team for all of the CRST companies?
A. That's correct.
Q. Okay. You said there are a number of factors negotiated in -- for hauling a load.
Can you tell me what those are?
A. Price. I would say that, again, on a small percentage of loads depending on the needs of the customer, we may have to negotiate a pickup or delivery time based on availability of capacity. I would say that volume sometimes is negotiated, number of loads we can accept.

MR. SMEDSTAD: Object to the form; compound.

Go ahead and answer.

Beyond the scope of designation.

A. You're asking if CRST customer service accepts freight, books freight, and sets delivery options, and we don't have any other means of getting loads? Is that effectively what you're asking?

BY MR. TUDDENHAM:

Q. Well, let me unpack that.

Do you have other means of getting loads other than the loads that CRST sales or your Customer Service Department arrange?

A. I would say our independent contractors have the ability to contact brokers directly, and provide information to our Customer Service Team who then enters it into our load master system on behalf of the independent contractor.

Q. Okay.

A. I'd say we also have the ability to partner with our Integrated Solutions Team, which is another division of CRST, and provide capacity to them as well when they generally use third-party capacity.

Q. What percentage of the loads that

C. Brueck

CRST Expedited carries are these load board trips that the driver brings to -- brings to CRST?

MR. SMEDSTAD: Beyond the scope of designation, object to form, vague, mischaracterizes testimony.

Go ahead and answer.

A. I would say it's a small percentage.

BY MR. TUDDENHAM:

Q. All right. 1 percent, 20 percent? I mean, "small" is pretty big?

MR. SMEDSTAD: Mischaracterizes -- excuse me, pardon me.

Beyond the scope of designation.

Go ahead and answer.

A. Yes. Single digits, 1 to 2 percent, maybe. I don't have the answer for you specifically.

BY MR. TUDDENHAM:

Q. Leaving aside the load board loads that are brought to CRST Expedited, all the other loads, the 95-plus percent are loads where the price and the pickup time, those sorts of issues are negotiated by CRST, sales or customer service; correct?

MR. SMEDSTAD: Beyond the scope of designation.

C. Brueck

Go ahead and answer.

A. Yeah, I can't think of anything else that would put one of our loads in the system.

BY MR. TUDDENHAM:

Q. So the answer is yes?

MR. SMEDSTAD: Same objections.

A. Yes.

BY MR. TUDDENHAM:

Q. And driver -- independent contractors have nothing to do with negotiating the terms of those loads; do they?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. No, but they have the right to refuse any load we offer them.

BY MR. TUDDENHAM:

Q. But they don't negotiate price?

A. On a particular load?

Q. Yeah. I'm leaving aside the load board loads. I'm talking about the 90-some percent of the loads that are generated by CRST, sales or customer service.

Drivers don't have anything to do with setting the price for those loads; do they?

C. Brueck

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. No, they are not involved in that process.

BY MR. TUDDENHAM:

Q. And they're not involved in setting the pickup or delivery times, either; are they?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. No, that's not true. I would say there are loads where independent contractors will provide customer service information on when they would be able to arrive at a delivery and the delivery appointment is set accordingly.

BY MR. TUDDENHAM:

Q. Okay. But the driver informs CRST customer service and CRST customer service is the one that deals with the customer?

MR. SMEDSTAD: Beyond the scope -- beyond the scope of designation.

Go ahead and answer.

BY MR. TUDDENHAM:

Q. Is that correct?

C. Brueck

A. I'm certain we have drivers who call customers directly frequently, but I would say, as a general rule of thumb, the driver contractor would let the Customer Service Team know what time they would be there, and the Customer Service Team would work with the customer to set the delivery appointment.

Q. Am I correct in understanding that CRST policy is that drivers, whether employee drivers or independent contractors, are not supposed to be dealing directly with the customers about delivery or pickup times?

MR. SMEDSTAD: Object to the form; beyond the scope of designation, mischaracterize prior testimony, compound.

Go ahead and answer.

A. I'm not -- I'm not aware of any written policy. I know that contractors and drivers, especially in first-come/first-serve scenarios, open delivery windows call customers and let them know what time they will be there, ask for directions. I believe it happens, yes.

BY MR. TUDDENHAM:

Q. Yeah, I did not phrase that question very well.

What I meant to say is that it is CRST policy that employee and independent contractor drivers should

C. Brueck

not be negotiating changes to the pickup and delivery times assigned by CRST, that they should go through CRST to make changes if necessary?

MR. SMEDSTAD: Object to the form; compound, beyond the scope of designation, asked and answered, mischaracterizes prior testimony.

Go ahead and answer.

A. I would say that contractors and drivers, most likely, do not understand our customers' requests and requirement as it relates to rescheduling or setting delivery appointments, and so in order to provide good information to our customers and follow what they've asked us to do, generally, that communication should go through our Customer Service Team.

BY MR. TUDDENHAM:

Q. And it's the Planning Department that actually assigns loads to individual trucks?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. So "assigns" is a very direct term. I would say that our Planning Team determines which loads to offer to which drivers and contractors.

BY MR. TUDDENHAM:

Q. How many planners does CRST Expedited have?

C. Brueck

MR. SMEDSTAD: Beyond the scope of designation, foundation.

Go ahead and answer.

A. It fluctuates between six and eight regional planners.

BY MR. TUDDENHAM:

Q. The planners are assigned to specific regions of the country?

MR. SMEDSTAD: Beyond the scope of designation, foundation.

Go ahead and answer.

A. For the most part, yes.

BY MR. TUDDENHAM:

Q. And I'm trying to figure out whether the region that would be the pickup region or the delivery region?

MR. SMEDSTAD: Is that a question?

MR. TUDDENHAM: That is a question.

MR. SMEDSTAD: Then object to the form; vague.

Go ahead and answer.

A. The load plan -- the regional planners work with the capacity that is in the region that they are assigned to.

BY MR. TUDDENHAM:

Q. Can you explain to me what you mean by "work with the capacity and the region they're assigned to"?

A. They're determining which loads to offer if the loads originate in the region they're assigned to, but they work with the capacity that's destined for the region they're assigned to.

Q. And these regional planners, they would deal with the capacity that's assigned to them, whether it's employee-driven trucks or independent contractor-driven trucks?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. That's correct.

BY MR. TUDDENHAM:

Q. "Capacity" refers to available trucks, regardless of who the driver is; correct?

A. That's correct.

Q. Okay. And who do the planners report to?

A. We have a manager of load planning who reports to our director of network performance, who reports to our vice president of network performance.

Q. Who is the current manager of load planning?

C. Brueck

Q. And who was it before Mr. Martin?

A. That is a new position.

Q. Okay. Where are the planners physically located?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. They are in the Expedited building in Cedar Rapids.

BY MR. TUDDENHAM:

Q. Can you explain to me how the regional planners go about planning a load, determining to offer a particular load to a particular truck?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. I would say there's no simple answer to that. It's a combination of available capacity, number of loads needing cover for customers, empty miles, tractor availability, driver need. There's a myriad of different factors that go into planning an entire region.

BY MR. TUDDENHAM:

Q. Well, that's what, I guess, I'm asking you.

Can you list the factors that go into this,

and then I'll ask you about the ones I have questions about?

So you mentioned available capacity, and I gather that means simply the number of trucks that are available?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I would say for the most part, yes. We also have the ability to utilize third-party capacity through our Integrated Solutions Group, so that's another factor of capacity.

BY MR. TUDDENHAM:

Q. Okay. And then you said the number of loads?

A. Yes.

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

BY MR. TUDDENHAM:

Q. And that would be the number of loads at any given day that you have to assign to a truck or offer to a truck?

MR. SMEDSTAD: Compound, beyond the scope of designation.

Go ahead and answer.

A. I would say yes, the number of orders that are booked into the system.

BY MR. TUDDENHAM:

Q. You mentioned the number of drivers.

How is that different from the available capacity?

MR. SMEDSTAD: Beyond the scope of designation.

A. I don't remember saying number of drivers. I said driver needs.

BY MR. TUDDENHAM:

Q. Oh. What do you mean by "driver needs"?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I would say if a driver needs routed to his or her home, if a driver is running low on hours of service and needs to take a 34-hour reset, if the equipment is due for preventive maintenance, those are all factors that come into being unable to just offer any load to a driver.

BY MR. TUDDENHAM:

Q. What other factors are considered?

C. Brueck

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. It's the ability to meet customer requirements.

THE REPORTER: Can you repeat that? That didn't come through.

A. Ability to meet customer requirements.

BY MR. TUDDENHAM:

Q. And would those be -- well, what customer requirements are you talking about?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I'd say the ability to make the pickup on time, and the ability to make the transit requirements on time.

BY MR. TUDDENHAM:

Q. Anything else?

A. Potentially cargo value.

Q. If it's a high-value cargo, you have to have a driver who's permitted to drive high-value cargo?

MR. SMEDSTAD: Object to the form -- object to the form of the question; beyond the scope of

designation.
Go ahead and answer.
A. No our general policy is we require two drivers in the tractor to haul a high-value load.
BY MR. TUDDENHAM:
Q. So high -- a high-value load couldn't be assigned to a solo driver?
MR. SMEDSTAD: Object to the form of the question; beyond the scope of designation.
Go ahead and answer.
A. I would say as a general rule of thumb, that's correct.
BY MR. TUDDENHAM:
Q. Any other factors?
MR. SMEDSTAD: Beyond the scope of designation.
Go ahead and answer.
A. Potentially, if a driver is required to have some sort of endorsement like HAZMAT or doubles to haul the load.
BY MR. TUDDENHAM:
Q. Okay. Anything else?
MR. SMEDSTAD: Same objections.
A. None that I can think of.

C. Brueck

A. No, not that I'm aware of.

BY MR. TUDDENHAM:

Q. Do the planners even know whether a truck in their available capacity is a -- driven by employees or driven by lease-operators?

A. I would say on their load planning screen, it's unlikely that they can differentiate between independent contractor and company driver, but they certainly have access to that information fairly easily.

Q. Sure. But would there any be -- can you think of any reason why they would go to the trouble of accessing that information?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. I would say if they needed to communicate any additional information to the fleet manager or driver manager, they may go in and see who the fleet manager and/or driver is.

Outside of that, I can't think of any reason why they would go in and look at that information.

Q. Is that an unusual situation where you would want to do that?

MR. SMEDSTAD: Object to the form;

C. Brueck

beyond the scope of designation.

Go ahead and answer.

A. No, we do not.

BY MR. TUDDENHAM:

Q. There is no system of coding trucks at all?

MR. SMEDSTAD: Object to the form; asked and answered, beyond the scope of designation.

Go ahead and answer.

BY MR. TUDDENHAM:

Q. Let me rephrase the question.

There's no system of coding of trucks that planners look at?

MR. SMEDSTAD: Object to the form; beyond the scope of designation, foundation.

Go ahead and answer.

A. Not currently.

BY MR. TUDDENHAM:

Q. Okay. Has there been in the past?

MR. SMEDSTAD: Same objections.

A. Yes.

BY MR. TUDDENHAM:

Q. When did that change?

A. July 2019.

Q. Can you describe the system prior to

July 2019, and then I will ask you how it's changed?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. In our own -- or excuse me, our old operating system, driver and fleet managers had the ability to enter, call it a rating from 1 to 6, which was, effectively, the transit capabilities of that particular driver or contractor.

BY MR. TUDDENHAM:

Q. "Transit capabilities," can you -- can you explain to me what that means?

A. Sure. So let's say I have a 2,000-mile load and the customer has allotted us 40 hours to get there. That's, effectively, a 50-mile-per-hour transit on average. If a driver or contractor has repeatedly shown that when offered and accepting those type of loads they deliver those late, we would indicate in the system that that driver does not have the capability or the wherewithal to deliver that 50-mile-an-hour transit or greater. So in order to meet customer requirements, we would look for trucks coded as, call it, 50 miles per hour or greater.

Q. You said there were six codings.

Can you tell me what constitutes in Code 1,

Code 2, Code 3, et cetera?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I would say there was general guidelines as it relates to on-time performance and communication and HAZMAT endorsement, but it was driver and fleet manager discretion.

BY MR. TUDDENHAM:

Q. Okay. I understand it was their discretion, but was it simply a categorizing how fast or how many miles per hour you generally ran? Was that one factor? Were there other factors that went into it?

MR. SMEDSTAD: Compound, beyond the scope of designation, foundation.

Go ahead and answer.

A. I would say 95 percent of the determination was their ability to pick up and deliver freight on time.

BY MR. TUDDENHAM:

Q. Okay. And was that expressed in terms of an average miles per hour?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

C. Brueck

that manage that?

MR. SMEDSTAD: Compound, foundation, beyond the scope of designation.

Go ahead and answer.

A. I don't have an average miles per hour for the fleet. I will tell you that our one-speed trucks in the former system could be counted on to deliver any load on time regardless of transit requirement.

BY MR. TUDDENHAM:

Q. One was the bottom designation or the top?

A. One was the best a driver could do.

Q. Okay. And if you were in Designation 6, there might be some question of your ability to deliver loads on time?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. Six indicated that it was a mentor student in the first five days of training.

BY MR. TUDDENHAM:

Q. Now, these codes from 1 to 6, they didn't differentiate between employee drivers and lease-operators?

MR. SMEDSTAD: Beyond the scope --

C. Brueck

beyond the scope of designation.

Go ahead and answer.

A. I would say customers didn't differentiate on-time performance between independent contractors and company drivers.

BY MR. TUDDENHAM:

Q. So it was just as possible for an employee team to be in a Number 1 category as a lease-operator team?

MR. SMEDSTAD: Beyond the scope of designation.

A. So yes, we had both company drivers and independent contractors rated as one-speed teams.

BY MR. TUDDENHAM:

Q. Okay. And these codes were available to the planners; correct?

A. Yes, I believe the planners had visibility to those codes.

Q. And the codes would factor into the assignment of at least some loads; correct?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. As a planner, if I had a customer that I knew we were having service issues with or I had a customer

that had very high transit requirements, I certainly would prefer to utilize a team that was coded as a one- or two-speed team on that load.

BY MR. TUDDENHAM:

Q. Regardless of whether it was an employee team or lease-operator team?

A. That's correct.

Q. During the period the codes were used, who actually assigned the code to a truck?

MR. SMEDSTAD: Beyond the scope of designation, foundation.

Go ahead and answer.

A. With the exception of the six, which was, I believe, done by the computer, the driver and fleet manager would be the ones to utilize the codes.

BY MR. TUDDENHAM:

Q. And I'm sorry, I may have asked this.

Is there a difference between a driver manager and a fleet manager?

A. Driver managers work with company drivers; fleet managers work with independent contractors.

Q. Okay. And was there any document that listed the things that the driver or fleet manager was supposed to take into account in assigning the codes?

Is there anywhere in CRST's records where the fact that a load is brokered would be recorded so that we could actually determine the number of brokered loads in any given period of time?

MR. SMEDSTAD: Foundation, beyond the scope of designation.

Go ahead and answer.

A. Not that I'm aware of.

BY MR. TUDDENHAM:

Q. They're just treated like every other kind of load once they're approved?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. In terms of booking into our system and subsequently billing, I would say yes, but certainly, the contractor who worked with the particular broker would be the one that will be attached to that load.

BY MR. TUDDENHAM:

Q. Right. There wouldn't be any designation in any records indicating that this is a brokered load as opposed to a CRST normal load?

MR. SMEDSTAD: Object to the form; beyond the scope of designation, asked and answered.

Go ahead and answer.

C. Brueck

A. That is effectively our, I guess, general term our brokerage division.

Q. Oh, okay. And is CRST Lincoln Sales still -- is that still the title of CRST Lincoln Sales?

A. I believe the correct term now is CRST Equipment Solutions.

Q. Equipment Solutions, okay.

(Whereupon, Exhibit 39, CRST SAFETY AND? OPERATIONS HANDBOOK, was marked.)

BY MR. TUDDENHAM:

Can you look at what I have marked as Exhibit 39, which is a CRST Safety and Operations Handbook. Exhibit 39 is Bates Stamped 2029 through 2187.

A. I have it open.

Q. Are you familiar with the CRST Safety and Operations Handbook?

A. I am aware of the existence of one. I can't say which particular version this one is.

Q. Right. You had provided us several versions, but this is provided to both employee and lease-operators -- employee drivers and lease-operators?

A. I believe, currently, it's online, and it's not provided to anybody. Back in -- this one appears to be dated 2017, I'm not sure if that was provided to both

C. Brueck

with the company drivers, and independent contractor fleet managers do not manage anybody.

Q. Right. But they are -- they are assigned trucks that they transmit loads to, that they communicate with, that the independent contractors communicate with when they accept or decline a load; correct?

MR. SMEDSTAD: Object to the form; compound, beyond the scope of designation.

Go ahead and answer.

A. Yes, the independent contractors have a company representative that they partner with and communicate with on a regular basis.

Q. And who is the company representative?

A. That would be the fleet manager.

Q. Okay. Now, in the period 2015 to present, have driver managers or fleet managers ever had a mixture of company drivers and independent contractors, or have they always been completely and totally separate?

A. I would say as it relates to fleet managers who partner with independent contractors have not partnered with exclusively company teams. I would say the exception to what you're describing is when we have a company driver who is a student -- or "trainee" is the term we've used, I believe, on the truck with an

fleet managers do not do. Independent contractor fleet managers are expected to continue to offer freight to independent contractors in the event of load refusals. Company drivers cannot refuse loads. I would say that route compliance is another component of company driver management that we don't have our independent contractor fleet managers do anything with. Those are a few examples.

Q. Are there others that you can think of?

A. I would say that company driver managers are held accountable to pay for layovers and breakdowns that independent contractors do not receive, so additional compensation versus settlement is another thing that company driver managers are responsible for.

Q. How many loads does a fleet manager offer to a lease-operator truck at a time?

MR. SMEDSTAD: Object to the form; beyond the scope of designation, foundation.

Go ahead and answer.

A. It could be one, it could be multiple.

BY MR. TUDDENHAM:

Q. In what circumstances would it be multiple?

MR. SMEDSTAD: Beyond the scope of designation.

C. Brueck

Go ahead and answer.

A. If a -- drivers in general, contractors or employee drivers in general, would certainly prefer to plan out their routes, their days as far as in advance as they can. I would say that there are instances where maybe a contractor is headed to an area where we have extra freight and we can offer multiple loads at one time or a contractor has a routing requirement, i.e., "I want to go home in three days," and rather than make them pay for their own fuel and deadhead, we may offer them a load to a location that's not their home followed up by a load that is a -- destined for their home.

So there are definitely examples of times where we have offered multiple loads to contractors at once.

BY MR. TUDDENHAM:

Q. And would you do the same thing for an employee driver?

A. We certainly might give loads to drivers to get home. The difference is the contractor has the ability to refuse said loads, and company drivers do not.

Q. You said that company drivers don't have the ability to refuse a load, but aren't they, in fact, supposed to refuse a load if they are concerned about

C. Brueck

A. I don't have a percentage of how often drivers are offered multiple loads at once on either side.

BY MR. TUDDENHAM:

Q. Are lease-operators sometimes offered a second load as a way to encourage them not to turn down the first load?

MR. SMEDSTAD: Object to the form; beyond the scope of designation.

Go ahead and answer.

A. I can't speak to frequency. I can say that the business relationship between fleet manager and independent contractor could certainly create situations where a contractor says, "I've had a bad experience in that area. I don't want to go to that area without understanding the full context of available freight," and therefore, I can certainly see situations where a load is offered out of the destination region to the contractor so that they're able to keep moving.

BY MR. TUDDENHAM:

Q. If a lease-operator turns down a load, it's simply sent back to the planner to assign another truck?

A. There is communication from the fleet manager to the planner. It's not necessarily sent back. It's more likely just an instant message or format that says,

C. Brueck

"This contractor has turned down this load."

Q. And if the planner doesn't have another truck to assign the load to, would there be communication back to the fleet manager to see if you can get him to take the load?

MR. SMEDSTAD: Beyond the scope of designation, foundation.

Go ahead and answer.

A. I certainly think there has been times where we've asked the fleet manager to have more contextual conversation with the contractor in terms of what other freight is available, if there's freight available, what this load refusal may mean for the next load to give the full context of the decision-making to the contractor, but I would say in a vast, vast majority of those cases, the next line of communication, if no truck is available, is to the Customer Service Team to reschedule the load according to next available capacity.

BY MR. TUDDENHAM:

Q. Okay. But a -- in those circumstances like that, the fleet operator -- the fleet manager might inform the lease-operator that, "You, of course, have the right to turn this down, but there aren't any loads in this area, and you may have to sit the whole weekend until

C. Brueck

A. I would say prior system, when that system existed, if a contractor or driver had shown repeated ability to service freight on time, that more freight options came available to them, potentially.

BY MR. TUDDENHAM:

Q. When are lease-operators supposed to contact their fleet manager?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

A. In what scenario?

BY MR. TUDDENHAM:

Q. Well, okay. It's Wednesday morning. Do I -- am I supposed to contact my -- and I don't have load, am I supposed to contact my driver fleet manager or wait to be contacted? How does it work?

A. I would say there's no expectation that a driver or contractor contacts their driver manager in any specific way. I would say in the scenario you described, we would have the contractor showing as available for dispatch in our computer system and be available to be planned and then the load would be sent out via normal fashion.

Q. Is the lease-operator supposed to notify his

A. It's required by the FMCSA to have an electronic logging device on commercial motor vehicles.

BY MR. TUDDENHAM:

Q. My question -- I'm not asking you about FMCSA regulations.

My question is, all employee trucks and all lease-operator trucks that are leased from Lincoln Sales have an electronic logging device on them; correct?

MR. SMEDSTAD: Compound.

Go ahead and answer.

A. Yeah, so we're in compliance with the law.

BY MR. TUDDENHAM:

Q. Okay. And do the lease-operator trucks from Lincoln Sales have a device that pings the GPS location of the truck on a regular basis?

A. Yes, both the Maven and the Omnitracs provide locations.

Q. And so you know -- do you know how often it pings the location?

A. I'm not sure. Depending on the device, it's either every 5 or 15 minutes. I believe the Maven pings it more frequently than that, but we don't collect that information.

Q. Where does the pinging go to? Does it go

to --

MR. SMEDSTAD: Beyond -- beyond the scope of designation.

Go ahead and answer.

A. That information would feed into our McLeod portal.

Q. Tell me what the McLeod portal is?

A. That's our operating system.

Q. Okay. Does the logging information feed into the McLeod portal as well?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. In terms of available hours of service and -- is that what you're referring to?

BY MR. TUDDENHAM:

Q. Well, just the electronic logging device records their -- their hours of service, just like they used to do on paper, it does it electronically; correct?

A. Correct.

Q. And does that for employees and lease-operators; correct?

A. Correct.

Q. And does that information feed into the McLeod portal?

A. I'm not sure if the granular detail feeds into McLeod, but certainly from an hours remaining standpoint, we have visibility to that for both employee drivers and contractors.

Q. What other information is -- what other information is generated by the Omnitrac [sic] or Maven system?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. I can't think of any other information generated by either Maven or Omnitracs off the top of my head.

BY MR. TUDDENHAM:

Q. What about engine speed?

A. I'm not familiar enough to know if that comes through the Omnitracs or Maven device or if that's generated a different way.

Q. But CRST has access to information about the truck speed, the engine speed, hard braking incidents of both employee and lease-operator drivers; correct?

MR. SMEDSTAD: Compound.

Go ahead and answer.

A. I would say access to, yes. Regularly utilized, no.

C. Brueck

BY MR. TUDDENHAM:

Q. And with the GPS information, if I'm understanding this correctly, the planners, driver managers, fleet managers have knowledge of where a truck is at any given time, whether it's moving or not, and the available hours for the drivers in the truck?

MR. SMEDSTAD: Compound.

A. What were the three things again?

BY MR. TUDDENHAM:

Q. I'll separate them out.

A. Okay.

Q. CRST gets information from employee-driven trucks and lease-operator driven trucks that tell the fleet manager, driver manager, planners where the truck is at any given period of time, whether it's every 5 minutes or 15 minutes; correct?

MR. SMEDSTAD: Object to the form; compound.

Go ahead and answer.

A. We have access to that information at any time.

BY MR. TUDDENHAM:

Q. And that GPS information actually shows the latitude and longitude so you can tell whether the truck

is moving from one team to the next?
A. I'm not sure if that information is displayed in front of everybody at all times. I assume those pings, which I believe are cellular, not GPS, but are created via lat/long.
Q. But whether they're displayed or not, you have access to that information if you need it?
A. I do know it will show relative position to a city. That information is accessible, yes.
Q. And the planners, the fleet driver managers have access to the hours of service remaining for the drivers in both employee and lease-operator trucks; correct?
MR. SMEDSTAD: Compound.
A. I would say that anybody can look that information up. I don't believe it's actively used by everybody all the time.
BY MR. TUDDENHAM:
Q. Now, what was the system that you said recorded -- well, do you have a system for recording the speed of the truck; correct?
A. I don't know of any -- I don't know what the process is for recording the speed of the truck. All trucks are basically computers now that we can retrieve

have complete autonomy and control over what their business hauls.

BY MR. TUDDENHAM:

Q. Well, they have autonomy over what they can refuse to do, but they don't have autonomy over what CRST chooses to offer to them; do they?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. They do in the sense that if they communicate to their fleet manager that they won't run to a specific area of the country or this is the type of freight they like to haul, or they don't like to haul freight above a certain weight limit, they certainly can exclude freight offers from being made or at least create a conversation when that's the only option available.

BY MR. TUDDENHAM:

Q. I think from the answers to the interrogatories we received, that something like 80 to 90 percent of lease-operators drive as a lead driver training trainee drivers.

Does that sound correct?

MR. SMEDSTAD: Beyond the scope.

Go ahead and answer.

A. I'm not familiar with the interrogatory, but I

can tell you that current state our fleet is probably 65 to 70 percent mentors. The remainder would be teams or solos.

BY MR. TUDDENHAM:

Q. Are you talking about the lease-operator fleet or the whole -- the whole fleet?

A. I'm speaking of just the independent contractor group.

Q. Okay. Do you know whether that percentage was higher in the past?

A. It was higher in the past.

(Whereupon, Exhibit 29, Eligibility Requirements for Lead Driver Approval, was marked.)

BY MR. TUDDENHAM:

Q. If you look at Exhibit 29, which is Bates 10772.

A. Okay.

Q. Are you familiar with that document?

A. I'm aware of minimum expectations of mentors in order to be approved as a mentor. I can't say for certain that I've seen this particular document or when it was enforced.

Q. Are those -- on Exhibit 29, are those the

C. Brueck

student went out with a driver mentor for their introductory period, and then either drove as a co-driver for a while and potentially had safety violations or exhibited unsafe behavior and a decision was made to have that individual go back out with a driver mentor.

BY MR. TUDDENHAM:

Q. Okay. And Item 15 says, "Cannot have been on the watch list in the past 6 months."

Do you know what watch list is being referred to there?

MR. SMEDSTAD: Beyond the scope.

A. I would guess that is the watch list we discussed earlier.

BY MR. TUDDENHAM:

Q. I don't want you to guess, though.

Is this something we should ask Mr. Reges?

A. Yes.

(Whereupon, Exhibit 30, CRST Expedited, Inc. Independent Contractor Operating Agreement ADDENDUM-LEAD DRIVER PROGRAM, was marked.)

BY MR. TUDDENHAM:

Q. Exhibit 30, which is Bates 4565 through 4567.

A. 30? Okay. Okay.

Q. Is this part of the independent contractor

operating agreement, or is it a separate document?

A. This is a separate document.

Q. Okay. And when is it presented to a lease-operator?

A. When they express interest in operating as a driver mentor.

Q. Which may be at the orientation or may be at some subsequent date?

A. It would not be during the orientation.

Q. Why not?

A. Our mentor certification class does not occur during on-boarding. It is a separate session, which is probably the day after on-boarding concludes, which I'm sure there are contractors who go through on-boarding and then immediately go through mentor class, but it may be months down the road.

Q. Okay. How long is the mentoring class, how long does that last?

MR. SMEDSTAD: Beyond the scope.

Go ahead and answer.

A. I believe it's one day, eight hours.

BY MR. TUDDENHAM:

Q. And do you know --

A. Eight hours.

C. Brueck

strike that.

The independent contractor operating agreement is for a fixed term of one year or something like that.

Are you familiar with that?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

A. Yes, I believe there's an annual renewal process.

BY MR. TUDDENHAM:

Q. Okay. And assuming the lease-operator has made his deliveries on time, driven in a safe manner, is the operating agreement then generally renewed for another year?

A. There's no annual review of -- of performance process where we terminate ICOAs based on that process. So I would say as standard course of business, yes, those ICOAs are renewed for another year. I believe the contractor has to sign something that indicates that they would also like to renew it for another year.

Q. Right. Do they just sign an addendum extending the ICOA, or do they have to sign a whole new ICOA?

A. I'm not sure.

card as well.

BY MR. TUDDENHAM:

Q. Is there an advantage for the driver to use the advance card because then the fuel tax information gets to CRST and can be processed properly?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. I don't know much about fuel tax or the advantages to the contractors or anything along those lines. I will say that it's certainly not a requirement.

BY MR. TUDDENHAM:

Q. I understand it's not a requirement, but the advance card, if you use it at certain fuel stops, it gets you a reduced price; correct?

A. There are fuel stops where you -- the contractor would receive a cents-off discount from the pump price. That isn't necessarily the cheapest fuel in the area or even along their route necessarily.

But yes, their advance card will offer them a cents-off discount from the pump price.

Q. And you provide contractors with a list of the fuel stops -- fuel companies that provide that discount?

A. I believe there is an attachment that shows where they have the option to receive those discounts,

yes.

Q. All right. And if the driver used his settlement card as opposed to the advance card, he wouldn't get the discounts; right?

MR. SMEDSTAD: Object to the form; foundation, beyond the scope of designation.

Go ahead and answer.

A. I don't know. If they pulled cash off of their settlement card and paid in cash, I would say no. I am not sure whether they can swipe their settlement card into the pump, et cetera.

BY MR. TUDDENHAM:

Q. Who knows -- who would know how these settlement cards and advance cards work?

A. I would say Ben Lizer would probably be the best resource for that.

Q. CRST provides base plates for lease-operators? I mean, they charge them for it, but...

A. I believe so, yes.

Q. And CRST does IFTA permit fuel tax reporting for lease-operators?

A. I believe that is an option available to them.

Q. Do you know what percentage of drivers decline that option -- lease-operators decline that option?

C. Brueck

A. I believe they can if they have a cash advance, like if they said, "Give me $50 to go by oil," we would potentially do that. I don't believe that they have the ability to go into a gas station and swipe their advance card with no funds on it to purchase things for the truck.

BY MR. TUDDENHAM:

Q. Other than fuel?

A. Other than fuel.

Q. I'm not understanding something here.

You said the advance card doesn't have money on it unless they ask for it to be put on there; correct?

A. That's the way I understand it, yes.

Q. So every time a driver wants to use -- wants to buy fuel, he has to call his fleet manager, put money on his card so he can purchase fuel at one of the CRST discount places?

MR. SMEDSTAD: Beyond the scope of designation, mischaracterizes prior testimony.

Go ahead and answer.

A. No that's not accurate.

BY MR. TUDDENHAM:

Q. Okay. How does to work for fuel?

A. The card has the ability to, as you said, work

C. Brueck

like a credit card for different things. I believe the only thing that that card has that option toggled on for is fuel. Potentially, there may be some other -- I don't have them all memorized or know which ones are turned on. There may be oil to your point, or DEF, diesel exhaust fluid, they can purchase with that card, but they can't just go use it as a credit card at a scale house -- excuse me, at a CAT scale or to purchase -- for tolls, for example. It's like a very limited credit card, I guess, is what I would say that it has to be used to purchase this specific thing, which is fuel. And anything else that they want to purchase would need to be done in a cash transaction.

Q. Got it.

And who would know precisely what the advance card operates as a credit card for other than fuel?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I would think that would be fairly easy to look up and share that information. We should be able to access that fairly easily.

BY MR. TUDDENHAM:

Q. Okay. And to get the cash advance, to

purchase things that the advance card doesn't work as a credit card for, who does the driver contact?

A. So if it's a driver who is employed by a contractor, they would contact the contractor themselves for funds, or they would contact the fleet manager they're partnered with who would then need to talk to the contractor in order to issue fund to their driver. In the instance of contractor and driver are the same person, they would partner with their fleet manager on that.

Q. Okay. And do you know what CRST's policy is with regard to approving cash advances like that?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. I believe there are -- there are limits in terms of daily cash outlay, I guess I would say for lack of a better term, that fleet managers are approved to handle. Anything beyond that would need to have ops manager involvement, and then they have authorized up to a certain limit, and then anything beyond that, I believe there is no limit. It would just need Ben Lizer's involvement.

BY MR. TUDDENHAM:

Q. Okay. And do you know what the limit is for

the fleet manager?

A. I don't but could easily find that out.

Q. And would the same thing be true for on the employee driver side, if the driver manager could approve an advance up to a certain amount and then it's got to go up the chain?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. Yes, but traditionally the limits have been higher for independent contractors than company drivers.

BY MR. TUDDENHAM:

Q. Are all company drivers except for the cartage people paid by the mile?

A. We may have a very few, although we have more now with the recent change to student compensation who are paid a flat weekly rate.

Q. Is that something you're moving toward?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

A. I would say, holistically, probably not. We made a change in mid-August of this year to put students on a weekly flat pay, and we have some drivers in

C. Brueck

dedicated environments, very few, that we have a weekly flat pay.

BY MR. TUDDENHAM:

Q. Does CRST keep track of employee compensation, in other words, the total mileage pay paid to employee drivers?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

A. What do you mean "keep track of"?

BY MR. TUDDENHAM:

Q. Well, do you have monthly or annual reports saying that we have this expense for employee driver compensation?

MR. SMEDSTAD: Object to the form of the question; beyond the scope of designation.

Go ahead and answer.

A. We do have monthly financial statements produced that show all of our expenses including driver pay.

BY MR. TUDDENHAM:

Q. And is it driver pay broken down to employee driver pay and lease-operator driver pay?

MR. SMEDSTAD: Object to the form of the

C. Brueck

(Whereupon, Exhibit 2, CRST EXPEDITED, INC. INDEPENDENT CONTRACTOR OPERATING AGREEMENT, was marked.)

BY MR. TUDDENHAM:

Q. If you could take a look at Exhibit 2, which is an Independent Contractor Agreement, and turn to Exhibit B, which is Bates Stamp Number 40.

A. Okay.

Q. And if I'm reading the Section 1(A) base compensation correctly, essentially, lease-operators get 70 percent of the adjusted gross revenue; correct?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. If they -- if the carrier provides the trailer, yes.

BY MR. TUDDENHAM:

Q. And that's the case in the vast majority of cases; right?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. Yes.

BY MR. TUDDENHAM:

Q. Does the gross revenue appear on the rated

C. Brueck

Do you know if the driver is informed of those on the settlement sheet so he can see what's been deducted to come up with the adjusted gross revenue?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

A. I know fuel surcharge is called out separately on the settlement sheet. I don't know for sure about the other -- the other adjustments on the settlement sheet.

BY MR. TUDDENHAM:

Q. Do you know if CRST provides the driver, the lease-operator with a copy of the rated freight bill or a computer-generated document that contains the same information?

A. I would say it's a matter of normal course of practice, no, but certainly if a contractor asked for one, we would be able to provide it to them.

Q. And would he have to come to Iowa to get it?

A. No.

Q. Then under 1(B), looking again at page 40, after the driver gets his percentage of the adjusted gross income -- adjusted gross revenue, then he receives additional compensation, the first item 1(B)(1), he gets 97 percent of the fuel surcharges billed to the shipper; correct?

C. Brueck

A. That's correct.

Q. And do you know whether the settlement sheet or some other document given to the driver would reflect what the full fuel surcharge was so he can check whether he got 97 percent of it?

A. I don't know off the top of my head.

Q. Okay. And then there are under 1(B)(2), the driver gets additional compensation for accessorial charges, and there are two listed there, 1, overdimensional permit fees, the driver gets 100 percent of that; right?

MR. SMEDSTAD: Object to the -- object to the form of the question.

Go ahead and answer.

A. It says they get 100 percent of the overdimensional permit fees, but we don't do overdimensional, so it's irrelevant.

BY MR. TUDDENHAM:

Q. And then 1(B)(2)(b), other charges, the driver would get the same percentage that he got for the adjusted gross revenue for various detention charges, truck ordered but not used, and other accessorial charges that the carrier actually collects from the shipper for a shipment; correct?

decision?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

Beyond the scope of designation.

A. I would say ultimate responsibility for the content of the ICOA is at -- is on CRST.

BY MR. TUDDENHAM:

Q. Who at CRST would know why CRST made the decision to include those paragraphs?

MR. SMEDSTAD: Beyond the scope of designation, foundation.

Go ahead and answer.

A. I could not know who was over operations in 2012.

BY MR. TUDDENHAM:

Q. Okay. So it would have been the person in charge of operations in 2012?

A. Either operations or the independent contractor division.

Q. When you have recruited drivers to be independent contractors and they've passed all the background check and they are invited to the orientation, at some point in that process prior to the orientation, do

THE REPORTER: Okay.

MR. SWEENEY: My apologies.

THE REPORTER: We are off the record at 3:59 p.m.

(Whereupon, a recess was taken from 3:59 p.m. to 4:05 p.m.)

THE REPORTER: We're back on the record at 4:05.

BY MR. TUDDENHAM:

Q. CRST gets all of its trucks, both for employee drivers and the ones that they lease to lease-operators from Lincoln Sales; correct?

MR. SMEDSTAD: Asked and answered.

Go ahead and answer.

A. Yes, I believe that's true.

BY MR. TUDDENHAM:

Q. Okay. And do you know the process by which it is determined which Lincoln Sales trucks will go to employee drivers and which will be made available for lease by lease-operators?

MR. SMEDSTAD: Beyond the scope of designation.

Go ahead and answer.

A. They are effectively two different pools of

trucks, so when we purchased brand-new equipment, we tend to enter those into company fleets and run them in a company division for a couple of years, and then those are moved out of the company division and into the various lease purchase programs that we have at our organization.

BY MR. TUDDENHAM:

Q. And is there a reason why the employee drivers get the new trucks and the lease-operators get two or three-year-old used truck?

MR. SMEDSTAD: Foundation, beyond the scope of designation.

Go ahead and answer.

A. I would say a couple reasons:

One, many of our independent contractors across our organization are solos, and from a new truck perspective, they're expensive. So in terms of both best use of asset over the life of that truck, and I guess I would say the way our program is structured, we want contractors to be successful, so that's just the way we've chosen to structure our program.

BY MR. TUDDENHAM:

Q. I thought the ICOA said that lease-operators had to drive as a team.

Is that not true?

C. Brueck

historically, if not even today, requires team drivers --

MR. SMEDSTAD: Object to --

BY MR. TUDDENHAM:

Q. -- but not drivers to drive solo?

MR. SMEDSTAD: Object to the form of the question; beyond the scope of designation, asked and answered.

Go ahead and answer.

A. I would that when it was in the ICOA, the basis for that would have been the freight that CRST Expedited traditionally handled was primarily required team transit per our customer agreements. That's what our Sales Team solicited. It's primarily what our network was, and solos found it very difficult to be financially successful at Expedited.

BY MR. TUDDENHAM:

Q. And what has changed?

MR. SMEDSTAD: Object to the form of the question; beyond the scope of designation, foundation.

A. Excuse me. I would say that the industry as a whole has changed and there's just not as much long haul over the road team freight available like there was in the past enough for to us fill our network up, so the opportunity for us to bring in shorter length of haul,

Name:___________
Driver ID___________
Unit#___________

CRST Expedited, Inc. Independent Contractor Operating Agreement

ADDENDUM- LEAD DRIVER PROGRAM

Whereas CRST Expedited, Inc. ("Carrier") transports freight in interstate commerce and is continually in need of truck drivers and, as a result, instituted a truck driver training program ("DTP"). As a part of the Carrier DTP, certain new driver-candidate employees who are holders of a valid Commercial Driver's License ("Student Drivers") are required to drive with an experienced driver for Carrier ("Lead Driver") for a required period of time;

Whereas Carrier has a need for Lead Drivers to participate in its DTP;

Whereas the undersigned Contractor is currently an independent contractor for Carrier, transporting freight in interstate commerce pursuant to the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") they entered into;

Whereas Carrier and Contractor, in Contractor's sole discretion, desire Carrier to engage Contractor to perform, as an independent contractor, and not as an employee of Carrier, the Lead Driver function of Carrier's DTP, which is the function related to training individuals to be employee truck drivers for Carrier; and

Whereas it is to the mutual economic advantage of both parties to enter into this Addendum;

NOW, THEREFORE, in consideration of the mutual conditions and agreements contained herein, Carrier and Contractor enter into the Addendum and agree that:

1. SERVICES TO BE PERFORMED.

1(A). Contractor warrants that he/she has the training and experience to perform, and will fully perform, the requirements of Carrier's Lead Driver program, using his/her best efforts, proper equipment, materials, and supplies, and good, safe, and efficient procedures.

1(B). Contractor shall perform the Lead Driver function of Carrier's DTP, as set forth in the DTP materials furnished to Contractor by Carrier ("Lead Driver Services").

1(C). "Lead Driver Services" shall include Contractor's monitoring and guiding the Student Driver's performance of driving and other standard transportation services to assist Contractor in fulfilling Contractor's obligations under the Agreement. In each instance, before permitting the Student Driver to operate the Equipment or perform other tasks, Contractor shall first determine that, in Contractor's reasonable professional judgment, the Student Driver is sufficiently trained and qualified to perform the task safely and well. In addition to the safety requirements set forth elsewhere in the Agreement, Contractor shall take special care to ensure that the Student Driver complies with all federal, state, and local traffic (including speed), hours-of-service, and other highway safety laws and regulations.

1(D). Contractor shall furnish, at his/her expense, all labor, materials, Equipment, non-vehicular equipment, services, permits, licenses, fees, supervision, transportation, repairs, supplies, taxes, insurance, and everything else of any nature whatsoever necessary to perform the Lead Driver Services. The Student Driver, however, shall at all times remain Carrier's employee and shall be supervised and directly paid by Carrier and covered under Carrier's worker's compensation, health care, and other insurance coverages that he/she may be qualified for and request.

2. COMPENSATION AND DEDUCTIONS FROM COMPENSATION.

Exhibit 30

2(A). For the full and proper performance of the Lead Driver Services, Contractor shall be paid at the same rate of compensation as provided in the Agreement, with the expectation that actual compensation payments to Contractor will reflect a higher number of loads transported with the assistance of the Student Driver's services.

2(B). To help cover Carrier's wage and related costs for the Student Driver, Contractor hereby authorizes Carrier to deduct, from Contractor's settlement compensation, twelve cents ($0.12) per mile for every loaded mile operated by the Equipment (whether driven by Contractor or the Student Driver) under Carrier dispatch (as specifically directed or authorized by Carrier), based on Carrier's most recent (at the start of Contractor's trip) version of the Rand McNally MileMaker® HHG Mileage Guide 18 (Shortest Miles), which Carrier shall make available for viewing and printing of particular Contractor-requested point-to-point mileage calculations at any Carrier terminal during normal business hours.

3. INDEMNIFICATION.

3(A). Included in Contractor's indemnification of Carrier under Section 7(A) of the Agreement shall be all Damages that Carrier incurs arising out of Contractor's (including Contractor's agents' or employees') negligence, gross negligence, or willful misconduct in training, monitoring, or guiding the Student Driver.

3(B). Carrier agrees to defend, indemnify, and hold Contractor harmless from any claim (including any for which Contractor is not indemnified by Contractor's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Losses") that Contractor incurs arising out of or in connection with the Student Driver's acts or omissions while undergoing training with Contractor to the extent that such Losses result from any cause other than Contractor's (including Contractor's agents' or employees') negligence, gross negligence, or willful misconduct in training, monitoring, or guiding the Student Driver.

3(C). Carrier's indemnification obligation under Section 3(B) of this Addendum shall not include any fines, civil penalties, or other Losses (regardless of whether an inspection or enforcement citation names the Student Driver in addition to or instead of Contractor) arising out of or in connection with either (1) the condition, maintenance, or inspection of the Equipment or (2) except as set forth in Section 5(F)(3) of the Agreement, overweight or over- dimension loads.

4. INSURANCE.

4(A). Contractor's and Carrier's respective insurance obligations under Section 10 of the Agreement, as well as Contractor's physical damage and other optional insurance coverages, shall remain in full force and effect, including Contractor's obligation to maintain worker's compensation insurance on Contractor's employees (or, if Contractor so elects and where both state law allows and Carrier approves, occupational accident insurance);

4(B). Contractor shall ensure that Contractor's non-trucking liability and physical damage insurance coverages under the Agreement include endorsements or provisions covering any Student Driver under Contractor's instruction or supervision, in addition to Contractor. In the event of any claim, loss, or expense arising out of the Student Driver's acts or omissions while driving or otherwise under Contractor's instruction or supervision, Contractor's insurance coverages shall be primary to any other insurance that may be available from Carrier. If the Student Driver has an accident while driving Contractor's Equipment, Carrier shall pay half of any insurance deductible or indemnification amount that Contractor owes relating to the accident.

5. <u>INDEPENDENT CONTRACTOR.</u> Contractor and Carrier agree that Contractor shall remain an independent contractor while performing services under this Addendum. Contractor is solely responsible for the manner in which work is performed under this Addendum, and Carrier has no right to control or direct the details and manner in which Contractor's Lead Driver Services are to be accomplished. Contractor shall be responsible for the payment of all wages, salaries, taxes, and other costs or assessments associated with the providing of services under the Addendum, except as provided in the preceding sections.

6. <u>DURATION AND TERMINATION.</u> This Addendum shall begin when signed by both parties. Either party may terminate this Addendum at any time for any reason upon giving the other party thirty (30) days' written notice. If either party materially breaches this AddeMdum, the other party may terminate it immediately by oral notice, memorialized later in writing. If a party is found in material breach of this Addendum in any arbitration or court proceeding, that party shall pay the other party's reasonable attorneys' fees and other costs incident to the breach.

# ERRATA SHEET

Case Name: Anthony Cervantes, et al., v. CRST International, et al.

Deposition Date: November 2, 2022

Deponent: Chad Brueck

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| | | See attached | | |

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS 19th DAY OF December, 2022.

Melissa Stumpff

(Notary Public) MY COMMISSION EXPIRES: 08-31-24

NOTARIAL SEAL IOWA
MELISSA K STUMPFF
Commission Number 791778
My Commission Expires
08-31-24

| Page | Line | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 8 | 16 | president of general manager | president and general manager | Error |
| 27 | 18 | load master | LoadMaster | Error |
| 31 | 4 | driver contractor | driver or contractor | Error |
| 31 | 18 | first-serve scenarios, open delivery | first-serve scenarios or open delivery | Error |
| 36 | 20 | needing cover | needing covered | Error |
| 102 | 17 | drive wherever they have want | drive wherever they want | Error |
| 108 | 8 | ELB | ELD | Error |
| 108 | 16 | Or ELD | Our ELD | Error |
| 117 | 12 | freeform text fields | freeform text field | Error |
| 149 | 16 | revenue and home times less | revenue, and home time is less | Error |
| 149 | 17 | companies out with | companies out there with | Error |
| 150 | 24 | advanced card . . . their advanced card | advance card . . . their advance card | Error |
| 151 | 2 | advanced card | advance card | Error |
| 173 | 4 | purchase transportation | purchased transportation | Error |
| 173 | 8 | purchase transportation | purchased transportation | Error |
| 173 | 10-11 | other than compensation | other than purchased transportation | Error |
| 173 | 24 | budget variants | Budget Variance | Error |
| 175 | 18 | purchase | purchased | Error |
| 176 | 13 | purchase | purchased | Error |
| 227 | 1 | purchased | purchase | Error |

ACKNOWLEDGMENT OF DEPONENT

I, Chad Brueck, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

[signature] December 19, 2022

CHAD BRUECK DATE

Subscribed and sworn to before me this

19th day of December, 2022.

My commission expires: 08-31-24

Melissa Stumpff

Notary Public

NOTARIAL SEAL IOWA
MELISSA K STUMPFF
Commission Number 791778
My Commission Expires
08-31-24

# WELCOME TO CRST

It gives me great pleasure to welcome you, the professional driver to the Gold Team! Without a doubt the most satisfying part of my career at CRST are the friendships developed with thousands of the men and women who drive for the largest team carrier in America. Our commitment to you starts with our open door policy at CRST, which means at any time you are encouraged to stop in and see me or any of the management team to discuss whatever is on your mind.

You begin your career at CRST with an orientation program emphasizing safety. There is nothing we do at CRST that is more important than completing each and every load safely. The Safety and Training team will teach and challenge you to be the safest driver possible. Our expectation of you is to constantly improve your safety knowledge for the well-being of you and those around you on the highways. There are a lot of great training programs which will make you a safer and better driver, please take advantage of these by scheduling yourself into a safety class. Getting you home safely to your family is what matters to all of us!

You are the person closest to our customers and the rest of the team is here to support you in providing excellent customer service. As a team expedited carrier, we have many demanding customers who rave about the service provided by our outstanding drivers. You can help yourself by providing professional, reliable service to all our customers. In turn, you can expect the full support of the management team in assisting you to provide that great service. Please do not hesitate to contact myself, or anyone on the management team, if we are not giving you the full support you need to be a success.

In closing, it is with great pride I welcome you to a company I have called home for over 25 years. You have chosen a financially stable company that is an industry leader in providing expedited transportation. Welcome to the Gold Team, I look forward to working with you.

Drive Safely,

Mike Gannon

Group President – CRST International

Cameron Holzer

President CRST Expedited

# Operations Department Policies, Procedures, & Discipline

## Customer Relations

To the customer, you are CRST! Although this sounds simple, it is very important to remember. The customer pays your wages. A satisfied customer will call CRST again if we provide them with good service. Drivers may forget that without the customer there are no loads to haul and no miles to run. Over the years, we have had some customers who stayed with CRST because our drivers provided premier customer service. Unfortunately, some customers have been disappointed by the poor performance or unsatisfactory behavior on the part of a driver. It is not easy to be courteous when someone else is rude to you, but in any service-related business, it is an absolute necessity!

Good customer service is job security. Every time you leave a shipper or consignee, that customer will form an opinion about CRST. If it is a good opinion, you have done your job well. If it is a bad opinion, you have done a poor job at customer relations and may have lost the customer for CRST.

Drivers who give bad customer service cannot and will not be tolerated. A driver can make things easier for all drivers by being polite, courteous and by obeying the rules on the dock. The next time you load or unload, ask the customer how CRST drivers are doing. You can bet they will have an answer. We hope it is a good one.

### *Why is On-Time Delivery Important?*

Customers pay CRST to pick-up and deliver their freight safely and on time.

- What if a carrier cannot deliver a customer's freight on time?
- What if a carrier exceeds its customer's expectations by being on time for pick-up and delivery?
    - *Which company would you rather work for?*

The first thing a customer expects from CRST is that we arrive on time. When your fleet manager gives you an appointment time, keep it! If you are late, you run the risk of shutting down a production line or upsetting the customer's schedule. Being on time is your #1 responsibility after being safe. Many people depend on drivers. CRST relies on drivers to fulfill delivery promises. The Shipping or Receiving Department relies on drivers to keep them on schedule. Everyone at CRST relies on drivers to keep our customers happy. The professional driver takes pride in an on-time performance record.

Communication is the key! You must immediately notify Operations at the first indication that a late delivery may occur. Be prepared to provide reasons for being late. It is important to let the customer know that we are running behind before we miss the appointment time. It may save you having to wait. More than once a driver who did not communicate a late load to Dispatch ended up sitting more than a day or two while we worked to get the load rescheduled. Failure to communicate a late load to Dispatch will result in disciplinary action. Delivering a load on time is the responsibility of both drivers in the truck. Both drivers will be held accountable for a late load. Repeat late deliveries will be reported as a service failure regardless of notification. CRST's service target is 95%: Some customers expect as much as 95 - 97%!

**We need your help to service the customer! Can we count on you?**

### *Be On Time:*

The first thing a customer expects from CRST is that we arrive on time. When your fleet manager gives you an appointment time, keep it! If you are late, you run the risk of shutting down a production line or upsetting the customer's schedule. Being on time is your #1 responsibility after being safe. Many

Exhibit 2

# CRST EXPEDITED, INC.

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Rev. October 2017

***THIS AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, WHICH ARE HIGHLIGHTED IN BOLDFACED UNDERLINED TYPE.***

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

CRST Expedited, Inc. ("Carrier"), an authorized for-hire interstate motor carrier registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT") and applicable State and foreign authorities, and the undersigned independent contractor ("Contractor"), together the "Parties," in consideration of the mutual covenants herein contained and pursuant to the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, enter into this Independent Contractor Operating Agreement (the "Agreement").

1. CONTRACTOR'S EQUIPMENT AND SERVICES.

1(A). <u>Provision of Equipment and Services.</u> Contractor warrants that he/she is the "owner" of the equipment set forth in the attached Equipment Receipt and Section 1 of Appendix A (Contractor Election Form) or as supplemented in an Addendum ("Equipment") within the meaning of 49 C.F.R. § 376.2(d) and has full authority to contract the Equipment and services to Carrier; and that the Equipment is in good, safe, and efficient operating condition, meets all applicable federal, state, local, and foreign requirements, and is in all respects fit and serviceable for the use intended under this Agreement. Contractor hereby provides Carrier with professional truck driving services, other incidental transportation-related services, and the use of the Equipment.

1(B). <u>Team Driving.</u> To maximize Carrier's efficiency in meeting its customers' expedited transportation needs, Contractor agrees to have the Equipment operated using two-driver teams only, except when:

1(B)(1). Contractor has entered into a Lead Driver Program Addendum to this Agreement and a Contractor driver ("Lead Driver") is dropping off a Carrier driver-candidate employee under such Program ("Student Driver") at a Carrier-designated location and heading to Contractor-designated time not furnishing services under this Agreement ("Home Time");

1(B)(2). Lead Driver is coming back from Home Time and heading to pick up a Student Driver;

1(B)(3). Lead Driver has dropped off a Student Driver at a Carrier-designated location and no other Student Driver is immediately available to form a driving team with Lead Driver;

1(B)(4). Lead Driver has dropped off a Student Driver at a Carrier-designated location and is heading to pick up another Student Driver at a different location;

1(B)(5). One of Contractor's team drivers ("Team Driver") has dropped off co-Team Driver at home or other location for Home Time and is heading to another location for his/her own Home Time;

1(B)(6). Team Driver is coming back from Home time and heading to pick up co-Team Driver;

1(B)(7). Co-Team Driver is absent from the Equipment for no more than seven consecutive calendar days due to illness or other urgent personal business;

1(B)(8). Lead Driver or Team Driver whose Student Driver or co-Team Driver, respectively, is riding in but not driving the Equipment for no more than seven consecutive calendar days because the other driver has been temporarily disqualified by Carrier from driving (due to expiration of commercial driver's license or other reason approved by Carrier);

1(B)(9). Lead Driver or Team Driver is dispatched by Carrier to a Carrier terminal in connection with termination of this Agreement by Contractor or Carrier; or

1(B)(10). Carrier has disqualified a Student Driver or Co-Team Driver from driving, or the Student Driver or Co-Team Driver has ended his/her service with Carrier or Contractor, respectively, and Contractor's other Team Driver is heading to pick up another Student Driver or Co-Team Driver (not to exceed fourteen (14) consecutive calendar days).

1(C). <u>No Limitations on Contractor's Use of Equipment.</u> Carrier does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, or to furnish any specified number of loads or pounds of freight to Contractor or to guarantee any amount of revenue to Contractor. Contractor is free to accept or reject any specific shipment offered by Carrier. Contractor is not prohibited from entering into separate agreements to provide other equipment and other professional truck drivers, not identified as Equipment above or in an appendix and drivers not used to service this Agreement, to other motor carriers. Nor is Contractor, consistent with Section 1(E) of this Agreement, prohibited from using the Equipment for the pick up, transportation, or delivery of property for more than one common carrier or other person or entity.

1(D). <u>Exclusive Possession, Control, and Use.</u> Carrier and Contractor intend to relate to each other entirely as independent contractors, not as employer and employee. Nevertheless, solely to comply with 49 C.F.R. § 376.12(c)(1), Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. Contractor may operate the Equipment for another motor carrier during this Agreement only with Carrier's prior written consent (which shall not be unreasonably withheld) and only if done under a sublease between Carrier and the other authorized carrier (including Contractor, if Contractor has the requisite motor carrier registration/operating authority(ies) and insurance) pursuant to 49

C.F.R. § 376.12(c)(2), as applicable and the terms of Subsection E of this Section. Carrier shall not sublease the Equipment to another carrier without Contractor's prior written consent (which consent shall not be unreasonably withheld). Carrier shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, except when the Equipment is under sublease by Carrier to another authorized carrier. Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease.. The foregoing declarations are made in order to comply with DOT regulations (49 C.F.R. § 376.12(c)) and shall not be used to classify Contractor as an employee of Carrier. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Contractor's drivers are independent contractors or employees of Carrier and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."

1(E). <u>Subleases and Other Alternative Uses of Equipment.</u> At Contractor's request, Carrier may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of Carrier only under the terms and conditions set forth in this Subsection (E). The other uses may consist of (together, "Alternative Uses of Equipment"): **(i) Sublease** – Carrier subleases the Equipment (including driving services furnished by Contractor) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; **(ii) Contractor Motor Carriage** – Contractor uses Contractor's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this Subsection (E) relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and **(iii) Exempt Motor Carriage** – Contractor, lacking motor carrier operating authority of Contractor's own but possessing a validly-issued DOT Number, lawfully provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier (directly or through a motor freight broker).

1(E)(1). **Carrier's Authorization and Release.** To obtain Carrier's authorization for each Alternative Use of Equipment, Contractor shall take the following steps before accepting a trip:

1(E)(1)(a). <u>For Alternative Uses of Equipment Involving Subleases.</u> Have the Sublease Carrier complete, sign, date, and then fax, or scan and email, to Carrier a sublease in the form appended as **Appendix C (Sublease)** of this Agreement ("Sublease"), together with the Sublease Carrier's certificate of insurance required by Section 5 of the Sublease;

1(E)(1)(b). <u>For Alternative Uses of Equipment Involving Contractor Motor Carriage.</u> Telephone or email Carrier's dispatch and provide it with valid information about Contractor wishing to arrange the Alternative Use of Equipment – name, address, identification number (which shall be the U.S. Department of Transportation number for interstate private carriers, any applicable state number for intrastate private carriers, and the Federal Employer Identification Number for other private carriers and shippers), phone number, email address, and individual contact's name – and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip; and

1(E)(1)(c). <u>For Alternative Uses of Equipment Involving Exempt Motor Carriage.</u> Contractor shall submit to Carrier proof (including in the form of a printout of a search on http://li-public.fmcsa.dot.gov) that it has obtained a validly-issued DOT Number (and the name and State under which DOT has listed the DOT Number) and telephone or email Carrier's dispatch and provide it with valid information about the shipper or private carrier (same information as required in Section 1(E)(1)(b) above) and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip.

1(E)(2). **Compensation For All Alternative-Use-of-Equipment Operations.** In connection with a Sublease or other Alternative Use of Equipment, Contractor agrees that:

1(E)(2)(a). Contractor shall submit any necessary Sublease- or other Alternative Use-related shipping documents to, and obtain settlement compensation directly and exclusively from, Sublease Carrier (in the case of Sublease trips) or the shipper or private carrier (in the case of Contractor Motor Carriage or Exempt Motor Carriage trips). Notwithstanding anything in this Agreement to the contrary, Carrier shall have no responsibility for collecting freight charges or paying settlement compensation to Contractor for any Alternative-Use-of-Equipment trip; and

1(E)(2)(b). To avoid any implication that Carrier is subsidizing Contractor's independent business use of the Equipment, Contractor shall pay Carrier the per-trip Alternative-Use-Fee stated in Section 4 of **Appendix A (Contractor Election Form)** to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in

connection with the Alternative-Use-of-Equipment trip.

1(E)(3). **Carrier's Identification.**

1(E)(3)(a). Subleases. For the duration of any Sublease, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead the Sublease Carrier's identification; and

1(E)(3)(b). Contractor Motor Carriage. For any trip under Contractor's own operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to a shipper or private carrier, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead Contractor's identification. If Contractor possesses interstate or intrastate operating authority and no other motor carrier booked the shipment, the shipment, even if exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, shall be deemed to be one involving Contractor Motor Carriage

1(E)(3)(c). Exempt Motor Carriage. For any trip by Contractor, lacking Contractor's own operating authority but possessing a validly-issued DOT Number, on which it provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to a shipper or private carrier, Contractor shall remove or cover Carrier's identification from the Equipment and shall display Contractor's DOT Number and DOT-listed name (or, if applicable, D.B.A. Name) on the Equipment for the duration of each Exempt Motor Carriage trip.

1(E)(4). **Control of and Responsibility for the Equipment.** As required by 49 C.F.R. § 376.12(c)(1), Carrier, except for Sublease and Contractor Motor Carriage trips, shall with respect to the public have exclusive possession, control, and use of the Equipment, and assume complete responsibility for the operation of the Equipment, for the duration of this Agreement. For Sublease trips, Carrier's sublease to Sublease Carrier shall, in accordance with 49 C.F.R. § 376.22(c)(2), provide that Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease. For Contractor Motor Carriage trips, which also constitute subleasing, Contractor shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of trip.

1(E)(5). **Insurance.** For Alternative-Use-of-Equipment trips, just as for trips performed on behalf of Carrier, Carrier's and Contractor's insurance obligations shall be as set forth in Section 10 of this Agreement, provided that:

1(E)(5)(a). Subleases. As between Sublease Carrier and Carrier, the sublease shall provide that Sublease Carrier's public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage insurance shall cover the Equipment for the duration of the Sublease; be in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence); and be primary to any insurance coverages that Carrier may maintain; and

1(E)(5)(b). Contractor Motor Carriage. With respect to Alternative-Use-of-Equipment trips involving Contractor Motor Carriage (using Contractor's own operating authority), Contractor shall, and hereby warrants that he/she does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence), covering the Equipment for the duration of the Alternative-Use-of-Equipment trips. Contractor shall provide a valid certificate of insurance evidencing such coverages to Carrier before accepting any Alternative-Use-of-Equipment trips involving Contractor Motor Carriage. On such trips, as between Contractor and Carrier, Contractor's public-liability insurance and cargo loss-and-damage insurance policies shall be primary to any insurance coverages that Carrier may maintain.

1(E)(5)(c). Exempt Motor Carriage. Carrier's public liability coverage and cargo loss-and-damage coverage pursuant to Section 10(A) this Agreement shall apply to Exempt Motor Carriage trips.

1(E)(6). **Fuel Tax Reporting and Payment.** With respect to fuel tax reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), unless Contractor has elected, pursuant to Section 5(F)(2)(a) of this Agreement, to obtain Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Carrier shall be deemed the reporting entity with respect to the Equipment and the fuel consumed by the Equipment, and Carrier shall perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's

behalf. Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement quarterly any amount stated in Section 5(F)(2)(a)(2) of this Agreement.

1(E)(7). **International Registration Plan Reporting.** With respect to International Registration Plan reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), Carrier shall be responsible for reporting all miles traveled by Contractor's Equipment and in what state(s). Contractor shall provide Carrier promptly with documentation showing all miles traveled by state for each trip.

1(E)(8). **Driver Logs.** With respect to Sublease trips, Contractor shall submit a copy of all driver logs to both Carrier and Sublease Carrier after each trip. All driver logs should name both Carrier and Sublease Carrier; show all duty time for each 24-hour period of each trip; and the beginning and finishing time (designating a.m. or p.m.) worked for each identified motor carrier. Pursuant to 49 C.F.R. § 395.8(j), before each Sublease trip, Contractor shall provide to Sublease Carrier a signed statement stating the Contractor's total time on duty during the immediately preceding seven days and the time at which Contractor was last relieved from duty prior to beginning work for Carrier.

1(E)(9). **Driver Vehicle Inspection Reports and Repair Records.** With respect to Sublease and Contractor Motor Carriage trips, Contractor shall prepare and submit to Carrier a written Driver Vehicle Inspection Report complying with the requirements of 49 C.F.R. § 396.11, and Carrier shall obtain and maintain all records relating to repairs of the Equipment.

1(E)(10). **Remaining Agreement Terms.** In all other respects, the terms of this Agreement shall apply to Contractor's Alternative-Use-of-Equipment operations.

2. **GROSS COMPENSATION.** Contractor's gross compensation shall be as set forth in **Appendix B (Contractor Compensation)**, and such gross compensation shall constitute the total compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. As indicated in Section 5(F) (Operating Expenses) and Section 6 (Charge-Backs) of this Agreement, Contractor – as an independent contractor, not an employee – agrees to pay all of Contractor's operating expenses (including but not limited to those that Carrier initially advances and later charges back to Contractor) out of the gross compensation provided under this Section and **Appendix B (Contractor Compensation)** and any other Contractor moneys. Under no circumstances shall Carrier be responsible for such operating expenses.

3. SETTLEMENT PERIOD AND DOCUMENTATION.

3(A). Settlement. Carrier shall settle with Contractor, paying Contractor any Settlement Compensation, as defined in Section 6(A) of this Agreement within fifteen (15) calendar days after submission by Contractor or Contractor's agent, by mail or in person, of properly completed logs required by FMCSA and those documents, in proper form, necessary for Carrier to secure payment from the shipper, including but not limited to trip sheets, delivery receipts, loading/unloading records, bills of lading, and any other receipts for which compensation is to be paid. Contractor shall submit such driver logs and delivery documents to Carrier at its main headquarters or at such other place as Carrier may designate. Payment shall not be made contingent, however, upon submission of a clean bill of lading -- that is, one to which no exceptions have been taken. At each weekly settlement, Carrier shall furnish to Contractor, by the method chosen by Contractor in Section 5 of **Appendix B (Contractor Compensation)**, a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement").

3(B). Documentation. If compensation is based on a percentage of the revenue for a shipment, Carrier shall provide Contractor, before or at the time of settlement, with a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Contractor shall be permitted to examine Carrier's tariffs, or in the case of contract carriage, other documents from which rates and charges are computed, and documents underlying any computer-generated document, at its main headquarters during normal business hours. If rates and charges are computed from a contract, Contractor is entitled to examine only those portions of the contract containing the same information as would appear on a rated freight bill. Carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation. Carrier has the exclusive right to set the rates and amounts charged to Carrier's customers, shippers, consignors, or consignees, and nothing in this Agreement shall be construed to limit that right.

4. **COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS.** Neither Contractor nor Carrier shall engage in, or attempt, conspire, or threaten to engage in, any act or omission that would constitute a felony or intentional tort, whether or not relating to or arising out of operations under this Agreement. In addition, Contractor recognizes that Carrier's business of providing motor carrier freight transportation service to the public is subject to the requirements of Carrier's customers and to regulation by the federal government acting through DOT, and by various other federal, state, local, and foreign authorities. Contractor hereby acknowledges that he/she possesses full and complete understanding and knowledge of the applicable re-

quirements of all such authorities, including but not limited to DOT (including FMCSA's Compliance, Safety, Accountability ("CSA") Program), state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), and of all customer requirements provided to Contractor in writing. Accordingly, Contractor shall adhere to the following provisions of this Agreement to aid Carrier in discharging its legal duties and customer-service responsibilities:

4(A). Maintenance and Inspection. Contractor, at Contractor's expense, shall equip and maintain the Equipment in accordance with all applicable government regulations including but not limited to ensuring the Equipment's systematic repair and maintenance and keeping it in compliance with the laws and regulations of federal, state, local, or foreign authorities, and Carrier's safety and equipment maintenance policies. In order to ensure compliance with all such requirements, Contractor shall make the Equipment available for inspection by Carrier, at Carrier's expense, at any time upon reasonable request by Carrier. Contractor also shall have the Equipment inspected, at Carrier's expense, once annually in accordance with 49 C.F.R. § 396.17, either at Carrier's maintenance facility or another maintenance facility that Carrier authorizes. Contractor shall bear the expense of any additional inspections of the Equipment. To facilitate Carrier's compliance with 49 C.F.R. Part 396, Contractor shall keep and maintain, or cause to be kept and maintained, systematic records of the repair and maintenance of the Equipment, and shall, when requested orally or in writing by Carrier, promptly forward to Carrier all inspection, repair, or maintenance records requested.

4(B). Equipment Identification. Contractor shall apply, before placing the Equipment in Carrier's service, to the outside of the Equipment such identification as Carrier may designate in accordance with the requirements of all applicable federal, state, local, or foreign authorities, provided that Contractor shall first remove any paint, decals, or other items that, in Carrier's reasonable judgment, would interfere with such identification or be otherwise offensive. Carrier reserves the right to require from time to time the repainting or remarking of the Equipment at Contractor's expense. Upon termination of this Agreement or any other time the Equipment is being operated on behalf of any other carrier pursuant to Section 1(E) of this Agreement, Contractor shall immediately, at Contractor's expense, remove, paint over, or, in the case of operations on behalf of another entity, completely cover over, all of Carrier's identification (see Section 14 of this Agreement for requirements at termination of Agreement) all of Carrier's identification. At no time during this Agreement shall Contractor place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of Carrier, without Carrier's prior written consent pursuant to Section 1(E) of this Agreement (which consent shall not be unreasonably withheld).

4(C). Lawful and Safe Operations.

4(C)(1). In General. Contractor shall ensure that he/she and all drivers or other personnel he/she furnishes shall (a) drive or otherwise perform in a safe manner at all times so as to avoid actual or threatened commitment of a felony or intentional tort, endangering the public, the driver, and/or the property being transported; (b) adhere to and perform the terms of this Agreement; the requirements of all Applicable Law, Carrier's operating authorities, and, conditioned only upon Point (a) of this Subsection, all customer requirements (to the extent provided by Subsection (H) of this Section), and Carrier Policies and Procedures[1]; and (C) do not, in Carrier's reasonable judgment, cause, in whole or in part, through negligence, gross negligence, or willful misconduct, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5.

4(C)(2). Compliance, Safety, Accountability Program. The parties understand that, as discussed in FMCSA's CSA *Carrier Safety Measurement System Methodology* (Feb. 2013, Version 3.0) ("SMS"), as amended from time to time by FMCSA and published online at http://csa.fmcsa.dot.gov/Documents/SMSMethodology.pdf, FMCSA will impose negative points for violations found during roadside inspections under the seven CSA Behavior Analysis Safety Improvement Categories ("BASICs"). Collectively, the negative points accumulated across a carrier's fleet (including the vehicles of all contractors under lease to the carrier), help determine the carrier's CSA rating. Accordingly, Contractor, and any drivers of Contractor, shall at all times meet the CSA Program's safety standards sufficient to enable Carrier to (a) achieve and maintain a "fit" or similar rating that enables Carrier to operate without FMCSA intervention or restriction pertaining to any of the seven safety evaluation areas measured by CSA Program ("BASICs"); (b) obtain insurance coverage without increased costs associated with driver ratings or other such driver measurements or qualifications pertaining to drivers under CSA; and (c) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. As part of the driver qualification process or, for an existing Contractor and such Contractor's already-Carrier-qualified drivers, upon request by Carrier, each of Contractor's drivers (including Contractor, if a driver) shall consent and authorize Carrier to access applicable driver files, SMS safety scores and other data, and FMCSA's Pre-

[1] "Carrier Policies and Procedures" comprise Carrier's "Drug and Alcohol Policy," "Passenger Program Policy Statement," and the Federal Motor Carrier Safety Regulations (see "Rules & Regulations" at www.fmcsa.dot.gov). Carrier shall furnish a paper copy of the Drug and Alcohol Policy and the Passenger Program Policy Statement to Contractor, at no charge, contemporaneously with the start of this Agreement and, during this Agreement, shall make these materials available to Contractor on request for inspection at a Carrier terminal during normal business hours at no charge. Carrier shall furnish a paper copy of any amendments to the Drug and Alcohol Policy or the Passenger Program Policy Statement to Contractor, at no charge, before the amendments go into effect. Contractor may, at Contractor's expense, inspect, download, and/or print the Federal Motor Carrier Safety Regulations by accessing (including, on request, at any Carrier terminal) FMCSA's "Rules & Regulations" web page indicated above.

Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter by immediately reviewing, signing, and returning to Carrier the "PRIVACY-RELATED DISCLOSURES AND CONSENT FORM," attached as Appendix E to the Agreement. Contractor further agrees to notify Carrier in writing within two (2) business days of receiving notification from the FMCSA that Contractor or any of Contractor's drivers have been deemed "unfit" or "marginal" based on their safety, inspection, and compliance performance.

**4(C)(3). Communication System /EOBR.** To help fulfill government highway-safety and other Applicable Law requirements imposed on Contractor's drivers (including Contractor, if a driver) and/or Carrier, including FMCSA's hours-of-service regulations, by monitoring and documenting such drivers' and their Equipment's compliance with highway-safety and other Applicable Law requirements, Contractor shall maintain in an operable condition in each unit of Contractor's Equipment a communications and electronic onboard recorder system ("Communication System/EOBR") that constitutes the Omnitracs, LLC, model then-currently designated by Carrier.

4(C)(3)(a). Furnishing of Unit. *Except with respect to units of Equipment leased from CRST Lincoln Sales, Inc.*, (1) Contractor may elect to obtain, install in the Equipment, and maintain the above Communication System/EOBR, by initialing OPTION 1 in Section 3 of **Appendix A (Contractor Election Form)** or (2) Contractor may elect, by initialing OPTION 2 in Section 3 of **Appendix A**, to have Carrier arrange to have installed in the Equipment the Communication System/EOBR that constitutes the Omnitracs, LLC, model then-currently designated by Carrier. In the latter event, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the installation fee and weekly rent in the amounts set forth in Section 4 of **Appendix A**. *For units of Equipment Contractor chooses to lease from CRST Lincoln Sales, Inc.*, which will have the Omnitracs, LLC, Communication System/EOBR installed in them, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the weekly rent in the amount set forth in the Deductions Table of Section 4 of **Appendix A**. In all units of the Equipment, Contractor agrees to keep the Communication System/EOBR in an operable and functioning condition at all times that the Equipment is being operated in Carrier's service.

4(C)(3)(b). Network Charge. Whether the Communication System/EOBR is Contractor's or Carrier's, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement a network charge in the amounts stated in Section 4 of **Appendix A**.

4(C)(3)(c). Re-Installation of Carrier-Furnished Communication System/EOBR. In the event Contractor shall replace the unit(s) of Equipment (tractor(s)), Carrier shall bear the expense of removal and re-installation of any Carrier-furnished Communication System/EOBR in Contractor's replacement Equipment.

4(C)(3)(d). Return of Carrier-Furnished Communication System/EOBR. Contractor shall be responsible for the return of each Carrier-furnished Communication System/EOBR to Carrier immediately upon any request from Carrier or the termination of this Agreement, in accordance with Section 14 of this Agreement. A qualified technician selected by Carrier shall remove the Communication System/EOBR. If the Communication System/EOBR is lost, damaged as a result of Contractor's negligence, or not returned upon request or upon termination of this Agreement, Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement the entire expense incurred by Carrier in repairing or replacing the Communication System/EOBR, together with all collection costs. Carrier shall not be responsible for any loss or damage to Contractor's Equipment arising or resulting from the installation, use, or removal of the Carrier-furnished Communication System/EOBR.

4(C)(3)(e). Privacy-Related Disclosures and Consent Form. The "Privacy-Related Disclosures and Consent Form," which is attached as **Appendix E** of this Agreement, describes the categories of data to be collected through the Communication System/EOBR; the uses to be made of such data by Carrier; and the right of Contractor and any Contractor's driver to review the collected data on request to Carrier, but only data relating to the requesting Contractor (including that Contractor's drivers) or the requesting driver, respectively. The form in **Appendix E** also includes a consent paragraph, as described in Section 4(C)(2) of the Agreement.

4(C)(3)(f). Use of Communication System/EOBR. Contractor shall ensure that Contractor's drivers do not operate the voice, data, texting, or other features of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

4(D). Drivers. Contractor shall provide competent professional drivers who meet Carrier's minimum driver qualification standards (part of Carrier's Policies and Procedures) and all Applicable Law. As part of the driver qualification process, Contractor and Contractor's drivers shall authorize Carrier to access applicable driver files.

**4(D)(1). Medical Examinations.** Contractor acknowledges that DOT requires all drivers to undergo a complete medical examination prior to being allowed to drive, in any capacity whatsoever, in Carrier's motor carrier services. Such examination shall be performed and shall include testing for use of controlled substances and alcohol. Drivers may be required to take follow-up examinations, from time to time, in ac-

cordance with the requirements of 49 C.F.R. §§ 391.41 *et seq.* Additionally, if in the judgment of Carrier a further medical examination appears warranted, such examination shall be undergone. The expense of the initial medical examination for each of Contractor's drivers shall be the responsibility of Carrier; the expense of all subsequent medical examinations shall be the responsibility of Contractor.

4(D)(2). **Drug and Alcohol Testing.** As required by 49 C.F.R. §§ 382.103 and 382.601, Contractor and Contractor's drivers shall comply with Carrier's Drug and Alcohol Policy, including participation in Carrier's random drug and alcohol testing program, and any addendums or revisions thereto. Violation of Carrier's Drug and Alcohol Policy, or positive tests for prohibited drugs or alcohol, shall immediately disqualify Contractor's driver. Carrier shall bear the expense of all drug and alcohol tests.

4(D)(3). **Disqualification of Drivers.** Carrier shall have the right to disqualify any driver provided by Contractor in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law, in violation of Carrier's minimum qualification standards, or in violation of any policies of Carrier's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet Carrier's minimum qualification standards. Upon a driver's disqualification by Carrier, Contractor shall, if Contractor so chooses, furnish another competent, reliable, and qualified professional driver who meets Carrier's minimum qualification standards or this Agreement shall terminate immediately.

4(D)(4). **TWIC Requirement.** If a Contractor's driver lacks a Transportation Worker Identification Credential ("TWIC") from the Transportation Security Administration of the U.S. Department of Homeland Security when dispatched by Carrier to make a pickup or delivery at a port and therefore needs a suitably-credentialed escort, Contractor shall pay the fee charged by the escort.

4(E). Driver Records. Contractor shall regularly submit to Carrier all properly-completed driver log sheets within, as required by federal regulation (49 C.F.R. § 395.8(i)), thirteen (13) days following Contractor's completion of each log sheet and supporting documents (including original toll receipts for Carrier's reproduction), lumper (loader/unloader) receipts, trailer washout receipts, medical examination certificates, accident reports, DOT inspection documents, citations, Driver Vehicle Inspection Reports, and any other required data, documents, or reports. Contractor agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of Carrier or as authorized by Carrier, and shall indicate that the property transported is under Carrier's responsibility or that of a carrier to which the Equipment has been subleased.

4(F). Passenger Authorization. In accordance with 49 C.F.R. § 392.60(a), Contractor shall not allow any passengers (other than team co-drivers) to ride in the Equipment unless Carrier authorizes it in writing in advance. Carrier shall authorize Contractor to carry passengers (other than team co-drivers) only when one of the exceptions set forth in Sections 1(B)(1)-(10) of this Agreement to the team-driving requirement applies. Before Carrier shall give such authorization, Contractor, Contractor's driver, AND the passenger requesting authorization shall sign and submit to Carrier a fully executed release agreement pursuant to the "CRST, Inc. Passenger Program Policy Statement" available on request from Carrier. In addition, Contractor shall first obtain and maintain the passenger insurance coverage required by Section 10(B)(3) of this Agreement. **Contractor agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever.**

4(G). Paperwork Requirements. Contractor shall submit to Carrier, on a timely basis, all properly completed, accurate, and legible driver logs and supporting documents (including originals or photocopies of toll receipts), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that Carrier requests proving Contractor has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), Carrier will keep the original of this Agreement with a copy to be maintained by Contractor, and a second copy to be carried in the Equipment during the term of this Agreement.

4(H). Customer Requirements. Contractor shall adhere to and perform, with respect to each shipment offered by Carrier under this Agreement, all service standards and other requirements of Carrier's customers that have been furnished to Contractor in writing, in hard-copy or electronic form, in advance of the shipment and that may reasonably be adhered to and performed without violating Applicable Law or endangering the public, the driver, and/or the property being transported. If Carrier's customer conditions Contractor's driver's access to facilities or freight upon the driver's passing the customer's own drug or alcohol tests or upon Contractor's or Contractor's drivers' meeting other personal-equipment or vehicular standards not imposed by Applicable Law, this Agreement, or Carrier Policies and Procedures, Contractor shall be free, and shall incur no Carrier sanction as a result, to reject the tests and/or standards and to refuse Carrier's offer of the customer's shipment.

5. **CONTRACTOR'S RESPONSIBILITIES.** Carrier and Contractor both recognize their relationship as one of CARRIER and INDEPENDENT CONTRACTOR and not of EMPLOYER and EMPLOYEE, respectively. Subject only to regulatory mandates, related Carrier policies, and customer requirements, it shall be the sole responsibility of Contractor to determine the manner and means of performing all of Contractor's services under this Agreement, including, but not limited to:

5(A). Workers. Selecting, setting the compensation, hours, and working conditions, adjusting any grievances, and supervising, training, disciplining, and firing all drivers, drivers' helpers, and other workers necessary for the performance of Contractor's obligations under this Agreement, provided that Contractor shall ensure that all such

drivers and other workers comply with the terms of this Agreement, including the requirements of safe operations and compliance with Carrier's safety policies and procedures while operating the Equipment on Contractor's behalf. No person Contractor may engage shall be considered Carrier's employee. Contractor alone shall pay any employment expenses for Contractor's workers, including but not limited to worker's compensation insurance, employment taxes, and all other benefits and pensions for the Contractor and Contractor's drivers, drivers' helpers, and other workers.

5(B). Equipment. Selecting, purchasing, and financing, and the Equipment and deciding when, where, and how maintenance and repairs are to be performed on the Equipment. Contractor shall be free to substitute a different vehicle for the one constituting the Equipment, if each of the Contractor requirements of Section 1(A) of this Agreement is met and Carrier furnishes Contractor a new receipt covering the vehicle. The substitute vehicle shall thereupon constitute the Equipment under this Agreement.

5(C). Routes and Completion of Performance. Selecting all routes and refueling stops, provided that to meet customers' demands, Contractor agrees to make timely and safe deliveries of all loads, to notify Carrier when delivery has been made or when delivery will be delayed for any reason, and to be subject to Carrier's remedies for Contractor's nonperformance provided in Section 12 of this Agreement.

5(D). Loading. Loading and unloading freight onto and from the Equipment (if the shipper or consignee does not assume such responsibilities), with no additional compensation for this service except as provided in Appendix B (Contractor Compensation).

5(E). Use of Communications Equipment. Contractor shall ensure that the contractor, or the contractor's drivers, does not operate the voice, data, texting, or other features of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

5(F). Operating Expenses. Paying all operating expenses, including, but not limited to, all expenses for fuel, oil, tires and other spare parts, supplies, and equipment necessary for the safe, efficient, and lawful operation and maintenance of the Equipment; road taxes, mileage taxes, fuel taxes, Federal heavy vehicle use tax, and state or local property or indefinite situs taxes; fines for parking, moving, or weight violations resulting, at least in part, from Contractor's acts or omissions; ferry, bridge, tunnel, and road tolls; any C.O.D. freight revenue collected by Contractor from shippers or others under this Agreement and not remitted to Carrier; towing; empty mileage; registration fees, base plates, licenses (and any unused portions of such fees, plates, or licenses),and permits of all types (except as set forth in Appendix B (Contractor Compensation)); Contractors' drivers' or other workers' wages, employee benefits, insurance, pensions, employment taxes, advances, and any other levies or assessments based upon the operation of Contractor's equipment for Carrier; with the following exceptions:

5(F)(1). Detention and Accessorial Expense. Contractor is responsible for detention expense and accessorial services expense except when Carrier, in its sole discretion, elects to bill and actually collects either type of expense from a customer, in which event Carrier shall pay Contractor the percentage of such amounts specified in Appendix B (Contractor Compensation);

5(F)(2). Fuel and Mileage Tax Reporting. Contractor is responsible for all state mileage and/or fuel taxes.

5(F)(2)(a). If Contractor elects, by initialing Option 1 in Section 2(B)(2) of Appendix A (Contractor Election Form) or an addendum to this Agreement, to obtain Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Contractor shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and shall indemnify, defend, and hold Carrier harmless against all claims arising out of or relating to such fuel tax reporting and payment. If Contractor instead elects, by initialing Option 2 in Section 2(B)(2) of Appendix A, to have Carrier perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's behalf, Contractor hereby agrees that:

5(F)(2)(a)(1). To facilitate the parties' compliance with the various states' tax reporting and payment requirements (which generally hold the motor carrier liable if an independent vehicle operator performing transportation services on the carrier's behalf fails to make the required tax payments), Carrier shall be deemed to be the reporting entity with respect to the Equipment and the fuel consumed by said Equipment. In such event, Carrier shall settle with Contractor monthly and submit quarterly, in Contractor's name as indicated herein, as to all the applicable reports and payments of fuel taxes required of it by the taxing bodies and authorities of the appropriate states, provinces, and other governmental bodies with respect to the Equipment operated under this Agreement. To assist in Carrier's computing and payment of fuel taxes, it shall issue Contractor an advance card for each of Contractor's drivers that may be used for fuel purchases ("CRST Advance Card"). Contractor and Contractor's drivers are free not to use Carrier's Advance Card but, to the extent they choose not to, Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. In addition, if Contractor's Equipment lacks an Omnitracs, LLC, Communications System/EOBR (as defined in Section

6(A). Deductions Table. Contractor hereby authorizes Carrier to charge back or deduct – from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's Escrow Funds (to the extent provided under Section 8 of this Agreement), or from other amounts Carrier owes to Contractor at the time of settlement with Contractor – amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) of this Agreement, resulting in a net amount, if any, to be remitted to Contractor ("Settlement Compensation"). If Contractor's settlement compensation proves insufficient, Contractor hereby authorizes Carrier to deduct such items from Contractor's Escrow Fund established under Section 8 of this Agreement. Where no dollar figure is listed in the Deductions Table, the deductions will vary in amount and shall be computed as indicated in the column headed "Amount of Deduction or Method of Computation" or in Section 4 of Appendix A (Contractor Election Form) or in an addendum to this Agreement. Except as otherwise indicated in that column, (a) Carrier shall charge Contractor no administrative ("admin.") fee or markup and (b) Carrier shall credit Contractor with all rebates, discounts, credits, or refunds that correspond to particular charge-backs or deductions and that Carrier receives while this Agreement is in effect or, in the case of taxes and fees, even after this Agreement is terminated. **Instead of or in addition to making the deductions authorized by this Section or other provisions of this Agreement and any addendum, Carrier shall have a right to recover, through collection agencies, the right of setoff, and all other available legal means, any such amounts Contractor owes, or comes to owe, Carrier under this Agreement.**

6(B). Information Regarding Deductions. Carrier shall provide Contractor with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all charge-backs and deductions, Carrier shall make available to Contractor, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

6(C). Changes in Existing Deduction Items. If any deduction item, amount, or method of computation on the Deductions Table in Section 4 of Appendix A (Contractor Election Form) will be changing, whether at Contractor's request or on Carrier's initiative, Contractor shall be so notified by personal delivery, fax, other written notice, or, if the parties have both signed Appendix D (Consent to Conduct Business by Electronic Methods), by appropriate electronic means outlined in that Appendix. **Such modified items, amounts, or methods shall replace and supersede those shown in the Deductions Table that appears in Section 4 of Appendix A (Contractor Election Form). A change shall not take effect until twenty (20) days after the notice is deemed given under Section 13 of this Agreement or such later time as is stated on the notice. Contractor's failure, by the end of 20-days after such notice, to notify Carrier of any objection to the change shall constitute Contractor's express consent and authorization to Carrier to implement the change and modify accordingly the amount deducted or otherwise recovered from Contractor pursuant to Subsection (A) of this Section or the Deductions Table in Section 4 of Appendix A (Contractor Election Form), beginning immediately after the 20-day period. If Contractor fails to notify Carrier of an objection within the 20 day period – or if Contractor notifies Carrier in writing of any objection within the 20-day period stated in Section 13 of this Agreement and the parties are then unable to resolve the matter, the change shall be rescinded as to Contractor back to its effective date (with any necessary credit or deduction made on Contractor's next settlement sheet) and the parties shall each have the right to terminate this Agreement immediately thereafter.** Even after the twenty-day period, Contractor retains Contractor's right to terminate this Agreement in accordance with the procedures set forth in Section 14 of this Agreement, although Contractor shall remain subject to the change from the effective date of the change until the effective date and time of the termination of this Agreement.

6(D). No Required Purchases from Carrier. Contractor is not required to purchase or rent any products, equipment, or services from Carrier or its affiliates as a condition of entering into this Agreement.

7. INDEMNIFICATION AND HOLD HARMLESS.

7(A). In General. **Except to the extent Contractor's acts or omissions are covered under the parties' respective insurance policies as set forth in Section 10 of this Agreement and Appendix A (Contractor Election Form) with no expense to Carrier, Contractor agrees to defend, indemnify, and hold Carrier harmless from any claim of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Carrier pays or otherwise incurs arising out of or in connection with Contractor's (including Contractor's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any amounts due Carrier under Paragraph 1 of this Subsection. Carrier shall furnish Contractor with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made. If Contractor operates the Equipment for any purpose other than the carriage of Carrier's lading, Contractor shall hold Carrier harmless and indemnify Carrier for any damage (including attorneys' fees) arising from such use. This Subsection shall remain in full force and effect both during and after the termination of this Agreement.**

7(B). Indemnity Limits. **Contractor's indemnity obligations under Subsection (A) of this Section shall be limited as follows:**

7(B)(1). **With respect to claims of personal injury (including death) or damage to the property of third-parties, Contractor shall have no indemnity obligation to Carrier under Section 7(A).**

7(B)(2). **With respect to claims of cargo loss, damage, or delay, including clean-up ex-**



App. 102
CRST000013

Dollars ($1,500) of the total amount in Damages that Contractor paid or otherwise incurred per occurrence. This dollar limit shall not apply to Damages arising out of or in connection with such claims if involving Carrier's (including Carrier's agents' or employees') gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Carrier shall credit to Contractor's next Settlement Compensation any amounts due Contractor under this Section from Carrier. This Section shall remain in full force and effect both during and after the termination of this Agreement.

8. **ESCROW FUNDS.** Contractor authorizes Carrier, and Carrier agrees, to establish and administer as required escrow funds a General Escrow Found and a Maintenance and Other Reserve Fund (together, "Escrow Funds"), both of which Contractor and Carrier agree shall be governed by the following terms and conditions.

8(A). Principal.

8(A)(1). **General Escrow Fund.** As the minimum principal to be held in the General Escrow Fund, Carrier shall deduct from Contractor's settlement compensation and deposit in this Fund the Principal Amount stated in Section 8(A) of **Appendix A (Contractor Election Form)**, at the flat weekly rate stated therein, beginning the first week of services provided by Contractor under this Agreement. If, at any time, the balance in the General Escrow Fund falls below the Principal Amount, Contractor authorizes Carrier to resume the weekly deductions until the full principal amount is replenished.

8(A)(2). **Maintenance and Other Reserve Fund.**

8(A)(2)(a). **Minimum Principal.** As the minimum principal to be held in the Maintenance and Other Reserve Fund, Carrier shall deduct from Contractor's settlement compensation and deposit in this Fund the Principal Amount stated in Section 8(B)(1) of **Appendix A (Contractor Election Form)**, at the Principal cents-per-mile rate stated therein, beginning the first week of services provided by Contractor under this Agreement. If, at any time, the balance in this Fund falls below the Principal Amount, Contractor authorizes Carrier to resume the weekly deductions until the full principal amount is replenished.

8(A)(2)(b). **Additional Principal.** If Contractor elects to continue building the Maintenance and Other Reserve Fund once the Principal Amount has been fully deposited, Contractor shall initial **OPTION 1** in Section 8(B)(2) of **Appendix A (Contractor Election Form)** and specify therein an Additional Principal Amount (over and above the Principal Amount) and an Additional Principal cents-per-mile. Carrier shall then make weekly deductions from Contractor's settlement compensation at this latter rate, and corresponding deposits in the Fund, until the sum of the Principal Amount and Additional Principal Amount is reached or if, Contractor does not initially specify an Additional Principal Amount, until Contractor does so by written notice to Carrier. If, at any time, the balance in this Fund falls below the sum of the Principal Amount and Additional Principal Amount (but above the minimum Principal Amount), Contractor hereby authorizes Carrier to resume the weekly deductions until such sum is replenished. Contractor may discontinue or change the Additional Principal Amount or the deduction rate at any time by written notice to Carrier.

8(B). Specific Items to Which Escrow Funds May Be Applied. The Escrow Funds shall be held by Carrier to guarantee the performance of Contractor's obligations under this Agreement (including any addendum). Specifically –

8(B)(1). **General Escrow Fund.** This Fund shall apply to all deduction items set forth in the Deductions Table in Section 4 of **Appendix A (Contractor Election Form)** and any addendum ("Escrow Items").

8(B)(2). **Maintenance and Other Reserve Fund.**

8(B)(2)(a). During the Agreement. This Fund shall apply, during the Agreement, to the extent of all Principal and Additional Principal available, to all maintenance, repair, and tire-related Escrow Items and thereafter, to the extent any Additional Principal remains, all other expenses related to the operation of the Equipment under this Agreement (not including personal and household expenses) for which Contractor asks Carrier orally, followed by a written request, for a disbursement.

8(B)(2)(b). Upon Termination of the Agreement. This Fund shall apply, upon termination of the Agreement, to all Escrow Items.

8(C). Accountings. While the Escrow Funds are under Carrier's control, Carrier shall provide an accounting to Contractor, no less frequently than monthly and separately for each Escrow Fund, on Contractor's settlement sheets or separately, of all transactions involving the Escrow Funds, including the amount and description of any deduction from or addition to the General Escrow Fund or the Maintenance or Other Reserve Fund. In addition, upon Contractor's request at any time, Carrier shall provide Contractor with an accounting of any transactions involving the Escrow Funds.

8(D). Interest. Carrier shall pay interest to Contractor on the Escrow Funds, separately, on a quarterly basis ("interest period") beginning with receipt of the first Contractor contribution of principal. The interest rate shall be established on the date the interest period begins and shall be equal to the average yield, or the equivalent coupon issue yield, whichever is lower, of 91-day, 13-week U.S.

Treasury bills, as established in the weekly auction by the Department of the Treasury.

8(E). Final Settlement. At the time of the return of any remaining balance in the Escrow Funds, Carrier may deduct monies for all Escrow Items. Such deductions shall be limited to amounts Carrier actually spends, incurs, or owes to a third party, or that Contractor owes to Carrier or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any Contractor obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by Carrier in seeking the return of its identification devices and other property, all amounts Carrier actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. Carrier shall not make deductions from the Escrow Funds for items for which, by the end of forty-five (45) days after termination, neither Contractor nor Carrier has yet made an expenditure or incurred a quantified, legally binding obligation to pay. Carrier shall provide a final accounting to Contractor of all such final deductions made from the Escrow Funds within forty-five (45) days from the date of termination of this Agreement.

8(F). Return Of Escrow Balance. In no event shall the Escrow Funds, less any final deductions pursuant to Subsection 8(E) of this Section, be returned to Contractor later than forty-five (45) days from the date of termination of this Agreement. Carrier's use, or post-termination return to Contractor, of any balance in the Escrow Funds shall not constitute a waiver of Carrier's right to recover, through any available lawful means, any additional amounts Contractor owes, or comes to owe, Carrier under this Agreement.

9. CONTRACTOR NOT EMPLOYEE OF CARRIER.

9(A). In General. It is understood and agreed that Contractor is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.

9(B). Certification of Status. Contractor shall provide necessary documentation and apply for certification of Contractor's independent-contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota (where, if Contractor is domiciled in that State, Contractor shall successfully complete and submit to the proper authorities an Independent Contractor Verification Application, SD E-Form 1658).

9(C). Selection of Equipment, Maintenance, and Routes. Subject only to all Applicable Law and safety considerations, it shall be the sole financial responsibility of Contractor to select, purchase or lease, and finance the Equipment; to decide when, where, and how maintenance and repairs are to be performed on the Equipment; and to select all routes and decide all meal, rest, and refueling stops, provided that to meet Carrier's customers' demands, Contractor agrees to make timely and safe deliveries of all loads, and also agrees to notify Carrier when delivery has been made or when delivery will be delayed for any reason.

9(D). Contractor's Workers. Subject again only to all Applicable Law and safety considerations, Contractor hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation insurance (or, if Contractor prefers, occupational accident insurance where both state law allows and Carrier approves), adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of Contractor's use or employment of drivers, drivers' helpers, and other personnel to perform any aspect of this Agreement. No person Contractor may engage shall be considered Carrier's employee. Contractor shall be solely responsible for complying with any and all state, federal, local, and foreign laws applicable to the terms and conditions of employment of Contractor's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the Contractor purchases a license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for Contractor's employees. Contractor's performance of these responsibilities shall be considered proof of Contractor's status as an independent contractor in fact.

9(E). Taxes.

9(E)(1). **Contractor's Form of Business and Agreement to File Returns and Pay Taxes.** As an independent contractor, Contractor is free to choose the form in which to operate Contractor's business. Contractor shall file all federal, state, local, and foreign income, withholding, employment, and federal heavy vehicle use tax forms and returns that Contractor may be required by law to file, on account of Contractor and all drivers, drivers' helpers, and other workers used by Contractor in the performance of this Agreement at the time and place that may be specified in the applicable federal, state, local, and foreign laws, and to pay when due all taxes and contributions reported in such forms and returns. In that regard, Contractor knows:

**9(E)(1)(a). Of Contractor's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from Carrier;**

**9(E)(1)(b). That the social security tax Contractor must pay is higher than the social security tax the individual would pay if he or she were an employee; and**

**9(E)(1)(c). That the service provided by Contractor to Carrier pursuant to the Agreement is not work covered by the unemployment compensation laws of any state, including Georgia; provided, however, that should Contractor employ or use drivers, helpers, or other workers to fulfill Contractor's obligations under the Agreement, and such drivers, helpers, or other workers are covered by the unemployment laws of any state, including**

Georgia, Contractor is solely responsible for providing unemployment insurance for such drivers, helpers, or other workers.

9(E)(2). Access to Contractor's Tax Records. Contractor agrees to furnish Carrier such evidence of compliance with the foregoing as Carrier shall reasonably require, including but not limited to proof of income and payroll taxes currently paid by Contractor (including as provided in Paragraph 2 of this Subsection) or withheld by Contractor from the wages of Contractor's drivers and other workers.

9(E)(3). Carrier's Filing of IRS Form 1099. Carrier shall, itself or through an agent, file federal income tax IRS Form 1099s with the Internal Revenue Service with respect to Contractor if the amount of compensation Carrier pays Contractor during a calendar year reaches the level at which federal law requires such forms to be filed.

9(F). The Parties' Financial Obligations if Contractor is Determined to Be an Employee. If, whether on Contractor's initiative or not, Contractor is declared to be an employee of Carrier by any federal, state, local, or foreign court, administrative agency, or other governmental body ("Reclassification Decision"), Contractor and Carrier hereby agree that this Agreement shall be rescinded back to the time of its formation and that both parties shall be returned to their respective positions before this Agreement was signed. Specifically, Contractor and Carrier agree that notwithstanding any other provision of this Agreement:

9(F)(1). Contractor shall, upon the Reclassification Decision becoming final and no longer appealable, immediately (a) owe Carrier, for each week or other period this Agreement was in effect, all gross compensation under Section 2 of this Agreement and Appendix B, less any charge-backs under Section 6(A) of this Agreement, previously paid to Contractor by Carrier; (b) shall relinquish all rights in any balances in escrow funds then under Carrier administration that are traceable to compensation previously paid to Contractor by Carrier; and (c) shall owe Carrier any cash advances provided by Carrier to Contractor that Contractor used for personal, household, or other expenses not in performance of Contractor's obligations under this Agreement or that Contractor retained unspent. Contractor shall be entitled to deduct from these amounts any expenses (including, for Equipment, other equipment, or tools used in performing work for Carrier, any actual rent or installment-purchase payments made by Contractor or, if none, payments that would equal fair-market rent for items of similar kind, age, and condition) Contractor incurred in performance of Contractor's obligations under this Agreement that were not covered by charge-backs or paid by Carrier;

9(F)(2). Carrier shall, upon the Reclassification Decision becoming final and no longer appealable, immediately owe Contractor, for all work activities during each week or other period this Agreement was in effect (including any activities for which Carrier has not yet paid Contractor), only the then-applicable federal minimum hourly wage or, if higher, a State's then-applicable minimum hourly wage but only to the extent Contractor's wage-earning activities occurred in that State, multiplied by Contractor's total hours actually performing on-duty work for Carrier, consisting of both driving and non-driving time, under the FMCSA Hours of Service Regulations, 49 C.F.R. Part 395, or under a State's hours of service regulations to the extent applicable. The total hours worked shall be computed based on any relevant, reliable evidence, which may include estimates or projections based on Settlement Statements, driver logs, shipment and/or vehicle tracking data, bills of lading, fuel receipts, toll receipts, and testimony; and

9(F)(3). Because reclassification of Contractor's status from independent contractor to employee would fundamentally change the parties' contracting assumptions and expectations, either party may, immediately upon initial issuance (even if appealed or appealable) of a Reclassification Decision, terminate this Agreement on one day's notice to the other. The provisions of this Subsection shall be deemed to survive any termination of this Agreement.

10. INSURANCE.

10(A). Carrier's Insurance Obligations. Pursuant to FMCSA regulations (49 C.F.R. Part 387) promulgated under 49 U.S.C. § 13906 and applicable state laws, Carrier shall maintain public liability insurance (personal-injury/property-damage coverage and environmental restoration coverage) and cargo insurance in at least such amounts as are required by, covering the Equipment at all times the Equipment is being operated on behalf of Carrier. Carrier's possession of such insurance, however, shall in no way restrict its rights of indemnification against Contractor as provided for in Section 7 of this Agreement.

10(B). Contractor's Insurance Obligations. Contractor shall maintain, at its sole expense, the following minimum insurance coverages during this Agreement:

10(B)(1). Non-Trucking (Bobtail) Liability Insurance. Contractor shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to Contractor whenever the Equipment is not being operated on behalf of Carrier in a combined single limit of not less than five hundred thousand dollars ($500,000), with a deductible no greater than one thousand dollars ($1,000), for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage Carrier shall facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 5 of Appendix A (Contractor Election Form). In addition, the required coverage shall be primary to any other insur-

ance that may be available from Carrier. Contractor shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**10(B)(2). Workers' Compensation/ Occupational Accident Insurance.**

10(B)(2)(a). Worker's Compensation Coverage. If domiciled in one of the following states: Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, New York, North Carolina, and South Carolina or any state that requires such coverage, Contractor shall provide workers' compensation insurance coverage on Contractor and shall provide Workers' Compensation Coverage in all states on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state. In lieu of Workers' Compensation Coverage, Carrier may accept Occupational Accident Coverage for any Contractor who lives in the above outlined states; however, approval of such coverage shall be on a case-by-case basis and at the sole discretion of Carrier.

10(B)(2)(b). Kansas, Mississippi, and Utah.

10(B)(2)(b)(1). Kansas and Mississippi. If Contractor is domiciled in Kansas or Mississippi, Contractor shall provide occupational accident insurance coverage of at least $1 million on Contractor and workers' compensation insurance coverage on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state;

10(B)(2)(b)(2). Utah. If Contractor is domiciled in Utah and is the sole owner (as that term is defined in 49 C.F.R. § 376.2(d)) and exclusive driver of the Equipment, Contractor shall provide Carrier with evidence, in the form required by Subsection C of this Section, of occupational accident insurance coverage and a copy of a valid Workers' Compensation Coverage Waiver ("WCCW") issued by the Industrial Accidents Division of the Utah Labor Commission (through the application online at https://webaccess.laborcommission.utah.gov/wccoveragewaivers). If Contractor is domiciled in Utah and is not the sole owner and exclusive driver of the Equipment, Contractor shall provide evidence, in the form required by Subsection C of this Section, of workers' compensation insurance coverage on both Contractor (unless Contractor has provided Carrier with a copy of a valid WCCW) and those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of Utah;

10(B)(2)(c). Other States. If *domiciled* in any other state, Contractor shall provide workers' compensation insurance coverage for those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state;

10(B)(2)(d). Workers' Compensation Coverage Details. Workers' compensation coverage, where required by the above paragraphs, shall be in amounts not less than the statutory limits required by the applicable state's law. The worker's compensation insurance policy shall provide principal coverage in Iowa and, if different, the state in which Contractor is domiciled (which state, if Contractor is a resident of North Carolina, shall be deemed to be North Carolina), and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. If Contractor is domiciled in any of the four foregoing states, Contractor shall have state-fund coverage. As evidence of such coverage, Contractor shall provide Carrier with a copy of the insurance policy declarations page for Carrier's verification before operating the Equipment under this Agreement.

10(B)(2)(e). Occupational Accident Coverage. Occupational accident insurance policy, where required or permitted by the above paragraphs, shall include either an endorsement or a separate policy provision whereby an admitted insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by Contractor alleging employee status. The occupational accident insurance coverage must be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 6 of **Appendix A (Contractor Election Form)**, and only if Carrier approves the coverage.

**10(B)(3).** Passenger Insurance. If Contractor wishes to carry passengers ten years old or older in the Equipment (subject to Carrier so authorizing in advance pursuant to Section 4(F) of this Agreement), Contractor shall first procure, carry, and maintain passenger liability insurance that shall provide coverage to Contractor whenever the Equipment is being operated (whether or not on behalf of Carrier) for injury or death to any person riding as a passenger in the Equipment in a combined single limit of not less than fifty thousand dollars ($50,000) benefit for accidental death, dismemberment, and paralysis for children ages ten through seventeen years old and not less than one hundred thousand dollars ($100,000) for individuals more than seventeen years old; not less than one hundred thousand dollars ($100,000) for accident medical benefit over a 52-week benefit period; not less than one hundred fifty dollars ($150) per tooth and one thousand dollars ($1,000) maximum per accident dental benefit; and not less than five hundred thousand dollars ($500,000)

aggregate limit of liability per occurrence, and with no deductible. Such coverage shall be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the "CRST Passenger Accident Program Enrollment Form and Certificate of Insurance" available upon request from Carrier. In addition, such coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for any loss or damage in excess of the policy limits.

10(B)(4). Other Insurance. In addition to the insurance coverages required under this Agreement, it is solely Contractor's responsibility to procure, carry, and maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision), or other insurance coverage that Contractor may desire for the Equipment, for any satellite equipment Contractor leases from Carrier, or for Contractor's health care or other needs. <u>As provided in Section 7 of this Agreement, Contractor holds Carrier harmless with respect to loss of or damage to Contractor's Equipment, trailer, or other property, and Carrier has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to Contractor's Equipment, trailer, or other property. Contractor acknowledges that Carrier may, and Contractor hereby authorizes Carrier to, waive and reject no-fault, uninsured, and underinsured motorist coverage from Carrier's insurance policies to the extent allowed under Iowa law (or such other state law where the Equipment is principally garaged), and Contractor shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.</u>

10(B)(5). <u>Cargo, Carrier's Trailer(s), and Related Expenses</u>. Contractor shall procure, carry, and maintain insurance coverage for cargo loss, damage, or delay, including clean-up expenses incurred in connection with such loss, damage, or delay, and insurance coverage for loss or damage to Carrier's Trailer(s) or other Carrier property, including towing expenses incurred in connection with such loss or damage, in a combined single limit of not less than seventy-five thousand dollars ($75,000) with a deductible no greater than one thousand five hundred dollars ($1,500). Such coverage shall be no less comprehensive than the coverage Carrier shall facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 5 of Appendix A (Contractor Election Form). In addition, the coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

10(C). <u>Requirements Applicable To All Of Contractor's Insurance Coverages.</u> Contractor shall procure insurance policies providing the above-described required coverages solely from properly-licensed insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of Carrier), and Contractor shall not operate the Equipment under this Agreement unless and until Carrier has determined that the policies are acceptable (Carrier's approval shall not be unreasonably withheld). Contractor shall furnish to Carrier written certificates obtained from Contractor's insurance carrier or carriers showing that all coverages required by this Agreement have been procured from such insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, the effective date and expiration date, and the amounts and types of coverage; list Carrier as an additional insured with primary coverage, and show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification. If a certificate of insurance provided to Carrier under this Subsection does not show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification, Contractor shall provide, or cause its insurance carrier to provide, such notice to Carrier.

10(D). <u>Contractor's Liability if Required Coverages Are Not Maintained. In addition to Contractor's indemnity obligations to Carrier under Section 7 of this Agreement, Contractor agrees to defend, indemnify, and hold Carrier harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that Carrier may incur arising out of or in connection with Contractor's failure to maintain the insurance coverages required by this Agreement. In addition, Contractor, on behalf of Contractor's insurer, expressly waives all subrogation rights against Carrier, and, in the event of a subrogation action brought by Contractor's insurer, Contractor agrees to defend, indemnify, and hold Carrier harmless from such claim.</u>

10(E). <u>Availability Of Insurance Facilitated By Carrier.</u>

10(E)(1). Contractor May Opt for Insurance Facilitated by Carrier. Contractor may, if he/she so chooses by initialing one or more boxes in the right-hand column of the "CERTIFICATE OF INSURANCE" table in Section 6 of Appendix A (Contractor Election Form) (or, for passenger liability coverage, by completing a "CRST International Passenger Accident Program Enrollment Form and Certificate of Insurance") authorize Carrier to facilitate on Contractor's behalf the insurance coverages required or made optional by this Agreement. In any such case, Carrier shall deduct or otherwise recover pursuant to Section 6 of this Agreement the cost of such coverage (which includes a mark-up earned by Carrier's affiliated insurance company and amounts for administrative services), as indicated in the attached Certificate of Insurance and/or on the "Insurance coverages" row in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) (and under any notice and revised Certificate of Insurance pursuant to Section 10(F) of this Agreement).

10(E)(2). Automatic Authorization If Required Coverages Are Not Maintained. If Contractor

at the end of this Agreement; or three business days after being deposited in the United States Mail with first class postage prepaid and properly addressed to the other party at the address shown at the end of this Agreement. Carrier and Contractor shall be under a continuing duty to provide a correct address and telephone number to the other party, and Carrier and Contractor (if the latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone-number, or fax-number change shall be given in writing.

14. DURATION OF AGREEMENT AND TERMINATION.

14(A). Term. This Agreement shall begin on the Effective Date and end on the Termination Date in the "In Witness Whereof" paragraph just above the signature block below.

14(B). Equipment Receipt. Upon taking possession of the Equipment, Carrier shall furnish Contractor with a receipt, in the form attached hereto, identifying the Equipment and stating the date and time when possession is taken by Carrier. The receipts required by this Section may be transmitted to Contractor by hand, mail, overnight delivery, fax, or other means of communication. Carrier shall maintain those records regarding the Equipment required by 49 C.F.R. § 376.11(d).

14(C). Termination. Either party may terminate this Agreement immediately, in accordance with the procedures in Subsection (D) of this Section, for any of the reasons set forth in that Subsection. In addition, this Agreement may be terminated at any time for any reason upon twenty (20) days' prior written notice to that effect to the other party personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or, if both parties have signed Appendix D (Consent to Conduct Business by Electronic Methods), by the electronic means specified in that appendix. The effective date and time of termination shall be as set forth in the written notice given by either party, or on the receipt for the Equipment if one is issued by Contractor to Carrier, or at the date and time when, as a practical matter, possession of the Equipment by Carrier pursuant to 49 C.F.R. § 376.11(b)(2) ends, whichever of these three dates/times is earliest.

14(D). Reasons for Unilateral Termination by a Party. Notwithstanding anything to the contrary in this Agreement, in the event of (1) a party's engaging in, or attempting, conspiring, or threatening to engage in, any act or omission that would constitute a felony or intentional tort, pursuant to Section 4 of this Agreement; (2) the insolvency or filing of bankruptcy of either party; (3) Contractor's violation of, or failure to fully adhere to and perform, the requirements of (a) any customer of Carrier to the extent provided by Section 4(H) of this Agreement, (b) any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), (c) Carrier's operating authorities; or (d) Carrier Policies and Procedures, all pursuant to Section 4(C) of this Agreement; (4) Contractor's causing, in whole or in part, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, pursuant to Section 4(C) of this Agreement; or (5) any other material breach of this Agreement by either party, the other party may terminate this Agreement by giving immediate oral (but only if the other party is reachable in person or by telephone), followed by written, notice of termination to the breaching party. In addition, Section 9(F)(3) of this Agreement provides, among other things, that either party may unilaterally terminate this Agreement on one day's notice if and when an initial decision is issued by a court or administrative agency reclassifying Contractor from independent-contractor to employee status.

14(E). Survival of Liabilities and Entitlements. If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Contractor or Carrier under this Agreement, such liability or entitlement shall continue, notwithstanding the termination of this Agreement, until such liability or entitlement is satisfied in full.

15. CONTRACTOR'S OBLIGATIONS UPON TERMINATION. Upon termination of this Agreement:

15(A). Completion of Performance. Contractor shall, unless otherwise instructed by Carrier, complete performance of all transportation and other services required by Carrier and any bills of lading pertaining to any shipment or shipments that Contractor may be engaged in hauling at the time of termination. Contractor shall receive no compensation for any shipment with respect to which he/she has failed to complete all required transportation and other services. In the event Carrier instructs Contractor not to complete performance of transportation or other services that Contractor is willing and able to perform, Carrier shall pay Contractor compensation determined in accordance with Appendix B (Contractor Compensation) for the portion of such services that Contractor performed prior to termination.

15(B). Return of Carrier's Property. Contractor shall, immediately upon termination of this Agreement or the completion of the transportation or other services provided for herein, whichever occurs later, both remove all of Carrier's identification devices from the Equipment and, except in the case of identification painted directly on the Equipment, return them to Carrier via prepaid hand-delivery, overnight delivery, or certified mail (provided that if the identification device has been lost or stolen, a written notice (letter) certifying its removal shall satisfy this requirement); return all of Carrier's property, including trailers, base plates, permits, and other paperwork, Omnitracs communications equipment, and freight, to Carrier's facility in Cedar Rapids, IA, or to any closer location Carrier designates; and pay Carrier all amounts Contractor owes Carrier at that time under this Agreement.

15(C). Remedies for Failure to Return Carrier's Property. If Contractor fails to return Carrier's property or freight to Carrier or remove and return all of Carrier's identification from the Equipment upon termination of this Agreement, Contractor shall pay Carrier all expenses (including reasonable attorneys' fees) Carrier incurs in seeking the return of such items, and Carrier may pursue other remedies

## APPENDIX A

### CONTRACTOR ELECTION FORM

1. EQUIPMENT. The commercial motor vehicle equipment ("Equipment") governed by this Agreement consists of:

| Equipment Type (*Specify* Tractor or Trailer) | Year | Make | Model | Serial (VIN) # | Carrier Unit # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

2. BASE PLATES AND PERMITS

2(A). Base Plates. If Contractor so elects (by initialing OPTION 1, "Carrier shall obtain base plate...," below), Carrier shall initially pay the amount owed to the issuing jurisdiction for the base plate(s) and deduct or otherwise recover pursuant to Section 6(A) of this Agreement that expense, plus an administrative fee to Carrier. If this Agreement is terminated prior to Contractor's complete reimbursement of Carrier's expense, Carrier is hereby authorized to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any remaining amount. If Contractor removes and returns the base plate(s) to Carrier upon the termination of this Agreement and if Carrier then receives a refund or credit for the base plate(s) or resells the plate(s) to another contractor, Carrier shall refund to Contractor a prorated share of the amount received by Carrier, less any transfer or replacement fees owed to the plating jurisdictions.

CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS:

KP __ **OPTION 1:** **Carrier shall obtain Indiana (if Contractor has title to the vehicle) or Iowa International Registration Plan base plate for Contractor's tractor and charge the cost back to Contractor. The annual cost shall consist of the amount Carrier paid the issuing State for the plate (estimated initially and then adjusted up or down to match the actual amount billed to Carrier by the State), plus a ten percent (10%) administrative fee to Carrier.**

_____ **OPTION 2:** **Contractor shall obtain own base plate for tractor.**

2(B). Permits. Certain governmental permits and licenses, which are the financial responsibility of Contractor under Sections 5(F) and (G) of this Agreement, must be maintained to authorize Contractor to provide services to Carrier legally.

2(B)(1). Unified Carrier Registration Fee. In 2005, Congress enacted the Unified Carrier Registration ("UCR") fee as a replacement for numerous states' Single-State Registration System ("SSRS") fees, effective with the 2007 calendar year. The UCR fee is assessed against a motor carrier based on the number of trucks in the carrier's fleet. Carrier shall deduct once a year, or otherwise recover pursuant to Section 6(A) of this Agreement, a pro rata share of this fee whatever fee is set under the law for the year divided by the number of trucks in Carrier's fleet, with no administrative fee paid to Carrier).

2(B)(2). IFTA Permit and Fuel Tax Reporting. Under the International Fuel Tax Agreement ("IFTA"), an annual fuel tax permit must be obtained, and quarterly fuel taxes must be reported and paid to the IFTA base state, for the Equipment's operations nationwide. Contractor may, by initialing the line to the left of OPTION 1 below, elect to obtain the IFTA permit and perform (or have a third-party vendor perform) all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(a) of this Agreement. Alternatively, Contractor may, by initialing the line to the left of OPTION 2 below, elect to have Carrier obtain the IFTA permit and perform all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(b) of this Agreement.

CONTRACTOR SHOULD INITIAL <u>ONE</u> OF THESE TWO OPTIONS:

_____ OPTION 1: Contractor shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment at Contractor's expense.

_____ OPTION 2: Carrier shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment, and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the permit fee (with no admin. fee to Carrier), and any additional fuel tax that Contractor may owe.

2(B)(3). Other Required Permits. To make Contractor eligible to handle shipments in States served or transited by Carrier, Carrier shall obtain all permits required by law with respect to the Equipment and deduct or otherwise recover pursuant to Section 6(A) of this Agreement the cost (with no Carrier administrative fee).

2(B)(4). Return of Permits. All permits and licenses issued in Carrier's name shall be returned to Carrier upon termination of this Agreement. No refund shall be made to Contractor by Carrier of the permit costs upon termination of this Agreement, even if returned permits are reused by Carrier. Contractor shall be liable to Carrier for all expenses incurred by Carrier due to Contractor's failure to return all such permits.

2(C). Settlement Deductions. Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement seventy-five dollars ($75.00) per week until the total cost of base plate(s), permits, and/or fuel tax reporting (not including any additional fuel tax that Contractor may owe) under this Appendix are fully paid. The deductions shall begin immediately for current Contractors and the third full week after a Contractor first enters into this Agreement for new Contractors.

2(D). Itemization Available. Contractor may, upon request, obtain an itemization of the base plate and/or permit fees Carrier has advanced for Contractor pursuant to this Appendix, the portion of the total already paid by Contractor and the portion remaining.

3. COMMUNICATIONS SYSTEM/EOBR. In accordance with Section 4(C)(3) of this Agreement *(CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS):*

*CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS:*

_____ OPTION 1: Contractor shall furnish and install Contractor's own compatible Communications System/EOBR the Equipment.

_____ OPTION 2: Carrier shall arrange, at its expense, to have a Communications System/EOBR installed in the Equipment and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the weekly rent set forth in Section 4 of this Appendix. *IF CONTRACTOR INITIALS THIS OPTION, CONTRACTOR SHALL ALSO SIGN THE ATTACHED OMNITRACS, LLC, SYSTEM RECEIPT.*

Under either OPTION 1 or OPTION 2, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement a network usage charge of the amount per week shown in Section 4 of this Appendix (such amount being based on the average per-truck messaging usage charges to Carrier by Omnitracs, LLC, with no mark-up or administrative charge to Carrier).

4. DEDUCTIONS TABLE. Pursuant to Section 6(A) of this Agreement, Contractor hereby authorizes Carrier to charge back or deduct – from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's Escrow Fund, or from other amounts Carrier owes to Contractor at the time of settlement with Contractor – amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table immediately below:

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| AQ | Accounting services if Contractor elects to obtain them from American Truck Business Services by signing the American Truck Business Services Addendum. | *See* the American Truck Business Services Addendum. |
| AD, WC | Advance Card -- Advances in compensation not yet earned loaded by Carrier, at Contractor request, on Carrier's advance card ("CRST Advance Card"). | 1. Amount Carrier loaded on Contractor's CRST Advance Card at Contractor's request, plus a $4 per-Card-load fee (comprising both the amount charged by the CRST Advance Card issuer and an admin. fee to Carrier).<br><br>2. For each Carrier cash-load onto the Advance Card, the |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | | third-party issuer of the Card will debit the Card a transaction fee for each direct-deposit or registration of a preauthorized check drawn from the Card after the first two debits. Also, each time Contractor uses the Advance Card to obtain cash from an automated teller machine, to make a purchase (at any truck stop or other vendor honoring such cards), or to make certain other transactions, the third-party issuer of the Card will deduct a per-transaction fee. None of the revenue from the Card-issuer's fees shall be shared with Carrier. All Advance Card transactions are governed by Card-issuer rules, which, together with Card-issuer transaction fee information, shall be available to Contractor by contacting the Card issuer's Internet web address listed on the Card or the Card issuer's Customer Service telephone line, 1-800-226-3870.<br><br>3. For use of the *credit*-card feature of the CRST Advance Card for fuel purchases, *see* "Fuel Purchases" row below. |
| SA, AD | Advance check | If Contractor elects, with Carrier's prior written consent, to use a Carrier advance check to pay any of Contractor's expenses under this Agreement, Carrier shall charge back the amount advanced, plus a $4 per-transaction fee (comprising both the fee charged by issuer of Carrier's advance checks and an admin. fee owed to Carrier). |
| ___ | **Alternative Uses of Equipment Fee** to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in connection with each Alternative-Use-of-Equipment trip. | For Exempt Motor Carriage, a $250-per-trip Alternative Use Fee. For all other Alternative Uses of Equipment, a $150-per-trip Alternative-Use-Fee |
| ___ | **Cash-on-Delivery freight revenue** from shippers, sublease carriers, or others that was not collected, or was collected but not remitted, by Contractor to Carrier when such actions were required by this Agreement. | Amount of freight revenue not collected, or collected but not remitted, to Carrier in violation of this Agreement. |
| KZ | **Co-Driver Schooling Charges** if Contractor elects, by executing the Co-Driver Schooling Deductions Addendum, to have Carrier provide driver training, and qualify, a relative or friend as a co-driver with Contractor. | *See* the Co-Driver Schooling Addendum. |
| LM, TO, ER, MR | **Collection costs** | Amount Carrier pays a collection agency to collect past-due amounts under § 19 of Agreement. |
| ___ | **Communications equipment - Charges for loss** of or damage to the Communications System/EOBR under § 4(C)(3) of this Agreement, if Contractor elects, by so indicating in Appendix A (Contractor Election Form), § 3, to have Carrier install such equipment in Contractor's tractor Equipment at Contractor's expense. | Amount paid to third-party vendor or otherwise incurred by Carrier. |
| | **Communications System/EOBR rental charges**, if Contractor elected to have Carrier install a Communications System/EOBR in the Equipment pursuant to § 4(C)(3) of Agreement and § 3 of Appendix A (Contractor Election Form). | $7.63 per week |
| S6 | **Communications Systems/EOBR network charge** for unlimited messaging using communications equipment pursuant to § 4(C)(3) of Agreement. | $9 per week |
| AC, CC | **Damages, losses, fines, penalties, court costs,** | To extent the Damages are subject to the indemnity limits |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | attorneys' fees, and other expenses (together "Damages") Carrier incurs in connection with Contractor's obligations under this Agreement or breach thereof arising out of Contractor's negligence, gross negligence, willful misconduct, or other culpable acts or omissions under this Agreement, pursuant to § 7 of Agreement, subject to indemnity limits set forth in §§7(B)(1)-(2) of Agreement. | set forth in §§ 7(B)(1)-(2) of Agreement, Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement up to $100 per week, until fully paid, for the up-to-$1,000 in Damages owed by Contractor for each accident claim (AC, A1, A2, A3, A4); and up $100 per week, until fully paid, for the up-to-$1,500 in Damages owed by Contractor for each non-accident claim (CC, C2, C3, C4). If the Damages are governed instead by § 7(B)(3) of Agreement, the full amount of the Damages may be deducted immediately or on whatever schedule Carrier sets. |
| AR | **Deficit payment:** Amounts deducted to retire debt to Carrier from previous settlement(s), plus interest | Amount Contractor owes Carrier, plus interest at a rate of 1.5% per month (18% per annum), unless applicable state law requires a lower rate. |
| EF | **Detention, accessorial, and other customer-charge revenue** not collected by Carrier from its customer because of Contractor's failure to transmit to Carrier the necessary documentation supplied by the shipper or consignee | Amount Carrier was unable to collect from customer as a result of Contractor's failure to transmit to Carrier the necessary documentation supplied by the customer, provided that no charge-back shall be made to Contractor if he/she contacted Carrier's dispatch regarding issue prior to departure from customer (consignor or consignee) location. |
| | **Driver Recruiting** charges pursuant to Driver Recruiting Addendum if Contractor elects to employ or contract to obtain the driving services of a Carrier employee-driver | *See* Driver Recruiting Addendum. |
| EY, JF | **Earnings Correction** - Credit to, or deduction from, Contractor's settlement compensation to reflect difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill | Amount credited or deducted shall be determined by applying Contractor's compensation rate(s) from **Appendix B (Contractor Compensation)** to the difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill |
| NZ, | **Equipment lease payments** if Contractor elects, by executing the Equipment Lease Charges Addendum and the Equipment Lease appended to it, to lease the Equipment from CRST Lincoln Sales, Inc. or One-Call Transportation, Inc. | *See* Equipment Lease and Equipment Lease Charges Addendum. |
| —— | **Escort fee** pursuant to § 4(D)(4) of this Agreement if Contractor's driver lacks a TWIC and therefore needs a suitably-credentialed escort in order to make a pickup or delivery at a port | Amount Carrier paid to escort. |
| FE | **Express mail** or other package delivery services if Contractor charges them to Carrier's account with the delivery service vendor. | Amount Carrier paid to U.S. Postal Service or other package delivery service vendor. |
| FD | **Fines, penalties,** including traffic tickets and related court costs, attorneys' fees, and other legal expenses that § 5(F)(3) of Agreement makes Contractor responsible for | Amount Carrier paid or otherwise incurred. |
| TX | **Fuel and mileage taxes** | In connection with quarterly computation and submission of fuel and mileage tax reports and payments to the various taxing jurisdictions, any net fuel or mileage tax owed at that time with respect to Contractor's operations in all taxing jurisdictions combined shall be deducted at $100 per week until fully paid,. Carrier shall credit Contractor at next settlement with any net fuel or mileage tax credits or refunds due Contractor with respect to Contractor's operations in all taxing jurisdictions combined. *See also* of **Appendix A (Contractor Election Form), § 2(B)** regarding possible charge-backs for IFTA Fuel Tax Permit. |
| FU | **Fuel purchases** | 1. When Contractor elects to purchase fuel from third-party vendors using the credit-card feature of the CRST |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | | Advance Card, Carrier shall deduct – and show on Contractor's settlement statement – or otherwise recover pursuant to § 6(A) of Agreement an amount no greater than the price posted at the fuel vendor's pump (plus the Card-issuer's transaction fee in certain instances – *see* Item 3 below). The amount deducted or otherwise recovered, if less than the cash (pump) price, is the result of a cents-off-retail discount to Contractor that Carrier has negotiated with the fuel vendor. Discount amounts available to Contractor are as indicated in Supplement 1 ("CRST Fuel Purchasing Program") to this Appendix. Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement the cents-off-retail discount price (that is, the price posted at the fuel vendor's pump, less the cents-per-gallon discount negotiated by Carrier, at time of Contractor's purchase). In the event of any changes in Supplement 1, Carrier shall provide Contractor with an updated version before the changes take effect.<br><br>2. If Carrier receives any discount on Contractor's fuel purchases or if the fuel purchases of all Carrier's contractors combined reach certain volumes resulting in Carrier's receiving rebates from some fuel vendors, Carrier shall retain all such discounts and rebates and NOT share them with Contractor or other contractors.<br><br>3. If Contractor elects to purchase fuel, using the CRST Advance Card, at a truck stop that is not listed in Supplement 1 to this Appendix and thus does <u>not</u> offer Carrier's contractors a cents-off-retail discount, Contractor will be charged back whatever transaction fee the Advance Card issuer charges to Carrier.<br><br>4. Contractor is under no obligation to use the CRST Advance Card for fuel or other purchases, and may instead use cash, checks, or other credit or charge cards. |
| ZA, ZB, ZC, ZD, ZE, ZF (etc.), GA | **Garnishment orders** (including but not limited to child-support orders) by courts and tax liens against Contractor or Carrier compensation | $100 per week or the amount Carrier paid in compliance with any lawfully issued order or lien, a copy of which Carrier shall supply to Contractor at or before the first deduction relating to it, plus an admin. fee to Carrier (the amount to be determined by the law of the jurisdiction issuing the order or lien, or, if such state does not address admin. fees, the law of the State of Iowa). After termination of, but not during, this Agreement, Carrier shall deduct from Contractor's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in Contractor's Settlement Compensation. |
| BD | **General Escrow Fund** (former Performance Bond) contributions by Contractor | *See* **Appendix A (Contractor Election Form), § 8(A)** |
| MZ | **Inspection of Equipment** to the extent the financial responsibility is Contractor's under Agreement, § 4(A) | Amount Carrier paid outside vendor. If Contractor elects to obtain inspections from Carrier's maintenance facility, the amount Carrier incurred for parts and labor resulting in a price competitive with other maintenance vendors in the relevant market |
| BT, 7S, DP, PJ, | **Insurance coverages** Contractor elects, via the CERTIFICATE OF INSURANCE in § 6(A) of Ap- | *See* **Appendix A (Contractor Election Form), § 5**<br>The costs stated in **Appendix A (Contractor Election** |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| PP, IB, GP | pendix A (Contractor Election Form) and/or by executing a CRST International "Passenger Accident Program Enrollment Form," to have Carrier facilitate or that Carrier maintains at its expense because Contractor failed to provide proper evidence of the purchase or maintenance of the required coverages under § 10(E) of Agreement | Form), § 5, are amounts the insurer(s) charged for the required and optional coverages Contractor selected (and for those required coverages with respect to which Contractor failed to provide Carrier proper evidence of Contractor's purchase and maintenance of them), including, where indicated, profit to Carrier's affiliated insurance company and/or an admin. fee to Carrier. The costs are subject to possible increases (*see* § 10(F) of Agreement). |
| LI, LE | Licensing (base plate fees), if Contractor elected, by so indicating in § 2 of Appendix A (Contractor Election Form) or an Addendum, to have Carrier pay the fees in advance | *See* Appendix A (Contractor Election Form), § 2(A), or an Addendum, regarding partial refunds of base plate fees Carrier shall provide Contractor under certain circumstances. |
| LI, LE | Licensing (permit fees) under § 7(B) Agreement and § 2 of Appendix A (Contractor Election Form) or an Addendum, but not including overdimensional permit fees | *See* Appendix A (Contractor Election Form), § 2(B) or an addendum. |
| IL | Loan payments if Contractor elects, by so indicating on Loan Addendum, to borrow an amount of $1,000 or more from Carrier to cover cost of maintenance, repairs, or other expenses | Weekly payments of at least $250/week based on principal and interest agreed to by Contractor and Carrier, as reflected in Loan Addendum. |
| DU | Logo Store clothing and other items that Contractor elects to purchase at Carrier's store | Amount Carrier incurred, plus markups resulting in prices (which shall be provided to Contractor upon request at the time he/she purchases or places order for items) competitive with other vendors in the relevant market(s). |
| R8 | Maintenance and Other Reserve Fund contributions by Contractor | *See* Appendix A (Contractor Election Form), § 8(B). |
| RJ, RH, P9, M2, ML, RG, RG, RI, RJ, RK, RL | Maintenance, repairs, parts, and replacement tires that Contractor elects, and Carrier each time agrees, to have Carrier advance funds for the purchase from third-party maintenance providers and charge Contractor back for it | Amount Carrier paid maintenance provider. If Contractor elects to obtain products or services from Carrier's third-party maintenance provider, the amount Carrier incurred for parts and labor, plus an administrative fee of $5 per hour, resulting in a price competitive with other maintenance vendors in the relevant market. If Contractor elects to pay the outside vendor directly using a Carrier Advance Check or Card, *see* "Advance Check" or "Advance Card" rows above. |
| MC | Motel/hotel guestroom and other charges if Contractor elects to have Carrier advance such charges | Amount Carrier paid outside vendor or, if Contractor elects to stay in Carrier's hotel, the amount Carrier incurred, plus a markup resulting in a price (which shall be provided to Contractor upon request at the time he/she checks into the hotel) competitive with other hotel/motel vendors in the relevant market |
| MC | Operating expenses not otherwise listed in this table for which Contractor is responsible under this Agreement and regarding which Carrier receives a purchase order or invoice is otherwise requested by Contractor to make an expenditure in the first instance. | Amount Carrier paid or otherwise incurred. For use of Advance Card to pay for maintenance, repairs, or tires, *see* "Advances Card" row above. |
| MC | Parking charges Carrier paid outside vendor for parking | Amount Carrier paid outside vendor. |
| RQ | Personal Insurance Program, including medical, dental, vision, critical illness, disability, and permanent life coverages. | *See* the Personal Insurance Program Addendum. |
| PY | Physical examinations for Contractor's drivers | Amount Carrier paid outside vendor. See also "Co-Driver Schooling Addendum, if applicable. |
| IL | Previous deficit payment plan: Payments by Contractor to retire debt owed to Carrier from operations under a previous independent contractor operating agreement pursuant to a Loan Addendum. | *See* Loan Addendum. |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| FI | Routing and/or Fuel Optimization Services if Contractor elects, by initialing OPTIONS 2 or 3 in Appendix A (Contractor Election Form), § 7, to purchase such services from or through Carrier | *See* Appendix A (Contractor Election Form), § 7 |
| FC | Sublease payments to Carrier if Contractor elects to use the Equipment to handle trip-leased loads pursuant to § 1(E)(2)(b) of Agreement | *See* § 1(E)(2)(b) of Agreement. |
| MC | Travel cost (bus, air, taxi, or other passenger fares) if Contractor needs to travel due to an accident or for other Carrier-approved trips. | Amount Carrier paid outside vendor. |
| MC | Termination-related expenses pursuant to § 14 of Agreement, including without limitation reasonable attorneys' fees, involved in seeking the return of, replacing, or having to forego refunds, credits, or sale proceeds relating to Carrier's base plates, permits, identification, and other property, including trailers, paperwork, satellite communications equipment, and freight | Amount Carrier paid or otherwise incurred. |
| RJ, RH, P9, M2, ML, RG, RG, RI, RJ, RK, RL | Tire purchases if Contractor elects to purchase tires at discount from retail prices through Carrier's National Account Programs | Amount Carrier paid to outside vendor plus a $10 per tire admin. fee to Carrier |
| T0 | Tolls for highways, bridges, tunnels, ferries, and other facilities | Amount Carrier paid to the toll authorities, plus any related fines, penalties, and fees |
| ___ | Trip-completion additional expense and/or damages, pursuant to § 12 of Agreement | Amount Carrier paid or otherwise incurred beyond the amount of Contractor's forgone compensation pursuant to § 12 of Agreement |
| T8 | TRANSFLO Express® charges if Contractor elects to use Carrier's account with TRANSFLO Express® to send correspondence to Carrier's offices or those of its affiliates on an expedited basis | $15 per month for unlimited dispatches, comprising both the amount Carrier paid to TRANSFLO Express® and an admin. fee to Carrier. |
| MZ | Truck washes if Contractor uses Carrier's account | Amount Carrier paid outside vendor. |
| TU | Usage charge for Carrier's Trailer(s), pursuant to § 5(H) of Agreement | $25 per week |

5. __CERTIFICATE OF INSURANCE.__ Contractor hereby requests Carrier, through Carrier's insurer, to facilitate on Contractor's behalf (if they are available) the insurance coverages Contractor has selected by placing Contractor's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. <u>Non-Trucking (Bobtail) Liability Insurance:</u><br><br>Name of Insurer: Great Plains Casualty, Inc.<br><br>Policy No: GPNTIA030 and GPENTIA031<br><br>Effective Date(s): From the effective date (below) of this Certificate of Insurance through the next succeeding June 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>Amount of Coverage: $500,000 combined single limit<br><br>Cost to Contractor: **$30 per Unit of Equipment per month**<br>*Includes profit to Carrier's affiliated insurance company*<br><br>Deductible: $0 per occurrence<br><br>If Contractor domiciled in Michigan:<br><br>Name of Insurer: Hudson Insurance Co.<br><br>Policy No: TIS40101-127674<br><br>Effective Date(s): From the effective date (below) of this Certificate of Insurance through the next succeeding October 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>Amount of Coverage: $500,000 combined single limit<br><br>Cost to Contractor: **$44.17 per Unit of Equipment per month**<br>*Includes profit to Carrier's affiliated insurance company*<br><br>Deductible: $0 per occurrence | K YES<br><br>_____ NO |
| 2. <u>Workers' Compensation Insurance</u> *(CONTRACTOR SHOULD INITIAL "YES" IN THE COLUMN TO THE RIGHT OF <u>ONLY ONE</u> OF THE FOLLOWING TWO OPTIONS -- A OR B):*<br><br>A. **By initialing "YES" in the column to the right, CONTRACTOR ELECTS TO PURCHASE WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF AND CONTRACTOR'S DRIVERS OR OTHER EMPLOYEES (IF ANY) FROM AN INDEPENDENT SOURCE <u>NOT</u> FACILITATED BY CARRIER. CONTRACTOR HAS PROVIDED CARRIER WITH A COPY OF THE INSURANCE POLICY DECLARATIONS PAGE EVIDENCING SUCH COVERAGE IN ACCORDANCE WITH SECTION 10(B)(2)(d) OF THIS AGREEMENT.** | _____ YES |
| B. **By initialing "YES" in the column to the right, Contractor attests that HE/SHE HAS NO EMPLOYEES AND that he/she is <u>NOT</u> a resident of, and the work is <u>NOT</u> principally localized in, KANSAS or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator, and CONTRACTOR HAS ELECTED <u>NOT</u> TO OBTAIN WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF INDEPENDENTLY.** | _____ YES |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 3. <u>Occupational Accident Insurance</u><br><br>WHERE STATE LAW ALLOWS AND CARRIER APPROVES<br><br>Name of Insurer: Zurich American Insurance Co.<br><br>Policy No: 216-000-654<br><br>Effective Date(s): From the effective date (below) of this Certificate of Insurance through the next succeeding November 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>Amount of Coverage: Up to $1,000,000 per occurrence based on schedule of benefits available to Contractor upon request (benefits are reduced for individuals over 70 years old)<br><br>Cost to Contractor: $154.00 per covered individual per month (including an administrative fee to Carrier), deducted at $35.54 per week for 52 weeks – or, if over 70 years old, $145.00 per covered individual per month (with no administrative fee to Carrier), deducted at $36.25 per week for first 48 weeks of coverage year<br>*All costs include profit to Carrier's affiliated insurance company*<br><br>Deductible: $0 | A YES<br><br>_____ NO |
| 4. <u>Physical Damage Insurance:</u><br><br>Name of Insurer: Great Plains Casualty, Inc.<br><br>Policy No: GPPYIA040<br><br>Effective Date(s): From the effective date (below) of this Certificate of Insurance through the next succeeding September 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>Amount of Coverage: Contractor-specified value of Unit of power-unit Equipment of $_______________ (any Tractor Equipment claims, however, shall be paid at only the actual cash value of insured Tractor Equipment at time of occurrence, in accordance with insurance policy)<br><br>Cost to Contractor: 4.5% of Contractor-specified value of Tractor Equipment, deducted weekly for 52 weeks<br>*Includes profit to Carrier's affiliated insurance company and administrative fee to Carrier*<br><br>Deductible: $1,000 per occurrence | A YES<br><br>_____ NO |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 5. Insurance for Cargo, Carrier's Trailer(s), and Related Expenses<br><br>Name of Insurer: Great Plains Casualty, Inc.<br><br>Policy No: GPPYIA022<br><br>Effective Date(s): From the Effective Date as stated in Section 2(a) of this Agreement through the next succeeding September 1st, and each subsequent renewal period.<br><br>Amount of Coverage: $75,000 combined single limit per occurrence for damage to cargo, Carrier's Trailer(s), and related towing and clean-up costs. For more details regarding coverage, see insurance policy.<br><br>Cost to Contractor: $34.62 per week<br>*Includes profit to Carrier's affiliated insurance company*<br><br>Deductible: $1,000 per occurrence | [initials] YES<br><br>_____ NO |

6. **CERTIFICATE OF WORKERS' COMPENSATION INSURANCE (If Contractor Elects NOT To Have Coverage Facilitated By Carrier)**

**If Contractor has elected NOT to have Carrier facilitate workers' compensation (or, where permitted, occupational accident) insurance coverage,** Contractor hereby certifies that the statement below, to the left of which Contractor's undersigned authorized representative has inscribed Contractor's initials, is true and correct (Contractor **SHOULD INITIAL ONLY ONE BOX**):

| CONTRACTOR: Please Initial ONE Box Below If Statement Is TRUE | STATEMENT |
|---|---|
| __________ | 1. Contractor has NO employees; and he/she IS domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, Contractor **HAS purchased workers' compensation insurance coverage for himself/herself.** Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement is attached hereto; OR |
| __________ | 2. Contractor has NO employees; and he/she IS domiciled in Kansas, Mississippi, or Utah. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, **Contractor HAS purchased workers' compensation insurance coverage or occupational accident insurance coverage for himself/herself.** The certificate of insurance and declarations page from Contractor's insurance policy (as required by Section 10(C) of this Agreement) is attached hereto; OR |
| __________ | 3. Contractor has NO employees; and he/she IS NOT domiciled in Kansas, Mississippi, Utah, or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. **Contractor has elected NOT to purchase workers' compensation insurance coverage for himself/herself.** NOTE: In some states (consult Carrier as to which ones), workers' compensation coverage under this Agreement shall be mandatory if Contractor is a corporation or limited liability company; OR |
| __________ | 4. Contractor has NO employees; and he/she IS NOT domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. **Contractor has nonetheless elected to purchase workers' compensation insur-** |

| CONTRACTOR: Please Initial ONE Box Below If Statement Is TRUE | STATEMENT |
|---|---|
| | ance coverage for himself/herself. Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy; OR |
| ______ | 5. Contractor has [insert number]____ employees and, as REQUIRED by Section 10(B)(2) of this Agreement, HAS purchased workers' compensation insurance coverage (or occupational accident insurance coverage where both state law allows and Carrier approves) for himself/herself (if Contractor is a natural person) and those of Contractor's drivers, employees, agents, and other persons required to be covered under the workers' compensation law of any state that is reasonably likely to have jurisdiction over Contractor's business operations. Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement. |

7. ROUTING AND FUEL OPTIMIZATION SERVICES. To improve Contractor's efficiency and profitability, Contractor may choose to rely on either free or purchased routing and fuel optimization information, software, or other services. If Contractor elects to purchase such services from or through Carrier, he/she should initial OPTIONS 2 below. Otherwise, Contractor should initial OPTION 1.

*CONTRACTOR SHOULD INITIAL ONLY ONE OF THESE OPTIONS:*

(AB)___ OPTION 1: Contractor shall obtain routing and/or fuel optimization information, software, or other services, including such free online services as those found at www.mapquest.com, maps.yahoo.com, and maps.google.com, on Contractor's own or forgo such services altogether.

_____ OPTION 2: Carrier shall facilitate Contractor's purchase of routing and/or fuel optimization services from third-party vendor PC*Miler, using the most recent version of the PC*Miler|Web internet-based routing platform, by paying the $19.95 /month price to the vendor (with no admin. fee to Carrier) and deducting or otherwise recovering this expense from Contractor pursuant to Section 6(A) of this Agreement in the amount of $4.99/week

_____ OPTION 3: Carrier shall sell its own routing and/or fuel optimization services to Contractor for $4.00/week price to the vendor and deducting or otherwise recovering this expense from Contractor pursuant to Section 6(A) of this Agreement.

8. PRINCIPAL IN ESCROW FUNDS.

8(A). General Escrow Fund. The Principal Amount in the General Escrow Fund shall be two thousand dollars ($2,000), to be deducted, pursuant to Agreement § 8(A)(1), at seventy-five dollars ($75) per week.

8(B). Maintenance and Other Reserve Fund.

8(B)(1). Minimum Principal. The minimum Principal Amount in the Maintenance and Other Reserve Fund shall be two hundred fifty dollars ($250), to be deducted, pursuant to Agreement § 8(A)(2), at one cent ($0.01) per mile for all loaded miles operated under Carrier dispatch (as specifically directed or authorized by Carrier), based on Carrier's most current (at the time of Contractor's trip) version of Rand McNally MileMaker® computerized mileage guide, which Carrier shall make available for viewing and printing of particular Contractor-requested point-to-point mileage calculations at any Carrier terminal during normal business hours.

8(B)(2). Additional Principal. In accordance with Section 8(A)(2)(b) of the Agreement –

*CONTRACTOR SHOULD INITIAL ONLY ONE OF THESE TWO OPTIONS:*

(AB)___ OPTION 1: Contractor chooses to continue building the Maintenance and Other Reserve Fund once the minimum Principal Amount has been fully deposited, and hereby authorizes Carrier to deduct from Contractor's settlement compensation and deposit in the Fund one hundredth of a cent ($0.01) per mile for all loaded miles operated under Carrier dispatch or Twenty-five Dollars ($25.00) per week up to a total Additional Principal of $ .03 . If no total amount is stated, the specified deductions shall not end until Contractor notifies Carrier in writing to stop them.

_____ **OPTION 2:** Contractor chooses NOT to build any Additional Principal in the Maintenance and Other Reserve Fund.

THIS APPENDIX A, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ __.m. Central Time on the 3 day of Jan, 2018

Contractor: Anthony Kemit

By: ______________________
Signature

______________________
Authorized Representative's Name (Typed or Printed)

Title

Driver's Name if Different

Date

Tractor No.

Carrier: CRST Expedited, Inc.

By: [signature]
Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA 52406
Tel. 319-731-3890
Fax 319-731-9245

## OMNITRACS, LLC, COMMUNICATION SYSTEM/EOBR RECEIPT

Contractor hereby acknowledges that the following items of an Omnitracs, LLC, communications unit have been received by him/her from, and installed in Contractor's Equipment (truck tractor) indicated below, by Carrier:

**Each Omnitracs, LLC, System Unit:**

| | |
|---|---|
| 1 | Outdoor Unit (Antenna) |
| 1 | Communications Unit (Black Box) |
| 1 | Display Unit (Keyboard and Screen) |
| 1 | Pager System |

**Equipment (Tractor) #** ______________________

**Omnitracs, LLC, Unit #** ______________________

Contractor: ______________________

By: Anthony [signature] ______________________
Signature

______________________
Authorized Representative's Name (Typed or Printed)

______________________
Title

______________________
Driver's Name if Different

01-03-18
Date

______________________
Tractor No.

## APPENDIX B

## CONTRACTOR COMPENSATION

1. CONTRACTOR'S GROSS COMPENSATION. As the total gross compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services, Carrier shall pay Contractor Base Compensation plus Additional Compensation as follows:

1(A). Base Compensation

1(A)(1). **Applicable Percentages.** Carrier shall pay – A percentage of Adjusted Gross Revenue, as defined in Paragraph 2 of this Subsection, billed to the shipper for a shipment as follows -- seventy percent (70%) if the Carrier provides the trailer; seventy-five percent (75%) if Contractor provides the trailer; or seventy-eight percent (78%) if Contractor provides a refrigerated trailer.

1(A)(2). **Definitions.** Throughout this Agreement –

1(A)(2)(a). Gross Revenue shall mean all revenue – billed by Carrier to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "Carrier's Customer" throughout this Agreement) in connection with shipments Contractor hauls under this Agreement – for pickup and delivery charges, mileage charges, linehaul transportation charges, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges.

1(A)(2)(b). Adjusted Gross Revenue ("AGR") shall mean Gross Revenue for a particular shipment, reduced by any and all:

1(A)(2)(b)(1). Incentive, discount, fee (including for loading or unloading services provided by Carrier's Customer either directly or through a Third Party), or commission Carrier gives Carrier's Customer with respect to the shipment;

1(A)(2)(b)(2). All amounts Carrier paid to third parties, including but not limited to Carrier's Customer or an affiliate of Carrier, (together, "Third Parties") in relation to movement of the shipment if not covered by a charge separately stated on Carrier's invoice to Carrier's Customer, including, but not limited to, fees or commissions (including commission recoveries), paid to brokers, freight forwarders, interline or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading (including lumper) services, freight payment-processing fees (consisting of the actual cost incurred by Carrier for the shipment if Carrier's customer or an outside payer makes deductions from Carrier's freight charges related to electronically-transmitted billing and payment account use), amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to Contractor; and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; and

1(A)(2)(b)(3). Charges separately stated on Carrier's invoice to Carrier's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), detention charges actually received from the shipper, loading and unloading (including lumper) charges, "truck ordered but not used" charges, insurance surcharges, escort service charges, tolls, overdimensional and other permits, trailer charges, cartage charges, spotting charges, freight payment processing fees, excess-value charges or high-value freight charges, surcharges for special security measures, charges for Third-Party contract services, charges for the international p ortion of loads going to or coming from Mexico, and charges for other services Carrier obtained from a broker, freight forwarder, interline or augmenting carrier, warehouse or other storage provider, terminal, agent, other independent contractor, or other third party.

1(B). Additional Compensation

1(B)(1). **Fuel-Related.** Ninety-seven percent (97%) of the fuel surcharges billed to the shipper for a shipment; and

1(B)(2). **Accessorial Charges.**

1(B)(2)(a). Overdimensional Permit Fees. One hundred percent (100%) of any overdimensional permit fee (if paid by Contractor).

1(B)(2)(b). Other Charges. The same percentage as Section 1(A)(1) of this Appendix applies to Adjusted Gross Revenue of any detention charges, "truck ordered but not used" charges, loading and unloading (lumper) expense, tolls, and other accessorial charges that Carrier actually collects from the shipper for a shipment.

1(B)(3). Hazardous Materials Charges. For hazardous materials shipments booked after October 21, 2013, requiring the use of a driver that is certified by the DOT as qualified to operate a vehicle containing hazardous materials or where a Shipper requests the use of a hazardous materials qualified driver for a shipment after that date, Carrier shall pay Contractor four cents ($.04) per mile on those shipments in addition to the compensation Carrier pays pursuant to Section 1(A) of this Appendix B. In the event Contractor has as a co-driver on a shipment Contractor has accepted pursuant to this Section 1(B)(3) a driver not qualified to operate a vehicle containing hazardous materials, Carrier will pay Contractor four cents ($.04) per mile on a split-mile basis. In the event Contractor has as his co-driver on a shipment Contractor has accepted pursuant to this Section 1(B)(3) a driver who is also certified to operate a vehicle containing hazardous materials, then Carrier will pay four cents ($.04) for all miles on the shipment. By accepting the hazardous materials shipments, Contractor represents to Carrier that the driver operating the motor vehicle used to transport the hazardous materials shipment is qualified to operate a motor vehicle containing hazardous materials.

2. CHANGES IN COMPENSATION.

2(A). Temporary Change. Carrier and Contractor may make a temporary change in Contractor's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement by both parties' signing (either manually or, as indicated in Section 2(B) of this Appendix, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. Contractor shall be under no obligation to accept the change in compensation by signing such an addendum, and Carrier shall not terminate this Agreement for Contractor's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in such event, Carrier are hereby authorized not to assign you loads covered by such change in the meantime. Such temporary change shall not be effective for more than twenty (20) calendar days.

2(B). Ongoing Change. If any aspect of Contractor's compensation set forth in this Appendix B will be changing on an ongoing basis, Contractor shall be provided a proposed addendum containing the change at least twenty (20) calendar days in advance by hand, fax, overnight delivery, or, if the parties have agreed to such forms of communication by both signing **Appendix D (Consent to Conduct Business by Electronic Methods)** of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix. If Contractor wishes to continue operating on behalf of Carrier, he/she shall, by the effective date and time shown on the addendum, EITHER manually sign the addendum and deliver it to Carrier by hand, fax, or overnight delivery OR, if both parties have signed Appendix D of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix. If Contractor does not take one of these actions consenting to the change within the time indicated on the addendum,, the addendum shall operate as a notice of termination under Section 14 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in such event, Contractor shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

3. EARNINGS ADJUSTMENTS.

3(A). Billing Error. If Carrier discovers and corrects an error in, or in Carrier's sole judgment decides to retroactively increase or decrease, the amount of any item billed to Carrier's customer on a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall credit to, or deduct from, Contractor's gross compensation at the next settlement a share – corresponding to the percentage of such revenue normally payable to Contractor for the shipment – of the additional amount Carrier actually collects or refunds in remedying the error. Carrier shall provide Contractor, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Section 3(B) of this Agreement with respect to the shipment.

3(B). Billed Amount Uncollectible. If, after making a commercially reasonable effort to do so, Carrier is unable to collect from a customer the full amount of any item billed to the customer for a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall deduct from Contractor's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of such revenue normally payable to Contractor for the shipment. Carrier shall give Contractor, before or at the time of settlement, a written explanation of Carrier's efforts to collect from its customer and the computation of the amount being deducted from Contractor's gross compensation, Escrow Fund, and any other amounts due Contractor from Carrier.

4. METHOD OF DISBURSEMENT OF SETTLEMENT COMPENSATION. Carrier shall pay Contractor any net settlement compensation due through the OPTION specified by Contractor below (with no administrative fee to Carrier).

Contractor SHOULD INITIAL ONLY ONE OF THESE THREE OPTIONS (on the line to the left):

NC OPTION 1 (Cash Loads onto Contractor's Settlement Card): Carrier shall pay settlement compensation by loading cash onto Contractor's Settlement Card, which is purely a debit card (in other words, Contractor may use it for transactions only up to the total cash value on the card, not for credit transactions). For each Carrier cash-load onto the Settlement Card, the third-party issuer of the Card will debit the Card a transaction fee for each direct-deposit or registration of a preauthorized check drawn from the Card after the first two debits. In addition, each time Contractor uses the Settlement Card to obtain cash from an automated teller machine, to make a purchase (at any truck stop or other vendor honoring such cards), or to make certain other transactions, the third-party issuer of the Card will deduct a per-transaction fee. None of the revenue from the Card-issuer's fees shall be shared with Carrier. All Settlement Card transactions are governed by Card-issuer rules, which, together with Card-issuer transaction fee information, shall be available to Contractor by contacting the Card Issuer at its Internet web address listed on the Card or the Card Issuer's Customer Service telephone line, 1-800-226-3870.

_____ OPTION 2 (Weekly Payments via Carrier Bank Check – Mailed): Carrier shall pay settlement compensation by sending a bank check by U.S. First Class Mail to the address required by Section 13 (Notices) of this Agreement or, if Contractor chooses the following different address, to:

______________________________________
Address (Street, P.O. Box)

______________________________________
City, State & Zip Code

_____ OPTION 3 (Weekly Payments via Carrier Bank Check – Picked Up at Terminal): Carrier shall pay any Settlement Compensation by making a bank check available for pick-up by Contractor at the terminal of Carrier to which Contractor is assigned during normal business hours. If Contractor wishes to have an authorized representative pick up the check, Contractor must first deliver to Carrier a signed and dated letter giving the full name, address, and telephone number of the representative and stating the period during which Contractor wishes the representative to pick up the check on Contractor's behalf.

5. METHOD OF DELIVERY OF SETTLEMENT STATEMENT. Carrier shall deliver Settlement Statements, including any attachments, to Contractor through the OPTION specified by Contractor below:

Contractor SHOULD INITIAL ONLY ONE OF THESE FOUR OPTIONS (on the line to the left):

_____ OPTION 1 (U.S. First Class Mail): Carrier shall send the Settlement Statements to Contractor by U.S. First Class Mail to the address required by Section 13 (Notices) of this Agreement or to the address shown under OPTION 2 of Section 4 of this Appendix.

_____ OPTION 2 (Fax): Carrier shall fax the Settlement Statements to Contractor at fax number __________________.

_____ OPTION 3 (Email): Carrier shall email the Settlement Statements to Contractor at the email address shown in Appendix D (Consent to Conduct Business by Electronic Methods) of this Agreement if the parties have agreed to email communication by both parties so indicating in and then signing Appendix D.

NC OPTION 4 (Online): Carrier shall post the Settlement Statements on the password-protected webpage, accessible only to Carrier and Contractor, identified in Appendix D of this Agreement if the parties have agreed to online communication by both parties so indicating in and then signing Appendix D.

THIS APPENDIX B, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ __.m. Central Time on the _______ day of _______________, 20___.

Contractor: ______________________

By: Anthony Perrante
Signature

______________________
Authorized Representative's Name (Typed or Printed)

______________________
Title

01-03-18
Date

______________________
Driver's Name if Different

______________________
Tractor No.

Carrier: CRST Expedited, Inc.

By: Phillip Reges
Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA 52406
Tel. 319-731-3890
Fax 319-731-9245

## APPENDIX E

### PRIVACY-RELATED DISCLOSURES AND CONSENT FORM

EOBR Requirement and Its Purposes. All Contractors that enter into an Independent Contractor Operating Agreement ("Agreement") with CRST Expedited, Inc. ("Carrier") have, under the Agreement (including Section 4(C)(3)) and this Appendix, agreed to maintain in each unit of Equipment (as defined in Section 1(A) of the Agreement) a compliant and functioning Electronic On-Board Recorder (referred to in the Agreement and this Form as "Communication System/EOBR" or simply "EOBR")), also sometimes referred to as an Electronic Logging Device ("ELD"). The principal purpose of this new requirement is to assist Contractor's drivers and Carrier in complying with Federal Motor Carrier Safety Administration's ("FMCSA") Hours of Service regulations and other Applicable Law (as defined in Section 4 of the Agreement) and in avoiding adverse safety scores and FMCSA interventions under FMCSA's Compliance, Safety, Accountability ("CSA") Program. The EOBR may also assist in providing load dispatching and tracking services to meet the requirements of Carrier's customers.

Categories of Electronic Information Collected by EOBR. The EOBR is capable of collecting various categories of data regarding the Equipment and its operation, including but not limited to (collectively "Electronic Information"):

- Name of the driver and any co-driver(s), and corresponding driver identification information
- Duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving")
- Date and time the Equipment is in operation
- Location of the Equipment (as determined by satellite or terrestrial sources)
- Distance travelled (including when the Equipment crosses state lines)
- Name and U.S. Department of Transportation number of Carrier
- 24-hour period starting time
- Multiday basis used by Carrier to compute cumulative duty hours and driving time
- Hours in each duty status for the 24-hour period, and total hours
- Equipment number
- Load information, such as shipping document number(s), or name of shipper and commodity(ies)
- Fuel use, including when the Equipment is refuelled
- Speed of the Equipment
- Hard-braking events
- Power-on self-tests and diagnostic error codes.

The Electronic Information is transmitted from your Equipment to the third-party vendor of the EOBR (*see below*) and then from the vendor to Carrier. Carrier may from time to time access certain categories of the Electronic Information in furtherance of its efforts to comply with Applicable Law, including FMCSA's Hours of Service regulations, or to meet customer requirements.

Carrier Uses of the Electronic Information. The third-party vendor – Omnitracs, LLC -- responsible for the collection and storage of the Electronic Information. Carrier does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the EOBR installed operates under lease to Carrier, and for a reasonable time thereafter. If Contractors or their drivers have questions about the safeguards those companies have put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact Omnitracs, Inc. at http://www.omnitracs.com. Carrier has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendors, and limits access to the Electronic Information to authorized individuals who need to know the information in order to comply with Applicable Law, including the Hours of Service Regulations.

Right to Review Electronic Information. Contractor and any Contractor's driver shall have the right, on written request to Carrier, to review the collected Electronic Information that Carrier itself continues to have access to, but only Electronic Information relating to the requesting Contractor (including that Contractor's drivers') or the requesting driver, respectively. A written request for such a review should be addressed to me by email or U.S. Mail.

**Signing This Form. By signing below, the listed Contractor (whether or not a driver) and Driver (if any, employed by Contractor) represents that he/she has read and understood the privacy-related disclosures described above.**

**CONSENT TO CARRIER'S ACCESSING CERTAIN SAFETY-PERFORMANCE DATA OF DRIVERS. In addition, by signing below, the listed Contractor (if a driver) and Driver (if any, employed by Contractor) authorize Carrier to access applicable driver files, FMCSA Safety Measurement System ("SMS") safety scores and other data, and FMCSA's Pre-Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter.**

If you have questions regarding the Electronic Information collected through the EOBR or how the Electronic Information is accessed and used by Carrier, please feel free to contact your Operations Director. Thank you.

| *If you are a Contractor (or authorized officer, partner, member, or proprietor of one) for CRST Expedited, Inc., please complete this signature block:* | *OR, if you are a professional truck driver employed by such a Contractor, please complete this signature block:* |
|---|---|
| CONTRACTOR *(Print Name)*: ______ | DRIVER *(Print Name)*: ______ |
| *Employer ID No.*: ______ | *Soc. Sec. No. (last 4 digits only)*: ______ |
| *OR Soc. Sec. No. (last 4 digits only)*: ______ | *Employed by CONTRACTOR (Print Name)*: ______ |
| By: Anthony Kenneth [signature] Signature | By: ______ Signature |
| ______ Printed Name of Authorized Rep., if any | |
| ______ Title | |
| ______ Mobile Telephone Number | ______ Mobile Telephone Number |
| 01-03-18 Date | ______ Date |

# CRST Expedited, Inc. Independent Contractor Operating Agreement

## ADDENDUM – AMERICAN TRUCK BUSINESS SERVICES

Whereas the undersigned Contractor wishes to purchase accounting and other services from American Truck Business Services, and whereas CRST Expedited, Inc. ("Carrier") is willing to facilitate such purchase through settlement deductions and other means of recovery, therefore, pursuant to Section 16(D)(3) of the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") they have entered into, the parties hereby agree to amend the Agreement as follows:

1. PURCHASE OF SERVICES. By signing this Addendum, Contractor elects to obtain accounting and other business services from American Truck Business Services ("ATBS") in accordance with a contract between Contractor and ATBS, documentation of which is attached.

2. SETTLEMENT DEDUCTION OR OTHER RECOVERY. Contractor hereby authorizes and directs Carrier to deduct or otherwise recover pursuant to Section 6(A) of the Agreement, and to remit to ATBS, initially $____________ per month and, in the future, such other amounts as may be billed by ATBS to Contractor through Carrier.

3. DISCONTINUATION. Contractor may discontinue the above deductions from compensation by requesting such discontinuation in a written notice to Carrier, attaching a copy of the letter or other document by which Contractor has given ATBS written notice of Contractor's wish to cancel his/her participation in the plan.

4. LIMITED SCOPE AND COPIES. Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum – the Agreement shall remain in full force and effect in accordance with its terms. Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor. Both parties shall then attach this Addendum to their copy of the Agreement.

**THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ __.m. Central Time on the ______ day of __________, 20___.**

| | |
|---|---|
| **CONTRACTOR:** ________________ | **CARRIER: CRST EXPEDITED, INC.** |
| By: ________________ Signature | By: [signature] Signature |
| ________________ Authorized Rep.'s Name (Typed or Printed) | Phillip Reges Authorized Rep.'s Name (Typed or Printed) |
| ________________ Title | ________________ Title |
| ________________ Date | ________________ Date |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

NO. 1:20-cv-00075-CJW-KEM

VIDEO TELECONFERENCE DEPOSITION OF DIANE LAPPE

THE VIDEO TELECONFERENCE DEPOSITION OF DIANE LAPPE, taken before Kristi L. Miller, Certified Shorthand Reporter and Notary Public of the State of Iowa, commencing at 9:00 a.m. Central Standard Time, June 22, 2023, with all parties appearing remotely.

Reported by: Kristi L. Miller, C.S.R.

# DIRECT EXAMINATION BY PLAINTIFFS

know what is on a settlement statement?

MR. SMEDSTAD: Object to the form, foundation, speculation. Go ahead and answer.

A. No.

Q. Okay. So do you know what a settlement statement is?

A. Yes.

Q. And what is it?

A. It is a representation or a detail of what was paid out to the independent contractor in our conversation. So it should give their information so we know that we're paying them, the time period that it pays, and what loads they moved during that period of time, what deductions were on there, what earnings that are on there. And the deductions could be recurring or, you know, one-time deductions.

Q. Thank you. And so you mentioned that there's information about the loads that the independent contractors hauled.

Do you know what information pertaining to each load is included on a settlement statement?

MR. SMEDSTAD: Object to the form, vague. Go ahead and answer.

A. It would be the line haul of the load and then any accessorials.

Q. And when you refer to the "line haul of the load," do you know -- what does line haul mean?

A. Typically the amount paid from Point A to Point B.

Q. And do you know, is that usually the independent contractors hauling from Point A to Point B?

MR. SMEDSTAD: Object to the form, vague. Go ahead and answer.

A. Repeat the question, please.

Q. Sure. Do you know whether the work of hauling from Point A to Point B is conducted by the independent contractor?

A. Yes.

MR. SMEDSTAD: Same objection. Go ahead and answer.

Q. Was that a yes?

A. Yes.

Q. Okay. Thank you. And you also mentioned "accessorials." What do you mean by

accessorials?

A. So any additional charges, additions to the load. Fuel is theoretically an accessorial because it's not included in the line haul. So basically anything other than line haul on the load.

THE WITNESS: Did anyone else notice, is she froze up? Is it just me?

MR. SMEDSTAD: I think it's just the witness.

MS. KING: Can you hear me?

THE WITNESS: Yeah, now I can.

MS. KING: Okay. If there are ever any technical glitches, you can't hear me, I freeze, do what you just did and let us all know.

Q. All right. So for line haul, what information about the line haul would be included on a settlement statement?

MR. SMEDSTAD: Object to the form, vague as to time. Go ahead and answer.

A. Just it's whatever rate was agreed upon between the customer and CRST, and then for the statement purposes it would be a percentage of that.

A. I don't know.
Q. Okay. So do you know what appears on a legacy system settlement statement at all?
A. Only the ones I pulled. So they seemed to be like our current system. Obviously things are a little bit different on there, so I can't -- I can't say for sure because I didn't sit there and stare at it and analyze it, and I don't work with it every day.
Q. And when you say your "current system," are you referring to the LME system?
A. Correct.
Q. Do you know what a rated freight bill is?
A. Yes.
Q. And what is a freight bill?
A. A freight bill is our invoice to our customer.
Q. Do you know what information appears on a freight bill?
A. It's usually designed by what the customer requests. It could just be the rate agreed upon. It could have a breakdown of accessorials. It depends on the customer request or requirements.

Q. And when you refer to a "rate agreed upon," is that the line haul rate?

A. That would be the overall rate. So it depends on whether it would be an all-in rate or if it would be broken out into line haul and accessorials. Some customers only want it to be one way and others want it a different way, so we -- we do it how our customer requests.

Q. And besides the line haul and accessorials, if it's broken out, is there any other information on a freight bill?

MR. SMEDSTAD: Foundation. Go ahead and answer.

A. It would be the origin/destination so that they know what load it's for, any reference numbers the customer requires to be able to pay us quickly and accurately.

THE WITNESS: I think we froze up again.

MS. KING: Can you hear me?

THE WITNESS: Yep, now I can.

MS. KING: Hopefully I'm not just not moving.

Q. So on the freight bill, the accessorial charges, if they're broken out,

what information on the accessorials charges is listed on a freight bill?

MR. SMEDSTAD: Vague, foundation. Go ahead and answer.

A. It would be whatever the customer requests. It may be just fuel. Maybe they only want to see fuel. Maybe there's certain other charges that they want broken out. Any additional charge that we're charging them for would be on there.

Q. And to go back to the settlement statement, you indicated the accessorials for the load might be listed on a settlement statement?

A. Yes.

Q. What information regarding the accessorial charges would be on the settlement statement?

MR. SMEDSTAD: Object to the form, foundation. Go ahead and answer.

A. It would be the same things that are on a customer statement except obviously dependent on what the independent contractor agreement states is something that we would pass-through or, you know, pay for.

Q. And when you refer to "customer statement," is that the same thing as the freight bill?
A. Yes. Sorry.
Q. That's okay. Do settlement statements contain the full amount that was listed on the freight bill for accessorial charges?
MR. SMEDSTAD: Foundation. Go ahead and answer.
A. I don't believe so. It would be the amount paid to the independent contractor.
Q. Just to confirm, so does CRST include information from freight bills on independent contractor settlement statements?
MR. SMEDSTAD: Foundation, asked and answered. Go ahead and answer.
A. Yeah, I'd have to look and see and compare the two, but it's going to have some of the accessorials listed. I'm not going to say that it would have all of them. And it could be the full amount, depending on what our agreement is with the independent contractor.
Q. Do you know in what scenario it would be the full amount?
MR. SMEDSTAD: Object to the

form, vague, incomplete hypothetical.

Q. You can answer.

A. I don't know.

Q. Do you know whether there are any charges that are listed on a freight bill that CRST does not include on an independent contractor settlement statement?

MR. SMEDSTAD: Object to the form, foundation, speculation. Go ahead and answer.

A. I don't know.

Q. Do you know what charges CRST settles to independent contractors?

A. 70 percent.

MR. SMEDSTAD: Object to the form. Pardon me. Object to the form. Go ahead and answer.

A. Sorry. 70 percent.

Q. And when you say 70 percent, is that 70 percent of a specific charge, or what are you referring to?

A. The line haul.

Q. Is there anything else that CRST settles to independent contractors?

MR. SMEDSTAD: Object to the

form, foundation. Go ahead and answer.

A. The fuel.

Q. Anything else?

A. Accessorials, depending on what the accessorial is.

Q. And for each of those charges that CRST settles to the independent contractor, does it list them on the settlement statement?

MR. SMEDSTAD: Foundation. Go ahead and answer.

A. Yes.

Q. And do you know whether for each of those charges it includes information from the freight bill on the settlement statement?

MR. SMEDSTAD: Object to the form, foundation. Go ahead and answer.

A. It would -- repeat the question.

Q. Sure. For each of those charges, do you know whether CRST includes information from the freight bill on the settlement statement?

MR. SMEDSTAD: Vague, foundation, asked and answered. Go ahead and answer.

A. It would -- it would show, again, the line haul rate, the fuel, and the accessorials

that would be paid to the independent contractor.

Q. All right. I would like to show you an exhibit. I'm just going to share my screen. Can you see my screen, Ms. Lappe?

A. Yes.

Q. Okay. This document has previously been marked as Exhibit 80. It starts at Bates Stamp CRST 001867 through 1870.

Do you recognize this document, Ms. Lappe?

A. Yes.

Q. What is it?

A. It is an owner-operator statement, independent contractor statement, settlement statement.

Q. Thank you. And the check date is May 1st, 2020. Do you know whether this is an LME settlement statement?

A. Yes.

Q. All right. I just wanted to go over a couple of the terms that are listed here on the settlement statement.

So there's this top row here, and it says "Origin, Destination, Loaded," and

# DEFENDANT'S DISCOVERY RESPONSES

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO CRST EXPEDITED, INC.**

Defendant, CRST Expedited, Inc. d/b/a CRST The Transportation Solution, Inc. (CRST), for its supplemental responses to Plaintiff's First Set of Interrogatories to CRST Expedited, Inc. (Interrogatories) Nos. 1, 2, and 8 in response to Plaintiffs' May 26, 2021 letter, states as follows:

1. For each year during the Relevant Time Period, state the number of Drivers who worked for CRSTX, differentiating whether the Drivers were:

(a) CRSTX employee drivers (not including Student Drivers) who worked for CRSTX;

(b) CRSTX Student Drivers assigned to drive with a Driver (i.e. a Driver who signed an ICOA);

(c) CRSTX Student Drivers assigned to drive with an Employee Driver;

(d) Drivers who worked for CRSTX pursuant to ICOAs;

(e) Drivers whose ICOA provided CRSTX a truck the Driver obtained pursuant to an Equipment Lease with CRST Lincoln Sales.

**Original Response:** CRST objects to Interrogatory No. 1 as improperly compound in that it contains five discrete subparts asking for specific data broken down further into yearly increments (resulting in 20 separate requests). CRST also objects to the Interrogatory as vague as to the meaning of "each year during the Relevant Time Period" as it does not identify whether Plaintiffs seek information on a calendar year basis or for a 12-month period beginning at the start of the "Relevant Time Period" (or some other date). Based on discussions with Plaintiffs' counsel, CRST has interpreted the request to seek information on a calendar year basis. CRST objects to providing data related to any time prior to October 23, 2017 as irrelevant and outside the scope of the defined Relevant Time Period.

CRST further objects to Interrogatory No. 1 as vague and ambiguous. Plaintiffs request information regarding the "number of Drivers who worked for CRSTX, differentiating whether the Drivers" meet certain criteria. Plaintiffs have defined "Drivers" as "any individual who signed an ICOA with CRSTX," but excluding individuals with a controlling interest in CRST and Fleet Drivers. Despite this definition, Plaintiffs confusingly request data related to CRST Student and Employee Drivers, who do not fit within the category of "Drivers" as defined by Plaintiffs in the Interrogatories. CRST has interpreted the term "Drivers" in the first sentence to instead mean "individuals" (including any individuals operating as business entities).

CRST also objects to Plaintiffs' use of the term "worked for" insofar as it connotes an employment relationship between CRST and Drivers. Drivers like Plaintiffs were in business for themselves and contracted with CRST to provide equipment and a DOT-qualified driver to perform professional driving services pursuant to the terms of their ICOAs. In responding to this Interrogatory, CRST has interpreted this phrase as "provided services to."

CRST objects to Interrogatory No. 1 as unduly burdensome and not proportional to the needs of the case. Some of the data sought by Plaintiffs is not readily identifiable from any of CRST's data sources, as CRST does not maintain a yearly breakdown of drivers with the requested information, and, due to changing TMS systems in 2019, coupled with drivers regularly coming and going and changing the way in which they do business, it is extremely burdensome for CRST to accurately count the individuals falling within the various categories identified by Plaintiffs.

CRST further objects to subpart (a) as vague, ambiguous, unduly burdensome, and not proportional to the needs of the case. Specifically, subpart (a) requests the number of employee drivers not including student drivers who worked for CRST during the relevant time period. This is vague and ambiguous because student drivers are considered employee drivers of CRST. CRST cannot identify with any level of certainty the number of non-student employee drivers in a year period given the way drivers were historically coded into its system. CRST objects to subparts (a), (b), and (c) as irrelevant, unduly burdensome, and not proportional to the needs of the case. These subparts seek data related only to employee drivers who are not putative class or collective members in this case. CRST is still working to gather a count of (a) the number of employee drivers in each year, (b) the number of student drivers who trained with an independent contractor each year, and (c) the number of student drivers who trained with an employee driver and will supplement its response with the requested information. In response to subparts (d) and (e), CRST has identified the following approximate counts (these counts are subject to some degree of error given data anomalies and input errors):

| | **Oct. 23, 2017 to Dec. 31, 2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|
| Number of Independent Contractors who executed and worked pursuant to ICOAs (excluding fleet operators) | 426 | 975 | 1054 | 765 |
| Number of Independent Contractors who leased trucks pursuant to leases with CRST Lincoln Sales, Inc. (excluding fleet operators) | 380 | 830 | 876 | 726 |

**Supplemental Response:** CRST reiterates that it does not maintain the requested counts of drivers in its system. To the best of CRST's knowledge and based on the data available in its system, CRST can identify the following in response to subparts (a), (b), and (c). Due to limitations on the data available in CRST's Legacy system, it cannot provide some of the requested information prior to July 30, 2019.

| | **10-23-2017 to 12-31-2017** | **2018** | **1-1-2019 to 7-29-2019** | **7-30-2019 to 12-31-2019** | **2020** | **1-1-2021 to 4-29-2021** |
|---|---|---|---|---|---|---|
| (a) Number of Non-Student Employee Drivers | 253 | 1,492 | 767 | 730 | 1,849 | 702 |
| (b) Number of Student Drivers Who Trained With an IC | | | | 1,194 | 2,516 | 882 |
| (c) Number of Student Drivers Who Trained With an Employee Driver | | | | 1,048 | 1,871 | 453 |

CRST is not withholding any information responsive to this request.

2. For each year during the Relevant Time Period, state the number of Drivers who used a Team Driver, identifying those who were:

(a) an Employee Driver or a Student Driver;

(b) hired by a Driver in accordance with the Driver's ICOA ¶ 5(A), and not an employee of CRSTX.

**Original Response:** CRST objects to Interrogatory No. 2 as improperly compound in that it contains two discrete subparts asking for specific data broken down further into yearly increments (resulting in eight separate requests). CRST objects to Interrogatory No. 2 as overly burdensome and not proportional to the needs of the case. CRST is still analyzing the data sources

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO CRST EXPEDITED, INC.**

Defendant, CRST Expedited, Inc. dba CRST The Transportation Solution (CRST), for its response to Plaintiffs' Second Set of Interrogatories to CRST Expedited, Inc., states as follows:

9. Identify, and state whether they are currently employed by or under contract with Defendants, any Driver given the authority to drive for another trucking company, including pursuant to ¶1(E) under the ICOA, while under contract or lease with Defendants.

**Response:** CRST objects to Plaintiffs' Second Set of Interrogatories because, when accounting for Plaintiffs' First Set of Interrogatories and all discrete subparts, they exceed 25 in number as allowed by Fed. R. Civ. Proc. 33(a)(1). CRST objects to this interrogatory on the grounds that the term "Defendants" is vague, ambiguous, and undefined. CRST Expedited interprets the term as referring to it. CRST objects to this interrogatory on the grounds that it is not limited to a relevant time period. CRST objects to this interrogatory on the grounds that it is unduly burdensome and not proportionate to the needs of the case because obtaining the information it seeks would require CRST to review every email and other communication between it and each

member of the conditionally certified collective and the putative class to determine whether such requests were made and, if so, the dispositions of the requests. The burden is compounded by the fact that CRST changed email applications in approximately mid-2018 and recovery of emails prior to the conversion would be difficult, time consuming, and expensive, if not impossible. CRST has no central collection of records reflecting owner-operator requests to perform transportation services for other motor carriers while under contract with CRST and the results of such requests and is therefore unable to identify any such owner-operators.

10. State the percentage of all loads offered by Defendants to Drivers that were rejected for any reason during the Relevant Time Period. Please state the percentage for each Plaintiff and for the Drivers as a group.

**Response:** CRST objects to Plaintiffs' Second Set of Interrogatories because, when accounting for Plaintiffs' First Set of Interrogatories and all discrete subparts, they exceed 25 in number as allowed by Fed. R. Civ. Proc. 33(a)(1). CRST objects to this interrogatory on the grounds that the term "Defendants" is vague, ambiguous, and undefined. CRST Expedited interprets the term as referring to it. CRST objects to this interrogatory on the grounds that the Relevant Time Period, as defined by Plaintiffs, is overbroad and not limited to a relevant time period. CRST objects to this interrogatory on the grounds that it is unduly burdensome and not proportionate to the needs of the case because obtaining the information it seeks would require CRST to trace tens of thousands of loads to the tractors to which each load was tendered during the relevant time period, match the tractors to the individuals operating them at the time, determine whether those individuals are members of the conditionally certified collective or the putative class, and review every communication with those individuals to determine whether rejection of a load occurred. The burden is compounded by the fact that CRST changed email applications in

CRST is searching its records for responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

12. Identify any Discovery Opt-In Plaintiff to whom CRST gave authority to drive for another trucking company, including pursuant to ¶ 1(E) under the ICOA, while under contract or lease with Defendants.

**Response:** CRST objects to Plaintiffs' Third Set of Interrogatories because, when accounting for Plaintiffs' First and Second Sets of Interrogatories and all discrete subparts, they exceed 25 in number as allowed by Fed. R. Civ. Proc. 33(a)(1). Without waiving its objection, CRST is searching its records for responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

**Supplemental Response:** For the Relevant Time Period delineated in Plaintiffs' Third Set of Interrogatories, no Discovery Opt-In Plaintiff received authority from CRST to haul freight for another motor carrier while being party to an ICOA with CRST.

13. Identify any Discovery Opt-In Plaintiff who provided a leased truck to CRST pursuant to an ICOA that they did not lease from CRST Lincoln Sales and the period for which they provided such a truck.

**Response:** CRST objects to this interrogatory on the grounds that the information it seeks is neither relevant nor reasonably calculated to lead to the discovery of relevant information because leasing a vehicle from CRST Lincoln Sales, Inc. is not an element of the definition of the conditionally certified collective. Without waiving its objection, CRST is assessing its ability and the burden related to locating responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO CRST EXPEDITED, INC.**

Defendant, CRST Expedited, Inc. dba CRST The Transportation Solution (CRST), for its response to Plaintiff's First Set of Requests for Admission to CRST Expedited, Inc., states as follows:

1. For the Relevant Time Period, admit that no Alternative-Use-Fee has been deducted from any Opt-In Driver's settlement as described in Section 4 of Appendix A of ICOA forms such as those filed as Doc. 39-2, Doc. 39-4, or similar provisions in other ICOA forms. If CRST denies this request for admission, produce all settlements or other documents showing the deduction of such fees.

**Response:** CRST admits that it made no deductions from settlement payments made to Opt-In Drivers for Alternative Uses of Equipment Fees as described in paragraph 4 of Appendix A of the ICOAs described in Request No. 1.

68. For the Relevant Time Period, all documents containing or concerning CRSTX's minimum driver qualification standards as referenced in ¶4(D)(3) of ICOA forms such as those filed as Doc 39-2 or Doc 39-4, or similar provisions in other form ICOAs.

**Response:** CRST objects to this request on the grounds that the Relevant Time Period, as defined by Plaintiffs, is overbroad and not limited to a relevant time period. See CRST011260 - CRST011289.

69. For the Relevant Time Period, all documents containing or concerning requests by Drivers to haul freight for a motor carrier or entity other than CRSTX using Equipment leased to CRSTX pursuant to the Driver's ICOA. This request includes, but is not limited to, requests for CRSTX to consent to such "Alternative Uses of Equipment" as described in ¶1(E) of ICOA forms such as those filed as Doc. 39-2, Doc. 39-4, or similar provisions in other ICOA forms; documents provided to CRSTX pursuant to ¶1(E) of ICOA forms such as those aforementioned in this request; and documents reflecting CRSTX's response to such requests.

**Response:** CRST objects to this request on the grounds that the term "Equipment" is vague, ambiguous, and undefined. CRST interprets the term to mean the power unit(s) owned by owner-operators and leased to CRST in accordance with the federal leasing regulations, 49 C.F.R. Part 367. CRST objects to this request on the grounds that the Relevant Time Period, as defined by Plaintiffs, is overbroad and not limited to a relevant time period. Using the aforementioned meaning of "Equipment," CRST located no documents responsive to this request.

70. For the Relevant Time Period, all documents reflecting the number of Drivers who purchased their equipment at the expiration of the lease term in accordance with ¶19 of the Lease, such as CRST000125-CRST000147, or similar provisions in other form Leases.

CRST is searching its records for responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

12. Identify any Discovery Opt-In Plaintiff to whom CRST gave authority to drive for another trucking company, including pursuant to ¶ 1(E) under the ICOA, while under contract or lease with Defendants.

**Response:** CRST objects to Plaintiffs' Third Set of Interrogatories because, when accounting for Plaintiffs' First and Second Sets of Interrogatories and all discrete subparts, they exceed 25 in number as allowed by Fed. R. Civ. Proc. 33(a)(1). Without waiving its objection, CRST is searching its records for responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

**Supplemental Response:** For the Relevant Time Period delineated in Plaintiffs' Third Set of Interrogatories, no Discovery Opt-In Plaintiff received authority from CRST to haul freight for another motor carrier while being party to an ICOA with CRST.

13. Identify any Discovery Opt-In Plaintiff who provided a leased truck to CRST pursuant to an ICOA that they did not lease from CRST Lincoln Sales and the period for which they provided such a truck.

**Response:** CRST objects to this interrogatory on the grounds that the information it seeks is neither relevant nor reasonably calculated to lead to the discovery of relevant information because leasing a vehicle from CRST Lincoln Sales, Inc. is not an element of the definition of the conditionally certified collective. Without waiving its objection, CRST is assessing its ability and the burden related to locating responsive information and will supplement its response to this interrogatory as required by the Federal Rules of Civil Procedure.

before September 1, 2015. *See* Fed. R. Civ. Proc. 26(b)(1). Any claims related to load number 69139069 are time-barred under the applicable statute of limitations.

4. For load number 71287017, admit that:

   a) Defendants had an obligation under the ICOA to pay the Opt-In Driver $140 for the $200 detention charge Defendants billed and collected from the customer;

   b) Defendants did not give the Opt-in Driver, before or at the time of settlement, a rated freight bill or other documentation showing the $200 detention charge Defendants billed and collected from the customer; and

   c) Defendants did not pay the Opt-In Driver $140 for the $200 detention charge Defendants billed and collected from the customer.

**Amended Response:** Defendant admits that it billed and collected from its customer $2,325.00, which included a $200 detention charge for load number 71287017. Defendant further admits that it paid 70% of the detention charge in the amount of $140, to the contractor who hauled the load, because the charge falls within the description of charges that it agreed to pay 70% of to the opt-in driver. Defendant denies that it did not provide the Opt-In Driver the information required by 49 C.F.R. 376.12(g) and denies the remaining allegations contained in Request No. 4.

5. For load number 71287017, admit that:

   a) Defendants had an obligation under the ICOA to pay the Opt-In Driver $175 for the $250 layover charge Defendants billed and collected from the customer;

b) Defendants did not give the Opt-in Driver, before or at the time of settlement, a rated freight bill or other documentation showing the $250 layover charge Defendants billed and collected from the customer; and

c) Defendants did not pay the Opt-In Driver $175 for the $250 layover charge Defendants billed and collected from the customer.

**Amended Response:** Defendant admits that it billed and collected from its customer the total amount of $2,325.00, which included a $250 layover charge for load number 71287017. Although the layover charge appears to have been charged to Defendant's customer in error, Defendant admits that the charge falls within the description of charges that it agreed to pay 70% of to the opt-in driver. Defendant further states that, after conducting a reasonable inquiry, it cannot find a payment to the Opt-In Driver for 70% of the layover charge. Defendant admits that it did not provide the opt-in driver with a rated freight bill at the time of settlement and because it appears that it did not pay the opt-in driver a portion of the layover charge, Defendant admits that the settlement statement it provided the opt-in driver did not show the $250 layover charge.

6. For load number 69291008, admit that:

a) Defendants had an obligation under the ICOA to pay the Opt-In Driver $245 for the $350 lumper charge Defendants billed and collected from the customer;

b) Defendants did not give the Opt-in Driver, before or at the time of settlement, a rated freight bill or other documentation showing the $350 lumper charge Defendants billed and collected from the customer; and

c) Defendants did not pay the Opt-In Driver $245 for the $350 lumper charge Defendants billed and collected from the customer.

**Amended Response:** Defendant objects to Request No. 6 regarding load number 69291008, which was hauled before September 1, 2015. *See* Fed. R. Civ. Proc. 26(b)(1). Any claims related to this load are time-barred under the applicable statute of limitations.

7. For load number 72909125, admit that:

   a) Defendants had an obligation under the ICOA to pay the Opt-In Driver $840 for the $1,200 reconsignment charge Defendants billed and collected from the customer;

   b) Defendants did not give the Opt-in Driver, before or at the time of settlement, a rated freight bill or other documentation showing the $1,200 reconsignment charge Defendants billed and collected from the customer; and

   c) Defendants did not pay the Opt-In Driver $840 for the $1,200 reconsignment charge Defendants billed and collected from the customer.

**Amended Response:** Defendant admits that it billed and collected from its customer the total amount of $4,400.00, which included a $1,200 reconsignment charge for load number 72909125. Defendant further admits that it did not pay the Opt-In Driver a portion of the reconsignment charge because the Opt-In Driver did not haul any portion of the load related to the reconsignment. Defendant further admits that it paid the Opt-In Driver who hauled the load more than 70% of the linehaul charges for the portion of the load he hauled. Defendant admits that it did not provide the opt-in driver with a rated freight bill at the time of settlement and because the opt-in driver did not haul any portion of the load related to the reconsignment Defendant admits that the settlement statement it provided the opt-in driver did not show the reconsignment charge. Defendant denies the remaining allegations contained in Request No. 7.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' THIRD SET OF REQUESTS FOR ADMISSION TO CRST EXPEDITED, INC.**

Defendant, CRST Expedited, Inc. dba CRST The Transportation Solution (CRST), for its response to Plaintiffs' Third Set of Requests for Admission to CRST Expedited, Inc., states as follows:

9. For each trip hauled by an Opt-In Driver or Rule 23 Driver and recorded in the Legacy Database, admit that CRST080061 and CRST080063 together contain all the information that appears on the settlement statement CRST provided to the Opt-In Driver/Rule 23 Driver for the trip.

**Response:** CRST admits the following information recorded in the legacy system that appears on settlement statements is contained in CRST080061:

- CRST entity name;
- Independent contractor indicator;
- Pay id;
- Settlement statement date;
- Contactor name and SSN;
- Load number;
- Earnings (Equip. Rent) figure;

- Load or linehaul revenue;
- Load miles;
- DH miles; and
- Rate (aka Pay Rate).

CRST admits the following information recorded in the legacy system that appears on settlement statements is contained in CRST080063:

- CRST entity name;
- Independent contractor indicator;
- Pay id;
- Settlement statement date;
- Contractor name and SSN;
- Load number; and
- Deductions, Reimbursement, and Adjustment figures and corresponding memo notes.

CRST denies that CRST080061 and CRST080063 contain all information recorded in the legacy system that appears on settlement statements because settlement statements also contain the following information which is not reflected in CRST080061 and CRST080063:

- YTD Earnings, Reimbursements, and Deductions;
- Contractor address;
- From & To entities/locations/dates;
- Rate;
- Tax entries, i.e., FIT, FICA, SIT;
- Division;
- Weight; and
- The totals of recurring deductions.

10. For each movement hauled by an Opt-In Driver or Rule 23 Driver and recorded in the LME Database, admit that CRST080062 and CRST080064 together contain all the information that appears on the settlement statement CRST provided to the Opt-In Driver/Rule 23 Driver for the movement.

**Response:** CRST admits the following information recorded in the LME system that appears on settlement statements is contained in CRST080062:

- Payee id

- Contractor name;
- Independent contractor indicator (aka payee type);
- Check number;
- Check date;
- Settlement number (aka order id); and
- Order info. (i.e., origin, destination, loaded indicator, miles, tractor id, ship date, delivery date, gross pay aka linehaul charge, pay rate, net pay).

CRST admits the following information recorded in the LME system that appears on settlement statements is contained in CRST080064:

- Payee id
- Contractor name;
- Independent contractor indicator (aka payee type);
- Check number;
- Check date;
- Settlement number (aka order id); and
- Deductions info. (i.e., type, description, memo aka reference no., date, unit, rate, net pay)

CRST denies that CRST080062 and CRST080064 contain all information recorded in the LME system that appears on settlement statements because settlement statements also contain the following information which is not reflected in CRST080062 and CRST080064:

- CRST entity name; and
- Escrow info.

11. For each trip hauled by an Opt-In Driver or Rule 23 Driver and recorded in the Legacy Database, admit that CRST080112, CRST080113, CRST080115, and CRST080117 together contain all the information that appears on the rated freight bill for the corresponding load.

**Response:** CRST admits the following information recorded in the legacy system that appears on rated freight bills is contained in CRST080112, CRST080113, CRST080115, and CRST080117:

- Shipper ID;
- Shipper Name;
- Shipper City;

- Shipper State;
- Shipper Zip;
- Consignee ID;
- Consignee Name;
- Consignee City;
- Consignee State;
- Consignee Zip;
- Bill to ID;
- Bill Date;
- Load #;
- Freight Invoice #;
- Bill of Lading;
- Ship Date;
- Delivery Date;
- PPD/COLL;
- Linehaul Distance (PCS);
- Linehaul Charge;
- Accessorial Units (PCS)
- Accessorial Charge Description;
- Accessorial Rate;
- Accessorial Charge;
- Loaded Miles; and
- Total Charges.

CRST denies that CRST080112, CRST080113, CRST080115, and CRST080117 contain all information recorded in the legacy system that appears on rated freight bills because rated freight bills also contain the following information which is not reflected in CRST080112, CRST080113, CRST080115, and CRST080117:

- Shipper Street Address;
- Consignee Street Address;
- Bill To Name;
- Bill To Street Address;
- Bill To City;
- Bill To State;
- Bill To Zip;
- Delivery Receipt #;
- Drivers;
- Div.;
- Trac #s;
- Trailer #;

- PCS (As it relates to package QTY);
- Description (As it relates to package QTY);
- Weight; and
- Linehaul Rate.

12. For each movement hauled by an Opt-In Driver or Rule 23 Driver and recorded in the LME Database, admit that CRST080118, CRST080119, and CRST080120 together contain all the information that appears on the rated freight bill for the corresponding order.

**Response:** CRST admits the following information recorded in the LME system that appears on rated freight bills is contained in CRST080118, CRST080119, and CRST080120:

- Invoice Number;
- Invoice Date;
- Order Number;
- Bill To ID;
- Ship Date;
- Bill of Lading;
- Consignee Reference;
- Linehaul Weight;
- Linehaul Distance;
- Linehaul Rate;
- Linehaul Charge;
- Rate Min. Weight;
- Accessorial Charge Description;
- Accessorial Units;
- Accessorial Rate;
- Accessorial Charge; and
- Total Charge.

CRST denies that CRST080118, CRST080119, and CRST080120 contain all information recorded in the LME system that appears on rated freight bills because rated freight bills also contain the following information which is not reflected in CRST080118, CRST080119, and CRST080120:

- Shipper Name;
- Shipper Address;
- Consignee Name;

- Consignee Address;
- Bill To Name;
- Bill To Address;
- Driver ID;
- Driver Name;
- Tractor; and
- Trailer.

Dated: July 14, 2023

Respectfully submitted,

*/s/ James T. Spolyar*

James H. Hanson (admitted *pro hac vice*)
James T. Spolyar (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-492-9205; F: 317-684-2414
jhanson@scopelitis.com
jspolyar@scopelitis.com

Adam C. Smedstad (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
5470 Shilshole Ave., Ste 520
Seattle, WA 98107
P: 206-288-6192; F: 206-299-9375
asmedstad@scopelitis.com

Charles Andrewscavage (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603-2427
P: 312-255-7200; F: 312-422-1224
candrewscavage@scopelitis.com

Attorneys for Defendants,
CRST International, Inc. and CRST Expedited, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

ANTHONY CERVANTES and MIKE CROSS, *individually and on behalf of all other similarly situated persons*,

Plaintiffs,

vs.

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

No. 20-CV-75-CJW-KEM

**ORDER**

---

This matter is before the Court on plaintiffs' Motion to Correct Fair Labor Standards Act ("FLSA") Collective Action Class Definition. (Doc. 156). Defendants do not oppose the motion. (*Id.*, at 3). For the reasons stated in plaintiffs' motion, the Court **grants** the motion.

Accordingly, the FLSA class definition provided in the Court's Order conditionally certifying the FLSA collection action (Doc. 147) is amended to read as follows:

> All drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an Independent Contractor Operating Agreement (ICOA) and who have not leased more than one truck at a time to CRST.

Defendants are **directed** to provide to plaintiffs the required contact information for any class members who fall within this amended class definition and who were omitted from the original data.

**IT IS SO ORDERED** this 22nd day of February, 2021.

C.J. Williams
United States District Judge
Northern District of Iowa

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES, et al., )
Plaintiffs )
vs. ) Case No.
) 120-cv-00075-CJW-KEM
CRST INTERNATIONAL, et al., )
Defendants. )
-----------------------------)

# DEPOSITION OF PHILLIP KLOPP

Conducted Virtually
Thursday, April 14, 2022

Reported by:
CARLA S. KIMBROUGH, CSR
JOB NO. 209590

# DIRECT EXAMINATION BY PLAINTIFFS

Q. And was that consistent throughout your work there that you had two solo trucks?

A. I would say it would be consistent that it never exceeded two.

Q. And what was the lowest number of solo trucks?

A. Zero.

Q. And would you be able to say whether for the majority of time you were there whether you had no solo drivers?

A. I would say for the majority of the time that I was there I never had more than one solo driver.

Q. So can you explain to me when you say the standard setup of one lease-operator driver who trains students, can you describe for me what that standard setup was in more detail?

A. So in general our lease-operator drivers would be certified as lead drivers at the time of their hiring. Because it was expected that anyone who drove solo would not be successful with CRST Expedited. Success being defined in terms of consistent positive

pay checks.

And the way that the relationship with the student driver would work is they would be expected to be on the truck, I want to say, for 28 days and 10,000 miles. And the goal was to have the student trained in that time and then moved onto the company side.

Q. Okay. And once a student was trained and left and moved onto the company side, what would the lease-operator driver do at that point?

A. They would be driving solo until we were able to get a new student on their truck.

Q. I see. And how long typically was that period that they were driving solo?

A. It could be anywhere from less than 24 hours upwards onto a month.

Q. And can you tell me what the -- give me an idea of what the average was?

A. I'd say the average wait time would be at least a week.

Q. And during that period that somebody was driving solo, was it your understanding that the expectation was that they would not be

P. Klopp

Q. And was the lead driver required to be with the student driver at all times?
A. Define be with.
Q. So was the lead driver required to be in the truck with the student driver if the truck was moving?
A. Yes.
Q. And I think you've said before the lead driver's job was to train the student.
Is that correct?
A. Yes.
Q. And I think you said the lead drivers were certified as trainers.
Is that correct?
A. Yes.
Q. And do you know how they became certified as lead driver?
A. That was done through the lead driver program that CRST Expedited had, which was managed by two other people.
Q. And do you know who those people were?
A. Brian Eichenberger and Jennie Heiser, during my time there anyway.

know that they tended to be in the 40 to 50 mile per hour range. And I want to say for the fresh student -- first week of the student being on the truck, I think we generally expected it to move at 38 miles per hour.

Q. So during that period would that truck be able to take a load --

A. So --

Q. -- that was expected to travel at 40 or 50 miles per hour?

A. No. We would not expect them to be able to travel at that speed. So they would not be assigned a load whose delivery window would require that speed.

Q. Okay. And so how then did the student driver's ability to drive evolve over the training period?

A. So after the first week it was generally expected that the student driver would be capable of driving their own shift while the lead driver would be in the sleeper berth. And it would be expected that that would be the setup until the student completed their training.

Q. And how did you come by these expectations?

A. They were given by CRST.

Q. Were they given to you in writing?

A. Certainly in one form or another.

Q. And do you remember the form that you received them in?

A. The form that I specifically received them in I recall being oral.

Q. Do you remember --

A. But I -- sorry.

Q. Go ahead.

A. But I'm -- I'm certain it existed in a written form one way or another. I even in -- possibly in the binder that I had previously mentioned. I want to say it was probably outlined in there.

Q. And do you remember who it was that gave you those instructions orally?

A. That would have been my -- the lady who trained us. And then anyone else if you happen to have questions at any point in your tenure with CRST.

Q. And while a student was driving with

P. Klopp

load to them for them to review the information, it would turn that A into an S for sent. And then we would wait for a response from the lease-operator driver as to whether or not they were committing to the load. If they committed to the load, the driver manager would then change that S to a C so the planners know that they no longer had to worry about that load and that truck.

And then in the lease-operator's case if they turned down the load, we would message the planners and let them know that the load had been turned down.

Q. And I think you said a moment ago that the planners didn't distinguish between lease-operators and employee drivers for a particular load.

Is that correct?

A. Yes.

Q. And how did you know that?

A. Well, it was just in the sense that the -- the planner's goal was to make sure that our customer's freight was taken care of. So to them it did not make too much difference if

it was a company driver or a lease-operator driver that was committed to taking care of a load.

They -- they were directed to some extent that they would -- how do I word this. There was some understanding that they were expected to give some of the better paying freight to the lease-operator drivers, but that would not be necessarily a determining factor in assigning a load.

Q. So would it -- do you know whether when a planner assigned the load whether the planner knew if that truck was a lease-operator truck or a company truck?

A. Yeah. So the way that anyone could identify a company truck from a leased truck at a glance would be in the truck's number. If it was an 11 -- if it was a 111 truck number, or maybe just the first two ones, it was a lease-operator truck. And a company truck would be notated as a 10 truck.

Q. And did you communicate with planners on a regular basis?

A. Yes.

P. Klopp

Q. Okay. And were drivers assigned multiple loads that they could choose between?

A. No. They were offered one load at a time.

Q. And did lease-operator and employee drivers drive the same types of loads?

A. Yes.

Q. So if a load was assigned to a driver, what was the driver's option with respect to that load?

A. The -- for a lease-operator driver, their option was to say yes or to say no.

Q. Okay. And what happened if the lease-operator driver said yes?

A. If they said yes, then the load was theirs. And assuming that no extenuating circumstance arised, they would perform it from start to finish.

Q. And what happened if a lead operator driver said no?

A. It would be situational dependant. But in some cases we could receive pushback from the planners. They might not be happy about receiving a no from a driver. And I

A. I would ask that you give me a better sense of what you mean by --

Q. Sure.

A. -- can they expect to be better.

Q. Sure. So if a lease-operator rejected a load --

A. Uh-huh.

Q. -- would that lease-operator driver know whether the next load assigned to her would be a better or a worse load?

MS. PAYNTER: Objection, compound, calls for speculation. You can answer.

A. They -- they would not have any knowledge of subsequent loads.

Q. And if a lease-operator driver rejected a load would she know at that time how long she would have to wait for another load to be assigned to her?

MS. PAYNTER: Objection, calls for speculation. You can answer.

A. They would have no -- again, they would have no indication outside of what the driver manager could guess at for what -- for how soon they could expect another load. To

kind of try to capture what I feel like you're getting at, what would happen in the conversation with the driver manager and the driver.

So any time one of my drivers would turn down a load if I felt like it was a bad idea to turn down the load, I would be calling them and explaining the freight situation in their given area. So in some cases it could be that there's a lot of freight available in the region that they are waiting to receive a load.

And in those situations I would tell my drivers, yeah, sure. Go ahead say no to the load. Chances are we'll have another offer here soon. In cases where freight was lacking in a given region and they were telling me no to a given load, I might be calling them up and saying I understand why you want to say no to this load, but at the same time I also need you to understand that if we say no to this load we could go looking at a long wait before we receive our next offer.

Q. If a lease-operator driver rejected a load, did that create extra work for

still understand oath.

Is that correct.

THE WITNESS: Yes, sir.

BY MR. SWEENEY:

Q. The next thing I wanted to ask you about was whether lease-operator drivers were allowed to drive for other motor carriers while they were working for CRST?

A. So I'd like you to offer a definition on what that would look like.

Q. Yeah. So in your experience, did any lease-operator driver drive for another trucking company while they were working for CRST?

A. No, they did not.

Q. Was it your understanding that they were able to go and drive for another trucking company while they were working for CRST?

A. I would say it was pretty explicit that they were not allowed to.

Q. And why do you believe that?

A. Because it simply wasn't allowed. The closest that anyone could get to do that would be through brokering a load if CRST did

not have any freight for them to run.

Q. Okay. I just want to go back for a moment to the idea of driving for another trucking company. Why do you say -- why do you think it was explicitly not allowed?

A. Because we specifically would tell them that if you do that you won't have a lease with us anymore.

Q. And how -- why did you tell them that?

A. Because that is what we were instructed to do by the company.

Q. Okay. And who at the company instructed you to do that?

A. I mean it would be any number of folks in the management above us. It was pretty well understood by everyone that the lease-operator drivers drove for CRST, not for other companies.

Q. And do you remember that being raised at your training?

A. Yeah. Yeah. We were -- that was told us in our training. They drive for CRST. They don't drive for other companies.

P. Klopp

allowed to broker a load if CRST had loads to assign to the lease-operator driver?

A. No. If CRST had freight available for the driver, they either took that freight or they took no freight.

Q. I see. So if a lease-operator driver rejected a load, they could not then go and try to broker a load.

Is that correct?

A. That is correct.

MS. PAYNTER: Objection, leading.

You can answer.

A. That is correct.

Q. Were you aware of any instances where a broker load may come in and it just took too long for that load to be processed at CRST for the driver to be able to take it?

MS. PAYNTER: Objection, calls for -- no, I'm going to withdraw that.

A. So I am vaguely recalling a situation where that may have happened. But not clearly enough that I necessary want to say yes.

Q. Can you explain to me what you

which case I would inform them of the policy that if we have freight you don't broker a load.

Q. And are you able to tell me how out of ten requests on average, how many would actually end up in a brokered load?

A. Keeping in mind the context that drivers would request outside of the policy conditions. So to answer your question directly, I would say one out of ten.

Q. Okay. So in the course of a month with your -- in the course of a month with your team of trucks, can you give us an estimate as to how many brokered loads would actually happen?

A. Never more than two.

Q. Never more than two.

A. No.

Q. And in the course of a month what would be the range of loads that your trucks would drive?

A. Range as in miles?

Q. No. No. So during the course of a month, what was the range of how many loads the

trucks you managed may drive in the aggregate?

A. Ah, okay. It's kind of a difficult question to answer given how many variables are involved in coming up with a number for that. There's so much that can be in flux in an entire month. So I would give a rough estimate of 15 to 25 loads a month.

Q. So that's 15 to 25 per truck or 15 to 25 for all the trucks that you managed?

A. Per truck.

Q. So if you were -- let me do a little math here. You're probably better than me, but if you were managing 18 trucks, I'm going -- excuse me. I'm going to use Excel because you never want to trust a lawyer to do math. But if you were managing 18 trucks and they did even the low end 15 loads, that would be, I believe, 270 loads.

Is that right?

A. I'll trust your Excel sheet.

Q. Okay. But it was 270 loads. So in that month you would have 270 loads and not more than two brokered loads.

Is that right?

P. Klopp

MS. PAYNTER: Objection, leading.

A. Yes.

Q. And then on the high side of that, I think you said you had 36 trucks at some point, and they might get 25 loads in a month. And if that was the case, you'd have 900 loads.

A. Okay.

Q. And never more than two of those loads would be brokered loads.

Is that correct?

MS. PAYNTER: Objection, leading.

A. Correct.

Q. Okay. So if CRST accepted a load, I think you said it would go to customer service.

Is that correct?

MS. PAYNTER: Objection, vague.

A. So I'll just reiterate that part of the process again.

Q. Uh-huh.

A. So assuming that we've already received the yes from the planner and assuming that the driver has found a load that they would like to broker, the broker then sends me an e-mail with the load information. And then

P. Klopp

Q. Okay. And do you know if CRST expected drivers to respect those policies while they were available for work?

A. Yes.

Q. Do you know if CRST had a policy regarding speeding?

A. Yes.

Q. And do you know what the policy was?

A. So the way that the speeding worked was so every truck had GPS tracking through the Qualcomm. And using the GPS tracking their speed was monitored. Any time that they were ten miles an hour or more over the speed limit, a notification would be generated for a third-party company. That third-party company would then weed out anything that was at exactly ten miles an hour, and they would not report that to CRST.

But 11 miles an hour or more over the speed limit would be reported to us. It would be recorded as a speeding event in the driver's file more or less I would call it. And while I don't recall the exact parameters of the policy, it was something to the effect

of three speeding events in a 90-day period could lead to termination of the lease.

Q. And just the file that you talked about, can you describe what that file was?

A. So every driver had their assigned driver ID. So it would look something like DE91 for their driver identification.

And that is how we would manage them in the computer system. So we would take that driver ID and we show it on a truck or off a truck. And they would also have a file within that system containing any write-ups or any issues that would have occurred with that driver during their tenure with the company.

Q. And was that a paper file or an electronic file?

A. Electronic.

Q. And do you know whether the speeding rules applied to company drivers as well?

A. They did.

Q. Do you know if CRST -- well, do you know if lease-operator drivers were required to take drug tests?

A. Yes, they were per DOT regulation.

P. Klopp

Q. And what would happen if a driver didn't get her truck inspected as required?

A. So I'm not entirely comfortable with this specific line of questioning because I can't think of any time where I had any kind of issue pop up with truck inspections. I -- one thing I can speak specifically to is CRST had a running program where any driver, lease-operator or company driver, if they got a -- if they perfectly passed most stringent inspection, which if I recall correctly was a level-one inspection, although I'm not entirely sure, then they would be rewarded with I want to say $20 from the company.

Q. Do you know if the lease-operator drivers were required to follow the hours of service standards?

A. Yes.

Q. Okay. And do you know if CRST enforced hours of service standards for lease-operator drivers?

A. Yeah. We had access to their e-logs. And through its own setup such as it was, we would be able to tell if they were in

or out of their hours of service if they were being properly logged and would discuss any such issues with those -- with the driver. We had an e-log specific team of people that would keep an eye on those things and let us know if they saw any issues.

Q. And what would happen if a driver violated the hours of service requirements?

A. Assuming that it wasn't anything too severe, it would be discussed with the driver, notes of it would be made in the previously discussed file of the driver notating the conversation and the results of the conversation. And I would assume that after repeated violations, their lease would be terminated.

Q. And were lease-operator drivers required to follow yard rules?

A. I'm not familiar with yard rules.

Q. So did CRST's customers have rules regarding process and behavior in their yards?

A. Yeah. Yeah. They would be held to the same standard that a company driver would in that sense.

P. Klopp

Q. I see. And would CRST enforce the lease-operator's compliance with those rules?

A. Yeah. That would probably fall under the context of behavior conduct.

Q. I see. And did the lease-operator driver have any route restrictions?

A. Not explicitly. So there was one route that was highly discouraged, the I-70 west of Denver. And the reason being that we wanted them to understand was if you happen to have a breakdown out there it's going to be extremely expensive and we're not going to assist you with that cost.

Q. I see. And did specific loads sometimes have route restrictions?

A. I would say only the ultra high value loads. So running loads for like Nintendo, carrying a trailer full of video game consoles. Those -- those would be the only ones that might have specific route restrictions. But even then I want to say when it came to the lease-operator drivers they still were allowed some discretion in how they got from A to B.

P. Klopp

Q. I see.

A. Only -- but when it came to those UHV loads, they would be strictly monitored. And if for any reason the driver did not respond to questions regarding the route, it would be considered a more or less emergency situation. And it would be treated as if the load might have been hijacked. Police would be contacted. Another truck would be sent to rescue the load. So on and so forth.

Q. And when CRST assigned the load to a lease-operator driver, did it include instructions regarding pick up times and delivery times?

A. Yes.

Q. And did CRST enforce those pickup times and delivery times for lease-operator drivers?

A. Yes.

Q. And what would happen if the lease-operator driver missed a pickup time or delivery time?

A. Most of the time probably not anything. It -- it would largely depend on how

to government authorities issuing citations.

Q. And did CRST enforce -- enforce those requirements?

A. I would say I'm not entirely comfortable with that particular question just in the sense that I never specifically had experience with an issue like that.

Q. Very good. And I want to talk a little bit about CRST's monitoring of drivers, I mean whether they monitor them. Do you know whether CRST monitored driver's locations?

A. In the sense that we had the GPS tracking on the truck that they leased.

Q. I see. And was that -- was the GPS on trucks that were not leased as well?

A. If I remember correctly, the GPS was part of the Qualcomm system. So if we had a situation where a driver either owned their truck or came into possession of their truck through a third party not related to CRST, it would still have that GPS tracking for the Qualcomm system that they did put into the truck.

Q. And did CRST also have a GPS on the

company trucks?

A. Yes. And in addition to other devices.

Q. And I think you talked a little bit before about CRST monitoring lease-operator's hours of service.

Is that right?

A. Yes.

Q. And do you know if they also monitored company driver's hours and service?

A. Yes, they did.

Q. Talk a little bit -- so did CRST monitor lease-operator driver's progress on their -- with their loads?

A. Yes.

Q. And how did they do that? Mr. Klopp, are you still with us?

A. Yeah. Did you -- where did you lose me?

Q. So we were just asking how CRST monitored lease-operator driver's progress with their loads.

A. Just through the GPS tracking previously mentioned.

P. Klopp

Q. And did anybody at CRST actually monitor that progress?

A. Yeah. Mostly customer service would in terms of maintaining responsibility for the load and the relationship with the customer. So, for example, there were a few occasions where I would receive a message from a customer service representative saying, hey, I'm really concerned about where this guy is on his route. Or it looks like he's running behind for meeting his delivery window. Please look into it and resolve the situation. Something to that extent.

Q. And did you have the ability to monitor their progress?

A. I did.

Q. And let's talk about truck maintenance for a little bit. Was it your experience that a lease-operator driver's trucks broke down from time-to-time?

A. Yes.

Q. And was that a frequent event?

A. Frequent in the sense that any given driver manager could probably expect at least

P. Klopp

Q. I see. I see. And what if a truck -- lease-operator committed to a load but in between the commitments and the time to pick it up something happened and they were unable to pick up the load? What would CRST do in that situation?

A. So if there was another truck that could meet those times, it would be assigned to that truck. If no other truck could meet those times, it would remain with the original truck.

Q. And if a lease operated driver could not deliver a load on time, what could CRST do?

A. That, again, would be context specific. CRST is basically just looking at what is going to be the option that brings us closest to that delivery window. So if there is another truck that can do it, it'll get assigned to that truck. If there is not another truck that can do it, then it will stay with the original truck.

Q. And was it your understanding, though, that at the end of the day it was CRST's obligation to make sure that the load was picked up and delivered for the customer?

P. Klopp

A. Yes. I would say that the obligation fell to CRST before it fell to the driver, though CRST would hold the driver responsible.

Q. And could a driver unilaterally change a pickup or a drop off time?

A. No.

Q. Could a lease-operator driver contact a customer to negotiate a change in the schedule?

A. No.

Q. If a lease-operator driver wanted to change a pickup or a drop off time, what were they supposed to do?

A. I do not believe that option would be available to them at all.

Q. Let's talk a little bit more about the lead driver program and ask who assigned the student driver to lease-operator drivers?

A. That would fall to the student planners.

Q. And do you know if they had discretion as to which student to assign to which driver?

A. Yes, to some degree. So for the most part they were responsible for pairing the students with the lead drivers. However, situations could arise where a lead driver without a student could end up talking to a student without a lead driver at a terminal, and they might decide that they like each other and they want to work together. So they would contact us with the other driver's ID.

And we would check. And then us, the driver managers, would check in with the student planners and say, hey, these two drivers want to get together. Is there any reason that they can't. Assuming that there is no reason that they can't, then they would be paired together.

There would be situations where if a lead driver had previously been accused of sexual harassment or sexual assault but not subsequently terminated, they could be gender restricted on their students. So a male lead driver who may have received a harassment or an assault accusations in the past would likely be barred from training any female students. And

Q. And would they -- was there a bathroom on the truck as well?

A. No. Not on -- I think there are some trucks out there, but not, like, CRST specific trucks that would have toilets on board.

Q. And did you have an understanding as to how CRST paid lease-operator drivers?

A. They were paid according to the load.

Q. And who set the load pay rate?

A. So the customer would tell CRST what they're willing to pay for a load to be performed. And then if that load ended up on a lease-operator truck, the lease-operator would get 70 percent of the load's paying and the -- and CRST would get 30 percent of the load's pay.

Q. I see. And who determined the 70/30 percent split?

A. Who determined that?

Q. Yes.

A. CRST did.

Q. And would drivers be able to

negotiate that split?

A. Real quick I also want to add I believe that the load pay might have been separated also from the fuel surcharge. And if it was, I believe CRST also took a cut of the fuel surcharge. Though I do not recall what that percentage split was.

Q. And can you explain what a fuel surcharge was?

A. Not beyond those -- it was basically money meant to pay for the gas.

Q. All of the gas?

A. To transport.

Q. To pay for all of the gas?

A. Not necessarily all of it. It would just be more or less this is what we're willing to offer.

Q. And did all loads have fuel surcharges?

A. Not all but most.

Q. I see. And I had asked you with respect to the 30 to 70 percent split whether the lease-operator driver were able to negotiate that percentage.

P. Klopp

A. No. They had no negotiation power over that whatsoever.

Q. Okay. And did CRST expect the lease-operator drivers to pay the expenses of driving for CRST?

A. Yes.

Q. And what were those expenses?

A. Fuel, repair costs, maintenance costs. So basically anything you might have to pay to upkeep a truck, the driver would take on that cost.

Q. Any other costs, insurance or things like that?

A. I'm not entirely familiar with the breakdown of insurance. I believe it may have been a situation where it was part CRST, part driver.

Q. And if a driver could not meet the -- a lease-operator driver could not meet those expenses in a given week, would CRST advance them the money to pay them?

A. In the sense that it would get paid through their com data card one way or the other. And it could result in a situation

and stuff like that, that was maintained in more of a paper manner and I think was done more in the higher levels of management and in cooperation with HR. What we had in our system was more just a method of tracking issues.

Q. And can you give me any detail as to where that took place, what part of CRST's system?

MS. PAYNTER: Objection, vague and foundation. You can answer.

A. Well, so it was contained in the same computer program where we would handle any other bits of our computer work. So same system where we handle the truck's coding, the assigned loads, sent loads, committed loads, driver IDs, truck numbers. So it was contained in that system.

Q. And, again, what types of things would go in there?

A. Mostly stuff related to issues with the driver. So speeding events, behavioral conduct events, e-logs events, stuff like that.

Q. And just ask you, when you were -- if you can walk me through the actual kind of