**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| **Anthony Cervantes and Mike Cross, individually and on behalf of all other similarly situated persons,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CRST, International, Inc., and CRST Expedited, Inc.,**<br><br>**Defendants.** | **CASE NO. 1:20-cv-75-CJW-KEM** |

**DECLARATION OF ANTHONY CERVANTES IN SUPPORT OF PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION AND FOR ISSUANCE OF NOTICE**

I, ANTHONY CERVANTES, declare if called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am a named plaintiff in this case.
2. I drove a truck for CRST Expedited from January 2018 until August 2019 as a lease-operator. I drove my truck myself.
3. To become a lease operator driver for CRST, I had to attend CRST's four-day orientation at CRST headquarters in Cedar Rapids, Iowa.
4. CRST paid my expenses for attending the orientation.
5. Approximately 20 other drivers attended the first three days of the orientation, including lease operators and CRST Expedited employee drivers.
6. During the first three days of orientation, we went through the same general driver training that employee drivers go through. The employee drivers were in training with us.

7. During the orientation, all of the drivers, employees and lease-operators, received the CRST handbook and were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, pet policy, etc. All of the drivers in my orientation group were told they had to comply with CRST's handbook and policies.

8. The last day was dedicated to the lease-operator program. There was no driver training in the last day, it was dedicated to signing the lease and contract, picking a truck, signing up for insurance and ATBS, receiving company IDs, etc.

9. On the last day, I signed a pre-printed lease to lease a truck from CRST Lincoln Sales, Inc. (Lease).

10. I also signed a pre-printed "Independent Contractor Operating Agreement" ("ICOA") with CRST which recited that I was leasing the truck I had just leased from CRST Lincoln Sales back to CRST Expedited and that claimed to make me an independent contractor driver for CRST Expedited. A copy of the ICOA is attached as Exhibit A.

11. The CRST representative presented the Lease and Contract to me as one package that I had to sign at the same time.

12. At the time I did not have the funds to make a down payment on a truck lease or to obtain the insurance for a truck. I only thought I could become a lease operator because CRST Expedited's Driver Recruiters, including Matt Young, told me that I would not have to pay any money down and that CRST would advance all of the funds necessary for me to lease a truck and to begin driving.

13. I signed my Lease and Contract on the last day of orientation with the other lease operators in our orientation group. I saw the Leases and Contracts that the other lease operators signed. They were the same standard form Lease and Contract, with only our names,

trucks, and payment schedules being different.

14. I believe the Lease and Contract were written by CRST and CRST Lincoln Sales, Inc., as I was not involved in writing it.

15. The Lease and Contract were offered to us on a take-it-or-leave it basis. We were not permitted to negotiate the terms of the Contract, and we were not permitted to negotiate the terms of the Lease other than choosing the truck we were to lease.

16. I quit driving for CRST in February 2018 because I was not earning the income that CRST's recruiters had told me I would make.

17. After I quit, CRST Expedited representatives, including my driver manager Phil Klopp, contacted me to get me to come back to work. Phil told me that if I came back and drove as a lead driver to train CRST employee drivers, I would make $3,000 in net income a week.

18. In March 2018, I decided to come back based on the representations Phil Klopp and others made to me regarding what my income would be. I signed a second contract in March 2018. It was the same form contract that I had signed in January. A copy of that contract is attached as Exhibit B.

19. Both Contracts were supposed to end on October 1, 2018, but I continued driving for CRST until August 2019. I continued to use the same truck I leased from CRST Lincoln Sales in March 2018.

20. After I first signed the Lease and Contract in January 2018, CRST set me up with a fuel card. The fuel card allowed me to purchase fuel on CRST's credit. I did not have to pay cash for fuel; the bill was sent to CRST and CRST would then deduct the fuel cost from my earnings. CRST also paid the fuel tax payments for me. I would not have been capable of paying for the fuel or the tax payments without CRST 's assistance.

21. CRST arranged for and advanced the funds to pay for all the insurances required for the truck and then deducted the cost from my earnings. CRST provided me advances for truck repairs and maintenance and other operating expenses.

22. I was not in business for myself. I was only able to work as an lease-operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of operating the truck and then collected them back from me each week out of my gross earnings.

23. I and other lease operators could not work for anyone other than CRST while under contract with CRST. We were told that by CRST representatives during our orientation class.

24. During my time working for CRST there were many weeks when, despite working long hours, I would receive a negative settlement – that is, I would end my work week owing CRST money despite the many hours of work I had put in. By way of example, my settlements for the pay periods ending April 12, April 19, and April 26, 2018 were negative, and there were many other weeks for which I received negative settlements.

25. As a lease-operator, I had to follow CRST's work rules and procedures taught to me during orientation and set forth in CRST's policy manual. The work rules and procedures applied to me as a lease-operator were the same as those CRST applied to its employee drivers. I know that from our orientation with employee drivers and from training CRST employee drivers in those policies, rules, and procedures.

26. These work rules controlled things like where to park my truck, driving rules, prohibited routes, how to pick up and deliver loads, and safety.

27. I and other lease-operators were required to follow CRST's procedures for filling out and

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| **Anthony Cervantes and Mike Cross, individually and on behalf of all other similarly situated persons,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CRST, International, Inc., and CRST Expedited, Inc.,**<br><br>**Defendants.** | **CASE NO. 1:20-cv-75-CJW-KEM** |

**<u>DECLARATION OF MIKE CROSS IN SUPPORT OF PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION AND FOR ISSUANCE OF NOTICE</u>**

I, MIKE CROSS, declare that if called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am a named plaintiff in this case.
2. I began working for CRST as an employee driver in approximately October 2016 and left in 2017.
3. I became a lease operator truck driver for CRST Expedited in October 2018 and continue in that job. I have always driven my truck myself.
4. To become a lease operator for CRST, I had to attend CRST's three-day orientation at CRST headquarters in Cedar Rapids, Iowa.
5. Approximately 20 other drivers attended the first two days of the orientation, including lease operators and employee drivers.
6. During the first two days of orientation, we went through the same general driver training

that employee drivers go through. The employee drivers were in training with us.

7. The last day was dedicated to lease-driver program. There was no driver training in the last day, it was dedicated to signing the lease and contract, picking a truck, signing up for insurance and ATBS, receiving company IDs, etc.

8. During the orientation, all of the drivers in attendance, employee drivers and lease operators, received the CRST handbook and we were trained in CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, hazmat policies, pet policy, etc.

9. We began the orientation early in the morning and CRST representatives trained us in CRST's policies, practices and procedures in areas such as driving, handling loads, and safety.

10. During the orientation, I was required to sign a pre-printed contract to lease a truck ("Lease") from CRST Lincoln Sales, Inc.

11. During the orientation period, I was also required to sign a pre-printed contract with CRST Expedited called an "Independent Contractor Operating Agreement" ("ICOA"). This ICOA stated that I was leasing the truck I had just leased from CRST Lincoln Sales to CRST Expedited and that I would drive it for CRST Expedited as an independent contractor.

12. I signed my Lease and ICOA at the orientation with the other lease operators. I saw the Leases and ICOAs that the other lease operators signed. They were the same standard form Lease and ICOA, with only our names, trucks, and payment schedules being different.

13. I believe the Lease and ICOA were written by CRST and CRST Lincoln Sales, Inc., as I was not involved in writing it.

14. The Lease and ICOA were offered to us on a take-it-or-leave it basis. The trainer at the orientation told us that we did not have any ability to negotiate any of the terms.

15. At the time, I did not have the funds to make a down payment on a truck lease or to obtain the insurance for a truck. The trainer at orientation told me that I would not have to pay any money down and that CRST would advance all of the funds necessary for me to lease a truck and to begin driving.

16. After I signed the Lease and ICOA, CRST set me up with fuel cards, truck registration, on-board communications equipment, and the truck itself. The fuel card allowed me to purchase fuel on CRST's credit. I did not have to pay cash for fuel; the bill was sent to CRST and CRST would then deduct the fuel cost from my earnings. CRST handled the fuel tax payments for me. I would not have been capable of paying for the fuel or the tax payments without CRST 's assistance.

17. CRST arranged for and advanced the funds to pay for my insurance and then deducted the cost from my earnings. CRST provided me advances for truck repairs and maintenance and other operating expenses.

18. CRST also set me up with an account with ATBS, a company that helps keep track of expenses and prepares tax filings for truckers.

19. Although the ICOA CRST and I signed classified me as an independent contractor, my work is the same as it was when I was an employee driver for CRST: CRST still controls the loads I get, I have to follow the same CRST rules, CRST still governs my truck speed, I still have to fill out the same paperwork, I still receive the same CRST safety and policy messages, etc. In fact, there is no real difference in the work I perform as lease operator and the work I performed as a CRST employee driver.

20. I am not in business for myself. I did not have any kind of trucking business prior to driving as a lease operator for CRST. I am only able to work as a lease-operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of operating the truck and then collected them back from me on a weekly basis.
21. I and other lease operators are not allowed to work for anyone other than CRST while under contract with CRST. We were told that by CRST representatives during our orientation class.
22. As a lease-operator, I had to follow CRST's work rules and procedures taught to me during orientation and set forth in CRST's policy manual. The work rules and procedures applied to me as a lease-operator were the same as those CRST applied to me as an employee driver.
23. These work rules controlled things like where to park my truck, driving rules, prohibited routes, how to pick up and deliver loads, and safety.
24. I and other lease-operators are required to follow CRST's procedures for filling out and filing paperwork, and to stay in contact with the dispatch office and CRST's driver manager.
25. CRST requires my truck to have the CRST company signage on it.
26. We were told that it was company policy that our trucks were governed at 68 miles an hour no matter what the speed limit on the road.
27. While driving for CRST, it assigned me its employee drivers to train. During my tenure with CRST, I trained more than 12 CRST employee drivers for an average of 21 days each.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| **Anthony Cervantes and Mike Cross, individually and on behalf of all other similarly situated persons,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CRST, International, Inc., and CRST Expedited, Inc.,**<br><br>**Defendants.** | **CASE NO. 1:20-cv-75-CJW-KEM** |

**DECLARATION OF LINDA GRAVELLE IN SUPPORT OF PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A FLSA COLLECTIVE ACTION AND FOR ISSUANCE OF NOTICE**

I, LINDA GRAVELLE, declare if called to testify, I could and would testify to the following facts which are within my personal knowledge.

1. I am a plaintiff in this case.
2. I began working as a lease operator for CRST Expedited in April of 2017 and stopped in November of 2019.
3. To become a lease operator driver for CRST, I traveled from Seattle to attend a four-day orientation at CRST headquarters in Cedar Rapids, Iowa.
4. During the orientation, CRST presented me with a chart showing how much money I would make based on the number of miles I drove as a leased operator. I expected to make at least the amount of money shown on the chart, but I did not.
5. Approximately 20 other drivers attended the orientation.
6. During the orientation, we received the CRST handbook. CRST introduced us to the

program and reviewed what we needed to know in order to drive for them, including CRST's policies, practices and procedures in areas such as driving rules, handling loads, safety, pet policy, fuel purchasing, etc. The CRST trainers told all of the drivers in my orientation group that we had to comply with CRST's handbook and policies.

7. On the second day, we were given a pre-printed lease to lease a truck from CRST Lincoln Sales, Inc. to sign (Lease).

8. At the same time, we were given a pre-printed "Independent Contractor Operating Agreement" ("ICOA") with CRST which recited that I was leasing the truck I had just leased from CRST Lincoln Sales back to CRST Expedited and that claimed to make me an independent contractor driver for CRST Expedited. A copy of the ICOA is attached as Exhibit A.

9. We were not given time to review these documents before they were given to us to sign, and we did not have an opportunity to ask questions.

10. The CRST representative presented the Lease and ICOA to us as one package that we had to sign at the same time.

11. I was able to lease my truck and obtain insurance from CRST putting no money down. At the time I did not have the funds to make a down payment on a truck lease or to obtain the insurance myself. I could become a lease operator only because I did not have to pay any money down and CRST would advance all of the funds necessary for me to lease a truck and begin driving.

12. I signed my Lease and ICOA with the other lease operators in our orientation group. We walked over to a desk, stood in a line and a CRST employee told us where to sign. I saw the Leases and ICOAs that the other lease operators signed. They were the same standard

form Lease and ICOA, with only our names, trucks, and payment schedules being different.

13. I believe the Lease and ICOA were written by CRST and CRST Lincoln Sales, Inc., as I was not involved in writing it.

14. The Lease and ICOA were offered to us on a take-it-or-leave it basis. We were not permitted to negotiate the terms of the ICOA, and we were not permitted to negotiate the terms of the Lease other than choosing the truck we were to lease.

15. As a lease operator, CRST set me up with a fuel card. The fuel card allowed me to purchase fuel on CRST's credit. I generally did not have to pay cash for fuel; the bill was sent to CRST and CRST would then deduct the fuel cost from my earnings. CRST also paid the fuel tax payments for me. I would not have been capable of paying for the fuel or the tax payments without CRST's assistance.

16. CRST arranged for and paid for all the insurances required for the truck and afterwards deducted the cost from my earnings. CRST deducted money from my pay each week to pay into a maintenance fund. If I needed truck repairs or maintenance that CRST said was not covered by the maintenance fund, CRST would advance me the cost of the maintenance or repair and deduct it from my weekly pay.

17. I was not in business for myself. I was only able to work as an lease-operator for CRST because I was able to obtain my truck and other things like insurance, operating authority, licenses, permits, etc. from CRST and because CRST advanced all the costs of operating the truck and then collected them back from me each week out of my gross earnings.

18. I and other lease operators could not work for anyone other than CRST while under contract with CRST. We were told that by CRST representatives during our orientation

class.

19. During my time working for CRST there were many weeks when, despite working long hours, I would receive a negative settlement – that is, I would end my work week owing CRST money despite the many hours of work I had put in. By way of example, my settlements for the pay periods ending February 1, 2018, February 20, 2018 and February 27, 2018 were negative and there were many other weeks for which I received negative settlements.

20. As a lease operator, I had to follow CRST's work rules and procedures taught to me during orientation and set forth in CRST's policy manual. The work rules and procedures applied to me as a lease-operator were the same as those CRST applied to its employee drivers. I know that from training CRST employee drivers in those policies, rules, and procedures.

21. These work rules controlled things like where to park my truck, driving rules, prohibited routes, how to pick up and deliver loads, and safety.

22. I and other lease operators were required to follow CRST's procedures for filling out and filing paperwork, and for staying in contact with the dispatch office and CRST's driver manager.

23. CRST required my truck to have the CRST company signage on it.

24. We were told at orientation that it was company policy that our trucks were governed at 68 miles an hour no matter what the speed limit on the road. As a warning, CRST sent me and other drivers notices that it had terminated other drivers for speeding. CRST installed a device in our trucks so they were able to monitor our speed.

25. While driving for CRST, CRST assigned me its employee drivers to train. During my tenure with CRST, I trained more than 10 CRST employee drivers.

26. If I wanted to drive with a team driver, I needed CRST's permission and if I received permission, CRST had to approve my choice of team driver. If the driver was not already an employee of CRST, they had to attend a CRST orientation and get a CRST company ID before they could become my team driver.

27. As a lease operator, I had to get CRST's approval for maintenance and repairs required for my truck, and I had to use a CRST-approved maintenance facility for the maintenance or repair work.

28. As a lease operator, I was not allowed to make modifications to the truck without CRST's permission.

29. CRST required me and other lease operators to get permission to have guests in the truck. I was told at orientation that pets were not allowed to ride on the truck.

30. I had to follow all these rules or CRST could have terminated my ICOA. I understand that if CRST terminated my ICOA, I would still owe lease payments and that money would be taken out of any escrow or maintenance accounts and settlement proceeds I would otherwise be owed, and I would lose any equity I had in the truck.

31. CRST paid me a percentage of the revenue it received for loads that I carried. CRST negotiated the load price with its customers and I had no control over it. CRST could and did take loads away from me after I had agreed to take them and began driving to the pick-up point. When that happened, I would incur time and expenses for the load but receive no compensation for it.

32. I received my pay weekly in the form of a settlement. The settlement listed my revenue per load and then deducted all the expenses and costs of running the truck. Each week, CRST deducted for the lease payment, several different insurance coverages that I was

required to carry, fuel, , trailers, fuel and highway taxes, CRST employee/trainee driver fees, Qualcomm fees, a satellite fee, a license plate fee, and contributions to escrow accounts. CRST also deducted for payments it required me to make into escrow and maintenance accounts.

33. If I did not earn enough gross pay in a week to cover the expenses and costs that CRST had advanced for me, I received a negative settlement and would not receive any pay until I paid all outstanding expenses and costs, past and present.

34. Because I had to pay for all costs and expenses related to insuring, operating and maintaining the truck, there were some weeks that I did not make a lot of money. In some weeks I did not make the minimum wage for every hour I worked. In some weeks my expenses were more than my earnings and I actually ended up owing CRST money.

35. On average, after paying all the expenses and costs associated with operating the truck I earned less as an owner operator for CRST than I had earned as an employee driver with other companies.

36. CRST told me what loads I was eligible to take, when loads had to be picked up and when delivered, and what equipment I was required to have on board.

37. While working for CRST as a lease operator I was only allowed to carry CRST loads.

38. While working for CRST as a lease operator, I was not allowed to work for other carriers.

39. If there were no CRST loads available where I was located, I had to drive to where a CRST load was available or sit and wait for a load to become available where I was.

40. I could only use CRST's fuel card at truck stops where it was accepted. I almost exclusively used CRST's fuel card to purchase fuel because CRST offered a discount on fuel bought through its card and so the fuel was cheaper.

41. As a lease operator, I incurred weekly expenses even when I was not driving.

42. CRST often assigned me loads that were not profitable. If I refused a load because it was not-profitable, CRST would punish me by requiring me to sit and wait before they assigned me another load.

43. Because I had to pay so much in weekly costs and expenses related to insuring, operating and maintaining the truck, I could not afford not to work. So, I was often away from my home and family for weeks or even a month at a time. I generally worked as many hours each week as I could when I was driving for CRST.

44. I remember reading sections 7 and 9(F) of the ICOA and thinking that these sections prevented me from bringing CRST to court. As a result of these paragraphs I did not think that it was possible for me to challenge my status as an independent contractor and it certainly would not have been worthwhile since I would have ended up owing CRST money whether I won or lost. It was only after I learned about this case that I became aware that these paragraphs were probably unenforceable and that I could challenge my classification as an independent contractor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of October, 2020.

Linda Gravelle

Linda Gravelle (Oct 22, 2020 17:10 EDT)

Linda Gravelle

# CRST Lease Purchase Information Packet




CRST has immediate openings available for experienced professional drivers interested in taking their career to the next level. We offer some of the **highest miles** in the industry, which translates into **high revenue** for your business. If you have current over the road experience, a good work history and safety record, you may qualify for one of the industry's best lease purchase programs.

For more information, or to ask questions, call **Jon Brown 319-390-2805**

**Program Highlights**

- Contractors earn 70% of the revenue!
- 97% of the fuel surcharge!
- $0 money down and no credit check!
- 20 days notice will end the lease with no financial penalty to you!
- Late model Freightliner Cascadia's for lease with the majority being 2013 - 2014. There are some 2012's available that will have approximately 500K-650K miles.
- All of CRST's lease purchase units come with a guaranteed bumper-to-bumper maintenance program.
- Lease lengths vary depending on the year of the tractor, typically running between 2 and 4 years.
- Buyout option after the term of the lease is completed. An affordable $5000 balloon/buyout payment is all that stands between you and owning the tractor outright. You have the option to pay the balloon payment in full or set up a weekly payment plan.

**Truck Specifications**

- 2012, 2013, & 2014 Freightliner Cascadia's
- 435 HP, 14-Liter Detroit DDC engine
- Eaton Fuller straight 10 speed transmission

CRST®

EXPEDITED

# CRST Lease Purchase Information Packet




CRST has immediate openings available for experienced professional drivers interested in taking their career to the next level. We offer some of the **highest miles** in the industry, which translates into **high revenue** for your business. If you have current over the road experience, a good work history and safety record, you may qualify for one of the industry's best lease purchase programs.

For more information, or to ask questions, call Jon Brown 319-390-2805

## Program Highlights

- Contractors earn 70% of the revenue!
- 97% of the fuel surcharge!
- $0 money down and no credit check!
- 20 days notice will end the lease with no financial penalty to you!
- Late model Freightliner Cascadia's for lease with the majority being 2013 - 2014. There are some 2012's available that will have approximately 500K-650K miles.
- All of CRST's lease purchase units come with a guaranteed bumper-to-bumper maintenance program.
- Lease lengths vary depending on the year of the tractor, typically running between 2 and 4 years.
- Buyout option after the term of the lease is completed. An affordable $5000 balloon/buyout payment is all that stands between you and owning the tractor outright. You have the option to pay the balloon payment in full or set up a weekly payment plan.

# CRST Lease Purchase Information Packet



CRST has immediate openings available for experienced professional drivers interested in taking their career to the next level. We offer some of the **highest miles** in the industry, which translates into **high revenue** for your business. If you have current over the road experience, a good work history and safety record, you may qualify for one of the industry's best lease purchase programs.

For more information, or to ask questions, call **Jon Brown 319-390-2805**

## Program Highlights

- Contractors earn 70% of the revenue!
- 97% of the fuel surcharge!
- $0 money down and no credit check!
- 20 days notice will end the lease with no financial penalty to you!
- Late model Freightliner Cascadia's for lease with the majority being 2015 - 2016. There are some 2014's available that will have approximately 500K-650K miles.
- All of CRST's lease purchase units come with a guaranteed bumper-to-bumper maintenance program.
- Lease lengths vary depending on the year of the tractor, typically running between 2 and 4 years.
- Buyout option after the term of the lease is completed. An affordable $5000 balloon/buyout payment is all that stands between you and owning the tractor outright. You have the option to pay the balloon payment in full or set up a weekly payment plan.

## Truck Specifications

- 2014, 2015 & 2016 Freightliner Cascadia's
- 435 HP, 14-Liter Detroit DDC engine
- Eaton Fuller straight 10 speed transmission

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

- - - - - - - - - - - - - - - - x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

Case No. 1:20-cv-00075-CJW-KEM

-against-

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

- - - - - - - - - - - - - - - - x

DATE: Thursday, March 10, 2022
TIME: 10:00 a.m.

Videotaped deposition of DELVIN CATO, taken by Defendant, in the above-entitled action, held via Zoom, Veritext Virtual, pursuant to notice, taken before Elizabeth Willeski, a Stenographic reporter and Notary Public within and for the State of New York.

# DIRECT EXAMINATION BY DEFENDANT

A Yes.

Q All right. And just general timelines, you started working for CRST as a lease purchase operator after orientation; is that right?

A Yes.

Q So early November, were you driving?

A You said was I driving early November, no, for CRST, no. It was around the end of November.

Q All right. And then do you recall, was it about April of 2019 when you stopped operating for CRST?

A Yes, it was somewhere around there.

Q All right. How long was the training period for those new drivers that were in your truck?

A That would be three to four weeks.

Q So you would train a driver for that period of time and then would you get a new student driver?

A Yes.

Q Earlier when you were recalling a

have the money to do it myself.

Q All right. Had you ever obtained your base plate before?

A Yeah, earlier when I first got my truck -- I mean when I first got my own truck back in 2010.

Q Okay. And so it's an investment up-front that you would have to make in order to obtain your own base plate?

A Yes.

Q Okay. And I know you described it that you were in a somewhat desperate financial situation that just wasn't an option for you to be able to pay for your own base plate at this point in time?

A Correct.

Q All right. Now, the section that follows base plates talks about permits. Do you know what an IFTA permit is?

A Yes.

Q Okay. It's I-F-T-A. Do you know what that stands for?

A International fuel tax, not sure about the A.

is that right?

A As far as I remember.

Q Okay. I think for CRST you were using a Qualcomm. Does that ring a bell?

A That sounds correct.

Q Okay. So here you chose the option where CRST would obtain and install that Qualcomm unit in your truck rather than you providing one and installing it, right?

A Yes.

Q Do you recall why you chose that option?

A Still with the finances, relating to my finances.

Q Okay. And the next section, Section 4, this is the section that describes deductions. Do you recall if this is where you looked to to determine what deductions you had authorized be made on your settlements?

A I'm not sure.

Q Okay. I'm going to scroll down. The next page we're going to look at is CRST19294. At the top of this page it says type of coverage. Do you see that?

A Yes.

Q All right. And it has several sections here for the selection of insurance coverage, and the first one is non-trucking Bobtail liability insurance. Do you know what that is?

A Oh, yes, pretty much. Pretty much.

Q Okay. Does this cover your truck when you're not hauling goods?

A Yes. It covers the tractor when you're not hooked to the trailer.

Q Okay. So maybe you've dropped a load and you're just operating your truck, it still provides coverage for your truck?

A Yes, like maybe you drop your load and you use your tractor as a personal vehicle maybe to go to Walmart to get groceries, just to go pick something up from a restaurant or something, so that covers your tractor while you're Bobtailing.

Q And so here you checked the box that has your initials next to the word yes. Is it your understanding that you were selecting an option where CRST would

facilitate coverage through Hudson Insurance Company for your Bobtail insurance?
A Yes.
Q All right. And then that deduction would be taken from your settlement?
A Yes.
Q All right. I assume on this, just like the other items that we've discussed, that financially it was better for you to be paying a small amount for this coverage than it would have been for you to obtain it on your own?
A Yes.
Q Okay. Did you try to price or obtain insurance coverage before you entered into this agreement?
A No. I didn't have the finances to even think to.
Q And after you signed the agreement, did you check the pricing you were paying to see if you might be able to get a better deal somewhere else?
A No.
Q Okay. So there's a section here

for workers' compensation insurance, and you didn't selection that; is that right?

A Looks like it.

Q Okay. You didn't have any employees as you were operating for CRST?

A No.

Q Okay. And then the next section is called occupational accident insurance, and you selected this option as another option for CRST to help you obtain through Zurich, the insurance company; is that right?

A Yes.

Q Okay. And that was the cost that was deducted from your settlements in order to provide that coverage to you?

A Yes.

Q And that coverage was for if you personally were injured while you were working, it provided you insurance coverage for that?

A Yes.

Q Okay. And then the next section, Section 4, is physical damage insurance from Great Plains Casualty. Do you know what

physical damage insurance is?

A Yes, pretty much.

Q Okay. How is that different for Bobtail?

A Bobtail covers if something happens to -- if something happened to your truck, they -- somebody hits your truck and maybe they don't have insurance, so the physical damage actually covers if you actually hit something or you actually tear something up.

Q Okay. So it's your understanding that they would cover any damage to third-party property while you were operating your truck?

A Yes.

Q Okay. And again, this is the coverage that you selected for CRST to help facilitate through Great Plains Casualty and deduct it off your settlement?

A Yeah.

Q And, again, it was financially better for you rather than you to get your own insurance; is that right?

MS. MARTIN: Objection.

Q I'm sorry, what was your response Mr. Cato?
A Right.
Q And the last section under this insurance section is insurance for cargo, carrier trailer, and related expenses. This type of coverage, is it your understanding that it would have covered the cargo in your trailer, the trailer itself, and charges related to those two things?
A Yes.
Q Okay. So if while delivering a third-party's property you were in an accident, you have physical damage insurance for any damage you might have caused, but also a separate policy for what you were actually hauling; is that right?
A Yes.
Q Okay. And as before, same scenario where you selected yes on this portion of the agreement so that CRST would help facilitate and charge back the amounts for that coverage; is that right?
A Yes.

much tried to accept whatever they sent me because I knew if I didn't take it, it might be a while before I got another load.

Q Is that because of the loads that were available?

A Yes. Yes.

Q Did you accept loads based on whether or not after you dropped the load you would be able to get another load out of that town?

A Yeah. But a lot of times, driver manager would tell you they could get you something, and when you get there, you still couldn't get it anyway. A lot of times I would just take a load just to keep my truck moving.

Q Were there areas of the country that had higher rates paid for loads?

A As far as I remember, yeah, if you were going west to, like, cross-country west coast to east coast they pay, going up to the New Jersey area, maybe even Illinois area, something like that, I think they paid a little more than like going down to Texas or

Florida or something like that.
Q Did you have any limitations based on your trainees that were in the truck as to whether or not you would accept a load?
A No, not really.
Q Did the trainee have any say on whether or not you would accept a load?
A Only if they were uncomfortable like driving in a certain weather situation and I knew the weather was a certain way. For the most part, we pretty much ran whatever they gave us, because sometimes -- it was a few times I tried to turn a load down because I was uncomfortable with taking a trainee in a certain weather situation, but they still, you know, I still ended up doing it because of the fact of, hey, if you don't take this load, you know, you may not be able to get any. This is all we got right now.
Q Would you have conversations with your driver manager in those situations where you discussed whether or not there was an alternative load to take?
A She would be the one that told me,

hey, this is all we got right now, so if you don't take this load, you know, all I can try to do is get you something else. But you never know how long that something else is going to -- that other load is going to take. It could be within the next hour; it could be a couple days before you get another load. Just sitting.

Q Do you recall -- sorry. You said now that you were just sitting?

A Yeah, if you pass up a load, you might just be sitting there for a couple of days not making any money.

Q Did you have that happen?

A Oh, yeah, a couple times.

Q Okay. So you declined a load and you were waiting for a better load and instead you just sat and waited?

A Yeah, I have done it maybe a couple of times. Once you do it so many times, you're not going to keep doing it. You are going to take whatever you can take to keep your truck moving.

Q Who was your driver manager?

A Yeah, but they did want a notice.
Q What notice did you provide?
A I gave them about a week notice.
Q All right. One more document here that I want to show you, Mr. Cato. It's an equipment lease. I've numbered it Exhibit 4, Bates number is CRST19318. Do you see that document?
(Exhibit 4 was introduced for the record.)
A Yes.
Q All right. And it shows equipment description. It's that 2016 freightliner. Is that the truck that you leased that we looked at earlier in your independent contractor agreement?
A Yes, looks like it.
Q Okay. And this lease provides you with the term of the lease with 208 payments?
A Yes.
Q All right. And there was no security deposit, right?
A Yes.
Q No money down. And then we've

- While you do **NOT** need a **hazmat endorsement** to start, CRST does ask that you apply for the endorsement within 60 days of signing contract. Hazmat endorsed teams experience up 15% more freight/revenue.

## Our Business Model

- **Lead Driver Program** – The Company utilizes independent contractors as lead drivers, or trainers, for new drivers making their way into the industry. The independent contractors pay $0.09 cents/mile for all loaded miles when they have a student. If the contractor and the student run 4000 miles this translates to $360/week. On a percentage based (70%) program this means that a driver trainer can nearly double their profits if they are willing to help usher in the next generation of drivers. Refer to page 6 to see the net profit increase!

- **Train your spouse/partner program** – This program allows the independent contractor to train their spouse/partner if they are a recent graduate from trucking school (90 days) or have been driving a tractor trailer but have not been over-the-road. CRST also has the ability to help your spouse/partner earn their class A CDL. We offer over **50%** off our training program to anyone bringing in their own co-driver. The total expense for you is **$3000**, which includes tuition, the cost of transportation, drug test, physical, and housing while in school for **three weeks**. Once the student has been hired, CRST will make settlement deductions of $50/week from the independent contractor's settlement until the tuition has been paid in full. The only money required upfront is for licensing fees and food. CRST typically recommends that the student bring $350-$400 with them when they begin school to cover these costs.

## Orientation

CRST conducts orientation for the lease purchase program Monday through Friday of each and every week. Orientation is held at our corporate headquarters in Cedar Rapids, IA. CRST will arrange your transportation via rental car and reimburse your fuel cost. We will also provide you with lodging ($0 expense) paid for by the company. Meals-Breakfast and lunch will be available free of charge provided by the company.
As you can see, when it comes to a great lease purchase program, CRST has got it all covered! An industry leader since 1955, CRST has used its 60 years of experience in implementing the most profitable lease program in the business.

- To help offset the cost of transportation to orientation (rental car), drug test, physical and lodging during orientation each driver will be charged a onetime administrative fee of $75 which will be settlement deducted at $25/week for 3 weeks.

## CRST Minimum Qualifications

- Must be at least 21 years old.
- Must pass a DMV/DOT physical and a pre-employment drug screen.
- If you are diagnosed with sleep apnea you must prepared to provide CRST with a compliance report (printout) from your machine covering the last 30 days.
- You must have a good driving record and have been licensed in the United States for a minimum of 2 out of the last 3 years.
- No DUI, DWI, or open container violations in the last 5 years. No more than 1 DUI in the last 15 years and no more than 2 DUI's in your lifetime.
- All Criminal Convictions will be reviewed by CRST management on a case by case basis.

## Weekly Fixed Costs/Deductions

| Deduction | Amount | Details |
|---|---|---|

| | | |
|---|---|---|
| Truck Payment<br>Trailer Rental | $449/week<br>$25/Week | Deducted for the term of the lease (2-4 years). |
| Base Plates and Permits | $75/week | Deducted for 6 months ($2,070/year). Indiana based plates. |
| Escrow(Interest Bearing)<br><br>2nd Escrow | $75/week<br><br>$25/week | Deducted for 26 weeks until account has reached $2000. Deducted for 10 weeks until account has reached $250 |
| Federal Highway Use Tax (2290) | $10.58/week | Deducted each week of the year for a total of $550 |
| Physical Damage Insurance | $60.58/week Based on a unit valued @ $70K | Calculated at 4.5% of the truck's value. |
| Bobtail Insurance<br><br>Trailer, Cargo & Clean up Insurance | $30/month- $6.92/week<br>$42/month- Michigan Res<br><br>$34.62/Week | Deducted the 3rd week of each month. |
| Qualcomm Satellite Rental | $16.63/week | Provides for unlimited use of the Qualcomm unit. |
| Trans-Flo Fee | $15/month- $3.46/week | Deducted the 3rd week of each month. |
| **Total** | **$781.79/week** | **Total fixed costs/week** |

- **No truck payment will be deducted for the first 2 weeks of the lease!** Along with getting settlements twice per week, this means that you have the opportunity have cash flow into your bank account quicker.

As an independent contractor running under our authority, CRST will calculate the fuel tax owed quarterly for each truck. While the majority of fuel tax is paid at the pump, if any additional amount is owed it will be deducted at a rate of $100/week once the quarterly calculations have been made. Lead drivers & residents of the states of CO, KS, MA, MS, NH, NJ, NV, NC, NY and SC are required by law to carry occupational health and accident insurance which will be deducted at $35.54/week. This coverage is also required for all employees of independent contractors.

**Variable costs**

- The single largest variable cost for each lease purchase driver in the CRST fleet will be fuel. Our aggressive sales staff will benefit you by negotiating a top tier fuel surcharge (FSC). Example - As an independent contractor at CRST you will receive 97% of the fuel surcharge billed to the customer. 2015 average ranged from 27-43 cpm.

- Each independent contractor is responsible for the cost of their tolls and scales.

- Each lease purchase unit is backed by our reputable maintenance program. On a standard 3 or 4 year lease CRST will provide 2 years on a 3 year lease and 3 years on a 4 year lease of guaranteed bumper-to-bumper maintenance for $0.15/mile. Regardless of the length of the lease, the last 12 months will cover all preventative, routine and standard wear and tear maintenance for $0.13/mile. During the last 12 months the

reports. To request a free copy of any reports or to dispute the report, you can contact HireRight by mail at P.O. Box 33181, Tulsa, OK, 74153 or by phone at (800) 381-0645 or by email customerservice@hireright.com.

Please be aware that HireRight does not make any employment decisions for CRST and will not be able to provide you with any information regarding any decision made by CRST.

Do you authorize CRST to obtain the following reports?

## OVER-THE-ROAD DRIVER JOB DESCRIPTION

An over-the-road driver must be able to pick up, transport and deliver product in a safe, professional, courteous and timely manner, driving a semi-tractor in the contiguous 48 states, with up to a 53' trailer.

The driver is the single direct contact responsible for good public relations with the motoring public and with existing and prospective clients and customers. The driver must be able to communicate orally and in writing with others including company representatives, fellow drivers, and customers. The driver must be able to read, write and do basic math to properly complete bills of lading, tripsheets, logs, accident, and cargo claims paperwork. The driver must be able to read and understand maps.

The driver must know and understand Department of Transportation rules and regulations pertaining to over-the-road drivers, equipment, and cargo listed in the Federal Motor Carrier Safety Regulations. The driver must understand and comply with company policies and procedures.

The driver must have a basic mechanical knowledge of a tractor/trailer. The driver must be able to perform DOT equipment inspections, hook/unhook trailers, and enter and exit the tractor and trailer. The driver must be able to shift manual transmission engines, control the steering wheel, operate the brake and accelerator pedals, and be able to back and park a tractor-trailer unit.

The driver must have a long history of honesty; display safe behaviors at all times and have the ability to get along with others. Felony convictions involving safety, drugs or alcohol, or crimes against persons may disqualify you from consideration for a driving position with CRST.
The driver must meet DOT standards for physical exam, drug test, and commercial drivers' license as well as company standards.

The driver must be able to drive up to a 10 hour shift and up to 70 hours per week. In the coast-to-coast team operation, the driver must work effectively with their co-driver to perform their job responsibilities while working relatively long hours and performing repetitive work in a tractor. This may require the driver to be away from home 21 days or more at a time, work with variable work/rest cycles due to frequent deadlines and meeting delivery schedules, be exposed to environmental extremes, and encounter day-to-day stressful situations.

Drivers on occasion must load and unload trailers handling weights of up to 75 pounds and be able to mount snow chains on tires. Drivers may be required to use loading/unloading devices such as electric floor jacks and hand dollies.

This job description is intended to accurately state the working conditions and the tasks that must be performed for this job. However, the description is not an exhaustive list and the driver may be required to perform other tasks or other work from time to time as assigned to the driver by his supervisor or management.

| | |
|---|---|
| Have you reviewed the job description above? | [redacted] |
| Do you understand the requirements? | |
| Can you perform the requirements of this job with or without reasonable accommodation? | |

| **General Information** | |
|---|---|
| How did you hear about CRST? | [redacted] |
| Please be specific (i.e., if from a magazine, put the magazine name here): | |
| If "Other" media selected above, please describe: | |
| Were you referred by a CRST Driver? | |
| Please list the CRST Employee's name, terminal and ID#, if you have it: | |
| If you have spoken with a CRST recruiter, please select his/her name: | |

CRST Position Descriptions

- **Company Driver:** Student and Experienced Drivers interested in joining CRST.
- **Lease Purchase:** Drivers interested in CRST's lease purchase program.
- **Owner Operator:** Owner Operators interested in joining CRST.

| | |
|---|---|
| What type of position are you applying for? | [redacted] |
| Have you ever been known by any other name? | |
| List all names: | |
| Can you speak, read and write English? | |
| Can you legally work in the United States? | |
| How many years have you had a valid driver's license? | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DECLARATION OF CHAD BRUECK**

I, Chad Brueck, declare and state as follows:

1. I am the President of CRST Expedited, Inc. (CRST). I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion to Conditionally Certify FLSA Collective Action, For Issuance of Notice, and for Equitable Estoppel Regarding the Limitations Period.

2. This declaration is based on my personal knowledge and my review of records maintained by CRST over which I have responsibility. I have personal knowledge of the facts contained in this declaration based on my review of relevant records and, if called as a witness, I could and would testify competently as to the information contained herein.

**Background Facts**

3. CRST is a regulated, for-hire motor carrier authorized by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the U.S. Department of Transportation (DOT), to provide trucking services to the shipping public nationwide.

4. CRST is an Iowa corporation that has its principal place of business in Cedar Rapids, Iowa, where it is headquartered.

5. To transport its customers' freight, CRST signs Independent Contractor Operating Agreements (ICOAs) with independent contractor owner-operators (Contractors) under which the Contractors agree to provide equipment (i.e., a commercial motor vehicle with a combined gross vehicle weight rating of 80,000 pounds) and a DOT-qualified driver.

6. Owner-operators who contract with CRST are responsible for providing their own truck and a DOT-qualified driver.

7. Approximately 7% of the Contractors already have their own trucks when they begin hauling for CRST.

8. Contractors who do not have their own trucks, and qualify, may obtain a truck from CRST Lincoln Sales, Inc. through a lease-purchase agreement.

9. At the end of the lease term, a lease-purchase operator can purchase the truck for the stipulated value agreed to by the parties.

10. The terms of these leases vary based on the age and mileage of each truck.

11. CRST dispatchers notify owner-operators of load opportunities, and the owner-operators are free to accept or reject those loads.

12. Owner-operators have complete control over what loads they haul and can pick any available load based on anticipated revenue or any other factor relevant to the Contractor.

13. They can likewise ignore or decline a load.

14. Some Contractors own and drive their own trucks, and others lease more than one truck and hire drivers to drive those trucks.

15. CRST pays those fleet operators for the completed deliveries, and fleet operators, in turn, pay their drivers for the labor performed on terms agreed upon between themselves.

16. The fleet operators determine how much to pay their drivers.

# Equipment Lease

**With Maintenance ( Expedited) – Freightliner**

**CRST Lincoln Sales, Inc.**
3930 16th Avenue, SW
Cedar Rapids, IA 52406-0068
Phone: 319-731-3890
Fax: 319-731-9245

Lessee Legal Name: Anthony Cervantes

DBA: ______

Street Address: ______

City/State/Zip: ______

Contact: ______ Phone Number: ______ Fax Number: ______

| EQUIPMENT DESCRIPTION | | | | | Security Deposit |
|---|---|---|---|---|---|
| Year | Make | Model | VIN# | Unit# | $ 0 |
| 2015 | FRTL | | 3AKJGLD51FSGS2448 | 116039 | |

| | | | |
|---|---|---|---|
| TERM | 131 Weeks | START DATE | 1/23/2018 (Mo. Day Yr.) |
| RENT PAYMENT UPON SIGNING* | $ ______ (crossed out) | | |

| BASE RENT* | Number | Frequency | Each Payment Amount |
|---|---|---|---|
| | 131 | Weekly, during both First Period and Second Period below | $449.00 |

| ADDITIONAL RENT* | FIRST PERIOD (Comprehensive Maintenance Furnished By Lessor - *see Sections 6(b)(1), (3), below*): | | SECOND PERIOD (Only Routine Maintenance Furnished By Lessor - *see Sections 6(b)(2), (3), below*): |
|---|---|---|---|
| | FROM 1/2/2018 (Mo. Day Yr.) TO 7/21/2018 (Mo. Day Yr.) | FROM 7/22/2018 (Mo. Day Yr.) TO 7/21/2019 (Mo. Day Yr.) | FROM 7/22/2019 TO 7/21/2020 (Mo. Day Yr.) |
| | Fifteen cents ($0.15) per mile for all hub/odometer (both authorized and unauthorized) miles, with a minimum of two thousand eight hundred eighty dollars ($2,880) per quarter, as detailed in Section 2(b)(1) and (2) below. | Fifteen cents ($0.15) per mile for all hub/odometer (both authorized and unauthorized) miles, with a minimum of two thousand eight hundred eighty dollars ($2,880) per quarter, as detailed in Section 2(b)(1) and (2) below. | Thirteen cents ($0.13) per mile for all hub/odometer (both authorized and unauthorized) miles, with a minimum of two thousand four hundred dollars ($2,400) per quarter, as detailed in Section 2(b)(1) and (2) below. |

***All rent payments include administrative-cost reimbursements and markups benefiting Lessor.**

This **Equipment Lease (With Maintenance)**, including all attached Schedules and addendums (collectively "Lease") is entered into by and between CRST Lincoln Sales, Inc., an Iowa corporation ("Lessor"), with its principal place of business at 3930 16th Avenue, SW, Cedar Rapids, IA 52406-0068, and the above-named Lessee.

1. **LEASE OF EQUIPMENT.** Lessor shall lease to Lessee the vehicle described above, together with all replacements, improvements, substitutions, additions, and accessories (collectively "Equipment"), on the terms and conditions in this Lease. Each reference herein to "Lessor's assigns" means any purchaser, transferee, assignee, or secured party hereof and any of their assignees, and, in the case of any partnership or trust, shall also include each partner or beneficiary thereof, including each stockholder of any corporate partner or beneficiary.

2. **LEASE TERMS AND LEASE PAYMENTS.**



Exhibit 3

# SCHEDULE A

## STIPULATED LOSS VALUE SCHEDULE

The parties to this Agreement agree that the Stipulated Loss Value of the Equipment is the amount shown below for each payment period with an implied interest rate of ten percent.

Truck # New Truck

| No. | Payment Date | Stipulated Loss Value | No. | Payment Date | Stipulated Loss Value | No. | Payment Date | Stipulated Loss Value | No. | Payment Date | Stipulated Loss Value | No. | Payment Date | Stipulated Loss Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1/23/18 | $ 55,561 | 53 | 1/22/19 | $ 36,868 | 105 | 1/21/20 | $ 16,212 | 157 | | | 209 | | |
| 2 | 1/30/18 | $ 55,219 | 54 | 1/29/19 | $ 36,490 | 106 | 1/28/20 | $ 15,794 | 158 | | | 210 | | |
| 3 | 2/6/18 | $ 54,876 | 55 | 2/5/19 | $ 36,112 | 107 | 2/4/20 | $ 15,375 | 159 | | | 211 | | |
| 4 | 2/13/18 | $ 54,533 | 56 | 2/12/19 | $ 35,732 | 108 | 2/11/20 | $ 14,956 | 160 | | | 212 | | |
| 5 | 2/20/18 | $ 54,189 | 57 | 2/19/19 | $ 35,352 | 109 | 2/18/20 | $ 14,535 | 161 | | | 213 | | |
| 6 | 2/27/18 | $ 53,844 | 58 | 2/26/19 | $ 34,971 | 110 | 2/25/20 | $ 14,114 | 162 | | | 214 | | |
| 7 | 3/6/18 | $ 53,499 | 59 | 3/5/19 | $ 34,589 | 111 | 3/3/20 | $ 13,693 | 163 | | | 215 | | |
| 8 | 3/13/18 | $ 53,153 | 60 | 3/12/19 | $ 34,206 | 112 | 3/10/20 | $ 13,270 | 164 | | | 216 | | |
| 9 | 3/20/18 | $ 52,806 | 61 | 3/19/19 | $ 33,823 | 113 | 3/17/20 | $ 12,846 | 165 | | | 217 | | |
| 10 | 3/27/18 | $ 52,458 | 62 | 3/26/19 | $ 33,439 | 114 | 3/24/20 | $ 12,422 | 166 | | | 218 | | |
| 11 | 4/3/18 | $ 52,110 | 63 | 4/2/19 | $ 33,055 | 115 | 3/31/20 | $ 11,997 | 167 | | | 219 | | |
| 12 | 4/10/18 | $ 51,761 | 64 | 4/9/19 | $ 32,669 | 116 | 4/7/20 | $ 11,571 | 168 | | | 220 | | |
| 13 | 4/17/18 | $ 51,412 | 65 | 4/16/19 | $ 32,283 | 117 | 4/14/20 | $ 11,144 | 169 | | | 221 | | |
| 14 | 4/24/18 | $ 51,062 | 66 | 4/23/19 | $ 31,896 | 118 | 4/21/20 | $ 10,717 | 170 | | | 222 | | |
| 15 | 5/1/18 | $ 50,711 | 67 | 4/30/19 | $ 31,508 | 119 | 4/28/20 | $ 10,288 | 171 | | | 223 | | |
| 16 | 5/8/18 | $ 50,360 | 68 | 5/7/19 | $ 31,120 | 120 | 5/5/20 | $ 9,859 | 172 | | | 224 | | |
| 17 | 5/15/18 | $ 50,007 | 69 | 5/14/19 | $ 30,731 | 121 | 5/12/20 | $ 9,429 | 173 | | | 225 | | |
| 18 | 5/22/18 | $ 49,655 | 70 | 5/21/19 | $ 30,341 | 122 | 5/19/20 | $ 8,998 | 174 | | | 226 | | |
| 19 | 5/29/18 | $ 49,301 | 71 | 5/28/19 | $ 29,950 | 123 | 5/26/20 | $ 8,566 | 175 | | | 227 | | |
| 20 | 6/5/18 | $ 48,947 | 72 | 6/4/19 | $ 29,559 | 124 | 6/2/20 | $ 8,134 | 176 | | | 228 | | |
| 21 | 6/12/18 | $ 48,592 | 73 | 6/11/19 | $ 29,167 | 125 | 6/9/20 | $ 7,701 | 177 | | | 229 | | |
| 22 | 6/19/18 | $ 48,236 | 74 | 6/18/19 | $ 28,774 | 126 | 6/16/20 | $ 7,266 | 178 | | | 230 | | |
| 23 | 6/26/18 | $ 47,880 | 75 | 6/25/19 | $ 28,380 | 127 | 6/23/20 | $ 6,831 | 179 | | | 231 | | |
| 24 | 7/3/18 | $ 47,523 | 76 | 7/2/19 | $ 27,986 | 128 | 6/30/20 | $ 6,396 | 180 | | | 232 | | |
| 25 | 7/10/18 | $ 47,166 | 77 | 7/9/19 | $ 27,591 | 129 | 7/7/20 | $ 5,959 | 181 | | | 233 | | |
| 26 | 7/17/18 | $ 46,807 | 78 | 7/16/19 | $ 27,195 | 130 | 7/14/20 | $ 5,521 | 182 | | | 234 | | |
| 27 | 7/24/18 | $ 46,448 | 79 | 7/23/19 | $ 26,798 | 131 | 7/21/20 | $ 5,000 | 183 | | | 235 | | |
| 28 | 7/31/18 | $ 46,089 | 80 | 7/30/19 | $ 26,400 | 132 | | | 184 | | | 236 | | |
| 29 | 8/7/18 | $ 45,728 | 81 | 8/6/19 | $ 26,002 | 133 | | | 185 | | | 237 | | |
| 30 | 8/14/18 | $ 45,367 | 82 | 8/13/19 | $ 25,603 | 134 | | | 186 | | | 238 | | |
| 31 | 8/21/18 | $ 45,005 | 83 | 8/20/19 | $ 25,203 | 135 | | | 187 | | | 239 | | |
| 32 | 8/28/18 | $ 44,643 | 84 | 8/27/19 | $ 24,803 | 136 | | | 188 | | | 240 | | |
| 33 | 9/4/18 | $ 44,280 | 85 | 9/3/19 | $ 24,402 | 137 | | | 189 | | | 241 | | |
| 34 | 9/11/18 | $ 43,916 | 86 | 9/10/19 | $ 24,000 | 138 | | | 190 | | | 242 | | |
| 35 | 9/18/18 | $ 43,551 | 87 | 9/17/19 | $ 23,597 | 139 | | | 191 | | | 243 | | |
| 36 | 9/25/18 | $ 43,186 | 88 | 9/24/19 | $ 23,193 | 140 | | | 192 | | | 244 | | |
| 37 | 10/2/18 | $ 42,820 | 89 | 10/1/19 | $ 22,789 | 141 | | | 193 | | | 245 | | |
| 38 | 10/9/18 | $ 42,454 | 90 | 10/8/19 | $ 22,384 | 142 | | | 194 | | | 246 | | |
| 39 | 10/16/18 | $ 42,086 | 91 | 10/15/19 | $ 21,978 | 143 | | | 195 | | | 247 | | |
| 40 | 10/23/18 | $ 41,718 | 92 | 10/22/19 | $ 21,571 | 144 | | | 196 | | | 248 | | |
| 41 | 10/30/18 | $ 41,349 | 93 | 10/29/19 | $ 21,163 | 145 | | | 197 | | | 249 | | |
| 42 | 11/6/18 | $ 40,980 | 94 | 11/5/19 | $ 20,755 | 146 | | | 198 | | | 250 | | |
| 43 | 11/13/18 | $ 40,610 | 95 | 11/12/19 | $ 20,346 | 147 | | | 199 | | | 251 | | |
| 44 | 11/20/18 | $ 40,239 | 96 | 11/19/19 | $ 19,936 | 148 | | | 200 | | | 252 | | |
| 45 | 11/27/18 | $ 39,867 | 97 | 11/26/19 | $ 19,525 | 149 | | | 201 | | | 253 | | |
| 46 | 12/4/18 | $ 39,495 | 98 | 12/3/19 | $ 19,114 | 150 | | | 202 | | | 254 | | |
| 47 | 12/11/18 | $ 39,122 | 99 | 12/10/19 | $ 18,702 | 151 | | | 203 | | | 255 | | |
| 48 | 12/18/18 | $ 38,748 | 100 | 12/17/19 | $ 18,289 | 152 | | | 204 | | | 256 | | |
| 49 | 12/25/18 | $ 38,374 | 101 | 12/24/19 | $ 17,875 | 153 | | | 205 | | | 257 | | |
| 50 | 1/1/19 | $ 37,998 | 102 | 12/31/19 | $ 17,460 | 154 | | | 206 | | | 258 | | |
| 51 | 1/8/19 | $ 37,622 | 103 | 1/7/20 | $ 17,045 | 155 | | | 207 | | | 259 | | |
| 52 | 1/15/19 | $ 37,246 | 104 | 1/14/20 | $ 16,629 | 156 | | | 208 | | | 260 | | |

**This SCHEDULE A, which completely replaces and supersedes any earlier schedule, addendum, or other provision of this lease relating to the same subjects, is agreed to by the undersigned parties as of the latest date set forth below:**

**LESSEE**

By: [signature]
Signature

Printed Name and Title

01-05-18
Date

**LESSOR: CRST Lincoln Sales, Inc.**

By: [signature]
Signature

Printed Name and Title

Date

# CRST Lincoln Sales, Inc.

# Lease Purchase Pricing

**Current Date**
**1/3/2018**

| | | |
|---|---|---|
| VIN | | new truck-40mos |
| Date of 1st Lease Payment | | 1/23/2018 |
| Lease Payments Received After | **9/23/2016** | 33 |
| Unit # | | New Truck |
| Computed Lease Cost | | 55,903 |
| Lease Term | | 131 |
| Implied Interest Rate | | 10% |
| Balloon | | 5,000.00 |
| Total Lease Payments | | 58,819.00 |
| Total # of Payments @ 449 | | 131 |
| | | |

Automatic Pricing-

a. **Term**. The lease term of the Equipment is specified in the table above.

b. **Rent**. The rent for the Equipment ("Rent"), shall consist of the Rent Payment Upon Signing (if any), the Base Rent Payments, and the Additional Rent, in the respective amounts set forth in the table above, which include administrative-cost reimbursements and markups benefiting Lessor. "Additional Rent" shall be calculated and deducted as follows:

1. **Additional Rent for First Period**.

A. **Initial Computation**. During the **First Period**, the Additional Rent, at the per-mile rates and for the portion(s) of the First Period and for the minimum mileage indicated, set forth in the table on page 1 above shall be deducted from Lessee's settlement compensation by the motor carrier ("Carrier") with which Lessee has entered into an Independent Contractor Operating Agreement ("ICOA") and shall be paid over to Lessor for all Carrier-authorized miles (with all distances to be determined by the then-current edition of the Rand-McNally mileage guide) during the preceding week, increased by eighteen percent (18%) to take into account the Equipment's unauthorized miles (together, "First Period Initial Computation Miles").

B. **Quarterly Reconciliation**. Once each quarter during the **First Period**, Carrier shall record the Equipment's actual hub/odometer miles operated during the preceding quarter, compare the number with the First Period Initial Computation Miles, make any necessary adjustments in settlement compensation at Lessee's next ICOA settlement, and arrive at a corresponding accounting reconciliation with Lessor. Specifically, if the actual hub/odometer miles are lower than the First Period Initial Computation Miles, Carrier shall credit Lessee's settlement compensation with the difference, multiplied by the cents-per-mile rate set forth for the relevant portion of the First Period in the table on page 1 above, provided that Carrier shall deduct, and remit to Lessor, an amount equal to no less than 24,000 miles, multiplied by such cents-per-mile rate, each quarter. If the total actual hub/odometer miles are greater than the First Period Initial Computation Miles, Carrier shall deduct from Lessee's settlement compensation the difference, if any, multiplied by such cents-per-mile rate.

2. **Additional Rent for Second Period**.

A. **Initial Computation**. During the **Second Period**, the Additional Rent, at the per-mile rate for the Second Period and for the minimum mileage indicated, set forth in the table on page 1 above shall be deducted from Lessee's settlement compensation by Carrier and shall be paid over to Lessor for all Carrier-authorized miles (with all distances to be determined by the then-current edition of the Rand-McNally mileage guide) during the preceding week, increased by eighteen percent (18%) to take into account the Equipment's unauthorized miles ("Second Period Initial Computation").

B. **Quarterly Reconciliation**. Once each quarter during the **Second Period**, Carrier shall record the Equipment's actual hub/odometer miles operated during the preceding quarter, compare the number with the Second Period Initial Computation Miles above, make any necessary adjustments in settlement compensation at Lessee's next ICOA settlement, and arrive at a corresponding accounting reconciliation with Lessor. Specifically, if the actual hub/odometer miles are lower than the Second Period Initial Computation Miles, Carrier shall credit Lessee's settlement compensation with the difference, multiplied by the cents-per-mile rate set forth for the Second Period in the table on page 1 above, provided that Carrier shall deduct, and remit to Lessor, an amount equal to no less than 24,000 miles, multiplied by such cents-per-mile rate, each quarter. If the total actual hub/odometer miles are greater than the Second Period Initial Computation Miles, Carrier shall deduct from Lessee's settlement compensation the difference, if any, multiplied by such cents-per-mile rate.

c. **Overall Lease Payments**. The Rent, any Security Deposit escrow fund contributions, and all other items owed to Lessor under the Lease as specified in the table on page 1, in Section 2(b), and in Schedules B, C, and D ("Overall Lease Payments") shall be due and payable, starting on the First Overall Lease Payment Date specified in the table above, and weekly thereafter. All Overall Lease Payments shall be payable, without notice or demand, at the above address of Lessor or at such other place as Lessor or Lessor's assigns shall notify Lessee of in writing. Lessee shall execute the attached Authorization and Assignment authorizing and directing Carrier to compute and deduct weekly the Overall Lease Payments from Lessee's earned and available settlement compensation and/or escrow fund balances under the ICOA. In addition to the Overall Lease Payments and except to the extent Carrier expressly assumes the following obligations through the ICOA, Lessee shall be responsible for acquiring and paying for any plates, licenses, or permits necessary to operate the Equipment and any federal, state, or local taxes and fees, including the Federal Heavy Vehicle Use Tax, registration fees, weight-distance taxes, state property or indefinite situs taxes, sales taxes (including in connection with this Lease transaction), highway use taxes, ferry, bridge, tunnel, and road tolls, or other charges assessed against the Equipment arising from Lessee's use, as well as all fuel costs, fuel taxes, empty mileage, loading and unloading expenses, detention and accessorial charges, and any other costs of operating the Equipment. Lessee's liability for these taxes, fees, and other expenses shall survive the expiration of this Lease.

3. **DELIVERY AND ACCEPTANCE.** Lessee shall select the type, quality, and supplier of the Equipment from among those made available by Lessor. Lessor shall not be liable to Lessee for any failure or delay in obtaining delivery of any Equipment. Upon delivery of the Equipment to Lessee, Lessee shall forthwith inspect it and, unless Lessee gives Lessor prompt written notice of any defect in or other proper objection to it, including that the Equipment is not in Good Operating Condition (defined as roadworthy and meeting all Federal and state regulatory requirements as to safety and equipment), Lessee shall execute and deliver to Lessor an Acceptance Certificate, in the form attached hereto, covering the Equipment. Lessee's execution of an Acceptance Certificate covering the Equipment shall conclusively establish that, as between Lessor and Lessee, Lessee has unconditionally accepted the Equipment for all purposes of this Lease and has agreed that the Equipment is in Good Operating Condition.

4. **NET LEASE. NO OFFSET.** THIS IS A NET LEASE, AND ALL OVERALL LEASE PAYMENTS PAYABLE BY LESSEE HEREUNDER SHALL BE PAID UNCONDITIONALLY WHEN DUE, WITHOUT ABATEMENT, DEDUCTION, COUNTERCLAIM, OR SETOFF OF ANY NATURE, INCLUDING ANY THEREOF ARISING OUT OF ANY PRESENT OR FUTURE CLAIM LESSEE MAY HAVE AGAINST LESSOR, OR ANY OF LESSOR'S ASSIGNS, OR THE MANUFACTURER, OR SUPPLIER OF THE EQUIPMENT. In no event, except as otherwise expressly provided herein, shall this Lease terminate or shall any of Lessee's obligations be affected by reason of any defect in, damage to, or loss or destruction of all or any part of the Equipment, from any cause whatsoever, or any interference with Lessee's use of the Equipment by any person or for any other cause whatsoever.

5. **DISCLAIMER OF WARRANTIES.** LESSOR, NOT BEING THE MANUFACTURER OR THE VENDOR OF THE EQUIPMENT, HEREBY MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF ANY KIND OR AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PURPOSE, OR ITS CAPACITY OR DURABILITY, OR THE QUALITY OF THE MATERIAL OR WORKMANSHIP OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER RELATING THERETO, OR ANY PATENT INFRINGEMENT OR PATENT OR LATENT DEFECTS, AND LESSEE HEREBY ACKNOWLEDGES THE FOREGOING DISCLAIMER BY LESSOR. Provided no Event of Default has occurred and is continuing hereunder, and so long as the Equipment is subject to this Lease and Lessor is legally permitted so to do, Lessor hereby authorizes Lessee at Lessee's expense to assert for Lessor's account, all rights of Lessor under any manufacturer's, vendor's, or dealer's warranty on the Equipment.

## 6. USE, MAINTENANCE, AND INSPECTION OF EQUIPMENT.

a. Use of Equipment. Lessee shall use the Equipment exclusively in the operation of Lessee's transportation business and in compliance with all federal, state, local, and foreign statutes, laws, ordinances, and regulations, and applicable insurance policy conditions. Lessee agrees that, except as otherwise provided below, he/she shall be the driver assigned to the Equipment. If Lessee is ill, disabled, or otherwise unable to drive the Equipment, he/she must submit a written request to substitute a competent, licensed driver who will be under his/her control and direction and will not abuse the Equipment and will operate it with reasonable care, diligence, and caution, and subject to all provisions of this Lease, which request Lessor shall review within five (5) business days. Any request not approved by Lessor in writing within that period shall be deemed disapproved. If Lessor approves Lessee's request (and Lessor's approval shall not be unreasonably withheld), Lessor may attach reasonable conditions to protect its interest in the Equipment. At a minimum, Lessee shall ensure that he/she and any substitute driver possess valid commercial driver's licenses and meet, throughout the Lease Term, all applicable federal and state driver qualifications and motor vehicle safety requirements. If, in Lessor's reasonable judgment, a driver is not in compliance with these qualifications and requirements, Lessee shall replace the driver at Lessor's request with one approved by Lessor. No passenger may be carried without a prior written passenger authorization from Carrier. No more than one passenger may be carried at one time.

b. Maintenance and Repairs.

1. Comprehensive Maintenance Furnished During First Period. During, and only during, the **First Period**, set forth in the table on the first page of this Lease, Lessor shall furnish for the Equipment, at the maintenance facilities of a provider specified by Lessor ("Maintenance Provider") or other provider approved by Maintenance Provider and at Lessor's expense (including but not limited to all labor, parts, supplies, employee compensation and benefits and employment taxes), the following maintenance services, except in the event of damage resulting from the events described in Section 6(b)(3)(C) below. Specifically, Lessor shall:

A. Maintain each unit of the Equipment at an operational level that is sufficient to adequately perform in a safe and timely manner, the intended and customary functions of the equipment;

B. Maintain each unit of Equipment in compliance with current CRST Lincoln Sales company policies, all applicable original-equipment-manufacturer maintenance procedures and warranty policies, and the safety standards for over-the-road vehicles and emissions controls, and the Federal Motor Carrier Safety Act. Lessor shall maintain the Equipment so as to meet or exceed the in-service criteria specified in the Federal Motor Carrier Safety Regulations in 49 C.F.R. Parts 390, 393, 396, and Appendix G to Part 396. Lessor shall follow the preventive maintenance schedule set forth in Schedule E to this Lease, and Lessee shall cooperate by making the Equipment available for such scheduled maintenance in a timely way.

C. Rebuild, replace, and/or overhaul the engine, engine parts, transmission, axles, and/or other major components of a unit of Equipment upon failure of such components except where the failure is caused by damage to the Equipment, as set forth in Section 6(b)(3)(C) of this Lease;

D. Inspect each unit of Equipment at a CRST Lincoln Sales-designated facility at least every 40,000 miles (in conjunction with the scheduled maintenance described in Schedule E to this Lease); and

E. Provide road service (including towing) for the Equipment necessitated by mechanical and tire failures caused by any failure on Lessor's part to perform, in a commercially reasonable manner, the maintenance and inspection services required by Sections 6(b)(1)(A), (B), (C), and (D) of this Lease.

2. <u>Routine Maintenance Furnished During Second Period</u>. During, and only during, the **Second Period**, set forth in the table on the first page of this Lease, Lessor shall furnish for the Equipment, at the maintenance facilities of a provider specified by Lessor ("Maintenance Provider") or other provider approved by Maintenance Provider and at Lessor's expense (including but not limited to all labor, parts, supplies, employee compensation and benefits and employment taxes), the following maintenance services except in the event of damage resulting from the events described in Section 6(b)(3)(C) below. Specifically, Lessor shall:

A. Repair or, at Lessor's discretion, replace (both furnish and install) all:

1. Tires when repair or replacement is due to normal wear and tear and not to curbing, low tire pressure, or road hazards, with the choice of replacement tire left to Lessor's discretion;

2. Brakes and brake components;

3. Oil, lubricants, antifreeze, washer, and other consumable fluids (only up to one gallon per week), batteries, oil filters, fuel filters, and air filters;

4. Belts and hoses;

5. Alternators;

6. Air conditioning systems;

7. Heater blowers; and

8. Clutch, clutch housing, and clutch assembly;

B. NOT repair or replace (instead leaving these services to Lessee to perform at Lessee's expense):

1. Engine or any internal engine parts, including but not limited to engine head, valves, valve springs and keepers, rocker arms and shafts, camshaft and bearings, or head gasket;

2. Fuel injectors;

3. Electronic Control Module ("ECM") or any associated electronic components;

4. Turbo or inner cooler;

5. Oil cooler, pan, or pump;

6. Transmission or any of its internal parts;

7. Axle assemblies or any of their internal parts;

8. Timing case cover or timing gears;

9. Exhaust manifold;

10. Intake manifold;

11. Oil leaks, accessory drive seals, cam follower boxes, or cylinder problems;

12. Front suspension, king pins, or spring hangers; or

13. Radiator;

C. Inspect each unit of Equipment at a CRST Lincoln Sales-designated facility at least every 40,000 miles (in conjunction with the scheduled maintenance described in Schedule E to this Lease); and

D. Provide road service (including towing) for the Equipment necessitated by mechanical and tire failures caused by any failure on Lessor's part to perform, in a commercially reasonable manner, the maintenance and inspection services required by Sections 6(b)(2)(A) and (C) of this Lease;

E. BUT Lessee shall follow the preventive maintenance schedule set forth in Schedule E to this Lease, and shall perform all necessary maintenance and repairs not set forth in Section 6(b)(2)(A) of this Lease.

3. **During BOTH First Period and Second Period.** During both the **First Period** and the **Second Period**, all of the following conditions and requirements apply:

A. Lessee shall return the Equipment to a maintenance facility of Maintenance Provider or other provider approved by Maintenance Provider for inspection, preventive maintenance and repair during normal business hours at scheduled times as agreed upon by the parties. In addition, Lessee shall report to Maintenance Provider, using the speediest means of communications available, any trouble concerning the Equipment as quickly as reasonably possible, and, to prevent damage, shall conduct pre-trip inspections of the Equipment, including checking oil and coolant levels, tire pressure, and any DOT-specified in-service item.

B. In the event the Equipment is disabled for any reason, Lessee shall immediately notify Maintenance Provider by the speediest means of communications available. Lessee shall not cause, or permit, any person other than Maintenance Provider or other persons authorized by Maintenance Provider, to perform any maintenance, repairs, or modifications, or adjustments to the Equipment without Maintenance Provider's prior consent, and shall abide by Maintenance Provider's reasonable instructions concerning emergency repairs. In the event the Equipment is disabled due to mechanical or tire failure, Lessor shall, within a commercially reasonable period of time after Maintenance Provider's receipt of notification, require Maintenance Provider to properly repair, or cause the repair, of the Equipment. Lessor shall have no responsibility for any repair or service to the Equipment away from the facilities of Maintenance Provider unless authorized by Maintenance Provider and documented by a properly-receipted and itemized bill for such repairs or services, listing the Lessor's Unit Number for the Equipment. Lessee, at his/her expense, shall transport the Equipment to the maintenance facilities of Maintenance Provider or other provider approved by Maintenance Provider for regular and emergency maintenance services. If road service (including towing) is needed, *see* Sections 6(b)(1) and (2) above.

C. SUBJECT TO SECTION 10 BELOW, LESSEE SHALL BE RESPONSIBLE FOR ALL REPAIRS AND/OR REPLACEMENTS MADE NECESSARY BY LOSS OF OR DAMAGE TO THE EQUIPMENT OR ITS SYSTEMS OR COMPONENTS (INCLUDING BUT NOT LIMITED TO ITS TIRES, BRAKES, GLASS, MATTRESSES, FIRE EXTINGUISHERS, TRIANGLE KITS, AND OTHER COMPONENTS), RESULTING FROM (1) A COLLISION OR OTHER SERIOUS ACCIDENT, REGARDLESS OF WHETHER ATTRIBUTABLE TO THE ACTS OR OMISSIONS OF LESSEE OR TO THOSE OF ANOTHER PERSON; (2) ABUSIVE OR NEGLIGENT HANDLING OF THE EQUIPMENT BY LESSEE (INCLUDING BUT NOT LIMITED TO USING EXCESSIVE SPEED DOWNHILL AND CAUSING REAR-END FAILURES THROUGH SPIN-OUTS); (3) THEFT OR VANDALISM, REGARDLESS OF WHETHER ATTRIBUTABLE TO THE ACTS OR OMISSIONS OF LESSEE OR TO THOSE OF

ANOTHER PERSON; (4) LESSEE'S FUEL STARVATION OF THE EQUIPMENT, (5) LESSEE'S ENGAGING OF THE POWER-DIVIDER INCORRECTLY, OR (6) LESSEE'S FAILURE TO DRAIN AIR TANKS DAILY FOLLOWING EACH USE. ANY SUCH REPAIRS SHALL BE PERFORMED ONLY WITH THE CONSENT OF MAINTENANCE PROVIDER, WHICH SHALL NOT BE UNREASONABLY WITHHELD. LESSEE SHALL KEEP THE EQUIPMENT'S INTERIOR CLEAN AND FREE OF DEBRIS IN ORDER TO ALLOW FOR PROPER ACCOMPLISHMENT OF SERVICES AND REPAIRS; AND LESSEE SHALL DEFER ALL NON-SAFETY-RELATED MAINTENANCE REQUESTS UNTIL THE EQUIPMENT'S NEXT SCHEDULED SERVICING. LESSEE SHALL ALSO BE RESPONSIBLE FOR:

1. Providing road service (including towing) for the Equipment necessitated by causes other than mechanical and tire failures;
2. Jump-starts of Equipment after Lessee has taken home-time;
3. All wipers, washer nozzles, and consumable fluids (oil, antifreeze, and washer fluid) in excess of one gallon per week; and
4. Inverter installations and removals (but only with Lessor's prior approval).

**D.** Lessor shall not be obligated to provide substitute vehicles or to pay for Lessee's hotel bills, meals, or other incidental or operating expenses while maintenance or repairs are being performed on the Equipment.

**c.** **Modifications to Equipment.** Lessee shall make no addition, improvement, or modification to the Equipment unless Lessor gives Lessee written permission in advance (and Lessee shall not authorize changes in horsepower of the Equipment or modifications to engine speed governors that would permit speeds exceeding 68 miles per hour). When Lessee returns the Equipment to Lessor, any item Lessee affixed with Lessor's approval may be removed only if Lessor reasonably determines that removal will not damage or lessen the value of the Equipment and Lessee pays for any such removal. Any alteration Lessor does not approve in writing shall be removed at Lessee's expense or retained by Lessor as its property, at Lessor's option. From time to time, Lessor may, at its option and expense, make such alterations, additions, or improvements as it shall deem appropriate.

**d.** **Inspection.** Upon Lessor's request, Lessee shall permit Lessor to have access to the Equipment at all reasonable times for the purpose of inspection and examination, including the periodic 40,000-mile inspections mandated by this Lease, including Schedule E.

**7. TITLE TO AND LOCATION OF EQUIPMENT.**

**a.** As between Lessor and Lessee, Lessee shall have exclusive possession, control, and use of the Equipment for the duration of this Lease, and shall assume complete responsibility for the operation of the Equipment. However, Lessee is not buying the Equipment during this Lease. This Lease constitutes a lease and Lessor is merely allowing Lessee to use the Equipment, with an option to purchase it at the successful completion of the Lease Term. The Equipment shall at all times be and remain personal property of Lessor, notwithstanding that any items may now or hereafter be affixed to the Equipment, and title thereto shall at all times during this Lease remain in Lessor.

**b.** Upon Lessor's request, Lessee agrees, at his/her expense, to affix a tag, plate or stencil to the Equipment showing Lessor's title thereto.

**c.** Provided that no Event of Default has occurred and is continuing hereunder, Lessor agrees that Lessor shall not interfere with Lessee's quiet enjoyment and use of the Equipment during the Lease.

**8. INDEMNIFICATION.** Lessee shall indemnify, defend, and hold Lessor and its assigns harmless from and against any claim (including any for which Lessor is not indemnified by its insurance) of direct, indirect, or

consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Lessor incurs arising out of Lessee's (including Lessee's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions in inspecting, maintaining, or using the Equipment or otherwise performing, or failing to perform, Lessee's obligations under this Lease. Lessee hereby authorizes Lessor to charge Lessee back for all amounts due Lessor under this Section 8 (*see* Schedule D). Lessor shall furnish Lessee with a written explanation and itemization of any deduction for cargo or property damage before it is made. In the event that any report or return is required to be made with respect to any obligation of Lessee under this Lease, Lessee shall do so promptly and send a copy of such report or return to Lessor. If Lessor is required to make such a report or return, Lessee shall promptly furnish to Lessor such data and information in such form as will enable Lessor to make and file such report or return as expeditiously as possible, and Lessor shall send a copy of such report or return to Lessee. Lessor and Lessee agree to keep each other informed of any major problems, attachments, liens, or encumbrances that arise in the operation of the Equipment, reporting information relating to any accident or lawsuit that occurs and cooperating with each other and insurers in the investigation, prosecution, or defense of any accidents, claims, or suits arising from the operation of Carrier, the Equipment, or this Lease. The parties' obligations under this Section shall survive the expiration or earlier termination of this Lease.

9. **LIENS AND ENCUMBRANCES.** Lessee shall not directly or indirectly create or permit to exist, and shall promptly and at his/her own expense discharge, any lien, charge, or encumbrance on the Equipment, except for any lien, charge, or encumbrance resulting solely from the acts of Lessor.

10. **LOSS, DAMAGE OR DESTRUCTION.** Lessee shall bear all risks of loss, damage, theft, or destruction of or to the Equipment. If the Equipment becomes lost, stolen, destroyed, irreparably damaged, confiscated, requisitioned, or commandeered (herein called a "Loss"), Lessee shall promptly notify Lessor thereof in writing and shall, at Lessor's option, either (a) replace the Equipment with like equipment that has a market value at least equal to, the Stipulated Loss Value of the Equipment as of the date, next following such Loss, shown on the Stipulated Loss Value Schedule (Schedule A hereto), that is in Good Operating Condition, and to which clear title shall pass to Lessor, plus pay Lessor all accrued and unpaid Overall Lease Payments owing for the Equipment for all periods commencing prior to such date, or (b) on such date next following such Loss, pay Lessor an amount equal to the sum of (i) the Stipulated Loss Value of the Equipment as of the next date thereafter shown on the Stipulated Loss Value Schedule (Schedule A hereto), plus (ii) all accrued and unpaid Overall Lease Payments owing for the Equipment for all periods commencing prior to such date, and upon such payment the Lease of the Equipment shall terminate and Lessor shall transfer to Lessee, without recourse or warranty, all of Lessor's right, title, and any interest in and to the Equipment as of such date.

11. **INSURANCE.** Lessee's obligations as to insurance shall be as set forth in attached Schedule B ("Insurance").

12. **EVENTS OF DEFAULT.** Lessee shall be in default under this Lease upon the happening of any of the following events or conditions (herein called "Events of Default"):

    a. Lessee shall fail to make any Overall Lease Payment within ten (10) days after the same is due and payable; or

    b. Lessee or any guarantor of Lessee's obligations hereunder ("Guarantor") shall be in default in payment or performance of any other indebtedness or obligations now or hereafter owed by Lessee or by any Guarantor to Lessor, or to any parent, affiliate or subsidiary of Lessor, under any other agreement or instrument; or

    c. Lessee shall fail to perform or observe any other covenant or agreement to be performed or observed by it under this Lease, and such failure shall continue for ten (10) days after written notice thereof by Lessor to Lessee; or

d. Any representation, warranty, certification, or statement made or furnished to Lessor herein or in any other document by or on behalf of Lessee or by any Guarantor proves to have been false in any material respect when made or furnished; or

e. Lessee or any Guarantor shall make an assignment for the benefit of creditors, or bankruptcy, arrangement, reorganization, liquidation, insolvency, receivership, or dissolution proceedings shall be instituted by or against Lessee or any Guarantor, and if instituted-against Lessee or any Guarantor, shall be consented to or be pending and not dismissed for a period of 30 days; or

f. The condition of Lessee's or any Guarantor's affairs shall change so as, in the reasonable opinion of Lessor, to impair Lessor's title to the Equipment or increase Lessor's credit risk; or

g. **Lessee's ICOA with Carrier is terminated by Carrier or Lessee.**

13. **REMEDIES OF LESSOR.** Upon the occurrence of an Event of Default, Lessor, at its option, may exercise any one or more of the remedies set forth in Subsections (a) through (e), except as provided in Subsection (f), below:

a. Terminate this Lease upon written notice to Lessee, without prejudice to any other remedies hereunder,

b. Declare the entire amount of unpaid Rent then accrued and thereafter payable for all Equipment then leased hereunder to be immediately due and payable, or declare the aggregate Lease balance of all Equipment then leased hereunder as of the Overall Lease Payment Date coincident with or next preceding the date of the occurrence of such Event of Default to be immediately due and payable, whereupon Lessee shall become obligated to pay to Lessor forthwith, as liquidated damages for the loss of the bargain and not as a penalty, such unpaid Rent or such aggregate Lease balance, as the case may be,

c. Cause Lessee, at his/her expense, to promptly assemble the Equipment or any Item thereof and return the same to Lessor at such place as Lessor may designate in writing,

d. Enter upon the premises where the Equipment is located, and, without notice to Lessee, and with or without process, take immediate possession of the Equipment without liability to Lessor by reason of such entry or taking possession, and without such action constituting a termination of this Lease unless Lessor notifies Lessee in writing to such effect,

e. Sell, re-lease or otherwise dispose of the Equipment in a public or private sale or lease transaction, and apply the proceeds of such sale or re-leasing, after first deducting all costs and expenses of such sale or re-leasing, to Lessee's obligations hereunder, with Lessee remaining liable for any deficiency and with any excess being retained by Lessor, and proceed by court action to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof. In addition to the foregoing, Lessee shall be obligated hereunder for the payment of all other amounts then or thereafter payable by Lessee to Lessor hereunder, including without limitation, amounts owing for indemnification.

f. Lessor may draw on the Security Deposit, authorized under Section 22 of this Lease, or on moneys in any escrow fund under Lessee's ICOA with Carrier, only for all accrued and unpaid Overall Lease Payments owing for the Equipment for all periods commencing prior to the Event of Default and for those amounts Lessor actually spends, incurs (including, with respect to necessary repairs to the Equipment, an adjuster's itemized estimate, subject to partial refund or further assessment, respectively, if the total actual repair expenses amount to less than, or more than, the estimate), or owes to a third party before or within forty-five (45) days after termination of this Lease in (1) returning the Equipment to the Good Operating Condition it was in when leased, excepting only reasonable wear and tear from normal use but including replacement of mattresses, overall cleaning of interior and exterior of the Equipment, detailing work and repairs of dents, scratches, and other deficiencies in order to return the Equipment to a commercially reasonable condition for resale; (2) in recovering instead the Stipulated Loss Value of the Equipment as of the date, next following the

Event of Default, shown on the Stipulated Loss Value Schedule (Schedule A hereto) if, in Lessor's commercially reasonable judgment, the damage to the Equipment is so extensive that repairing it would not be economically justified; (3) in replacing any equipment or accessories that are missing from the Equipment; (4) in selling or leasing the Equipment to a third party; (5) in returning the Equipment to the location where delivery was made, or such other closer location as Lessor may specify at the time; and (6) in securing possession of the Equipment if Lessee does not voluntarily return the Equipment. Aside from drawing on the Security Deposit or escrow funds, Lessor has a right to recover, through all available legal means, any additional amounts Lessee owes, or comes to owe, Lessor under this lease.

14. **FURTHER ASSURANCES.** Lessee shall promptly execute and deliver to Lessor such further documents and assurances and take such further action as Lessor may from time to time reasonably request in order more effectively to carry out the purpose of this Lease and to protect the rights and remedies of Lessor hereunder, including without limitation, the execution and delivery of financing statements under the Uniform Commercial Code and appropriate consents and waivers from landlords and mortgagees. Lessee authorizes Lessor to sign and execute any and all necessary forms to protect Lessor's rights and remedies, including, but not limited to insurance claims, financing statements under the Uniform Commercial Code, and appropriate consents and waivers.

15. **SUBLEASE AND ASSIGNMENT.** The provisions of this Lease shall be binding upon, and shall inure to the benefit all of Lessor's assigns and successors, and any permitted successors and assigns of Lessee.

    a. Without Lessor's prior written consent, Lessee shall not assign any of Lessee's rights hereunder or sublet or transfer the Equipment.

    b. Lessor may, at any time, with or without notice to Lessee, sell, transfer, assign, mortgage, and grant a security interest in this Lease, any Schedule, and the Equipment, in whole or in part, and in such event any such purchaser, transferee, assignee, or secured party shall have and may exercise all of Lessor's rights hereunder, including the right to receive Overall Lease Payments solely with respect to the Equipment to which such sale, transfer, assignment, mortgage, and grant of security interest related. Any such sale, transfer, assignment, mortgage or security interest shall be subject to Lessee's rights and options, if any, hereunder so long as no Event of Default has occurred and is continuing hereunder. Any of Lessor's assigns may re-assign such rights and may mortgage and grant a security interest in the Equipment. All obligations of Lessor to Lessee hereunder shall be enforceable against Lessor and Lessor's assigns except for any of Lessor's assigns who is a lender and/or secured party. Lessee agrees that upon written notice to Lessee of any such sale, transfer, assignment, mortgage, or security interest, Lessee shall accept and comply with the directions and demands of Lessor's assigns. THE RIGHTS OF ANY OF LESSOR'S ASSIGNS SHALL NOT BE SUBJECT TO ANY DEFENSE, COUNTERCLAIM, OR SETOFF, NOT ARISING FROM OR RELATED TO THIS LEASE, THAT LESSEE MAY HAVE AGAINST LESSOR.

16. **THIS AGREEMENT IS A LEASE.** Lessor and Lessee hereby agree that this Lease is a lease, that Lessor is the owner of the Equipment, and that the relationship between Lessor and Lessee shall always be only that of lessor and lessee. Lessee agrees that Lessor is entitled to and shall have the right to claim the following tax benefits with respect to the Equipment: (a) depreciation deductions for Federal Income Tax purposes and depreciation or cost recovery deductions for Iowa and any other applicable state income tax purposes: and (b) all items of income and deduction relating to this Lease.

17. **NOTICES.** All notices required hereunder shall be in writing and shall be deemed to have been given when delivered personally; when mailed with proper postage, for first class mail prepaid, addressed to Lessor or Lessee, as the case may be, at their respective addresses as set forth herein or at such other address as either of them shall from time to time designate in writing to the other, or in the case of Lessor's assigns, at the addresses designated by them in writing; when deposited with an overnight delivery company with the express charges prepaid and properly addressed to the other party at the foregoing addresses; or when faxed to the other party at the fax number shown at the beginning of this Lease. Lessor (and its assigns) and Lessee shall be under a continuing duty to provide a correct address and telephone number to the other party, and Lessor (and its assigns) and Lessee (if the

latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone-number, or fax-number change shall be given in writing.

18. **LATE CHARGES.** If Lessee fails to pay any Overall Lease Payment when the same becomes due, Lessee shall pay interest on such delinquent payment from the due date until paid (without regard to any grace period) at the lower of one and one-half percent (1-1/2%) per month or the maximum rate of interest permitted by law.

19. **PURCHASE OF THE EQUIPMENT.** IF LESSEE IS NOT IN DEFAULT, LESSEE MAY PURCHASE THE EQUIPMENT AT THE EXPIRATION OF THE LEASE TERM FOR THE STIPULATED LOSS VALUE AT THE TIME, AS SHOWN ON SCHEDULE A, WHICH VALUE INCLUDES ADMINISTRATIVE-COST REIMBURSEMENTS AND MARKUPS BENEFITING LESSOR. IN ADDITION, LESSEE MAY REQUEST TERMINATION OF THIS LEASE IN ORDER TO PURCHASE THE EQUIPMENT AT ANY TIME DURING THE LEASE. IF LESSOR, IN ITS SOLE DISCRETION, SHOULD GRANT SUCH REQUEST, SUCH TERMINATION SHALL BECOME EFFECTIVE, AND LESSEE SHALL RECEIVE TITLE TO THE EQUIPMENT, ONLY ON PAYMENT OF THE STIPULATED LOSS VALUE AT THE TIME AS SHOWN ON SCHEDULE A, WHICH VALUE INCLUDES ADMINISTRATIVE-COST REIMBURSEMENTS AND MARKUPS BENEFITING LESSOR, PLUS ALL ACCRUED AND UNPAID OVERALL LEASE PAYMENTS OWING FOR THE EQUIPMENT FOR ALL PERIODS COMMENCING PRIOR TO SUCH TERMINATION.

20. **RETURN OF EQUIPMENT.** Lessee shall return the Equipment to Lessor, at Lessee's expense, at the expiration or termination of this Lease, to 3930 16th Avenue, SW, Cedar Rapids, Iowa, in the same Good Operating Condition as when leased, excepting only reasonable wear and tear from normal use, together with any assigned Carrier trailer as directed by Carrier's dispatch and all license plates, registration certificates, or other documents, owned or in the name of Lessor or Carrier, relating to the Equipment. Upon request of Lessee, Lessor may in its sole discretion allow Lessee to retain some or all of such license plates or other documents. Unless otherwise agreed by Lessor, Lessee shall give Lessor at least sixty (60), and not more than ninety (90), days' notice of the return of the Equipment.

21. **MISCELLANEOUS.** This Lease (including all Schedules and addendums executed by Lessee and Lessor) constitutes the entire agreement between Lessor and Lessee with respect to the leasing of the Equipment, and fully replaces and supersedes all prior agreements and undertakings (including attachments), oral and written, express or implied, or practices between the parties, relating to the same subject matter. The headings used in this Lease have no substantive effect and are used for convenience. References in this Lease to "he/she," "him/her," and "his/hers" shall be read as "it" and "its," respectively, if Lessee is a corporation, limited liability company, partnership, or other entity, rather than a natural person. No provision of this Lease may be changed, waived, amended, discharged or terminated except by a written instrument signed by both parties, except as provided in Section 3 of Schedule D and except that Lessor may insert the serial number of the Equipment on any Schedule. No express or implied waiver by Lessor of an Event of Default hereunder, or of any other matter, shall in any way be construed to be, a waiver of any future or subsequent Event of Default or other matter whether similar in kind or otherwise. If any provision (including any sentence or part of a sentence) of this Lease is declared invalid for any reason, such provision shall be deemed ineffective without invalidating the other provisions hereof. If Lessee fails to perform any of his/her obligations under the Lease, Lessor may, but shall not be obligated to, perform the same without thereby waiving such default, and any amount paid or expense or liability incurred by Lessor in such performance shall be paid or reimbursed by Lessee upon Lessor's demand. Time is of the essence of this Lease and all of its provisions. Original, faxed, or otherwise imaged signatures shall be equally valid.

22. **SECURITY DEPOSIT ESCROW FUND.** For the duration of this Lease, Lessee authorizes Lessor, and Lessor agrees, to establish and administer a required Security Deposit escrow fund ("Security Deposit") in accordance with Schedule C.

23. **GOVERNING LAW.** This Lease shall in all respects be governed by and construed in accordance with the laws of the United States and, except as otherwise provided herein, the State of Iowa, without regard to the choice-of-law rules of Iowa or any other jurisdiction. THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE

ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING LINN COUNTY, IOWA. LESSOR AND LESSEE HEREBY CONSENT TO THE JURISDICTION OF SUCH COURTS.

**Lessee and Lessor hereby execute this Equipment Lease on , at 12: 01 a.m.**

**LESSEE'S OBLIGATIONS REGARDING MAINTENANCE OF THE EQUIPMENT INCREASE DURING THE SECOND OF THIS LEASE'S TWO PERIODS (SEE SECTION 6(b)).**

**BY SIGNING BELOW, LESSEE ACKNOWLEDGES THAT VEHICLES SUITABLE FOR HIS/HER PROVISION OF SERVICES UNDER INDEPENDENT CONTRACTOR OPERATING AGREEMENTS WITH CRST MALONE, INC., CRST EXPEDITED, INC., AND OTHER MOTOR CARRIERS ARE AVAILABLE FOR PURCHASE OR LEASE FROM NUMEROUS COMPANIES OTHER THAN LESSOR CRST LINCOLN SALES, INC.; THAT LESSEE IS FREE TO LEASE A VEHICLE OBTAINED FROM ANOTHER SOURCE TO SUCH CARRIERS; AND THAT LESSEE IS NOT REQUIRED TO SIGN THIS EQUIPMENT LEASE AS A CONDITION OF ENTERING INTO AN INDEPENDENT CONTRACTOR OPERATING AGREEMENT WITH ANY SUCH CARRIERS.**

**LESSEE**

By **X** Anthony [signature] Title Owner Date 01-03-18

Printed Name

**LESSOR**
By Jan M Wiltgen Title CRST Lincoln Sales Date 4/4/18

Printed Name Jan M. Wiltgen

**PERSONAL GUARANTY:** **In consideration of Lessor's entering into the above Lease with Lessee and other good and valuable consideration, which is acknowledged to have been received, the undersigned jointly and severally unconditionally guarantee the due, regular, and punctual payment of all Overall Lease Payments due and the prompt performance of all of Lessee's obligations and duties under the above Lease. Lessor shall not be required to exhaust its remedies against Lessee or the Equipment as a condition of recovery under this guaranty. The undersigned waive any right to notice or of consent or exoneration by virtue of or with respect to acceptance of this guaranty, or default, failure to perfect a security interest, amendment, release, settlement, extension, or compromise of the Lease, the Equipment, or Lessee. The obligations under this guaranty shall survive any initiation by or against Lessee of insolvency or bankruptcy proceedings. This guaranty is effective as of the earlier of the Start Date of the above Lease or the date of signature hereof by the undersigned.**

Guarantor's Signature ____________ Guarantor's Signature ____________

Printed Name ____________ Printed Name ____________

Street Address ____________ Street Address ____________

City, State, Zip Code ____________ City, State, Zip Code ____________

Date ____________ Date ____________

## CERTIFICATE OF ACCEPTANCE OF LEASED EQUIPMENT

Lessee certifies that the Equipment identified in the table on page 1 of this Lease has been received by Lessee; that all necessary installation has been completed; that Lessee has inspected the Equipment before signing the Lease and found the Equipment to be in Good Operating Condition; that, in all respects, the Equipment is satisfactory to Lessee; and that the Equipment is accepted "as is" by Lessee for all purposes under the Lease. The Equipment is correctly described in this Lease, and Lessor is authorized to insert serial numbers on the Lease.

**LESSEE**

By **X** ______________________ Title Owner Date Accepted 01-05-18

Printed Name ______________________

Location Where Delivery of Equipment Was Made: ______________________, __________.
City State

**CRST Lincoln Sales, Inc.**
3930 16th Avenue, SW
Cedar Rapids, IA 52406-0068
Phone: 800-726-2778
Fax: 319-390-2785

# AUTHORIZATION AND ASSIGNMENT

Lease #__________________________

To: CRST Expedited, Inc. ("Carrier")

1. The undersigned Lessee hereby authorizes and directs Carrier to pay CRST Lincoln Sales, Inc., 3930 16th Avenue, SW, Cedar Rapids, Iowa 52406-0068 ("Lincoln"), the Rent (including making the Initial Computation and Quarterly Reconciliation of Additional Rent under Section 2(b)(1) and (2)), any Security Deposit escrow fund contributions, and all other items owed to Lessor under the Equipment Lease entered into by Lessee and Lincoln on __ ("Lease") as specified in the table on page 1, in Section 2, and in Schedules B, C, and D of the Lease (together "Overall Lease Payment") in varying amounts communicated by Lessor to Carrier each week, and to deduct these amounts from Lessee's next weekly settlement and/or escrow fund under Lessee's Independent Contractor Operating Agreement ("ICOA") with Carrier. The weekly deductions shall begin on the First Overall Lease Payment Date shown on the page 1 of the Lease and weekly thereafter for ______ (__) consecutive weeks or until the balance due has been paid to Lincoln.

2. If Lessee's ICOA with Carrier expires or is terminated for any reason, Carrier is hereby authorized and directed to use all final settlement compensation, escrow fund moneys, or other amounts due Lessee under the ICOA, after deducting amounts due Carrier, to pay Lincoln any Overall Lease Payment amounts still owed by Lessee to Lincoln, except as provided in Section 13(f) of the Lease, and only thereafter to pay the balance to Lessee.

3. At such time as Lessee's ICOA with Carrier expires or is terminated, Carrier is authorized and directed to immediately notify Lincoln of the expiration or termination.

4. Carrier is authorized and directed to supply Lincoln, upon request, a copy of Lessee's ICOA.

**LESSEE**

By **X** [signature] Title ____________________ Date 01-03-18

Printed Name __________________________

## SCHEDULE B

## INSURANCE

1. **LESSEE'S INSURANCE OBLIGATIONS**. Lessee shall maintain, at Lessee's sole expense, the following minimum insurance coverages during this Lease:

   a. **Non-Trucking (Bobtail) Liability Insurance**. Lessee shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to Lessee whenever the Equipment is not being operated on behalf of Lessor in a combined single limit of not less than five hundred thousand dollars ($500,000), with a deductible no greater than one thousand dollars ($1,000), for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be primary to any other insurance that may be available from Lessor. Lessee shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

   b. **Physical Damage Insurance**. Lessee shall procure, carry, and maintain physical damage insurance that will provide coverage to Lessee at all times in a combined single limit of one hundred thousand dollars ($100,000), or the Stipulated Loss Value of the Equipment as shown in Schedule A for the next date after the occurrence, whichever is less, for physical loss or damage to the Equipment (including theft and collision for Equipment consisting of motor vehicles) in any one occurrence. Such coverage shall be primary to any other insurance that may be available from Lessor. Lessee shall be responsible for all deductible amounts (which shall not exceed one thousand dollars ($1,000) per occurrence) and for any loss or damage in excess of the policy limit.

   c. **Other Insurance**. In addition to the insurance coverages required under Sections 2(a)-(c) above), it is solely Lessee's responsibility to procure, carry, and maintain any other insurance coverage that Lessee may desire for the Equipment or for Lessee's health care or other needs. As provided in Section 10 of this Lease, Lessee holds Lessor harmless with respect to loss of or damage to Lessee's Equipment, trailer, or other property, and Lessor has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to Lessee's Equipment, trailer, or other property. Lessee acknowledges that Lessor may, and Lessee hereby authorizes Lessor to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from Lessor's insurance policies to the extent allowed under the laws of Iowa (the state in which Lessor's insurance policies are delivered), and Lessee shall cooperate in the completion of all necessary documentation for such waiver, election, rejection, or reduction.

2. **REQUIREMENTS APPLICABLE TO ALL OF LESSEE'S INSURANCE COVERAGES**. Lessee shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of Lessor), and Lessee shall not operate the Equipment under this Lease unless and until Lessor has determined that the policies are acceptable (Lessor's approval shall not be unreasonably withheld). Lessee shall furnish to Lessor written certificates (and policies if requested by Lessor) obtained from Lessee's insurance carrier or carriers showing that all coverages required by this Lease have been procured from insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of Lessor), that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, the expiration date, list Lessor and Lessor's assigns as additional insured's with primary coverage, and show that written notice of cancellation or modification of the policy shall be given to Lessor and Lessor's assigns at least thirty (30) days prior to such cancellation or modification.

3. **LESSEE'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED**. In addition to Lessee's indemnity obligations to Lessor under Section 8 of this Lease, Lessee agrees to defend, indemnify, and hold Lessor harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that Lessor may incur arising out of or in connection with Lessee's failure to maintain the insurance coverages required by this Lease. In addition, Lessee, on behalf of Lessee's insurer, expressly waives all subrogation rights against Lessor, and, in the

event of a subrogation action brought by Lessee's insurer, Lessee agrees to defend, indemnify, and hold Lessor harmless from such claim.

**This SCHEDULE B, which completely replaces and supersedes any earlier schedule, addendum, or other provisions of this Lease relating to the same subjects, is agreed to by the undersigned parties as of the latest date set forth below:**

**LESSEE**

By: **X** Anthony [signature]
Signature

Anthony Cervantes
Printed Name and Title

01-03-18
Date

**LESSOR: CRST Lincoln Sales, Inc.**

By: Jan M Wiltgen [signature]
Signature

Jan M. Wiltgen
Printed Name and Title

4/4/18
Date

## SCHEDULE C

### SECURITY DEPOSIT ESCROW FUND

As authorized by Section 22 of this Lease, Lessor shall establish and administer a Security Deposit escrow fund ("Security Deposit"), which Lessee and Lessor agree shall be governed by the following provisions:

1. **Principal**. As principal to be held in the Security Deposit, Lessee agrees to authorize and direct Carrier to deduct from Lessee's settlement compensation and remit to Lessor for deposit in Lessee's Security Deposit: __NONE_______________ dollars ($____0____) per week beginning _____________ ___, 201_, until the balance in the Security Deposit reaches __________________________ dollars ($___0_____) and to resume such deductions whenever the Security Deposit balance drops below that amount.

2. **Specific Items to Which Security Deposit May Be Applied**. The Security Deposit shall be held by Lessor to guarantee the performance of Lessee's obligations under this Lease. The specific items to which the Security Deposit shall apply are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by Lessor that are Lessee's responsibility under this Lease -- specifically, the charge-back and deduction items set forth in Schedules B, C, and D and any other schedules or addendums to the Lease, and, upon termination, all of Lessee's obligations under Section 13(f) of this Lease (all hereafter referred to as "Security Deposit Deduction Items") -- to the extent that the amounts owed by Lessee for such Security Deposit Deduction Items exceed the portion of Lessee's earned and payable compensation (and/or ICOA escrow fund moneys) that Carrier remits to Lessor, or that Lessee otherwise pays Lessor, when Overall Lease Payments (as set forth in Section 2(c) of this Lease) come due or upon termination of this Lease.

3. **Accountings**. While the Security Deposit is under Lessor's control, Lessor shall provide an accounting to Lessee, no less frequently than monthly, of all transactions involving the Security Deposit, including the amount and description of any deduction from or addition to it. In addition, upon Lessee's request at any time, Lessor shall provide Lessee with an accounting of any Security Deposit transaction.

4. **Interest**. Lessor shall pay Lessee interest on the Security Deposit on at least a quarterly basis. The amount of interest shall be established on the date the interest period begins and shall be equal to at least the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of the Treasury. For purposes of calculating the balance on which interest is paid, Lessor may deduct a sum equal to the average advance (including charge-backs and other deductions) that Lessor made to Lessee during the period of time for which interest is paid.

5. **Final Settlement**. To have any remaining balance in the Security Deposit returned following termination of this Lease, Lessee must first comply with all of the specific obligations set forth in Section 13(f) of this Lease and make payments to Lessor for all Security Deposit Deduction Items. At the time of the return of any remaining balance in the Security Deposit, Lessee hereby authorizes Lessor to apply any and all moneys in the Security Deposit to all Security Deposit Deduction Items, to the extent provided in Section 13(f) of this Lease. Lessor shall provide a final accounting to Lessee of all such final deductions made from the Security Deposit within forty-five (45) days from the date of termination of this Lease.

6. **Return of Security Deposit Balances**. In no event shall the Security Deposit, less any final deductions pursuant to the above provision, be returned to Lessee later than forty-five (45) days from the date of termination of this Lease. Lessor's use or post-termination return to Lessee of any balance in the Security Deposit shall not constitute a waiver of Lessor's right to recover, through all available legal means, any additional amounts Lessee owes, or comes to owe, Lessor under this Lease.

**This SCHEDULE C, which completely replaces and supersedes any earlier schedule, addendum, or other provisions of this Lease relating to the same subjects, is agreed to by the undersigned parties as of the latest date set forth below:**

**LESSEE**

By: **X** [signature]
Signature

Anthony Cervantes
Printed Name and Title

01-03-18
Date

**LESSOR: CRST Lincoln Sales, Inc.**

By: [signature]
Signature

Jan M. Wiltgen
Printed Name and Title

4/4/18
Date

## SCHEDULE D

### CHARGE-BACKS AND OTHER DEDUCTIONS

1. **List of Charge-Backs and Other Deductions**. Lessee agrees to authorize and direct Carrier to charge back or deduct the following items from Lessee's settlement compensation or, if Lessee's compensation at the next settlement is insufficient to cover the items, to deduct them from Lessee's escrow fund under the ICOA, and in both situations to remit the amounts electronically to Lessor weekly. Where no dollar figure is listed in the table below, the deductions will vary in amount and will be computed as indicated in the column headed "Amount, or Method of Computation, of Deduction." Except as otherwise indicated in that column, (a) Lessor shall charge Lessee no administrative ("admin.") fee or markup and (b) Lessor shall credit Lessee with all rebates, discounts, credits, or refunds that correspond to particular charge-backs or deductions and that Lessor receives while this Lease is in effect or, in the case of taxes and fees, even after this Lease is terminated.

| CHARGE-BACK OR DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION OF DEDUCTION |
|---|---|
| **Changes, alterations, improvements** in the Equipment required by law, approved by Lessor, or removed at Lessee's expense because not approved by Lessor | Amount Lessor paid or otherwise incurred |
| **Claims, losses, damages, or expenses** (including reasonable attorneys' fees) under Lease §§ 6(b)(3)(C), 8, and 10 | Amount Lessor paid or otherwise incurred, as further specified in Lease §§ 6(b)(3)(C), 8, and 10 |
| **Equipment Purchase** | *See* Lease § 19 and Schedule A |
| **Equipment Rent** | *See* table on page 1 of Lease. Rent payments include administrative-cost reimbursements and markups benefiting Lessor |
| **Federal Heavy Highway Vehicle Use Tax** | $10.58 per week (the $550 annual tax divided by 52 weeks) |
| **Late Charges** on amount of Equipment Rent and other charges due under Lease § 18 | 1.5% per month (18% annually) or maximum lawful rate if less |
| **Licenses, permits, taxes, other operating expenses**, related levies, fines, penalties, liens, and encumbrances pursuant to Lease § 2(c) | Amount Lessor paid or otherwise incurred |
| **Maintenance, repairs, parts, and towing charges** not covered by Lessor under Lease § 6(b) | Amount Lessor paid outside vendor or, if Lessee elected to obtain products or services from Lessor-designated third-party maintenance provider, the amount Lessor paid such provider, plus markups resulting in prices or rates (which shall be provided to Lessee upon request at the time Lessee purchases or places an order for items) competitive with other vendors in the relevant market(s). The third-party provider's labor rates include an admin. fee to Lessor's affiliated motor carrier of approximately $5 per hour. |
| **Modifications to Equipment** – Expenses relating to such modifications to the extent Lease § 6(c) makes Lessee responsible for the expenses | Amount Lessor paid or otherwise incurred |
| **Security Deposit** escrow fund contributions | *See* Schedule C |
| **Termination-related expenses and losses** under Lease § 13, including Equipment Rent and other amounts due under this Lease; expenses and losses in returning the Equipment to its condition when leased, in replacing any missing equipment or accessories, in selling or leasing the Equipment to a third party, in returning the Equipment to Lessor's facility, and in securing possession of the Equipment | Amount Lessor paid or otherwise incurred. With respect to any necessary refurbishment of the Equipment: if done at a facility owned or operated by Lessor or one of its affiliates, the amount Lessor or the affiliate incurred, plus markups resulting in prices or rates (which will be posted or otherwise provided to Lessee upon request at the time Lessee places an order) competitive with third-party vendors in the relevant market(s) |

2. **Information Regarding Deductions**. Lessor shall provide Lessee with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all charge-backs and deductions, Lessor shall make available to Lessee, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

3. **Changes in Existing Deduction Items.** If an item in any of the above columns will be changing, Lessee will be so notified by personal delivery, satellite communication, fax, or other written notice. In any event, Lessee shall not be subject to any such change until thirty (30) days after such notice or such later time as is set forth in the notice. **Lessee's failure, by the end of 30 days after such notice, to notify Lessor of any objection to the change shall constitute Lessee's express consent and authorization to the carrier with whom Lessee has entered into an ICOA to implement the change and modify accordingly the deductions from Lessee's settlement compensation, beginning immediately after the 30-day period.** If Lessee fails to notify Lessor of Lessee's objection within the 30-day period -- or if Lessee notifies Lessor of Lessee's objection within the 30-day period and Lessee and Lessor are then unable to resolve the matter to Lessee's and Lessor's mutual satisfaction -- Lessee and Lessor shall each have the right to terminate this Lease immediately thereafter. Section 13 of this Lease ("Remedies of Lessor") shall then apply in all respects except that Lessee shall owe no Overall Lease Payments for periods beginning after the date of termination.

**THIS SCHEDULE D, which completely replaces and supersedes any earlier schedule, addendum, or other provisions of this Lease relating to the same subjects, is agreed to by the undersigned parties as of the latest date set forth below.**

**LESSEE**

By: **X** [signature]
Signature

Printed Name and Title

01-03-18
Date

**LESSOR: CRST Lincoln Sales, Inc.**

By: [signature]
Signature

Jan M. Wiltgen
Printed Name and Title

4/4/18
Date

## SCHEDULE E

## PREVENTIVE MAINTENANCE SCHEDULE

| PERFORM EVERY 40,000 MILES: | | |
|---|---|---|
| ☐ Lubricate & inspect chassis | ☐ Change oil & filters | ☐ Inspect fan hub |
| ☐ Check all lube levels | ☐ Change fuel filters | ☐ Check king pins & tie rods |
| ☐ Inspect & inflate tires | ☐ Check air filter indicator | ☐ Check front wheel bearings |
| ☐ Check batteries | ☐ Inspect belts tension & condition | ☐ Check drivers equipment |
| ☐ Check safety equipment | ☐ Inspect air lines for rubbing & trailer lines | ☐ Check gear oil |
| ☐ Drain air tanks | ☐ Inspect tires & check for loose wheels | |
| ☐ Check lights | ☐ Inspect for air leaks (pressure loss) | |
| ☐ Test anti-freeze to -40° | ☐ Check clutch free travel | |
| ☐ Check oil in front wheels | ☐ Check suspension | |
| ☐ Adjust steering axle & drive axle, brakes & check lining thickness | ☐ Check & record Nalcol level ppm | |
| ☐ Check annual inspection | ☐ Change water filter | |
| **IN ADDITION -** | **Perform once each year:** ☐ Change power steering filter & fluid | |
| | **Perform every 360,000 Miles:** ☐ Change air dryer cartridge | |

**This SCHEDULE E, which completely replaces and supersedes any earlier schedule, addendum, or other provisions of the Lease relating to the same subjects, is agreed to by the undersigned parties as of the latest date set forth below.**

**LESSEE**

By: **X** Anthony Dewitt
Signature

______________________
Printed Name and Title

01-03-18
Date

**LESSOR: CRST Lincoln Sales, Inc.**

By: Jan M Wiltgen
Signature

Jan M. Wiltgen
Printed Name and Title

4/4/18
Date

Page 18 – Summary

Duration of Agreement and Termination

Acceptance of this agreement begins when you get to the truck and take possession. If not satisfied with the truck in any way, contact your fleet manager. An inspection sheet will be given to you in your folder to walk around the truck with. You do not need to turn it in to anyone, but it is for your records so that you proof of existing condition. You can drive the truck for your inspection but do not go excessive miles with it.

Termination of the agreement can be at any time for any reason upon 20 days written notice. It is beneficial for you to work during that 20 days because your weekly deductions will still occur. The truck must be turned in at a CRST terminal, not one of our drop yards.

Skip to Page 21 – First page to start signing of documents

REDACTED

**From:** Traelei Annett-Jaeger <tjaeger@crst.com>
**Date:** October 26, 2020 at 10:58:53 AM EDT
**To:** Benjamin Lizer <blizer@crst.com>, Larry REDACTED
**Subject: RE: Checking In**

I sent a message over to collections. They had already pulled back one account. He just found the duplicate account and has stopped that as well.

---

**From:** Benjamin Lizer <blizer@CRST.com>
**Sent:** Monday, October 26, 2020 08:42
**To:** Larry REDACTED
**Cc:** Traelei Annett-Jaeger <tjaeger@CRST.com>
**Subject:** RE: Checking In

Chat with Traelei on this and she can get it figured out for you. I have copied her in on this email

DELIVERING PROMISES AND DRIVING SUCCESS

CRST

THE TRANSPORTATION SOLUTION

Ben Lizer
Director – Operations, Independent Contractors
CRST Expedited
Office Direct: (319) 731-6332
blizer@crst.com

CRST Values Safety; Make Safety Part of Everything You Do!

*This email (including any attachments) is covered by the Electronic Communications Privacy Act, 18USC,2520-2521. It is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error and then delete it. Thank you.*

---

**From:** Larry REDACTED
**Sent:** Monday, October 26, 2020 8:40 AM
**To:** Benjamin Lizer <blizer@CRST.com>
**Subject:** Re: Checking In

EXTERNAL EMAIL - This email is from REDACTED who is outside of the organization.
There’s 2 things on collections both with different amounts

Sent from my iPhone

> On Oct 26, 2020, at 5:44 AM, Benjamin Lizer <blizer@crst.com> wrote:
>
> That looks to be your deficit you left with us when you were here last time – we set it up on a payment plan
>
> <image001.png>
>
> Ben Lizer
> Director – Operations, Independent Contractors
> CRST Expedited
> Office Direct: (319) 731-6332
> blizer@crst.com
>
> CRST Values Safety; Make Safety Part of Everything You Do!
>
> *This email (including any attachments) is covered by the Electronic Communications Privacy Act, 18USC,2520-2521. It is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error and then delete it. Thank you.*
>
> ---
>
> **From:** Larry REDACTED
> **Sent:** Saturday, October 24, 2020 12:10 PM
> **To:** Benjamin Lizer <blizer@CRST.com>
> **Subject:** Re: Checking In

EXTERNAL EMAIL - This email is from REDACTED [redacted] who is outside of the organization.
<image002.png>
Sent from my iPhone

On Oct 24, 2020, at 7:13 AM, Benjamin Lizer <blizer@crst.com> wrote:

It should not be if we moved it to a collections company. Call the company, let them know you are making payments directly with CRST. Let me know what they say,

<image001.png>

Ben Lizer
Director – Operations, Independent Contractors
CRST Expedited
Office Direct: (319) 731-6332
blizer@crst.com

CRST Values Safety; Make Safety Part of Everything You Do!

*This email (including any attachments) is covered by the Electronic Communications Privacy Act, 18USC,2520-2521. It is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error and then delete it. Thank you.*

---

**From:** Larry REDACTED [redacted]
**Sent:** Saturday, October 24, 2020 5:02 AM
**To:** Benjamin Lizer <blizer@CRST.com>
**Subject:** Re: Checking In

EXTERNAL EMAIL - This email is from REDACTED [redacted] who is outside of the organization.
Yes I have a question!
If I'm paying back my debt from my paychecks why is it still in collections on my credit?
How does that work?

Sent from my iPhone

On Oct 22, 2020, at 8:38 AM, Benjamin Lizer <blizer@crst.com> wrote:

Hey Larry,

Just checking in to see how everything is going so far in your first two weeks, make sure we are meeting your expectations as a business partner. Give me a call or shoot me an email when you have a minute please – I saw you were on sleeper so I didn't want to wake you.

<image001.png>

Ben Lizer
Director – Operations, Independent Contractors
CRST Expedited
Office Direct: (319) 731-6332
blizer@crst.com

CRST Values Safety; Make Safety Part of Everything You Do!

*This email (including any attachments) is covered by the Electronic Communications Privacy Act, 18USC,2520-2521. It is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error and then delete it. Thank you.*

# SECTION I: EMPLOYMENT POLICIES AND PRACTICES

## INTRODUCTION

It is the hope that your employment with our Company is very rewarding and satisfying for both you and CRST International, Inc., including its subsidiary companies (the Company). The Company offers exceptional employment opportunities and one of the best compensation and benefit packages in the industry. It is important that each employee understands the terms and conditions of his/her employment status with the Company. All employment at the Company is "at-will." This means that both employees and the Company have the right to terminate employment at any time, with or without advance notice, and with or without cause. No one other than an officer of the Company has the authority to alter this arrangement, to enter into an agreement for employment for a specified period of time, or to make any agreement contrary to this at-will status. Any such agreement must be in writing, must be signed by an officer of the Company, and must express a clear and unambiguous intent to alter the at-will nature of the employment relationship. This Driver Employee Handbook does not constitute a contract of employment.

The Company maintains a drug-free environment. An applicant receiving a conditional offer of employment must undergo a general pre-employment substance abuse (drug) test. A conditional employee must satisfactorily pass the pre-employment test before he/she is eligible to begin employment. The policies and benefits described in this handbook are subject to change at management discretion. Any suggestions you may have are welcome.

## DISCLAIMER

The Company expects your cooperation in making these policies work. The Company's intent in preparing, implementing and distributing these policies is to help ensure compliance with federal, state and local laws. These policies are not intended to impose any contractual obligation on the Company or any of its employees or their representatives. It is the responsibility of the employee to become familiar with these rules. Any employee who violates these policies shall be subject to disciplinary action, up to and including termination. The Company reserves the right to interpret and administer the provisions of this Handbook as needed. Except for the policy of at-will employment, which can only be changed in writing by an officer of the Company, the Company has the maximum discretion permitted by law to change, modify or delete any provision in this Handbook at any time. This Handbook supersedes any prior versions published or distributed by the Company all inconsistent oral or written statements. In addition to the policies outlined in the Driver Employee Handbook, CRST also complies with applicable State and Federal Laws.

## CONCEALED WEAPONS

Employees may not, at any time while on any Company owned property, including anywhere that Company business is conducted (customer locations, client locations, trade shows, restaurants, Company event venues, and so forth) possess or use any weapon. Weapons include, but are not limited to, guns, knives or swords with blades over four inches in length, explosives, brass knuckles and any chemical whose purpose is to cause harm to another person. Regardless of whether an employee possesses a concealed weapons permit or is allowed by law to possess a weapon, weapons are prohibited on any Company property or in any location in which the employee represents the Company for business purposes, including those listed above.

Any employee discovered to be in possession of a weapon is subject to immediate termination. Personal protection devices such as pepper spray, knives with blades 3" or less, etc are permitted.

Copyright © 2016 CRST Expedited & CRST Dedicated Proprietary and Confidential

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| ANTHONY CERVANTES and MIKE CROSS, On Behalf of Themselves and All Others Similarly Situated, | ) | |
| Plaintiffs, | ) | |
| -vs- | ) | No. 1:20-cv-00075 |
| CRST INTERNATIONAL, INCORPORATED, and CRST EXPEDITED, INCORPORATED, | ) | |
| Defendants. | ) | |

Zoom videotaped deposition of MICHAEL DOSIER, taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 3214 West McGraw Street, Suite 300, in the City of Seattle, Washington, at 10:00 a.m. on the 4th day of November, 2022.



Veritext Legal Solutions
800-336-4000

# DIRECT EXAMINATION BY DEFENDANT

different every week.

Q And in your experience that's true, what the driving managers told you, that it was different every week?

A Well, yeah. But I mean -- That is true. But there's also an average that if you're out the whole week what to expect. And that would have been nice to know. But they were real -- And I understand them being reluctant on giving anybody a number because there is a variance. And it all depends on the driver.

Q So it all depends on the driver. Can you explain that to me?

A Well, a lazy driver that wants to stop every hour to stretch his legs and go get something to eat and -- and only drive 400 miles a day is not going to make the same amount as somebody like me who stays out there for three months at a time and runs my clock out almost every day and puts in 600, 650, sometimes 700 miles in a day. There's a big, huge difference in those two incomes.

Q And so the way a driver operates can

affect his ability to make a profit, is that right?

A Correct. Well, I guess both for a lease driver and a company driver, because I mean technically you're only getting paid if those wheels are moving. So the more miles you put on that truck, the more money you're going to make.

Q Let's talk -- Let's talk about being a lease purchase driver for a second.

How were you paid when you were a lease purchase driver?

A They would pay you in settlements. So you get paid 48 hours after -- after the load delivers. You would get 100 percent of the fuel surcharge. You would get -- what was it -- 70 percent of the -- of the line haul. And then they would -- they would take out all your expenses, your fuel, your maintenance costs, your insurances and all that out of it.

Q And did you ever ask to see invoices to CRST's customers?

A I did ask a couple times. Because a couple of the booking agents would actually

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
CAUSE NO. 1:20-cv-00075-CJW-KEM

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

-vs-

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

REMOTE VIDEO DEPOSITION OF ANTHONY CERVANTES

The deposition upon oral examination of ANTHONY CERVANTES, a witness produced and sworn before me, Amy Doman, Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Defendants, at the residence of the deponent in Wiggins, Colorado, scheduled to begin at 11:08 a.m., on Monday, April 19, 2021, pursuant to the Federal Rules of Civil Procedure.

# DIRECT EXAMINATION BY DEFENDANT

A What rights did I have?
Q Right.
A I had the right to refuse it. But then that didn't guarantee me another load.
Q Right. It would be whatever the next load that was available that you could be assigned to, correct?
MS. KROLL: Object to form.
BY MR. HANSON:
Q Let me reask the question.
If you didn't take the load that was offered, then you would have to wait for when there was the next available load, correct?
MS. KROLL: Object to form.
A Available load that was profitable or at least appeared to be profitable.
BY MR. HANSON:
Q Right. In these loads that you hauled, it's better to keep the truck moving delivering loads, correct?
A Yes.
Q I mean, ultimately, that's what you want to do is go from one load to the next because that increases the amount that you earn on each settlement week, correct?
A Yes.
Q Is that what you tried to do is to keep the truck

moving, delivering loads?
A Yes.
Q And that would increase your compensation as a contractor for CRST?
A Yes.
Q And that would be true with any company that you worked as a lease purchase contractor, right?
A Yes.
Q It says that CRST said that they want you to be available at least two weeks at a time.
What does that mean to you or what was your understanding of that?
A Just to be available to work.
Q Did you ever take home time while working for CRST?
A Yes.
Q What would you do on your home time?
A Are you asking what I do to get home, or how did I get home, or what did I do when I got home?
Q What did you do when you got home?
A I spent time with my kids and my grandchildren.
Q What did you do with the truck when you went on home time?
A Left it at a facility.
Q Left it at a facility?
A CRST facility.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
* * *

ANTHONY CERVANTES and
MIKE CROSS, on behalf of
themselves and all others
similarly situated,
Plaintiffs, VOLUME I
vs. CASE NO. 1:20-cv-00075-CJW-KEM
CRST INTERNATIONAL, INC.
and CRST EXPEDITED, INC.,
Defendants.

* * *

Remote deposition via Zoom of LINDA GRAVELLE, a Plaintiff herein, called by the Defendants for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Vicky L. Marcon, a Notary Public within and for the State of Ohio, at the home of Linda Gravelle, 269 Water Street, Wadsworth, Ohio, on Tuesday, June 22, 2021, at 11:00 a.m. EST.

* * *

# DIRECT EXAMINATION BY DEFENDANT

Q. That's -- okay. So, you felt free to say no to a load that was offered to CRST. Is that right?
A. Most of the time.
Q. Most of the time. And when you say so, what does that mean? First of all, let me ask another question. Let me retract that question. Is there anybody else in the room with you?
A. No.
Q. Okay. You say most of the time you felt like you could refuse a load. Why the most? I mean, couldn't you, as an owner-operator, refuse any load you wanted to refuse?
A. Not really.
Q. Why?
A. Because on Friday afternoon, if you turn down a load, and they don't give you anything else, you're going to be sitting all weekend, and the payment is still due on Tuesday, regardless.
Q. Okay. Understood. I'm going to -- I'm going to publish an exhibit. So, have a look and let me know, and if you can't -- or

A. Yes.
Q. Okay. And then you left CRST? No?
A. Yeah.
Q. And why did you leave?
A. I'm not working just to make truck payments --
Q. Okay.
A. -- and to go into debt again.
Q. But once you meant -- I'm sorry. Once you left Meadowlark, weren't you an employee driver at CRST?
A. No.
Q. You weren't?
A. No.
Q. Okay. And the lease purchase program was attractive to you because it looked like an opportunity to make money, and your friend said, hey, that's a -- this is a good option. Right?
A. Yes.
Q. Okay. Did you find that to be the case?
A. Not always.
Q. How often?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

* * *

ANTHONY CERVANTES and
MIKE CROSS, on behalf of
themselves and all others
similarly situated,
Plaintiffs, VOLUME II

vs. CASE NO. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC.
and CRST EXPEDITED, INC.,
Defendants.

* * *

Continuation of remote deposition via Zoom of LINDA GRAVELLE, a Plaintiff herein, called by the Defendants for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Vicky L. Marcon, a Notary Public within and for the State of Ohio, at the home of Linda Gravelle, 269 Water Street, Wadsworth, Ohio, on Tuesday, June 29, 2021, at 11:00 a.m. EST.

* * *

# DIRECT EXAMINATION BY DEFENDANT

read? I don't go there. Then they would try to send me to Vermont. They would waste my entire day sending me loads they knew I wouldn't accept. And so, by the end of the day, at 3:30, 4:00, you weren't going to get a load at all that day going anywhere you went.

Other things like that, as -- they would say, we don't have any freight going anywhere else in the country but there, from one of the biggest hubs in the country. And I could look at a load board and see there were a lot of other loads going out, but it wasn't a CRST load board. And because I elected not to go there, I wasn't allowed to book a load going anywhere else through them.

Q. Did it ever happen that if you turned down a load there wasn't another load offered to you?

A. Yes.

Q. And what did that mean for you and your work?

A. I had no control over my pay at that time, and if they don't offer you a load and you tell them you want to look at the load board and find a load, they could reject any

load that you sent in that you wanted to do. Because, when you find a load, they make it their load, and then they assign it to your truck.

Q. Did you ever accept a load that was -- did not pay well or was less than ideal because you were afraid that there wouldn't be something else offered after that?

A. On a Friday afternoon, you bet, because I couldn't afford to sit all weekend.

MS. RAFFERTY: All right. I don't have any further questions. Thank you.

THE WITNESS: Thank you.

MR. SPOLYAR: I have nothing else. So, we can go off the record, unless you want to take the transcript orders on the record. That's fine, too.

THE VIDEOGRAPHER: Vicky, do you need transcripts on the record?

THE COURT REPORTER: No. We can go off.

THE VIDEOGRAPHER: We're going off the record. The time is 11:37 a.m. This concludes today's testimony given by Linda Gravelle. Total number of media units used is

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES AND MIKE )
CROSS, ON BEHALF OF )
THEMSELVES AND ALL OTHERS )
SIMILARLY SITUATED, )
)
Plaintiffs, ) CASE NO.:
)
VS. ) 1:20-CV-00075-CJW-KEM
)
CRST INTERNATIONAL, INC. )
AND CRST EXPEDITED, INC., )
)
Defendants. )

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
JACOB ONOLAPO FAPOHUNDA
JANUARY 11, 2022
(REPORTED REMOTELY)
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JACOB ONOLAPO FAPOHUNDA, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on January 11, 2022, from 9:00 a.m. CST to 1:15 p.m. CST, before Lisa M. Durham, CSR in and for the State of Texas, reported by machine shorthand, at the location of the witness in the City of Fort Worth, County of Tarrant, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

# DIRECT EXAMINATION BY DEFENDANT

Did you ask questions of individuals in that class about any provisions of the ICOA?

A. No. Not that I can really think of, no.

Q. I thought you testified just a few minutes ago that you had questions related to -- for the -- making the -- let me finish -- just making the insurance payments and the lease payments and could you actually expect that, right? That's a question that you said you posed to somebody.

A. The header of the class.

Q. Okay. And what did that person tell you?

A. It all depends on how much driving we do.

Q. And did you ask anybody else questions about the ICOA?

A. No one else.

Q. What did you do with that information that this person gave you about it all depends on the level of driving that you do? What did you do with that information?

A. I took out of that that if you do not -- it's the same thing as if you were -- you know, sad to say this, but it's the same thing as if -- as if you were an employee driver. If you don't drive, you don't get paid, and on top of that, I mean, if you don't drive, you go into debt, so --

lease to owner-op, I wanted to know if this was actually something that would pay more than a company driver. And so they said, well, yeah, you're expected to make 2,000, you know, minimum a week, that is, if you run your truck.

And so I was like, okay, that's fine. I can run my truck. That's, you know, super easy to do. I can -- I can definitely get, you know, 3,000 miles a week, you know. If you -- if everything goes well, that's something I can -- I can pull off easily.

And -- but I didn't know that there would be times where I'd be doing, you know, 3,000 miles a week and then still end up with nothing, or there would be times that I'd be stuck in some shipper with some weird situation and then end up with nothing.

So, you know, regardless of how much I wanted to work and how much I did work, there were times where, you know, I could end up with, like, a hundred dollars or -- I remember one time I ended up negative. So that -- that was the -- that was the whole crux of it.

It was -- yeah, I wasn't really expecting a whole -- like, oh, yeah, you know, hey, everything is going to be great with you all of the time, but there were times where it was kind of that.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

--------------------------------------------x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all other similarly situated,

Plaintiffs,

v. Case No. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,

Defendants.

--------------------------------------------x

Remote deposition

March 1, 2022

12 p.m.

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION of ALISSA POWERS, before Michele Moskowitz, a shorthand reporter and Notary Public of the State of New York.

REF: 5085346

# DIRECT EXAMINATION BY DEFENDANT

and then anything was deducted from what I made for what I owed for fuel, the truck payment, insurances, for what I owed the company for that, and then I would get what's left essentially or in a couple -- in instances I owed on occasion.

Q. Okay. And you just previously testified that there were instances when you received a negative settlement from CRST?

MR. SMEDSTAD: Object to the form, mischaracterizes testimony. Go ahead and answer.

A. Yes.

Q. And were there ever instances where you received a negative settlement after having worked for that period of time the settlement was supposed to pay you for?

A. Yes.

Q. So despite having worked, you ended up owing CRST money?

MR. SMEDSTAD: Leading.

A. Yes.

Q. I have no further questions.

MR. SMEDSTAD: Okay. I just have a few.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

CIVIL ACTION FILE

vs.

1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

REMOTE VIDEO DEPOSITION OF
SHEDDRICK MILLER
September 30, 2022
11:07 a.m.

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

# CROSS EXAMINATION BY PLAINTIFFS

Q I just have a few follow-up questions.
Earlier, Mr. Miller, you indicated that when you rejoined CRST in 2018 that your goal was to be able to run your business while working at CRST, correct?
A Correct.
Q Were you able to achieve that goal while at CRST in 2018 and 2019?
A No.
Q While working at CRST at any of the times in 2015, 2016, and again in 2018 and 2019, did you ever receive a negative settlement from CRST?
A Yes.
Q What is a negative settlement?
A Where all your expenses add up over what you netted.
Q Do you remember any circumstances in particular when you received a negative settlement?
A I can't right offhand regard every particular day, no.
Q Were there ever any instances where you worked that week running a load for CRST but still received a negative settlement?
A Yes.
Q So on those weeks when you had worked and

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
Case No. 1:20-cv-00075-CJW-KEM
-------------------------------------X
ANTHONY CERVANTES and MIKE CROSS,
on behalf of themselves and all others
similarly situated,
Plaintiffs,
v.
CRST INTERNATIONAL, INC. And CRST
EXPEDITED, INC.,

Defendants.
- - - - - - - - - - - - - - - - - - - - -x

January 26, 2022
9:05 a.m. Central Time

DEPOSITION of TABITHA MEEKS, the Plaintiff in the above-entitled action, held at the above time and place, taken before Dawn Matera, a Certified Shorthand Reporter and Notary Public of the State of New York.

*     *     *

# DIRECT EXAMINATION BY DEFENDANT

Q. And why is that?
A. They wouldn't get you nothing else.
Q. Was that because --
A. And I was going to say, I only rejected two loads, I think, the whole time I was there. But everybody that I know, they said the same thing. If they turned down a load, they would have to sit for a couple of days before they got anything else.
Q. Do you believe that was just because of the available loads in the area where you were sitting?
A. No.
Q. What do you believe caused the delay?
A. In my opinion, I believe it was because they didn't want to look for another load. Because it would be good areas.
Q. And when you say they wouldn't want to look for a load, who are you referencing?
A. I don't know if it would be the

to about hiring on David?
A. No. I know he had put in the app, and they had told him no. And I had messaged somebody. I think it may have been Ben. And about, you know, was there anything he could do, because it had been seven years previously. And they said, no, there was nothing that they could do.
Q. When he put in his application, did he indicate that he wanted to be a driver under you?
A. I would assume he did.
Q. His CDL wasn't suspended or anything like that?
A. No.
Q. If you had been able to drive -- I am sorry, if you had been able to hire a driver to operate your truck instead of you, you could have driven for another motor carrier, right?
A. Yes.
Q. Did you ever ask about using your tractor to operate for another motor carrier, what's called trip leasing?
A. No, because I was always told

we couldn't do it.

Q. Who told you that?

A. I think somebody said it during the owner operator class that we had to do.

Q. Are you aware of anyone doing that, using their tractor that was leased to CRST but operating it at times for another motor carrier?

A. No.

Q. After orientation, you don't recall ever bringing that up with CRST?

A. No.

Q. Did you ever elect not to work and take time off?

A. Not other than going home.

Q. How often did you ask for home time?

A. In the beginning, probably I would go two or three months. And then I got to where, you know, it was about every month to month-and-a-half.

Q. How long were you at home for home time?

A. Well, I would generally go home

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and )
MIKE CROSS on behalf ) Case No. 1:20-cv-0075-CJW-KEM
of themselves and all )
others similarly )
situated, )
)
Plaintiffs, )
)
v. )
)
CRST INTERNATIONAL, )
INC., and CRST )
EXPEDITED, INC., )
)
Defendants. )
______________________)

The videoconference videotaped deposition of RODERICK FISHER, called by the Defendant for examination, pursuant to the Rules of Civil Procedure for United States District Courts pertaining to the taking of depositions, taken before A. Christine Hylton, a Notary Public, Registered Professional Reporter, at 10:06 a.m., January 17, 2022, taken remotely from Moline, Illinois.

# CROSS EXAMINATION BY PLAINTIFFS

stop driving the truck?

A. No, ma'am.

Q. Okay. Earlier you testified that you were free to turn down loads.

What happened if you turned down a load?

A. If you turned down a load, generally they will try to get you another load, but sometimes it could take a whole day, maybe two days before you get another load.

Or you may turn down a load that you deem is not profitable, and you get another load that's even less profitable. So in order for you to, you know, not make any money, sometimes we just choose to take the load anyway.

Q. Would you take unprofitable loads because you did not know whether you would get another load from CRST?

MR. ANDREWSCAVAGE: Objection, leading.

MS. KING: You can answer, Roderick.

THE WITNESS: Some -- sometimes, yes.

MS. KING: Okay. I have no further questions.

MR. ANDREWSCAVAGE: I just have a couple follow-ups based on that.

REDIRECT EXAMINATION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS,
on behalf of themselves and
all others similarly situated,
Plaintiffs,

vs. CASE NO. 1:20-CV-00075-CJW-KEM

CRST INTERNATIONAL, INC. and
CRST EXPEDITED, INC.,
Defendants.

- - -

Video Deposition of JAMES EDDEN,

Taken by Charles Andrewscavage,

Before Shannon E. Jordan,
Certified Court Reporter,
Via Veritext Videoconferencing,
On Friday, August 12, 2022,
Beginning at 11:15 a.m. & ending at 1:01 p.m.

- - -

# DIRECT EXAMINATION BY DEFENDANT

Q And you had the ability to reject loads if you didn't want to take them; correct?
A Yes.
Q And you had the ability to choose which loads you wanted to run; correct?
A That's kind of --
MS. KING: Objection.
THE WITNESS: -- the same question; right?
BY MR. ANDREWSCAVAGE:
Q What?
A That's kind of the same question.
Q Fair enough. It's the same question asked a different way. What -- what -- how did you make the decision whether or not to accept or reject a load?
A The miles and the money. You have to take the money and split it down -- break it down to the amount you're making per mile. And if it didn't make sense, then it's no need in taking it.
Q Okay.
A But if you don't -- I -- I -- I mainly took -- I main -- I -- I kind of took most of the loads they sent me, though, because I --

you never knew when the next load was going to come to you.

Q Uh-huh (affirmative). Okay. But you would -- you would take each load they would give you the mileage; is that correct?

A They would tell you -- they would tell you the amount of miles they're paying for.

Q Okay. And they would give you the overall revenue?

A Right.

Q Okay. And then would you take that overall revenue and figure out your percentage, which was 70 percent?

A Right. And then I break that down to see what I'm making per mile.

Q Okay. Did you ever take into account fuel costs?

A Yes, that's -- that's the reason why you break that down.

Q Yeah. Okay. And so if it wasn't profitable, you wouldn't take a load?

A Yeah, I didn't want it. Not saying that I wouldn't take it, but I didn't want it.

Q Okay. And did you ever tell your dispatcher that, you know, this one is just not

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

Case No. 1:20-cv-00075-CJW-KEM

----------------------------------------x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

----------------------------------------x

March 30, 2022
12:38 p.m.
Virtual Deposition

ZOOM EXAMINATION BEFORE TRIAL of a Plaintiff, ANTHONY WHISENTON, pursuant to Notice, held at 9435 N 59th Street, Glendale, Arizona 85302 before Mandy Fein, a Notary Public of the State of New York.

# DIRECT EXAMINATION BY DEFENDANT

Q. Other than your complaint about the delays in payment for loads that you delivered and that CRST failed to honor its obligation to get you adequate income, and your inability to get brokered loans, were there any other provisions of the contract that we've marked as Exhibit 4 that you feel CRST failed to honor?

A. Yes. Because it -- it -- okay, you get the impression that if I can't secure loads on my own, if you saying that I can secure loads, but then when I attempt to secure the load, I'm not able to secure the load, or if the loads that you send me there was loads that they sent me that I did not want to take, and in this one particular instance, they sent me a load that didn't bring revenue to me, so I called in I stated why I didn't want the load. They was like well, you take this load because we now have three or four other loads already booked to you. So then I'm like well, well, I don't know about those other three or four loads because no one has sent me the information on the other three or four loads, and I don't

want to take necessarily -- at the time I don't necessarily want to take this first load because this first load brings me no revenue based off of the expenses having to train this employee, I am going to have to pay this employee when I pick up this load, I am going to have to pay this employee. I'm gonna have to put fuel in here. So then my revenue on that particular load plus their taking seventy percent, I make nothing on carrying that load.

So, I'm -- I'm calling in to object to that. Then they explain to me, well, they have three or four other loads on here. So then I said well, I don't know and I was, you know, being talked to like I was some kind of bad guy or I don't know what's going on, and you doing something wrong by calling in and rejecting a load because I can only make the decision based off of what information is presented to me. So, when I don't know about three or four other loads that you have stacked onto this truck and then I'm only calling in to reject the first load because the first load doesn't bring me any revenue, I shouldn't have been spoken to in those

kind of terms.
Q. This was a conversation that you had with your driver manager Corey?
A. That wasn't with Corey. It was someone else answered the phone at that time.
Q. Do you know who it was?
A. I don't know the lady's name, no.
Q. And did you end up taking the load that you did not want to take because it was not going to provide you any revenue?
A. Yes.
Q. And did you then receive the three or four loads that this lady, whose name you do not recall, said she had available for you?
A. Yes.
Q. Were those loads -- loads that you generated revenue off of?
A. Yeah. I was able to generate revenue because I turned in a bill of lading technically earlier than you're supposed to.
Q. So, other than the instances that we've just described, the CRST failing to give you adequate income, a delay in payment when loads were delivered after the settlement time

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

* * *

ANTHONY CERVANTES and
MIKE CROSS, on behalf of
themselves and all others
similarly situated,
Plaintiffs,

vs. CASE NO. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC.
and CRST EXPEDITED, INC.,
Defendants.

* * *

Remote videotaped deposition via Zoom of GABRIEL PLACIDE, a Plaintiff herein, called by the Defendants for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Vicky L. Marcon, a Notary Public within and for the State of Ohio, at the home of Gabriel Placide, 35 Old Orchard Lane, Monroe, Ohio, on Monday, May 23, 2022, at 12:00 p.m. Eastern Standard Time.

* * *

# DIRECT EXAMINATION BY DEFENDANT

truck fixed, or offer me one load and I'm under contract, I should be getting several deals. It's a big company. How is it possible to only have one load available a day. That was just horrible.

Q. Anything else?

A. How much time you got?

Q. I have all day.

A. Okay. Me too. All right. Let me think about it. CRST, how did they treat me as an employer. I had to do everything they said. You know, I had to -- they made me teach. They made me fill out paperwork teaching. They made me -- I had to wait on them for permission, like, you know, like they're my parents, to get my truck fixed, where I can get it fixed at, what all I can get repaired, when I needed more repairs. I had a leak in the windshield. They wouldn't approve it. I had to take -- I had to drive my student around in a rental car past different states. I didn't get paid for that.

They controlled my loads, basically. They, basically, controlled my loads. You could say I had an option, but if I didn't drive, I didn't pick that option, they'd advise

you that your dispatcher could give -- the planning team could get mad and mess up your potential earnings by, you know, turning down loads, so they'd precaution you that. They'd give you a precaution about that. So, you don't want to turn down loads around CRST or you'll get punished.

Q. Do you know whether other lease purchase operators turned down loads?

A. I don't know.

Q. Were any of the things that made you feel like you were treated as an employee at CRST different from the things that you felt made you feel like you were an employee at Roadrunner?

A. They offered less. They offered less loads. It was even worse.

Q. Were any of the things that made you feel like you were an employee at Roadrunner different from the things that made you feel like you were an employee at CRST?

A. At least Roadrunner offered you multiple loads at a time. You might not have been able to negotiate them, but at least you could pick more than one.