BEN LIZER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and
MIKE CROSS, on behalf
of themselves and all others
similarly situated
Plaintiffs, Case No.
vs. 1:20-cv-00075-CJW-KEM
CRST INTERNATIONAL, INC.,
and CRST EXPEDITED, INC.,
Defendants.
____________________________/

REMOTE ORAL DEPOSITION OF BEN LIZER

IOWA CITY, IOWA

WEDNESDAY, DECEMBER 7TH, 2022

REPORTED BY:
DEBORAH HABIAN, RMR, CRR, CLR
JOB NO. 219955

# DIRECT EXAMINATION BY PLAINTIFFS

assistant, two operations -- manager of operations, excuse me, and anywhere from 10 to 14 fleet managers and then over them I have business partnerships/relationships with anywhere from 500 to 700 independent contractors.
Q. Okay. And you indicated that you oversee two managers of operations, correct?
A. Right.
Q. And are those both managers of operations of independent contractors?
A. Yes.
Q. And in your position as a manager of operations, do you remember about when you started that position?
A. Which one?
Q. The manager of operations of independent contractors.
A. I started that I believe in the fall of 2017.
Q. And what were your responsibilities in that position?
A. Responsibility for that position? Predominantly why I came over there was to help

assist in increasing the utilization of the independent contractor fleet, meaning getting more miles for them, setting up better business relationships and then really empowering and expanding the abilities of the fleet managers as well to better run in partnership with their independent contractor partners.

Q. And in that position, who reported to you?

A. I believe it was 12 to 14 fleet managers.

Q. And did you oversee any employee drivers in that position?

A. I did not.

Q. Did you have contact with independent contractors in that position?

A. Did I have contact with independent contractors?

Q. Correct.

A. Yes, absolutely.

Q. Okay.

A. I need to clarify on your previous question for the company drivers. So, yes, there'd still be student drivers on independent

But general transfer, general purposes for estimating times, probably around a half hour.

Q. And does CRST track the amount of time that it takes for an independent contractor to pick up a drop-and-hook load?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: I'm not sure if I fully understand that question. Do we track if they're on time or how long it takes them to hook to the load?

BY MS. KING:

Q. Well, I guess does CRST track whether the independent contractor is on time?

A. Yes, we do.

Q. Okay. And how does CRST track that?

A. Based off the macro the driver sends in or a geofence location of the truck.

Q. And when you mention geofence location, what is that?

A. To the best of my knowledge, it's like a GPS ping. It's -- I don't fully understand that technology.

Q. Okay. And then my other question is

BEN LIZER

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: You'd have to clarify what you mean by "regular maintenance".

BY MS. KING:

Q. Sure. So does CRST expect drivers to keep a -- strike that.

Does CRST expect independent contractors to wash and clean their trucks?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: No, not that I'm aware of.

BY MS. KING:

Q. Okay. Does CRST expect drivers to perform preventative maintenance on their trucks?

MR. SMEDSTAD: Foundation.

THE WITNESS: We do not expect the drivers to perform preventative maintenance. We do expect them to have preventative maintenance completed on their truck.

BY MS. KING:

Q. Okay. And what preventative

maintenance does CRST expect to be completed on independent contractors' trucks?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: I believe it's outlined in the lease agreement, but I'm not an expert on the mechanical things we have to complete on a truck within a preventative maintenance parameter.

BY MS. KING:

Q. Okay. Do you know who would know that?

A. Yes.

Q. And who is that?

A. That would be Lincoln Sales, someone within that company.

Q. Is there anyone you would suggest that would know that?

MR. SMEDSTAD: Object to the form of the question.

THE WITNESS: To the best of my knowledge, I would start with Chad Johnson.

BY MS. KING:

Q. Do you know whether CRST tracks whether an independent contractor performed the

preventive -- or had preventative maintenance conducted on their truck?

A. Yes, I believe that's something we track.

Q. And how does CRST track that?

A. I'm not aware. That'd be on the Lincoln Sales side.

Q. Okay. Is that something Chad would know?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: Yes, I think I misspoke with his name. I think Dennis Hogan would be the correct contact for that, not Chad Johnson. Excuse me.

BY MS. KING:

Q. Okay, thank you.

So does CRST expect independent contractors to have any necessary repairs performed on their trucks?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: We would expect the truck to be in legal, safe working order.

BEN LIZER

managers?

MR. SMEDSTAD: Foundation.

THE WITNESS: It depends who the Qualcomm box is pointed to, but I would say 99 percent of the time that's going to be pointed to their fleet manager for their after-hours coverage.

BY MS. KING:

Q. Okay. So I want to discuss the CRST lead driver program. Are you familiar with the lead driver program?

A. Yes. It's called the mentor program now, I believe, if we're talking about the same thing.

Q. Okay. And what is the mentor program?

A. The mentor program for the independent contractor side is an option that independent contractors can elect into to maximize their potential gross earnings, and what it entails is they have a CRST company student on their truck that they train and adhere to our specifications within the mentorship program in order to complete that student's training.

Q. And how long is a student driver on the

BEN LIZER

independent contractor's truck?

MR. SMEDSTAD: Object to the form of the question, foundation.

Go ahead and answer.

THE WITNESS: It's changed around in the past before, but I believe, generally speaking -- I think it's -- 21 days is the minimum and 12,000 miles, I believe.

BY MS. KING:

Q. Okay. Do you know whether independent contractors are responsible for any expenses related to training students?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

THE WITNESS: There are no expenses that I am aware of outside of the student charge fee that the independent contractors take on.

BY MS. KING:

Q. Okay. So outside of the student charge fee, you don't know if there are other expenses?

MR. SMEDSTAD: Asked and answered.

Go ahead and answer.

THE WITNESS: There shouldn't be any

BEN LIZER

MR. SMEDSTAD: Foundation.

THE WITNESS: I'm sure there are other people that would know as well. The main issue is I just need to see what our most current ICOA is to see if this is the most current version of it.

BY MS. KING:

Q. All right, so I'm going to stop sharing and show you a different exhibit.

So this is what's entitled the lead and student driver compliance agreement. You can see it's been previously marked as Exhibit 32. Do you recognize this document?

A. I'm familiar with the document, yes.

Q. And what is it?

A. The Lead and Student Compliance Agreement I believe outlines in general the expectations for mentor drivers training their students. Or to be part of the mentor program, to the best of my knowledge is what it is.

Q. And do you know whether this is the current Lead and Student Compliance Agreement?

A. No, I don't -- I don't -- I can't tell if this is the most current one or not.

BEN LIZER

A. This is not the current PowerPoint we use.

Q. Okay. Do you know when this PowerPoint was used?

A. Ah... no, I -- sorry. No, I would have to guess.

Q. Okay. All right, so I want to take you to slide 4. As you see, it says "Trailer Pools" and it goes on to say "each market has a specific number of trailers to match customer needs."

Do you know how CRST assigns trailers to independent contractors?

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

THE WITNESS: Yeah, so the independent contractors will let us know if they need a trailer and at which point -- excuse me, by "us" they'll let their fleet manager know that their truck needs a trailer and then the fleet manager would reach out to the planner of the region and then they would them know where the nearest available trailer is.

BEN LIZER

BY MS. KING:

Q. Okay. And do you know how CRST assigns trailers to employee drivers?

A. It would be the same process.

Q. And do you know whether independent contractors and employee drivers are assigned trailers from the same pool of trailers that are referenced here?

A. Yes, they are assigned from the same pool of trailers.

Q. And under the next bullet point on slide 4 it states "Do not bobtail without written permission on the Qualcomm."

Do you know whether independent contractors are told this during orientation?

A. Yeah, so we clarify what our bobtail policy is in regards to our trailer pool. So we tell them independent contractors can bobtail whenever or wherever they want, they have that freedom as independent contractors. And it's also their business costs so, we talk about the costs of that as well, so if they want to bobtail home. But we also talk about our trailer pools within markets.

on there. That's not my area of expertise really as far as --
Q. Okay.
A. Or management I guess you could say.
Q. Do you know who would know?
A. I think your contact or point to start would be Robert Morris.
Q. And who is he?
A. Or, excuse me, probably Terry Pump would be your better one, T-E-R-R-Y P-U-M-P. And he --
Q. Thank you.
A. Sorry.
Q. No, go ahead. I didn't mean to interrupt you.
A. Oh. And he would be the director of safety.
Q. Okay. Thank you.
And now I'm going to show you what's been marked as Exhibit 24. As you can see, it's marked as Exhibit 24 and Bates stamped CRST 009770.
Are you familiar with this document?
A. I am not, actually. Is there a date on

this document when it was created?

Q. I do not see a date on the document. The title of the document is "Brokering Freight."

Is there another document that you're aware of that pertains to brokering freight?

A. We -- so this is our -- this is like, I should say, excuse me, documents we've sent in the past for drivers saying who are the easiest brokers to work with and then the information they need accordingly such as our motor carrier number, the C.H. Robinson T code.

So it's all similar information, but this is certainly a new format of it. This could be -- and I don't have a tight grasp on everything. This could be one of my office managers created for their drivers to have quick access to brokering and make the processes easier.

Q. Okay. And the other documents that you're referring to, do you have access to those documents?

A. Yes. I believe those were also sent with the discovery documents if I recollect

correctly.

Q. Okay. And so is it your understanding that independent contractors cannot broker a load if they have rejected a load that CRST offered?

A. So in the past, that has been our policy and that's why when I saw this this morning I was shocked to see that because that should not be the case anymore.

Q. And do you know when that was CRST's policy?

A. I believe up until roughly a year ago, give or take.

Q. And what's CRST's current policy?

A. Our current policy is we want all the freight we could get, and if we have excess freight, we -- with our new computing system now, we're able to communicate with what's called our integrated department who can broker our excess freight out.

Q. Okay. And so under the current policy can an independent contractor broker a load even if they have already rejected a load CRST offered?

BEN LIZER

A. Absolutely.

Q. Is it your understanding that an independent contractor cannot relay a load that they've brokered for themselves?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

THE WITNESS: That is correct.

BY MS. KING:

Q. All right, besides that one change regarding whether or not an independent contractor rejected a load, is there anything else on this document that has changed recently?

A. I'm going --

MR. SMEDSTAD: Foundation.

THE WITNESS: I'm going to look at it on my computer real quick just to make sure that I can speed through it.

BY MS. KING:

Q. Sure.

A. (Reviewing document.)

After reviewing the document, nothing specific comes to mind, no.

Q. And is it your understanding that the document accurately reflects CRST's policy

BEN LIZER

regarding brokering freight prior to the recent change about a year or a year and a half ago that you mentioned?

MR. SMEDSTAD: Foundation.

Go ahead and answer.

THE WITNESS: Just to clarify, the change, meaning if you refuse a CRST load, you cannot broker your own?

BY MS. KING:

Q. Correct.

A. Yes, then the rest of this seems to be -- or, excuse me. No, so the Coyote Logistics or -- no, sorry. Oh, no, I was thinking Uber Freight. My apologies.

Then, yes, the rest of this seems to be consistent with prior to the change from a year plus ago or whatever we identified.

Q. Okay. Thank you.

(Plaintiffs' Exhibit 59 was marked for ID.)

BY MS. KING:

Q. And now I'm going to show you an e-mail. You just mentioned Uber Freight. Can you see this document?

on Bates stamped CRST 02049988 it appears to be an e-mail from you dated April 27th, 2022. Do you recognize this e-mail?
A. Yes.
Q. And what is it?
A. It is an e-mail I sent out to our business partners.
Q. And again business partner is independent contractors, correct?
A. Yes.
Q. And under the second heading "Load Board" you discuss CRST's load board. Do you know what CRST's load board is?
A. Yes.
Q. And what is it?
A. It is a new technology we offer to our independent contractor partners that they can now see all the freight within our network and plan themselves on it.
Q. Do you know when this CRST load board went into effect?
A. Rough estimate, I think it was July or August when we started testing it on a select few trucks.

Q. Has the CRST load board got -- is it fully in effect and available to all independent contractors?

A. It is not fully in effect yet as we're still working through some technological bugs with it.

Q. Do you know who has access to the load board currently?

A. Yes.

Q. And who has access?

A. All of our team independent contractors have access to the load board. "Team" is identified meaning there's an independent -- there is no CRC company driver on that truck such as a student meaning.

Q. Do you know if employee drivers who run as teams have access to the load board?

A. What do you mean by "employee drivers"?

Q. Drivers that CRST classifies as employees.

A. Employees of CRST?

Q. Correct.

A. No, they do not have access as they are not independent contractors.

BEN LIZER

Q. Okay, so earlier you were -- you gave me an overview of what the CRST load board is. Could you explain to me the process if an independent contractor wanted to book a load through the load board how would that work, like step-by-step.

A. Yeah. So they will have -- once you're a business partner with us and if you want to have access to it, I believe they get an e-mail and that's how they get access and they create their own account and their account is based off their -- I believe their truck number.

So at that point they log in to the app and then they're able to select where they're at, so their location, meaning state, they can select surrounding states if they want to bounce for a load and then they can look at all the loads we have, the rates and the fuel surcharge on the loads, where they pick up and deliver, and then they can also -- it's called a next plan or pre plan option, so they can plan a load behind that load as well.

Q. Do you know if the only loads on the load board are CRST loads?

BEN LIZER

A. That is correct, as of right now it's only loads in the CRST network. We are working to expand the technology to get external loads boards -- excuse me -- an external load board included in it as well.

Q. And do you know when CRST expects to implement the external load boards?

A. I do not have a date time on that yet.

Q. Okay. And do you know if CRST places any limitations on what loads an independent contractor can take from the load board?

A. What kind of limitations would you be referring to exactly?

Q. So are independent contractors only able to see loads that are within a certain distance of where they are or are they able to see every single CRST load?

A. Understood.

So the only load that will populate on the load board is loads that are not already committed and planned on another truck. So if another independent contractor says "I want this load, I'm committing to it," it's their load that will then pull it off the load board so the

other independent contractors cannot see it and try to commit to it.

Q. Do you know if the loads on the load board are also loads that are available to employee drivers or would be assigned to an employee driver?

MR. SMEDSTAD: Asked and answered, compound.

Go ahead and answer.

THE WITNESS: These loads are everything within our network, so they have the potential to be assigned to a company truck as well, yes.

BY MS. KING:

Q. Okay, thank you.

Now, with this load board in effect, if an independent contractor decides -- elects to use the load board, does CRST still offer them individual loads?

A. No, at that point we code them in the system and we do not offer them any freight.

To clarify, at times we may recommend a load that they may have missed to see if they're interested in that, but then it's ultimately

their decision if they would like to haul that load or not.
Q. Okay. And besides being an independent contractor driving as a team, are there any other qualifications to have access to the CRST load board that drivers must meet?
MR. SMEDSTAD: Foundation.
THE WITNESS: As of right now, the qualification is you have to be an independent contractor team and that's essentially your basic qualification to have access to the load board.
BY MS. KING:
Q. And do you know if having access to the load board affects an independent contractor's ability to broker freight?
MR. SMEDSTAD: Object to the form.
Go ahead and answer.
THE WITNESS: No, it does not affect their ability to broker freight.
BY MS. KING:
Q. So the same process that we described earlier regarding brokering freight would apply to independent contractors who use CRST's load

board; is that correct?

A. Maybe if you can clarify that question a little bit better for me, please.

Q. Sure. So the same policy, you know, the old policy regarding -- let me strike that.

I'm going to I strike that question. I'm moving on.

Do you know what percentage of eligible independent contractors have registered to use the load board?

A. I don't know the percentage, but I could give a rough estimate on the number of total trucks registered in it.

Q. Okay. Please give me the estimate.

A. It's roughly 190 trucks.

Q. Do you know how many trucks in total are eligible?

A. It would be probably not much more than 200 to 210 in total.

Q. Do you know if there's any circumstances under which an independent contractor could lose access to the load board?

A. Yes.

Q. Okay. And what are those?

A. Consistent with our ICOA, if they're not servicing the freight for our customers and we're losing business, then we will strip their ability to access our load board.

Q. So could an independent contractor lose access to the load board by delivering freight late?

A. Yes.

Q. And could an independent contractor lose access for failing to arrive on time for a pickup of a load?

A. Potentially, yes, but it's all situational for pickup or delivery to clarify on my previous answer.

Q. And are the loads that independent contractors haul for CRST's load board treated the same way for pay here in the ICOA?

A. Yes, correct.

Q. All right. So then if you scroll down to -- scroll up, I'm sorry, under the "Safety" heading, you'll see that there's a statement here where you indicate that "Watching these videos is a positive step in doing that and a hundred percent something I look at when making

those decisions."

And in the sentence previously you were talking about "Independent contractors growing the fleet and expanding their business to the load board when it's ready."

Does CRST track whether independent contractors watch safety videos?

A. Yes, they do.

Q. And how do they track that?

A. I'm not sure how it's tracked. That would be a safety -- our safety department to tell you exactly how it's tracked. I just know it is tracked.

Q. Would Terry Pump from the safety department know?

MR. SMEDSTAD: Foundation.

THE WITNESS: Yeah. And if not, he'd be able to point you in the right direction.

BY MS. KING:

Q. Are there any -- do you know if there are any consequences for an independent contractor not watching safety videos?

A. There are no consequences. It's completely mandatory -- or it's completely

optional, excuse me, for them to watch the videos.

Q. Do you know why CRST tracks who watches the videos if it's optional?

A. I would have to speculate on -- for the company drivers, because it is mandatory. For the IC drivers, I would have to speculate why they track it.

Q. Do you know if independent contractors have access to the same safety videos as employee drivers?

A. I'm not sure if they have all the same access or not. That would be better asked for our safety department, that posting.

Q. So as is stated here, is this accurate whether or not independent contractors view safety videos is something that you consider in allowing access to the CRST load board?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

THE WITNESS: I don't -- unless I'm missing something, I don't see anything that mentions the safety videos with the load board versus -- I was looking at this as a fleet

expansion item.

BY MS. KING:

Q. Okay, so --

A. I guess it says... (reviewing document) "....or your business to the load board."

Okay, yeah, so that's fair then. So, yeah, this is really all encompassing of just we look at different things with our business partners to see if they're a good business partner. If they take advantage of free technology with safety, if they, you know, are able to plan themselves successfully on the load board, then those are all things to consider when expanding our business.

Q. And are there any other things that you consider when determining whether or not an independent contractor is a good business partner?

A. There -- yeah, there's a lot of different discretionary considerations that go into it as well, I'm sure.

Q. Can you list some of them?

A. Yeah. So just generalize, like for instance we're not going to be business partners

BEN LIZER

with someone sexually harassing our staff, certain ethical guidelines like that. People that don't represent their own business well and then haul a CRST trailer, we are not going to be affiliated with that as well.

Q. And what do you mean by "don't represent their business well"?

A. So I guess I can't think of specific examples with it. Just in general, like I said, if someone's -- I don't know, this is very speculative -- threatening a customer or harassing a customer or people -- pedestrians and stuff and it gets called in, just in general people who are acting dangerous or unethically, we wouldn't want to be business partners with them as well. So there are just a lot of discretionary items, perhaps.

Q. Okay. So CRST can exercise discretion in allowing an independent contractor to use the load board then?

MR. SMEDSTAD: Object to the form.

Go ahead and answer.

THE WITNESS: Yes, if they are -- yes.

MS. KING: Okay, so now I'm going to

show you what will be marked as Exhibit 58.

(Plaintiffs' Exhibit 58 was marked for ID.)

BY MS. KING:

Q. This is another e-mail Bates stamped CRST 02050041 through CRST 02050044.

And if you go down to Bates stamp CRST 02050043, the body of the e-mail, it's an e-mail from you dated August 19th, 2022. Do you recognize this document?

A. Yes.

Q. Okay. And what is it?

A. This looks to be an e-mail I sent on August 19th to my business partners, meaning the independent contractors with CRC.

Q. Okay. And under the "Service" heading, the last sentence of the first paragraph, it indicates "I want to reiterate that if you cannot perform on time per expectations, you will risk losing access to the load board to plan your own freight." Do you see that?

A. Yes, I see that.

Q. Is that one of the discretionary items that we were just discussing?

A. Correct.

Q. Okay. And do you know if CRST keeps track of independent contractors' on-time performance?

A. We are working on a way to, but currently, no, we don't really have a good way of doing that.

Q. Okay. And besides possibly losing access to the load board, are there any other repercussions to an independent contractor for failing to be on time?

A. Yeah, so again it's situational. There could be valid reasons for why they were not on time such as weather and safety related events. So just because you're late doesn't mean it's a bad late, to be clear, but, yes, there are other repercussions that could happen as well.

Q. Okay. And what are those other repercussions?

A. Consistent with our ICOA, it can lead up to termination of our lease agreement with a driver.

Q. And besides termination, are there any others?

received in the mass amount of e-mails I get. I don't recall all my e-mails specifically, this being one of them.

Q. Okay. Do you know who Trailei is?

A. Yes.

Q. And who is that?

A. So it's pronounced "tray-lee".

Q. "Tray-lee."

A. She would have been I believe at this time a fleet manager with the independent contractors and she's now currently still employed with CRC as well -- CRST as well.

Q. And here you reference that "There are times that it may ping you when you are -- ping you in a shutdown when you are -- were in one based off how they were set up."

What is "a shutdown" that you're referring to?

A. In this e-mail it looks like I was referring to the mandatory weather shutdowns by CRST.

Q. And what happens when CRST has a mandatory weather shutdown?

A. Independent contractors are not to be

operating our equipment within those weather zones.

Q. And do you know whether CRST tracks whether independent contractors operate in those weather zones?

A. Yes.

Q. And how do they do that?

A. I'm not -- I'm not sure how the tracking is done from an IT standpoint, but I do know it's tracked and we get e-mail notifications if they are traveling during -- or traveling within a weather shutdown area.

Q. And when you say "we get e-mail notifications," who receives those e-mail notifications?

A. Operations.

Q. So is that fleet managers?

A. Excuse me, operations and safety receive those e-mails. So, yes, fleet managers, to answer your followup question.

Q. And what happens if a fleet manager receives that e-mail?

MR. SMEDSTAD: Foundation.

THE WITNESS: They're expected to

contact the driver to let them know they are in a weather shutdown zone.

BY MS. KING:

Q. Do you know whether an independent contractor can be terminated for being in a weather shutdown zone when they should not be?

A. I don't --

MR. SMEDSTAD: Object to the form of the question.

Go ahead and answer.

THE WITNESS: Independent contractors can be terminated since they're not company employees, but their lease agreements are susceptible to that if they are repeat offenders.

BY MS. KING:

Q. And you earlier mentioned that the independent contractor during those weather shutdowns cannot operate equipment. Does that include Lincoln Sales leased tractors?

A. That --

MR. SMEDSTAD: Object to form foundation.

Go ahead and answer.

answer your question?

Q. Yes.

A. Okay.

Q. You also mentioned whether or not independent contractors are repeat offenders will dictate, you know, whether or not they would possibly be terminated.

Does CRST -- do you know whether CRST tracks its independent contractors that will be repeat offenders for violating this policy?

MR. SMEDSTAD: Object to the form of the question, mischaracterizes prior testimony.

Go ahead and answer.

THE WITNESS: I believe it is tracked, yes.

BY MS. KING:

Q. Do you know where it would be tracked?

A. To the best of my knowledge, it would be the e-mails that ping to us when they're traveling in it.

Q. Okay. You also mentioned a DOT shutdown. Are there ever instances where CRST may have a weather shutdown that was not issued by the DOT?

A. Yes.
Q. And do you know when that would happen?
A. Yeah. At times.
Q. Can you give me some examples?
A. I believe most recently when the hurricane went through Florida would be an example. We had alert messages set up in a parameter around there to alert our drivers and to keep our business partners safe as well.
Q. All right, thank you.
I just want to take you back quickly to the PowerPoint slide we were looking at earlier, Exhibit 60. Do you remember this, seeing this document?
A. Yes.
Q. And earlier you testified that this was a version of the PowerPoint used during CRST's independent contractor operations, correct?
A. This appears to be previous versions we -- excuse me. This appears to be a previous version we have used, yes.
Q. Do you know how this is different, if at all, from the previous versions that were used from the new versions used?

# Lead and Student Compliance Agreement

**The Lead Driver and entry level driver are expected to follow the guidelines outlined below. These items must be discussed on the first day of training and applied to the entire day training period. The Lead and Student are required to sign this form at and submit it to their Driver Manager, along with any additional required training forms at the completion of training.**

1. The entry level driver should trip plan all trips during the training period.
2. The Lead Driver will be "On Duty Not Driving" (line 4), while entry level driver drives, for a minimum of their first 3-5 days notifying their DM ASAP if that will exceed 5 days.
3. The Lead Driver will shut the truck down for 10 hours a day for the first 3-5 training days.
4. The entry level driver will not drive between midnight and 5:00a.m. during the first 5 days of training. This applies even if the entry level driver has been approved to proceed to Team Operation.
5. The entry level driver must be given ample opportunity to back and to drive in cities. They must be comfortable enough by the end of their training to drive as co.
6. The Lead Driver will use commentary driving as often as possible.
7. The entry level driver will use commentary driving as often as possible.
8. The Lead Driver and entry level driver will comply with all CRST policies against unlawful harassment/sexual harassment and creating a hostile environment in the workplace.
9. Ground guides will be used when backing or during any low speed maneuvers when possible and utilize G.O.A.L. Get Out And Look.
10. Seat belts and bunk straps/nets will be used.
11. No one is permitted in the top bunk while the truck is moving even if truck is equipped with an upper bunk net.
12. CRST expects drivers to avoid parking on shoulders and/or ramps except in case of emergency.
13. The wheels will not turn unless the Lead Driver is in the truck or on the ground spotting (Even at the fuel island).
14. Entry level drivers will be trained to access exit ramps at speeds no greater than 10 miles an hour under the posted ramp speed. (Posted ramp speeds are for cars)
15. U-turns are a violation of CRST policy.
16. Hands-free cell phones are allowed. Drivers are prohibited from holding, dialing or reaching for a hand-held mobile device. (Hands-free includes voice-activated features, earpiece or headset, or Bluetooth capabilities.)
17. Lead will complete written evaluation form on the entry level driver that will be submitted at the conclusion of training. Entry level driver will send in Macro 15 for their evaluation of Lead, once they are on their truck.
18. Lead Drivers will not drive while the entry level driver is logged in on the Qualcomm as the active driver nor will the entry level driver drive while the Lead Driver is logged in on the Qualcomm as the active driver.
19. **This packet will be filled out in its entirety and turned in to the Safety Trainer or Driver Manager by entry level driver before he is given his Post Training Road Test or is upgraded to Co-Driver Status. It is the entry level driver's responsibility to ensure this is done.**
20. **LEADS- Please keep a (filled out) copy of this packet for YOUR records on EACH entry level driver.**

**Lead Signature/ID**______________________________________**ID**__________**DATE**_______________

**Entry Level Driver Signature/ID**___________________________**ID**__________**DATE**_______________

**Exhibit 32**

**60 day check-in**

- Minimum 10 backs and 10 instances of coupling and uncoupling documented on backing logs
    - 5 straight
    - 5 angle/alley dock
- trip planning
    - student can read, understand and follow route and fuel solution sent to QC (if applicable)
    - lead has shown student how to match up route to map/atlas
    - lead has shown student correct way to use GPS (if applicable)
        - GPS is an additional tool, not to be relied upon 100%
- QC usage
    - Student can log own hours and understands what duty line to be logged for each task
    - Student understands when to send a free form vs macro
    - Student knows what macros to send in from start of a load to finish and how to fill them out
    - Student knows how to fill out paper logs in the event the QC goes down
- Vehicle Inspections and How to pass a level 1 DOT inspection (view check list from CVSA website https://www.mjai.com/wp-content/uploads/2018/03/NAS-Level-1-Truck-Inspection-Procedure-Chart.pdf_N.pdf)
    - Student knows what to expect during an inspection
    - Student knows how to check service brakes, including trailer brake connections
    - Student knows how to check lighting devices and reflectors
    - Student knows how to check tires properly, including tread depth and air pressure

As the Lead Driver, ________________, I acknowledge the above additional training has been completed.

Lead Signature ____________________________ Date ___________

Student Signature ________________________________ Date ___________

bluto8075@gmail.com[bluto8075@gmail.com]; justinhopkins313@gmail.com[justinhopkins313@gmail.com]; JAYSANGELS123@GMAIL.COM[JAYSANGELS123@GMAIL.COM]; johnnymuchison@hotmail.com[johnnymuchison@hotmail.com]; thjeff55@gmail.com[thjeff55@gmail.com]; jeffreymlvll@gmail.com[jeffreymlvll@gmail.com]; jeremygraham112@yahoo.com[jeremygraham112@yahoo.com]; METTLERJACKSON3@GMAIL.COM[METTLERJACKSON3@GMAIL.COM]; jjmeyer@majoredime.com[jjmeyer@majoredime.com]; BIGSEXY3812@GMAIL.COM[BIGSEXY3812@GMAIL.COM]; jabryllortega12@gmail.com[jabryllortega12@gmail.com]; youngbrightsta3@gmail.com[youngbrightsta3@gmail.com]; james73175@gmail.com[james73175@gmail.com]; jonasp1483@hotmail.com[jonasp1483@hotmail.com]; aguileiva@gmail.com[aguileiva@gmail.com]; JORDANALLEN235@GMAIL.COM[JORDANALLEN235@GMAIL.COM]; jeanborgella1981@gmail.com[jeanborgella1981@gmail.com]; johnmays1972@gmail.com[johnmays1972@gmail.com]; REDDRAGON2463@GMAIL.COM[REDDRAGON2463@GMAIL.COM]; jadinrolle9@gmail.com[jadinrolle9@gmail.com]; velezjoseph70@gmail.com[velezjoseph70@gmail.com]; pty507trans@gmail.com[pty507trans@gmail.com]; hahaholley@gmail.com[hahaholley@gmail.com]; JE3857@GMAIL.COM[JE3857@GMAIL.COM]; JAIIAH@ME.COM[JAIIAH@ME.COM]; TIJERINOJORGE85T@GMAIL.COM[TIJERINOJORGE85T@GMAIL.COM]; justin_jones49@aol.com[justin_jones49@aol.com]; JEFFREYDICKS069@GMAIL.COM[JEFFREYDICKS069@GMAIL.COM]; wesbyjanuary@gmail.com[wesbyjanuary@gmail.com]

**From:** Benjamin Lizer
**Sent:** Fri 8/19/2022 8:58:24 AM
**Subject:** Weekly Message
**Received:** Fri 8/19/2022 8:58:00 AM

Good morning IC partners!

**Safety**
Continue safe work. No amount of money or miles is worth your safety, or the safety of others on the road. Log in to your Gold Mine and complete your safety videos – there is some solid stuff on there that is great for refresher if nothing else. I pull a lot out of it, especially since I haul my big scary camper from time to time *

**Service**
A topic I don't feel I have touched on much – but service of our freight. We all can see the stats of the economy right now, and freight is slowing down. With that comes a decline in rates, which we are now officially starting to see. In addition to the rates coming down, we also see a much greater focus by the customers for service. Just today I found out we lost lanes with FXF and FXG that will result in losing 20k miles per week. We absolutely have to do a better job picking up and delivering on time. We cannot have missed alarm clocks or distractions from what time it is as an excuse. I want to reiterate that if you cannot perform on time expectations, you will risk losing access to the load board to plan your own freight.

Now, to be clear, this doesn't open the door for unsafe driving. Safe driving and on time service go hand in hand. If you are fatigued, or any other safety related issue that will cause the load to be late, so be it. We need to shut down in a safe area. You MUST communicate to dispatch though, as we can send someone to rescue the load from you and still try to deliver it on time, saving future lanes for everyone. Failure to communicate properly on unsafe events can also lead up to losing access to the load board.

Especially for our mentor fleet, coaching the student and making sure they know where they are going and what they are doing will be important. With rates beginning to come down, we need to not just hold the lanes we have now, but also increase them. We will need to run more miles to make more money in general, but then to also help offset the loss in future rates. To be clear, our weekly miles continues to increase as we are winning more lanes and new customers, but we cannot lose business on the back end!

Message from TrueChoices:
"Hurry the chance to sign up for TrueChoices ends today.  Call a benefit consultant today at 800-877-9637 to learn more."

BEN LIZER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated

Plaintiffs, Case No. 1:20-cv-00075-CJW-KEM

vs.

CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,

Defendants.
______________________________/

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 to 175, inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid and includes changes, if any, so made by me.

______________________________
BEN LIZER

SUBSCRIBED AND SWORN TO before me this 28th day of December, A.D. 2022.

______________________________
Notary Public

MELISSA K STUMPFF
Commission Number 791778
My Commission Expires

# ERRATA SHEET

Case Name: Anthony Cervantes, et al. v. CRST International, Inc., et al.

Deposition Date: December 7, 2022

Deponent: Ben Lizer

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 34 | 23 | 90 | 97 | not what I stated |
| 41 | 24 | services used | service issues | mis quote |
| 52 | 8 | partner | depart | mis quote |
| 89 | 6. 9 | IT | IC | mis quote |
| 122 | 4 | integrate it | integrated | mis quote |
| 127 | 15 | CRC | CRST | Typo |
| 138 | 16 | CRC | CRST | Typo |
| 141 | 12 | CRC | CRST | typo |
| 147 | 17 | CRC | CRST | typo |
| 153 | 20 | GOAQTR | GUA | typo |
| 153 | 25 | GOAQTR | GUA | typo |
| 167 | 5 | Trailei | Traelei | spelling |
| 167 | 13 | CRC | CRST | typo |
| 169 | 13 | can | cannot | mis quote |
| 170 | 18 | let | out | typo |

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS 28th DAY OF December 2022.

(Notary Public) MY COMMISSION EXPIRES: 08-31-24

MELISSA K STUMPFF
Commission Number 791778
My Commission Expires
08-31-24

## OPERATIONS DEPARTMENT POLICIES, PROCEDURES, & DISCIPLINE

# CUSTOMER RELATIONS

To the customer, you are CRST! Although this sounds simple, it is very important to remember. The customer pays your wages. A satisfied customer will call CRST again if we provide them with good service. Drivers may forget that without the customer there are no loads to haul and no miles to run. Over the years, we have had some customers who stayed with CRST because our drivers provided premier customer service. It is not easy to be courteous when someone else is rude to you, but in any service-related business, it is an absolute necessity!

Good customer service is job security. Every time you leave a shipper or consignee, that customer will form an opinion about CRST. If it is a good opinion, you have done your job well. If it is a bad opinion, you have done a poor job at customer relations and may have lost the customer for CRST.

Drivers who give bad customer service cannot and will not be tolerated. A driver can make things easier for all drivers by being polite, courteous and by obeying the rules on the dock. The next time you load or unload, ask the customer how CRST drivers are doing. You can bet they will have an answer. We hope it is a good one.

### *Why is On-Time Delivery Important?*

Customers pay CRST to pick-up and deliver their freight safely and on time.

- What if a carrier cannot deliver a customer's freight on time?
- What if a carrier exceeds its customer's expectations by being on time for pick-up and delivery?
  - *Which company would you rather work for?*

The first thing a customer expects from CRST is that we arrive on time. When your fleet manager gives you an appointment time, keep it! If you are late, you run the risk of shutting down a production line or upsetting the customer's schedule. Being on time is your #1 responsibility after being safe. Many people depend on drivers. CRST relies on drivers to fulfill delivery promises. The Shipping or Receiving Department relies on drivers to keep them on schedule. Everyone at CRST relies on drivers to keep our customers happy. The professional driver takes pride in an on-time performance record.

Communication is the key! You must immediately notify Operations at the first indication that a late delivery may occur. Be prepared to provide reasons for being late. It is important to let the customer know that we are running behind before we miss the appointment time. It may save you having to wait. More than once a driver who did not communicate a late load to Dispatch ended up sitting more than a day or two while we worked to get the load rescheduled. Failure to communicate a late load to Dispatch will result in disciplinary action. Delivering a load on time is the responsibility of both drivers in the truck. Both drivers will be held accountable for a late load. Repeat late deliveries will be reported as a service failure regardless of notification. CRST's service target is 95%: Some customers expect as much as 95 - 97%!

**We need your help to service the customer! Can we count on you?**

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

Case No. 1:20-cv-00075-CJW-KEM

Honorable Judge C.J. Williams

Videotaped Deposition of:

BARRY ROBINSON

Taken on behalf of the Defendants

July 6, 2022

---

ALPHA REPORTING
A VERITEXT COMPANY
RHONDA S. NICHOLSON, RPR
One Vantage Way, Suite D-115
Nashville, Tennessee 37228
(615) 244-4812
www.alphareporting.com

# DIRECT EXAMINATION BY DEFENDANT

questions about?
A. I didn't ask them about the contract, but I was asking them to explain certain things. You know, why we don't get paid detention pay. And I guess they probably, you know, off the top of their head was stating some of the stuff out of the agreement, but I'm not sure.
Q. Okay. Besides detention pay, any other issues that you asked CRST personnel about?
A. About -- no. I don't -- I don't think so.
Q. At the time you signed the independent contractor operating agreement, did you think that any parts of it were unfair?
A. Yes.
Q. What parts?
A. The part -- like if you're lease purchase or owner-operator, you're supposed to have more say-so than a company -- company driver. I almost felt like I was still a company driver the way the loads was -- I had to ask them for loads or give me a load or I had to sit at a particular place waiting on loads almost like one, two or three days.
And it seemed like if I was a lease purchase owner-operator, they shouldn't have been

treating me like that way. I should have been like top priority, try to get a load out of that spot, but -- made me feel like I was still part of -- you know, working the company, I was a company driver.

Q. Uh-huh. Did you talk to anybody about those concerns?

A. Yes. I used to, you know, talk to -- to my driver manager who was ever on driver manager duty that evening, night or -- you know, or even if my original driver manager was there, which his name is Drew -- Drew Freie. If he don't be in, it would be the evening-time driver managers.

And I'll tell him -- I'm going like, Why you-all got me sitting here waiting on a load? They will send me to certain places where loads don't really come out of. Kentucky. You know, places like Kentucky or Illinois at certain times, but --

I have the option of turning it down, but at the time, I don't -- not aware fully in my head -- thinking the load is good, I don't want to turn it down. And if I do turn it down, they may kind of get offensive and take an attitude and not give me another decent load, you know, coming out

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

- - - - - - - - - - - - - - - - x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

Case No. 1:20-cv-00075-CJW-KEM

-against-

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

- - - - - - - - - - - - - - - - x

DATE: Thursday, February 24th, 2022
TIME: 11:30 a.m.

Videotaped deposition of ADAM ST. AMOUR, taken by Defendant, in the above-entitled action, held via Zoom, Veritext Virtual, pursuant to notice, taken before Elizabeth Willeski, a Stenographic reporter and Notary Public within and for the State of New York.

# DIRECT EXAMINATION BY DEFENDANT

A I'm being told where to go, what to do. It's just like a regular job. You get a load. They tell you where to go, where to pick it up, where to drop it off.

Q Okay. And the other -- lease purchase driver you described, how is that different from being a company driver?

A It's not any different because, there's -- there's -- it's not any different. When I refuse a load and I get the same one the following day or it's not advised of refusing a load, when I tried to plan for getting loads, like with C.H. Robinson several times, they were turned down because of CRST's matrix. That's not any different. I wasn't allowed any control.

Q Okay. So when were you a company driver for CRST?

A Oh, God. You guys got to look to your records. Because I went to CRST company driver, lease program, but before that, every time you switched to a different division, they take you off and start you over again with your work experience, but you can see I

THE TRANSPORTATION SOLUTION™

CRST®

INTERNATIONAL

**Violation Policy Acknowledgement**

I Anthony Whisenton________ have received information in regard to the CRST International Company Policy pertaining to violations that may include, but are not limited to making U-Turns, speeding, parking on the shoulder of a public road, rear-end accident, and loss of control of vehicle. **CRST International Inc. (CRST Dedicated Services, Inc., CRST Expedited, Inc., CRST Malone, Inc., CRST Specialized Transportation, Inc., Gardner Trucking, Inc., Pegasus Transportation, Inc., The BESL Transfer CO) drivers and contractors must understand that if involved in any of the violations listed below, they may be subject to safety review, DDC or other disciplinary action up to and including termination of employment, lease or contract.**

- All Driving for CRST must comply with Federal, State, and Local regulations/laws.
- Any Compliance, Safety, and Accountability (CSA) BASIC category violation.
- Operation of a CMV, which results in a citation, warning, or CSA violation.
- Any operation of a CMV in a dangerous or careless manner which results in a CSA Unsafe Driver Violation Severity Weight of 7 or more, including speeding in excess of 10 mph, speeding in construction zones, failing to use seat belt, failure to observe a traffic control device, reckless driving, texting, or cell phone use (See CRST Cell Phone Policy).
- Operating a CMV while ill, fatigued, or driving after being declared Out-of-Service under the Hours of Service regulations.
- Operating or having access to a CMV while possession of alcohol or illegal drugs, or impaired due to alcohol, illegal drugs, or misuse of prescription or over-the-counter medication. (See CRST Alcohol/Controlled Substance Policy).
- Operating a CMV declared and marked "Out of Service Vehicle" without all completed repairs required by the "Out of Service Notice".
- Any serious accident, including loss of control, rear-end, lane change, intersection, or run-under. This also applies to U-turns on a public roadway without a collision involved.
- Any roadside inspection with violations based on severity and time weight of an individual's Driver Safety Measurement System (DSMS) Total.

** Speeding is determined by report of moving violations (citation or warning), driver's Record of Duty Status, and /or from Engine Control Module (ECM) reports. The ECM is accessed during each maintenance service, The ECM printed report shows high speed, high RPM time and date.

I understand and will adhere to the CRST International, Inc. violation policy.

Anthony Whisenton ________ 02-02-2020

Print Name Date

[signature]

________________________

Applicant's Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

-----------------------------------------X

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

PLAINTIFFS,

-against-

Case No. 1:20-cv-00075- CJW-KEM

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

DEFENDANTS.

-----------------------------------------X

DATE: March 26, 2022

TIME: 12:11 P.M.

VIDEOTAPED DEPOSITION of the Plaintiff, JUSTIN LOMAX, taken by the Defendant, pursuant to a Notice and to the Federal Rules of Civil Procedure, held via videoconference, before Laura Anzelone, a Notary Public of the State of New York.

# DIRECT EXAMINATION BY DEFENDANT

J. LOMAX

aware that you could have hired somebody else to drive your truck, and you answered yes; is that correct?

A. Yes. It was my understanding that you could do that, but they would -- like, it wasn't up to me a hundred percent to hire them. That was actually up to CRST to decide whether or not they wanted to hire them and if they met their requirements.

Q. Do you remember what those requirements were?

A. They just had to pass the M.V.R., pass, you know, drug screening, and stuff like that. They have to have possibly a certain amount of experience. That might have something to do with it as well. Different rules, requirements, pre-employment requirements. You know, you can't have so many speeding tickets within a certain timeframe, and stuff like that.

Q. Do you recall -- are you familiar with the Federal Motor Carrier Safety Administration?

Page 118

J. LOMAX

A. Yes. The F.M.C.S.A. Yes.

Q. The F.M.C.S.A. has requirements for being qualified as a driver. Are you aware of those requirements?

A. For the F.M.C.S.A.?

Q. Yes.

A. Nah. Excuse me. No. I'm sorry. No. I am not aware of that.

Q. So, you don't know whether CRST's requirements to hire somebody were any different than those with F.M.C.S.A.?

A. Actually, insurance is going to have -- plays a key role with that as well. They tell you whether or not they want to except a driver or not. It is not just strictly based upon the F.M.C.S.A. The F.M.C.S.A., it is fine, they will take you, but it also comes down to insurance.

Q. How so? I'm not sure I understand.

A. Well, you can be a truck driver and get a D.W.I., and the F.M.C.S.A. says that you have to wait a year before you go back to work, but there are not too many

Page 119

J. LOMAX

companies that will make you wait at least seven years to actually have the insurance bring you on. That's for an example. The insurance is not going to cover you. You are not going to be able to work for that company.

Q. Did you ever want to hire somebody to operate your truck?

A. Nah.

Q. So, you didn't try to get anybody hired?

A. No.

Q. Is there a reason why you didn't do that?

MS. MARTIN: Objection.

MR. BULLOCK: What's your objection?

MS. MARTIN: It is asked and answered.

He talked about why he wouldn't hire or couldn't hire someone.

MR. BULLOCK: I don't know if I would agree with that.

Q. Were there any other reasons

Page 120

J. LOMAX

why you didn't try to hire somebody on your truck besides qualifications of insurance?

A. I couldn't afford them.

Q. Were you aware that you could have driven for other companies besides CRST?

MS. MARTIN: Objection. Form. Foundation.

What timeframe? While he was working for CRST? I mean, it is not clear. Do you want to clarify your question?

MR. BULLOCK: Yes. I will.

Q. While you were with CRST, were you aware that you were able to drive for any other motor carrier?

MS. MARTIN: Objection. Form. Foundation.

You may answer.

A. Um, you're saying while I was with CRST, was I aware that I could pull loads for other companies while working for CRST?

Q. Yes.

Page 121

J. LOMAX

A. Is that what you're trying to explain?

Q. I am asking whether you knew that to be the case or not.

A. No. I knew that we were only allowed to pull CRST loads. I couldn't say, hey, Tommy or my friend wants me to pick up, you know, some freight or whatever instead of taking you guys' load and take somebody else's load and get paid off of it. No. I wasn't allowed to do that type of stuff.

Q. So, it was your understanding that while you were a 1099 operator for CRST, you were not allowed to haul any load for any other carrier?

A. Not without their permission. And if --

Q. Sorry. Go ahead. I didn't mean to interrupt you.

A. If they had a customer that was, you know -- it wasn't like CRST's freight. If they like went through a middleman, a broker, like, yeah, they are



J. LOMAX

giving me the load. I only got loads from them. Loads came across the board, but I never found the loads. They found the loads. That's what they did. I never ever got my own load nor was I ever told that I can go get my own load.

Q. Were you told that you could not go get your own load?

A. No. I think guys kind of just knew that we are leased -- the lease contract or whatever, that we can only pull their freight. I am pretty sure -- I don't know if it was the contract, but I am pretty sure guys knew.

Q. Were you able to reject loads while you were under this contract with CRST?

A. Yes. I told you that already.

Q. Did you ever reject loads?

A. Um-hum.

Q. Did you ever take days off?

A. Absolutely.

Q. Why did you take days off?

A. Spend time with my friends and



J. LOMAX

family, take care of certain errands at the house, and also because I could have been out of hours, maximize my hours as well.

Q. Was your schedule more flexible than it was with All Score?

A. Was the schedule more flexible? What do you mean when you say more flexible, like, could I just go to work whenever I wanted to?

Q. If you want to take a day off while you were under contract with CRST, could you have done that?

A. Yeah. I mean, I could tell them that -- you know, if I wasn't feeling well, I could take the day off and stuff like that.

Q. Did you ever take days off just because you didn't feel like driving that day?

A. Not to the best of my knowledge. If I ever did, it was probably because I maybe wasn't feeling well. I might have had a little cold or something like that.



J. LOMAX

Q. Going back to Exhibit 2, which I will represent is the Independent Contractor Agreement that we went through a little earlier.

Just to be clear, you are familiar with this document, at least you have seen it before, Mr. Lomax?

A. Yeah. I don't really remember it, but it looks somewhat -- just the top page all the extra stuff I don't know about.

Q. Sure.

Now, I am looking at Appendix A, which is CRST022999. It is tilted Contractor Election Form.

A. If I am not mistaken, that was like the options we had for trucks, right? It gives us a certain amount of options because I don't see any there.

Q. Are you saying you don't see the screen?

A. It says Option 1 and Option 2. What are these, the makes and models of the truck and the VINs, right? But there is

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

-vs-

CRST INTERNATIONAL, INC. And CRST EXPEDITED, INC.,

Defendants.

Case No.: 1:20-cv-00075-CJW-KEM

-------------------------------

The videotaped deposition of EUGENE THOMPSON taken by counsel for the Defendant pursuant to notice and by agreement of counsel, reported by Carmen J. Thomas, RPR, CCR 2790, by Videoconference, on Tuesday, March 22, 2022, commencing at 12:44 p.m.

# DIRECT EXAMINATION BY DEFENDANT

Yes, ma'am.

MR. SPOLYAR: Meagan, go ahead.

MS. RAFFERTY: I'll just instruct you not to reveal any of the contents of discussions you've had with anyone in our office.

THE WITNESS: Okay.

BY MR. SPOLYAR:

Q So I'll -- I'll re-ask the question.

Do you remember reading that question number one at any point in the past?

A How long ago will you mean by "the past"?

Q Well, let's go down and see when it was signed.

This was signed by one of your attorneys on January 10th of this year. So it would have been within the last few months.

A Jesus, I can't remember that, Mr. James. I'm -- honest, man, I -- I signed it, and if I read it and signed it, I did. But like I said, I -- I just -- I can't -- I can't remember. I have a hard time remembering things.

Q I understand.

A Back in January, Jesus.

Q Last question.

While you were under contract with CRST, so

we're talking about that time frame from April until August of 2018, did you ever drive for any other motor carrier other than CRST?

A Oh, no, sir. That was forbidden. No, sir. That's forbidden. No, sir.

MR. SPOLYAR: I don't have any other questions.

Meagan, do you have any?

MS. RAFFERTY: I just have a few.

CROSS-EXAMINATION

BY MS. RAFFERTY:

Q Mr. Thompson, you talked a little bit earlier about getting maintenance on your truck --

A Yes, ma'am.

Q -- do you remember -- okay.

When -- when your truck needed maintenance, could you take it to any shop that you wanted to take it? Did you have your choice of where to take it?

A Yes, ma'am. I had a choice.

Q And so did you have to get permission or clearance from anyone before you took your truck in to get maintenance?

A Oh, yes, ma'am. Anything outside of CRST, you got to have permission.

Q Okay. And when you say "anything outside of

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
Case No. 1:20-cv-00075-CJW-KEM
----------------------------------------x
ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,
Plaintiffs,

- against -

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,
Defendants.
----------------------------------------x
April 6, 2022
10:09 a.m.
Virtual Deposition

ZOOM EXAMINATION BEFORE TRIAL of a Plaintiff, MICHAEL NOBLE, pursuant to Notice, held at 4637 Stanley Court, Winston Salem, North Carolina 27101 before Mandy Fein, a Notary Public of the State of New York.

# DIRECT EXAMINATION BY DEFENDANT

Q. Because you didn't have to put any money down, correct?

A. Correct.

Q. And if you had gone to another leasing operation, it's likely that they would have required some kind of down payment before they would have leased you a vehicle, correct?

A. Correct.

Q. So, it was the best deal that you were aware of at the time to obtain a truck, correct?

A. Yes, yes.

Q. And you touched on this a little bit, but I want to find out what you meant while you were under contract with CRST Expedited, did you haul loads for any motor carriers other than CRST Expedited?

A. No. I mean, no, I would say no because, you know, you given the loads, they could be contracted through somebody else, you know, but CRST booked the load.

Q. Right, and I am not trying to get -- I am not trying to have you speculate about how that load came to be available on your Qual

Com, but, rather, I am asking a little something different.

Did you ever take the truck that you were leasing and haul a load for a motor carrier other than CRST Expedited, that is --

A. No.

Q. -- you either went out and finish -- let me finish so that's clear. You either went out and found a load yourself, it didn't come across your Qual Com or you didn't hear about it from a driver manager?

A. No.

Q. Was it your understanding that you could have if you wanted to?

A. No. I don't think the contract would allow that.

Q. But in order to find out, you would have to go and read the contract, correct?

A. Yes. I'm basing it on what I know, but you probably have to read the contract.

Q. Was there anything that was ever told to you at orientation or that you read in the contract that turned out to be false, just not true?

## WELCOME TO CRST INTERNATIONAL, INC.



Welcome to the CRST Team! We are pleased that you have chosen CRST for your new career opportunity.

We are one of the nation's leading transportation companies. We are proud to say that we have grown to be one of the largest transportation companies in the United States, with over 1,200 office employees, 4,000 Company drivers and 2,500 independent contractors. At CRST, our success is based on a mission that drives the decisions we make each day:

A long standing history of financial stability, generated from revenue growth and profitability;

Outstanding customer service and a commitment to value for our customers;

Core value instilled in our fleet of "Safety First";

An investment in our people to ensure we have an engaged, dedicated workforce with advancement opportunities for the next generation of leadership.

We know that this mission helps to set us apart from our competitors. We also know that the strength of CRST International is in the quality of our service, the customers we serve and the efforts of all of you. We want you, as an integral part of this team, to make it your personal mission to positively impact our customers. You have an opportunity to make a tremendous difference, and I wish you much success in your new position at CRST!

Sincerely,



Dave Rusch
President and CEO

*Copyright © 2016 CRST Expedited & CRST Dedicated Proprietary and Confidential*

# HISTORY AND PROFILE OF CRST

In 1955, Herald Smith had vision for the future. With no trucks or customers, Herald and his wife Miriam purchased the authority for **C**edar **R**apids **S**teel **T**ransport on borrowed money and set up a business in a refurbished chicken coop they bought for $125. Herald convinced firms in Cedar Rapids he could save them money. He contracted owner/operators who were hauling livestock to Chicago to return with loads of steel. It worked and CRST began to grow. Many acquisitions were made through the years, yet the company remains family-owned.

In November 1997, CRST International announced its transformation from a trucking company to a total transportation company to better serve the needs of its customers. CRST International management restructured the company from five independently functioning companies into one entity to better serve its customers. Now with a single call, customers can arrange the broadest range of services in the industry. This began "The Transportation Solution" - moving from a trucking company to a total transportation company.

CRST International, Inc. is one of the nations leading Transportation and Logistics Companies in the U.S., with annual revenues over $1 billion and a workforce of over 1000 office employees, over 3,500 company drivers, and works with over 1,700 independent contractors. Headquartered in Cedar Rapids, Iowa and with offices across the United States, CRST operates with zero debt, which gives us the ability to reinvest in equipment, technology and human capital–all designed to bring our customers the finest services at a competitive cost.

CRST Expedited is the nation's largest team carrier with one of the newest fleets in the industry. Servicing the lower 48 states and Mexico with more than 1,700 company-owned tractors, 3,500 van trailers, 2,000 team drivers, 350 single drivers, and more than 250 independent contractors. CRST Expedited includes TCTS: Temperature Controlled Team Service – Refrigerated Teams, and CRST Air Cargo Expedited.

CRST Dedicated Services Founded in 1955 offers specialized expertise serving a wide variety of customers across manufacturing, retail, lumber, steel, glass, automotive and LTL sectors. Services include Dry Van, Flatbed, Bulk Container, Team/Solo/Slip-seat, LTL Line haul, Local Delivery, Straight Truck, Tanker, Pups, and Yard Jockey.

CRST Malone is one of the oldest privately held truckload carriers in the industry, having served the flatbed marketplace since 1928. Headquartered in Birmingham, Alabama, CRST Malone is the largest flatbed organization in the nation under one roof. We currently have over 1400 trucks and operate over 90 field offices throughout the contiguous United States. With over 1,200 contractors, CRST Malone is one of the country's largest flatbed carriers, and includes BESL Transfer, a local/regional flatbed carrier.

Specialized Transportation, inc. (STI) has been an asset-based industry leader of specialized supply chain solutions since 1965, formerly as the high value products/logistics division of North American Van Lines. In 2011, STI became a wholly owned subsidiary of CRST International; inc., and provides customized supply chain solutions for products that require high touch support, special handling and equipment, and value added on site services. Supporting the business to business and business to consumer markets, we provide multi-modal logistics supported by an extensive network of distribution centers throughout the U.S. and Canada. The suite of services includes specialized padded van transportation, trade show support, first and final mile logistics, white glove services, transportation management, warehousing, home delivery, and technology tools. We specialize in supporting customers in the Technology, Healthcare, Industrial, Furniture, Store Fixtures, Retail, and Financial Services.

***SIGNATURES NEEDED ASAP NO LATER THAN OCTOBER 31, 2016***

CRST Expedited, Inc.
3930 16th Avenue
Cedar Rapids, IA 52416

**NOTICE OF ADDENDUM**

**TO ALL CURRENT CRST EXPEDITED, INC. CONTRACTORS:**

CRST Expedited, Inc. ("CRST Expedited") would like to renew the parties' Independent Contractor Operating Agreement ("Agreement") on the same terms as set forth in the revision dated September 1, 2015 and/or extended by Addendum in September 2015 for an additional one-year term. Toward that end, we are enclosing an Addendum that, if signed by both parties, would extend the term of the Agreement so that it terminates on October 1, 2017.

Please review this Notice and the enclosed Addendum carefully. Then, if you agree, please sign and date BOTH copies of the Addendum and return one signed copy to CRST Expedited AS SOON AS POSSIBLE AND NO LATER THAN OCTOBER 31, 2016, BY FAXING IT TO HEATHER BOEKE AT (319) 731-6506. The Addendum will become effective at 12:01 a.m. Central Time on the earlier to occur of the Contractor's date of signing or October 31, 2016.

Please feel free to call me with any questions regarding this Notice. Thanks and be careful.

Terry Pump
Director, Independent Contractors
CRST Expedited, Inc.

CRST Expedited, Inc. Independent Contractor Operating Agreement

## ADDENDUM

Whereas the undersigned Contractor and CRST Expedited, Inc. ("Carrier") wish to extend the term of the Independent Contractor Operating Agreement, including any appendixes and addendums, between the parties ("Agreement") so that it terminates on October 1, 2017; therefore, in consideration of the covenants and agreements contained in the Agreement, the parties hereby agree, pursuant to Section 16(D)(3) of the Agreement, to amend the Agreement as follows:

1. **NEW TERMINATION DATE.** The Termination Date in Section 14(A) of the Agreement, the "IN WITNESS WHEREOF" paragraph immediately following Section 20 of the Agreement, and the Statement of Lease appended to the Agreement, shall be October 1, 2017.
2. **LIMITED SCOPE AND COPIES.** Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum – the Agreement shall remain in full force and effect in accordance with its terms. Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor. Both parties shall then attach this Addendum to their copy of the Agreement.

**THIS ADDENDUM**, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Central Time on the earlier to occur of Contractor's date of signing below or October 31, 2016.

**CONTRACTOR:** ____________________

By: ____________________
Signature

____________________
Authorized Rep.'s Name (Typed or Printed)

____________________
Title

__________
Date

__________
Truck #

__________
Driver ID

**CARRIER: CRST EXPEDITED, INC.**

By: [signature]
Signature

Terry Pump
Authorized Rep.'s Name (Typed or Printed)

Director, Independent Contractors
Title

*Fax to Heather Boeke*
*Fax # 319-731-6506*

*SIGNATURES NEEDED ASAP NO LATER THAN DECEMBER 15, 2017*

CRST Expedited, Inc. 3930 16th Avenue
Cedar Rapids, IA 52416 NOTICE OF

ADDENDUM

TO ALL CURRENT CRST EXPEDITED. INC. CONTRACTORS:

CRST Expedited, Inc. {"CRST Expedited") would like to renew the parties' Independent Contractor Operating Agreement ("Agreement") on the same terms as set forth in the revision dated September 1, 2016 and/or extended by Addendum in September 2016 for an additional one-year term. Toward that end, we are enclosing an Addendum that, if signed by both parties, would extend the term of the Agreement so that it terminates on October 1, 2018.

Please review this Notice and the enclosed Addendum carefully. Then, if you agree, please sign and date BOTH copies of the Addendum and return one signed copy to CRST Expedited AS SOON AS POSSIBLE AND NO LATER THAN DECEMBER 15, 2017 BY FAXING IT TO LAURA HERMANSON AT 319-731-9245. The Addendum will become effective at 12:01 a.m. Central Time on the earlier to occur of the Contractor's date of signing or December 15, 2017.

Please feel free to call me with any questions regarding this Notice. Thanks and be safe.

Phil Reges
Director, Independent Contractors CRST Expedited, Inc.

Whereas the undersigned Contractor and CRST Expedited, Inc. ("Carrier") wish to extend the term of the Independent Contractor Operating Agreement, including any appendixes and addendums, between the parties ("Agreement") so that it terminates on October 1, 2018; therefore, in consideration of the covenants and agreements contained in the Agreement, the parties hereby agree, pursuant to Section 16(D)(3) of the Agreement, to amend the Agreement as follows:

1. NEW TERMINATION DATE. The Termination Date in Section 14(A) of the Agreement, the "IN WITNESS WHEREOF" paragraph immediately following Section 20 of the Agreement, and the Statement of Lease appended to the Agreement, shall be October 1, 2018.
2. LIMITED SCOPE AND COPIES. Except as expressly amended by this Addendum -or by other addendums or amendments, if any, not inconsistent with this Addendum -the Agreement shall remain in full force and effect in accordance with its terms. Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor. Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Central Time on the earlier to occur of Contractor's date of signing below or December 15, 2017.

CONTRACTOR:________________________

By: __________________________________ ____

**Signature**

______________________________________

**Authorized Rep.'s Name (Typed or Printed)**

______________________________________

**Title**

____________

**Date**

____________

**Truck#**

____________

**Driver ID**

CARRIER: CRST

Phil Reges

**Authorized Rep.'s Name {Typed or Printed)**

**Director. Independent Contractors**

**Title**

*Fax to:*
*LauraHermanson*
*Fax# 319-731-9245*

*SIGNATURES NEEDED ASAP NO LATER THAN DECEMBER 15, 2018*

CRST Expedited, Inc.
3930 16th Avenue
Cedar Rapids, IA 52416

NOTICE OF ADDENDUM

TO ALL CURRENT CRST EXPEDITED, INC. CONTRACTORS:

CRST Expedited, Inc. ("CRST Expedited") would like to renew the parties' Independent Contractor Operating Agreement ("Agreement") on the same terms as set forth in the revision dated September 1, 2017 and/or extended by Addendum in September 2017 for an additional one-year term. Toward that end, we are enclosing an Addendum that, if signed by both parties, would extend the term of the Agreement so that it terminates on October 1, 2019.

Please review this Notice and the enclosed Addendum carefully. Then, if you agree, please sign and date BOTH copies of the Addendum and return one signed copy to CRST Expedited AS SOON AS POSSIBLE AND NO LATER THAN DECEMBER 15, 2018 BY FAXING IT TO LAURA HERMANSON AT 319-731-9245. The Addendum will become effective at 12:01 a.m. Central Time on the earlier to occur of the Contractor's date of signing or December 15, 2018.

Please feel free to call me with any questions regarding this Notice. Thanks and be safe.

Brian Weiss
Director of Operations – IC
CRST Expedited, Inc.

114409

CRST Expedited, Inc. Independent Contractor Operating Agreement

ADDENDUM

Whereas the undersigned Contractor and CRST Expedited, Inc. ("Carrier") wish to extend the term of the Independent Contractor Operating Agreement, including any appendixes and addendums, between the parties ("Agreement") so that it terminates on October 1, 2019; therefore, in consideration of the covenants and agreements contained in the Agreement, the parties hereby agree, pursuant to Section 16(D)(3) of the Agreement, to amend the Agreement as follows:

1. NEW TERMINATION DATE. The Termination Date in Section 14(A) of the Agreement, the "IN WITNESS WHEREOF" paragraph immediately following Section 20 of the Agreement, and the Statement of Lease appended to the Agreement, shall be October 1, 2019.
2. LIMITED SCOPE AND COPIES. Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum -the Agreement shall remain in full force and effect in accordance with its terms. Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor. Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Central Time on the earlier to occur of Contractor's date of signing below or December 15, 2018.

CONTRACTOR: Anthony Cervantes

By: [signature]
Signature

Anthony G Cervantes
**Authorized Rep.'s Name (Typed or Printed)**

Owner
**Title**

12/11/18
**Date**

114409
**Truck#**

536B
**Driver ID**

CARRIER: CRST

Brian Weiss
**Authorized Rep.'s Name (Typed or Printed)**

**Director of Operations - IC**
**Title**

*Fax to:*
*Laura Hermanson*
*Fax# 319-731-9245*

TERRY PUMP

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and
MIKE CROSS, on behalf
of themselves and all others
similarly situated

Plaintiffs, Case No.

vs. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC.,
and CRST EXPEDITED, INC.,

Defendants.

____________________________/

REMOTE ORAL DEPOSITION OF TERRY PUMP

CEDAR RAPIDS, IOWA

THURSDAY, FEBRUARY 9TH, 2023

REPORTED BY:
DEBORAH HABIAN, RMR, CRR, CLR
JOB NO. 221713

# DIRECT EXAMINATION BY PLAINTIFFS

apply to independent contractors and employee drivers who want to be a lead driver?

A. Can you scroll down?

Q. Sure. (Complying.)

Tell me when you'd like me to keep scrolling.

A. Yeah, scroll down to the bottom a little more.

Q. (Complying.)

A. Yes, these apply to both company drivers and independent contractors.

Q. And if you see point 15 states "Cannot have been on the watch list in the past six months." Do you know what the watch list is?

A. I do.

Q. What is it?

A. It is an arbitrary document that a driver or contractor would sign prior to coming into our authority or working with us that would signify that they had some safety history prior to coming to CRST.

Q. Do you know whether CRST updates the watch list while independent contractors and employee drivers are hauling freight for CRST?

TERRY PUMP

A. Recruiting, training. At least those two departments.

Q. Do you know how these departments obtain the information that inform them to create the watch list for that certain driver or independent contractor?

MR. SPOLYAR: Objection, form, speculation.

Go ahead.

THE WITNESS: It's usually information that's contained in the application and the documentation required by the FMCSA prior to bringing them into our authority.

BY MS. KING:

Q. And if an employee driver or independent contractor is placed on the watch list, then they cannot be a lead driver for the next six months; is that correct?

A. Yeah. And this is only done prior to coming to CRST. It's not done like in a post scenario.

Q. Okay. And besides not being able to be a lead driver for the next six months, are there any other consequences for an independent

30(B)(6) - JERRY KILGORE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and
MIKE CROSS, on behalf
of themselves and all others
similarly situated
Plaintiffs, Case No.
vs. 1:20-cv-00075-CJW-KEM
CRST INTERNATIONAL, INC.,
and CRST EXPEDITED, INC.,
Defendants.
____________________________/

REMOTE ORAL 30(B)(6) DEPOSITION OF JERRY KILGORE
CEDAR RAPIDS, IOWA
TUESDAY, JANUARY 24TH, 2023

REPORTED BY:
DEBORAH HABIAN, RMR, CRR, CLR
JOB NO. 221244

# DIRECT EXAMINATION BY PLAINTIFFS

characters.

Q. And in Column H, how are these values calculated?

A. There are -- there's certain types of revenue that are designated as load revenue or line haul, I guess is another term that we use to designate that, and the baseline haul charge that's kind of a common concept in trucking, the base line haul charge is the main component of that.

There may be some other components to that, things that in our ICOA agreement with the contractors that we would use the same rate, we would apply the same rate as we do the line haul.

So, for instance, hypothetical situation, a contractor has an agreement to be paid 70 percent of the revenue, the load revenue. All of the items for which they are paid 70 percent would be part of this load revenue. Anything outside of that would not be captured here.

Q. So, for example, the figure in Column H would capture a detention payment that was paid

A. -- it could be hourly. It could be any number of things, depending.

Q. So --

A. In the system there's another qualifier that would say, you know, this is the type of pay, here's the rate, and the rate would be applicable to the type of pay.

Q. And so looking at this pay rate format here for these payees with the payee type C that also have a per diem --

A. Yes, this is all related to our company drivers.

Q. I see.

A. So I can almost guarantee that data is not applicable to this case. The per diem field is not applicable totally for company drivers and the payee type C is not applicable either. It's only for -- those are only for company drivers.

Q. Thank you.

A. And this per diem pay date, likewise, the post key, likewise is background database.

Q. And so AK, the "prorated revenue," do you know what value was in that?

30(B)(6) - JERRY KILGORE

A. This should be -- yes. Hold on a minute. No, you're on there.

This is the line haul revenue of the load times the ratio of miles associated with the movement, and the ratio of the -- so, you know, you take the line haul and you multiply that by the ratio of miles -- movement to total miles, and you get the prorated revenue.

Q. And is this prorated revenue a number that is charged to the customer?

A. I believe that that is the line haul charge.

Q. So we --

A. In other words, this data is coming from settlement and payee tables. It's not coming from billing tables. So that particular field doesn't have anything do with charging customers.

Q. Okay. So we see here that in Column Q -- in many cases in Column Q that it matches up with the prorated revenue?

A. Correct.

Q. But in some cases it does not. Do you know the reason why not?

A. I would guess that there's multiple movements associated with this order and the driver only ran one of the movements.

It is very possible that a driver is assigned -- so, you know, again, drivers are assigned at the movement level and if the overall line haul charge for the order is 2500 and then the driver runs a portion of that, in this case you could do the math to see what the percentage of that is, but this appears rough math to be something like 25 percent of -- maybe 30 percent of the overall miles.

If that movement was 30 percent of the miles of the total load, total order, then we'd take that line haul charge times 25 or 30 percent, whatever the ratio is, to get that number.

Q. So is what you're saying is the line haul charge is on an order level and the prorated revenue is on a movement level; is that right?

A. That's what I believe.

Q. Okay. And "ship date" here, do you know what that is, Column AN?

30(B)(6) - JERRY KILGORE

Case Name:

Deposition Date:

Deponent:

| Pg. | No. | Now Reads | Should Read | Reason |
| --- | --- | --- | --- | --- |
| | See Attached | | | |

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS 7th DAY OF April, 2023.

SHERYL M GATES
Commission Number 170063
My Commission Expires
June 24, 2023

(Notary Public) MY COMMISSION EXPIRES: 6-24-2023

Case Name: Anthony Cervantes and Mike Cross vs. CRST International, Inc., and CRST Expedited, Inc.
Deposition Date: January 24, 2023
Deponent: Jerry Kilgore

| Page | Line No. | Now Reads | Should Read |
|---|---|---|---|
| 39 | 14 | these things are marked on. | these things work. |
| 39 | 18 | how trailer data and the attributes about a | with trailer data and the attributes about a |
| 45 | 18 | what that is abbreviated as the load number, | what is recorded as the load number, so |
| 46 | 17 | movement between Chicago where I last on-loaded | movement between Chicago where I last unloaded |
| 52 | 8 | to designate that, and the baseline haul charge | to designate that, and the line-haul charge |
| 52 | 10 | base line haul charge is the main component of | line-haul charge is the main component of |
| 57 | 23 | one application asks the other appli- -- passes | one application asks the other application to pass data |
| 59 | 16 | would be Chicago -- would be Joliet.· So | would be Chicago to Joliet.· So |
| 61 | 13 | OmniTRACS, who made the machines.· Those reports | Omnitracs and Maven Machines.· Those reports |
| 61 | 17 | say it is the IFTA reports -- in terms of the | say it is the IFTA report is the |
| 61 | 18 | mileage that a truck ran in a given state is | mileage that a truck ran in a given state |
| 61 | 19 | ·produced by -- in an IFTA report on a monthly | on a monthly |
| 61 | 21 | ·is what is captured, not necessarily all the | is what captures all the |
| 62 | 9 | captures.· And it isn't structured data, but | captures.· And it is structured data, but |
| 65 | 12 | A.· That's the driver under -- or | ·A.· That's the driver pay rate -- or |
| 70 | 22 | ·different in this particular terminology we use | different segments. In this particular terminology we use |
| 84 | 10-14 | | ***I don't recall exactly what I said, but it wasn't what is recorded here*** |
| 85 | 16 | delivery status.· And it would flow down to | delivered status.· And it would flow down to |
| 91 | 21 | class in the table, yes, then you can pull the | data in the table, yes, then you can pull the |
| 100 | 13 | ·A.· They could in fact get a -- you know, | ·A.· They could in fact get a new ID, |
| 100 | 24 | ·would -- you know, if -- you could imagine | ·would use a bad social. You could imagine |
| 114 | 3 | other drivers.· So it's the -- in most cases | other drivers, but doesn't drive. |
| 114 | 4 | it -- I would -- there maybe a situation where | So while there may be a situation where |
| 114 | 5 | one of the payees is not an active driver, but | one of the payees is not an active driver, |
| 114 | 6 | in many cases that we have where we have a | |
| 114 | 7 | driver that doesn't -- so we more often have a | we more often have a |
| 114 | 18 | Well, so the driver ID is main -- is -- | |
| 115 | 23 | Yeah, this would be very similar to an | |
| 115 | 24 | ·almost -- I mean, this would be the same as | This would be the same as |
| 166 | 22 | I helped find."· Yeah, it does not appear I | (not sure what was said here, but this doesn't seem correct)· Yeah, it does not appear I |
| 168 | 24 | ·instance, if there's a -- what the column would | Don't know what was said here that was missed by the recorder. |
| 171 | 13 | "vrs_deduct_hist" as well as there's some data | "drs_deduct_hist" as well as there's some data |
| 171 | 14 | in here from "vrs_payee" and from a table titled | in here from "drs_payee" and from a table titled |
| 173 | 4 | ·payroll run, you have deductions associated with | settlements run, you have deductions associated with |
| 173 | 5 | a payroll run.· And when you do a payroll run, | a settlements run.· And when you do a settlements run, |
| 182 | 25 | A.· Josh Gehling is the manager of our -- | A.· Josh Juehring is the manager of our -- |
| 200 | 13 | can't definitively say that in Column D that | can definitively say that in Column D that |
| 358 | 23 | know, we don't have a cradle chart for dwell | know, we don't have a Pareto chart for dwell |
| 359 | 18 | payment under_amount is in fact -- I can confirm | payment_amount is in fact -- I can confirm |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**REPLY EXPERT REPORT OF BRIAN KRIEGLER, PH.D.**

The attached document is the Reply Expert Report of Plaintiffs' retained expert, Brian Kriegler, Ph.D., dated January 12, 2024, served pursuant to Fed. R. Civ. P. 26(a)(2)(D).

Dated: January 12, 2024

By: /s/ Rebecca King

Rebecca King (*pro hac vice*)
GETMAN, SWEENEY & DUNN PLLC
260 Fair Street
Kingston, NY 12401
Phone: (845) 255-9370
rking@getmansweeney.com

*Attorneys for Plaintiffs*

a. (Minimum wage) The Kriegler Report matches compensable time with pay from the subsequent week,[8] whereas Dr. Song matches work time and earnings by load, effectively crediting pay received in one week over several weeks.[9]

b. (Minimum wage) The Kriegler Report calculates compensable time subject to a 16-hour maximum per calendar day to include time during which a load is in progress, and/or the driver is driving or on duty, whereas Dr. Song calculates compensable time using different data criteria.[10]

c. (Minimum wage) The Kriegler Report considers certain deductions to be work-related per instructions from Plaintiffs' counsel, whereas Dr. Song does not agree with the criteria that I have implemented.[11]

d. (TILA) The Kriegler Report calculates separate TILA damages for (i) linehaul charges, (ii) fuel-related accessorial charges, and (iii) non-fuel related accessorial charges, whereas Dr. Song offsets drivers' underpayments with overpayments within and across loads.[12]

7. It is incorrect of Dr. Song to characterize my damages methodology and results as "flawed," "inflated," or "unreliable" when differences stem from alternative legal assumptions about the data. Broadly speaking, Dr. Song's data decisions are tangential to my understanding of Plaintiffs' allegations and/or the legal assumptions that I was instructed to make. *See* Sections III.A and III.B below.

8. Additionally, the Song Report criticizes the Kriegler Report for not including workweeks in which there is compensable work time and no corresponding pay

---

[8] *See* Kriegler Report, Appendix A.

[9] *See*, *e.g.*, Song Report, § V.A.3.

[10] *See*, *e.g.*, Song Report, ¶ 125b.

[11] *See*, *e.g.*, Song Report, § V.B. The work-related deductions at issue where Dr. Song and I disagree are: (i) maintenance/installment loans, (ii) payments to escrow accounts, (iii) property insurance payments, and (iv) maintenance deductions.

[12] *See*, *e.g.*, Song Report, § VI.B.

30. **Reply Exhibit 8B** shows updated damages under the FLSA, Iowa Statute, and the higher of the two. This exhibit is analogous to Exhibit 8B in the Kriegler Report.

### B. Updated TILA Damages

#### *1. Updated Summary for the Named Plaintiffs and Rule 23 Class*

31. I have updated TILA damages calculations to account for the three changes to the data criteria described in Section III.C above.[39] Updated damages for the Named Plaintiffs and Rule 23 Class before extrapolating are as follows:

- Anthony Cervantes: $3,246.22
- Mike Cross: $5,789.35
- Rule 23 Class: $5,140,008.85.

32. There are 320,505 loads during the TILA Damages Period and within the Historical Data. Therefore, average damages per load per Rule 23 Class Member are equal to $5,140,008.85 / 320,505 = $16.04.

33. Rule 23 classwide TILA damages from April 24, 2022 through November 3, 2022 are $432,394.62. This dollar amount is used as a proxy to estimate classwide TILA damages during the Post-Data Period. Therefore, classwide TILA damages including extrapolations are $5,140,008.85 + $432,394.62 = $5,572,403.47.

#### *2. For Individual Drivers*[40]

34. **Reply Exhibit 9** is analogous to Exhibit 9 in the Kriegler Report. The distinction is that the calculations in Reply Exhibit 9 account for the updates described in Section III.C above.

---

[39] *See* ¶ 25 above.

[40] Just as in the Kriegler Report, the work papers also show full results for each individual.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**AFFIRMATIVE EXPERT REPORT OF STEVE VISCELLI, PH.D.**

The attached document is the Affirmative Expert Report of Plaintiffs' retained expert, Steve Viscelli, Ph.D., dated November 3, 2023, served pursuant to Fed. R. Civ. P. 26(a)(2)(D).

Dated: November 3, 2023

By: <u>*/s/ Rebecca King*</u>
Rebecca King (*pro hac vice*)
GETMAN, SWEENEY & DUNN PLLC
260 Fair Street
Kingston, NY 12401
Phone: (845) 255-9370
rking@getmansweeney.com

*Attorneys for Plaintiffs*

**Background on the Lease Operator Labor Management Model**

CRST uses the lease operator labor management model common in long-haul trucking. This arrangement is often characterized by motor carriers as a continuation of the long-standing tradition of independent owner-operators in the trucking industry. As explained in detail at the end of this section, there are fundamental differences between independent owner-operators, who own and operate their own trucking business, and lease operators. In fact, the lease operator model is a labor management strategy of relatively recent origin and the result of market conditions for motor carriers produced after deregulation, technological change, and a transformation of norms in the industry's labor markets.[1]

## A. Regulation of the Industry and Labor

The trucking industry was historically subject to extensive economic regulation that limited both price competition and market entry by new firms. The primary intent of this regulation was to ensure adequate service to rural communities and fair pricing for smaller shippers. Prior to deregulation of the industry beginning in the late 1970s, large trucking firms were very profitable and truck drivers, most of whom were members of the International Brotherhood of Teamsters, were among the nation's highest paid blue-collar workers. During regulation, nationwide collective bargaining developed and wages were taken out of competition and working conditions standardized across the nation. As a result, trucking firms in most segments of the industry did not compete based on how much they paid workers or basic working conditions (e.g. how often drivers slept in their trucks or had to team drive with inexperienced trainees).[2]

Regulation was enacted in 1935 to combat the industry's tendency toward excessive competition. In terms of economic theory, several factors cause this tendency. First, trucking lacks asset specificity: the capital investments required for trucking are not generally tailored to narrow or specific product markets, and trucks are, for the most part, interchangeable and readily available. This means that barriers to entry are low, so when trucking is profitable new firms enter the market and existing firms can increase capacity quickly, reducing rates. CRST, for instance, might haul higher value expedited freight when it can but will haul lower cost dry freight when needed.

Second, trucking is a derived-demand industry. That is, what trucking produces is entirely dependent on the immediate demand for its services from customers. Trucking firms cannot store what they produce for later sale. When demand slackens, some portion of equipment, facilities, and labor will be immediately underutilized. When that happens, firms may have strong incentives to "keep the wheels rolling" by cutting the rate they charge customers, even taking a loss on individual loads to maintain market share or generate revenue to cover fixed expenses and survive down periods.

---

[1] Viscelli, Steve. 2016. *The Big Rig: Trucking and the Decline of the American Dream.* Berkeley: University of California Press.
[2] Ibid. Chapter 1.

These characteristics mean that unregulated trucking markets are volatile and over the long-term there is significant risk but very little, if any, profit to be made by simply owning trucks as an asset—that is why firms like CRST shift the costs and liability of owning trucks to workers using the lease operator model. In hindsight, regulation protected the profits of firms and the wages of drivers. It also protected small retailers and producers and made the industry safer. In the absence of economic regulation, large global retailers and manufacturers have benefitted and many aspects of the industry have had to be re-regulated for safety, most notably via the creation of the Federal Motor Carrier Safety Administration.

## B. Lease-Operators in Long-Haul Trucking

Deregulation at the end of the 1970s unleashed tremendous competitive forces, completely reshaping the way freight moved. Over the following decade most of the leading less-than-truckload firms in the industry were driven out of business. Cost cutting brought lower wages, greater amounts of unpaid time waiting and doing non-driving work, and less desirable working conditions for truckers. Total employee compensation per mile, including benefits, fell by 44 percent in long-haul trucking from 1977 to 1987.[3]

Immediately after deregulation, trucking firms needed less expensive labor and turned to existing independent owner-operators, who worked primarily in agricultural hauling, which was never regulated, to shed the costs of expensive, inflexible unionized labor. In the first years after deregulation using owner-operators was a survival strategy for many carriers.[4]

But the shift to owner-operator labor was short-lived. Despite carrier interest, by the mid-1980s, this labor supply was declining rapidly as intense competition and plummeting freight rates bankrupted many owner-operators. Soon the most profitable for-hire motor carriers were truckload firms making their profits through more efficient use of non-union employee drivers and sending these drivers point-to-point across large geographical areas. Owner-operators were being squeezed by declining rates and unable to invest in their equipment, resulting in poor customer service and low productivity. In contrast, the high asset utilization achieved by the profitable truckload companies that emerged after deregulation required that trucks be dependable and that drivers accept whatever loads were assigned to them by the increasingly sophisticated load-planning systems that were being developed, including those using satellite-linked computers.[5] Owner-operators, while appealing in terms of low pay and reducing capital costs and the unlikelihood of unionization, were resistant to carrier control because they wanted to pick whatever freight paid the best and could not achieve the equipment reliability required by

---

[3] Corsi, Thomas M., and Joseph R. Stowers. 1991. "Effects of a Deregulated Environment on Motor Carriers: A Systematic Multi-Segment Analysis." *Transportation Journal* 30: 4-28. Belzer, Michael. 2000. *Sweatshops on Wheels: Winners and Losers in Trucking Deregulation.* New York: Oxford University Press.

[4] *See* Nickerson, Jack A., and Brian B. Silverman. "Why Firms Want to Organize Efficiently and What Keeps Them from Doing So: Inappropriate Governance, Performance, and Adaptation in a Deregulated Industry." *Administrative Science Quarterly* 48 (2003):433-65.

[5] Hubbard, Thomas N., "Information, Decisions and Productivity: On Board Computers and Capacity Utilization in Trucking", *American Economic Review*, Vol 93, No 4, September 2003, pp.1328-1353.

the new breed of truckload firms that came to dominate long-haul trucking. Within just a few years, the number of loads hauled by owner-operators dropped dramatically.[6]

From the late-1980s to the mid-1990s, the leading truckload carriers generally favored non-union company driver labor. But continually deteriorating pay and working conditions were causing increasingly high levels of employee turnover and associated costs. To retain drivers longer and gain the cost advantages of independent owner-operators, carriers began adopting a new model in the mid-1990s. Firms began consciously transforming the labor market institutions around contracting, to create a new kind of owner-operator that would fit their needs: the lease operator.[7]

The use of lease operators is deeply intertwined with the use of sophisticated technologies. Satellite- and cellular-linked computers allow firms to more efficiently monitor trucks, plan loads, and coordinate and dispatch drivers.[8] But in order to maximize the return on the greater information these systems provide and the control they facilitate, planners must be able to assume that drivers will generally accept the load they have assigned to them and do what they are instructed to do. Research suggests this contributed to the decline in the use of owner-operators with such rights.[9] Choosing whose loads to haul based on how much they pay—a regular practice of independent owner-operators historically—is fundamentally at odds with the way long-haul firms have sought efficiency gains and profit since deregulation. As explained below, with rare exceptions, CRST lease operators can only haul loads assigned by CRST and CRST is able to manage its lease operators in ways that ensure they almost always accept the loads assigned to them. Furthermore, while employee drivers can switch firms within days, lease operators have to consider all of the obligations of their lease agreements, escrow accounts and the additional downtime of switching from one firm to another.

Through various individual and industry-wide recruitment and informational efforts (e.g. websites), truckload firms create a pool of lease operators very different from previous independent owner-operators that can be incorporated into more efficient fleets utilizing satellite-linked computers. In the mid-70s, a majority of all owner-operators were union members in many segments; virtually none are today.[10] Just before deregulation, 33% of all owner-operators owned more than one truck and 16% of all owner-operators owned more than 5 trucks.[11] By 1997, less than 14% of all owner-operators owned more than 1 truck and less than 2% owned more than 5 trucks.[12] There have not been representative surveys done since that time that could accurately estimate the number of lease operators that own more than one truck, but I suspect it is likely to be less than 1%. Perhaps most importantly, by 1997, 90% of lease operators received

---

[6] Corsi, Thomas M., and Joseph R. Stowers. 1991. "Effects of a Deregulated Environment on Motor Carriers: A Systematic Multi-Segment Analysis." *Transportation Journal* 30: 4-28.
[7] Viscelli, 2016. Chapter 3.
[8] Hubbard, Thomas N., "Information, Decisions and Productivity: On Board Computers and Capacity Utilization in Trucking", American Economic Review, Vol 93, No 4, September 2003, pp.1328-1353.
[9] Baker, George P. and Thomas N. Hubbard. "Contractibility and Asset Ownership: On-Board Computers and Governance in U. S." *The Quarterly Journal of Economics*, Vol. 119, No. 4 (Nov., 2004), pp. 1443-1479.
[10] Wyckoff, Daryl D. 1979. *Truck Drivers in America.* Lexington, MA: Lexington Books.
[11] Agar, Michael. 1986. *Independents Declared: The Dilemmas of Independent Trucking.* Washington, DC: Smithsonian Institution Press.
[12] Belman, Dale L., Kristen A. Monaco, and Taggert J. Brooks. 2005. *Sailors on the Concrete Sea: A Protrait of Truck Drivers' Work and Lives.* East Lansing, MI: Michigan State University Press.

CRST offers. Opt-In Barry Robinson signed an ICOA on September 23, 2020 and explained that "Nine times out of ten, I accept it and say yes because I fear saying no. Because I'm thinking, [i]f I say no, they're going to let me sit there and say, Well, you turned it down. We gave you a load. You turned it down. We can't—that's all we had. And now I'll just be sitting there. So I just be sitting there. So I just take what they offer, you know, instead of relying on them to do the right thing and send me a load." Barry Robinson Depo Tr. 74:02-75:04; 103:17-104:02.

That lease operators draw the conclusion that refusing loads will cost them more than they could gain is essential to operating the lease operator management model efficiently.

Once loads are assigned, in order to ensure on-time delivery to its customers, CRST must monitor and direct its drivers, both employees and lease operators, in essentially the same way. As CRST makes clear in its Safety and Operations Handbook: "To the customer, you are CRST!" [CRST 002042]. The Operations Department Policies, Procedures, & Discipline section of that Handbook makes clear that being on time is the main expectation and that drivers will be held accountable, because customers expect this of CRST. But lease operators are not capable of meeting this customer expectation themselves. The long-haul loads CRST moves require not only additional labor—the driving work of another team driver, most often a CRST trainee—but often additional equipment. Long-haul trucks can break down, they can get stuck in weather, drivers can get sick, etc. A load can get behind schedule for any number of reasons. While CRST expects drivers to be on-time as much as possible, there is no way that CRST can depend on lease-operators to independently achieve the 95-97% on-time delivery rate that it is selling to its customers and that its customers expect (CRST002042).

CRST's freight must move very fast. Once drivers are assigned a load, they must organize every minute of their time around the requirements of that load. The CRST Safety and Operations Handbook states: "CRST's total transit time standard is 50 mph! From Pickup to Delivery, you must average 50 mph, including DOT required Rest Breaks, fuel stops, driver swaps, meals, breaks, showers, weigh stations, traffic, etc." (CRST002045).

This means that drivers can only perform essential tasks and take care of absolute physical necessities and legally required breaks. The Safety and Operations Handbook states: "Team planning requires no shut down periods, except driver swaps, fueling, and breaks." (CRST002045).

To achieve this speed, CRST requires drivers, both lease operators and company drivers, to drive as a team. Expedited 30(b)(6) Depo, Abernathy, Tr. 101:14-103:22 (referring to Ex. 17, Annotated ICOA). In order to ensure drivers are meeting the pace for on-time delivery, CRST monitors and manages all of its drivers. CRST lease operators and company drivers are required to have GPS-enabled equipment installed on their trucks. CRST managers regularly check on their progress and intervene to ensure on-time delivery. *See* Reges Depo Tr. 145:16-145:21 (CRST's dispatching software regularly keeps track of where trucks are and relays that information to CRST staff); Expedited 30(b)(b) Depo, Brueck, Tr. 112:13-112:22 (CRST driver managers, fleet managers, and planners have access to employee's and lease operators' truck's GPS at any time). For instance, in the Qualcomm messages sent from CRST to lease-operators in CRST011223 there are numerous instances of driver managers tracking trucks and asking drivers

why they appear to be running late. For example, in message 43255371, Mr. Klopp says "good morning guys, I am tracking you for delivering at 1300 today. Can you tell me where and why we lost time?" Similar messages are sent by other managers including Katie, Sondra, Dave, Scott and others.

Ensuring on time delivery is an around the clock CRST management task. When drivers' primary manager is not at work, other shifts of managers track them. A manager monitoring Mr. Cervantes says in message 41485296, "hello, My name is Bronte- I will be taking care of customer service side of things tonight until 1900 then Christina will be in to make sure were hitting satisfactory. it is okay to be a little early, vs a little late. Please let me know when you get to shipper, leave shipper and arrive to destination. if you send me your macros as supposed to and if you stop tell me whats going on i will promise to not blow your qualcom and phone up. :) thank you! drive safe! Bronte." (CRST011223).

CRST may terminate a lease operator's agreement for failure to be on time for loads. Lizer Depo Tr. 139:09-139:23.

"When your fleet manager gives you an appointment keep it! . . . You must notify Operations at the first indication that a late delivery may occur. . . . Failure to communicate a late load to Dispatch will result in disciplinary action." Safety Handbook CRST004384.

If a lease operator is repeatedly late for a pickup or drop-off window, CRST "wouldn't pursue them as a business partner given a certain amount of inability to service CRST's customer freight." Lizer Depo Tr. 40:25-42:02.

If a lease operator "cannot withhold the agreement to their ICOA which is service expectations for the customers, then we would terminate our lease agreement with them and separate our business ties." Lizer Depo Tr. 42:09-42:13.

The reason CRST managers track drivers' progress and require regular communication from drivers is not just to hold lease operators accountable and to alert customers to potential late loads. In the event that drivers might be late, CRST will intervene to take a load from a driver, lease operator or company driver and have another truck haul it. In the industry these are known as relays, repowers or rescues. In message 29975219 Katie asks, "Hi Anthony and Ruben, why are you stopped and what is your eta to get rolling again?" and then in the next message to the truck, message 29982561, she asks "Good morning, How soon will you be back on the road? Need to know asap if we need to look for a rescue. Thanks."

A rescue is a prime example of CRST "making" trucking service by coordinating the work of lease operators with other drivers, CRST employees and other lease operators, to ensure on-time delivery. If CRST wants to, it can take loads it has offered and accepted away from drivers. As it apparently did to Mr. Cervantes before he sent message 3278968, "THE LOAD THAT WAS TAKEN FROM ME TO CALIFORNIA DELIVERED ON THE 19TH, I COULD OF MADE THIS LOAD EASILY WHY DOES CRST ADVERTISE SOLO AND TEAM OPPORTUNITIES BUT DENYS ME THESE LOADS AS SOLO WAITING PATIENTLY." (CRST011223).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, individually and on behalf of all other similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | No. 20-CV-75 CJW-KEM<br><br>**ORDER** |

---

**TABLE OF CONTENTS**


I. BACKGROUND ........................................ 3

II. MOTION TO RECONSIDER & RELATED MOTIONS ........................ 4

A. Standard of Review ........................................ 4

B. Count 2 – Iowa Minimum Wage Claim ........................................ 6

1. How to Evaluate Whether Plaintiffs Are Employees Under the FLSA ........................................ 6

2. Difference in Analysis Before and After July 1, 2020, and Its Effect on Class Certification ........................................ 9

C. Count 6 – Section 376.12(g) ........................................ 13

1. The Actual Damages Requirement ........................................ 13

plaintiffs' Section 376.12(g) claim is appropriate. Thus, the Court grants plaintiffs' motion to reconsider as to Count 6.

### *III. MOTION TO APPOINT CLASS COUNSEL*

When appointing class counsel, the Court must consider:

> (1) the work counsel has done in identifying or investigating potential claims in the action;
> (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (3) counsel's knowledge of the applicable law; and
> (4) the resources that counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A). The Court may, among other items, consider additional information relevant "to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B)–(E).

The Court has reviewed information about plaintiffs' counsel, submitted in plaintiffs' motion. (Docs. 281 & 281-1). Counsel have ably represented plaintiffs since inception of the case. Counsel have experience in navigating class actions and show knowledge of and intellectual engagement with the applicable law. Thus, the Court finds plaintiffs' counsel can fairly and adequately represent the interests of the class. The Court appoints as class counsel: Getman, Sweeney & Dunn, PLLC; Martin & Bonnett, PLLC, and; Edward Tuddenham.

### *IV. CONCLUSION*

For these reasons, plaintiffs' motion to reconsider (Doc. 282) is **granted**. The Court certifies plaintiffs' Iowa minimum wage claim (Count 2) in full and plaintiffs' TILA claim under Section 376.12(g) (Count 6), thereby amending its previous order on class certification. (Doc. 276).

Based on the Court's rulings here and in its previous order (Doc. 276), the Court **certifies** the following Rule 23(b)(3) class as to plaintiffs' Iowa minimum wage claim (Count 2) and TILA claim under Section 376.12(g) (Count 6):

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST Expedited, Inc.[12] during the applicable limitations period, subject to any equitable tolling and equitable estoppel.

Accordingly, plaintiffs' motion to certify counts 2–6 as Rule 23(b)(3) class actions (Doc. 244) is no longer held in abeyance and is **granted** as to plaintiffs' Iowa minimum wage claim (Count 2) and TILA claim under Section 372.12(g) (Count 6). Plaintiffs' motion to modify the proposed class definition (Doc. 281) is **denied as moot**. Plaintiffs' motion to amend/correct the third amended complaint (Doc. 295) is **held in abeyance**. Plaintiffs' motion to appoint class counsel (Doc. 281) is **granted**.

**IT IS SO ORDERED** this 16th day of August, 2022.

C.J. Williams
United States District Judge
Northern District of Iowa

[12] In its order on plaintiffs' motion to certify class, the Court found it necessary to change "CRST" to "CRST Expedited, Inc." here for clarity. (*Compare* Doc. 247, at 7, *with* Doc. 276, at 26). Neither party has taken issue with this change.

PHIL REGES

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and
MIKE CROSS, on behalf
of themselves and all others
similarly situated

Plaintiffs, Case No.

vs. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC.,
and CRST EXPEDITED, INC.,

Defendants.

___________________________/

REMOTE ORAL DEPOSITION OF PHIL REGES
IOWA CITY, IOWA
THURSDAY, NOVEMBER 10TH, 2022

REPORTED BY:
DEBORAH HABIAN, RMR, CRR, CLR
JOB NO. 219400

# DIRECT EXAMINATION BY PLAINTIFFS

inexperienced drivers?
A. It's a verbiage nuance. So it all depends on what people use for verbiage. So there's -- student drivers are student drivers, but inexperienced drivers, just depends on the verbiage used by the person.
Q. So if somebody said "inexperienced driver," could they be referring to a student driver?
A. Yes.
Q. And if somebody said "a student driver," they could be referring to a new driver; is that correct?
A. A student driver is by definition inexperienced.
Q. So if you'd imagine a Venn diagram and we have student drivers and inexperienced drivers, is that the same group of people, is it an overlapping group?
A. By my definition of it and by my usage of it, yes.
Q. Same. Thank you. Yeah.
And then I think the last person you said was Brian, and I'm sorry, I forgot how to

October 1st of 2018; is that right?

A. Correct.

Q. Okay. So am I correct in assuming here that if a driver signed this addendum, that their ICOA would end then on October 1st of 2018? Is that right?

A. I don't know that it would end, no.

Q. Well, it says here "would extend the term of the agreement so that it terminates on October 1st of 2018."

When they say "the agreement," do you know what they're referring to?

A. My interpretation of "the agreement" is the ICOA.

Q. Okay. And so this says "extended". So it terminates on October 1st of 2018; is that correct?

A. No, it says it would extend the term of the agreement.

Q. Okay. So am I correct in understanding that if a driver has an ICOA -- strike that.

Am I correct in understanding that if a driver had an ICOA at this time and they signed this addendum, that their ICOA would then

PHIL REGES

terminate on October 1st of 2018?

MR. HANSON: I'm going to object. It calls for a legal conclusion.

MR. SWEENEY: I'm not asking for a legal. I'm just asking for his understanding of it.

MR. HANSON: His understanding is fine, Mike.

THE WITNESS: (Reviewing document.)

Do you want me to answer that, Mike?

BY MR. SWEENEY:

Q. Yeah, please.

A. So this document is redone every year. We renew the ICOA every year in my knowledge -- to my knowledge at least.

Q. Okay. So let me ask if a driver didn't sign this addendum, would they just continue working?

A. I don't think we ever ran into that. So I'm not fully aware of what would happen if they didn't sign it, but...

Q. But this document tells me if you sign this, then your agreement is going to terminate on October 1st of 2018; is that right?

A. If that's your interpretation, yes.
Q. Well, what's your interpretation?
A. My interpretation is it's renewed every year, so it would -- there would be another document that comes out in 2018 that would renew it again until 2019.
Q. Okay. And my question to you is: If a driver doesn't sign that renewal, what happens?
A. My best estimate is their ICOA would terminate.
Q. Okay. And have you ever had the experience that that happened, that a driver refused to sign the addendum?
A. Not to my knowledge, no.
Q. And is it your experience that drivers always sign the addendum?
A. To the best of my knowledge, yes.
Q. And if a driver didn't sign the next year's addendum by October 1st of 2018, would they be able to continue working?
A. I assume it would be the same as if it was this agreement for the one that ended in 2018.
Q. So let's make sure that this exhibit

A. Um... you'll have to clarify that question.
Q. Yeah, prior to the load board is it your understanding that CRST would offer a driver a load and the driver would then have the opportunity to reject or accept that load?
A. That's correct.
Q. And does CRST still do that?
A. Yes.
Q. So can you explain to me how it is that they still offer the load and yet the load board is available? How does that work?
A. Current state, we don't have our whole fleet on the load board yet.
Q. I see. What percentage of fleet is on the load board?
A. I would estimate probably 30 percent.
Q. And I think you said that the load board began earlier in 2022; is that right?
A. I believe that's when it started, yes.
Q. And has it been a gradual increase in the percentage of the independent contractor fleet who has access to the load board?
A. Yes.

PHIL REGES

Q. And do you know what the distinction is between the independent contractor drivers who have access to the load board and those who do not?

A. Yes.

Q. And what is that distinction?

A. While we're rolling it out, we have it -- we have it available for the contractors with an employee on the truck with them.

Q. So does that mean that it's not available for the lead drivers?

A. While we're rolling it out, no.

Q. And do you know if there's an expected date by which it will be fully rolled out?

A. We have not set a date yet, no.

Q. And what's your impression as to how it's -- the roll-out is going?

A. My impression is it's going well.

Q. And the second thing that you talked about, I think, as a catalyst towards the team drivers was that now independent contractors are able to take a driver from the company fleet; is that right?

A. Correct.

so you can leave that out, but do you know of any other presentation materials that are used at orientation?
A. For the contractor orientation?
Q. Right.
A. I don't know specifically, no.
I've got to log back into my computer. I didn't do that. Sorry.
Q. Okay. Or I'm happy to put it up on the screen if that's more convenient for you.
A. Yeah.
Q. Do you want to just do that?
A. Yeah.
Q. And I'm going to ask you to take a look at a document that's entitled "Operations Overview, Phil Reges." Do you see that document?
A. I do.
MR. HANSON: What number is that, Mike?
MR. SWEENEY: It's Exhibit No. 45.
(Plaintiffs' Exhibit No. 45 was marked for ID.)
BY MR. SWEENEY:
Q. And I'm going to ask you, Mr. Reges, if

you recognize this document?

A. I do.

Q. And can you explain for me what it is?

A. It's the presentation given to contractors during their onboarding process.

Q. And is this something that would be used on that second day that you talked about before?

A. Typically, it would be their second day, yes.

Q. Okay. And who would use this?

A. Generally, it is the operations manager or the director presenting this to the contractors.

Q. And this has your name on it. Is this from a period when you were acting in that role?

A. Yes.

Q. And is this still used for orientation for independent contractors, including lease operators?

A. This one is not, no.

Q. Sorry?

A. This one is not, no.

Q. So is there a different one used for

Q. So that was presentation material that would have been used in that first day; is that correct?
A. I don't know if it was in that first day or when that was presented, but we used a PowerPoint.
Q. Do you know if this PowerPoint is still used?
A. I don't believe the -- I don't know. Well... I don't know.
Q. Who would know?
A. Somebody from our safety team most likely, the training staff.
Q. Would know if a customer service PowerPoint was being used?
A. Correct.
Q. Okay. And who in safety would be the best person to ask about that?
A. Dennis Harrington I believe runs the onboarding process.
Q. Okay. I want to take you through a couple of screens here.
Okay, so this is, I believe -- what are we on, screen number -- slide number 5 entitled

"Freight." Do you see that?
A. I do.
Q. Okay. And in the report here it says "I-70 west of Denver is restricted."
Is that a restriction that applies to all independent contractors?
A. Yes.
Q. And does that mean that the independent contractors are not supposed to drive on I-70 west of Denver?
A. That's correct.
Q. Any other roads that independent contractors are restricted from?
A. Restricted by CRST?
Q. Yes.
A. Not that I'm aware of, no.
Q. And is CRST able to put restrictions on if they feel there's a safety concern for a certain road due to weather or something else?
A. Yes, we do -- we do shut down roads for weather.
Q. And those shutdowns apply to independent contractors and company drivers equally; is that correct?

A. That's correct.

Q. Also here in the second bullet point it says "Do not bobtail without written permission on the Qualcomm."

Can you explain to me what that means?

A. That means that drivers are not to not take a trailer with them without written permission.

Q. And this is a presentation for independent contractors; is that correct?

A. That's correct.

Q. So that restriction would apply to them; is that right?

A. That's right.

Q. And then the last one is "High freight value" and says "cannot go to or through the house."

Can you explain to me what that means?

A. If they are hauling a load that is deemed high value, they cannot go to their house or stop at their house is what "through the house" means.

Q. I see. Okay.

And then next it says "Communicate when

you stop every time?"

Can you explain to me what that means?

A. That is our ask of contractors, to let us know when they are stopping underneath a high value load.

Q. And is that a request or a requirement?

A. It's a request.

Q. I'll take you to the next slide which I believe is number 6 and it says "Rate aka RPLM." Explain to me what RPLM is.

A. Rate per loaded mile.

Q. And how is that determined for independent contractors?

A. There's no differentiation between rate per load and mile for a contractor or anyone else.

Q. Well, when independent contractors are paid per load, they're paid a percentage of the load rate; is that correct?

A. Correct.

Q. And how does the rate per loaded mile then come into play?

A. Rate per loaded mile is how much the customer is paying us.

driver program to be?
A. It is a program where we train students to have them have the ability to get a co-driver and drive together.
Q. And do you know when it started?
A. No, not specifically.
Q. All right. And do you know who runs it currently?
A. You have to be more specific with what "it" is. There's several pieces to the lead driver program.
Q. And what are the pieces to the lead driver program?
A. There's training and then there's management of it --
Q. Okay.
A. -- and then there's student assigning.
Q. Anything else?
A. Not that I can think of, no.
Q. So who's responsible for the training?
A. Those are our -- I believe their title is mentor co-leaders.
Q. And what do you understand a lead driver to be?

A. A driver with six months of experience that trains students.

Q. And is a mentor and a driver the same thing?

A. No.

Q. I'm sorry, strike that. A mentor and a lead driver, is that the same thing?

A. That is.

Q. Okay. So can lead drivers be -- okay, can independent contractors be lead drivers?

A. Yes.

Q. And can company drivers be lead drivers?

A. Yes.

Q. Is there any distinction in the role of an independent contractor lead driver and a company lead driver?

A. They're both responsible for training students, so I would say no.

Q. And do they train the students in the same way?

A. I don't think any lead driver mentor trains the students in the same way.

Q. So are there certain standards that

CRST wants a lead driver to meet?
A. In order to become a mentor or lead?
Q. Yes.
A. Yes.
Q. Are those standards the same for independent contractor drivers and company drivers?
A. I believe so, yes.
Q. And does CRST train drivers to become lead drivers?
A. We have a mentor class, yes, lead driver class.
Q. And who's responsible for that mentor class?
A. The mentor coordinators.
Q. And how many mentor coordinators are there?
A. Currently, there are two.
Q. Do you know who they are?
A. I do.
Q. Can you tell me?
A. Monica Hillgenberg, H-I-L-G-E-N-B-E-R-G, and Storm Douglas.
Q. And are they based in Cedar Rapids?

that correct?

A. Not specifically, no.

Q. And that's the minimum. And how does CRST determine whether a student needs more than the minimum?

A. Typically they have to complete, obviously, a certain amount of miles for the time and they have to complete their packet that they have. So there's several different requirements on that packet that they have to complete before they are what we consider to be graduated from that student program.

Q. I might have that packet. Bear with me just a moment.

A. Um-hum.

Q. I'll try to find it here.

Okay, let me take you to Exhibit 32. And do you recognize this exhibit?

A. Yes.

Q. And can you explain to me what you recognize this to be?

A. The Lead and Student Compliance Agreement.

Q. And what's the purpose of this

document?

A. The purpose is to set minimum guidelines on what a lead driver should be doing.

Q. Okay. And are these the things that a lead driver that -- strike that.

A couple of things in here. In 6, "The lead driver will use commentary driving as often as possible." Can you explain to me what commentary driving is?

A. Commentary driving is talking about what's going on, what's happening, what that person is looking at as they're driving. It's part of our Smith System.

Q. And what is the Smith System?

A. It's a recognized program for defensive driving, essentially. It's not a CRST program. It is a, as far as I know, nationally recognized system for defensive driving.

Q. I see. And when you say that the commentary driving is part of that, is the Smith System incorporated into the lead driver training program?

A. It is the current state, yes.

question because I don't think you have the title correct.

Q. Okay. Well, is it your understanding that the lead students -- I'm sorry.

Well, no, maybe I'm looking at the wrong thing. I apologize. Yeah.

Is it your understanding that this Lead Student Compliance Agreement is something that the lead driver is supposed to comply with?

A. Yes.

Q. And is it your understanding that they're supposed to comply with the Backing Log?

A. I don't understand your question.

Q. So it says here that "It is expected that every entry level driver complete at least 20 backs over the course of the training in order to become more proficient."

Is it your understanding that the lead driver is supposed to make sure that the entry level driver completes at least 20 backs over the course of the training?

A. Yes.

Q. And, in fact, they have to document that; is that correct?

says a "60-day check-in". Do you know what that is?

A. I do not.

MR. SWEENEY: Okay, why don't we break for lunch. How long do you need for lunch?

MR. HANSON: Let's take thirty minutes.

MR. SWEENEY: Thirty minutes it is. We'll be back at 1:39. Sorry, 12:39 your time.

MR. HANSON: Yeah, we'll do 12:40.

(Recess taken from 12:10 p.m. to 12:40 p.m. CST)

BY MR. SWEENEY:

Q. So, Mr. Reges, you understand you remain under oath?

A. Yes, I do.

Q. I'd like to show you another document, if I can. This is a document that's been marked as Exhibit 29. I have it up on the screen. It's a one-page document.

Take a look at that and I'm going to ask you if you recognize that document.

A. Yes, I do.

Q. And what is this document?

A. The requirements for lead driver

approval.

Q. And is it your understanding that these requirements apply to both company drivers and independent contractors who want to be lead drivers?

A. From my understanding, yes.

Q. Okay. I'd like you to look at another document, if you can. See if we can get this one up. This is a document that's marked as Exhibit No. 30.

You see this on the screen, Mr. Reges?

A. Yes.

Q. And do you recognize this document?

A. I do.

Q. And what is this document?

A. Addendum to the ICOA.

Q. And what's the purpose of the addendum?

A. To outline the lead driver program.

Q. And is this given to independent contractors when they're given the ICOA?

A. If they are a lead driver, I would assume it is either when they're given the ICOA or after when they're through the lead driver training.

Acknowledgement that the driver has to sign and date. And my question to you is do you know whether or not this Violation Policy Acknowledgement for the Lead Driver Certification Program applies to both company drivers and independent contractors who are seeking to become lead drivers?

A. The violation policy applies to all drivers.

Q. Thank you.

And I think we've looked at Exhibit 32 before, but I just want to ask is it your understanding that Exhibit 32, the document you see here, applied to both independent contractors and company drivers seeking -- that are lead -- that are lead drivers?

MR. HANSON: Could we have that question read back to me, please.

THE REPORTER: Sure.

(Record read.)

MR. HANSON: You can answer.

THE WITNESS: Yes, that's my understanding.

PHIL REGES

BY MR. SWEENEY:

Q. And do you know if those documents are still in effect?

A. I don't.

Q. And who would know that?

A. That would be our mentor coordinators.

Q. And if you had to look for an updated policy in this, how would you go about it?

A. I would ask them for the latest copy of it.

Q. Thank you.

Let me ask you do you know what systems are in place to insure that drivers deliver loads in a timely manner at CRST?

A. What do you mean? What kind of systems?

Q. Are there any monitoring systems to ensure that drivers are delivering the loads as they're required to?

A. There are currently, yes.

Q. Can you explain to me what they are?

A. They're -- we have a dashboard with the measurements of on-time performance.

Q. And what does the dashboard show?

A. Percentage of on-time deliveries.
Q. Does it show where the truck is?
A. The dashboard that I'm talking about, no.
Q. And does CRST have a way of finding out where the truck is?
A. Yes.
Q. And how do they do that?
A. Trucks are monitored by GPS.
Q. So if CRST -- someone at CRST wanted to know where a particular truck was at a particular time, they'd be able to find that out, right?
A. For the most part, yes.
Q. And is there any program that regularly keeps track of where the trucks are and relays that information to CRST staff?
A. Yes.
Q. And what is that program?
A. That's our dispatching software.
Q. And who has access to the dispatching software?
A. Several people across the organization.
Q. And would driver managers have access

PHIL REGES

to it?

A. Yes.

Q. And when I say "driver managers," do driver managers manage both company drivers and independent contractors?

A. No.

Q. Is there a different title --

A. Yes.

Q. -- than driver manager?

A. Yes.

Q. And what is that title?

A. Fleet manager.

Q. And that information we talked about, the fleet dispatching, is that available to managers as well?

A. Yes.

Q. And a little while ago you talked about being a driver manager when you started and being responsible for independent contractors. Did that change at some point where they split those titles out to a driver manager?

A. Yes.

Q. Sorry?

A. Yes, it was split out.

Q. And when was it split out?

A. I don't remember the exact timing. Estimation is sometime around 2017.

Q. Okay. And are the duties of the driver manager and the fleet manager different?

A. Yes.

Q. And how are they different?

A. The fleet managers are managing a fleet of contractors and the driver managers are managing company drivers.

Q. And are the goals of the driver manager and the fleet manager different?

A. What do you mean by "goals"?

Q. Well, what is the ultimate goal of a driver manager?

A. Of a driver manager is to make their driver successful and make revenue for the company.

Q. I see. And what is the goal of the fleet manager?

A. Same thing as revenue and partnering with the contractors to make them successful.

Q. I see. Okay.

So the dispatch system, I think you

said the fleet managers and the driver managers both have access to that; is that right?

A. That's correct.

Q. And would safety have access to it too?

A. Yes. Most of safety.

Q. Would planning have access to it?

A. Yes, they would.

Q. Would customer service have access to it?

A. Yes.

Q. And does that dispatch system show the location for trucks for both company drivers and independent contractors?

A. Yes, it does.

Q. Any other systems that show the position of the truck on a regular basis?

A. Yeah, I'm sure there are others, yes.

Q. Can you tell me what they are?

A. Before we transitioned, it would have been the OmniTRACS satellite messaging system. And then more recently, it's Maven. They have a portal.

Q. Okay. And when you say "they have a portal," what do you mean?

PHIL REGES

A. For the OmniTRACS there was an OmniTRACS device and for Maven it's a tablet.

Q. And is it the same for company drivers and independent contractors?

A. For which system they have?

Q. Yeah. No, just the device that's used to feed that information from the truck, is that device used on both company driver and independent contractor trucks?

A. Both can be used on there, yes. The contractors can also bring their own communications device if they choose to.

Q. I see. And if they bring their own communications device, does that sync in with the CRST system?

A. We would sync it in, yes.

Q. And do all of the communication devices sync in with the CRST system?

A. Um... I'm not sure.

Q. And in your experience do -- well, let me ask this. Do all these operator trucks have the same system as the company trucks?

A. The same two systems, the main two systems that we use on the company fleet?

Q. Do you know where the information is kept?

A. I do not.

Q. And does CRST -- actually, strike that.

And do you know how independent contractors are compensated?

A. I do.

Q. And can you explain to me how that is?

A. They are paid 70 percent of the line haul and 97 percent of the fuel surcharge.

Q. Is that it?

A. Is that it for?

Q. Their whole compensation.

A. They can get -- it's basically any other sort of charges that the customer pays, they get -- they can get paid for as well.

Q. And do you know how they get paid for those?

A. Either through an accessorial or through payroll.

Q. I see. And when you say "a line haul," what is a line haul?

A. The line haul is the rate that we charge the customer, essentially that load rate

per mile that we talked about times the miles.

Q. I see. And who determines what rate a customer will be charged for per load?

A. Depends on what kind of load it is and what customer it is.

Q. Do the drivers have any input into that?

A. If they book their own load, they do, yes.

Q. I see. And is that a broker load? Is that what you're talking about?

A. Not necessarily a broker load, but if they book their own.

Q. I'm sorry, you mean like an alternative use?

A. No, "broker" is a very specific term.

Q. We'll talk about that, I guess, in a few minutes, but with respect to the loads that CRST gives to them to haul, do the drivers have any role in determining what the rate is for that load?

MR. HANSON: Objection to the form of the question.

THE WITNESS: For that load, no.

PHIL REGES

Q. I understand that, but my question's a little bit different. It's asking whether you know whether CRST is contemplating any other measure of hours.

A. I don't know.

MR. SWEENEY: I'm going to pull up another document here. It's Exhibit 50.

(Plaintiffs' Exhibit No. 50 was marked for ID.)

BY MR. SWEENEY:

Q. I'm going to share it on the screen. Do you see this, Mr. Reges?

A. I do.

Q. And do you recognize the document?

A. I do.

Q. And what is it?

A. It's a settlement.

Q. And can you tell me what a settlement is?

A. Essentially, the same word for a contractor that a paycheck would be. It's more of a common phrase for it.

Q. And there's a section up here that says "Settlement Pooler GA Columbus, Ohio." Can you

PHIL REGES

just don't pay that, CRST just doesn't pay that?

A. Correct.

Q. Okay. And what about the occupational insurance, does that come from his pay as well?

A. I don't believe that one lapses, no.

Q. And is that because CRST pays it and then Mr. Cross pays them back?

A. I believe so, yes.

Q. And is that true of everything on here other than the health insurance?

A. I believe so.

Q. So in this case Mr. Cross ends up with a negative balance of $2,997.79 and he gets nothing in pay, and does that negative balance carry over to the next week's settlement?

A. Yes.

Q. So the next week he's got to make at least $2,997.79 just to pay what he owed for the prior time; is that right?

A. That's correct.

Q. And do you know how often independent contractors get paid?

A. They currently get paid once a week.

Q. And if a driver wanted to dispute

PHIL REGES

something on the settlement, what's the process for doing that?

A. They would generally talk to their fleet manager or payroll, depending on what the item is that they want to dispute.

Q. And if they wanted documentation regarding something that was disputed, how would they get that documentation?

A. You're going to have to be more specific on what documentation they want.

Q. So if they were disputing, for example, what a line haul was, the amount of a line haul, how would they get documentation as to what amount that line haul was?

A. We would -- it's whatever we sent them in the message when we sent them the load is what they have in there.

Q. Could the driver get access to the bill that CRST sends to the customer?

A. I would doubt it. I don't know if bills are sent in bulk or if they're individually sent. I would doubt anything is individually sent. So I don't know that we would share a full-on bill of every lane with

the customer that we have and send that all to the contractor.

Q. And in Mr. Cross's situation, if he goes into a week and he has a deficit of $2,900 and he goes into the next week and CRST doesn't have freight for him to carry that would generate the revenue of at least $2,900, does he remain in a deficit for the week after that?

MR. HANSON: Objection, calls for speculation.

THE WITNESS: Yeah, it would depend. I don't know.

BY MR. SWEENEY:

Q. What would it depend on?

A. So the way that contractors are paid is they're paid based on what they've turned in for their documentation. If he hadn't scanned a hundred loads before this one, he can pretty easily clear out $2,900 even if he ran no loads the following week.

Q. I see. And in the instance that Mr. Cross didn't have any loads from prior weeks that were unpaid and he had to rely just on those loads that he had hauled in that current

safety related, so it may be something to do with safety instead.

Q. Okay, thank you.

A. Yep.

Q. The next thing I wanted to talk to you about was brokering. And Mr. Gross had indicated that you might have more information than him on brokering and the brokering process.

I want to ask you, first of all, are you familiar with the concept of independent contractors brokering loads?

A. Yes.

Q. Okay. Can you explain to me how it works?

A. Is there a specific part you want to know about?

Q. Yeah, so I want to know -- I can certainly walk you through it, but I would like to know kind of how the process works, what is it that the independent contractors are allowed to do and how would they go through with that and what are the approval processes along the way?

A. So a contractor can broker their own

PHIL REGES

freight if there's no other freight available. They work with a customer or a broker or their own contact of some kind to find that freight, rate the freight and then get it sent in to our customer service team to get put into the system and then dispatched out on their truck.

Q. Okay. So is there a limitation as to who the independent contractor can get a load from?

A. There are some limitations, yes.

Q. Okay. And, you know, we talked about that in Exhibit No. 24 and, again, we sent this along to you. Did you review this as part of preparing for today?

A. Yes, I did.

Q. Do you know what this is?

A. I do.

Q. And can you explain to me what it is?

A. It's a document for contractors to see who we work with regularly as far as brokers and then outlining a bit of the process of what they do once they broker a load and then typical restrictions as far as what we can and cannot book in for freight.

PHIL REGES

Q. Okay. So in the first part there when it says "Brokers we work with" --

A. Um-hum.

Q. -- are those the only brokers that an independent contractor is allowed to use?

A. No.

Q. And has that always been true or is that a recent development?

A. Has what always been true?

Q. That independent contractors --

MR. HANSON: I'm going to object --

BY MR. SWEENEY:

Q. (Continuing) -- could reach out beyond the list of brokers that CRST provides?

MR. HANSON: I'm going to object to the question. It's vague and ambiguous.

THE WITNESS: Contractors can reach out to potentially anyone who has freight to book freight in.

BY MR. SWEENEY:

Q. Has that always been the case?

A. To my knowledge, yes.

Q. And so why is this list provided to them?

A. This is the list of brokers that we regularly work with and would -- we had relationships with.

Q. And so how would it work for an independent contractor if there was no loads available from CRST? How would they get a load from one of these brokers or another broker?

A. They would call them and see if they have freight available for them to -- that they want.

Q. And if the broker said that freight was available, does the independent contractor have to get that load approved from CRST before he or she can haul it?

A. The load doesn't necessarily have to be approved itself. The stipulations that go into place with -- that are down in that third section, none of those things and nothing hazardous and nothing that we don't haul and that, as an example, they can't book a refrigerated load on a van trailer, so they would need approval for all of that and it's more check and balances than approval.

Q. So if an independent contractor found a

load and it didn't violate anything in that third section here, can they just take it and haul it or do they have to give notice to CRST and wait for authorization?

A. They would have to get it over to CRST so that we could get it into our system and so that it would be billed properly and the information would be in the system.

Q. I see. And does CRST at that point have the discretion to tell the independent contractor that he or she can't haul that load?

A. If it violates one of those things, we certainly could, yes.

Q. Okay. Any other reasons that CRST could tell a driver "You can't take that load"?

A. I know that it's a general practice that if we have a surplus of loads sitting in a location and the contractor wants to book their own, we do not do that typically because of the service to the customer.

Q. Okay. So in that instance, CRST could refuse authorization of a load that an independent contractor sought to broker?

A. Potentially.

PHIL REGES

Q. And it says in that second section there "You must send load tender they receive to their DM and customer service."

And is the load -- what is the load tender?

A. The sheet of paper that lists the details of the load, including the rate.

Q. And does the driver send load tender to their driver manager in customer service before giving authorization to haul it or they just send it to them when they receive the load tender from the broker?

A. It depends.

Q. Okay. And is a driver -- if they get a load tender and they send the load tender to the driver manager in customer service, can they then pick up the load and begin hauling it or do they have to wait for authorization for someone to be able to do that?

A. The load has to be entered in our system before they should go and haul it.

Q. So they would have to wait until they got notice from somebody that the load was in CRST's system; is that correct?

Q. Would it be available to the dispatch team as well?

A. Yes.

Q. Would it be available to the fleet manager as well?

A. Yes.

Q. And if any of those people looked at that load and CRST's system, would they be able to distinguish at first glance between it and a load that CRST had brokered itself?

A. I'm not sure.

Q. And who bills the customer for the load?

A. Our billing team would.

Q. So CRST would bill the customer; is that correct?

A. Correct.

Q. And it would issue a freight bill of some sorts to that customer; is that right?

A. I would assume so, yes.

Q. And do you know if CRST keeps track of which loads are brokered by independent contractors as opposed to loads that are brokered by CRST itself?

A. CRST does not, not that I'm aware of.

Q. So if you wanted to go and find out how many loads independent contractors brokered, would you be able to find that out on CRST's system?

A. Not any way that I know of, no.

Q. And when CRST issues the bill to the shipper, that bill is kept in the normal course of CRST's recording; is that correct?

A. I don't know.

Q. I mean, do they keep that information in their files?

A. I'm not sure.

Q. And would the load be subject to the contractor compensation provisions in Appendix B of the ICOA in -- I can show that to you if you like.

This is the page you referred to before where the independent contractor gets paid a percentage of line haul and a percentage of the fuel surcharge. Would the load be subject to this contractor compensation process?

A. Yes, it should be the same.

Q. So CRST would keep a certain percentage

of the line haul; is that right?
A. Correct.
Q. And they keep a certain percentage of the fuel service charge; is that correct?
A. Correct.
Q. And they keep a certain percentage of any assessorials; is that correct?
A. Or some of the assessorials, yes.
Q. And for others they pay them out entirely; is that correct?
A. Correct.
Q. And that brokered load would appear on a driver's settlement; is that correct?
A. I would assume so, yes.
Q. And would it be shown any differently from other loads that the driver is hauling?
MR. HANSON: Objection, it calls for speculation.
THE WITNESS: Yeah, not that I'm aware of, but I don't know for sure.
BY MR. SWEENEY:
Q. And who would know that?
A. Somebody on our settlements team maybe.
Q. And who runs the settlements team?

PHIL REGES

can only speak to my time in the role. And in these documents there's five months of the time when I was VP of Ops and that's it for the stats.

Q. If you would take a look here for this "IC Select Solo," do you know what that is?

A. (Reviewing document.)

It's the name of a division where trucks are kept.

Q. So what does IC Select Solo mean? I'm trying to figure out what the "solo" aspect of that is.

A. That was the solos groups running specific customers.

Q. I see. And this only begins in '20 and '21. So is it fair to surmise that that Select Solo group was only in play beginning in October of 2020 and only continued until February of 2021?

A. These numbers don't include anything past February of 2021.

Q. I see. All right. So is it fair to say -- fair to assume then that this began in October of 2020?

PHIL REGES

(Plaintiffs' Exhibit No. 52
was marked for ID.)

BY MR. SWEENEY:

Q. I'm going to ask you to take a look at one of the other sheets that was just marked as Exhibit No. 52 -- that's CRST 040939 -- and ask you if you're familiar with this report?

A. I am.

Q. And can you explain to me what it is?

A. This is our contribution report on our monthly financials.

Q. And is this produced monthly?

A. It is.

Q. And do you know who generates it?

A. Our finance team.

Q. And do you know who on the finance team does?

A. I do not.

Q. And this indicates on here that the author is Justin Deegan. Do you know who Justin Deegan is?

A. I do.

Q. And who's he?

A. He's the controller for Expedited.

# Brokering Freight

MC #- 114273

CH Robinson T Code- 4776

## Brokers we work with-

**Arrive Logistics-** contact them at 312-471-6827

**CH Robinson**- chrobinson.com- 855-229-6128

**Coyote Logistics-** They have a load board- Coyote.com

If you have smart phone you can download the app- Coyote Logistics LLC- sign up with your email and use our MC #

**Echo Global Logistics-** contact them at 800-354-7993

**Redwood Logistics-** contact them at 512-808-4320

**XPO Logistics-** xpologistics.com

**Driver must send load tender they receive to their DM and customer service.**

When brokering your own freight CRST does have a few stipulations that you have to follow.

You cannot broker your own load if you have rejected a load that CRST has offered you.

If you take a food grade required trailer load it is your responsibility to make sure your trailer is clean- no odors- no holes.

You cannot relay a load that you have brokered for yourself.

If you take a load with a late fee and the load is late that fee comes out of your portion.

**You cannot take a load with the following-**

- Temp control
- Freeze Protection
- Non Dry Van trailers
- Plated trailers
- Anheuser Busch loads
- Loads that require you to haul over 45,000 lbs
- Government Facility loads for PU or Delivery
- Wet Battery Loads
- Commodity Check- NO PAPER ROLLS
- No HV Loads- over $250,000 in Value
- No driver assist loading/ unloading
- CRST deems non-haul

Exhibit 24

# CRST Lead Driver Certification Training – Lead Compliance

## Lead Driver Training Expectations

**Environment Expectations**

- Maintains professional working environment in and out of truck
  - Follows the CRST Expedited drug and alcohol policies listed in handbook
    - No drugs at anytime
    - No consumption of alcohol outside of home time
  - Maintains clean truck
  - Provides regular opportunities for showers, laundry, restroom breaks, etc.
- Professional appearance and grooming.
  - Complies with CRST dress code
  - Reiterates the dress code with students and holds them accountable

**Training Topics**

- Student taught to carry license and DOT medical card at all times
  - Ensuring the license is valid and not suspended
  - Ensuring that address listed with CRST matches address listed on CDL
  - Ensuring medical information is up-to-date
- Student taught all CRST paperwork and processes
  - Trip sheets and BOL's
  - Transflo
  - OS&D
  - After hours FM coverage
- Student taught to follow all DOT and CRST policies
  - Student will be taught to correctly identify open scale houses
  - Student will be taught proper scaling procedures
  - State Bridge laws
  - Student will be taught weight limits
  - Students will be taught proper load securement procedures
  - Students will be taught all CSA topics one category at a time
- Student taught how to use the Qualcomm
  - Includes understanding all Macros
- Student taught to use logs properly
  - E-logs
  - Paper logs
  - HOS "log it as you do it"
- Students taught to understand permit book and to actively check expiration dates
  - Cab card
  - Trailer registration
  - IFTA/NY HUT stickers
  - Other state specific permits
- Student instructed to use defensive driving techniques
  - Utilizes the Smith System skills and requires student to use them
- Commentary driving will be used by both the student and lead driver

(Updated July 2019)

# CRST Lead Driver Certification Training – Lead Compliance

I (*PRINT*)________________________________ understand and will follow the guidelines outlined below. These items must be discussed on the first day of training with my student and will apply to the entire 28 day training period.

1. The student should trip plan all trips during the training period.
2. The Lead Driver will be "On Duty Not Driving" (line 4), while student drives, for a minimum of their first 3 days notifying their FM ASAP if that will exceed 5 days.
3. The Lead Driver may shut the truck down for 10 hours a day for the first 5 training days or until Lead is comfortable with proceeding to Team Operation (minimum 3 days).
4. The entry level driver will not drive between midnight and 5:00 a.m. during the first five days of training. This applies even if the entry level driver has been approved to proceed to Team Operation.
5. The student must be given ample opportunity to back and to drive in cities. They must be comfortable enough by the end of their training to drive as co.
6. The Lead Driver will use commentary driving as often as possible.
7. The Student will use commentary driving as often as possible.
8. The Lead Driver and student will comply with all CRST policies against unlawful harassment/sexual harassment and creating a hostile environment in the workplace.
9. Ground guides will be used when backing or during any low speed maneuvers when possible and utilize G.O.A.L. Get Out And Look.
10. Seat belts and bunk straps/nets will be used.
11. No one is permitted in the top bunk while the truck is moving even if truck is equipped with an upper bunk net.
12. CRST expects drivers to avoid parking on shoulders and/or ramps except in case of emergency (Switching drivers is not an emergency).
13. The wheels will not turn unless the Lead Driver is in the truck or on the ground spotting (Even at the fuel island).
14. The student will be trained to access exit ramps at speeds no greater than 10 miles an hour under the posted ramp speed. (Posted ramp speeds are for cars)
15. U-turns are a violation of CRST policy.
16. Hands-free cell phones are allowed. Drivers are prohibited from holding, dialing or reaching for a hand-held mobile device. (Hands-free includes voice-activated features, earpiece or headset, or Bluetooth capabilities.)
17. Lead and students will complete written evaluation forms on one another and submit them to Safety at the conclusion of training.
18. Lead Drivers will not drive while the Student is logged in on the Qualcomm as the active driver nor will the Student drive while the Lead Driver is logged in on the Qualcomm as the active driver.

**Lead ID#**_______________

**Signature**____________________________________**DATE**_________________

**Exhibit 31**

(Updated July 2019)

# CRST Lead Driver Certification Training – Lead Compliance

## Lead Driver Training Expectations

**Environment Expectations**

- Maintains professional working environment in and out of truck
    - Follows the CRST Expedited drug and alcohol policies listed in handbook
        - No drugs at anytime
        - No consumption of alcohol outside of home time
    - Maintains clean truck
    - Provides regular opportunities for showers, laundry, restroom breaks, etc.
- Professional appearance and grooming.
    - Complies with CRST dress code
    - Reiterates the dress code with students and holds them accountable

**Training Topics**

- Student taught to carry license and DOT medical card at all times
    - Ensuring the license is valid and not suspended
    - Ensuring that address listed with CRST matches address listed on CDL
    - Ensuring medical information is up-to-date
- Student taught all CRST paperwork and processes
    - Trip sheets and BOL's
    - Transflo
    - OS&D
    - After hours FM coverage
- Student taught to follow all DOT and CRST policies
    - Student will be taught to correctly identify open scale houses
    - Student will be taught proper scaling procedures
    - State Bridge laws
    - Student will be taught weight limits
    - Students will be taught proper load securement procedures
    - Students will be taught all CSA topics one category at a time
- Student taught how to use the Qualcomm
    - Includes understanding all Macros
- Student taught to use logs properly
    - E-logs
    - Paper logs
    - HOS "log it as you do it"
- Students taught to understand permit book and to actively check expiration dates
    - Cab card
    - Trailer registration
    - IFTA/NY HUT stickers
    - Other state specific permits
- Student instructed to use defensive driving techniques
    - Utilizes the Smith System skills and requires student to use them
- Commentary driving will be used by both the student and lead driver

(Updated July 2019)

# CRST Lead Driver Certification Training – Lead Compliance

- Student taught to pass all roadside inspections
    - Vehicles inspections/PTI's will be completed by student on a daily basis (And logged as on duty not driving for at least 15 minutes)
    - DVIR's for tractor and trailer sent in regularly
    - Student will be taught professional communication with inspector
- Student taught to utilizes the GOAL method
    - Ground guides will be used when backing or during any low speed maneuvers and utilize GOAL
- Student taught to plan all trips during training period
- Lead driver should spend the first 3 to 5 days observing student before proceeding to team driving
    - Lead driver will be "on duty, not driving" whenever student is behind wheel during the first 3 to 5 days
- Seat belt and bunk straps/nets need to be used
    - No one is permitted in the top bunk while the truck is in motion
- Student taught to back a minimum of 20 times
    - 10 times of straight
    - 10 times angle backing (45 or 90 degree acceptable)
- Student taught to drive in large cities. (1 time per week documented)
- Students taught to shift in various situations
    - Downshifting and double clutching A MUST
- Students taught to enter and exit highways at a maximum of 10 mph under posted ramp speed
- Completing written evaluations forms on each other
    - Provide student with feedback throughout the training process
- Owner Operators require routing information from CRST?

**<u>Training Don'ts</u>**

- Students should be taught about the CRST Mobile Device policy.
    - Students are to be taught not to hold, dial, or reach for a mobile phone. They may use hands-free, voice-activated, an earpiece or headset or Bluetooth-enabled devices.
- Do not have student drive without lead driver in truck
    - Except in the instance of ground spotting
- Do not drive while student is logged into the Qualcomm nor have student drive while lead is logged into the Qualcomm
- Do not park on shoulders and/or ramps except in the case of an emergency
- Do not wait until the last minute to fill out the Lead/Student Compliance Agreement paperwork

**I understand the above outlined training criteria and agree to train all students according to these standards.**

**Lead ID#_______________**

**Signature____________________________________DATE_________________**

(Updated July 2019)

CRST Lead Driver Certification Training – Lead Compliance

**Violation Policy Acknowledgement**

I (*PRINT name*) ____________________________________________,
a driver in CRST Lead Driver Certification Training, have received information in regards to the CRST Expedited Company Policy pertaining to making U-turns, speeding and or parking on the shoulder of a freeway. I understand that if I am involved in any of the above stated violations, then I will be subject to either Termination or a Defensive Driving Course (DDC).

| **Terminations** | **Possible Termination/DDC** |
|---|---|
| U -turn | Driver's record of duty status not current |
| Parking on shoulder of freeway | False report of duty status |
| Failure to use seatbelt | Speeding 6-14 mph |
| No driver's record of duty status | Failure to obey a traffic control device |
| Speeding 15 mph or more | Driver not in possession of medical card |
| Speeding in a construction zone | Driving without a CDL |
| Loss of control of a vehicle | Driving failing to retain previous 7 days logs |
| Rear-end accident | Driving over 11 hour |
| Driving while texting or talking on cell phone | Driving over 14 hours on duty |
| | Bypassing an open scale |

* Speeding is determined by reports of moving violations, and from Engine Control Module (ECM) reports. The ECM is accessed during each maintenance service. The ECM printed report shows high speed, high RPM, time and date.

I understand and will adhere to the CRST Expedited Violation Policy.

I will train students to adhere to these standards, and will not permit them to participate in any of these prohibited behaviors.

______________________________________ ____________

Driver Signature ID Number

Date _________________

(Updated July 2019)

# CRST Lead Driver Certification Training – Lead Compliance

## Violation Policy Acknowledgement

I (*PRINT name*) ____________________________________________, a driver in CRST Lead Driver Certification Training, have received information in regards to the CRST Expedited Company Policy pertaining to sexual harassment/positive work environment and discrimination.

I understand that if I am involved in any of the violations addressed in the information printed below and on the reverse side of this sheet, that I will be subject to disciplinary action up to and including termination.

Driver Signature: ________________________________________________

Date: ________________________ Driver ID Number: ____________

**UNLAWFUL HARASSMENT/DISCRIMINATION**

CRST is committed to providing a work environment that is free of harassment and discrimination. In keeping with this commitment, CRST maintains a strict policy prohibiting harassment or discrimination based on race, color, creed, religion, sex, sexual orientation, age, mental and/or physical disability, national origin, or any other characteristic protected by law. This includes any form of verbal, non-verbal, physical, and visual harassment. This policy applies to all employees of CRST, including supervisors and non-supervisory employees.

Moreover it is the policy of CRST to prevent and prohibit misconduct on the job, including sexual harassment or any other type of harassment or discrimination by co-workers, other employees, including supervisors, and persons doing business with or for the Company. **Any employee who reports any act of harassment and/or discrimination will NOT be subject to ANY form of retaliation. All reports of harassment and/or discrimination will be handled in a confidential manner.**

Any employee found to have acted in violation of the foregoing policies will be subject to appropriate disciplinary action, up to and including termination.

Harassment and/or discrimination may take many forms including but not limited to:

A) Any discriminatory or harassing action based on one's protected characteristic (race, citizenship, color, religion, sex, sexual orientation, age, and/or disability) that has the purpose or effect of unreasonably interfering with an individual's work performance or adversely effecting an individuals employment opportunities.

B) Such verbal, non-verbal, discriminatory or harassing actions that create a hostile work environment. These may include but are not limited to:

1. Verbal conduct such as epithets, derogatory comments, slurs, or unwanted sexual advances, invitations or comments.

2. Visual conduct such as derogatory posters, cartoons, drawings, or gestures.

3. Physical conduct such as assault, blocking normal movement, or interference with work, when directed at an individual.

(Updated July 2019)

## Violation Policy Acknowledgement

C) Sexual harassment includes, but is not limited to, threats or demands to submit to sexual requests in order to keep a job or avoid some other loss, and offers of job benefits in return for sexual favors ("Quid Pro Quo").

D) Retaliation for having reported harassment or discrimination.

Sexual harassment may include:

A) Making unwelcome sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature as a condition of an employees' employment; or

B) Making submissions to/or rejection of such conduct the basis for employment decisions affecting the employee; or

C) Creating an intimidating, hostile, or offensive working environment by such conduct.

An individual has a disability under the Americans with Disabilities Act when he/she:

A) Has a physical or mental impairment that substantially limits one or more major life activities;

B) Has a record of such impairment; or

C) Is regarded as having such impairment

An employee may be considered disabled after the condition has been treated or mitigated. For example, someone who has impaired vision, but the vision is corrected with glasses, the vision impairment is **not** considered a disability.

When appropriate CRST International Inc. will *reasonably* accommodate a qualified disabled individual, as depicted under the ADA guidelines, who can perform the essential functions of the job.

Employees who are subjected to/or witness harassment or discrimination should immediately report such conduct to any one of the following members of management:

**Immediate Supervisor/Fleet Manager**
**Human Resources - (319) 390-2770…or - 1-866-934-4895**

The Company will take the following steps in addressing complaints of harassment or discrimination in a confidential manner:

1. Fully inform the employee of his/her avenues to report and redress the harassment pursuant to the Company's internal complaint procedure. Advise the employee that s/he will not be disciplined or otherwise retaliated against as a result of making a complaint.

2. Immediately conduct a thorough, objective and complete investigation of the alleged harassment and make a determination about whether unlawful harassment has occurred.

3. Take prompt and effective remedial action commensurate with the severity of the offense of harassment that occurred.

4. Advise the employee of actions taken to address the complaint.

(Updated July 2019)

# CRST Footwear Policy

This policy requires adequate footwear for employees and or other personnel performing tasks where there is a reasonable potential for foot injury or other personal injury from slip, trip and fall incidents. This includes but is not limited to exposure to falling and or rolling objects, working in close proximity to wheel and track vehicles, performing any type of maintenance activities and operating material handling equipment.

Adequate footwear is defined as footwear that provides protection from hazards in the foot protection area. Adequate footwear includes shoes or boots with slip resistant soles.

Leather sole cowboy boots, athletic shoes, tennis shoes, open toed shoes, sandals or shoes of similar construction and material must not be worn when working as they do not provide adequate protection.

By signing this statement I the undersigned agree that at all times in the CRST work environment I will wear the adequate work related footwear.

Name_______________________________________________

Signature___________________________ Date_____________

(Updated July 2019)

# Lead and Student Compliance Agreement

**The Lead Driver and entry level driver are expected to follow the guidelines outlined below. These items must be discussed on the first day of training and applied to the entire day training period. The Lead and Student are required to sign this form at and submit it to their Driver Manager, along with any additional required training forms at the completion of training.**

1. The entry level driver should trip plan all trips during the training period.
2. The Lead Driver will be "On Duty Not Driving" (line 4), while entry level driver drives, for a minimum of their first 3-5 days notifying their DM ASAP if that will exceed 5 days.
3. The Lead Driver will shut the truck down for 10 hours a day for the first 3-5 training days.
4. The entry level driver will not drive between midnight and 5:00a.m. during the first 5 days of training. This applies even if the entry level driver has been approved to proceed to Team Operation.
5. The entry level driver must be given ample opportunity to back and to drive in cities. They must be comfortable enough by the end of their training to drive as co.
6. The Lead Driver will use commentary driving as often as possible.
7. The entry level driver will use commentary driving as often as possible.
8. The Lead Driver and entry level driver will comply with all CRST policies against unlawful harassment/sexual harassment and creating a hostile environment in the workplace.
9. Ground guides will be used when backing or during any low speed maneuvers when possible and utilize G.O.A.L. Get Out And Look.
10. Seat belts and bunk straps/nets will be used.
11. No one is permitted in the top bunk while the truck is moving even if truck is equipped with an upper bunk net.
12. CRST expects drivers to avoid parking on shoulders and/or ramps except in case of emergency.
13. The wheels will not turn unless the Lead Driver is in the truck or on the ground spotting (Even at the fuel island).
14. Entry level drivers will be trained to access exit ramps at speeds no greater than 10 miles an hour under the posted ramp speed. (Posted ramp speeds are for cars)
15. U-turns are a violation of CRST policy.
16. Hands-free cell phones are allowed. Drivers are prohibited from holding, dialing or reaching for a hand-held mobile device. (Hands-free includes voice-activated features, earpiece or headset, or Bluetooth capabilities.)
17. Lead will complete written evaluation form on the entry level driver that will be submitted at the conclusion of training. Entry level driver will send in Macro 15 for their evaluation of Lead, once they are on their truck.
18. Lead Drivers will not drive while the entry level driver is logged in on the Qualcomm as the active driver nor will the entry level driver drive while the Lead Driver is logged in on the Qualcomm as the active driver.
19. **This packet will be filled out in its entirety and turned in to the Safety Trainer or Driver Manager by entry level driver before he is given his Post Training Road Test or is upgraded to Co-Driver Status. It is the entry level driver's responsibility to ensure this is done.**
20. **LEADS- Please keep a (filled out) copy of this packet for YOUR records on EACH entry level driver.**

**Lead Signature/ID**________________________________________**ID**__________**DATE**_______________

**Entry Level Driver Signature/ID**____________________________**ID**__________**DATE**_______________

**Exhibit 32**

# Freight

- All 48 States
  - I-70 West of Denver is Restricted
    - Safety
    - Breakdown Cost
- Trailer Pools
  - Each market has specific # of Trailers to match Customer needs.
  - Do NOT bobtail without written permission on the Qualcomm.
- High Value Freight
  - Cannot go <u>to</u> or <u>through</u> the house
  - Communicate when you stop! Every time!









damages or affirmative defenses as to specific individual class members, are tried separately. *See Tyson*, 577 U.S. at 453.

Here, plaintiffs show common evidence to make a prima facie showing of their allegations that they and class members are employees for purposes of Section 91D.1. Namely, as in their motion for conditional certification under the FLSA, plaintiffs highlight the ways CRST controlled the use of their trucks and their location and travel speed, and ensured plaintiffs' economic dependence on CRST, and prevented Drivers from working for other motor carriers, despite provisions to the contrary. (*See* Doc. 247, at 13–16). These facts will weigh in the determination of whether plaintiffs had the right to control the physical conduct of their work, independent nature of plaintiffs' work, and the intent of the parties as memorialized in the ICOA and Leases, which were materially the same among plaintiffs and the putative class members. *See Fesler*, 794 F. Supp. 2d at 1008–09; (*See also* Doc. 247, at 13–16). Further, the same evidence would suffice for each class member to make a prima facie showing that he or she, too, is not an independent contractor under Iowa law and is properly considered an employee under the FLSA.

Indeed, whether this evidence makes the Drivers independent contractors or employees depends on predominately common questions. It is established in the record that they signed materially uniform contracts and adhered to materially uniform policies set by CRST. (*See* Docs. 147, at 6 (citing Docs. 113-5, 113-8, & 113-9)), 247, at 22). Further, defendants do not dispute this. The questions of whether these contracts and policies controlled the Drivers' physical conduct, whether the Drivers were on the payroll, whether Drivers were paid by time or job, whether they were required to provide equipment, tools, supplies, and materials, whether the contract provided for work at a fixed price, whether the Drivers' business was independent in nature, whether the Drivers' work is part of CRST's regular business, the Drivers' and CRST's intent as

**LOCKHART, MORRIS & MONTGOMERY, INC.**

1401 N Central Expy Suite 225
Richardson, TX 75080-4681
(877) 214-3355 (P)

May 15, 2020

LINDA REDACTED
REDACTED

Current Creditor: CRST INTERNATIONAL INC
Account# REDAC
Balance Due: $2,274.80

Please be advised that we represent the current creditor referenced above. Your account was placed in our office for collection because there is presently an unpaid balance due.

**Unless you notify us within thirty (30) days after receipt of this notice that you dispute the validity of this debt, or any portion thereof, Lockhart, Morris & Montgomery, Inc., will assume this debt is valid.**

**If you notify us in writing within thirty (30) days from receiving this notice that you dispute the validity of this debt, or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment, (if applicable), and mail you a copy of such judgment or verification.**

**If you request to us in writing within thirty (30) days after receiving this notice, we will provide you with the name and address of the original creditor, if different from the current creditor.**

We are authorized to accept payment on behalf of CRST INTERNATIONAL INC, by phone, cashier's check, personal check, ACH, money order, wire transfer, credit card and through our website at www.lmmcollections.com.

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. But we will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described above.

We believe everyone wants to pay a valid debt and would appreciate an opportunity to assist you in doing so. Financial breakthrough is available to everyone! Let's make it better together!

This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.

Lockhart, Morris & Montgomery, Inc.
1401 N Central Expy Suite 225
Richardson, TX 75080-4681
(877) 214-3355

***** Detach Lower Portion And Return With Payment *****

1401 N CENTRAL EXPY SUITE 225
RICHARDSON TX 75080-4681
ADDRESS SERVICE REQUESTED

PLEASE CIRCLE THE CREDIT CARD YOU WISH TO USE

MasterCard VISA DISCOVER AMERICAN EXPRESS

| CARD NUMBER | EXP. DATE |
|---|---|
| CARD HOLDER NAME | CVV |
| SIGNATURE | AMOUNT PAID |

Balance: $2,274.80
Account #: REDA
Current Creditor: CRST INTERNATIONAL INC

12345678-000031-01-1-AA

0108120024008870233065714819235---kD0HA4ELAAIW

LINDA REDACTED
REDACTED

LOCKHART, MORRIS & MONTGOMERY, INC.
1401 N CENTRAL EXPY SUITE 225
RICHARDSON TX 75080-4681

-CU102638-PL95-GEN-kD0HA4ELAAIW-10/10/18

CRST009978- CRST Driver Employee Handbook

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

# CRST011260 – CRST Expedited Hiring Guidelines (Draft)

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

CRST011267

CRST Driver Qualifications Guidelines

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

CRST011275

CRST Carrier Group Qualification Guidelines (Draft)

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

# Excerpts from the Expert Rebuttal Report of Dr. Chen Song

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

Exhibit 90 from CRST Expedited, Inc. ESI 30(b)(6) Deposition of Michael Gannon, dated May 16, 2023

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)

Excerpts from CRST Expedited, Inc. ESI 30(b)(6) Deposition of Michael Gannon, dated May 16, 2023

(Pending Decision on Plaintiffs' Motion for Leave to File Under Seal)