IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DECERTIFY FLSA COLLECTIVE ACTION AND CLASS ACTION**

**TABLE OF CONTENTS**


I. INTRODUCTION AND ARGUMENT SUMMARY ..... 1

II. BACKGROUND ..... 3

A. Procedural Background and Standard of Review ..... 3

B. CRST's Operations and Named Plaintiffs ..... 5

III. ARGUMENT ..... 8

A. No Efficient, Manageable Way to Try the Independent Contractor Issue Exists ..... 8

1. The degree of control exercised by the alleged employer over the business operations. ..... 9

2. The relative investments of the alleged employer and employee. ..... 11

3. The degree to which the alleged employee's opportunity for profit and loss is determined by the employer. ..... 12

4. The skill and initiative required in performing the job. ..... 15

5. The permanency of the relationship. ..... 16

6. The degree to which the alleged employee's tasks are integral to the employer's business. ..... 17

7. Remaining factors under Iowa state law. ..... 17

B. PLAINTIFFS FAIL TO IDENTIFY AN FLSA-VIOLATING POLICY ..... 18

VI. CONCLUSION ..... 21

## TABLE OF AUTHORITIES

### Cases

*Andel v. Patterson-UTI Drilling Co.*,
280 F.R.D. 287 (S.D. Tex. 2012)........ 20

*Blair v. TransAm Trucking, Inc.*,
309 F. Supp. 3d 977 (cited in Doc. 147 at 5)........ 3, 8, 9, 20

*Bouaphakeo v. Tyson Foods, Inc.*,
564 F. Supp. 2d 870 (N.D. Iowa 2008)........ 4

*Bouaphakeo v. Tyson Foods, Inc.*,
765 F.3d 791 (8th Cir. 2014)........ 4

*D & C Express, Inc. v. Sperry*,
450 N.W.2d 842 (Iowa 1990)........ 17

*FedEx Home Delivery v. NLRB*,
563 F.3d 492 (D.C. Cir. 2009)........ 19

*Fesler v. Whelen Eng'g Co.*,
794 F. Supp. 2d 994 (S.D. Iowa 2011),........ 8, 9, 12, 17, 18

*Hernandez v. Triple Ell Transp., Inc.*,
15 P.3d 199 (Idaho 2007)........ 19

*Iowa Mut. Ins. Co. v. McCarthy*,
572 N.W.2d 537 (Iowa 1997)........ 3, 8, 9, 12

*Jin v. Shanghai Original, Inc.*,
990 F.3d 251 (2d Cir. 2021)........ 5

*Judkins v. Southerncare, Inc.*,
74 F. Supp. 3d 1007 (S.D. Iowa 2015)........ 3

*Kennedy v. LTI Trucking Services, Inc.*,
No. 4:18CV230 HEA 2019 WL 4394539 (E.D, Mo. Sept. 13, 2019)........ 19

*Lopez v. Midstates Horse Shows, Inc.*,
776 N.W.2d 302, 2009 WL 3337614 (Ct. App. Iowa 2009)........ 17

*Merrill v. Pathway Leasing, LLC*,
No. 16-cv-02242-KLM, 2019 WL 5078655 (D. Colo. Oct. 9, 2019)........ 19

*Miller v. Centerfold Entertainment Club, Inc.*,
No. 6:14-CV-6074, 2017 WL 10185485 (W.D. Ark. Mar. 10, 2017)........ 5

*Moba v. Total Transp. Svc. Inc.*,
16 F. Supp. 3d 1257 (W.D. Wash. 2014) ........ 17

*Petrone v. Werner Enterprises, Inc.*,
No. 8:11CV401, 2017 WL 510884 (D. Neb. Feb. 2, 2017) ........ 19

*Pouliot v. Paul Arpin Van Lines, Inc.*,
292 F. Supp. 2d 374 (D. Conn. 2003) ........ 19

*Rios v. Current Carrier Corp.*,
No. 14-10247-GAO, 2015 WL 1443058 (D. Mass. Mar. 30, 2015) ........ 19

*Roeder v. DirectTV, Inc.*,
No. C14-4091-LTS, 2017 WL 151401 (N.D. Iowa 2017) ........ 2, 9, 11, 15, 16, 17

*Salazar v. Agriprocessors, Inc.*,
No. 07-CV-1066-LRR, 2008 WL 782803 (N.D. Iowa Mar. 17, 2008) ........ 4, 20

*Scott v. NOW Courier, Inc.*,
No. 1:10-cv-971-SEB-TAB, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012) (dismissing ........ 20

*Universal Am-Can, Ltd. v. Workers' Compensation Appeal Board*,
762 A.2d 328 (Pa. 2000) ........ 20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 5

*Walsh v. Alpha & Omega USA, Inc.*,
39 F.4th 1078 (8th Cir. 2022) ........ 2, 8, 9, 12, 13, 17

*White v. 14051 Manchester Inc.*,
301 F.R.D. 368 (E.D. Mo. May 30, 2014) ........ 3

*White v. National Football League*,
756 F.3d 585 (8th Cir. 2014) ........ 5

*Wilkinson v. Palmetto State Transp. Co.*,
676 S.E.2d 700 (S.C. 2009) ........ 19

**Statutes**

29 U.S.C. § 201 ........ 1
29 U.S.C. § 216 ........ 3
49 U.S.C. § 14102 ........ 19
Iowa Code Ann. § 91D.1(1)(a)-(b) ........ 2

**Rules**

Fed. R. Civ. P. 23 ........ 1, 4, 5, 6

## Regulations

49 C.F.R. Part 376 .......... 17
49 C.F.R. § 376.11 .......... 7
49 C.F.R. § 376.12 .......... 1, 17, 19
Employee or Independent Contractor Classification Under the Fair Labor Standards Act,
89 Fed. Reg. 1638 (Jan. 10, 2024) .......... 15
Lease and Interchange of Vehicles—Declaratory Order, Fed. Carrier Cas. P 38,121,
1994 WL 70557 (I.C.C. Mar. 8, 1994) .......... 19

## Other Authorities

*Newberg on Class Actions* § 7:22 (6th ed. 2023 update) .......... 5

Defendants, CRST International, Inc. (CRST International) and CRST Expedited, Inc. (CRST), respectfully submit this Brief in Support of Motion to Decertify FLSA Collective Action and Class Action.

## I. INTRODUCTION AND ARGUMENT SUMMARY

Plaintiffs are drivers of tractor-trailers who claim they were employees of Defendants (collectively, CRST) instead of independent contractors as described in their agreements with CRST. This Court conditionally certified a collective action in the case under 29 U.S.C. § 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (FLSA). Doc. 147. Almost 630 individuals opted into the collective action alleging CRST failed to pay them the federal minimum wage. In addition, this Court certified two claims in the case for class treatment under Fed. R. Civ. P. 23(b)(3): Plaintiffs' minimum wage claim under Iowa law, and a claim under the federal leasing regulations, 49 C.F.R.§ 376.12(g). Docs. 276, 296. CRST conducted written discovery on 63 opt-ins and deposed 28 opt-ins. Based on that discovery, CRST seeks decertification of Plaintiffs' FLSA and Iowa minimum wage claims because their claims cannot be resolved on a representative basis.

Plaintiffs' minimum wage claims under both the FLSA and Iowa law require a prerequisite demonstration that they and the collective and class they represent were CRST's employees. Now that discovery is complete, there is no common evidence to prove that Plaintiffs and the collective are "similarly situated" for the purpose of final certification of the collective (Doc. 147 at 4) or that Rule 23(a)(2) or (b)(3) are satisfied such that class certification remains appropriate. As set forth below, a trial on the independent contractor status of the opt-ins and class members cannot rely upon representative testimony but will require evidence from each collective and class member on their individual experiences.

The Eighth Circuit, in its most recent pronouncement on the classification question, applied the multi-factor economic realities test. That test considers the following factors:

1. The degree of control exercised by the alleged employer over the business operations;

2. The relative investments of the alleged employer and employee;

3. The degree to which the alleged employee's opportunity for profit and loss is determined by the employer;

4. The skill and initiative required in performing the job;

5. The permanency of the relationship; and

6. The degree to which the alleged employee's tasks are integral to the employer's business.

*Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022). "No one factor is controlling and the court must base its decision on the totality of the circumstances." *Roeder v. DirectTV, Inc.*, No. C14-4091-LTS, 2017 WL 151401 at *9 (N.D. Iowa 2017) (internal citations omitted).

The fact-sensitive nature of the FLSA's test is mirrored in Iowa's Minimum Wage Law (IMWL), which requires that "[e]very employer, as defined in the federal Fair Labor Standards Act . . . shall pay to each of the employer's employees, as defined in the federal Fair Labor Standards Act[,] . . . the state hourly wage . . . ." Iowa Code Ann. § 91D.1(1)(a)-(b). Thus, the IMWL tracks the definitions of "employer" and "employee" under the FLSA. Under Iowa's test, however, the extent of an alleged employer's control over a worker is determined by evaluating 12 factors:

> (1) who had the right to control the physical conduct of the work; (2) whether the purported employee was on the employer's payroll; (3) the method of payment, whether by time or by job; (4) who provided the equipment to accomplish the work; (5) the individual's obligation to furnish necessary tools, supplies, and materials; (6) the existence of a contract for the performance of a certain kind of work at a fixed price; (7) the independent nature of the individual's business; (8) the individual's employment of assistants, with the right to supervise their activities;

> (9) the time for which the individual is employed; (10) whether the work is part of the regular business of the employer; (11) the intent of the parties; and (12) the right to control the progress of the work, except as to final results.

*Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542 (Iowa 1997), *aff'd* 688 F.3d 439 (8th Cir. 2012). (hereafter, the *McCarthy* factors)

Where the experiences of collective and class members vary and depend upon their individual interactions with an alleged employer, the fact-sensitive nature of the multi-factor tests precludes adjudication of the case as a collective or class action. *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003 n.182 (cited in Doc. 147 at 5).

Plaintiffs' FLSA minimum wage claim should also be decertified because they can point to no uniform policies or practices that resulted in a violation of the FLSA. To be considered similarly situated Plaintiffs must suffer from a single policy that violates the FLSA. *See Judkins v. Southerncare, Inc.*, 74 F. Supp. 3d 1007, 1009 (S.D. Iowa 2015) ("To avoid decertification . . . Plaintiffs must demonstrate that they are similarly situated, which is proved if they suffer from a single, FLSA-violating policy . . . ."). Plaintiffs have failed to identify any CRST policy that violates the FLSA. *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 376 (E.D. Mo. May 30, 2014) ("The Court decertifies this action because it would be untenable for this case to proceed on a collective basis when there is no uniform policy, nor shared experience and, consequently, representative testimony could not be presented regarding any shared experience.").

## II. BACKGROUND

### A. Procedural Background and Standard of Review

In January 2021, this Court conditionally certified this case as a collective action under 29 U.S.C. § 216(b). Doc. 147. The following month, the Court refined the definition of the collective as "[a]ll drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an Independent Contractor Operating Agreement (ICOA) and who have not leased

more than one truck at a time to CRST." Doc. 157. In conditionally certifying the collective, this Court acknowledged the two-step approach that "distinguishes between conditional class certification, generally made at the notice stage, and a final class certification determination made after discovery is largely complete." Doc. 147 at 3 (quoting *Salazar v. Agriprocessors, Inc.*, No. 07-CV-1066-LRR, 2008 WL 782803, at *4-5 (N.D. Iowa Mar. 17, 2008) (quotation marks omitted)). The Court described the first step as a "lenient standard" that "requires that a plaintiff merely provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." Doc. 147 at 3 (quoting *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 892 (N.D. Iowa 2008) (quotation marks omitted)). Conditional certification may be granted as long as Plaintiffs "make a modest factual showing sufficient to demonstrate that they and potential plaintiffs were victims of a common policy or plan that violated the law." *Id.* (quoting *Salazar*, 2008 WL 782803, at *4).

The decertification stage, on the other hand, "is a fact-intensive inquiry which requires the Court to consider factors such as (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014). The standard required by the second stage is far more strict than that of the first. "The stricter post-discovery standard requires plaintiffs to convince the court that the factual record reveals putative plaintiffs are still similarly situated to existing plaintiffs." *Bouaphakeo*, 564 F. Supp. 2d at 893 (internal quotation marks omitted).

This Court also certified Plaintiffs' Iowa minimum wage claim in August 2022 as a Rule 23 class action. Doc. 296. That class consists of:

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one

> truck at a time to CRST Expedited, Inc. during the applicable limitations period, subject to any equitable tolling and equitable estoppel.

With respect to a Rule 23 class, a certification order "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). District courts must monitor class proceedings as the case develops to ensure all Rule 23 requirements remain satisfied through final judgment. "Similarly, after a class has been certified, decertification is appropriate when it becomes clear during the course of the lawsuit that the class fails to meet one or more of the requirements of Rule 23." *Miller v. Centerfold Entertainment Club, Inc.*, No. 6:14-CV-6074, 2017 WL 10185485, at *2 (W.D. Ark. Mar. 10, 2017). *See also Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021).

Maintaining the requirements of Rule 23 throughout the life of a class action is critical to the preservation of a defendant's due process rights. "Indeed, so important are the Rule 23 class prerequisites that courts often decertify classes *sua sponte*, even at the appellate level, after finding that class litigation is no longer appropriate or has become obsolete." *White v. National Football League*, 756 F.3d 585, 594 (8th Cir. 2014). Continued certification is appropriate only "if the trial court is satisfied, after a rigorous analysis," that all of the "prerequisites of Rule 23(a)" and one of the alternative requirements of Rule 23(b) have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). In adjudicating a motion for decertification after discovery is complete, the burden of proving all the prerequisites of Rule 23 are met remains with the plaintiff. Rubinstein, *Newberg on Class Actions* § 7:22 (6th ed. 2023 update).

### B. CRST's Operations and Named Plaintiffs

CRST is a motor carrier authorized by the U.S. Department of Transportation (DOT) to provide transportation services to customers across the United States. *Declaration of Chad Brueck*, ¶ 3 (*Brueck Decl.*, Doc. 127-3, Ex. 2). CRST engages drivers to timely deliver its customers' freight. Two types of drivers perform services for CRST: company drivers, who are employed by

the company directly and independent contractor owner-operators (Contractors) who contract with the company to make deliveries. Ex. 3 *Abernathy Dep.* at 18:11-20:11; Ex. 4 *Brueck Dep.* 16:10-16.[1] There are significant differences between the day-to-day operations of these two groups of drivers. Company drivers have set schedules, are not permitted to decline loads (except for very limited safety-related reasons), are paid on a cents-per-mile basis and are required to abide by all company policies. *See, e.g.*, Ex. 8 *Evans Dep.* at 14:18-16:20; Ex. 10 *Cross Dep.* at 92:11-22. Company drivers are also paid on a regular basis through CRST's payroll system, and CRST owns the trucks they drive. Ex. 6 *Cervantes Dep.* at 185:17-186:17; Ex. 7 *Daniel Dep.* at 39:4-13; Ex. 8 *Evans Dep.* at 14:18-16:20; Ex. 9 *Fink Dep.* at 48:12-49:16.

Contractors, on the other hand, are not subject to the same restrictions as employee drivers. Contractors set their own schedules,[2] can (and do) decline loads offered to them for any reason,[3] and are paid on a per-load basis.[4] Contractors provide the trucks they use to make deliveries.[5] Because Contractors operate their own businesses, they are responsible for all business-related

---

[1] Throughout this brief, citations to deposition transcripts appear as [last name] Dep. at [page]:[line]. An index of all exhibits to this brief is submitted as Exhibit 1.

[2] Ex. 6 *Cervantes Dep.* at 230:12-231:4, 242:18-246:14, 252:13-253:5; Ex. 11 *Corpening Dep.* at 64:18-65:2, 66:15-67:13, 99:23-101:25; Ex. 10 *Cross Dep.* at 259:22-265:5; Ex. 12 *Edden Dep.* at 40:22-41:25, 45:9-15; Ex. 13 *Fisher Dep.* at 136:20-137:3; Ex. 14 *Gess Dep.* at 46:6-15; Ex. 15 *Gravelle Vol. II Dep.* at 23:10-24:20; Ex. 16 *Johnson Dep.* at 105:25-106:8; Ex. 17 *Lomax Dep.* at 155:23-156:15; Ex. 18 *Powers Dep.* at 17:11-25, 18:1-20; Ex. 19 *Thompson Dep.* at 115:1-25

[3] Ex. 6 *Cervantes Dep.* at 142:4-145:13; Ex. 11 *Corpening Dep.* at 65:3-10; Ex. 10 *Cross Dep.* at 90:6-93:4; Ex. 7 *Daniel Dep.* at 77:18-81:8; Ex. 12 *Edden Dep.* at 42:1-43:23; Ex. 20 *Fapohunda Dep.* at 72:19-73:1; Ex. 9 *Fink Dep.* at 106:2-107:19; Ex. 13 *Fisher Dep.* at 87:3-87:19; Ex. 21 *Gravelle Vol. I Dep.* at 47:1-4, 84:12-85:5; Ex. 16 *Johnson Dep.* at 115:10-16; Ex. 17 *Lomax Dep.* at 123:16-124:4, 166:17-25; Ex. 22 *Mareus Dep.* at 112:10-113:7; Ex. 23 *Meeks Dep.* at 81:23-82:3; Ex. 24 *Noble Dep.* at 124:1-126:13; Ex. 18 *Powers Dep.* at 124:1-125:8; Ex. 25 *Robinson Dep.* at 103:9-25; Ex. 19 *Thompson Dep.* at 186:1-187:20; Ex. 26 *Williams Dep.* at 26:8-26:21.

[4] Ex. 6 *Cervantes Dep.* at 185:17-186:17; Ex. 7 *Daniel Dep.* at 39:4-13; Ex. 8 *Evans Dep.* at 14:18-16:20; Ex. 9 *Fink Dep.* at 48:12-49:16; Ex. 27 *Placide Dep.* Vol. II at 17:7-19:4; Ex. 18 *Powers Dep.* at 10:10-20; Ex. 25 *Robinson Dep.* at 25:11-26:17; Ex. 28 *Shines Dep.* at 14:6-15:14; Ex. 4 *Brueck Dep.* at 86:10-87:15*; Brueck Decl.* ¶¶ 5-6, 11-13, 22.

[5] The class certified by the court under Fed. R. Civ. P. 23(a) and (b)(3) is limited to contractors who signed ICOAs and leased the trucks they operated from CRST Lincoln Sales, Inc. CRST Lincoln Sales is not a party to this lawsuit. The collective conditionally certified by the court comprises contractors who signed ICOAs regardless of where those individuals obtained their trucks.

expenses. [6] Contractors are paid via settlement statements and only receive money from CRST when they choose to haul loads for the company. Contractors have the choice to operate as Contractors or Company drivers. The record reflects that drivers frequently elect to become Contractors after starting out as Company drivers.[7]

Under federal law, the ICOA governs the relationship between CRST and each Contractor and contains language required by the federal leasing regulations. *See* Ex. 29 *Anthony Cervantes ICOA*; 49 C.F.R. § 376.11(a). The ICOA specifies compensation paid to Contractors for hauling loads and the services the Contractors will provide. Appendix B to the ICOA governs compensation and provides that Contractors are paid 70% of Adjusted Gross Revenue (defined as the amount that CRST charged the customer for the load, less certain deductions) for each load they deliver. *See* Ex. 29 at App'x B.[8] Contractors are also entitled to 97% of any fuel surcharge (i.e., amounts charged to the shipper based on the price of fuel) and 70% of certain accessorial charges billed to customers. *Id.*

Contractors testified that they had the right, under their ICOAs, to haul brokered loads including named Plaintiff Anthony Cervantes.[9] Cervantes, for his part, actually hauled a load that was brokered from another carrier.[10] His election to do so demonstrates not only that he was free to turn down CRST loads at his election, but also that he could turn down CRST's freight in favor

[6] *See also* Ex. 6 *Cervantes Dep.* at 150:21-151:8, 241:25-242:13; Ex. 17 *Lomax Dep.* at 36:3-10; Ex. 18 *Powers Dep.* at 16:6-17:15, 138:4-9; Ex. 16 *Johnson Dep.* at 15:3-19; Ex. 27 *Placide Dep. Vol. II* at 27:5-28:2; *accord* Ex. 4 *Brueck Dep.* at 165:18-166:14; Ex. 30 *Reges Dep.* at 168:18-169:4.

[7] Ex. 11 *Corpening Dep.* at 28:9-18, 31:16-19, 32:10-20; Ex. 7 *Daniel Dep.* at 63:24-64:16; Ex. 31 *Dosier Dep.* at 26:19-27:1; Ex. 8 *Evans Dep.* at 28:15-31:9; Ex. 18 *Powers Dep.* at 11:7-12; Ex. 32 *St. Amour Dep.* at 71:17-72:11; Ex. 27 *Placide Dep.* Vol. II at 19:11-20:13; Ex. 33 *Ridner Dep.* at 54:5-16; Ex. 19 *Thompson Dep.* at 31:21-32:6; Ex. 9 *Fink Dep.* 20:21-21:1.

[8] Appendix B identifies higher compensation percentages where the Contractor provided the trailer for a load. But that scenario did not apply to the vast majority of loads at issue in this case.

[9] See Ex. 6 *Cervantes Dep.* at 223:13-23, 257:10-259:14; Ex. 31 *Dosier Dep.* at 37:2-10; Ex. 28 *Shines Dep.* at 87:11-91:6, 93:1-94:5, 97:1-98:10; Ex. 34 *Whisenton Dep.* at 78:21-79:9, 126:5-127:2.

[10] See Ex. 6 *Cervantes Dep.* at 223:13-23, 257:10-259:14.

of hauling a load from another carrier. And several Contractors testified that they had the right, under their ICOAs, to haul loads for other motor carriers.[11]

Some Contractors entered into multiple leases with CRST to provide transportation services. For example, Cervantes drove with CRST in two stints. Declaration of Anthony Cervantes, Doc. 245-3, ¶ 3; Ex. 6 *Cervantes Dep.* at 172:7-20, 192:9-18. Cross also contracted with CRST numerous times over a period of approximately two years between 2018 and 2020. Ex. 2 *Brueck Decl.*, ¶ 31. And, consistent with the testimony of multiple opt-ins, both Cervantes and Cross testified to hiring drivers or co-drivers themselves.[12]

## III. ARGUMENT

### A. No Efficient, Manageable Way to Try the Independent Contractor Issue Exists

Discovery is closed and, even though CRST deposed less than 1% of the class and less than 5% of the collective, their testimony reveals significant variations between Plaintiffs' experiences on issues impacting resolution of the economic-realities test used to assess their independent contractor status under both the FLSA and Iowa law.[13] Those variations make a fair trial based on representative testimony of Plaintiffs impossible. In *Blair v. TransAm Trucking*, Inc., 309 F. Supp. 3d 977 (D. Kan. 2018), which this Court relied upon in granting conditional certification, the court noted that decertification "is typical in cases where it must be determined whether the putative plaintiffs are employees or independent contractors. Courts typically deny collective certification

---

[11] Ex. 29 §§ 1(C), 1(D), 1(E). Ex. 10 *Cross Dep.* at 207:8-18; Ex. 28 *Shines Dep.* at 93:1-94:5; Ex. 34 *Whisenton Dep.* at 78:21-79:9.

[12] Ex. 6 *Cervantes Dep.* at 153:3-155:17, 255:5-256:8; Ex. 11 *Corpening Dep.* at 34:24-35:11, 38:17-40:3; Ex. 10 *Cross Dep.* at 117:11-119:14; Ex. 31 *Dosier Dep.* at 70:14-71:17; Ex. 12 *Edden Dep.* at 27:22-29:20; Ex. 8 *Evans Dep.* at 50:7-24, 52:20-53:2; Ex. 13 *Fisher Dep.* at 129:4-13; Ex. 16 *Johnson Dep.* at 70:24-71:18; Ex. 17 *Lomax Dep.* at 109:22-110:20, 115:19-115:24; Ex. 23 *Meeks Dep.* at 171:4-7; Ex. 18 *Powers Dep.* at 109:12-15; Ex. 28 *Shines Dep.* at 17:1-6, 105:4-106:22, 107:6-20; Ex. 32 *St. Amour Dep.* at 110:18-111:16; Ex. 34 *Whisenton Dep.* at 107:7-109:6; Ex. 26 *Williams Dep.* at 83:21-84:15.

[13] While the economic realities test factors and the *McCarthy* factors are similar, they diverge in some areas, which are noted in this section. *Walsh*, 39 F.4th at 1082; *Fesler*, 794 F. Supp. 2d at 1008-09 (quoting *McCarthy*, 572 N.W.2d at 542). Here, where the factors correspond, they are discussed together.

in these cases, because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole." *Id.* at 1003 n.182 (cited in Doc. 147 at 5). As described in *Blair*, a trial to resolve the factors analyzed under the economic realities test and Iowa's additional factors will require inquiries into individual collective and class member circumstances and experiences. Continued certification of the claims is therefore inappropriate.

**1. The degree of control exercised by the alleged employer over the business operations.**

When assessing "the degree of control exercised by the alleged employer over the business operations," the Eighth Circuit considers "the alleged employer's right to control the way work is performed." *Walsh*, 39 F.4th at 1083. "Such control can be demonstrated in several ways," including:

> [A]ssigning trips, pressuring drivers to accept trips offered by dispatch, regulating the times at which drivers could provide services, requiring the drivers to obtain permission to take a break, tracking drivers through GPS location monitoring, and requiring drivers to submit travel logs.

*Id.* (collecting cases). "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Roeder*, 2017 WL 151401 at *11 (internal citations omitted).

Under the *McCarthy* factors, Iowa state courts consider "who had the right to control the physical conduct of the work" (first factor), "the independent nature of the individual's business" (seventh factor), "the individual's employment of assistants, with the right to supervise their activities" (eighth factor), and who had "the right to control the progress of the work, except as to final results" (twelfth factor). *Fesler*, 794 F. Supp. 2d at 1008-09 (quoting *McCarthy*, 572 N.W.2d at 542).

Opt-ins gave conflicting testimony on these control factors, including whether they set their own schedules and routes. For example, Plaintiff Cervantes testified that he planned his own routes with the exception of certain restrictions on I-70. Ex. 6 *Cervantes Dep.* at 230:12-231:4. And he chose the times he operated his truck and when and where to stop for breaks. Ex. 6 *Cervantes Dep.* at 242:18-246:14. Opt-in Robert Corpening testified that he drove nearly every week during a four-year period and attempted to accumulate 70 hours of driving each week. Ex. 11 *Corpening Dep.* at 64:18-24. Mr. Corpening testified that CRST wanted him to take a certain route to deliver a load and, when he told them he would not take the suggested route, CRST canceled the load. Ex. 11 *Corpening Dep.* at 66:15-23. Plaintiff Cross testified that he chose to drive regular hours Monday through Friday. Ex. 10 *Cross Dep.* at 261:22-262:7. Opt-in James Edden testified that he requested home time, and CRST tried to accommodate him. Ex. 12 *Edden Dep.* at 41:17-20. When he got home, he would sometimes "take an extra day or two" if it took CRST an extra day or two to route him to his home. Ex. 12 *Edden Dep.* at 41:19-25. Joseph Gess testified that he used the routing instructions CRST gave him when he accepted a load "unless, in my experience, I had traveled from them roads and know something that was shorter." Ex. 14 *Gess Dep.* at 46:6-10. Linda Gravelle testified that the weather dictated the route she chose to take because "sometimes it's better to go 60 miles out of route than be shut down for two days because of weather." Ex. 15 *Gravelle Vol. II Dep.* at 24:8-20. Opt-in Michael Johnson testified that he returned to contracting with CRST because he could dictate the days he worked and did not work. Ex. 16 *Johnson Dep.* at 105:25-106:8. Justin Lomax testified that he could take breaks any time he wanted, but that CRST gave him a route to take to deliver his load. Ex. 17 *Lomax Dep.* at 155:23-157:18. Eugene Thompson likewise testified that CRST gave him the route to take when he accepted a load. Ex. 19 *Thompson Dep.* at 115:2-10.

Opt-ins testified inconsistently on their ability to refuse loads. Mr. Cervantes testified that he could not refuse loads as a contractor "[b]ecause if you refused a load, you sat." Ex. 6 *Cervantes Dep.* at 142:9-17. Derrick Daniel likewise testified that refusing a load as a contractor would result in him being put at "the bottom of the—of the pile of the other drivers in front of you." Ex. 7 *Daniel Dep.* at 76:15-25. Mr. Edden testified that he took "most of the loads" CRST offered him because "you never knew when the next load was going to come to you." Ex. 12 *Edden Dep.* at 42:23-43:2. Jacob Fapohunda testified that he had "no real say in which loads" he hauled because refusing a load meant that he would "be sitting with no work." Ex. 20 *Fapohunda Dep.* at 72:20-73:1. Barry Robinson testified that he felt compelled to accept the loads CRST offered to him because "[i]f I say no, they're going to let me sit there and say, well, you turned it down. . . . So I just take what they offer, you know, instead of just relying on them to do the right thing and send me a load." Ex. 25 *Robinson Dep.* at 103:9-104:2. Glenn Williams testified that he, too, felt compelled to accept unprofitable loads because CRST would make him sit without work if he refused them. Ex. 26 *Williams Dep.* at 26:8-27:8.

In contrast, Terry Evans testified that Contractors could refuse loads and determine when they were available for dispatch, both of which were options unavailable to company drivers. Ex. 8 *Evans Dep.* at 14:18-16:2. Christoper Fink testified that his inability to refuse loads as a CRST company driver drove him to become a Contractor with the company. Ex. 9 *Fink Dep.* at 86:17-88:17. Mr. Corpening testified that, as a Contractor, he could refuse loads CRST offered him. Ex. 11 *Corpening Dep.* at 65:3-21.

**2. The relative investments of the alleged employer and employee.**

"The second factor considers the amount the worker has invested in the business." *Roeder*, 2017 WL 151401 at *16 (internal citations omitted). When considering this factor, "the worker's investment must be compared to that of the alleged employer." *Id.* Under the *McCarthy* factors,

Iowa state courts consider "who provided the equipment to accomplish the work" (fourth factor) and "the individual's obligation to furnish necessary tools, supplies, and materials" (fifth factor). *Fesler*, 794 F. Supp. 2d at 1008-09 (quoting *McCarthy*, 572 N.W.2d at 542).

Plaintiffs' Rule 23 class definition operates as a fail-safe with respect to the relative-investments-of-the-parties factor. Because class membership is limited to individuals who leased a truck from CRST Lincoln Sales, Inc. (Lincoln Sales), it artificially excludes the experiences of Contractors, operating under the same leases, who leased a truck from another source or owned their truck outright. Likewise, Plaintiffs' decision to exclude Contractors who leased multiple trucks to CRST at the same time also artificially circumscribes the opportunities available to Contractors. For example, David Tromp operated as many as eight trucks under contract with CRST providing dedicated services to a CRST customer. Doc. 257-13, ¶ 8. Plaintiffs' decision to artificially mask these opportunities cannot alter the fact that they exist.

Under the circumstances, it is unsurprising that opt-ins—so restricted by the class definition—testified they leased their trucks from Lincoln Sales because the terms of their leases presented the best opportunities available to them at the time to lease a truck with an opportunity to purchase the vehicle. *See, e.g.*, Ex. 20 *Fapohunda Dep.* at 112:19-113:11; Ex. 9 *Fink Dep.* at 114:4-25; Ex. 22 *Mareus Dep.* at 105:7-106:15.

### 3. The degree to which the alleged employee's opportunity for profit and loss is determined by the employer.

To determine the degree to which the alleged employee's opportunity for profit or loss is determined by the alleged employer, the Eighth Circuit "generally consider[s] whether workers had control over profits and losses depending on their managerial skill." *Walsh*, 39 F.4th at 1084 (internal citations and quotations omitted). A worker exercises managerial skill if the worker "set[s] his own hours and rates" and has "the ability . . . to earn additional income through his own initiatives." *Id.* "In other words, facts demonstrating that a worker can use his managerial skill to

improve his efficiency such that he c[an] complete more jobs weigh in favor of independent contractor status." *Id.* (internal quotations omitted).

As discussed above in Section III.A.1., opt-ins gave conflicting testimony on whether their opportunity for profit or loss was determined by CRST or their own decisions and initiative. While some testified to their ability to set their own schedules and select profitable loads, others contend CRST controlled their profits and losses because it decided how often they drove and penalized them for refusing loads by making them sit idle. For example, Roderick Fisher testified to trying to bargain with CRST by offering to take a lower-paying load on the promise of a higher-paying subsequent load, but "I've never been successful with that." Ex. 13 *Fisher Dep.* at 137 12-17.

The conflicts in the record evidence do not end there. For instance, some opt-ins analyzed the profitability of loads before deciding to accept them. Opt-in Michael Noble testified that he considered both the revenue related to a load offered to him and the possibilities related to the revenue of loads available at his destination for his next load before deciding to accept a load. Ex. 24 *Noble Dep.* at 125:20-126-13. Mr. Robinson conducted the same analysis and testified that he would sometimes travel empty in order to position himself in a location where profitable freight was available. Ex. 25 *Robinson Dep.* at 96:20-98:3. Other opt-ins testified that they conducted no such analysis. Rather they claimed they had no choice but to accept the loads CRST offered because refusing the loads left them without work. Ex. 6 *Cervantes Dep.* at 142:9-17; Ex. 7 *Daniel Dep.* at 76:15-25; Ex. 12 *Edden Dep.* at 42:23-43:2; Ex. 20 *Fapohunda Dep.* at 72:20-73:1; Ex. 25 *Robinson Dep.* at 103:9-104:2; Ex. 26 *Williams Dep.* at 26:8-27:8. Independent businesses in all facets of industries consider whether to turn down available work or to wait for the next available opportunity.

Other opt-ins testified that CRST's decisions impacted their operating expenses, and thus their profits. Justin Lomax testified that CRST told contractors like him where to buy fuel. "[T]hey

told us that we were independent, but we didn't get to fuel up where we wanted to whenever we wanted." Ex. 17 *Lomax Dep.* at 157:12-158:2. Eugene Thompson also testified that CRST told him where to fuel his truck. "[I]t was also their route as well. Because, you know, they got fuel stops along the way too on that route. So that's why it's best to follow that route because they got some fuel stops on there that you can stop at." Ex. 19 *Thompson Dep.* at 115:15-19. On the other hand, opt-ins testified they managed cash flow by electing to have CRST absorb initial costs that they would pay for by deductions from future load payments. Ex. 36 *Cato Dep.* at 92:8-95:15 (electing that CRST obtain his truck's license plate, fuel tax sticker, and provide and install an electronic communication system in his truck).

Whether an opt-in made a profit or incurred a loss in a given period of time also depended on their choice to participate in CRST's lead driver program or hire their own co-driver. Under the lead driver program, opt-ins elected to train new drivers who were employed by CRST. Lead drivers paid a per-mile fee for the trainee in exchange for receiving all of the revenue generated by the miles the trainee drove. Ex. 35, *Addendum – Lead Driver Program*, ¶ 2. Some Contractors elected to participate in this program while others elected to hire their own co-drivers and set those individual's pay. Mr. Cervantes testified that he hired a co-driver named David Smith. Ex. 6 *Cervantes Dep.* at 153:3-154:20. Ms. Gravelle testified that she hired three co-drivers at various times and also acted as a lead driver training CRST students. Ex. 21 *Gravelle Vol. I Dep.* at 54:14-55:8. In turn, they received the full 70% of the revenue for the delivered loads without having to hire a co-driver.

An opt-in's profit or loss also depended upon how they handled the costs they paid to operate their businesses. Some opt-ins deducted business expenses from their taxable income to net more take-home pay. For example, Mr. Corpening used a laptop to manage his business in 2015 and deducted depreciation on that computer. Ex. 11 *Corpening Dep.* at 71:20-72:25. He

claimed deductions for other expenses as well, such as truck expenses (74:21-75:3) and tolls, scale, and fuel expenses (81:23-82:19). Others did not file tax returns at all. Ex. 20 *Fapohunda Dep.* at 125:18-25.

### 4. The skill and initiative required in performing the job.

In weighing the skill factor, courts in the Eighth Circuit consider "whether plaintiffs' profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401 at *18 (internal citations omitted).

Here, the testimony described in Section III.A.1. demonstrates the disparities between the opt-ins' initiative and foresight and how their unique approaches bore on their profitability. In addition, the U.S. Department of Labor's recent final rule, Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638 (Jan. 10, 2024), which takes effect in March 2024, states truck driving that requires a commercial driver's license is a skill that indicates independent contractor status "for a worker who uses truck-driving skills in connection with business-like initiative. *Id.* at 1712. Nevertheless, opt-ins disagree on whether their driving constituted a special skill. Barry Robinson testified that a normal person on the street could possess the skills necessary to do the driving he did, i.e., to drive an 18-wheel tractor-trailer unit with a combined Gross Vehicle Weight Rating of 80,000 pounds. Ex. 25 *Robinson Dep.* at 62:17-23. Anthony Cervantes disagreed and testified to having to learn to control a tractor-trailer when, for example, driving in mountains. Ex. 6 *Cervantes Dep.* at 240:21-241:14.

### 5. The permanency of the relationship.

The permanency-of-the-relationship factor considers whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401 at *21 (internal citations omitted). "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor" and "[t]he more permanent the relationship, the more likely the worker is to be an employee." *Id.* (internal citations omitted).

The record belies any suggestion of uniformity with respect to the permanence of Contractors relationships with CRST. For example, Anthony Cervantes was under contract with CRST for two stints: one of six weeks in January 2018 followed by another between March 2018 and August 2019. Ex. 6 *Cervantes Dep.* at 172:7-20, 192:9-18. Michael Cross terminated and subsequently re-contracted with CRST several times, one time remaining terminated for only 72 hours. Ex. 10 *Cross Dep.* at 193:21-195:12. Other Contractors followed similar on-again off-again patterns for much longer periods of time. *See, e.g.,* Ex. 9 *Fink Dep.* at 153:8-154:14, 155:17-25, 175:16-24 (contracted with CRST collectively 4 years 3 months, but terminated and re-contracted with CRST four to five times); Ex. 28 *Shines Dep.* at 49:10-12; 56:2-58:12; 71:4-72:21; 84:12-21 (signed and terminated three separate ICOAs with CRST between 2018 and March 2020, the first lasting a little over a month, and the third lasting five months).

There is no consistency in timespans that pot-ins contracted with CRST. Some were short, e.g., 0-3 months. Others lasted more than a year. A trial to resolve the factor would require testimony from each individual collective and class member. Plaintiffs cannot whitewash the record by noting that, *when each contracted*, the Contractors only drove for CRST; the fact that Contractors frequently terminated and later re-contracted with CRST demonstrates that they could and did drive for other motor carriers. There is no basis to find that the permanency-of-the-relationship factor can be resolved by representative evidence.

### 6. The degree to which the alleged employee's tasks are integral to the employer's business.

The sixth and final factor turns on "whether [the] worker['s] services are a necessary component of the [alleged employer's] business." *Walsh*, 39 F.4th at 1085 (internal citations omitted). Under the *McCarthy* factors, Iowa state courts consider whether "the work is part of the regular business of the employer" (tenth factor). *See Fesler*, 794 F. Supp. 2d at 1008-09.

CRST is a logistics company, and the nature of its business is the timely delivery of its customers' freight. The primary service the opt-ins offer is to haul loads for CRST's customers. Thus, the absence of conflicting testimony on this factor is not surprising. Nevertheless, whether collective and class members are integral to CRST's business is of less moment than other factors. Motor carriers have engaged the services of independent contractors to provide vehicles and perform deliveries for decades, and the federal government regulates their relationships. See 49 C.F.R. Part 376 (authorizing and regulating a motor carrier's transportation of property using equipment and services of others and mandating, at 49 C.F.R. § 376.12, that such services be provided under a written contract); *Krupicki v. Eagle One, Inc.*, 2014 LEXIS U.S. Dist. 46038, at *10 (E.D. Ark. Apr. 3, 2014) (finding plaintiff failed to meet burden of proof of employee status, despite finding that "integral" factor favored plaintiff as a delivery driver; *Moba v. Total Transp. Svc. Inc.*, 16 F. Supp. 3d 1257, 1265-66 (W.D. Wash. 2014) (disregarding the factor entirely in the independent contractor analysis); *Roeder*, 2017 WL 151401 at *9 ("No one factor is controlling and the court must base its decision on the totality of the circumstances."); *see also D & C Express, Inc. v. Sperry*, 450 N.W.2d 842, 844 (Iowa 1990); *Lopez v. Midstates Horse Shows, Inc.*, 776 N.W.2d 302, 2009 WL 3337614 at *3 (Ct. App. Iowa 2009) (unpublished table decision).

### 7. Remaining factors under Iowa state law.

Four of the *McCarthy* factors applied by courts under Iowa state law do not neatly correspond to any of the Eighth Circuit's six factors for classification under the FLSA. These

additional factors are: “whether the purported employee was on the employer’s payroll” (second factor), “the method of payment, whether by time or by job” (third factor), “the existence of a contract for the performance of a certain kind of work at a fixed price” (sixth factor), and “the intent of the parties” (eleventh factor). *See Fesler*, 794 F. Supp. 2d at 1008-09.

The first three remaining factors, like the integral-to-the-employer’s-business factor under *Walsh*, are not subjects likely to generate conflicting testimony from opt-ins. The final remaining factor, however, seeks the “intent of the parties.” It is difficult to imagine a more singularly individual inquiry than the intent of a party at the moment in time when he or she entered into an agreement. As this Court observed in declining to certify Plaintiffs’ fraud claim, this type of inquiry cannot be resolved on anything but an individualized basis: “Indeed, in light of Iowa precedent, it strains the imagination to think of when the question of whether reliance is justifiable would *not* be individual, given that the analysis of whether a decision is justifiable depends on the qualities and characteristics of the particular class members and the specific circumstances surrounding their individual actions.” Doc. 276 at 63 (emphasis in original). Just so with the question of a class member’s intent as to the nature of his or her relationship with CRST. A trial to resolve the factor would necessarily entail examining each person who entered the agreement to ascertain their intent at the time.

## B. PLAINTIFFS FAIL TO IDENTIFY AN FLSA-VIOLATING POLICY

Plaintiffs’ argument for conditional certification rested on the allegations that (1) the ICOAs state that they and the collective members were independent contractors, (2) the policy of CRST treating them as independent contractors was unlawful because, “as a matter of economic reality, they were employees” of CRST, and (3) as a result of CRST’s policy of classifying them as independent contractors, CRST violated the FLSA by paying them less than minimum wage in certain workweeks. *Plaintiffs’ Memorandum of Law In Support Of Motion To Conditionally*

*Certify FLSA Collective Action, For Issuance Of Notice, And For Equitable Estoppel Regarding The Limitations Period* (Plaintiffs' Memorandum), Doc. 113, ¶¶ 6, 9-11; *Third Amended Complaint*, Doc. 108. Liability under the FLSA for minimum wage claims must be demonstrated on a workweek-by-workweek basis, and there is no liability unless Plaintiffs can demonstrate that CRST had a "decision, policy, or plan" and that decision, policy, or plan resulted in violations of the minimum wage across all workweeks. *Merrill v. Pathway Leasing, LLC*, No. 16-cv-02242-KLM, 2019 WL 5078655 (D. Colo. Oct. 9, 2019); *Kennedy v. LTI Trucking Services, Inc.*, No. 4:18CV230 HEA 2019 WL 4394539 (E.D, Mo. Sept. 13, 2019); *Petrone v. Werner Enterprises, Inc.*, No. 8:11CV401, 2017 WL 510884 (D. Neb. Feb. 2, 2017) Otherwise, each workweek must be analyzed to determine whether there are minimum wage allegations. Plaintiffs' misclassification allegations do not inform the economic-realities test that determines the fundamental issue in the case—whether Plaintiffs were independent contractors—or otherwise show the existence of a "single decision, policy, or plan *that violated the law*" and accordingly fail to demonstrate there are similarly-situated individuals. *Rios v. Current Carrier Corp.*, No. 14-10247-GAO, 2015 WL 1443058, at *1 (D. Mass. Mar. 30, 2015) (emphasis added).

In their first point, Plaintiffs refer to the ICOAs they signed with CRST. The ICOA is required by the federal leasing regulations[14] and has no bearing on an individual's status as an independent contractor or employee.[15]

---

[14] 49 C.F.R. § 376.12 (requiring a "written lease" "between the authorized carrier and the owner of the equipment" and identifying specific terms the lease must have).

[15] 49 C.F.R. § 376.12(c)(4) ("Nothing in the provisions . . . is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."); *see also Lease and Interchange of Vehicles—Declaratory Order*, Fed. Carrier Cas. P 38,121, 1994 WL 70557, at *6 (I.C.C. Mar. 8, 1994) ("regulations should have no bearing" on the subject of state tort, contract, and agency law and must not "create carrier liability where none would otherwise exist"); *Pouliot v. Paul Arpin Van Lines, Inc.*, 292 F. Supp. 2d 374, 383 (D. Conn. 2003) (lease regulations have no impact on the type of relationship that exists between the parties to the lease); *Hernandez v. Triple Ell Transp., Inc.*, 15 P.3d 199, 205 (Idaho 2007) ("adherence to federal law" was not evidence of motor carrier's control over owner/operator); *Wilkinson v. Palmetto State Transp. Co.*, 676 S.E.2d 700, 705 (S.C. 2009) (federal regulation "is not intended to affect" the independent contractor determination under state law), cert. denied, 130 S. Ct. 741 (2009); *FedEx Home Delivery v. NLRB*, 563 F.3d 492,

As to Plaintiffs' second point, contracting with independent contractors instead of hiring employees does not constitute an illegal "decision, policy, or plan" making the proposed class similarly situated.[16] The record establishes that it was Contractors, not CRST, who decided whether they would drive for CRST as an employee or as an independent contractor. *See Salazar*, 2008 WL 782803, at *5 ("Although the standard is a lenient one, plaintiffs must present more than mere allegations; i.e., some evidence to support the allegations is required." (quotation and citation omitted)); *Andel v. Patterson-UTI Drilling Co.*, 280 F.R.D. 287, 290 (S.D. Tex. 2012) (opining a court "cannot only look to [Defendant's] uniform classification of the workers" and "[i]nstead . . . must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole."); *Scott v. NOW Courier, Inc.*, No. 1:10-cv-971-SEB-TAB, 2012 WL 1072751, at *9 (S.D. Ind. Mar. 29, 2012) (dismissing plaintiffs' efforts to demonstrate independent contractors are similarly situated based on the "virtually identical agreements" and "broad-brush" references to the services provided because these fail "to illuminate the ways and extent to which [the courier company] allegedly maintains substantial control over its drivers' performance").

As to their third point, Plaintiff's own expert witness demonstrates that CRST's classification of Contractors as independent contractors did not result in CRST paying them less than the minimum wage in all workweeks. Indeed, as Dr. Song notes in her report, Plaintiffs' expert's damage calculations demonstrate that CRST Contractors earned far more per hour than employee drivers based on the U.S. Department of Labor's Bureau of Labor Statistics. Moreover,

---

501 (D.C. Cir. 2009) (indicating "constraints imposed by customer demands and government regulations do not determine the employment relationship"); *Universal Am-Can, Ltd. v. Workers' Compensation Appeal Board*, 762 A.2d 328, 336 (Pa. 2000) ("obligations imposed by law upon a motor carrier . . . when leasing equipment from an owner-operator are not probative" of the independent contractor determination).

[16] *Blair*, 309 F. Supp. 3d at 1002 ("[I]n determining whether there exists substantial evidence of a 'single decision, policy, or plan,' the fact that the Leased Drivers were classified as 'independent contractors' is irrelevant.").

nothing in the record or Plaintiffs' expert reports identifies a single policy or practice that caused *certain Contractors* to earn less than the minimum wage in certain workweeks. The absence of such a uniform policy means that this Court will have to conduct a workweek-by-workweek analysis of each instance in which a Contractor earned less than the minimum wage to determine whether his failure to do so resulted from something CRST did or decisions that the Contractor made in that workweek. Plaintiffs have offered no basis on which the Court can resolve those questions without a Contractor-by-Contractor and workweek by workweek analysis.

## VI. CONCLUSION

The discovery CRST conducted destroys the illusion that a trial on Plaintiffs' claims that CRST misclassified them as independent contractors and failed to pay them minimum wage under the FLSA and Iowa law may be conducted using representative testimony. The disparities in the testimony of the small number of opt-ins deposed in the case leads to the inescapable conclusion that the collective and class should be decertified.

Dated: January 31, 2024

Respectfully submitted,

*/s/ James H. Hanson*

James H. Hanson (admitted *pro hac vice*)
James T. Spolyar (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-492-9205
F: 317-684-2414
jhanson@scopelitis.com
jspolyar@scopelitis.com

Adam C. Smedstad (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
5470 Shilshole Avenue NW, Suite 520
Seattle, WA 98107
P: 206-288-6192
F: 206-299-9375
asmedstad@scopelitis.com

*/s/ Kevin J. Visser*
Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
P: 319-366-7641
F: 319-366-1917
kvisser@spmblaw.com

Attorneys for Defendants,
CRST International, Inc. and CRST Expedited, Inc.

4875-3781-2384,