IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
CAUSE NO. 1:20-cv-00075-CJW-KEM

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

-vs-

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

# REMOTE VIDEO DEPOSITION OF ANTHONY CERVANTES

The deposition upon oral examination of ANTHONY CERVANTES, a witness produced and sworn before me, Amy Doman, Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Defendants, at the residence of the deponent in Wiggins, Colorado, scheduled to begin at 11:08 a.m., on Monday, April 19, 2021, pursuant to the Federal Rules of Civil Procedure.

anything that was received by midnight would be paid on the following Thursday, correct?

A Yes.

Q Now, "General Information" says: "CRST does not force dispatch. We do ask our independent contractors to be available for at least two weeks at a time, but how much time you take off will be up to you."

Do you agree that CRST does not use a forced dispatch?

A No.

Q Why not?

A Because if you refused a load, you sat.

Q In other words, if you refused a load, you had to wait until there was another available load, correct?

A Correct.

Q Did you, most of the time, have a second load ready for you when you were finishing up the load you were under?

A Most of the time I did.

Q At CRST, did they call that stacking?

A I don't know what they called it.

Q Have you ever heard that term before?

A I have.

Q Is that how most of your loads were, you finished one load and you had the next one waiting for you?
A Yes.
Q When you say the forced dispatch, what makes you think that you would have -- well, let me restate it this way.
If you're not under a forced dispatch, then you must be under a unforced dispatch, correct?
A Correct.
MS. KROLL: Object to form.
BY MR. HANSON:
Q It's one or the other, correct?
A Correct.
Q What rights would you have in a situation where it was not forced dispatch with respect to the loads that are offered to you?
MS. KROLL: Object to form.
A Can you repeat that, please?
BY MR. HANSON:
Q Yeah. Let me just ask --
MR. HANSON: Amy, would you read that back for me?
(Record read.)
Q Does that question make sense to you, Mr. Cervantes?

A What rights did I have?
Q Right.
A I had the right to refuse it. But then that didn't guarantee me another load.
Q Right. It would be whatever the next load that was available that you could be assigned to, correct?
MS. KROLL: Object to form.
BY MR. HANSON:
Q Let me reask the question.
If you didn't take the load that was offered, then you would have to wait for when there was the next available load, correct?
MS. KROLL: Object to form.
A Available load that was profitable or at least appeared to be profitable.
BY MR. HANSON:
Q Right. In these loads that you hauled, it's better to keep the truck moving delivering loads, correct?
A Yes.
Q I mean, ultimately, that's what you want to do is go from one load to the next because that increases the amount that you earn on each settlement week, correct?
A Yes.
Q Is that what you tried to do is to keep the truck

moving, delivering loads?
A Yes.
Q And that would increase your compensation as a contractor for CRST?
A Yes.
Q And that would be true with any company that you worked as a lease purchase contractor, right?
A Yes.
Q It says that CRST said that they want you to be available at least two weeks at a time.
What does that mean to you or what was your understanding of that?
A Just to be available to work.
Q Did you ever take home time while working for CRST?
A Yes.
Q What would you do on your home time?
A Are you asking what I do to get home, or how did I get home, or what did I do when I got home?
Q What did you do when you got home?
A I spent time with my kids and my grandchildren.
Q What did you do with the truck when you went on home time?
A Left it at a facility.
Q Left it at a facility?
A CRST facility.

complete the trip?
A Correct.
Q In the two shifts, correct?
A Correct.
Q On the load that was generated, like on this where it says 1,500-mile length of haul, who received the revenue from the load that was delivered?
MS. KROLL: Object to form.
A CRST received the revenue and then they transferred it to me, whatever was taken out.
BY MR. HANSON:
Q Based on the percentage?
A Correct.
Q So you would receive 70 percent of whatever the load paid, correct?
A Correct, yes.
Q If you were to try and do a $1,500 -- or a 1,500-mile trip as a solo driver, that would take you maybe two to two and a half days, correct?
A Yes.
Q Now, it says: "Optional health insurance benefits through True Choice personal insurance for owner-operators and their families."
Did you sign up for health insurance on this optional health plan?

A Yes, I did.
Q Were you required to do that?
A No.
Q That's something that you decided that you wanted, the health insurance benefit?
A Yes.
Q And you ended up paying for it, correct?
A Oh, yes, uh-huh.
Q There is a pet allowance for a truck. Did you ever have a pet?
A No.
Q Did any of your student drivers have a pet?
A No.
Q So that one -- that bullet point had no effect on you, correct?
A Correct.
Q It says you don't need a hazmat endorsement to start. They ask you to apply for it.
Did you have a hazmat endorsement at the time that you joined CRST?
A Yes.
Q And you -- did you keep that during the entire time that you worked as a contract driver for CRST?
A Yes.
Q So on the couple of loads that you hauled on

Q Not something you want in your truck, huh?
A No.
Q Did you ever try to recruit your own drivers to be a second driver with you?
A Yes.
Q What was your experience like with recruiting your own drivers?
A Well, I had to call CRST to get permission. CRST then did a background check, did the formalities, qualifying them as a driver. And then I had to pay the driver. And that was David Smith.
Q How long did you run with David Smith as your employee codriver?
MS. KROLL: Object to form.
A I believe about six months.
BY MR. HANSON:
Q How did you get to know David Smith?
A He's my daughter's boyfriend.
Q Is he still a truck driver?
A He is.
Q And did he participate in the CRST-sponsored trucking school?
A No.
Q Where did he go to truck driving school?
A I'm not sure where he went to truck driving school

but he had a CDL. He just didn't have
over-the-road experience.
Q Didn't have enough experience to go solo?
A Correct.
Q So you brought him to CRST to do the training with
him?
A Yes.
Q Did you get paid 100 percent for the loads that
were delivered when he was your -- when you were
working on training him?
A No. I got 70 percent of the load.
Q Okay. I'm sorry.
You got the full 70 percent of the loads that
the two of you delivered, correct?
A Correct.
Q And how -- and did it enable you to deliver the
loads more quickly because you had two drivers
versus trying to operate or trying to make those
deliveries with a single driver?
A Yes.
Q How did your relationship with him end as your
codriver?
A I told him to seek employment somewheres else so he
could be closer to his family. And he got a job
with Dominos Pizza doing regional work.

Q As a truck driver though?
A Yes.
Q He would not have really fit into this local driver program, correct?
MS. KROLL: Object to form.
A What do you mean he wouldn't fit into the local driver?
BY MR. HANSON:
Q I'm sorry. Let me -- I meant lead driver, if I said local -- into this lead driver program, because he didn't go to a CRST-sponsored school, correct?
A I don't know. I didn't go to a CRST-sponsored school either. But CRST took me on. So if he had a -- over-the-road experience and a CDS, I'm sure CRST would have taken him as a lead driver if he wanted to.
Q Under the "Lead Driver Program" that is on page 3 of Exhibit 1, it says: "The independent contractors pay -- contractors pay $0.09 per mile for all loaded miles when they have a student."
Did you pay the $0.09 per mile to the company when he worked as a trainee under you?
A I believe they took it out of my settlement.
Q And then you got 100 percent of the settlement?

MS. KROLL: Object to form.
A I couldn't tell you unless I looked at it. But I know it wasn't no $3,000 a week.
BY MR. HANSON:
Q So you don't think you made 3,000 per week?
A No.
Q How long did you work for CRST, Mr. Cervantes?
A I don't know. Maybe a year and -- maybe a year and a half.
Q You started -- as I see the records, you made an application in late '17 and began working sometime in early 2018 and worked for about six weeks maybe. And then left -- well, it would have been the end of February you left in 2018.
Do you recall whether that's a correct statement of the time period that you started and ended with CRST the first time?
A Yes.
Q Then you -- it looked like you came back in March of '18. Why did you come -- well, why did you leave at the end of February 2018?
A I was picking up trailers and damaged trailers rather than hauling loads, and I wasn't getting paid for any deadhead miles. I wasn't making any money.

purchase contractor for, not only the rest of 2008, but more than half of 2009?
A That's true.
Q Why didn't you --
MS. KROLL: Your years are off. Object to form. Asked and answered. You also said 2008 and 2009. Just if you want to clean that.
BY MR. HANSON:
Q 2018, you worked the rest of 2018, correct? Correct?
A Yes.
Q And then you worked until you said August of 2019?
A (Nods head.)
Q Why didn't you leave? You know, we're talking about 15 -- probably more than that. We're talking about 16, 18 months. So we're talking about 75 weeks, 85 weeks of time.
A Uh-huh.
Q Why didn't you leave CRST before then?
MS. KROLL: Object to form, asked and answered.
A Well, like I said, I tried to make it work. I tried to make money. I thought CRST would come through with their end of the deal.
BY MR. HANSON:

A I called my driver manager, Phillip Clop. And he sent me a list of companies that now were allowable to take for CRST. And so I called those numbers to see -- actually, I looked on the load board to see if those companies had any posted loads. And when I called several of them, they said they did not work with CRST anymore, any longer.

When I did find a load, I had -- they sent me the -- transferred me to somebody who worked with CRST has a liaison. He then contacted Phillip Clop. They sent the load over there that had to get approved and then they sent me the rate con.

Q So one you were trying to get through JJ Jerue, you ended up getting through the approved carriers that CRST had on its list?

A Right, because CRST would not allow me to give them a carrier packet or sign up to be a carrier for JJ Jerue.

Q On the load that you eventually took, was that a load that you selected?

A It was.

Q It was on a load board?

A Yes.

Q Where were you when that occurred, what area of the country?

was 9(C), something around there, it said that I had the sole decision-making of where, when, and how maintenance was to be performed. And that's why I had reached out to my driver manager and they said if I had any other questions to reach out to my driver manager with any further questions.

And that's why I reached out to legal to ask them because it says one on one page, and then on another contract said something different, in my reading. I think it's 9(C).

BY MR. HANSON:

Q Did you select the routes that you traveled with this truck?

A For the most part, yes. But we were not -- we were forbidden to go I-70 west of Colorado and I-70 east of Utah.

Q You said I-70 west of Colorado?

A Yes.

Q Correct?

A Yes.

Q And I-70 east of Utah?

A Yes.

Q Maybe I'm mixed up on my geography or I'm not remembering it. I didn't think 70 went through Utah?

A It does up until 15.
Q So is that an area that is a potential snow hazard, mountainous snow hazard?
A I would imagine, yes.
Q Is that what you would understand it to be?
A Being from Colorado, no.
Q Well, for a normal truck driver, not from Colorado?
MS. KROLL: Object to form.
A I don't think it would be any different than going through Seattle or California.
BY MR. HANSON:
Q Did you ever run that route?
A Through I-70?
Q Yes.
A No.
Q Is that because the loads didn't go that direction, you didn't need to?
A No, it was because they were told not to.
Q What repairs and maintenance did you do of the equipment that you yourself paid for?
A I believe all of them since they were deducted on a maintenance account.
Q So the repairs that you're talking about were deducted from the maintenance account, not from your settlement?

MS. KROLL: Object to form.
A I wouldn't call it specialized training. I would just call it caution.
BY MR. HANSON:
Q All right. The driver that had the accident in Denver a couple years ago coming down the mountain, he had a CDL, I'm assuming, from everything I understand from the story. But he was not qualified to drive in mountainous areas. Was that your understanding of the accident?
MS. KROLL: Object to form, foundation.
A My understanding of the accident is he disobeyed warning signs.
BY MR. HANSON:
Q He could have taken the truck runoff, in other words?
A Yes.
Q And he burned his brakes up coming down the mountain?
A Yes.
Q So it does take some special knowledge and understanding of how to navigate coming down a mountain range, correct?
A I wouldn't called it special knowledge. I would call it common sense.

Q Well, common sense. But just because you can drive a commercial motor vehicle doesn't mean that you have the ability to drive in mountain ranges, correct?
A No. Because a lot of people drive over the mountains of Tennessee, over the mountains of Utah, California, and Nevada. So I mean a mountain is a mountain.
Q And you have to learn how to not burn your brakes coming down a mountain, correct?
A You have to learn how to control coming down a mountain.
Q Control the vehicle, correct?
A Correct.
Q You didn't -- the company didn't have to provide you with any training when you came to work for CRST, correct?
A Correct.
Q And you knew the safety requirements of the DOT at the time you came, correct?
A Yes.
Q You didn't have to wear any type of a uniform, correct?
A No.
Q Did you bring any tools that you needed to do your

job as a truck driver?
A Maybe a screwdriver or a couple of wrenches for a replacement of fuses and headlights or things of that nature.
Q And then you brought the truck that you leased, you brought to the -- the work that you did, correct?
MS. KROLL: Object to form.
A To Lincoln Sales?
BY MR. HANSON:
Q Let me ask the question a little differently.
You leased a truck in order to be able to provide the trucking services to CRST, correct?
A Yes.
Q There were other trucking jobs that you could have taken at the time that you came to work for CRST, correct?
A Yes.
Q Is there any two days as an owner-operator for CRST that were the same from one day to the next?
A Meaning weatherwise? What -- what do you --
Q Weather, the work hours that you had each day, where you drove, how much you drove.
A Well, yeah, there was -- I mean I had a student, we drove across the road or I'd drive, he'd drive. It was the same, yes.

Q But you didn't -- you didn't work at the same time each day? Like, for example, in a factory job, you might work 8:00 to 4:00 or 8:00 to 5:00. Trucking isn't like that, is it?
A It depends on how you plan yourself out. You can -- currently, I could do that. I set up when I leave, when I stop. But as far as a team environment goes, one of the drivers may get sick, one of the drivers can't drive in the snow, so the weather or the traffic, so you'd have to stop and have to wait out like ten hours. So I could take over and drive. So yeah, there were occasions where it varied.
Q The hours varied from day to day, correct?
A Yes.
Q The places where you make deliveries, where you pick up from and deliver to, those are different with each trip, correct?
A Yes.
Q And you have, like you said, different traffic and weather patterns, that affects your work on a day-to-day basis, correct?
A Yes.
Q You kind of -- I lost you for a minute in terms of --

A I said yes, sorry.
Q You know, as -- you would call this an irregular route over-the-road type job, correct, for CRST?
MS. KROLL: I didn't hear that. Could you repeat that?
MR. HANSON: Yeah.
BY MR. HANSON:
Q For CRST, this is an irregular route over-the-road type work, correct?
A Irregular route? I'm not -- I'm not sure what you mean by "irregular."
Q You're not driving the same place from one day to the next to the next, correct?
A Correct.
Q Do you work -- other than with the codriver that you had that was a student driver, do you work with any other owner-operators that drive for CRST or did you?
A Currently? No.
Q No. Back at that time when you were an owner-operator.
A I'm not sure what your question is. Did I work with --
Q Right. Did you work with them -- you know, like in a -- say in a factory, you're next to the person

who is -- who is on the line next to you and you're working with them. You're maybe passing things to the next person in line on the manufacturing line.

But in the case of an owner-operator, you're not working with other owner-operators doing the same thing at the same time in the same location, correct?

A Not on a regular basis, no.

Q You may pass them, one may be going one way and you're going the other?

A Yeah. I would be in the terminal.

Q That would be CRST terminal?

A Yes.

Q What about out on the road? Would you be driving with other CRST drivers at the same time going to the same place?

A On occasions.

Q On occasion. How often would that happen?

A I couldn't tell you. It was -- like I said, we would take a route and drivers, you know, snowstorms, a lot of guys would stop over, I don't know -- you know, in New Mexico and they would wait out the storm and the others would just continue to drive. We would talk and go down the road or they sit and talk. But we were all going to the same

destination or state.
Q But you were making deliveries at different locations?
A Yes.
Q And you were not -- you were not aware of what the other drivers' schedules were on a day-to-day basis, correct, the other lease purchase contractors?
A No. I was not.
Q And you wouldn't know how often or how many hours in a day they would work from one day to the next, would you?
MS. KROLL: Object to form.
A Only if they had a new student, I would know.
BY MR. HANSON:
Q How would you know because they have a new student?
A Because we were required not to allow the student to drive, I believe, from the hours of 11:00 p.m. to 6:00 in the morning for the first three to five days.
Q But how many hours of that time the student driver -- or how many hours during the day the student driver was driving, you wouldn't know that, would you?
A No.

contractor?

MS. KROLL: Object to form.

A Now?

BY MR. HANSON:

Q No. When you were with CRST.

A Yes, it did.

Q And what affects the amount that you earn from week to week?

A The miles that I did and the deductions that they were taking out.

Q Does each load pay a different amount?

A Yes.

Q Did you ever run the same load with another CRST contractor going to the same place at the same time?

A A student? I'm not sure. Are you asking the same question about whether we went to the same place?

Q Another contractor. Did you run the same load delivering to the same place at the same time with another contractor, lease purchase contractor?

MS. KROLL: Object to form.

A I couldn't recall.

BY MR. HANSON:

Q That's not anything you recall doing, correct?

A No, but I don't know where they came from. I don't

know if I had seen the other CRST trucks at the same delivery spot or the same pickup spot.

Q Right. But you may end up at the same place, but you may have come from different places, correct?

A Correct.

Q How often do you communicate with the company during the course of a -- of your on-duty time period?

MS. KROLL: Object to form.

A I don't know. It varied again. In the beginning, I would get calls or I would call them and give them progress on when I was ready to have the three days or five days, and if they were ready to go. So those calls were probably once a day in the beginning. And then I would call prior to delivering for any possible loads that may be coming out of that area.

I would call when I did get a load, about the delivery date and time and whether or not the kid would be able to make it because of the weather or if they wanted me to drop them off or pick up a student.

So I don't know, maybe once a day.

Q You would talk to dispatch?

A Yes.

Q And you don't get any benefits from the company like paid health insurance, paid vacation, paid sick days, that type of thing, correct?
A Correct.
Q And when you were an employee driver, you generally can't hire other employees to do your job for you, can you?
A Out of my own pocket, I could, if I was going to have the trailer unloaded and they needed a lumper, I could choose to take out of my own pocket to pay it and not do the work myself and pay them.
Q And other than in a lumper situation, could you hire another driver to drive a company truck for you if you didn't want to drive it?
A I couldn't hire, no. I could refer them, but I couldn't hire them.
Q As on owner-operator with the equipment that you had a leasehold interest in, could you hire another qualified driver to operate that equipment for you if you didn't want to personally operate it yourself?
MS. KROLL: Object to form.
A That depended on the contract, whether or not I could sublease it or not.
BY MR. HANSON:

Q But if the contract allowed it, you would have been able to hire a different driver, correct?
A If it allowed it, yes.
Q And you understood in entering into this contract that you were going to be an independent contractor under the contract, correct?
MS. KROLL: Object to form.
A Yes.
(Exhibit 7 was marked for identification.)
BY MR. HANSON:
Q I'm going to show you one more exhibit. There's a document that's going to come up. It is going to take a little while to load. Well, it may take a little while for you.
Did the exhibit come up for you?
A Not yet.
Q Did it open up yet?
A No, not yet. Let me see.
Oh, sorry. That was my fault. I put it on airplane mode so nobody would bother me.
Q So did you pick it up now?
A Not yet.
Q Okay.
A Would this be under marked exhibits or Exhibit Share?

Q It is in marked exhibits.
A Okay. I'm sorry. Exhibit 6? Come on.
Q It's Exhibit 7.
A Okay. I got it.
Q Do you recognize what this document is?
A Yes.
Q It's the weekly or the biweekly settlement statements you would get?
A Yes.
Q Now, Exhibit 7 is Bates-stamped CRST 000635 through 1098. So it's a big exhibit. And I'd like you to turn back. I want to go back to -- back a few pages where we can look at one where you were hauling loads regularly. Let's go to --

MS. KROLL: Jim, my exhibit goes to 1098 and then there's a few pages after that.

MR. HANSON: I'm sorry. It's like 72, 73?

MS. KROLL: Yeah, just for the record.

MR. HANSON: Yeah. There's 466 total pages in this exhibit. And I'm not quite sure why they were marked like that. But that's the way they were marked. So I just pulled them from what we had produced.

MS. KROLL: That's fine. I just wanted to record to be clear.

MR. HANSON: Yeah.

BY MR. HANSON:

Q So Mr. Cervantes, are you back to -- I went back to March 27 of 2018. And that was page 641.

A Okay.

Q Do you see up at the top of that page, it shows that there was a load that went from -- it says Robinson, CH, Houston, Texas. I'm assuming that's CH Robinson the broker?

A Yes.

Q It's a brokered load, going from Houston to Avon, Massachusetts. Do you see that?

A Yes.

Q And the load revenue on that was $3,327.13 that shows you on the settlement statement, the revenue generated from the load, correct?

A From this, yes.

Q Yeah. And you got a 70 percent rate on it. And the load paid $1,810, correct?

A I'm looking for it.

Q It would be right underneath the -- you've got the --

A Oh, I see. I see it. Sorry.

Q Yep. And then -- yeah. I think that's the right amount. And then you've got -- then you've got

equipment rent. Let me go back. I was mistaken. I misstated it.

You've got 3,327 miles on the revenue times 70 percent. The load was 1,810 miles, do you see that?

A I do.

Q And then underneath that, on earnings equipment rent, it's got $2,328.99 which would be the 70 percent of the 3,327.13. Do you see that?

A $2,328.99 I see that under top.

Q You see where it says equipment rent?

A Yes.

Q That's your compensation from the loads, correct?

A Yes.

Q And then there were deductions. Now the maintenance account was done at $0.15 a mile, so there was a $320 charge on that. You had fuel of $118. Now, on the next line it says, advances $65 and a wire charge of $4. On that load, you took a $65 cash advance, correct?

A I don't know if it was a cash advance or if it was off our maintenance account, our volunteer maintenance account.

Q The maintenance account is shown up above as an amount that's put into an account for your benefit,

STATE OF INDIANA )
) SS:
COUNTY OF HAMILTON )

I, Amy Doman, Stenographic Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Notary Public in and for the County of Hamilton, State of Indiana, at Large, do hereby certify that ANTHONY CERVANTES, the deponent herein, was by me first remotely duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Defendants, at the residence of the deponent in Wiggins, Colorado, on Monday, April 19, 2021, pursuant to the Federal Rules of Civil Procedure;

That said deposition was taken down in stenographic notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by the said deponent; and that signature was requested by the deponent and all parties present;

That the parties were represented by their

counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action, that I am not a relative or attorney of either party or otherwise interested in the event of this action, and that I am not in the employ of the attorneys for any party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 30th day of April, 2021.

Amy Doman, RMR, CRR, CSR
Stenographic Reporter
Notary Public

My Commission Expires:
September 30, 2025,
Residing in Hamilton County, Indiana

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4509664
CASE NAME: Cervantes, Anthony, et al. v. CRST International, Inc., et al.
DATE OF DEPOSITION: 4/19/2021
WITNESS' NAME: Anthony Cervantes

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Anthony Cervantes

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date