IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
Case No. 1:20-cv-00075-CJW-KEM
-----------------------------------------x
ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,
Plaintiffs,

- against -

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,
Defendants.
-----------------------------------------x
April 8, 2022
1:04 p.m.
Virtual Deposition

ZOOM EXAMINATION BEFORE TRIAL of a Plaintiff, DERRICK DANIEL, pursuant to Notice, held in Pennsylvania, before Mandy Fein, a Notary Public of the State of New York.


Veritext Legal Solutions
800-336-4000

I just wanted to learn to drive and start a new career.

Q. As a company driver at CRST, were you required to take every load you were dispatched on?

A. Yes.

Q. And as a company driver at CRST, how were you paid?

A. By miles.

Q. A certain number of cents per dispatch miles; is that right?

A. Yes.

Q. And as a company driver at CRST, did you operate with a team it?

A. Yes, a co-driver.

Q. And you said you were also a company trainer; is that right?

A. Yes.

Q. And when you would have a trainee, did you run as a team or did you run as a solo with -- as you trained the other driver?

A. When you first start out, I can't remember if it's the first three days they have to drive solo while your are in the

A. I do not recall the year.

Q. Can you read this document or is it too small for you?

A. It says 2015.

Q. Do you have any reason to believe it was not a 2015 Freightliner you were driving when you were at CRST?

A. The paperwork can tell you anything because they can tell you it's a 2015 because it's gonna look just like a 2014 or vice versa.

Q. Right, so do you have reason to believe that it was not a 2015 Freightliner?

A. At that time, no.

Q. Do you believe that now?

A. I don't know.

Q. Okay.

And this is your signature here at the bottom of this page?

A. Yes.

Q. On the left?

A. Yes.

Q. Okay. Alright. This is the first election page. It is CRST024605 and the

section says, Base plates and permits.

Do you see that?

A. Yes.

Q. And it looks like there were two options on base plates, the carrier could obtain the base plate or the contractor could obtain their own base plate.

Which of those did you elect?

A. Option 1.

Q. Why?

A. Because I didn't know anything about trucking. As I said earlier, I was learning.

Q. And would you not make that same election today?

A. I will let the company buy it at first and then eventually get one, but I normally allow the company to do it because it's quicker. You don't have to sit at the terminal and wait longer --

Q. Okay.

A. For your plates to come in, I guess.

Q. So, you would make the same choice today knowing everything you know now?

A. Yes and no. It's a hard question to

you know, where if I have my own authority, I can negotiate more of a percentage, like getting my own trailer, possibly.

Q. So, are those your goals now?

A. Yes.

Q. Were those your goals at the time that you signed the agreement with CRST?

A. No.

Q. Okay.

And did you even know it was possible to get your own authority when you signed the lease operator agreement with CRST?

A. No.

Q. Okay.

How did you learn that it was possible to get your own motor carrier authority?

A. Over time doing research.

Q. So, it sounds like you're a guy who likes to research things, you researched the truck driving school before you started; is that right?

A. Yes.

Q. And did you do any independent research about becoming a lease operator at

CRST?

A. No.

Q. Why not?

A. The money.

Q. Okay.

So, when you say the money, what do you mean?

A. The, like I said, every time you go into a CRST facility, you see that number in bright black and gold letters and numbers, and at that time of being a company driver, I was making very low money, not -- certain weeks were good, most of the weeks were four hundred, five hundred and that's hard to survive off of.

Q. So, based on your experience as a company driver at CRST, did you understand that freight isn't always available?

A. That's -- I started to learn that afterwards, yes, maybe a few months later because, you know, your recruiter -- not your recruiter, but your dispatcher would say if y'all -- if y'all drive and you stay on the road more, you can make more money.

Q. And you said you learned that a few months afterwards, after what, becoming a company driver?

A. Yes. After driving you -- you -- you learn and you sacrifice going home because you need the money.

Q. Understood.

So, as a company driver at CRST, you understood that freight wasn't always available to pull?

A. Yes.

Q. Okay. Alright. Let's look at more of these elections, shall we? It looks like you opted here for the carrier to obtain the IFTA permit.

What's an IFTA permit?

A. Gas, your gas permits.

Q. Why did you have the carrier obtain it?

A. The same reason I did the license plate, I did not know what I was doing.

Q. And again, if you knew then what you know now, would you have obtained your IFTA permit yourself?

DANIEL

A. I don't know.

Q. There is a box here that lists Deductions, I'm not gonna ask you specifically about these, but I am happy to go back and look at them if you'd like. What I want to do is look at your insurance elections.

So, here non-trucking Bobtail liability insurance, it looks like you initialed yes to request coverage through CRST.

Do you see that?

A. Yes.

Q. Did you look into any other options for getting a cheaper policy?

A. No, but I was also told by one of the staff members there that because of you being a first year driver, your insurance will be higher than the company insurance.

Q. But you never did anything to verify that?

A. No.

Q. And why did you not do anything to verify that?

A. It made sense, like with car insurance, you know, when you're a first time

driver, your insurance is gonna be high compared to once you start having experience, no accidents, your insurance starts to get lower.

Q. Sure.

And that's because truck driving is a skill, right?

A. I can't call it a skill. It's a job and with any job, you get better at it through time.

Q. Did CRST ever charge you more than it said it would for participating in the insurance programs you elected?

A. I don't know.

Q. You don't know?

A. If they charged me more, if they cheated me out of money, I do not know. I know they cheated me out of money because I had to pay to teach their students.

Q. Okay. I appreciate that you found the student thing frustrating, but we are talking about insurance right now.

So, on the contract it tells you specifically what the cost to the contractor is

going to be, for example, occupational accident insurance, do you see that?

A. Yes.

Q. And it looks like you initialed yes to request the coverage.

Do you see that?

A. Yes.

Q. And it looks like here at the bottom a hundred and fifty-four dollars per covered individual per month including an administrative fee to carrier deducted at thirty-five dollars fifty-four cents per week for fifty-two weeks. The second part of that sentence is for drivers over seventy, but we established that you are thirty-four, so the over seventy section would not apply to you.

Correct?

A. Yes.

Q. So, did you not check your settlement statements to see if you were -- if CRST was actually charging you thirty-five dollars fifty-four cents?

A. I know they were taking out Qual Com fees, ComData fees, so it looked normal to me.

Q. And did you ever turn down a load that you were offered as a lease contractor for CRST?

A. Yes.

Q. When?

A. I don't remember the date.

Q. How many loads did you turn down?

A. I don't remember. I don't remember.

Q. More or less then five?

A. I do not remember.

Q. More or less then ten?

A. I do not remember.

Q. Okay.

Were there negative consequences for turning down a load?

A. Yes.

Q. What were those?

A. You have to sit longer, whether it was purposely done, but they always say when you decline a load -- that the dispatcher say when you decline a load, you always go to the bottom of the -- of the pile of the other drivers in front of you that they're supposed to dispatch.

Q. And your dispatcher told you that?

A. Yes.

Q. And do you recall -- you don't recall what the name of that person was?

A. No.

Q. And you don't recall how many times you turned down a load?

A. No. I -- I turned down some loads, but I do not -- I do not know the number.

Q. Okay, and do you recall whether you had to wait to get a different load when you turned down those loads?

A. Yes.

Q. How long did you have to wait?

A. It can be a range from eight hours, two days, if it's on the weekend, maybe.

Q. Did you ever wait two days because you turned down a load?

A. I believe I have. There was a time, I remember Washington, I was somewhere in Washington and I declined a load, and he says well, if you don't take this load, you're not gonna get out of Washington because it's hard to get freight right now. So, I deadheaded

all the way from Washington to Northern California, which is about six hundred miles, give or take, and he gave me a load that was -- that was low paying load. Then I said -- I declined that and said I'll drive to Southern California because I learned that's where the good freight comes from.

Q. Okay.

So, you could increase your profitability by going to where the good freight was?

MS. KROLL: Object to form.

MS. PAYNTER: What is the form objection?

MS. KROLL: The word, it's vague.

Q. Is there something vague about my question to you, Mr. Daniel?

A. I mean, because it's open-ended. It's like wouldn't you want to go to where it's possibly more money and when you're driving the -- you -- the dispatcher always tell you if you're in Southern California, they have a better pay rate. If you're in Northern California, the dispatcher, I can't

remember who exactly gives you the paperwork, but they have a map of the United States, every state, and Washington was red, and, you know, the dispatchers, they kind of teach you over the phone, like the green states where you'll get good paying freight going into Washington, and then it is hit or -- hit or miss with the pay rate coming out. We call it a red state, yellow state, green state on pay scales, you know, like they'll send you to Florida knowing that you'll get paid good, but on the back end, you might not get paid so good coming out.

Q. So, as a lease operator at CRST, you could make choices about where to go to get freight that increased your revenue?

A. Not really. They give you the loads and they asked if you want to take it or not. You -- you really need to not piss your -- your dispatcher off.

Q. Okay --

A. Or they could send you -- or they could send you to a place and then you can either decline it or you get stuck for a few

hours to a day or two.

Q. So, let's talk about what you just told me then because what you told me was there was no good freight coming out of Washington, so you went to California, Northern California first; is that right?

A. No. I said the dispatcher gave me a load that I declined.

Q. Right.

A. And he said there is no -- if you decline this, there is no good freight coming out and you're -- and you're gonna be sitting. So, I deadheaded to California because I know there's always freight there.

Q. Okay, and there wasn't a load that you wanted in Northern California, so you decided to deadhead to Southern California; is that right?

A. Because I'm -- I'm already wasting gas and I had a teammate. I had the teammate on the truck.

Q. Okay.

So, you made that choice to go to Southern California to earn more revenue then you

could have earned in Northern California; is that right?

A. In the hopes of earning more.

Q. And you said you had a team driver on the truck with you.

Was that a student?

A. Yes.

Q. Did you ever operate as a team with a co-driver and not just a student --

A. No.

Q. -- when you were at CRST? No, okay.

Were there times when you were a lease operator at CRST that you did not have a student?

A. Maybe for a couple of days, maybe a week.

Q. Okay.

Why did you stay at CRST as a lease operator for more than a year?

A. I just think I got comfortable to not -- at a point in time, I just got, I'm not gonna say stagnant, complacent, I didn't think I really had enough experience out there because even with a lot of companies, you still have to have two years of driving, and I

A. I have nothing else to say.

MS. KROLL: We'll read and sign. I did want to say that we'll read and sign.

THE VIDEOGRAPHER: I'm okay. So, if there is nothing further, this deposition of Derrick Daniel has concluded. The time is now 3:22. We are off the record.

(Time Noted: 3:22 p.m.)

_______________________

DERRICK DANIEL

Subscribed and sworn to
before me this _________
day of ________________.

_______________________

NOTARY PUBLIC

C E R T I F I C A T I O N

I, Mandy Fein, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of April, 2022.

MANDY FEIN