IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and )
MIKE CROSS, on behalf of )
themselves and all others )
similarly situated, )
Plaintiffs, )
) Case No.
vs. ) 1:20-cv-00075-CJW-KEM
)
CRST INTERNATIONAL, INC. )
and CRST EXPEDITED, INC., )
Defendants. )
____________________________)

REMOTE VIDEOTAPED DEPOSITION OF
TERRY EVANS
MARCH 21, 2022
11:11 a.m. CDT

Witness Appearing From:
Columbus, Nebraska

Conducted Remotely Via Videoconference

That's my allowance from the government for being a truck driver.
Q. It's your understanding that you get an allowance of $66 per day from the government for being a truck driver?
A. Yeah.
Q. And how do you get that allowance?
A. If you're a owner operator, you get that $66. If you are a company driver, in order for the company to give it to you or in order for you to be eligible for it, it has to come in sort of like a per diem. So they're giving you a portion of what they should be giving you totally.
Q. How long were you at Grand Island Express?
A. Total number of -- I think it was 11 months. I'm not sure. I'm not sure. I don't have my list of jobs on the side of me.
Q. In your testimony a couple minutes ago, you talked about some terms. You said "owner operator" and "company driver."
A. Yeah.
Q. Do you know what the difference is between being a company driver and being an owner operator?
A. A owner operator --
MS. KROLL: Object to form. Wait a

second, Terry. Object to form to the extent it calls for a legal conclusion.

Q. Go ahead and answer.

A. Excuse me?

MS. KROLL: You can answer.

A. Okay. The difference of a company driver and a owner operator, a owner operator has the authority to pick and choose his loads. A company driver does not have the opportunity to pick and choose his loads.

Q. Any other differences?

MS. KROLL: Same objection. You can answer.

A. Oh. Is there any other differences? Yeah, there's a lot of differences.

Owner operator is allowed to have a weekly settlement without taxes being tooken out. A owner operator is allowed to take off when he wants to without the company saying, oh, no, you can't take out, take off. A owner operator is allowed to refuse a load. A company driver is not allowed to refuse a load. He's allowed to refuse a load, but the aftereffects are different.

Is that good enough for you?

Q. I don't know. Is that the end of your

answer?
A. Yes, it is.
Q. Do you have an understanding as to whether or not there's a difference between who owns the truck that the owner operator is driving as opposed to a company driver?
MS. KROLL: Object to form.
A. Owner --
MS. KROLL: Go ahead. I'm just objecting to the form.
A. Okay. Because the owner operator owns his truck. A company driver don't own his truck.
Q. And do you know whether company drivers typically pay the expenses associated with operating the truck that they drive?
MS. KROLL: Object to form, foundation. Go ahead.
Q. That's why I said "do you know."
A. A company driver doesn't pay their expenses for the truck. A owner operator -- or there's -- I think what we're -- you're asking me a question of is owner operator and lease-purchase owner operator are different phases of truck -- of the trucking industry. Which one would you like to know about?

Q. And were you taking a job with Soar Transportation as a company driver or an owner operator?
A. A company driver.
Q. And how long were you with Soar Transportation?
A. Two and a half years.
Q. Why did you leave?
A. Took a job with -- oh, CRST.
Q. Was this in 2020?
A. Yeah.
Q. Did you voluntarily leave Soar Transportation, or were you terminated?
A. I voluntarily left.
Q. And how did you hear about the opportunity to work for CRST?
A. Advertising. They were sending me emails.
Q. What did those emails say?
A. They were offering me a job.
Q. Did they tell you anything in particular about the job they were offering?
A. No, I don't recall.
Q. Do you recall what it was that attracted you to the opportunity to work for CRST?
A. To become a owner operator again, to have

my own truck, that they had a lease-purchase program at CRST that they made it sound like it was the best out there.

Q. And what did they say that made it sound like it was the best out there?

A. I guess the settlement pay. I can't say "I guess." I can say they said the settlement pay.

Q. What did they tell you about the settlement pay?

A. I don't recall what they told me.

Q. When you say "they told me," are you referring to the emails that you received?

A. I'm referring to emails and recruiters.

Q. As you sit here today, are you able to recall anything about what a recruiter told you about the settlement pay you could expect to receive as a lease-purchase-program owner operator?

A. No, I can't recall.

Q. As you sit here today, are you able to recall what the emails said about the settlement pay you could expect to receive as a lease-purchase-program owner operator?

A. No, I don't recall, and I didn't save the emails.

Q. So other than believing that the CRST

lease-purchase program was, quote, the best out there, unquote, because of settlement pay, was there anything else that you were told that led you to believe that the lease-purchase program was an opportunity you should pursue?

A. Yeah, that they have very good equipment.

Q. Who told you that they had very good equipment?

A. The recruiter that I spoke with.

Q. Do you recall that recruiter's name?

A. No, I don't.

Q. Do you recall what the recruiter said about the very good equipment?

A. That they had good equipment.

Q. What did that mean to you?

A. That their trucks were in good shape.

Q. Anything else?

A. No.

MS. KROLL: Object to form. "Anything else" what?

MR. SMEDSTAD: About the good equipment and what that meant to him.

A. It meant to me that I can get in this truck, I won't break down, it had good components in it, it had good tires, it had good heating, good

engine, I can put some miles on this truck.

Q. As you sit here today, can you recall anything else that the recruiter told you that led you to believe that it was a good opportunity to join the CRST lease-purchase program?

A. That it had good safety bonuses and good quarterly bonuses and --

Q. Anything else?

A. That's it.

Q. And what were you told about the good safety bonuses?

A. That they were good safety bonuses.

Q. What meant -- made them good safety bonuses?

A. You drive the miles, safe miles, you don't tear up the equipment, you don't ruin anything, and you get a good safety bonus.

Q. And what do you consider a good safety bonus?

A. $1,500 every three months, something on your CRS -- your record saying, hey, this driver drove this many miles with no accidents, no tickets, no damaged freight.

Q. Did the recruiter tell you that you would receive a $1,500 safety bonus every three months?

multiple trucks to CRST?
A. I don't recall.
Q. Did anyone from CRST prevent you from pursuing the option of leasing multiple trucks to CRST?
A. I don't recall.
Q. Did you understand that you could have hired someone else to drive your truck instead of you?
A. Yeah, I understood that.
Q. Did you understand that other lease-purchase operators in fact hired other individuals to drive the trucks they were leasing to CRST?
A. No.
Q. You just were not aware of that?
MS. KROLL: Object to form.
A. No.
Q. Is that correct, sir?
A. I said no.
Q. Did anyone from CRST prevent you from hiring another individual to operate the truck that you were leasing to CRST?
A. I don't recall that.
Q. When you were not driving your truck for



Veritext Legal Solutions
800-336-4000

THE REPORTER: Question: "Well, I want to make sure I understand because I believe you said you were aware that you could hire another individual to operate the truck you were leasing to CRST, correct?"

Q. Go ahead and answer, sir.

A. I already answered. I said yeah.

Q. Okay. And if you had hired someone else to drive your truck, you could have worked for another company, correct?

A. Don't recall.

Q. But logically, sir, if you had decided to hire someone else to operate your truck, you could have gone and worked for whomever you wanted. Isn't that true?

A. Logically, I would have wanted the truck to be in good shape and I knew the company before I go hire somebody to drive it, logically.

Q. I understand. My question's different. My question is, had you decided to hire someone else to operate your truck, you could have gone and worked for anyone else you wanted, correct?

A. I wasn't thinking about hiring nobody else to drive my truck and go work for somebody else.

Q. But you could have, correct?



Veritext Legal Solutions
800-336-4000

A. If that's the path I wanted to go down, yeah, I could have.
Q. But you decided to drive the truck yourself, correct?
A. Yeah, I would think that's what you would do first. And besides that, that person that you hire has to go through CRST approval. You can't just hire somebody to drive the truck and go work somewhere else. That person has to be approved by CRST.
Q. Did you ever attempt to have a driver qualified to operate the truck you were leasing to CRST?
A. No.
Q. Do you know whether CRST would have approved a driver that you submitted for qualification?
A. I don't know. Never tried to do it, so I don't know.
Q. Did you obtain insurance through CRST programs?
A. Yeah.
Q. Did you shop around to see if you could get that insurance coverage cheaper elsewhere?
A. No, because CRST said they had the best

I, TERRY EVANS, have read the foregoing deposition and hereby affix by signature that same is true and correct, except as noted above.

______________________

TERRY EVANS

STATE OF ________________ )
COUNTY OF _______________ )

Before me, ___________________, on this day personally appeared TERRY EVANS, known to me (or proved to me under oath or through __________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of _________________, 2022.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF _________________

My Commission Expires: ___________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and )
MIKE CROSS, on behalf of )
themselves and all others )
similarly situated, )
Plaintiffs, )
) Case No.
vs. ) 1:20-cv-00075-CJW-KEM
)
CRST INTERNATIONAL, INC. )
and CRST EXPEDITED, INC., )
Defendants. )
___________________________)

REPORTER'S CERTIFICATE
REMOTE VIDEOTAPED DEPOSITION OF TERRY EVANS
MARCH 21, 2022

I, KAREN L. SHELTON, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, TERRY EVANS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e) that the signature by the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Errata contains any changes and the reasons therefor;



Veritext Legal Solutions
800-336-4000

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in or counsel to this action, nor am I financially or otherwise interested in the outcome of this action.

Certified to by me this 28th day of March, 2022.

Karen L. Shelton, CSR, RDR, CRR
TX CSR 7050 Exp: 10/31/23
Veritext Legal Solutions
Firm No. 571
300 Throckmorton Street
Suite 1600
Fort Worth, Texas 76102
(817) 336-3042  (800) 336-4000