IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| ANTHONY CERVANTES and MIKE CROSS on behalf of themselves and all others similarly situated, | ) | Case No. 1:20-cv-0075-CJW-KEM |
| Plaintiffs, | ) | |
| v. | ) | |
| CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC., | ) | |
| Defendants. | ) | |

The videoconference videotaped deposition of CHRISTOPHER FINK, called by the Defendant for examination, pursuant to the Rules of Civil Procedure for United States District Courts pertaining to the taking of depositions, taken before A. Christine Hylton, a Notary Public, Registered Professional Reporter, at 9:13 a.m., February 3, 2022, taken remotely from Moline, Illinois.



Veritext Legal Solutions
800-336-4000

Prior to that period of unemployment, were you a process server?

A. Yes.

Q. And then, in your words, you took a break, correct?

A. Yes.

Q. And then you attended J Tech to get your Class A CDL, right?

A. Correct. Yes.

Q. How long was that break period?

A. Maybe two months.

Q. Did you collect unemployment during that two months?

A. No.

Q. And did you quit your job as a process server, or was your position terminated?

A. I -- I just quit doing it.

Q. Oh. So you were like a free agent, I mean, you would -- you worked for yourself?

A. Yes.

Q. And what made you decide you wanted to pursue a career in truck driving?

A. Freedom.

Q. And what does that mean to you?

A. No boss over my head, able to go and travel



Veritext Legal Solutions
800-336-4000

wherever.

Q. The type of freedom that you just described, does that mean determining which types of loads you would take and which types of routes you would take?

A. No, I didn't know anything about that until about when I was working for CRST.

Q. Fair enough.

So you had ceased being a process server, and you were considering your next move as far as employment went, correct?

A. Yes.

Q. Besides truck driving, did you consider any other professions?

A. No.

Q. And you investigated truck driving jobs online, it sounds like, correct?

A. Yes.

Q. And you mentioned seeing an ad on Craigslist.

Did you see any other ads for truck driving jobs?

A. Yes.

Q. And did you see any other ads for carriers, motor carriers other than CRST, online when you were

Q. And underneath that text, is that your handwriting printing your name and your signature?
A. Yes.
Q. Okay. And does that refresh your memory, Mr. Fink, on what this document accomplished or meant?
A. Yeah.
Q. What -- what did it -- what did it mean to you?
A. That I was an employee of CRST, and I was hired.
Q. And when you first -- I want to go back in time to when you started talking to the recruiter in response to the Craigslist ad.
Were you interested in becoming -- and I'll call it a company driver?
What is -- do you understand the term, company driver?
A. Yes.
Q. What does that mean to you?
A. I work for the company.
Q. As an employee driver?
A. As an employee driver.
Q. And how about the term owner-operator, do you know what that term means?

A. At that time, no.
Q. No, I'm asking -- I'm asking right now.
A. I know what it means now, yes.
Q. What does it mean to you right now?
A. It means you're an owner-operator. You own your own semi, and you choose your own runs and make more money.
Q. And you make more money as an owner-operator?
A. Correct.
Q. And when you say "you own your own semi," does that include leasing it, or some kind of a financing arrangement with another company in order for you to have possession, legal possession of the truck?
A. Yeah. I would say yeah.
Q. Are you familiar with the Federal Motor Carrier Safety Regulations?
A. Yes.
Q. And do you know how those regulations define the owner of a truck?
A. No.
Q. Okay. If I told you that those regulations define the owner of a truck as someone who either has title to or lawful possession via a lease or other

this state. They would pay for the move. You know, they -- they sent all kinds of messages on Qualcomm.

Q. And were those messages about -- the ones you're referring to, are you willing to make a move, were those sent directly to you --

A. No.

Q. -- or were they sent to a larger group of people?

A. They were sent to all drivers.

Q. And I think you said twice now that you first heard about the Lease Purchase Program on Qualcomm.

And my question is, did you see anything else that provided you information on the Lease Purchase Program besides Qualcomm?

A. No.

Q. So when did you make the decision to enter the Lease Purchase Program, roughly, monthly and year?

A. Well, I mean, me and Jim, like I said, we had hooked back up as partners. We were trying to get ahold of the STI Division of CRST, which is a special transport. Couldn't get anybody to call us back, you know, no recruiters. I mean, we made phone calls; we tried.

Like I said, kept seeing them messages pop up on the Qualcomm. And I'm like thinking about it at this point, but it was the last leg for me was, and I -- I never even talked to Jim about it at all. We were in Atlanta, and it was last or the end of the month before October -- excuse me, I've got to sneeze. It doesn't want to come out -- and we had gotten a call. They wanted us to do a city job, and Jim knew how bad I hated doing city jobs.

Q. When you say "city job," you mean a pick up and a delivery within one city?

A. Correct. And we were in Atlanta.

THE COURT REPORTER: Meaghan, did you say something?

MS. RAFFERTY: No.

THE WITNESS: Okay. I thought I heard something, too.

So we -- we were -- we had just made our delivery in Atlanta. We had another load picking up in Atlanta. We were supposed to take it all the way to Washington State. We had just parked to get some rest, to get, you know, get ready to go pick up our load to take to Washington State, when Scott calls us, Kort, calls us and tells us we have to do this city job.

And I told him I wasn't doing it. I -- There's no money in it. And it just tears our hours up, you know, for 40 bucks. And we each make 20 bucks, but it takes us seven hours to do it. Absolutely hated it, and I fought it.

But in the end, I had to do it, because I was a company driver.

And once I completed it, I called Scort -- Scott up and I told him "Look, once we get done with our load in Washington State, you need to bring me into Cedar Rapids. I'm going to jump off because my contract will be up by then, and I'm going to go to the Lease Purchase Program. So you need to let me know who I need to talk to to get more information on it, but I'm definitely done. I'm not doing another city job. I love you, Scott, but this city job is not -- I'm done doing it."

Q. Understood.

What about Jim at that point? Was he going to remain a company driver and go off and get another partner?

A. At that point, he was still staying as a company driver. We had made our delivery to UPS, I believe it was in Renton, Washington. It only took about 20 minutes, and we already had another load

a job for 1200 miles paying, you know, $3800.

Q. And how would you find out what amount would be paid for a specific load when it was offered to you?

A. Qualcomm.

Q. And that amount showed the total amount that would be paid for you in compensation for the load?

A. It would tell us how much we were being paid for the load and how much we were getting in fuel surcharge.

Q. So then you would do the math and figure out what the total amount would be for that particular load?

A. Correct.

Q. And then you would decide whether to accept or decline the load, correct?

A. Correct.

Q. And would you agree with me that you would be required to accept a certain number of loads, or loads that paid certain amounts, in order to make $2,500 after deductions per week; is that a fair statement?

A. Can you repeat that, or say it a different way?

Q. Right.
So we've established that -- and you agreed with me -- that if you didn't drive, you didn't get paid anything, correct?
A. Correct.
Q. So what I am trying to determine is what, in your mind, were the loads that you would haul, if it wasn't miles, or couldn't be equated roughly to miles, what kind of loads -- what kind of load payments would you need to accept in order to make $2,500 per week after pay -- after deductions?
A. Well, the load had to make sense. I mean, I'm not going to take a load that's going 500 miles only paying $700 when I'm going to burn $300 worth of fuel. By the time you do all the deductions, I'll be lucky if I made a hundred dollars that day.
Q. On that particular load, is that what you're speaking of?
A. Correct.
Q. What about if there was a load that didn't pay a lot of money in your mind, that got you to an area where there were more lucrative loads departing? Was that -- did that ever figure into whether or not you would accept or decline a load?
A. Absolutely.

truck on your own from somebody else and brought it to your new relationship with CRST?
A. Yes.
Q. And did you elect to lease a truck with CRST Lincoln Sales?
A. Yes.
Q. Why did you do that?
A. No credit check, no money down, walk-away lease.
Q. When you say "walk-away lease," what do you mean?
A. It means there's no penalty if you turn the truck in.
Q. You had to give a certain amount of notice, but once you turned the truck in, you know, barring any damages or anything like that, you could walk away from it; is that fair?
A. Yes.
Q. Okay. And at the time that you made the decision to join the Lease Purchase Program, was that the best opportunity out there for you to obtain a truck?
A. Yes.
Q. Did you investigate any others?
A. No.

A. Yes.

Q. Okay. And on the page ending 046, I think you testified that is your signature?

A. Yes.

Q. And can you go down two pages to the Bates number ending in 14048, and let me know when you're there.

A. I'm there.

Q. Okay. And do you see a set of initials about halfway down that page?

A. Yes.

Q. And are those initials your handwriting?

A. Yes.

Q. And can you tell me what it is you were doing when you placed your initials there?

A. It's for the plates.

Q. For base plates?

A. Correct.

Q. And what did you elect to do with respect to base plates?

A. I elected to have them.

MS. RAFFERTY: Objection to the form. I'm sorry, I'm just putting my objection on the record to the form.

You can go ahead and answer.

THE WITNESS: That they were going to be taking care of the plates.

BY MR. SPOLYAR:

Q. And Option 2, if you had initialed there, then you would have taken care of the plates your- self?

A. Correct.

Q. And you elected to have CRST take care of those plates?

A. Yes.

Q. Can you turn over to the next page. At the top there's another set of initials. And this is the page ending in 14049, and I'm talking about the very top, next to Option 2, there are a set of initials.

Are those in your handwriting?

A. Yes.

Q. And what were you doing by selecting Option 2?

A. That had to do with the IFTA, the fuel tax.

Q. And so am I correct to say that you elected to have CRST obtain all IFTA fir -- IFTA permits and perform any tax reporting services?

A. Correct.

Q. And that had you selected Option 1, then you would have done those things, correct?

A. Correct.
Q. Okay. And the same page, but down under paragraph No. 3, where it says "Communication Systems EOBR," there are initials next to Option 2.
And are those your initials?
A. Yes.
Q. And what were you electing to do with Option 2 there?
A. This was the communication systems in the truck which -- that they were going to take care of it.
Q. And had you initialed Option 1, then it would have been your responsibility to furnish and install those communication systems; is that correct?
A. Yes.
Q. But you chose to go ahead and have CRST do it?
A. Yes.
Q. Okay. Can you go down to the Bates page ending in 14055, please.
A. Okay. I'm here.
Q. And at the top, in the center of the box, it says, "Type of Coverage." Do you see that?
A. Yes.
Q. And No. 1 below that says "Non-Trucking

(Bobtail) Liability Insurance," and there's some initials out under the column that says "initial yes to request coverage."

Are those your initials?

A. Yes.

Q. And so were you, with this election, asking CRST to arrange for bobtail coverage?

A. Yes.

Q. And over on the next page, 14056, there are a couple of different types of insurance. Could you look at those, and tell me what they are, and what your election was?

A. Well, the occupational, I chose yes. Workman's comp, take it out, yes.

Q. Are you saying that occupational accident was similar to the workman's compensation insurance?

A. Occupational accidental insurance, yes.

Q. So you elected to subscribe to an occupational accident insurance policy, correct?

A. Yes.

Q. And you could have declined that?

A. I don't think you could. I think they made us initial yes.

Q. Who told you to initial yes?

A. The people that were going through the

contracts.

Q. And do you remember who any of them were?

A. You know, there -- I have seen so many people, I couldn't tell you.

Q. What did they say you would do if you signed -- if you initialed next to no?

A. I --

Q. Let me back up. Let me back up.

Did you ask what would happen if you declined or initialed next to no, on occupational accident insurance?

A. I did not.

Q. And just getting back to what you said earlier, you testified that they told you you had to initial next to yes. Am I misstating your testimony?

A. No.

Q. What did you understand the consequences of not initialing next to yes as being?

A. You wouldn't get a truck.

Q. And so it was worth it to you, because you wanted the truck, and you wanted to operate under an Independent Contractor Operating Agreement --

A. Yes.

Q. -- to obtain occupational accident insurance?

MS. RAFFERTY: Objection, form.

MR. SPOLYAR: You can answer.

THE WITNESS: Yes.

BY MR. SPOLYAR:

Q. How about underneath that, physical damage insurance?

A. I chose yes. Those are my initials.

Q. And the last one I'll ask you about is just on the next page, 14057, insurance for cargo, carrier's trailers, and related expenses.

What was the election you made there?

A. Yes. Those are my initials.

Q. Okay. And, again, at any point during signing this Independent Contractor Operating Agreement, did you feel free to say no, I will not sign it, and I would rather go back to being a company driver for CRST?

A. I did not.

Q. You did not what?

A. I -- I -- I chose to sign the contract. I did not want to be a company employee.

Q. In part because you did not like some of the assignments, the driving assignments?

A. Correct.

Q. And the -- the one city load in Atlanta was



Veritext Legal Solutions
800-336-4000

happened next.

Did you become a lead driver?

A. I was a lead driver.

Q. And for how long were you a lead driver?

A. For the whole time I was there.

Q. And that's -- that's one thing I wanted to cover.

So we had J Tech from -- in late 2014, right, from November of 2014 into December 2014; do I have that right?

A. Correct.

Q. Okay. And then company driver from December 2014 through your ten-month obligation, which was about October of 2015, correct?

A. Correct.

Q. And this is -- so now we're sitting -- when you were sitting in lease purchase orientation, was it October-ish of 2015?

A. Yeah.

Q. Okay. And did you ever go back -- after October 2015, did you ever go back to becoming a company driver with CRST?

A. No.

Q. So the remainder of your driving with CRST was under the ICOA or a version of the ICOA; is that



Veritext Legal Solutions
800-336-4000

correct?

A. Yes.

Q. Okay. And when did that end? Did it ever end, or are you still under contract with CRST?

A. No, I am no longer an employee or a lease purchase contractor for CRST.

Q. When was the last -- to the best of your recollection, when was the last day that you drove as a lease purchase contractor for CRST?

A. February of 2020.

Q. And you broke up. There a little on my end.

February of 2020; is that correct?

A. Yes.

Q. And you said you were a lead driver the entire time?

A. Yes.

Q. And you were never a team driver; is that correct?

A. I was a team driver, but I didn't -- it didn't last long, because the student wanted to go back to being a company driver.

Q. So the -- was this a student that you instructed as a lead driver?

A. No, it was a friend of mine's student, who

told me about him.

Q. And he was driving with you. You said he wanted to go back to being a company driver.

Did you buy out his contract?

A. I was in the process, but because he wasn't with me long, CRST went ahead and gave him back his company job, and the contract for me paying it off was terminated.

Q. So you didn't -- you didn't end up owing anything for that?

A. No.

Q. Okay. Did you ever team drive with anybody else as a lease purchase operator?

A. No.

Q. It was lead driver straight through?

A. Yes.

Q. Was that time, October 2015 until February of 2020, were you continuously under contract and driving with CRST, or were there breaks in those -- in that time period when you were not under contract?

A. There were breaks.

Q. How many breaks would you estimate there were?

A. Four, five breaks, maybe. I can't remember the number.

drove with CRST before taking this extended home time?

A. Yes.

Q. And that you took that time until the end of January or early February of 2019, am I understanding that correctly?

A. Yes. I went back to the Philippines to see my wife.

Q. I see.

And so you turned in your truck and, again, lease payments were -- you were not making them during that time period, were you?

A. Correct.

MR. SPOLYAR: Okay, Bianca, would you pull that down.

So I counted -- I counted at least four times when you left and came back, but I may be off on that.

Does that sound about right to you, where you left driving for CRST and then returned, whether it was for extended home time, or to go drive for KLLM, or to travel to the Philippines to get married, or to take any other time off? Does that sound about right?

THE WITNESS: Yes.

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter, Registered Professional Reporter and Notary Public, do hereby certify that I acted as the Registered Professional Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to typewriting under my supervision and direction, correct transcript of the shorthand notes so taken; that said deposition was submitted to the witness for signature as requested and that any changes, if any, requested by the witness are attached hereto.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 9th day of February, 2022.

A. Christine Hylton
Registered Professional Reporter
and Notary Public

SIGNATURE PAGE

I, Christopher Fink, the witness in the foregoing deposition, do hereby certify that I have read the foregoing 208 pages of typewritten material and that the same is, with the corrections noted on the attached page, if any, a true and correct transcription of my deposition upon oral examination given at the time and place herein stated.

______________________
Christopher Fink

Subscribed and sworn to before me this ____ day of ____________, 2022.

________________________
Notary Public