UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
Case Number 1:20-CV-00075-CJW-KEM

ANTHONY CERVANTES and MIKE CROSS, )
on behalf of themselves and all )
others similarly situated, )
)
Plaintiffs, )
)
-vs- )
)
CRST INTERNATIONAL, INC. and CRST )
EXPEDITED, INC. )
)
Defendants. )

REMOTE VIDEO-RECORDED DEPOSITION OF
MICHAEL D. CROSS

The remote video-recorded deposition upon oral examination of MICHAEL D. CROSS, a witness remotely sworn by me, Tara Gandel Hudson, RPR, CRR, a Notary Public in and for the County of Hancock, State of Indiana, taken on behalf of the Defendants, with the witness located in Beaufort, Beaufort County, South Carolina, on the 5th day of August, 2021, scheduled to commence at 8:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to the time and place thereof.



Veritext Legal Solutions
800-336-4000

Follow the rules of the road.
Q How did you learn how to do it if your lead driver didn't teach you how to do it when you were first coming out of truck driving school?
A I was self-taught.
Q If you look at the Independent Contractor Operating Agreement, the page that we were on that we were just looking at, it's got in paragraph 1(C), in that second column, it says:
"No limitations on contractor's use of equipment."
Do you see that?
A Yes. No limitations on contractor's use of equipment.
Q Right. And in that paragraph you had the right to accept or reject any specific load that was offered to you by CRST; correct?
A This is the lease purchase agreement; correct?
Q This is the ICOA.
A What is ICOA?
Q The Independent Contractor Operating Agreement.
A Okay. Yes.
Q Did you, in fact, ever turn down loads from CRST?
A Yes, I have.

Q What were the reasons you --
It doesn't have to be reasons you gave to CRST, but what were the reasons you turned down loads?
A Because they would -- some of them would cost me money to take the load.
Q It would have been unprofitable for you to take the load?
A Yes. Not only unprofitable. It would cost me money out of my own pocket to take the load.
Q But taking money out of your pocket means that it's unprofitable; correct?
A Correct.
Q In other words, you're not getting a profit off of those loads that you turned down that you would have been hauling; correct?
A Yes. But when I say not only is it unprofitable, it would cost me money, which means I'm not making any profit but I also have to come out of my pocket to get the load there.
Q So that would put you in a loss situation?
A Yes, sir.
Q Any other reasons why you would turn down loads from CRST?
A Yes.

Q What other reasons?
A Some of the loads didn't pick up until twelve hours later. Some of the loads put me in a horrible state that I would wait days on end to get out of.
Some of the loads would have to have me relay with another driver, which they were never on time. I could be waiting days for them to get there. There was various different things, reasons on why.
Q As a company driver, when you worked for CRST, did you have the ability to turn down loads?
A Not that I recall.
Q In other words, that's forced dispatched as a company driver; correct?
A Yes. The only reason --
I have turned down a load before as a company driver.
Q For what reason?
A I was sick.
Q Any other reason?
A Not that I recall.
Q You understand what I mean when I say forced dispatch, don't you?
A Yes.

MR. SWEENEY: I'll object to the form of the question.
You can respond.
A Yes, sir.
BY MR. HANSON:
Q Now, if you go back to paragraph 1(C) of the Independent Contractor Operating Agreement -- I'm going to call it an ICOA. If I use that term, that's what I'm referring to as Exhibit 1, the Independent Contractor Operating Agreement.
A Yes.
Q Do you see that?
In the next line after turning -- accepting or rejecting specific shipment, any specific shipment offered by the carrier, it says:
"Contractor is not prohibited from entering into separate agreements to provide other equipment or other professional truck drivers, not identified as equipment above or in an appendix and driver's not used to service the agreement, to other motor carriers."
Do you see that sentence I just read?
A Yes, sir, I do.
Q Did you ever use the equipment in the service of another motor carrier?

same; correct?
A I hired no drivers.
Q You had drivers in your truck. Did you have to ensure that they also operated the equipment in a safe manner?
A Yes.
Q Before you would go to sleep, did you want to ensure that they were operating safely; that they knew how to operate the truck safely?
A Of course.
Q The second drivers that you had, were all of those student drivers?
A When you say second driver, who do you --
Q You always operated as a team; correct?
A Yes.
Q Were your team drivers always student drivers?
A No.
Q How did you get the second driver if it wasn't a team driver?
MR. SWEENEY: Object to the form of the question.
But you can respond.
A Are you referring to somebody specific?
BY MR. HANSON:
Q You told me that not every one of your team

drivers was a student driver.
A Yes.
Q If you had drivers that were not student drivers, how did you come to operate the equipment as a team with another driver that wasn't a student?
A Oh, now I understand.
At one point in time I did hire a female driver.
Q How long -- I'm sorry. Go ahead.
A I came across them when their student -- not their student. When their other team driver didn't show up. I talked it over with her and made an agreement. Got approved by CRST, and she was allowed to operate the truck.
Q When you say got approved, what do you mean by that?
A Any driver that operates on the CRST truck has to be approved through CRST, orientation through CRST, background per CRST. Everything has to be ran through CRST.
Q In other words, in order to put a driver in a truck, CRST has to make sure that they are DOT qualified; correct?
MR. SWEENEY: Object to the form of the

question.

But you can respond.

A Yes.

BY MR. HANSON:

Q Every place that you've worked as a truck driver, have you had to meet the DOT qualifications before you could operate the equipment for a motor carrier?

A I'm sorry. Repeat the question.

MR. HANSON: Tara, can you read that back for me.

(The requested text was read by the reporter.)

A Yes.

BY MR. HANSON:

Q Why do you have to be DOT-qualified? What's your understanding of why you have to be DOT-qualified?

A My understanding is for the safety of the public.

Q You'll look at page 1115. So go back. Go down another couple pages to paragraph 4(H). It's in the right-hand column.

A Yes.

Q It says customer requirements.

Were you given a compensation policy that set forth what the mileage rate based on the number of years of experience you had as a driver?
A When I started, I don't believe so.
Q Turn back to page 1126. I want you to look at paragraph 14(C). It's a paragraph entitled "Termination."
A Okay.
Q Now, in this case, CRST did not terminate this Independent Contractor Operating Agreement with you; correct?
A No.
Q In fact, it was you that terminated the agreement; correct?
A Yes.
Q When you were done with the relationship as a lease purchase contractor, had CRST breached this contract with you?
MR. SWEENEY: Object to the form of the question.
But you can respond.
A 14(C), no.
BY MR. HANSON:
Q Let's go back. Let's go back to Appendix A,

which begins on CRST001131.
Did you find it?
A 1131.
Q It's Appendix A.
A Yes, I'm looking at Appendix A.
Q Under 2(A), base plates, there's some initials there. Are those your initials?
A Yes.
Q Did you have Indiana base plates on your truck?
A Yes.
Q Did you have to pay for that as part of -- under a settlement deduction?
A Yes.
Q It's got permits in paragraph 2., and you elected -- and you have "MC" listed in Option 1, and it's crossed out, and then an "MC" under Option 2.
Is that your handwriting, both initials as well as the cross-out of Option 1?
A I'm sorry, I'm failing to see the same thing on my end.
Q 1132.
A 1132. Yes.
Q Why did you change your mind on Option 1 and Option 2?

A Because I was told that was the wrong option.
Q Did you try to obtain an IFTA permit?
A When I first signed this part, as far as the owner-operator, I thought it was my responsibility when I read it. They told me that was the wrong option, to pick Option 2.
Q Did you say, "No, I want to take Option 1"?
A I just followed their instructions.
Q Could you have chose Option 1 if you really wanted to?
A I did. They told me it was wrong.
Q Were you prepared to do all the fuel tax reporting under Option 1?
A I was unprepared for anything.
Q Did you know how to do the fuel tax reporting under Option 1?
A Absolutely not.
Q In paragraph 3, it's got communication system/EOBR. What is the communication system and EOBR?
A Communication system/EOBR.
Other than speculation, I don't know what it is.
Q I'm sorry? Other than speculation, what?
A I don't know what it is.

Q That's your initial there under Option 2?
A Yes.
Q In the next section on deductions table, did you have certain deductions taken from your settlements in accordance with this chart that's on pages 1132 through 1137?
A Yes.
Q Did you ever have deductions that were taken that were different than the amounts listed on this chart on these pages?
A Yes.
Q What deductions did you have that weren't on that chart?
A I've had a deduction for --
It was when the vehicle was sold, I was deducted for cleaning and a bunch of other stuff that later on I found out that I wasn't supposed to have deducted.
Q Did you bring that to CRST's attention?
A Yes, I did.
Q Who did you talk to?
A Ben Lyser -- I'm sorry. Drew.
Q What did he tell you?
A He said he would look into it.
Q And what kind of response did you get to him

after that -- get from him after that?
A That I might want to contact maintenance.
Q Did you contact maintenance?
A Yes, I did.
Q Who did you talk to in maintenance?
A I don't recall the gentleman's name. He was the supervisor.
Q What did you find out as a result of that call?
A That it was a complete mistake. I shouldn't have been deducted. It should have been charged to CRST and not me.
Q Did you get that money back?
A I believe so, yes.
Q Go to page 1138. It's got non-trucking bobtail liability insurance. Are those your initials that you requested coverage for bobtail insurance?
A Yes.
Q Was that to cover your use of the truck when you were not under a load?
A I didn't know what it was for. I was told to initial it.
Q Did you ever ask a question as to what is it for?
A Yes.

Q What were you told?
A That's insurance you have to have on the truck.
Q To cover what?
A Excuse me?
Q To cover what?
A The truck.
Q For what type of use did the insurance cover on the truck?
A I was unaware.
Q Did you ever ask a question as to what it would cover?
A Yes.
Q What were you told?
A The truck.
Q Was it when you were not operating it under CRST's authority?
A I don't know. I wasn't explained. They just said it was for the truck.
Q Does bobtail insurance cover when the truck is operated from under a load?
A I don't know.
Q What's your understanding of what bobtail insurance covers?
A I honestly don't know. Just damage.
Q There is on page 1139, it's got occupational

accident insurance. Did you sign up for that insurance that's at the top of page 1139?
A Yes.
Q That's your initials there?
A Yes.
Q Then there's --
(Reporter request for clarification.)
Q Under Number 4, that's physical damage insurance. Do you see that, your initial and the checkmark?
A Yes.
Q Did you sign up for that insurance?
A Yes.
Q What did that insurance cover?
A I honestly don't know.
Q Do you carry physical damage insurance on your personal vehicle?
A I carry full coverage with my personal vehicle.
Q Do you know whether you have physical damage insurance on your personal vehicle?
A I don't know. I just know it's full coverage. I don't know the difference between them.
Q Did you ever ask anybody questions as to what it covers?
A I just asked, "What do I need to cover my

vehicle in case I wreck it?"
And they said, "Get full coverage. It covers everything."
Q Did you ask the same question as to what covers the truck that I'm operating that I'm leasing from Lincoln Sales and operating under Expedited's operating authority?
A No. Because I was totally unaware.
Q You didn't ask a question about it?
A No. We were just told to sign it.
Q So, in other words, you were new to this game and you just signed everything they told you to sign?
A That's correct. I was totally oblivious. I never did it before.
Q And you didn't ask any questions about what it was for?
A No. Because I didn't know half of what it was.
Q And when you don't understand something, do you ask questions?
A I was too new to ask any questions.
Q You got charged back for something that you didn't feel like you owed, and you asked questions. If you're getting charged back for these items, why not ask questions about it?

A Because insurance is something we had to have. There was no way around it. We had to have that insurance. We were told by CRST, "You must sign here. You must have this insurance to operate the vehicle."

As far as the other charges, when I got charged for the other stuff, I knew it wasn't my responsibility to pay for a curtain and pay for everything else if they sold the vehicle to somebody else.

Q Paragraph Number 8 is "Principal in Escrow Funds." It's got "Maintenance and Reserve Fund" as the first one and an "Additional Principal" in the second one.

You chose Option 1. Your initials are there; correct?

A Can you tell me what page we're on?

Q 1141.

A 1141. Gotcha.

Can you repeat the question?

Q Yeah.

Why did you choose Option 1 instead of Option 2?

A I believe on here, if I'm looking at the right page, it's Option 3.

Q You're up in the "Routing and Fuel Optimization Services."
A I apologize.
MR. SWEENEY: Where do you want him to be, Jim?
MR. HANSON: Paragraph 4 -- or paragraph 8, "Principal and Escrow Funds."
MR. SWEENEY: It's 1141?
MR. HANSON: Correct.
A Okay. I see it.
BY MR. HANSON:
Q Why did you choose Option 1 instead of Option 2?
A Because I was told that's the one I had to pick.
Q What did you do with the money that was in the escrow fund at the end of the lease?
A CRST kept it.
Q Did you owe money to CRST at the end?
A No.
Q Did you ask a question as to why did CRST keep it if you didn't owe any money?
A Yes.
Q Who did you talk to?
A Drew.
Q What did Drew and you talk about? Tell me about your conversation with him.

BY MR. HANSON:
Q Would you turn to page 2 of Exhibit 4?
A Yes.
Q Do you recognize that as being the declaration you submitted in this case?
A Yes.
Q At the time you submitted this in -- let me get back to the signature page -- the 23rd of October of 2020, you were still a lease purchase contractor with CRST; correct?
A You said back in October?
Q October 23 of 2020.
A Yes.
Q Now, I'm curious. You were a lease purchase contractor. You ended up leaving in January of 2021, as I recall.
Do you agree with that date?
A Yes.
Q Or the end of December, I think you originally said. Maybe sometime in January.
Now, if you weren't being treated correctly as an owner-operator, or were being treated as an employee, why didn't you quit as soon as you realized that and go to work for somebody else?
A To be quite honest, CRST, I graduated with them.

I always felt like it was home. Loyalty, stubbornness, promises. It seems like every time I was ready to leave, they would add something sweet on the table, like better paying loads or a better truck or --

At one time I did leave. Actually, twice I left. Every time I was brought back in, promising things would be different.

Q You left as an owner-operator?

A Yes. Twice.

Q And --

A The first time was like 72 hours I left. I was in Oklahoma City. I still stayed in the truck because I was absolutely broke. Waiting to try to borrow some money from somebody. And they called me and said, "Fine, we'll do a payment plan and we'll get you in a different truck."

So I said, "All right."

I really didn't have a choice on that one.

The second time I had quit and they promised me that if I came back I was going to get better paying loads and they were going to give me a truck that I only had, I think it was a 12-month lease on and cheaper -- cheaper lease. I would get back to making money real

quick.

That never happened because when I went back, they never gave me a student. I told them. I said, "I need a student to drive because you guys are deducting my truck as if I have a student on the truck. And I can't get decent paying loads because I don't have a second driver."

And because they never gave me a student for nine days, I had no choice but to leave. I wasn't going back to having negative paychecks. I already did that before.

Q So you left one time based on, you said, promises that were made to you. I take it those promises didn't pan out; correct?

A Not to nitpick but I didn't leave because of promises. I left because I ran out of money. I wasn't making anything and I was negative. So that was the first time I left.

I believe you said I left because of promises. I came back because of promises.

Q All right. Then you left a second time; correct?

A Yes.

Q That was because you thought you had promises

BY MR. HANSON:
Q Right.
A I can say yes.
Q That it's not accurate?
A How do I answer this?
As to what the contract reads? Yes.
As to what we were told? No.
Q Paragraph 21 says:
"I and other lease operators are not allowed to work for anyone other than CRST while under contract with CRST."
Again, that kind of goes back to the questions I've just been asking you. Is that if you look at the Independent Contractor Operating Agreement, there are ways that you can work for other -- for someone else other than CRST while leased to CRST; correct?
A As to what you described, yes.
Q Now, the paragraph 22 says:
"As a lease operator, I had to follow CRST's work rules and procedures taught to me during orientation."
Are you talking about orientation as a company driver or as an owner-operator?
A Both.

Q When did you take some steps to become -- to get your own operating authority?
A I believe, as we previously discussed, when I thought about going to get my own truck, I talked it over with Ben Lyser and Drew.
Q So that would have been towards the end of 2020, beginning of 2021?
A I believe that was around the same time, yes.
Q What steps did you take other than talking to Drew and to Ben?
A I went to --
Filled out -- I went to online -- well, I didn't go to online.
I went online and I filled out some applications and was approved for financing.
Q For a truck?
A Yes, sir.
Q Did you do anything to obtain your own operating authority?
A No. I looked into it but I didn't pursue it other than looking into it.
Q Okay. Now, your job as a lease purchase contractor, you didn't work side by side with other lease purchase contractors.
In other words, you would haul whatever

loads that you took, other lease purchase contractors haul whatever loads they decide to take, and you don't work side by side with them in delivering the loads; correct?
A Unless it's a relay.
Q In which case you're not working with them side by side, you're just meeting at a particular point and changing trailers; correct?
A Correct. It would be the same load, different trucks.
Q Different trucks going -- you know --
When you drop the trailer you would go a different direction to pick up your next load than what the driver was that was going to deliver the load that he took from you; correct?
A Yes. Once I dropped it off at the relay, his job would be to finish the destination.
Q And your day-to-day work as a truck driver is not the same from one day to the next, is it?
A Not necessarily.
Q I mean, you end up hauling loads all the time but you're going in all different directions. You don't take the same route to do the same thing day in and day out on pickups and deliveries; correct?

A I could, if I wanted to. But I prefer not to.
Q But you didn't; correct?
A That's correct.
Q And you don't know what the other days were like for the other drivers; correct?
A That's correct.
Q And you don't know how much they worked and made on a weekly basis, do you?
A No.
Q Did you ever have two weeks that were the same?
A Can you be more specific?
Q Yeah.
Did you have two weeks in which you did the same thing starting out -- like for example -- let me give it to you in this example.
If I worked at a factory I may be told to report at 8:00 and I'm done at 5:00 every day, Monday through Friday.
Is that the way the trucking industry works?
A It all depends on the driver.
Q Right. In your case, did you work like that, where you started at 8:00 in the morning every day and ended at 5:00?
A Yes, sir.

Q Monday through Friday?
A Yes, sir.
Q Were you driving? Were you reporting to the same location every day to work, like somebody in a factory?
A Yes. I climbed up into the jump seat. Reported to work same day in my truck every day.
Q So -- but was the truck in the same location every day when you would climb -- when you would climb into the -- to actually drive the truck?
A No.
Q It would be all different parts -- could be all different parts of the country; correct?
A Yes.
Q And the things that you would do, the ability to drive the number of miles based on traffic and weather and those kinds of things, that would vary from day-to-day; correct?
A Yes.
Q That would be true for all drivers. Their days are never really the same, other than they are a truck driver every day; correct?
MR. SWEENEY: Object to the form of the question.
But you can respond.

A Again, that would have to deal with the driver and who he was driving for. Not all drivers drive for the same company. Some have dedicated routes where they drive the same lane every day, driving the same type of freight every day. Getting off the same time every day.
BY MR. HANSON:
Q Let's talk about CRST Expedited.
Did you have the same loads that you hauled from one day to the next?
A No.
Q All those loads would have a different point of origin and point of destination; correct?
A Yes.
Q Some loads may take two days to deliver and others may take the whole week; correct?
A No.
Q No?
A No.
Q What was wrong with the statement that I made?
A From going all the way as far as Pennsylvania to California, it wouldn't take any longer than three days.
Q Okay. So the longest time you were under load would be generally three days then?

A Yes, sir.
Q And then once you dropped, you would pick up another load going to a different destination than you started?
A Yes, sir.
Q And so from day to day --
From load to load you pick up and deliver at different places; correct?
A That is correct.
Q And if we were to look through your settlement sheets, it would show that you may travel from the Midwest to the West Coast, from the West Coast to Texas, from Texas to the Northeast.
You are moving along irregular routes; correct?
A Yes.
Q Do you know how any other driver is operating on a day-to-day basis while you are out on the road?
A No.
Q They don't have the same schedules, the same pickups and delivery locations as you do; correct?
A That would depend on the lane.
Q But you didn't have the same lanes every day;

correct?
A No, I did not.
Q Do you know of other CRST drivers that had the same lane that they worked every day?
A Personally, no.
Q Are you currently employed?
A Yes, sir.
Q Who are you working for?
A I previously stated, Warren.
Q Oh, that's right. Warren Transport?
A Yes, sir.
Q Okay.
MR. HANSON: Can we take just a short break. I may be done.
THE VIDEOGRAPHER: Off the record at 4:47 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on the record at 4:58 p.m.
BY MR. HANSON:
Q Mr. Cross?
A Yes, sir.
Q When we looked at the 2021 lease agreement for that other -- for the 2017 Freightliner, that was a different truck than what you had been

AND FURTHER THE DEPONENT SAITH NOT.

(Signature waived.)

___________________________________________

MICHAEL CROSS

STATE OF INDIANA )
) SS:
COUNTY OF HANCOCK )

I, Tara Gandel Hudson, RPR, CRR, a Notary Public in and for the County of Hancock, State of Indiana at large, do hereby certify that the deponent, MICHAEL CROSS, was by me remotely sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Defendants, with the witness located in Beaufort, Beaufort County, South Carolina, on the 5th day of August, 2021, scheduled to commence at 8:00 a.m., pursuant to the Federal Rules of Civil Procedure;

That said deposition was taken down stenographically and transcribed to English under my direction, and that the transcript is a true record of the testimony received remotely of said deponent; and that the signature of said deponent to his deposition was not requested;

That the parties were represented by their counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of either party, or otherwise

interested in the event of this action, and am not in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of August, 2021.

Tara Gandel Hudson

Seal

Notary Public, State of Indiana

Commission No. 682534

My Commission Expires March 27, 2024