IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION
Case No. 1:20-cv-00075-CJW-KEM

----------------------------------------x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

Defendants.

----------------------------------------x

March 15, 2022
12:34 a.m.
Virtual Deposition

ZOOM EXAMINATION BEFORE TRIAL of a Plaintiff, ROBERT CORPENING, JR., pursuant to Notice, held at 522 Wadale Drive, Albemarle, North Carolina 28001 before Mandy Fein, a Notary Public of the State of New York.

A. No, go ahead, go ahead, I'm sorry.
Q. How long -- let me take a step back.
How long were you a company driver at CRST?
A. For like a little over a year.
Q. So, 2014 and 2015?
A. Yes.
Q. And then, in 2015, what made you become a lease purchase contractor?
A. Yeah. I -- I just wanted to, you know, purchase some equipment through the lease purchase.
Q. Why did you want to purchase some equipment?
A. Because it was, to me, it was basically like doing the same thing, but you would be, I guess, self-employed.
Q. How did you go about transferring to the lease purchase program?
A. I contacted my driver manager.
Q. Who was that driver manager at the time?
A. I don't recall.
Q. Did anybody discuss how much money

rely on anything someone from CRST told you about how much money you would make on a weekly basis?

A. I don't recall. I don't remember.

Q. Can you recall anything else that went into your decision to become a lease purchase operator other than wanting to purchase equipment?

A. I don't recall.

Q. While you were a company driver, did you discuss or did you talk to any lease purchase contractors?

A. No, I didn't. Well, I don't recall talking to any lease purchase drivers.

Q. Was your decision driven mostly by your desire to purchase the equipment and be self-employed?

A. Yes.

Q. So, when you attended orientation in 2014, that was a company driver orientation?

A. Yes.

Q. Did you attend a separate orientation when you became a lease purchase contractor?

A. Yes.

Q. When was that?
A. It's like August of 2015.
Q. How long was that orientation?
A. I don't recall. I'm not really sure.
Q. Do you recall how you got to that orientation?
A. I drove the CRST company truck to Cedar Rapids, Iowa.
Q. By the time you got to Cedar Rapids, had you made up your mind that you were going to become a lease purchase contractor?
A. Yes.
Q. And that decision was based on your desire to purchase equipment and to be self-employed?
A. Yes.
Q. Anything else that the decision was based on?
A. I don't recall.
Q. So, I want to talk about orientation. You attended in 2015, August of 2015. So, these questions all go towards that orientation.
Okay?

Q. Do you recall whether anyone presented the number of miles you would receive as a lease purchase contractor?
A. No, I don't.
Q. Do you recall anything else about orientation?
A. I don't.
Q. Did you sign your independent contractor agreement at orientation?
A. I believe so, so yes, maybe, I think so, but I don't recall. I really -- could you repeat the question?
Q. Sure.
Well, why don't we do this, Mr. Corpening, I will come back to this. I will show you the agreement and we will talk about it at that point.
Okay?
A. Okay.
Q. Do you recall if CRST gave you a driver handbook during orientation in 2015?
A. I don't recall.
Q. Did you understand that you could become a fleet owner while contracting with

CRST?

A. Yeah. I believe I did hear some conversations about that, I think, I'm not sure.

Q. And those conversations that you referenced, when would they have occurred?

A. Maybe during orientation.

Q. Who would be a part of those conversations, do you recall?

A. I don't.

Q. Was that information that was presented to you by CRST?

A. I'm not sure, but it -- I don't recall. I'm not sure.

Q. I am going to go ahead and introduce as Exhibit 1 a ten page document. The first page says Exhibit 15 and I'll represent that was put on there by Plaintiff's counsel, and the substance of the document is on Bates Pages CRST 004254 through CRST 004262.

Mr. Corpening, what I am going to do is I am going to go ahead and share this document on my screen, so you will see it on your screen. This goes for all documents I show you today, if

on these samples in making your determination to contract with CRST, correct?

MS. RAFFERTY: Objection, form and foundation.

Q. You can answer.

A. No.

Q. No, that's not correct or no, you did not rely on them?

A. I don't remember seeing them, so I mean --

Q. If you never saw them, you can't rely on them, correct?

A. Yes, correct, correct.

Q. I am going to go ahead and take this down. I will stop sharing my screen.

At the orientation in 2015, Mr. Corpening, did anyone provide any advice on how to be a successful lease purchase operator?

A. I don't recall.

Q. Did anyone discuss with you your ability to hire someone else to run your truck?

A. I believe so.

Q. Who discussed that with you?

A. I don't recall.

Q. But it was discussed at orientation?

A. I don't know if it was at orientation, but I do remember that being said, that you could like hire someone to help you drive.

Q. Did you ever try to do that?

A. Yeah, I did. Yes, I did.

Q. When did you try to do that?

A. Technically, it was after the incident with the student had attacked me. CRST told me they wouldn't -- they wasn't gonna send me any more loads or any students. So, it was like how can I stay afloat and then I told them that I had a -- a guy that I trained that wanted to co-drive with me.

Q. What did they say?

A. I never got response from them.

Q. Did you ever follow up?

A. At the time, after the incident happened with the trainee when he attacked me, my driver managers told me to turn the truck in the next day. So, I mean, it was like hours, but no, I didn't follow up because it was like hours in between where I had to get

to the rental car to get back to North Carolina.

Q. You were a lead driver at CRST?

A. Yes.

Q. What is a lead driver?

A. It's a driver that helps students sharpen their skills, driving skills.

Q. By participating in the lead driver program, you did not have to go out and find your own co-driver, correct?

A. That is correct.

Q. That was a benefit to you?

A. I guess, yes, I'm not sure. I mean, I don't understand your question. Was it a benefit?

Q. Sure.

If you had to go out and find your own co-driver, right, you would have to employ that person, correct?

A. Yes.

Q. You would have to pay their full wage, correct?

A. Correct.

Q. And you would have to do the tax

Q. Did you have the ability to do that?
A. No, I didn't.
Q. Did anyone at CRST tell you that you could not do that?
A. As I remember, they had like a group of people that said you had to sign the contract and then go see the equipment. So, I mean, within that time frame, like it's my understanding --
Q. Did you review this agreement before you signed it?
A. Yes.
Q. Did you understand it?
A. Yes.
Q. And you freely signed it?
A. Yes.
MS. RAFFERTY: Objection, foundation.
Q. No one forced you to sign it?
A. No.
Q. I want to go over a couple of these elections that you made in some of these, Mr. Corpening.
MR. ANDREWSCAVAGE: So, for the record, we are now looking at CRST 020727.

Q. And you see it says, Base plates and permits?
A. Yes.
Q. You understood that you had the option to obtain your own base plates for your tractor as an independent contractor with CRST, correct?
MS. RAFFERTY: Objection to form.
Q. You can answer.
A. I believe they -- they instructed us or the contractors what option to pick, but I don't really remember details.
Q. And why do you believe that they instructed you what options to pick?
A. Because it was just like -- it was like they wanted everybody to go through the CRST companies for the plates, but I'm not sure because I don't really recall.
Q. But you selected Option 1, which is that, CRST would obtain the base plates for you, correct?
MS. RAFFERTY: Objection, foundation.
A. Yes.
Q. These are your initials, correct?

A. Correct.
Q. And you wrote those there?
A. I believe so.
Q. Do you know what IFTA permits are?
A. Yes.
Q. What is IFTA permits?
A. It's the fuel permits.
Q. And you selected the option that CRST would obtain the fuel permits for you, correct?
MS. RAFFERTY: Objection, foundation.
Q. I am sorry, Mr. Corpening, go ahead and answer again.
MR. ANDREWSCAVAGE: Or Mandy, repeat it.
THE COURT REPORTER: She cut him off, I didn't get it either.
Q. I will ask you again, Mr. Corpening, you selected Option 2, which is that, the carrier would obtain your IPTA permit; is that correct check?
MS. RAFFERTY: Objection, foundation.
Q. You can answer Mr. Corpening.
A. Yeah. I initialed that, but like I said, I believe that they told like all the in

the beginning -- everyone that wanted to be a contractor, they had instructed us what options to select, if I'm not mistaking.
Q. Did you ever ask anyone if you could do your own IPTA permits?
A. No, I didn't.
Q. Did you have interest in doing your own IPTA permits?
A. I don't believe so.
Q. Under 3 you selected the option to have CRST arrange for the communication system in your tractor, correct?
MS. RAFFERTY: Objection, foundation.
MR. ANDREWSCAVAGE: Meagan, can I understand the foundation objection? I am asking if that's what he initialed, that's what he selected. So, what's the foundation issue?
MS. RAFFERTY: You are asking whether he made that selection and he has testified that he believes that he was told where to sign.
MR. ANDREWSCAVAGE: Okay, that's not a foundation issue, I don't think, but alright, I understand --

MS. RAFFERTY: You --

MR. ANDREWSCAVAGE: I understand.

MS. RAFFERTY: You not thought establish that he made that selection.

MR. ANDREWSCAVAGE: I understand that objection. Thank you.

Q. Mr. Corpening, you initialed next to Option 2, correct?

A. Yes.

Q. And by doing that, you selected that the carrier shall arrange to have the communications system installed on your tractor, correct?

MS. RAFFERTY: Objection, foundation.

Q. You can answer, Mr. Corpening.

A. Yes. That's what I believe that class at that time was instructed to do was to select Option 2 and the carrier would arrange the communication systems.

Q. Did you ever go into the market and see if you could obtain a different communication system?

A. No, I didn't.

Q. Did you ever go see if you could get

the same communication system cheaper else where?

A. No, I didn't.

Q. Was it easier for you to have CRST obtain the communication system for you?

A. I am not really sure because at that time period, I wasn't really familiar with the whole communication systems and stuff since I was just trying to purchase that tractor at the time.

Q. So, if you had to do research on those communication systems at that time, would it have been difficult for you?

A. I don't think so.

Q. Would it have been time consuming?

A. Probably so.

MR. ANDREWSCAVAGE: For the record, we are looking at CRST 020734.

Q. Mr. Corpening, do you see here it says, Initial yes to request coverage, do you see that on the top, right-hand corner?

A. Yes.

Q. Do you see type of coverage, do you see that in the middle?

A. Yes.

Q. What is Bobtail Insurance?

A. Insurance for just the tractor.

Q. And you selected here, you initialed next to yes to obtain Bobtail Insurance through Great Plains Casualty, Inc., correct?

A. Yes, but I think that's what they -- I was instructed to select or that group.

Q. Did you ever ask anyone if you could get your own insurance?

A. I didn't, no.

Q. And you contracted with CRST for about four years, correct?

A. Yes.

Q. And did you ever try to get your own insurance?

A. I didn't, no.

Q. You did or you did not?

A. I did not.

Q. Did you ever look to see if you could obtain insurance cheaper than the insurance than Great Plains Casualty was providing?

A. I did not.

Q. Why not?

A. I didn't.

MR. ANDREWSCAVAGE: For the record, we are now at CRST 020735.

Q. Mr. Corpening, you see here it says, 3., Occupational Accident Insurance?

A. Yes. I see it.

Q. Can you say that again, Mr. Corpening, you had a lag on my end?

A. I said yes, I see it.

Q. What is occupational accident insurance?

A. It's for like occupational, if you hurt on-the-job, maybe.

Q. And you see in the right-hand column you put your initials next to yes?

A. Yes.

Q. And by doing that, you indicated that you wanted Great Plains Casualty -- you wanted to obtain your occupational accident insurance through Great Plains Casualty, Inc., correct?

A. Correct, but I think I was instructed to initial that, but I really don't remember, though, on there.

Q. Well, which one is it, Mr. Corpening,

were you instructed or do you not remember?
A. I think I was instructed to initial that because I -- it -- this was new to me.
Q. During the four years you contracted with CRST, did you ever look elsewhere to find occupational accident insurance?
A. I didn't.
Q. Did you ever look to see if you could find occupational accident insurance cheaper than what was being provided facilitated through Great Plains Casualty?
A. No, I didn't.
Q. Mr. Corpening, are you currently -- do you currently obtain your own insurance on your tractor?
A. No, I don't.
Q. Does your new carrier facilitate that insurance?
A. Yes, they do.
Q. And you made that election to have them facilitate it?
A. Yes. Well, actually, it's -- it's about the same as this contract where I was instructed to go with that selection, but ...

Q. Still on CRST 020735, do you see, 4. Physical Damage Insurance?
A. Yes.
Q. What is physical damage insurance?
A. It's insurance to cover any damage to the equipment.
Q. And do you see in the right-hand column you put your initials next to yes?
A. Yes.
Q. And by doing that, you indicated that you wanted to obtain that insurance through Great Plains Casualty, Inc., correct?
A. Correct.
MS. RAFFERTY: Objection, foundation.
Q. And during the four years you contracted with CRST, Mr. Corpening, did you ever go out and look to see if you could find cheaper physical damage insurance?
A. I didn't.
Q. Did you ever go to see if you could find any other physical damage insurance cheaper or not?
A. No.
Q. Did anyone at CRST ever tell you that

you could not do that?
A. I don't recall.
MR. ANDREWSCAVAGE: For the record, we are now on CRST 020736.
Q. We are looking at 5. Insurance for Cargo Carrier's Trailers and Related Expenses.
Do you see that, Mr. Corpening?
A. Yes.
Q. Do you see your initials next to yes, RC?
A. Yes.
Q. And by doing that, you signaled -- you indicated that you wanted to obtain cargo insurance through Great Plains Casualty, Inc., correct?
MS. RAFFERTY: Objection, foundation.
Q. You can answer, Mr. Corpening.
A. Yes. I believe I was instructed to.
Q. Okay, Mr. Corpening, did you ever go out and look to see if you could get cargo insurance elsewhere during the four years that you contracted with CRST?
A. I didn't, no.
Q. Do you recall who at CRST instructed

you to make these initials -- or make these selections that you testified to?
A. I believe it was, I don't know the name of who was doing orientation, they instructed the whole class at that time.
Q. Did you ever talk about these selections with anyone at CRST at the orientation?
A. No, I didn't.
Q. Why not?
A. At that time, this was all new to me, but I don't -- I didn't discuss it with anyone about the contract or anything that I recall.
Q. Mr. Corpening, and now we are looking at the bottom of CRST 020737 and the top of CRST 020738, and the heading says, Contractor should initial only one of these two options, and Option 1 says, Contractor chooses to continue building the Maintenance and Other Reserve.
Do you see that, Mr. Corpening?
A. Yes.
Q. And you see Option 2 says, Contractor chooses NOT to build any Additional Principal

in the Maintenance and Other Reserve Fund, do you see that?

A. Yes.

Q. You selected Option 2, correct?

A. Yes.

Q. And those are your initials, correct?

A. Yes, but I did -- I am sorry, go ahead.

Q. No, you finish, please. I am sorry.

A. I said I believe I did later on through the voluntary maintenance account. I know I did later on, but I didn't do it at that time because I just didn't select the option.

Q. And were you instructed to select one of these two options by someone at CRST?

MR. ANDREWSCAVAGE: Strike that, that's a bad question.

Q. Were you instructed to select Option 2 by a CRST employee at orientation?

A. Was that Option 2?

Q. Yes.

A. I don't recall.

Q. Why did you decide to build a

maintenance account later on?

A. I don't recall.

Q. Do you recall why you selected Option 2?

A. I don't, no. I don't recall.

MR. ANDREWSCAVAGE: We have been going a little bit over an hour. Can we take a five minute break? Let's go off the record.

THE VIDEOGRAPHER: The time is 1:45.

(RECESS)

We are back on the record. The time is 1:54.

Q. Good afternoon, Mr. Corpening.

You understand you are still under oath, correct?

A. Yes. Good afternoon.

Q. Mr. Corpening, did CRST ever charge you more than it said it would for participating in the insurance programs that you selected?

A. I don't recall.

Q. And you understood that you were going to get paid seventy percent of the revenue associated with the loads you hauled,

MS. RAFFERTY: Objection, form.
Q. Why not?
A. I didn't have any interest in multiple trucks.
Q. You understood you could do that if you wanted to, correct?
A. I'm not sure.
Q. Did you know any contract -- sorry, go ahead.
A. Yeah. I was just looking to purchase one tractor from them. That's all I wanted from them.
Q. And you were at CRST as a lease purchase operator for about four years, correct?
A. Correct.
Q. During that time -- during those four years, did you work every week?
A. I believe I drove like seventy hours or as close as I could get to seventy hours every week.
Q. Every week?
A. Just about.
Q. And you set your schedule?

A. Yeah, pretty much.

Q. And you decided what loads to haul, correct?

MS. RAFFERTY: Objection, form.

Q. You can answer.

A. They would send loads to the tractor and if I -- I could choose or deny a load.

Q. And that was your choice, correct?

A. Yes.

Q. How did you decide whether to accept a load?

A. I am not really sure, but, you know, I would just take the load, but if it was an area I didn't want to go to, I would deny the load.

Q. Did you ever look at the profitability on the load?

A. Yeah. Yeah. I would try to, you know, get an estimate of what the pay should be for that load.

Q. And we talked about that earlier, right, you would get the revenue and you would do the seventy percent calculation, and you would get the fuel, and you would do the

ninety-seven calculation; is that right?

A. Yeah. And I believe like CRST withdraws thirty percent of the load, yeah, but I don't know the exact formula because I don't remember -- I don't remember it, but it was somewhat like that.

Q. When you weren't driving your truck for CRST, did they place any restriction on what you could do?

A. What do you mean by restrictions?

Q. Did they ever tell you you couldn't, you know, go somewhere and do something?

A. I don't recall.

Q. Were you free while driving -- while contracting with CRST, were you free to select what routes you drove?

A. I remember they said a contractor could take the route, but I had experienced one time they wanted me to go a certain route and I told them I wasn't gonna go that route, so they canceled the load. I do remember that.

Q. And that was a one time experience?

A. I believe it was, but I'm not sure,

but I know it was a --

Q. Did that happen frequently over the four years you contracted with CRST?

A. I don't think it happened frequently, but I know it happened on occasions, I would say.

Q. But, otherwise, you were free to choose whatever route you wanted?

A. Yes.

Q. And you did choose whatever route you wanted, correct?

A. Yes.

Q. Did you ever calculate how much you were earning on a per mile basis?

A. I did, yes. I did, yes.

Q. And why did you do that?

A. So I would know the bottom line what I would need to make a profit and --

Q. Do you recall what you were making on a per mile basis?

A. I'm not really sure to the dollar amount or amount.

Q. What did you consider to believe a full workweek while you were at CRST?

started in August 2015, correct?

A. Correct.

Q. And so then, you generated in Box 1 here it says, seventy thousand two hundred eighty-two dollars in gross receipts for sales, do you see that?

A. Yes.

Q. You understand that's the revenue you generated for that tax year; is that correct?

A. Yes.

Q. So, in five months, you generated seventy thousand dollars in revenue; is that correct?

A. Yes, but I was also a company driver up until that time.

Q. I understand, so you were paid W-2 separately for that, correct?

A. Yes. Yes.

Q. Just as a lease purchase contractor, you had seventy thousand dollars in gross revenue in 2015?

A. Yes.

Q. In Part 2 on Page 1 it lists your expenses.

Do you see that?

A. Yes.

Q. Do you see Box 13 it has five hundred and fifty dollars of depreciation?

A. Yes.

Q. What is that depreciation on?

A. It was a lop top computer.

Q. What did you use the laptop computer for?

A. For my trucking business for the truck.

Q. It was a business computer?

A. Yes. That's what I purchased it for, to use it for trucking.

Q. And you did use it in for hauling for CRST?

A. Yes. I believe so.

Q. And you used it to manage your business?

A. I had it, but, you know, I don't recall if I used it to manage my business with software or whatever because I would mostly write in my notebook, the loads, information and stuff down.

A. I'm not sure because I had an accountant, ABS, who did my taxes for me. They do my taxes.

Q. So, you hired someone to do your taxes for your business?

A. Yes.

MS. RAFFERTY: Objection.

Q. You see Box 17, Legal and professional services?

A. Yes.

Q. You see the three hundred and twenty-seven dollars?

A. Yes.

Q. Do you know what that's related to?

A. I can't say exactly, so no.

Q. Do you have an estimate or a guess, do you have like any knowledge?

A. It could be for accounting service. I don't know. No, I don't.

Q. You see Box 20A, Vehicles, machinery, and equipment, you have an expense of eight thousand six hundred and eighteen dollars?

A. Yes.

Q. Are those related to expenses for

your tractor?
A. I believe so.
Q. Does that include your lease payments?
A. I don't know. My accountant handles that for me, so I don't know if it was for the lease payments that I made or what.
Q. Do you provide your accountant with documentation to prepare the Schedule C?
A. Yes. They are -- got like state tax settlements.
Q. Other than your settlement statements, did you provide them with anything else?
A. If I purchase anything, like business related, I would send them the receipts.
Q. Do you have any of that documentation still?
A. No.
Q. What was your accountant's name?
A. ABS -- ATBS, I meant.
Q. ATBS, where are they located?
A. I believe they are located in Iowa.
Q. In Iowa?

A. Could you repeat the question?

MR. ANDREWSCAVAGE: I will withdraw the question.

Q. Line 28 your tentative profit from 2015 was eighteen thousand two hundred dollars; is that correct?

A. Yes.

Q. That was for the six months that you drove, correct, as a lease purchase contractor?

A. Yes.

MR. ANDREWSCAVAGE: For the record, we are now looking at PLT-RC-2, Part 5, Other expenses.

Q. Do you remember we just looked at the twenty-two thousand dollar seven hundred ninety-six --

MR. ANDREWSCAVAGE: Strike that.

Q. Twenty-two thousand seven hundred ninety-six dollar expense in Line 27, Mr. Corpening?

A. Yes.

Q. Do you see here it is broken out into three different kinds of expenses, tolls, scales, parking and truck license is one, do

you see that?

A. Yes.

Q. And these would be expenses that you incurred over the road; is that right?

A. Yes.

Q. And then there is an expense for communication for one thousand seventy-two dollars.

Do you know what that is?

A. I believe it's cellular phone bill.

Q. And then there is a fuel expense of twenty thousand one hundred and forty-five dollars.

Do you see that?

A. Yes.

Q. And that is fuel for fueling your tractor, correct?

A. Correct.

Q. And you would have saved those receipts and sent them to ATBS?

A. If I fueled -- if I paid cash, I would send them in, but I used -- I think I used a company card, CRST fuel card.

Q. Com Data?

could you know ...

Q. No, I understand.

A. I know I did have some, but that was before I know, I had already disposed of them.

Q. I understand. All I am saying is that if you have any today, and I recognize you don't know sitting here today, don't throw them away from this point forward, okay?

A. Yes.

Q. Do you know if ATBS would still have that documentation?

A. I don't know.

MR. ANDREWSCAVAGE: We have been going a chunk of time, let's take another five minutes.

THE VIDEOGRAPHER: Going off the record at 2:50.

(RECESS)

We are back on the record. This marks the beginning of Media Unit Number 2. The time is 3:02.

Q. Mr. Corpening, you contracted on haul loads for CRST, correct?

A. Yes.

Q. And you did that throughout the country?

A. Yes.

Q. Did you have a specific region or lanes that you liked to run?

A. No.

Q. Did you spend more time in a specific part of the country like the west coast or the east coast?

A. No.

Q. Were there areas of the country that you avoided?

A. No, not really. I just -- whatever they dispatched, I would take most of them.

Q. And those were your choices, though, correct?

A. Yes.

Q. Did you deliver loads into Iowa?

A. Yes.

Q. How often?

A. I don't recall.

Q. Was it more or less then once a month?

A. I don't recall.

Q. What are the hours of service, Mr. Corpening?

A. Hours of service is exactly hours of service that you could drive.

Q. Yeah, the DOT hours of service, what are they?

A. The hours of service, this is what you are stating, the DOT, the hours you have available for the driver to drive the time frame.

Q. As a truck driver, you are regulated by the federal government, correct?

A. Yes.

Q. And you have to log all twenty-four of your hours in a given day, correct?

A. Yes.

Q. And you have to do it within four categories, correct?

A. Yes.

Q. One of those categories is on-duty driving, right?

A. Correct.

Q. And when you were contracting with CRST, what work would you log as on-duty

other than to say, Mr. Corpening, thank you for your time. I really do appreciate it.

MS. RAFFERTY: I would like a copy of the transcript, please.

THE VIDEOGRAPHER: Going off the record the time is 3:35.

(Time Noted: 3:35 p.m.)

______________________

ROBERT CORPENING, JR.

Subscribed and sworn to
before me this _________
day of ________________.

______________________

NOTARY PUBLIC

Job No. TX5129192

C E R T I F I C A T I O N

I, Mandy Fein, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of March, 2022.

MANDY FEIN