IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS,
on behalf of themselves and
all others similarly situated,
Plaintiffs,

vs. CASE NO. 1:20-CV-00075-CJW-KEM

CRST INTERNATIONAL, INC. and
CRST EXPEDITED, INC.,
Defendants.

\- - -

Video Deposition of JAMES EDDEN,

Taken by Charles Andrewscavage,

Before Shannon E. Jordan,
Certified Court Reporter,
Via Veritext Videoconferencing,
On Friday, August 12, 2022,
Beginning at 11:15 a.m. & ending at 1:01 p.m.

\- - -



Veritext Legal Solutions
800-336-4000

Q Okay. Did you meet any other contractors at orientation?
A Yeah, I -- I did.
Q Were there any individuals you met at orientation that previously contracted with CRST?
A No.
Q Okay. Did anyone at orientation -- so I asked you before you got to orientation, they made you a promise of how much you were going to make. Did anyone at orientation make you a promise of how much you were going to make?
A No.
Q Okay. What was discussed regarding compensation at orientation?
A The fact that you'll make 70 percent of the -- of the load.
Q Okay. And that was your -- and I believe you answered this before and I apologize if I'm repeating it. That was your experience when you actually drove; correct?
A Right.
Q So other than the safety presentation, right, it sounds like you took some tests essentially. What else -- what else occurred at orientation?

A They went over -- I think they went over the things that, like, one day was -- was lead driver class, the other day they went over -- the next day I think they went over the -- the lease and agreement, and that's when we started to sign everything. And -- but that was, like, towards the end of orientation right there.

Q Okay. We'll come back to that in a second. Did anyone provide any information how to become a successful owner-operator?

A Can you say that again?

Q Yeah. Did anyone discuss how to be a successful owner-operator with CRST?

A I mean, no, not that I remember.

Q Okay. Did anyone discuss that you had the ability to be a fleet owner, to own multiple trucks?

A Yeah, they said that, but I mean, I don't -- I don't really see how that would have worked, but they -- they did say that.

Q And why do you -- why -- you say you didn't see how that would have worked. So why did you say that?

A Because -- because it's, like, if you

don't get that truck paid for or it cost -- it would cost you a lot of money to -- to buy a student out of his contract in order to have him drive for you.

Or getting somebody else to come and drive for you, it really would be hard to do unless you just already know people that want to drive and they want to drive for you.

Q Okay. But if you did do that, you would have been able to do that at CRST; correct?

A Yeah, they said you could. Yeah.

Q Do you know anyone who was a fleet owner while you contracted with CRST?

A No.

Q Did anyone at orientation discuss your ability to hire someone else to run your truck?

A No. I think a -- another person at orientation was saying they -- they said that they wanted to hire their -- well, she said she wanted to hire her husband to drive with her.

Q Okay.

A But I -- I didn't -- I didn't get all that because I think they talked to them separate from us after that.

A Right.

Q All right. And that's when you started with CRST; correct?

A Correct.

Q So for the record, I'm now at CRST031071 and under heading 2, Base Plates and Permits. Do you see that, Mr. Edden?

A Correct.

Q What are base plates?

A The plates on the -- the -- the tag on the truck.

Q Okay. And as a contractor, you had the option to obtain your own base plates; correct?

A Right.

Q All right. And you selected that CRST would obtain them for you; correct?

A Uh-huh (affirmative).

Q And those are your initials here?

A Correct.

Q All right. No one forced you to do that?

A No.

Q Did you -- did you look to see if you could obtain your own base plates separately?

A No, I didn't.
Q Okay. Why not?
A Why, when they -- they already going to do it?
Q Fair enough. We talked a little bit about IFTA, which is 2(B)(2); right? IFTA Permit and Fuel Tax Reporting. We talked about that earlier.
A Right.
Q Do you -- and so down on CRST031072, Option 1 is, Contractor shall obtain the IFTA permit themselves, and Option 2 is that CRST shall obtain it for the contractor?
A Uh-huh (affirmative).
Q It looks like you initially selected Option 1, crossed it out, and selected Option 2; is that accurate?
A Yes.
Q Okay. And is this what you meant before when you were thinking about doing your own IFTA?
A Right. Because my -- a guy I went to trucking school with, he -- he did his, and he said it was -- it worked for him, but it was the company that he was with, though. It wasn't with

CRST.

Q Yeah. Okay. And you -- you ultimately made the decision to have CRST do it; correct?

A Right.

Q And you said that was your personal decision?

A Right.

Q No one from CRST forced you to do that?

A No.

Q And did you do any cost -- cost analysis to figure out if it would have been more expensive for you to do it yourself than to have CRST do it?

A It just -- I don't think it would have been more. But it would have took -- it would have took a lot -- a lot more time than I had.

Q Yeah. Okay. Under heading -- on the same page CRST031072 under 3, Communications Systems, there's an onboard computer in every truck; correct?

A Correct.

Q All right. And I think it's called a

Qualcomm; is that right?
A Uh-huh (affirmative).
Q All right. And you had the option to furnish your own onboard computer; correct?
A Correct.
Q All right. And you chose not to do that; correct?
A Uh-huh (affirmative).
Q All right. And that's what you initialed here under option two?
A Right.
Q All right. So CRST has provided that for you at your choice?
A Uh-huh (affirmative).
Q All right.
A Right.
Q And you understood, then, that they would charge -- they would charge you a certain amount for the onboard computer; correct?
A Right.
Q Okay. And did you look around in the market to see if you could find an onboard computer cheaper?
A No.
Q Why not?

A Because if I would have, then I -- ain't no telling how long it would have took for that to even happen.

Q Okay.

A So, I mean, that was -- that was me -- that would have been me putting off time that I could have been making money, so I -- I took -- I went that route.

Q Okay. And back to the base plates and the IFTA permitting, as well, you understood that CRST was going to charge you an amount for -- for performing those services; correct?

A Correct.

Q Okay. And you knew that before you signed; correct?

A Right.

Q All right. So now I am down on CRST031078. Okay? And it's -- this is sort of what prompted me to pull up the document; right? So CRST allows contractors -- it facilitates insurance if contractors want to select that; correct?

A Correct.

Q And the first type of coverage here in -- in this is non-trucking liability

insurance, sometimes called bobtail insurance. Do you know what bobtail insurance is?

A Uh-huh (affirmative).

Q What is it?

A The insurance you have when you're not hooked to a load. You're not -- it's just the insurance on the truck.

Q Okay.

A Not the load.

Q And -- and did you look for your own bobtail insurance?

A No.

Q No? And you -- you requested that CRST facilitate that insurance for you?

A Yes.

Q And that was your own choice?

A Right.

Q And you didn't make any effort to find anything cheaper?

A No.

Q Under point three, there's occupational accident insurance. What is occupational accident insurance?

A If you get in an accident while you're working.

Q Okay.
A Something happens.
Q Okay. And CRST -- did you look for your own occupational accident insurance?
A No.
Q Why not?
A I mean, I don't know. If I, like, if I would have just halted on doing any of this -- if I didn't have it already, like, if I was already running for myself or running for another company and maybe I would have done this. But it was going to take too much time for me to do any of this stuff and start making money.
By -- so it was basically just -- it was there already. So let me -- let's just do this so I can start driving.
Q Yeah. And so you didn't know if you could have gotten any of this insurance cheaper and you didn't care?
A Yeah, it didn't even matter.
Q Okay. And that's true for the rest of these insurance, physical damage insurance, the cargo insurance --
A Right.
Q -- that you selected. Okay. I'm

going to stop sharing this right now. Going back to the -- the independent contractor agreement. Did CRST fail to honor any of the terms of the agreement?

A No.

Q And you worked for CRST for approximately four years; correct?

A Not -- not -- not -- not quite. I think I was -- I first started in 2017 to 2020.

Q Yeah, so December '17 to October of 2020; is that right?

A Oh, that might be when they -- when they -- yeah. That might -- it was before that, though. It was, like, November or something like that.

Q Like, November?

A Of 20 --

Q November of '17?

A Yeah.

Q October of '20?

A Uh-huh (affirmative).

Q Okay. Did you work every week during that period?

A I was -- I was gone every week. I didn't work every week.

Q What do you mean you were gone every week?
A I was gone. Like -- like, in 2020, is when the -- the pandemic kind of started, so I might have been out, but I probably was sitting somewhere some of that -- most of that time.
Q Okay. So you were OTR and sort of waiting for a load at -- at certain points?
A Right.
Q Putting aside the pandemic period, though, you know, so let's say January '20 or January 2020, did you work every week during that period?
A Oh, no, I -- I -- my birthday is the first week of January, so I was at home. I probably didn't leave until the end of January.
Q Okay. And so, can you choose which weeks you did not work?
A I put in for the home time and they try to get me home. And if it -- if it took them a little longer to get me home, then I would, depending on what I needed to get home for, when I got there, if I -- I might take an extra day or two. If I -- if it took them an extra day or two to get me home.



Veritext Legal Solutions
800-336-4000

Q And you had the ability to reject loads if you didn't want to take them; correct?
A Yes.
Q And you had the ability to choose which loads you wanted to run; correct?
A That's kind of --
MS. KING: Objection.
THE WITNESS: -- the same question; right?
BY MR. ANDREWSCAVAGE:
Q What?
A That's kind of the same question.
Q Fair enough. It's the same question asked a different way. What -- what -- how did you make the decision whether or not to accept or reject a load?
A The miles and the money. You have to take the money and split it down -- break it down to the amount you're making per mile. And if it didn't make sense, then it's no need in taking it.
Q Okay.
A But if you don't -- I -- I -- I mainly took -- I main -- I -- I kind of took most of the loads they sent me, though, because I --

you never knew when the next load was going to come to you.

Q Uh-huh (affirmative). Okay. But you would -- you would take each load they would give you the mileage; is that correct?

A They would tell you -- they would tell you the amount of miles they're paying for.

Q Okay. And they would give you the overall revenue?

A Right.

Q Okay. And then would you take that overall revenue and figure out your percentage, which was 70 percent?

A Right. And then I break that down to see what I'm making per mile.

Q Okay. Did you ever take into account fuel costs?

A Yes, that's -- that's the reason why you break that down.

Q Yeah. Okay. And so if it wasn't profitable, you wouldn't take a load?

A Yeah, I didn't want it. Not saying that I wouldn't take it, but I didn't want it.

Q Okay. And did you ever tell your dispatcher that, you know, this one is just not

you that was the case; right?
A Oh, no. No, they ain't never -- they wouldn't ever tell you that.
Q All right. No one from CRST said that to you?
A No.
Q That's just your own inference?
A Right.
Q Did your dispatcher ever tell you the route you had to run to get from point A to point B from or to your destination?
A No.
Q That was -- you -- you were free to decide that yourself?
A Uh-huh (affirmative).
Q Did your dispatcher ever tell you where you needed to fuel?
A They told you where you got the best discounts at, so if -- if you didn't get a discount, it wasn't then -- it didn't make sense to get fuel. So --
Q No one --
A -- you really -- you really would have to get it where they -- where they tell you to.

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF COBB:

I hereby certify that the foregoing deposition was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

That the witness's right to read and sign the deposition was reserved;

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This 26th day of August, 2022.



SHANNON E. JORDAN, RPR, CCR-B-2126

ACKNOWLEDGEMENT OF DEPONENT

I, James Edden, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

James Edden Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC