IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

------------------------------------------X

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

PLAINTIFFS,

-against-

Case No. 1:20-cv-00075- CJW-KEM

CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,

DEFENDANTS.

------------------------------------------X

DATE: March 26, 2022

TIME: 12:11 P.M.

VIDEOTAPED DEPOSITION of the Plaintiff, JUSTIN LOMAX, taken by the Defendant, pursuant to a Notice and to the Federal Rules of Civil Procedure, held via videoconference, before Laura Anzelone, a Notary Public of the State of New York.

that. I have a basic understanding.

Q. What is your understanding of an independent contractor truck driver?

A. Independent contractor is supposed to be responsible for certain deductions and certain expenses to the truck versus the company driver, the company driver not being responsible for none of that.

Q. Are there any other differences to your understanding?

A. Besides the expenses to the truck, as far as the legalalities and everything like that, I don't really want to get into it. I am not an accountant. I am not a lawyer. So, that's not really my line of work.

Q. As a contractor for Hirschbach, did they force dispatch you?

MS. MARTIN: Objection. Form. Foundation.

MR. BULLOCK: You can answer.

A. You said did they force dispatch us?

A. No, but the company was designed for students to be on there. So, like you having a load that paid a certain amount, you don't get that load. The brokers and the direct shippers and everything like that that they deal with, they want the load to be delivered in an accelerated fashion. So, all their customers that they deal with, that's the way it was supposed to be. So, if you do solo, it won't work. With that company, it will not work with a 1099. You need to have a student because you can get a load. The load would probably pay half of the amount of the load with the student on there, but, at the same time, it is going to take you twice as long, so you really wouldn't be making little to no money at all without the students or a co-driver in the truck with you during the operation.

Q. Instead of the student, could you have had a co-driver in the truck with you?

A. Yes, but now you are talking

about having to compete with millions of trucking jobs in America that will pay that co-driver more than what you were willing to pay him out of whatever cut you are getting for being a 1099 worker.

Q. So, a co-driver would have been more expensive than a student driver?

A. Um-hum.

Q. But, just so I am clear, you didn't have to have a student driver, correct?

A. No. I could have possibly found a co-driver, but, again, I guess me having to find somebody that I am compatible with, I get along with and everything like that, to operate the truck when I am not operating. If they are experienced, they are not going to want to do it for cheap. To my understanding, I am responsible for paying them a cut out of whatever I made. Which I understand. Nobody is working for free. But, again, you know, I am responsible for paying them a cut out of that 70 percent. And they

Once they gave you the contract, you didn't ask to speak with a lawyer, correct?

A. No. Not at all.

Q. Before you exercised the walk-away lease provision and gave them the notice and left, did you speak with a lawyer about the contract?

A. No.

Q. Were you aware that you had the option to lease multiple trucks through CRST?

A. No.

Q. Did you know anybody who was driving for CRST who operated multiple trucks?

A. No.

Q. Did you understand that you could have had somebody else drive your truck instead of you?

A. Yes. They did tell us that, but they still have to be hired through CRST. They have to get approved through their --

MS. MARTIN: I'm sorry. Can somebody talk? I can't hear.

THE VIDEOGRAPHER: He was talking so you may have lost audio.

MR. BULLOCK: Let's go off the record for a minute.

THE VIDEOGRAPHER: Off the record AT 2:42.

This ends Media Unit Number 2.

Thank you.

(Whereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: On the record at 2:56.

This marks the beginning of Media Unit Number 3.

Thank you.

Q. Mr. Lomax, I am going to circle back to Exhibit 1 real quick. I am pulling it back up.

Can you see Exhibit 1, Mr. Lomax?

A. Um-hum.

Q. Is that a yes?

A. Yes. Sorry.

Q. I believe earlier you testified that you had seen this before; is that correct?

A. Yes.

Q. What do you remember about this?

A. Um --

Q. And tell me to scroll or do whatever you need.

A. Just the 70 percent revenue and the fuel surcharge. That's pretty much it. I don't really remember too much more.

Q. Did you base your decision to sign your contract with CRST on this document?

A. No. It was more so word of mouth with the family member that was already employed with CRST.

Q. Okay.

I am going to stop sharing this.

I believe before we went off the record, I asked you whether you are

aware that you could have hired somebody else to drive your truck, and you answered yes; is that correct?

A. Yes. It was my understanding that you could do that, but they would -- like, it wasn't up to me a hundred percent to hire them. That was actually up to CRST to decide whether or not they wanted to hire them and if they met their requirements.

Q. Do you remember what those requirements were?

A. They just had to pass the M.V.R., pass, you know, drug screening, and stuff like that. They have to have possibly a certain amount of experience. That might have something to do with it as well. Different rules, requirements, pre-employment requirements. You know, you can't have so many speeding tickets within a certain timeframe, and stuff like that.

Q. Do you recall -- are you familiar with the Federal Motor Carrier Safety Administration?



Veritext Legal Solutions
800-336-4000

A. Yes. The F.M.C.S.A. Yes.
Q. The F.M.C.S.A. has requirements for being qualified as a driver. Are you aware of those requirements?
A. For the F.M.C.S.A.?
Q. Yes.
A. Nah. Excuse me. No. I'm sorry. No. I am not aware of that.
Q. So, you don't know whether CRST's requirements to hire somebody were any different than those with F.M.C.S.A.?
A. Actually, insurance is going to have -- plays a key role with that as well. They tell you whether or not they want to except a driver or not. It is not just strictly based upon the F.M.C.S.A. The F.M.C.S.A., it is fine, they will take you, but it also comes down to insurance.
Q. How so? I'm not sure I understand.
A. Well, you can be a truck driver and get a D.W.I., and the F.M.C.S.A. says that you have to wait a year before you go back to work, but there are not too many

companies that will make you wait at least seven years to actually have the insurance bring you on. That's for an example. The insurance is not going to cover you. You are not going to be able to work for that company.
Q. Did you ever want to hire somebody to operate your truck?
A. Nah.
Q. So, you didn't try to get anybody hired?
A. No.
Q. Is there a reason why you didn't do that?
MS. MARTIN: Objection.
MR. BULLOCK: What's your objection?
MS. MARTIN: It is asked and answered.
He talked about why he wouldn't hire or couldn't hire someone.
MR. BULLOCK: I don't know if I would agree with that.
Q. Were there any other reasons


Veritext Legal Solutions
800-336-4000

why you didn't try to hire somebody on your truck besides qualifications of insurance?
A. I couldn't afford them.
Q. Were you aware that you could have driven for other companies besides CRST?
MS. MARTIN: Objection.
Form. Foundation.
What timeframe? While he was working for CRST? I mean, it is not clear. Do you want to clarify your question?
MR. BULLOCK: Yes. I will.
Q. While you were with CRST, were you aware that you were able to drive for any other motor carrier?
MS. MARTIN: Objection.
Form. Foundation.
You may answer.
A. Um, you're saying while I was with CRST, was I aware that I could pull loads for other companies while working for CRST?
Q. Yes.

A. Is that what you're trying to explain?

Q. I am asking whether you knew that to be the case or not.

A. No. I knew that we were only allowed to pull CRST loads. I couldn't say, hey, Tommy or my friend wants me to pick up, you know, some freight or whatever instead of taking you guys' load and take somebody else's load and get paid off of it. No. I wasn't allowed to do that type of stuff.

Q. So, it was your understanding that while you were a 1099 operator for CRST, you were not allowed to haul any load for any other carrier?

A. Not without their permission. And if --

Q. Sorry. Go ahead. I didn't mean to interrupt you.

A. If they had a customer that was, you know -- it wasn't like CRST's freight. If they like went through a middleman, a broker, like, yeah, they are

giving me the load. I only got loads from them. Loads came across the board, but I never found the loads. They found the loads. That's what they did. I never ever got my own load nor was I ever told that I can go get my own load.

Q. Were you told that you could not go get your own load?

A. No. I think guys kind of just knew that we are leased -- the lease contract or whatever, that we can only pull their freight. I am pretty sure -- I don't know if it was the contract, but I am pretty sure guys knew.

Q. Were you able to reject loads while you were under this contract with CRST?

A. Yes. I told you that already.

Q. Did you ever reject loads?

A. Um-hum.

Q. Did you ever take days off?

A. Absolutely.

Q. Why did you take days off?

A. Spend time with my friends and

family, take care of certain errands at the house, and also because I could have been out of hours, maximize my hours as well.

Q. Was your schedule more flexible than it was with All Score?

A. Was the schedule more flexible? What do you mean when you say more flexible, like, could I just go to work whenever I wanted to?

Q. If you want to take a day off while you were under contract with CRST, could you have done that?

A. Yeah. I mean, I could tell them that -- you know, if I wasn't feeling well, I could take the day off and stuff like that.

Q. Did you ever take days off just because you didn't feel like driving that day?

A. Not to the best of my knowledge. If I ever did, it was probably because I maybe wasn't feeling well. I might have had a little cold or something like that.

students are not going to be able to back -- they are not going to be able to do certain things by themselves, and they are going to need assistance, they are going to need help, so you help them. But we logged all that time as off duty because it was more beneficial to the company and the driver.

Q. While you were hauling the load, did you ever take breaks --

A. Oh, absolutely.

Q. -- aside from your hours of service?

A. What do you mean aside from the hours of service? The breaks were still -- the breaks were still done under hours of service. Hours of the service consist of off duty, sleeper, on duty, and off duty.

Q. Sorry. That was a poorly-worded question, so I apologize.

A. Got you.

Q. While you were driving, if you wanted to, did you ever pull over into a truck stop to get something to eat?

A. Absolutely. Yeah. Take little breaks and stuff like that. I flagged it as off duty. I would go into the store and grab something to eat. You are not moving or operating, that's off duty.

Q. Did you take those whenever you wanted?

A. Yeah. Absolutely. If I need to pull over and stretch my legs, grab something to eat, I could take that whenever I want.

Q. So, CRST never told you that you can't take any breaks?

A. No.

Q. Did CRST ever tell you that you could only take a certain number of breaks?

A. No.

Q. Did CRST ever tell you when you could take certain breaks?

A. No.

Q. So, it was just totally up to you?

A. Yeah. As long as you are doing it under the F.M.C.S.A. policy and the

hours of service, that's fine. At the time we had to take a thirty-minute break in the first eight hours of working, being on duty. Now, it is different. You can get fuel or you can be on duty for over a period of thirty minutes and not have to take a thirty-minute break. So, it is different. Those hours change every year or every two years as far as all that stuff is concerned.

Q. Did CRST require you to use certain fuel stations or truck stops?

A. I believe, yes. Yeah. They were actually responsible for telling us -- well, I am not going to say responsible. They pretty much told us where to fuel up at. They put that in our route. Like, when you get here, fuel up at this Pilot, grab this amount of gallons. We didn't -- you know, they told us that we were independent, but we didn't get to fuel up where we wanted to whenever we wanted. I believe they only preferred at the time -- I am not a hundred percent sure, it might

have been Loves as well, but Pilot and Flying Jay truck stops.
Q. Who told you to use only those truck stops?
A. CRST.
Q. Do you remember who at CRST?
A. Somebody in the lease orientation. It was probably on one of them papers, them saying that these are the truck stops that we would like you to fuel up at. Stop here, and we will build them in your route, and we will tell you how many gallons to get and stuff like that.
Q. Did you ever use a fuel station besides Flying Jay or Loves?
A. Yes. Sometimes you had to do what you had to do. Sometimes you had to do what you had to do because you were going to run out of fuel. So, yes, there were times that you had to do that. Sometimes, like, you know, you got to get fuel. You might have gone to the fuel stop they told you to go to, but when you got there, they were out of fuel or their pumps

MS. MARTIN: Okay.

A. Yeah. It was to my understanding that we couldn't reject loads. If you said you was going to do something, you had to do it unless you called out of work, which could also be considered a rejection of a load, calling out of work, but if you're sick, that's what you have to do. So, if that answers your question.

Q. You testified earlier that Martin Brower force dispatched you; is that correct?

A. Yeah. Martin Brower force dispatched.

Q. Did you also testify that while you were driving for CRST that you could reject loads?

A. Yes.

Q. Did you, in fact, reject loads?

A. Certain instances, certain times.

Q. So, that's a yes?

A. Yes. A few.

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_________________________
JUSTIN LOMAX

Subscribed and sworn to before me this _____ day of ________________ 20___.

_________________________
NOTARY PUBLIC

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NASSAU )

I, LAURA ANZELONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of March 2022.

LAURA ANZELONE