IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

---------------------------------------------x

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all other similarly situated,

Plaintiffs,

v. Case No. 1:20-cv-00075-CJW-KEM

CRST INTERNATIONAL, INC., and CRST EXPEDITED, INC.,

Defendants.

---------------------------------------------x

Remote deposition

March 1, 2022

12 p.m.

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION of ALISSA POWERS, before Michele Moskowitz, a shorthand reporter and Notary Public of the State of New York.

REF: 5085346

Q. Do you know what the difference is between being a company driver and an owner-operator?

A. Can you -- can you ask -- can you ask that question again?

Q. Well, you told -- do you know what a company driver is?

A. Yes.

Q. What is a company driver?

A. So the company basically puts you in a truck of their own, they pay for it, you drive for them, and you get a smaller wage and you don't essentially have any freedoms or choices.

Q. And what is an owner-operator?

A. So that's when you're essentially paying for a truck through a company or you outright own a truck and then you have the freedoms to choose your route, your loads, at a much higher percentage of pay.

Q. How old were you when you decided to get a CDL?

A. I believe I -- I was 23. It was just before my 24th birthday.

Q. And what was it that made you decide

to go and get a CDL?
A. I -- I had left nursing, I needed a break and needed a fresh start.
Q. So what made you consider becoming a truck driver?
A. The ability to travel and the money.
Q. And when you say ability to travel, what do you mean?
A. Previously to truck driving I had only ever been to one other state, so getting to see the United States was a big motivator.
Q. And where did you learn about the possibility of becoming a truck driver?
A. From my sister actually.
Q. Is she a truck driver?
A. She is.
Q. What is her name?
A. Tina Morris.
Q. Can you spell her last name for me?
A. Yes. M as in Mary O-R-R-I-S.
Q. And is your sister older or younger?
A. She's older than me.
Q. And how much older?
A. Five years.

Q. When you went to Pam Transport, were you aware of the difference between being a company driver and an owner-operator?

A. Not at that time, no.

Q. When did you first learn about the differences between being an owner-operator and a company driver?

A. I believe it was a couple -- a couple -- few months after I started, I heard about it and then I just continued to learn from there.

Q. How did -- from whom did you hear about the opportunity to become an owner-operator?

A. It was from an ex of mine.

Q. And you say an ex, what do you mean?

A. An ex boyfriend.

Q. What was your ex-boyfriend's name?

A. Steven Hart.

Q. Was he a truck driver?

A. Yes, he was.

Q. Was he an owner-operator?

A. Not at that time, no.

Q. What did Mr. Hart tell you about

being an owner-operator?

A. The basics of the money you could make, the freedoms you could have. Just the basics all around.

Q. What did he tell you about the money you could make?

A. He said I -- you know, I could easily make double to triple or more than what I was currently making as a company driver.

Q. Did he explain to you that you would be responsible for paying the expenses associated with operating the truck that you would be driving?

A. Yes.

Q. Did he explain to you that you would be able to put any qualified driver in the truck that you were leasing?

A. Yes.

Q. You told me about the freedoms associated with being an owner-operator and I believe you said that you had the opportunity to choose your own routes, correct?

A. Correct.

Q. Choose the loads you would take and

not take, correct?
A. Correct.
Q. Obviously choose whether to personally drive or not, correct?
A. That -- that's not -- no.
Q. Oh. All right. Because a bit ago I thought you just told me that you understood that you could put any qualified driver in your truck to drive your truck for you. Right?
A. Yes. But that did not pertain to my situation.
Q. What do you mean it didn't pertain to your situation?
A. I didn't have the insurances and at this point we were just talking about me learning about it, not actually driving.
Q. But you understood that that was an option?
A. Yes.
Q. After you left Pam Transport, did you go directly to Celadon?
A. Yes, I did.
Q. How did you learn about Celadon?
A. Through my ex-boyfriend.


Veritext Legal Solutions
800-336-4000

A. Not in my current circumstances.
Q. What does that mean?
A. I -- I don't know. I would assume that there would be legal, you know, businesses that need to be developed and a lot more things that I don't understand would need to be --
Q. Did CRST do anything to prevent you from hiring someone else to drive the truck that you were leasing to CRST?
A. No.
Q. As a contractor for CRST, you were paid a percentage of revenue for every load you hauled, correct?
A. Yes, that's correct.
Q. Did CRST ever fail to pay you the percentage it said it would?
A. I don't know.
Q. As you sit here today, can you think of a single instance in which CRST failed to pay you the percentage of revenue that it promised it would?
A. I believe there were a couple instances where the rate didn't exactly match what the loads supposedly paid.


Veritext Legal Solutions
800-336-4000

Q. How were the loads not "quote" cutting the minimum when you calculated what your percentage was?

A. One of the tools that CRST provided us with was a map of all the states that they serviced and they were color coordinated for how well the freight paid in that area and so when I broke everything down, if it didn't meet that general guideline, I would reject it.

Q. What general guideline?

A. The one that CRST provided with, like, the basis of freight in that area per mileage.

Q. What general guideline did CRST provide you regarding freight in a particular area?

A. As I stated, there was a map that they had where they broke it down between green, which meant great revenue; yellow, which meant, you know -- could vary between good and bad; and then red, which was a lower-paying area.

Q. And so tell me how you used that map to determine that you were not satisfying your minimum.

A. I used that as an aid to -- when I calculated the expenses, the fuel cost of where we were going, where we would have to fuel on the route, different things. Like, we might have to take paying for parking into consideration, if we needed load locks or straps that we would need to purchase.

Q. And when did you start rejecting loads on the basis that the loads you were being offered did not, quote, meet your minimum?

A. I don't remember a specific date.

Q. Was it in 2019?

A. There -- I mean, there were times throughout my time with CRST that I would reject loads.

Q. And we've talked about those times, correct?

A. Yes.

Q. Okay. Were you offered loads in 2019 that you rejected?

A. I believe so, yes.

Q. Does that account for the reason that you had to wait more to receive a load?

A. Not all the time, no.

POWERS

FURTHER EXAMINATION BY

MR. SMEDSTAD:

Q. Prior to coming to CRST, you understood that when you were leasing a truck to a trucking company, you would be responsible for the expenses associated with operating that truck, correct?

A. Yes.

Q. You can't think of a single instance in which CRST deducted more for the expenses associated with operating your truck than it said it would, correct?

MS. KING: Objection, asked and answered.

Q. Go ahead and answer.

A. I'm sorry, can you repeat?

Q. Sure. You can't think of a single instance in which CRST deducted more than it represented it would for the expenses associated with operating your truck, correct?

A. Well, in an instance when I went negative for one week, didn't have enough, it would then come out of my next settlement.

Q. But it was the -- in the incremental

A C K N O W L E D G E M E N T

STATE OF NEW YORK )
: ss
COUNTY OF )

I, ____________________, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____________________
ALISSA POWERS

Signed and subscribed to before
me, this ____ day of ______________, ______.
________________________________
Notary Public, State of New York

C E R T I F I C A T I O N

STATE OF NEW YORK )
)
COUNTY OF NEW YORK )

I, MICHELE MOSKOWITZ, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That ALISSA POWERS, the witness whose examination is hereinbefore set forth, was duly sworn/affirmed by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of March, 2022.

MICHELE MOSKOWITZ