IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,

Plaintiffs,

-vs-

CRST INTERNATIONAL, INC. And CRST EXPEDITED, INC.,

Defendants.

Case No.: 1:20-cv-00075-CJW-KEM

-------------------------------

The videotaped deposition of EUGENE THOMPSON taken by counsel for the Defendant pursuant to notice and by agreement of counsel, reported by Carmen J. Thomas, RPR, CCR 2790, by Videoconference, on Tuesday, March 22, 2022, commencing at 12:44 p.m.

Q Pulse. Thank you for that correction.
A Yes, sir. Yes, sir.
Q Where were you living when you were contacted by the woman after submitting your application to Driver Pulse?
A In Savannah, Georgia.
Q And how did you get from Savannah, Georgia, to Cedar Rapids, Iowa?
A They rented me a car, if I'm not mistaken. Yes, sir, they rented me a car.
Q And when that lady was talking to you about driving for --
You said Pegasus, correct?
A Uh-huh.
Q Did she talk about driving as a company driver or as an owner-operator?
A No. My whole point was going in as a owner-operator.
Q That's what you wanted to do?
A Yes, sir.
Q And why did you want to do that?
A It's like -- it's more freedom in a owner-operator. You can -- you don't -- you're not forced to go somewhere you don't want to go as opposed to having to go there.

Q So as an owner-operator, you could refuse dispatch loads, correct?
A Yes, sir.
Q But as an employee, you would be forced to take those loads, right?
A As an employee, you take what they give you.
Q When we were talking about the other truck driving -- I'm sorry -- the other trucking companies you worked with -- I'll just run down the list, and I want you to let me know if you were a company driver or an owner-operator with any of those companies.
And we left off with Milan Express. You said you were a company driver, right?
A Yes, sir.
Q How about with FFE? Were you a company driver or an owner-operator?
A Both.
Q Tell me about that transition. How did you start at FFE?
A I started as a lease operator, as a owner-operator. And they came with somewhat basically the same thing Swingline came with. I got through the one day. They come back a month later, said they never took it out. It drove me in the hole, and I could never get out the hole. So I had to stop being a

Q And that -- that was option one, correct?
A Yes.
Q That CRST would obtain your base plates?
A Yes.
Q And there was option two that says, "Contractor shall obtain own base plates for tractor."
Do you see that?
A Yes. I didn't have my own truck to get my own plates.
Q Where did you understand you were going to get a truck?
A What do you mean?
Q Well, you stayed, right, at the orientation, and you signed this independent contractor operating agreement, and you signed it in order to drive a truck with CRST Expedited, correct?
A Yes.
Q And what were you going to drive for CRST Expedited?
A What was I going to drive?
Q Correct.
A A truck.
Q And where were you going to get that truck?
A CRST. I explained that earlier.
Q And I'm not asking -- I'm asking about this

document that we're looking at here and the elections that you made when you signed it.

Are those your initials? Is that your handwriting --

A Yes.

Q -- your initials next to option one -- just let me finish the question, please.

Those are your initials and your handwriting?

A Yes.

Q And could you have elected option two where contractor, or you, would have obtained your own base plates?

A No.

Q You could not have?

A Why would you -- you cannot get your own base plates for a truck that does not belong to you.

Q You can't? Is that your testimony today?

A Yes. That's how I see it. Why would I get a -- buy a plate -- a license plate for a tractor-trailer -- for a tractor that belongs to your people or to someone else? You can't do that. That's just like me going to get a tag for your car and it's in your name.

Q How about what's called IFTA permits and fuel tax reporting? Do you understand what IFTA permits and

fuel tax reporting are?

A (Inaudible.)

Q I'm -- I'm sorry. You're cutting out. I'm -- I'm sorry. You're cutting out. I'll ask again.

Do you understand what IFTA permits and fuel tax reporting are?

A The fuel tax reporting and permits -- permits, you have to have those in your vehicle at all times when you are operating your vehicle.

Q You have to have what in your vehicle?

A You have to -- for one, you have to have this, your contract. Okay? You got to have that.

Q Uh-huh.

A You got to have your IFTA stickers, your -- your fuel permits, everything, before you even crank that truck up. You have to make sure you got all necessary paperwork, sir.

Q Uh-huh. I understand that.

And do you understand that there's quarterly fuel tax reporting that is related to driving a commercial motor vehicle for profit?

A No, I didn't know that.

Q And here underneath that "IFTA Permit and Fuel Tax Reporting," again, there are two options. And there are initials next to option number two.

Are those your initials and your handwriting?
A Yes, sir. Yes, sir.
Q And it says, "Carrier shall obtain IFTA permit and perform all fuel tax reporting... "
Goes on to say some other things too.
Would you know how to do fuel tax reporting?
A No, sir. That's -- no, sir.
Q So you elected to have CRST Expedited obtain your IFTA permit and do the fuel tax reporting, correct?
MS. RAFFERTY: Objection --
THE WITNESS: Yes.
MS. RAFFERTY: -- foundation.
BY MR. SPOLYAR:
Q And underneath that, on number three, it says "Communications Systems/EOBR."
Do you know what EOBR stands for?
A No. Could you --
Q How about --
A -- explain it?
Q I'm just asking you, and it's fine if you don't.
How about communications system? Do you understand what communications systems would come with the truck?
A Yes. Qualcomm.



Veritext Legal Solutions
800-336-4000

Q And under option one, it says, "Contractor shall furnish and install contractor's own compatible communications system or EOBR, the equipment."
Do you see that under option one?
A Yes, sir. I chose option two.
Q And those are your initials next to option two?
A Yes, sir.
Q That carrier, or CRST Expedited, would arrange for all of that installation?
A Yes, sir.
Q And we're now down on the page ending in 022570. And do you see at the top of the table where it says "Types of Coverage"?
A Yes, sir.
Q And right underneath that, it says, "Non-Trucking," and in parentheses, "(Bobtail) Liability Insurance"?
A Yes.
Q What does that mean to you? What's nontrucking bobtail liability insurance?
A Nontrucking bobtail liability insurance means if you're not pulling a load.
Q So you don't have a trailer?
A It says -- right. When you buy it, that's

why it says "nontrucking bobtail liability insurance." You know, like, when you own -- you know, like the situation I explained to you in Carlisle in -- in Pennsylvania on PC time. That's like what that is.
Q You're driving without a trailer, correct?
A Right.
Q And at the top of the table, on the right, it says, "Initial 'Yes' to Request -- Request Coverage." And there are initials next to the word "Yes."
Are those your initials?
A Yes, sir.
Q In your handwriting?
A Yes, sir.
Q And on the next page, ending in 22571, it says, "Occupational Accident Insurance."
Do you understand what occupational accident insurance is?
A Yes. It's -- it's like when you on the job and you have an accident.
Q And what would that insurance do for you if you were on the job and had an accident?
A It would cover the damages, but I would have to pay -- well, there was no deductible. So I guess everybody would have to just -- you know, attorney would have to come together and, you know, this and that, I

guess, you know, in the case of an accident like, you know --

Q Was it for injured -- I'm sorry. I cut you off. Go ahead.

A I was, like, you know, if the police get involved and stuff like that, you know. You know, that -- that's -- that's what I look at -- how I see it.

Q Was it to cover injuries to you, or was it to cover damage to equipment?

A I think that was, like, to cover them, the other people.

Q Are those your initials next to "yes" --

A Uh-huh.

Q -- under --

And then physical damage insurance, do you know what that is?

A That -- that's the damage to the vehicle, the physical damage.

Q And did you elect to have physical damage provided -- that you requested, rather, coverage for physical damage insurance?

A Yes. Yes, sir. Yes, sir, on that.

Q And, again, under "Insurance for Cargo, Carrier's Trailers, and Related Expenses," did you elect to have coverage?

A Yes. Have to.
Q How did you decide what route to take when you were on a dispatch with CRST Expedited?
A They give us a route to take. They'll usually give you a route to take or -- basically, most of my loads was going to Florida, so I knew the interstate.
Q And most of your loads were going to Florida from where?
A Out of California.
Q And you knew the interstate, so you would take the route that you thought would provide you the best trip there or the fastest trip there; is that correct?
A Yes, which was also they -- it was -- it was also their route as well. Because, you know, they got fuel stops along the way too on that route. So that's why it's best to follow that route because they got some fuel stops on there that you can stop at.
Q To fuel -- sorry. Go ahead.
A Yeah, you got fuel stops along the way.
Q So the routing that CRST Expedited provided you took into consideration fuel stops along the way? Is that what you're saying?
A Yes, sir. They had that mapped out for you

trucks.

MS. RAFFERTY: Okay. Okay. I don't have any other questions.

MR. SPOLYAR: Just a couple, then, follow-ups on that.

REDIRECT EXAMINATION

BY MR. SPOLYAR:

Q Mr. Thompson, you said, if you were taking a truck in for maintenance, that you would indicate that on your Qualcomm; is that correct?

A Yes, sir. Yes, sir. Like, if I'm taking it in -- like, if I make CR -- going into the CRST yard, I let them know, "putting truck in shop at such and such on the yard."

Q And then that message would tell dispatchers not to dispatch -- not to offer loads to you, correct?

A Right. And then when the truck out of the shop, I let them know, "truck out shop. Ready for dispatch."

Q And you froze there for just a second, but I understood you to say that, when the maintenance or service was complete, you would send another message saying that the truck was out of the shop and ready for dispatch, correct?

A Yes, sir.

Q And when dispatches came to you, you were free to decline those dispatches, right?
A Yes, I was free to choose my own load.
Q And did you, in fact, decline loads?
A Yes, I declined loads that didn't have any miles to them.
Q And did you plan sometimes to try to end up in locations where there was more profitable freight coming out so that you would refuse loads that were going to places that weren't good in order to accept loads -- wait for loads that were going to better locations?
A Sometimes my dispatcher will tell me, "Pick this load up here. Go there. It will be a better load for you."
If they didn't tell me that, I didn't move my truck on those small loads.
Q Because you didn't have to?
A Right. And plus, they would have to give me something that I can make money off of.
MR. SPOLYAR: I don't have anything else.
MS. RAFFERTY: I have no further questions.
MR. SPOLYAR: Thank you for your time today, Mr. Thompson.
THE WITNESS: Yes, sir.

CERTIFICATE OF REPORTER

I, Carmen J. Thomas, Registered Professional Reporter, and Notary Public, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of EUGENE THOMPSON; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 188 is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 28th day of March, 2022.

Carmen J. Thomas
Registered Professional Reporter

Job No. TX5129224

CERTIFICATE OF OATH

I, Carmen J. Thomas, Registered Professional Reporter, Notary Public, State of Florida, certify that witness, EUGENE THOMPSON, appeared via videoconference on the 22nd day of March, 2022 and was duly sworn.

WITNESS my hand and official seal this 28th day of March, 2022.

Carmen J. Thomas,
Registered Professional Reporter
Notary Public, State of Florida
MY COMMISSION HH 186102
EXPIRES November 16, 2025

Job No. TX5129224

E R R A T A S H E E T

IN RE: CERVANTES, et al., v CRST INTERNATIONAL, et al.

DEPOSITION OF: EUGENE THOMPSON TAKEN: 3/22/2022

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

Please sign, date, and return this sheet to our office. If additional lines are required for corrections, attach additional sheets.

At the time of the reading and signing of the deposition, the following changes were noted:

PAGE LINE CHANGE REASON

Under penalty of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

SIGNATURE OF DEPONENT: ___________________________

DATE: ____________________

Job No. TX5129224