IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES AND MIKE CROSS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, )
)
Plaintiffs, ) CASE NO.:
)
VS. ) 1:20-CV-00075-CJW-KEM
)
CRST INTERNATIONAL, INC. AND CRST EXPEDITED, INC., )
)
Defendants. )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
JACOB ONOLAPO FAPOHUNDA
JANUARY 11, 2022
(REPORTED REMOTELY)

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JACOB ONOLAPO FAPOHUNDA, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on January 11, 2022, from 9:00 a.m. CST to 1:15 p.m. CST, before Lisa M. Durham, CSR in and for the State of Texas, reported by machine shorthand, at the location of the witness in the City of Fort Worth, County of Tarrant, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Q. Does that sound right, that you signed this agreement on April 5, 2017?
A. Appears to be, yes.
Q. I want you to keep scrolling down to the next page, "equipment received." Do you see that?
A. Yes.
Q. And is that your signature on the lower left-hand part of that page?
A. Appears to be, yes.
Q. And, then, beginning on the next page at the top, it says "Appendix A, contractor election form." Do you see that page?
A. Contractor election form, yes.
Q. Okay. Do you remember signing this or -- or looking at this Appendix A, contractor election form, before?
A. No. I can't say I do remember.
Q. You see underneath the table where it says, "Number 2, base plates and permits"?
A. Yes.
Q. And do you see a set of initials next to Option 1?
A. Yes.
Q. And are those your initials?
A. Those are my initials.

Q. Did you write those initials?
A. I can't not -- I can't 100 percent say I wrote those initials, but they look like my handwriting.
Q. It does look like your handwriting?
I'm sorry. I was a little unclear. You said it does look like your handwriting?
A. It looks like it, but I can't verify it because, I mean, this is -- this is the age of information. So I can't really say, like, hey, this is -- this is mine or not. It's just -- it's just initials.
Q. Do you know what base plates mean?
A. Base plates would be the plates for your -- for your truck, correct, license plates?
Q. That's -- I'm just asking for your understanding.
A. Base plates and permits, no, I don't know what base plates means.
Q. Okay.
A. They might have been explained at the time, but I don't know what base plates means.
Q. And it looks like, with your initials next to Option 1, that you selected carrier shall obtain Indiana --
A. We were told if -- if we're in the class, I

remember many times we were told what to select.

Q. Who told you that?

A. This was the independent contractor or the -- I should say the lease-purchase person heading the class.

Q. Who was that?

A. I'm sorry. I don't remember the name.

Q. And how many people were there that fit that description?

A. Do you mean how many people were heading the class?

Q. Yes.

A. One. At the most, two.

Q. And so is it your testimony that the individual that was heading the class explained these options with respect to base plates? Let's start there.

A. They expressed what base plates were, to the best of my memory, but I can't remember 100 percent. Sorry. I can't -- I have to say unknown because I can't remember exactly what that person said at the time. But we were going through paperwork, and I would say -- yeah, I can't -- I can't 100 percent recall everything. Sorry.

Q. No. I'm not asking you to 100 percent recall everything that was said. What I'm asking you for is your recollection of whether options with respect to

obtaining base plates for your truck were explained to you in general.

A. Options for it, no.

Q. But you agree it says Option 1 and Option 2 right there?

A. Yes. I agree it says Option 1 and Option 2.

Q. And Option 1 says, "The carrier shall obtain base plates." I'm summarizing it, but in general, that's what it says, correct?

A. "Contractor shall obtain base plates for a tractor." Yes, I agree that's what it says.

Q. Okay. And Option 2 was that --

A. Oh, well --

Q. Well, Option 1 -- I'm sorry. Option 1 is "carrier shall obtain," right?

A. Yes.

Q. Who's "carrier" in this scenario?

A. Well, the carrier has -- I would say CRST, correct?

Q. Yeah. That's -- that's correct. And Option 2 says, "Contractor shall obtain own base plates" -- "own base plate for tractor." Is that something that you knew how to do or wanted to do?

A. It's not something I knew how to do.

Q. Keep scrolling down, then, to the top of the

next page. Well, actually, the bottom of that page that we were just talking about says, "If the permit and fuel tax reporting." Do you see that paragraph, the last paragraph on 12633?

A. Christ, 12663.

Q. 633. I'm still on the same page as your base plates.

A. Okay.

Q. And it says, "If the permit and fuel tax reporting." Do you see that?

(Sneezing)

THE WITNESS: Bless you.

A. Yeah, I see it.

Q. (BY MR. SPOLYAR) Okay. And do you see Option 1 and Option 2 at the top of the next page?

A. At the top of the next page?

Q. Yes.

A. Option 1 and Option 2.

Q. So when I say top of the next page, I mean CRST012634.

A. Yes, I see it.

Q. Okay. And Option 1 says, "Contractor shall obtain IFTA permit," and it goes on to say some other things, correct?

A. Yes.

Q. And is that your handwriting with JF written on that line and then crossed out?
A. Correct.
Q. And, then, you ended up initialing Option 2, correct?
A. Correct.
Q. And you did that because you didn't want to obtain your own IFTA permits. Is that correct?
MS. RAFFERTY: Objection to the form. You can answer.
A. So, yeah. This is -- this was being told select Option 2, not Option 1, and I took that as a mistake on my part, crossed out that part and then selected Option 2.
Q. (BY MR. SPOLYAR) So you put your initials next to Option 1 and then realized, as the contractor, you don't want to obtain your own IFTA permits. Is that correct?
A. That would be incorrect.
Q. Okay. What is correct?
A. The correct on that one would be basically everyone going through the class was told to select Option 2, not Option 1. Realizing that, you know, I was doing something other than what was going on, I selected Option -- you know, I put, as I was told to do,

Option 2.
Q. Anybody force you to select Option 2?
A. I can't say forced necessarily, but due to not having the full scope of what was actually happening there, it was being done on, I guess, good faith.
Q. What do you mean by that?
A. Well, it would seem, you know, this would be the procedure that was, you know, done before. And so, if they had somebody guiding you through the process, this would be the way to do it.
Q. Did you ask any questions -- go ahead. I cut you off. I'm sorry. Go ahead and complete your answer.
A. No. Go ahead. I would say that would be -- that would be it.
Q. Okay. Did you have any questions about these options?
A. I had questions to a certain degree. The question that I had was what would we need and how much financial would we need to do any of this on our own. Didn't really get an answer.
Q. When you say "any of this," what is "this" in that sentence?
A. Okay. So this would be something like purchasing a truck or something. I wanted to -- to figure it out because I wasn't exactly happy about doing

that one. What do you mean by "after"?
Q. Did those drivers that you are speaking of, having talked to about their expectations and your expectation on income, did those drivers talk to you about deductions that were made from the amounts paid to them for their driving work?
A. Do you mean weekly? Do you mean after they've paid off their lease?
Q. Well, let's start at the beginning. Let's say that -- you tell me what they told you. I can't -- I can't tell you what they told you. So what did they tell you?
A. Okay. I was told that it would be -- I should expect a minimum of 1600 every single month in truck payments, just the truck by itself. And that being said, you would need to be at a certain cents per mile to be able to get any kind of money. And so if you don't hit those cents per mile, you will be losing money. And so that was the warning that I was given by other drivers.
Q. I want you to scroll down on the -- the document tilted ICOA to -- to CRST012640.
A. 012 -- 012640?
Q. Correct.
A. Okay.

Q. Are you on that page?
A. Yes.
Q. Okay. Do you see at the top of that page where it says "type of coverage"?
A. Yes.
Q. And Number 1 is nontrucking or bobtail liability insurance?
A. Yes.
Q. Did you elect to get bobtail insurance coverage?
A. Yes.
Q. If you continue to scroll down to the next page, Number 3 is "occupational accident insurance," and again, you elected to obtain occupational accident insurance, correct?
A. Looks like it, yes.
Q. And Number 4 is "physical damage insurance," another election that you made to obtain that coverage, correct?
A. Yes.
Q. And cargo insurance, Number 5 on the next page, again, another election that you made?
A. Yes.
Q. I want to direct your attention, scrolling down -- let me get you a page. Can you scroll down to

Q. And you testified previously that you were making split pay as an employee driver. Is that correct?

A. Correct.

Q. Did you ever calculate how that split pay would compare to what you expected to make as a lease-purchase contractor?

A. There was -- there was a comparison on my part, and that couldn't have been really made accurately because the split pay didn't really apply necessarily to the lease to owner-op program.

Q. Well, it's a completely different structure of -- of compensation, right?

A. Somewhat correct, yes.

Q. Because you would take -- as a -- as a lease-purchase contractor, you would accept or decline loads based on revenue related to those loads, correct?

A. Incorrect.

Q. Oh, yeah. What -- then correct my statement.

A. This would be, you know, purely my experience. Once you are in a -- an area, you do your best to go to exactly where you have been dispatched. You can request to not be dispatched to certain places, but you have no real say in which loads you get because you're not actually going to pick them. You can, of course, say

no, but then you'd be sitting with no work.
Q. And my question is a little bit different, but -- and it relates to the calculation you talked about doing or the comparison you talked about doing between those split mile compensation as an employee and the compensation that you received after signing the ICOA and driving. Okay?
Did you ever -- did you ever attempt to calculate how those two compared to one another, was one higher than the other?
A. One -- are you -- okay. I'll have to ask for clarification. Are you speaking of before or after starting to drive as lease-owner?
Q. Did you ever compare the split-mile compensation that you were making before driving as a lease-purchase operator to the compensation that you were making after beginning driving as a lease-purchase operator?
A. The compensation that I was making was compared, basically, based on what I researched before. That was it.
Q. When you were doing research about CRST as compared to other companies? Is that what -- the research you're talking about?
A. No, before -- I did a little bit of looking

A. Yes, 2015.
Q. Okay. And that's the truck that you leased?
A. Yes.
Q. Okay. And if you had made all the payments under the equipment lease, what was your understanding with who would own the truck?
A. My understanding is, if I made every single payment and, at the end, I was able to make the lump sum payment, then I would own the truck outright and had full permission on it.
Q. Could you have brought -- I'm asking a little bit of a hypothetical here. Instead of leasing a truck from CRST Lincoln Sales, could you have obtained a truck somewhere else or owned one and brought it to the relationship with CRST?
A. I knew of other drivers that did so, but in my situation specifically, did I have the means to? Is that what you're asking or --
Q. Well, I'm asking if you had the freedom to, assuming that you had the means to do it, could you have brought your own truck, and you said that other contractors did so, correct?
A. Yes.
Q. But in your situation, you simply couldn't at the time, right?

A. Yes, exactly.
Q. Okay. Did -- did you investigate leasing a truck from any other company other than CRST Lincoln Sales?
A. Yes, I did, and I did not really have enough money to do that because nobody was doing really zero down or anything like that.
Q. So the lease with CRST Lincoln Sales was the best opportunity available to you to lease a truck with the potential of purchasing it outright, correct?
A. At the time, yes.
Q. While you were under contract with CRST -- and I'm going back to your time with the ICOA, which really corresponds, doesn't it, to the equipment lease that we're looking at? I mean, they're -- they're running at the same time, concurrently. Agree?
A. Could you break that down a little bit there?
Q. Yeah, sure. Sure. Your ICOA and your equipment lease ran, basically, from the same start date to the same end date roughly. Is that a fair statement?
A. Yes.
Q. And while you were under contract with CRST Expedited under your ICOA, did you haul goods for people or companies other than CRST Expedited with that truck?
A. No, not that I -- you couldn't.

question. I thought I asked if you have your tax returns for 2017 and 2018, and you said something to the effect of "I don't have them now," right?

A. I don't have them currently, no.

Q. And have you ever had them?

A. Yes. I have the forms sent to me already, and it was done through AT -- APTS -- ATPS, uh-huh.

Q. And so you did file taxes through that service?

A. I put that service into a filing, yes, but I didn't get to file those taxes for that year. So there's that.

Q. Okay. When you say "that year," what year are you referring to?

A. 2017.

Q. Okay. How about '18?

A. '18, no. Nothing concerning CRST really got filed for that time, so --

Q. I'm asking a little different question. Did you file returns at all, tax returns at all for 2017 or 2018?

A. No.

Q. Okay. And did you give any receipts to your attorneys for the expenses you incurred in operating your truck?

A. No.

STATE OF TEXAS X
COUNTY OF DALLAS X

I, LISA M. DURHAM, Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, do hereby certify that there came before me on January 11, 2022, at the location of the witness in the City of Fort Worth, County of Tarrant, and State of Texas, the following named person, to wit: JACOB ONOLAPO FAPOHUNDA, who was duly sworn to testify the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and his examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness and that signature of the witness, pursuant to Federal Rules of Civil Procedure Rule 30(e)(1)(A) and (B), as well as Rule 30(e)(2):

______ was requested by the deponent and/or a party before completion of the deposition.

XXXXXX was not requested by the deponent and/or a party before the completion of the deposition;

And that the amount of time used by each party at the deposition is as follows:

MR. SPOLYAR: 03:35:49

MS. RAFFERTY: 00:16:47

I further certify that I am neither attorney for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Given under my hand and seal of office on this the 17th day of January, A.D., 2022.

Lisa M. Durham, Texas CSR #6651
Veritext Legal Solutions
Firm Registration #571
300 Throckmorton Street
Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
Expiration Date: 01/31/22