IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated, | Case No. 1:20-cv-00075-CJW-KEM |
| Plaintiffs, | Honorable Judge C.J. Williams |
| v. | |
| CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC., | |
| Defendants. | |

Videotaped Deposition of:

BARRY ROBINSON

Taken on behalf of the Defendants

July 6, 2022

---

ALPHA REPORTING
A VERITEXT COMPANY
RHONDA S. NICHOLSON, RPR
One Vantage Way, Suite D-115
Nashville, Tennessee 37228
(615) 244-4812
www.alphareporting.com

preparing us -- the information for our trucks, to get our trucks and all of that. Met him in the class then.

Q. And so you and Chris then met in California where you paired up in a truck, right?

A. Yes, sir.

Q. And were you and Chris both company drivers?

A. Yes. Yes. We was company drivers when we was together.

Q. And do you know the difference between a company driver and an independent contractor?

A. Not explicitly, but basically I've got the idea.

Q. What does it mean to you?

A. To me, company driver is working for the organization, the company, and getting paid basically by the mile. And a lease purchase or owner-operator, they are -- they supposedly supposed to have their -- their own authority.

They get paid more. They get paid by the load and the rate -- pay rate more than -- more so than getting paid by the mileage. Mileage is kind of -- like 45 cents a mile to 30 cents in a mile. A lease purchase operator don't get paid -- like

they get paid by the load, to my understanding.

Q. How long -- I'm sorry. I didn't mean to cut you off. Were you continuing with your answer?

A. Yeah. I was -- I was saying that -- and they have more control over, you know, what they do, their work, or -- you know, as far as the load is supposed to go. They have more control.

Q. And when you say "control," can you give me any specific examples on what to you means control?

A. You're supposed to have a little more control than a company driver as far as picking your loads and, you know, getting the loads. Not sitting at a certain place for a long period of time waiting on a load. Should be able to get your load and go, supposedly.

Q. Sometimes it didn't work out that way, though, right?

A. No, sir. No, sir.

Q. How long -- I'm going to go back to the time now that you and Chris are paired up on the truck in California. You're both company drivers. How long did you and Chris remain together as a team of drivers?

A. Yes.
Q. And then you said something to the effect of -- you immediately saw an increase in your paychecks after making that switch in driver managers, right?
A. Yes.
Q. My question is: What was the difference between the time before you switched on Melvin's recommendation to after switching to that new driver manager?
A. Well, certain -- certain instances during the period -- driving with Chris -- and after I got with Melvin Hamlin's driver manager, Larry Yeo, my checks were like -- I would work like all seven days a week, and I would make like 6 or $7,000.
And one time my check was like 13 bucks, 11 to 13 bucks. And I'm going like -- you know, I'm going like, How could that be possible, that I work seven days a week and I end up with an $11 check? I -- it's just something I just couldn't understand in my head.
I was going like, If I had been even working at McDonald's, I probably would have got more money than that. I'm going like, Who could I



Veritext Legal Solutions
800-336-4000

page describing a truck tractor?
A. Yes.
Q. Do you recognize what that writing represents?
A. Yes.
Q. What does it represent?
A. The vehicle that I leased.
Q. And was that Tractor Number 622247?
A. Yes.
Q. And on the next page at the top, it says, "Appendix A." And below that, it says, "Contractor Election Form." Do you see that page?
A. Yes.
Q. And under Point 2 which is titled "Base Plates and Permits," there are two options. Do you see a set of initials in one of those blanks?
A. Yes.
Q. Are those your initials?
A. Yes, it is.
Q. Did you write those initials there?
A. I did.
Q. And do you know what base plates and permits are?
A. The license plate?
Q. Right. I'm just asking you: Do you

understand what base plates are?
A. Yes.
Q. And did you elect to have CRST obtain base plates for you under this agreement?
A. Yes.
Q. But you could have declined that option and obtained your own base plates, right?
A. Yes.
Q. And down to the next page -- I'm sorry. I switched over maybe too quickly. Here at the bottom of the page Bates Number 025913, Paragraph 2(B) says "Permits."
And it talks about unified carrier registration under Paragraph 2(B)(1). Then Paragraph 2(B)(2) says "IFTA permit and fuel tax reporting." Do you see those paragraphs?
A. Yes.
Q. Do you understand what unified carrier registration and IFTA permit and fuel tax reporting are?
A. I ain't -- I'm not too sure on the unified carrier registration. I think that -- international fuel tax agreement, IFTA, I understood that --
Q. Is it large enough for you to see or would

you like for me to enlarge it a little bit more?
A. Yeah. Enlarge it a little bit.
Q. Is that better?
A. So the first one is just -- okay. The first one is just a registration, truck registration, right? Yes. I understand.
Q. I'm going to scroll down then to the next page. And do you see an Option 1 and an Option 2?
A. Yes.
Q. And are those your initials next to Option 2?
A. Yes.
Q. And it says, "Carrier shall obtain the IFTA permit and perform all fuel tax reporting services with respect to the equipment," right?
A. Yes.
Q. "And shall deduct or otherwise recover pursuant to Section (6)(A) of this agreement the permit fee with no admin fee to carrier and any additional fuel tax that contractor may owe." Do you see that?
A. Yes.
Q. And you elected to have CRST do that work instead of doing it yourself, correct?
A. Yes, I did.

Q. And you authorized CRST to deduct that from your settlement payments, correct?
A. Yes.
Q. Scrolling down now to the bottom of this page, which is Bates labeled CRST025914. There's another set of initials under Paragraph 3 which starts off "Communications System/EOBR." Do you see those initials?
A. Yes.
Q. Did you write your initials in that Option 2?
A. Yes.
Q. And now we are on the page Bates labeled CRST025920, and the page contains a box. And in the top center of the box it says, "Type of coverage." Do you see that?
A. Yes.
Q. And to the right of that it says, "Initial yes to request coverage." Do you see that?
A. Yes.
Q. And are those your initials at the top of that page in the "yes" blank?
A. Yes.
Q. And over to the next page, "Type of Coverage," it says, "Occupational Accident

Insurance." And, again, there are initials in the "yes" blank. Are those your initials?
A. Yes.
Q. So did you elect to obtain occupational accident insurance?
A. Yes.
Q. And just below that, it says, "Physical Damage Insurance" and another set of initials in the "yes" blank. Are those your initials?
A. Yes.
Q. And you elected to obtain physical damage insurance through CRST; is that correct?
A. Yes.
Q. And over to the next page, the type of coverage is "Insurance for Cargo, Carriers, Trailers and Related Expenses." And are those your initials in the "yes" blank?
A. Yes, it is.
Q. So you elected to obtain cargo insurance and trailer insurance and related expenses through CRST's program?
A. Yes.
Q. And you could have declined it, right?
A. Yes.
Q. Now we're on the page Bates labeled

CRST025923. At the bottom of that page, there's Paragraph 8. It says, "Principal in escrow funds." Do you see that paragraph?

A. Yes.

Q. Do you know what an escrow fund is?

A. Not particularly. No.

Q. How about a maintenance and other reserve fund? Does that ring any bells with you?

A. Yes.

Q. What does that mean to you?

A. That they'll be -- the company, CRST, will be taking money out of my check towards maintenance if the truck breaks down.

Q. And then that money can be applied to fixing the truck?

A. Yes.

Q. And you could elect to have those deductions placed in that account; is that correct?

A. Yes.

Q. And under this Paragraph 8 -- I'm over to the top of the next page now, which is Bates labeled CRST025924.

The top of that page there's a set of initials under Option 2 that says, "Contract" --



Veritext Legal Solutions
800-336-4000

"Contractor chooses not to build any additional principal in the maintenance and other reserve fund."  Are those your initials?
A.      Yes.
Q.      So you elected to have the minimum amount deposited into the maintenance and other reserve fund and then stopping that deduction; is that correct?
A.      Yes.
Q.      But you could have -- or continued to have amounts deducted from your settlement payments and deposited in that account; is that correct?
A.      Yes.
Q.      And is that your signature then at the top of this page?
A.      Yes.
Q.      And over to the next page or the top the center it says, "Omnitracs, LLC, Communication System/EOBR Receipt."  Do you see that page?
A.      Yes.
Q.      Is that your signature?
A.      Yes.
Q.      And did you date that September 23, 2020?
A.      Yes.
Q.      I'm now down to the page that is Bates



Veritext Legal Solutions
800-336-4000

weeks.
Q. But overall, that was a good move for you?
A. Yes.
Q. Did anybody from CRST give you any documents before you signed this independent contractor operating agreement with the company?
A. I'm not sure. I'm not sure on that.
Q. You attended an orientation, right?
A. Yes.
Q. They may or may not have given you documents at that orientation?
A. Yes. They -- I got documents from that orientation.
Q. Do you still have any of those documents today in or until recently did you still have any of those documents?
A. I possibly do, but I can't --
Q. Do you remember -- go ahead. I'm sorry. I cut you off.
A. Yeah. But I can't remember where I put them at. I thought I had -- I don't know where they are.
Q. Did you -- do you recall if you gave any of those documents you obtained in orientation to your attorneys?

A. No, I didn't. Not that I know of. I may have. I'm not sure. I'm not sure.
Q. Understood. Did you read the independent contractor operating agreement before you signed it?
A. As far as -- as much as I could. Yes.
Q. What do you mean by that?
A. I read it, read the agreement. You know, when you're signing things, you -- you briefly read it and just sign it because you're trying to hurry up and finish and get it done and over with. I briefly read over it.
And every now and then -- like when I got in my truck, I start reading -- re-reading it over, try to understand it a little better than when I initially first started.
Q. So you read it briefly before you signed it. And then after you signed it, you went back and you maybe still go back today and look at the terms of the agreement from time to time?
A. Yes. Sometimes. Because maybe it's -- me and my friend, Melvin, might get to talking about -- he said, Did you read your contract? It's in your contract. Then he'll -- you know, we'll be talking about something, and he'll say,

It's in your contract.

And he'll say, Didn't you read it? And I said, Yeah, but I don't remember -- he said, Go back and read it. Then I, you know, try to find the contract and go back and read something me -- me and him was talking about.

Q. And those parts of the contract that -- that you did read, did you rely on them when you signed it?

A. Yes.

Q. Were there any parts of the contract that concerned you, that you had questions about, when you signed it?

A. Yes. For a minute.

Q. And what did you do about those parts? Let me ask that question -- that was a poor question. Let me ask it again.

What parts of the -- of the contract concerned you?

A. More like -- let me see. I can't think of it right now. Some parts of the insurance policy as far as like -- if I get in an accident, you know, how much that that covers, you know, medically and all, that kind of stuff.

And it's other parts of the contract I



Veritext Legal Solutions
800-336-4000

of that area. They'll give me, you know, any load. You know, messy -- messy load. Like it won't pay enough, you know.

Q. So do I understand it correctly that there's freight available from some regions of the country that pays better than freight coming out of other regions of the country; is that fair?

A. Yes.

Q. And in getting a load -- how would you go about getting a load as a lease purchase operator?

A. I just had to rely on CRST getting me the load -- they'll come up with -- saying they'll have to get with planning to get me a load coming out of a certain area.

And then once they get the load, they'll send it to my Raven or Qualcomm. And either I accept it, yes, that I want it, or no. Nine times out of ten, I accept it and say yes because I fear saying no.

Because I'm thinking, If I say no, they're going to let me sit there and say, Well, you turned it down. We gave you a load. You turned it down. We can't -- that's all we had. And now I'll just be sitting there.

So I just take what they offer, you know,

instead of just relying on them to do the right thing and send me a load.

Q. Do you think that they were telling the truth when they said that they had no other loads in -- in those instances where you sat after declining a load?

A. I -- I kind of think -- yes. I do believe they were -- were lying. Because in situations like -- other people is coming out of the same area getting loads. I'm going like, Why am I not one of them?

Why are you telling me that there ain't no loads when this -- others -- you've got all these other drivers are currently -- are currently -- they're -- they're moving out of this certain area. Why can't I? I do think they be lying to me. Some --

You know, it was just like whoever is the best driver, you're going to give him the best loads. That's just the way life is, you know. You ain't going to give it to the person that's late all the time or the person that's not on time all the time.

You're going to give it to your favorite driver that's going to get that load there. So



Veritext Legal Solutions
800-336-4000

C E R T I F I C A T E

I, Rhonda Nicholson, Registered Court Reporter and Notary Public, State of Tennessee at Large, do hereby certify that I recorded to the best of my skill and ability by machine shorthand the proceedings contained herein, that same was reduced to computer transcription by myself, and that the foregoing is a true, accurate, and complete transcript of the proceedings heard in this cause.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

This 21st day of July, 2022.

Rhonda Nicholson

______________________________

Rhonda Nicholson

LCR No. 160, Exp: 6/30/24

My Commission Expires: 3/2/2026

ACKNOWLEDGEMENT OF DEPONENT

I, Barry Robinson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Barry Robinson Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC



Veritext Legal Solutions
800-336-4000