IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ANTHONY CERVANTES and )
MIKE CROSS on behalf ) Case No. 1:20-cv-0075-CJW-KEM
of themselves and all )
others similarly )
situated, )
)
Plaintiffs, )
)
v. )
)
CRST INTERNATIONAL, )
INC., and CRST )
EXPEDITED, INC., )
)
Defendants. )
______________________)

The videoconference videotaped deposition of DARIUS SHINES, called by the Defendant for examination, pursuant to the Rules of Civil Procedure for United States District Courts pertaining to the taking of depositions, taken before A. Christine Hylton, a Notary Public, Registered Professional Reporter, at 10:29 a.m., January 13, 2022, taken remotely from Moline, Illinois.

A. After I got away from being a company driver, more towards a -- an owner-op, I was hoping to be at least in the six-figure range, a hundred thousand, a hundred thousand to 200,000, somewhere in there.

Q. Okay. You mentioned a company driver and owner-operator, correct?

A. Correct.

Q. Do you understand the difference between being a company driver and an owner-operator?

A. I believe I have a good idea what the differences are.

Q. And -- and what is your understanding of the differences?

A. Well, a company driver works for the company. They are employed by W-2, and they get paid a salary, depending on whether it be miles that they drive or -- or time that they drive, I guess.

And an owner-op works for the -- for himself, and either he's in a place to where he can broker his own loads or he has to go through a broker to get loads.

And I -- I -- I understand the -- the money there is much different, because one has a middleman and the other one doesn't.

Q. And which do you understand to be more profitable?
A. The owner-op with discipline.
Q. And when you say "discipline," you mean managing the expenses associated with operating your truck?
A. Not only managing --
MS. RAFFERTY: Objection.
You can answer.
MR. SMEDSTAD: Go ahead.
THE WITNESS: Oh, I'm sorry. Not -- not only managing the -- the money, the -- the actual time, the work that has to be done. It's a -- it's a lot of things that go into it.
BY MR. SMEDSTAD:
Q. You mentioned that some of your family and close friends are owner-operators, correct?
A. Yes.
Q. And are any of those individuals fleet operators?
A. I do -- There are two that have -- they have like three trucks they -- they manage themselves.
Q. And prior to becoming a commercial truck driver, did you have discussions with your family and

A. One of them drives, one of them does not.
Q. And is it your understanding that that's one of the advantages of being an owner-operator, that is, that you can elect not to personally drive the truck that you own?
A. Yes, I understand that.
Q. And did you know that prior to becoming a professional truck driver?
MS. RAFFERTY: Objection to form.
MR. SMEDSTAD: What is the objection?
MS. RAFFERTY: Form.
MR. SMEDSTAD: What -- what -- what is the form objection?
MS. RAFFERTY: I don't understand the question.
BY MR. SMEDSTAD:
Q. Sir, did you understand the question?
A. I think I did.
Q. Did you understand, prior to becoming a professional truck driver, that being an owner-operator would allow you to elect not to personally drive the truck you own?
A. Yeah, I -- yeah, I'd say I understand that.
Q. What was your first Class A driving job?
A. I worked for Swift.

Q. How many contracts did you sign with CRST?
A. Three, in total.
Q. And each of those contracts involved you leasing the truck that you were leasing to CRST, correct?
A. Correct.
Q. Did you read Exhibit 1 prior to signing it?
A. I did not read the entire document, no. There was a lot of, like, gazing through it.
Q. The first contract that you signed with CRST was in 2018; is that correct?
A. I believe that's -- yes.
Q. And did you read that contract prior to signing it?
A. It was the same, kind of -- kind of gazed through it. Didn't read the whole thing, no.
Q. Why didn't you read the whole thing?
A. Well, it's given to you, I believe at the end of the first day of the orientation for the lease operators, and they give it to you to take back to your room to read it, but -- the very next day -- and you've been going in orientation all day -- I didn't -- I didn't take the time to read the whole thing that night.
Q. When you decided to become a lease operator

again. You broke up.

MR. SMEDSTAD: How long did you operate under your first contract as a lease operator from -- for CRST?

THE WITNESS: I think it was just a little over a month.

BY MR. SMEDSTAD:

Q. Why did you decide to leave?

A. There -- there was a -- another lease operator in the same orientation as me. A couple of us had started friendships where we'd talk to each other. And that particular person that I'm talking about came up with a pay issue with CRST, and this was within a month. And it was to the tune of the sum of maybe $3,000 that they took back from him, which was supposed to be payment to him.

And there was another gentleman that had worked there previously before, who had kind of said that there are some things that you might not like here and whatnot.

You know, with what I had just seen happen, or what I had heard from this other gentleman that happened, and what I was listening to from the other gentleman, for me, it was a situation where, um, I don't want to be next on the list, so I decided

I think I may, you know, try my luck someplace else. So that was the reason for me leaving.

I knew I could not -- I could not go through with the situation where I had been working for a couple of weeks, and the money that I thought that I was going to receive was just not there. And I was being told that A, you owe us in fuel, and, no, you don't -- you don't have a paycheck. I -- I couldn't go through what he was going through, because I was already in the hole.

And I -- I figured if I got a guy who's been here before, telling me stuff like this has happened before, I just didn't want that to be me.

Q. So I want to unpack what you've said here.

The individual who came up with a pay issue with CRST, what was his name?

A. Jay.

Q. Jay what?

A. I can't remember his last name. We -- we only knew each other by first name. It was Jay.

Q. And there was another individual who told you that there were some things that you would not like working with CRST, correct?

A. Right.

Q. What was that individual's name?

A. Now I don't remember his name at all.
Q. At the time that Jay told you about this pay issue, you said you didn't want to be the next person with a pay issue, correct?
A. Correct. Correct.
Q. Because you'd already dug yourself a big hole with Swift, correct?
A. Correct.
Q. At the time that you decided that you did not want to be next, had you had any discrepancies in the pay that you received from CRST?
A. No. No.
Q. And I believe you told me a bit ago that one of the reasons you were comfortable signing the contract without fully understanding it or reading it was that you knew you could get out of the contract easily, correct?
A. Correct.
Q. And were you able to get out of the contract easily, when you terminated it after being a lease operator for approximately one month?
A. Yes, I was able to get out of it.
Q. What did you do after you terminated your contract, your first contract with CRST?
A. I went to work for another trucking

couldn't tell you. I don't know exactly when I -- when I stopped. I don't remember.

BY MR. SMEDSTAD:

Q. Why did you terminate your second contract with CRST?

A. The second time was when I was -- that's when some of the issues had arose that I had heard about, as far as there had been times where I'd been sitting for a little bit and couldn't get a load. I mean, that was -- that was the biggest issue; I couldn't get a load sometimes.

And then that, along with I kind of needed a break from the -- the new students. It kind of of gets nerve wracking. Sometimes you -- I mean, if you could imagine someone who teaches driving, and it's -- it's -- it's a little -- it draws on your anxiety, I guess. I kind of needed to pull back away from it, get a -- get a mental, mental and physical rest from it.

But the biggest thing is I was having some issues with the -- with the loads. Sometimes they weren't coming as frequently as I would have liked them to.

Q. Anything else other than sitting for a bit waiting for loads and needing a break from the

students?

A. Not that I can think of right now. It could have been, but I -- I can't think of anything else right now.

Q. I want to go back to Exhibit 1, which you'll recall is the contract you signed with CRST in August of 2019. Do you recall looking at that?

A. Yes.

Q. All right. I'm going to share my screen with that exhibit again.

Just to refresh your recollection, this page that I'm showing you on Exhibit 1 is CRST13310, and do you see a signature there --

A. Yes.

Q. -- on the left-hand side?

A. Yes.

Q. Is that yours?

A. Yes.

Q. And that -- the date of that signature appears to be August, what, 23rd, 2019?

A. Maybe 27th. I don't know.

Q. Yeah. And going to the next page, there is -- there are some initials next to it.

And option 1, under Base Plates, do you see those initials?

were going to sign that contract at the time that you went into orientation, correct?

MS. RAFFERTY: Objection to the form.

MR. SMEDSTAD: Is that correct?

THE WITNESS: Yeah, I'd pretty much made up my mind that I was going to work for the company, yes.

BY MR. SMEDSTAD:

Q. Because, as you said, it was easier to go back to what you knew, correct?

A. Correct.

Q. And how long were you operating under your third contract with CRST?

A. I believe it was from October to March of 2000 (sic).

Q. Of 2020?

A. Of 2020, I believe. I'm -- I'm not -- I'm not a hundred percent certain.

Q. October of 2019 through March of 2020 is the best of your recollection?

A. I believe so.

Q. And in your third contract, were there certain programs, insurance programs that you elected to participate in through the company?

A. I -- I believe so. I believe the -- the

MR. SMEDSTAD: Go ahead and answer. She's just making a record.

THE WITNESS: Oh, I -- I can't say that I knew all of the things in the contract, if they were unfair or not.

As far as from what I read previously, I couldn't say that what I read anything was unfair.

But the stuff that I didn't read, I couldn't tell you if it was unfair or not.

BY MR. SMEDSTAD:

Q. In practice, did you consider any of the terms under your third contract with CRST unfair to you?

A. Yeah. Yeah.

Q. What term was that?

A. As far as being able to use my truck for another company, or for another -- other loads that I could possibly find myself.

Q. And what was unfair, and what was -- what would you have liked the term to have been?

A. I -- I would have liked to be able to use my truck, obviously, for whatever I needed to use it for, in order to make money.

Q. Did you have any opportunities to use your truck other than hauling for CRST that CRST prevented

you from pursuing?

A. Well, I would have to say I...I would have to say yeah, they prevented me, because I -- I tried to adhere to the terms of the contract, and I -- I couldn't -- I couldn't get that done.

Q. How did you know that CRST was going to preclude you from hauling for another carrier with the truck that you were leasing to CRST?

A. One of those times where I was waiting for a load, and I had time on my hands, I know that I had skimmed over it before, about using the truck for other companies.

And I went and tried to reread that portion of the contract, which I did, and I thought that I was going to be able to use my truck according to the -- the contract.

But the only thing that was different about that was that or that was iffy about it was that I had to get their permission, and they had to obviously allow me to do it.

Q. Did you ever seek permission from CRST to use your truck to haul for other companies?

A. I called Ben Lyser personally and left him numerous voicemail messages.

Q. What opportunities did you identify to haul

for other companies with your truck?

A. I -- I can't say that I identified any other opportunities, because I had to first get the permission.

Q. Why were you asking for permission, if you didn't have opportunities to haul for other companies?

A. Because it makes no sense to look for other loads, if you don't have the permission.

Q. Did you ever look for other loads to haul for other companies?

A. Yes, I did.

Q. And did you find any?

A. No, I didn't find any, but I'd only looked for a little while. I only looked for a little time, but I figured it didn't make a difference, if I didn't have the permission anyway.

Q. So that the record is clear, while you had some down time, you reviewed terms of the contract you had signed that related to your ability to use your truck hauling for other companies; is that correct?

A. That is correct.

Q. And you determined that in order to do so, you would need permission from CRST, correct?

A. That is correct.
Q. And you left several voicemails for Ben Lyser requesting permission, correct?
A. Correct.
Q. But during this time, despite looking, you were not able to find any loads that were available for you to use your truck to haul for other companies; is that correct?
MS. RAFFERTY: Objection --
THE WITNESS: That --
MS. RAFFERTY: -- misstates prior testimony.
MR. SMEDSTAD: Go ahead.
THE WITNESS: I would say that is correct, because in trying to look for the loads, I found out that there's information about the truck that I'm going have to give out. That's more so part of the reason why I couldn't really look for loads anyway, because I have to give them specific information about the truck that I'm using, and I can't get that unless I get permission first.
BY MR. SMEDSTAD:
Q. Let me ask -- let's get a straight answer to this question.
Did you look for loads to haul for other

companies, using the truck that you were leasing to CRST?

A. Yes.

Q. Did you find any loads that were available to haul for other companies?

A. No.

Q. During the time that you were operating under your third contract with CRST, did CRST fail to honor any of its obligations to you under that contract?

A. I would say yes.

MS. RAFFERTY: Objection, foundation.

BY MR. SMEDSTAD:

Q. What terms did CRST fail to honor?

A. I -- I would say giving me the permission to use my truck, how I needed to use it to make money.

Q. Anything else?

A. No. No.

Q. And again, to cover the point, you never found any loads that were available for you to haul for other companies, despite looking, correct?

A. Right, because I'm lacking information.

Q. What information were these companies asking you for that you felt you couldn't provide?

A. I definitely had a copy of the con -- contract.

Q. So you were able to look through the contract to see if the information these companies wanted to know about your truck was in that contract, correct?

MS. RAFFERTY: Objection, asked and answered.

MR. SMEDSTAD: Go ahead and answer, sir.

THE WITNESS: I -- I had the opportunity to look, yes.

BY MR. SMEDSTAD:

Q. Did you?

A. I did not.

Q. Did CRST -- did anyone from CRST prevent you from providing the information that these other companies were asking for about your truck?

A. I -- I don't know if they were preventing me or not.

I don't -- I don't -- I didn't know where to look for the answers for the questions I was being asked.

Q. Well, my question is different.

I'm asking you whether anyone from CRST prevented you from providing the information that the

other companies were requesting about your truck?
A. That's what I'm saying, I don't know. I didn't know where to look for the answers for what I was trying to get. What I was trying to do, I didn't know where to look for that stuff from.
Q. Well, then, let's try and find the information that we're talking about.
You said the companies wanted to know about the insurance that was on your truck, correct?
A. I believe that was, yeah, I believe that was something they were asking about.
Q. And that information was contained in the contract that you signed, correct?
A. I -- I don't know. Was it?
Q. Well, let's take a look.
Again, I'm showing you Exhibit 1. Exhibit 1 shows the type of Non-Trucking (Bobtail) Liability Insurance on your truck, correct?
A. Okay.
MS. RAFFERTY: Objection, foundation.
MR. SMEDSTAD: He can say no, it doesn't.
MS. RAFFERTY: This contract doesn't cover the time period that we're talking about here.
BY MR. SMEDSTAD:
Q. Sir, you told me previously that all of the

these companies were asking for about your truck?
A. No, I can't -- I can't recall what all. I just remember insurance was one of them.
I don't know all of the questions that were asked. This is a couple of years ago.
Q. Do you recall ever asking anyone from CS -- CRST for the information that these companies were requesting about your truck?
A. Well, that -- that was my intention of asking Ben. That's -- that was the reason that I called to get the permission.
Q. Well, what, exactly, did you ask of Ben?
A. Well, I just laid -- left a brief message of I was calling to see if I could get the permission to use my truck for other companies, and for him to please call me back, and I left my phone number.
Q. Did you say anything else?
A. I don't remember saying anything else. I -- I know I just gave a general brief what I was calling for.
Q. Did Mr. Lyser return your calls?
A. No, he did not.
I called him plenty of other times before, and he's called me back, which is why I kind of found that odd, that he wouldn't call me back in

this instance.

Q. How many times did you leave a message for Mr. Lyser?

A. I believe it was either two or three times for this particular thing, but I had talked to Ben a couple of other times, but I had to just leave a message. I would have to say total maybe six or seven messages, I've left for Ben.

Q. Requesting permission to use your truck --

A. No.

Q. -- for other companies?

A. No, they weren't all for that.

I'm saying over the course of my time with CRST, possibly six or seven times I've left him a message to call.

Maybe three times is when I called just for this instance to get permission to use my truck.

Q. Other than not getting permission to use your truck to haul for another company, did CRST fail to honor any of its obligations to you under the third contract you signed with CRST, to the best of your knowledge?

A. To the best knowledge --

MS. RAFFERTY: Objection, foundation.

MR. SMEDSTAD: Go ahead and answer, sir.

failed to honor?

A. Not that I had read and known about. No, I can't say, no.

Q. You told me a bit ago that you understood that you could have someone else drive your truck instead of you, correct?

A. As far as this company goes?

Q. Yes.

A. No, that wasn't as far as CS -- CRST, that was as far as me being an owner-operator. That was under the premise of me knowing -- being an owner-operator, that I could possibly have someone else driving my truck.

Q. When you were training a new employee, those individuals are not you, correct?

A. Correct.

Q. And they were driving your truck, correct?

A. Correct. I'm -- I'm thinking that you mean alone, like me employing them.

Q. Do you know whether you had the option to employ another individual to drive the truck that you were leasing to CRST?

A. Yeah, I believe that was mentioned, yes.

Q. So you knew you could do it?

A. I guess so. I -- I -- I -- I wasn't

very -- I'm not very knowledgeable on that aspect of working with CRST. It was -- it was explained, I believe, but it's so confusing. It was something that I really wouldn't want to get into, but I do believe, yeah, it was explained, and someone could drive the truck.

And I believe I had seen people that owned trucks, and they had a couple of the -- company drivers driving their truck, but I didn't know how that was to be done. I hadn't had no experience in it, and I really didn't have an interest in it, in working for CRST.

If I was going to do that, I would have wanted to just own my own truck outright and, you know, did that on my own, not -- not through the company.

Q. Do you know whether other lease operators hired other individuals to drive their trucks?

A. Yeah, I believe I'd heard of that, yep.

Q. Did anyone from CRST prevent you from hiring others to operate your truck?

A. No.

Q. When you were not driving your truck for CRST, did CRST place any restrictions on what you could do with your time?

A. What I could do with my time?
Q. Correct.
A. No, I -- no, I don't think they had any restrictions, at least they didn't express them to me.
Q. If you had hired someone else to operate your truck, you could have worked for any other company that would hire you, true?
A. I'm sorry, re -- reask that question again, so I can try to understand.
Q. If you had elected to hire someone else to operate your truck, you could have gone and worked for any other company that would hire you, correct?
A. I guess that's in the realm of possibility, yeah. If I had someone else driving, I could possibly go someplace else and work, possibly.
Q. CRST didn't place any restrictions on your ability to do work for other companies if you hired someone else to operate your truck, correct?
A. Right.
Q. So, for example, if you had decided to hire someone else to operate your truck, you could have gone and worked as a company driver for another motor carrier, correct?
A. Correct.

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter, Registered Professional Reporter and Notary Public, do hereby certify that I acted as the Registered Professional Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to typewriting under my supervision and direction, correct transcript of the shorthand notes so taken; that said deposition was not submitted to the witness for signature.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 17th day of January, 2022.



A. Christine Hylton
Registered Professional Reporter
and Notary Public