# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, *individually and on behalf of all other similarly situated persons*, | No. 20-CV-75-CJW-KEM |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| vs. | |
| CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC., | |
| Defendants. | |

---

## TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ............................................................... 4

II.  DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION ...................... 6

    A.   Applicable Law........................................................................ 6

    B.   Analysis.................................................................................. 8

        1.   Control.................................................................... 10

        2.   Relative Investments ................................................. 14

        3.   Opportunity for Profit and Loss .................................. 15

        4.   Skill and Initiative ................................................... 18

        5.   Permanency of the Relationship .................................. 19

1

      6.      Integral to the Business ……………………………………………20

   C.     Conclusion ……………………………………………………………20

III.     PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ………20

   A.     Additional Relevant Facts for Plaintiffs' Summary Judgment Motion ….21

   B.     Summary Judgment Standard …………………………………………34

   C.     Employees or Independent Contractors …………………………………36

      1.      Applicable Law ……………………………………………………36

      2.      Analysis ……………………………………………………………37

          a.      Control ……………………………………………………38

          b.      Relative Investments …………………………………41

          c.      Opportunity for Profit and Loss……………………44

          d.      Skill and Initiative ……………………………………46

          e.      Permanency of the Relationship……………………48

          f.      Integral to the Business……………………………50

      3.      Conclusion …………………………………………………………51

   D.     Truth in Leasing Act …………………………………………………51

      1.      Applicable Law ……………………………………………………51

      2.      Analysis ……………………………………………………………52

        3.      Summation ……………………………………………………53

    E.    Conclusion ……………………………………………………54

IV.    DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ……..54

    A.    The Owner-Operator Exemption ………………………………….55

    B.    Statutes of Limitation……………………………………………68

        1.      Equitable Tolling……………………………………………69

        2.      FLSA Statute of Limitations ……………………………….73

    C.    Plaintiffs' Unlawful Deductions Claim …………………………….74

    D.    Plaintiffs' Unjust Enrichment Claim………………………………79

    E.    Plaintiffs' Fraud Claim…………………………………………81

V.    CONCLUSION …………………………………………………85

Case 1:20-cv-00075-CJW-KEM   Document 368   Filed 05/28/24   Page 3 of 85

This matter is before the Court on three motions: a motion for partial summary judgment by both parties, and a motion by defendants to decertify plaintiffs as a class and collective. Specifically, on January 31, 2024, plaintiffs filed their motion for partial summary judgment, (Doc. 328), which defendants resisted. (Doc. 354). Plaintiffs filed a reply to defendants' resistance. (Doc. 362). Also on January 31, 2024, defendants filed a motion for partial summary judgment, (Doc. 333), which plaintiffs resisted. (Doc. 352). Defendants filed a reply to plaintiffs' resistance. (Doc. 364). Also on January 31, 2024, defendants filed a motion to decertify plaintiffs' collective and class action, (Doc. 331), and a brief in support, (Doc. 342), which plaintiffs resisted. (Doc. 346). Defendants filed a reply to plaintiffs' resistance. (Doc. 358).

For the following reasons, the Court **denies** defendants' motion to decertify the collective and class action, **grants-in-part and denies-in-part** plaintiffs' motion for partial summary judgment, and **grants-in-part and denies-in-part** defendants' motion for partial summary judgment.

## I. *FACTUAL BACKGROUND*[1]

Defendant[2] provides transportation services to customers throughout the United States by delivering the customers' freight. (Doc. 342, at 10–13). Defendant engages two types of drivers to deliver the freight: so-called "company drivers," who defendant classifies as employees, and other drivers, who defendant classifies as independent

---

[1] The Court limits the facts in this section to those necessary for the motion to decertify. The Court includes a more detailed fact section, based upon the parties' statements of undisputed facts and responses, in the section of this order below regarding the cross-motions for partial summary judgment.

[2] The parties generally discuss defendants CRST International, Inc. and CRST Expedited, Inc. as though they are the same entity throughout the briefing. The Court follows the parties' lead and discusses the two defendants as though they are one throughout this order.

contractors, sometimes called "lease operators."[3]  Plaintiffs are a group of drivers who fall into the second category—that is, defendant classified them as independent contractors.  Plaintiffs, however, claim they were employees of defendant, and not independent contractors.  Thus, plaintiffs argue they were misclassified, leading to underpayment in violation of various laws.  Thus, the central issue throughout this litigation is whether plaintiffs were employees or independent contractors.

The Court previously conditionally certified plaintiffs' Fair Labor Standards Act ("FLSA") claim as a collective action.  (Doc. 147).  The class definition for the collective action is:

> All drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an Independent Contractor Operating Agreement (ICOA) and who have not leased more than one truck at a time to CRST.

(Doc. 157).

The Court also previously certified two of plaintiffs' claims—a claim under the Iowa Minimum Wage Law ("IMWL") and a claim under the Truth in Leasing Act ("TILA")—as class actions under Federal Rule of Civil Procedure 23.  (Doc. 296).  The class definition for these claims is:

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST Expedited, Inc. during the applicable limitations period, subject to any equitable tolling and

---

[3] Defendant refers to these drivers throughout the briefing materials as "contractors," and plaintiffs refer to the drivers as "lease operators."  The Court will refer to this group of drivers as either "drivers" or "lease operators."  The Court does not mean to imply any legal conclusion by using these terms instead of contractors.  Clearly, the main issue in this litigation is whether plaintiffs are independent contractors or employees.  Referring to the drivers as "contractors" throughout might indicate a legal conclusion, just as calling them "employees" throughout might indicate a legal conclusion.  Thus, the Court will stick with "drivers" or "lease operators."

equitable estoppel.

(*Id.*, at 23) (footnote omitted).

As noted above, this order covers three separate motions.  The Court will discuss defendant's motion to decertify first, then the cross-motions for partial summary judgment.  The Court will discuss additional facts within the analysis of each separate motion as necessary.

## II.  DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' FLSA COLLECTIVE ACTION AND RULE 23 CLASS ACTION

### A.  Applicable Law

The FLSA enables employees to maintain a collective action against their employer on behalf of "themselves and other employees similarly situated."  29 U.S.C. § 216(b).  Class members must file a consent to sue to become a party plaintiff in a collective action under the FLSA.  *Id.*; *see also Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 536 (8th Cir. 1975).  This Court has employed a two-step approach to determine whether it is appropriate to certify a collective action under the FLSA.  *See, e.g.*, *Salazar v. Agriprocessors, Inc.*, No. 07-CV-1006-LRR, 2008 WL 782803, at *4–5 (N.D. Iowa Mar. 17, 2008).  "The two-step approach 'distinguishes between conditional class certification, generally made at the 'notice stage,' and a final class certification determination made after discovery is largely complete."  *Id.* at *4 (quoting *Dietrich v. Liberty Square, L.L.C.*, 230 F.R.D. 574, 577 (N.D. Iowa 2005)).

The first step is conditional certification, where a plaintiff moves to conditionally certify the action early in the case for purposes of providing notice to similarly situated persons.  *Id.*  This lenient standard requires that a plaintiff "merely provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist."  *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 892 (N.D. Iowa 2008) (internal quotations and citation omitted).  Under the FLSA, "[t]he sole consequence of conditional

6

certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court[.]" *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) (internal citation omitted). Here, the Court conditionally certified the collective action under FLSA in January, 2021. (Doc. 147).

The second step—final certification—occurs at the close of discovery. *Frazier v. PJ Iowa, L.C.*, 337 F. Supp. 3d 848, 861–62 (S.D. Iowa 2018). It is plaintiffs' burden at this stage to "demonstrate that they are similarly situated, which is proved if they 'suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Judkins v. Southerncare, Inc.*, 74 F. Supp. 3d 1007, 1009 (S.D. Iowa 2015) (quoting *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014)). This second stage is a fact-intensive inquiry which requires the Court to consider the following factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Bouaphakeo*, 765 F.3d at 796 (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)) (alteration in original). Defendant's motion to decertify at issue here comes at this second stage, at the close of discovery, under the stricter level of scrutiny.

The Court also previously certified plaintiffs' claim under Iowa Code Chapter 91D—the IMWL—and plaintiffs' claim under the federal leasing regulations, 49 C.F.R. § 376.12(g), as class actions under Federal Rule of Civil Procedure 23. (Doc. 296). Under Rule 23(b)(3), the section the Court used to certify plaintiffs' IMWL and federal leasing claims, and the section defendant focuses its argument on, "the district court may certify a class action if it 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3)). The main issue in determining whether common questions of law or fact predominate is "whether the defendant's liability to all plaintiffs may be established with common evidence." *Id.* (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). "[T]he burden of showing that class litigation is appropriate generally remains on the plaintiff at all times during litigation." *White v. Nat'l Football League*, 756 F.3d 585, 594 (8th Cir. 2014).

So, under the FLSA claim, the issue is whether the plaintiffs are similarly situated. Whether plaintiffs are similarly situated takes into account the factual and employment settings of the plaintiffs, any individualized defenses that defendant potentially has against certain plaintiffs, and other fairness and procedural considerations. Under the claims certified as class actions, the main issue is whether common questions of law or fact predominate, which depends in large part on whether defendant's liability to each member of the class can be established with common evidence.

### B.     Analysis

Although the merits of plaintiffs' claims are not necessarily at issue in the motion to decertify, the factors of the underlying claims are highly relevant in determining whether plaintiffs are similarly situated or whether plaintiffs can establish their case against defendant using common evidence. The major issue in this litigation, and the only issue the parties discuss in their briefing on this motion, is whether plaintiffs were employees or independent contractors.

Under plaintiffs' FLSA claim, courts generally use the economic realities test in determining whether a party is an employee or an independent contractor. *See Walsh v.*

8

*Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022).[4]  This test examines six factors concerning the relationship between the alleged employer and alleged employee:

> (1) "the degree of control exercised by the alleged employer over the business operations;" (2) "the relative investments of the alleged employer and employee;" (3) "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer;" (4) "the skill and initiative required in performing the job;" (5) "the permanency of the relationship;" and (6) "the degree to which the alleged employee's tasks are integral to the employer's business."

*Id.* (quoting *Karlson*, 860 F.3d at 1093).  When considering the factors, "[n]o one is controlling nor is the list complete." *Karlson*, 860 F.3d at 1092 (quoting *United States v. Silk*, 331 U.S. 704, 716 (1947)).  Also, a contract between the alleged employer and employee which labels the alleged employee as an independent contractor "may be relevant but is not controlling." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)).

Thus, for the FLSA claim, the issue for the purposes of the motion to decertify is whether the plaintiffs who have opted into the collective are similarly situated when considering the six factors of the economic realities test as well as any other relevant considerations.  For plaintiffs' claim under Iowa law, the IMWL, the Court will also use the economic realities test.  Thus, the only difference in the decertification analysis

---

[4] In a footnote, the *Alpha & Omega* court appears to question whether the economic realities test accurately reflects the inquiry under the FLSA's definition of "employ." *See Alpha & Omega*, 39 F.4th at 1082 n.2; *see also Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089, 1092 (8th Cir. 2017) (noting that many courts use the economic realities test, "though neither the Supreme Court nor [the Eighth Circuit Court of Appeals] has ever held that it is the governing standard."). In *Alpha & Omega*, the court "assume[d] without deciding that the economic realities test is appropriate in determining whether a worker is an employee or independent contractor under the FLSA." 39 F.4th at 1082.  The parties here make their arguments under the economic realities test, so the Court will follow their lead and analyze the issue under this test.

9

between the FLSA collective and the Rule 23 class comes in the standards for certification. There is no difference between the tests used to determine whether plaintiffs are employees or independent contractors under the two claims.[5]

The Court will analyze how similarly situated the plaintiffs are under each factor of the economic realities test. The Court will also analyze whether common questions of law or fact predominate under each factor, which generally turns on whether plaintiffs can use common evidence to prove their claim.

### 1.    Control

Under this factor, courts generally consider "the alleged employer's right to control the way work is performed." *Alpha & Omega*, 39 F.4th at 1083. The *Alpha & Omega* court noted several "manifestations of control" other courts have found important under this factor, including: whether the alleged employer set hours for drivers, *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 146 (3d Cir. 2020); whether the workers were free to reject projects, *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019); and "workers' ability to determine their own schedules, mandatory guidelines during working hours, ability to set fee for services, and ability to perform services at other establishments." *Alpha & Omega*, 39 F.4th at 1083 (citing *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1060–61 (6th Cir. 2019); *Acosta v. Paragon*

---

[5] The parties make certain arguments concerning plaintiffs' IMWL claim under Iowa's common law standard for determining whether a person is an employee or independent contractor. (Docs. 342 & 346). The factors of the Iowa common law standard are listed in *Fesler v. Whelen Engineering Co.*, 688 F.3d 439, 442–43 (8th Cir. 2012). This Court initially used the Iowa common law test for plaintiffs' claim under Iowa law when discussing the issue of class certification. (Doc. 276, at 20). Later, however, the Court granted plaintiffs' motion to reconsider, (Doc. 296), where the Court held that analyzing the issue under the Iowa test was a clear error of law. (*Id.*, at 9). In the order granting the motion to reconsider, the Court noted that "the parties agree that using the economic realities test is appropriate and the Court concurs." (*Id.*). Thus, it has already been established in this litigation that the economic realities test is the appropriate test in analyzing plaintiffs' IMWL claim. Notably, the two tests cover substantially the same factors, but word the factors differently.

*Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241–42 (4th Cir. 2016)). This, of course, is not an exhaustive list of the subfactors to be considered within the control factor.

Defendant points to three aspects within the control factor where it argues members of the class of plaintiffs gave conflicting deposition testimony. Defendant focuses on the issues of whether the drivers set their own schedules, whether the drivers planned their own routes (as opposed to defendant directing the drivers to take a certain route), and whether the drivers had the ability to refuse loads. (Doc. 342, at 10–11).

One consideration here is the drivers' ability to set their own schedules. Cervantes, a named plaintiff, stated that the hours he worked varied from day to day, and he set up when he left and when he stopped. (Doc. 332-7, at 19). Robert Corpening, another driver, stated that he drove as close to seventy hours as he could just about every week he drove for defendant. (Doc. 332-12, at 24). Cross, the other named plaintiff, testified, concerning when drivers worked, that "it all depends on the driver," and that he chose to drive 8:00 AM to 5:00 PM Monday through Friday. (Doc. 332-11, at 25–26). Three other drivers testified that they essentially could choose the days they drove and could take breaks when they wanted. (Docs. 332-13, at 13; 332-17, at 6; 332-18, at 16).

The Court fails to see any conflicting testimony on this subfactor. The drivers did not each work the same hours, but all of the testimony defendant points to here appears consistent. Each driver could choose the hours they drove. The issue for the substantive analysis here will be whether drivers had the ability to set their own schedules. *See Alpha & Omega*, 39 F.4th at 1083. Although these drivers' testimony about the details of their schedules may differ, their testimony about their ability to set the schedule appears to be entirely consistent.

Another subfactor here is the drivers' ability to choose the routes they drove.

Cervantes testified that he selected the routes he traveled "for the most part," with certain exceptions on one stretch of road on Interstate 70 on which drivers were "forbidden to go." (Doc. 332-7, at 14). Corpening said that generally he was free to choose the route he took, except one instance in the approximately four years he drove for defendant, when defendant told Corpening to take a certain route, and when Corpening told them he "wasn't gonna go that route," defendant canceled the load. (Doc. 332-12, at 26–27). Joseph Gess, another driver, generally followed the route defendant suggested, "unless, in [his] experience, [he] had traveled them roads and know something that was shorter." (Doc. 332-15, at 2). Linda Gravelle, another driver, generally chose the routes in making pickups and deliveries, though she noted that defendant placed a restriction on a stretch of Interstate 70—apparently the same restrictions Cervantes testified to. (Doc. 332-16, at 2–3). Driver Justin Lomax said that defendant "pretty much told us where to fuel up," and that defendant "put that in our route," but Lomax also noted that sometimes he would fuel up elsewhere because "[s]ometimes you had to do what you had to do." (Doc. 332-18, at 17–18). Lomax also characterized the interaction as defendant "saying that these are the truck stops that [defendant] would like [the driver] to fuel up at." (*Id.*). Driver Eugene Thompson testified that defendant would usually give him a route to take with certain gas stations on the route. (Doc. 332-20, at 11).

Although it appears here that drivers generally had the ability to choose their routes, several courts have held that a driver's ability to choose a route is of little importance under the control factor. Courts have noted that "the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 668 (7th Cir. 2022) (quoting *Narayan v. EGL, Inc.*, 616 F.3d 895, 904 (9th Cir. 2010)). The Court agrees with the Seventh and Ninth Circuit on this front, meaning any difference in testimony concerning the drivers' ability to choose a route—if there is any meaningful

difference—holds little weight here.

Another consideration here is the drivers' ability to reject loads defendant offered them. Cervantes testified that he "had the right to refuse" a load defendant offered him, but "then that didn't guarantee me another load." (Doc. 332-7, at 4). Cervantes also said that "if you refused a load, you sat," meaning a driver would have to wait longer until defendant offered them another load. (*Id.*, at 2). Driver Derrick Daniel testified that he could, and did, turn down loads defendant offered him, but the consequence of doing so was to go to the end of the line and sit longer without a load afterwards. (Doc. 332-8, at 11). Driver James Edden said that he had the ability to reject loads, but that he "took most of the loads [defendant] sent [him], though, because . . . you never knew when the next load was going to come to you." (Doc. 332-13, at 14–15). Three other drivers testified that they also could turn down loads, but felt pressured to accept offered loads for the same reasons given by the other drivers. (*See* Docs. 332-21, at 11–12; 332-26, at 15–16; 332-27, at 2–3). Driver Terry Evans testified that an "owner operator is allowed to refuse a load." (Doc. 332-9, at 3). Driver Christopher Fink, who originally was a company driver—the group of drivers defendant classified as employees—testified that he later chose to become a lease operator because he disliked delivering loads within cities, and he was "not doing another city job." (Doc. 332-10, at 8). Finally, Corpening testified that he could choose to deny a load. (Doc. 332-12, at 25).

The Court again fails to see any material difference in the drivers' testimony. Some drivers stated that they had the right to refuse loads and that they in fact refused loads at times. Other drivers said that they felt pressure to accept loads, or that there were negative consequences for turning down loads. These two perspectives are entirely consistent. The drivers understood that they had the right to turn loads down, and exercised that right at times, but they also generally felt that turning down loads was a bad idea and came with certain consequences. After looking through the extensive

13

evidentiary record compiled for the purposes of the three motions at issue in this order, it appears to the Court that the drivers' ability to turn down loads—both theoretically and in reality—may be the factor in which the drivers agree most with each other. Thus, as for the control factor, the drivers are similarly situated, and common questions of fact predominate.

### 2. *Relative Investments*

The second factor of the economic realities test is "the relative investments of the alleged employer and employee." *Alpha & Omega*, 39 F.4th at 1082. This factor considers "the amount the worker has invested in the business" which is "compared to that of the alleged employer." *Roeder v. Directv, Inc.*, No. C14-4091-LTS, 2017 WL 151401, at *16 (N.D. Iowa Jan. 13, 2017) (citing *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989)).

Defendant essentially concedes that plaintiffs are similarly situated for the purposes of this factor. (Doc. 342, at 16–17). Defendant argues, however, that "[b]ecause class membership is limited to individuals who leased a truck from CRST Lincoln Sales, Inc. (Lincoln Sales), it artificially excludes the experiences of Contractors, operating under the same leases, who leased a truck from another source or owned their truck outright." (*Id.*, at 17). Thus, defendant says it is "unsurprising" that opt-ins testified that they all leased trucks from CRST Lincoln Sales, Inc., considering the fact that the class definition excludes any drivers who did not lease from CRST Lincoln Sales, Inc. (*Id.*).

The issue for the purposes of this motion to decertify is generally whether the drivers within the collective or the class are similarly situated. Although defendant may have a point that there may be an artificial reason all drivers in the class are similarly situated under this factor, the fact remains that they are similarly situated. For the purposes of the motion to decertify, the reason the drivers are similarly situated is

14

irrelevant. The drivers are similarly situated under this factor, as defendant concedes, and, thus, this factor does not provide any ground to decertify.

### 3. *Opportunity for Profit and Loss*

The third factor considers "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer." *Alpha & Omega*, 39 F.4th at 1082. For this factor, "courts generally consider whether workers had control over profits and losses depending on their 'managerial skill.'" *Id.* at 1084. "A worker exercising managerial skills such as setting his own hours and rates along with the ability for the worker to earn additional income through his own initiatives indicate control over profits and losses." *Id.* The *Alpha & Omega* court found significant which party set the drivers' rates and who facilitated trip assignments, drivers' ability to earn additional income through their own initiatives, and "whether drivers could provide services independent of their work for" the defendant. *Id.* at 1084–85.

Defendant cites to the testimony discussed above in section 1, the "Control" factor, generally relating to setting schedules and deciding whether or not to accept loads. (Doc. 342, at 18). Defendant specifically points to driver Roderick Fisher's testimony that he has turned down loads, and that he has asked for a higher-paying load in exchange for agreeing to take a lesser paying load, but Fisher has "never been successful with that." (Doc. 332-14, at 5). The Court finds this testimony consistent with all the testimony discussed under the control factor. The drivers all appear to be testifying that they have the right to turn down offered loads, and whether they accept the offer or turn it down, there is no certainty about what loads they will get afterwards.

Defendant next points to two drivers who testified that they considered the profitability of a specific load offered to them, as well as the potential loads that might be available at the destination of the initial offered load, before choosing to accept or decline the initial load. (*See* Docs. 332-25, at 9–10; 332-26, at 15–16). One of the

15

drivers who defendant points to here, Barry Robinson, may have conducted the analysis, but apparently did not usually act on the analysis. Robinson testified that he "just had to rely on [defendant] getting me the load[.]" (Doc. 332-26, at 15). Then, Robinson would either accept or decline the load, but Robinson further noted that "[n]ine times out of ten, I accept it and say yes because I fear saying no" because, if he said no, then he would sit without a load for a while. (*Id.*). As discussed above, other drivers testified that they would accept the loads because declining loads meant they would have to sit without work.

Defendant also points to operating expenses issues. This mainly includes whether defendant told the drivers where to get fuel, which is directly related to the choice of route discussed under the control factor.

One driver testified that he elected to have defendant absorb some of the initial costs, which apparently was later offset through deductions from load payments to the driver. (Doc. 332-37, at 6–7). These options appear to be standard options the driver can choose to select, or not select, when they agree to the contract with defendant.

Defendant asserts that a driver's profit or loss also depends on whether the driver chose to participate in the "lead driver program" or hire their own co-driver, and defendant says some elected to participate in the program, and some others hired co-drivers. (Doc. 342, at 19). Cervantes testified that he hired a co-driver and worked with him for six months. (Doc. 332-7, at 8). Cervantes also noted that he had to get permission from defendant to hire the co-driver. (*Id.*). Another driver hired three co-drivers and was a lead-driver in the program. (Doc. 349-3, at 669–70).

This disparity is the first example here of facts which could be different per driver. Still, the parties do not point to anything to show that the choice of hiring a co-driver or being a lead driver changed driver profit or loss in a material way. Also, the substantive issue here is the opportunity for profit and losses, and whose hands that opportunity is

16

in.  It appears the drivers had two fairly concrete options here.  The fact that some chose option A and some chose option B, and some chose both at different times, is not necessarily a disparity, but instead shows the options the drivers had within their relationship with defendant.

Defendant points to further differences in driver testimony about profits and losses by noting that Corpening deducted depreciation on a computer he used for managing his business[6] for tax purposes, as well as claiming deductions on other expenses.  (Doc. 342, at 19–20).  Another driver did not file tax returns in 2017 or 2018.  (Doc. 332-21, at 15).

In the main, the Court finds plaintiffs are similarly situated for the purposes of this factor.  Defendant points to possible disparities in what appears to be quite small determinants of profit or loss.  Plaintiffs make a good argument on this factor that the major source of profit or loss is the number, location, and profitability of loads.  (Doc. 346, at 11).  When considering who controls these major determinants of profits and losses, the evidence is quite similar as applied to each driver.  The other subfactors here appear to include very small differences, and the differences defendant points to do not generally involve "managerial skill."  The only disparity that could be of note would be choosing to hire a co-driver or alternatively choosing to be a lead driver, but neither party provides enough information on that issue to show that the choice makes any material difference in profits and losses.

The main determinant of profits and losses, it appears, is profitability of loads and

---

[6] Defendant says Corpening "used a laptop to manage his business[.]"  (Doc. 342, at 19).  This may overstate the matter.  The following is from Corpening's deposition transcript defendant cites in support of this statement:  "Q. What did you use the laptop computer for?  A. For my trucking business for the truck. . . . Q. And you used [the computer] to manage your business?  A. I had it, but, you know, I don't recall if I used it to manage my business with software or whatever because I would mostly write in my notebook, the loads, information and stuff down."  (Doc. 332-12, at 29).

17

number of loads. There is not disparity in the evidence concerning these two considerations. Each plaintiff and member of the class and collective appears to be similarly situated for the purposes of the major determinants. Thus, the drivers are similarly situated for the purposes of the opportunity for profits and losses factor.

### 4. Skill and Initiative

The fourth factor examines "the skill and initiative required in performing the job[.]" *Alpha & Omega*, 39 F.4th at 1082. One aspect of this factor courts have found significant is whether "profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401, at *19 (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 809 (6th Cir. 2015)).

Defendant again points back to the facts discussed under the control factor. (Doc. 342, at 20). Defendant also notes that one driver testified that a normal person on the street possesses the skills necessary to drive a truck, while another driver testified that he had to learn to control the truck, especially in the mountains.[7] (Doc. 342, at 20).

These were all truck drivers who were apparently somewhat randomly assigned various loads, which were coming from the same source, defendant. One could say that the plaintiffs and class and collective members are necessarily similarly situated here. They all do the same thing. They drive trucks. Even if there is a slight disparity in the drivers' opinions about the skill required to navigate through mountains—though, in truth, there does not appear to be much disparity on that issue—the Court will ultimately have to determine the skill and initiative actually required to perform the job, which should be the same for all drivers here, because they all had the same job.

---

[7] The driver testified that a driver has to "learn how to control [the vehicle] coming down a mountain." (Doc. 332-7, at 17). The driver also testified in the same line of questioning, regarding what it takes to navigate coming down a mountain, he "wouldn't [call] it special knowledge," and instead "would call it common sense." (*Id.*, at 16).

18

##### 5.     *Permanency of the Relationship*

The fifth consideration in the economic realities test is "the permanency of the relationship." *Alpha & Omega*, 39 F.4th at 1082. The question under this factor is whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401, at *21.

The actual duration of the various drivers' relationships with defendant varied quite a bit, ranging from a few months to several years. When each driver was under contract with defendant, however, they only drove for defendant, as defendant concedes in its brief. (Doc. 342, at 21). The contracts generally appear to have lasted a year in length, were renewed on the same date each year, and were renewed on satisfactory performance. Each of defendant's contracts with the drivers was materially the same, and included materially the same termination clauses. Either party could terminate the contract for any reason on 20 days' notice, and termination could be immediate under certain circumstances.

At first glance, this factor might appear to include the largest disparity between drivers' situations if one focuses on the actual duration of the various relationships, viewed in hindsight. The question here, however, is whether the drivers and defendant viewed the work as permanent. And, for the purposes of the motion to decertify, the issue is whether the evidence for the various drivers is similar in considering this factor. The contracts were all the same, and appear to have been entered into for the same length of time: one year at a time, plus routine renewal. Each parties' right to terminate was the same under the contract for each driver. Thus, at the very least, defendant treated each driver the same, and the drivers, and defendant, all appear to have had the same rights here. The only difference was when drivers would actually terminate their contracts. The drivers were similarly situated to a large enough degree that this factor does not provide grounds to decertify the class or collective on this basis.

19

### 6. *Integral to the Business*

Both parties agree there is no conflicting testimony under this factor. Defendant is a trucking company. Plaintiffs drive trucks. The drivers are clearly integral to the defendant's business. Thus, for the purposes of this final factor of the economic realities test, the drivers are similarly situated and common evidence can establish their claims regarding this final factor.

### C. *Conclusion*

The Court has found that common questions of fact or law predominate under the factors of the economic realities test. The Court has also found that the drivers are similarly situated here, as required for plaintiffs to go forward as a collective under their FLSA claim. Thus, defendant's motion to decertify plaintiffs' FLSA collective action and plaintiffs' Rule 23 class action is **denied**.

### III. *PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT*

The next motion before the Court is plaintiffs' motion for partial summary judgment under Federal Rule of Civil Procedure 56. (Doc. 328). Plaintiffs move for summary judgment on two issues: first, that plaintiffs and the members of the collective and class were employees of defendant under the FLSA and IMWL; and second, that defendant is liable to plaintiffs and the members of the class on plaintiffs' claim under the federal Truth in Leasing Act. (*Id.*). Plaintiffs filed a brief in support of the motion. (Doc. 337). Defendant filed a resistance. (Doc. 354). Plaintiffs filed a reply. (Doc. 362).

The Court will discuss additional facts relevant to plaintiffs' motion for partial summary judgment. The Court will then address the issues in turn.

For the following reasons, plaintiffs' motion for partial summary judgment is **granted-in-part and denied-in-part**.

20

## A. Additional Relevant Facts for Plaintiffs' Summary Judgment Motion

Defendant is a company which facilitates delivery of its customers' freight. (Doc. 349-4, at 3).[8] Defendant's primary product is dependable and speedy delivery of freight. (*Id.*). Another entity, CRST Lincoln Sales, Inc. ("Lincoln Sales"), leases trucks to defendant for defendant's employee drivers to use, as well as to the lease operators, who were not classified as employees. (*Id.*, at 1–2, 15). CRST International Holdings, LLC is the parent company to Lincoln Sales. (*Id.*). Lease operators had the option to lease a truck from Lincoln Sales without paying any money up front; instead, defendant would deduct the amount of the lease payments from the drivers' pay each time defendant paid the driver. (*Id.*, at 12–13). Defendant refers to the periodic payments of the drivers as "settlements." (*Id.*, at 23–24).

To accomplish the goal of delivering customers' freight, defendant hires employee drivers, who it calls "company drivers," as well as contracting with drivers who defendant classifies as independent contractors. (*Id.*, at 6–7). The non-employee drivers, sometimes called "lease operators," including plaintiffs and the members of the class and collective, enter into an "Independent Contractor Operating Agreement" ("ICOA") with defendant. (*Id.*, at 7). Many of the lease operators began as company drivers and later switched to lease operators. (Doc. 359-4, at 29).

Defendant generally controls price negotiations and pick-up and delivery schedules with the customers. (Doc. 349-4, at 3–5). Communications with the customers generally go through defendant's "Customer Service Team," though sometimes drivers might communicate directly with customers for things like letting the customer know when the

---

[8] As noted above, the two defendants here are CRST Expedited, Inc., and CRST International, Inc. The parties discuss the two CRST entities as a single entity throughout the briefing, and the Court follows their lead in this order. In fact, the two defendants were separate entities at the commencement of this lawsuit, but have since merged into one entity. (Doc. 349-4, at 1–2).

driver will arrive or asking for directions. (*Id.*; Doc. 328-2, at 42–43). Defendant also controls and is responsible for customer billing. (Doc. 349-4, at 6).

Defendant would "assign" loads to company drivers, who could not turn the assignment down, and would "offer" loads to lease operators, who had the right to turn the offered loads down under the ICOA. (Doc. 349-3, at 263). Defendant's planners took into account multiple factors when deciding who should be assigned or offered a load, but the planners did not consider whether a driver was a company driver or lease operator for the purposes of doling out loads. (Doc. 349-4, at 8). That is, defendant treated company drivers and lease operators the same for purposes of choosing who should take a specific load. One of the factors defendant's planners could take into account before 2019 was a driver rating, which managers would enter, effectively scoring the drivers mostly based on the drivers' ability to be on time. (*Id.*, at 53–54).

Defendant generally had the same qualification requirements to be an employee driver and a lease operator—the only difference was that defendant required lease operators to have six months prior driving experience, while employee drivers did not need to have any driving experience. (*Id.*, at 9–10). Some of the similarities in qualification requirements between the two groups are apparently required by federal law. (*Id.*). Defendant did not require lease operators to show an ability to run a business or check the drivers' credit ratings or the like. (*Id.*, at 11–12). Employee drivers and lease operators were presented with the same job description in the application form. (*Id.*, at 15–16). Once defendant accepted a lease operator's application, the driver was required to attend an orientation where defendant trained the drivers on defendant's policies, practices, and procedures. (*Id.*, at 14). The drivers were generally required to follow defendant's policies and procedures. (*Id.*, at 16–18).

At the drivers' orientation, defendant gave the drivers a packet which included the ICOA as well as the lease paperwork from Lincoln Sales. (*Id.*, at 18). The ICOA and

the lease were materially the same for all drivers. (*Id.*, at 20). The documents were drafted by defendant and Lincoln Sales, and, though they may not have technically been "non-negotiable," it appears none of the drivers successfully negotiated a change in any of the terms in the ICOA or lease, though some of them attempted to. (*Id.*, at 19–20). At the orientation, defendant trained the lease operators on operating a business, generating revenue and profits, fuel expenses, and decision-making. (Doc. 359-4, at 30). There were other differences in the orientations for lease operators and company drivers as well. (*Id.*, at 30–32).

Generally, the drivers would lease a truck from Lincoln Sales, then, in the ICOA, lease the truck to defendant. (Doc. 349-4, at 21). In the ICOA, drivers gave defendant "the exclusive possession, control, and use of the [drivers] Equipment" for the duration of the agreement.[9] (Doc. 349-4, at 72–73). Although not entirely clear, it appears that the leases varied in duration, but were generally agreed to for a term of a year or more. (*Id.*, at 27–28). That is, the term on the lease agreement document appears to generally have been a year or more; that does not mean, however, that the leases often lasted that long in reality. The ICOAs expired on October 1 of each year and were routinely renewed on satisfactory performance. (*Id.*, at 83–84). Thus, the ICOAs were generally agreed to for at least a year in length. In reality, the length of the relationship between defendant and drivers varied. Sometimes drivers would terminate the contract after short

_____

[9] Defendant points out that this language is required by federal regulation. (Doc. 349-4, at 72–73). The regulation defendant cites to appears to require in this situation that the lease provide that the carrier lessee must "have exclusive possession, control, and use of the equipment for the duration of the lease," and that the carrier lessee must "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). The regulation also provides that the language required by section (c)(1) is not "intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 C.F.R. § 376.12(c)(4).

periods, and sometimes drivers would stay for longer periods. (Doc. 359-4, at 42–45). Cervantes, for example, drove with defendant in two stints; one for six weeks, and one for almost a year and a half. (*Id.*). Other drivers appear to have driven with defendant for time frames spanning a few months to several years. (Doc. 359-4, at 42–45). The "turnover rate" for lease operators who had contracted with defendant and their employees was 62% (annualized) in October 2022, and the turnover rate for those who executed a lease with Lincoln Sales was 70% (year to date) in October 2022. (*Id.*, at 45).

The lease was considered to be in default if, among other things, the drivers' ICOA was terminated. (Docs. 349-4, at 28–29; 328-4, at 48–49). Upon default, the lease gave Lincoln Sales the right to terminate the lease, immediately repossess the truck, and accelerate the remaining lease payments, among other things. (Docs. 349-4, at 30–31; 328-4, at 49).

The ICOA provided that the drivers were responsible for all costs of operating the truck, including things like fuel, insurance, and maintenance of the truck. (Doc. 349-4, at 21). Defendant would then pay a percentage of load revenue to the driver. (*Id.*). The payouts came through "settlements," which were essentially comprised of a percentage of revenue the customer paid defendant for the load, plus other expenses, with deductions for lease payments and advances defendant had made to drivers for various operational expenses. (*Id.*, at 23–24). Specifically, under the ICOA, defendant generally paid the driver 70% of the adjusted gross revenue for a load—sometimes called "linehaul" by the parties—which was billed to the customer, so long as defendant provided the trailer, which defendant provided most of the time. (*Id.*, at 31–32, 95). The adjusted gross revenue was equal to the amount of gross revenue billed to the customer reduced by certain specified amounts. (*Id.*, at 93–94). So, generally, defendant paid drivers 70%

of the adjusted gross revenue for a load.[10]  When drivers only hauled loads for a portion of the shipment instead of the entire way, their payment would be reduced consistent with the pro rata amount of the total trip the driver hauled.  (Doc. 349-4, at 96–97).  Defendant set the prices it charged customers for delivery of the load and negotiated things like handling requirements and pick-up and delivery times with the customers.  (*Id.*, at 33–34).

The ICOA also included terms relating to the expenses drivers were responsible for.  Under the contract, drivers were responsible for "all operating expenses," including categories such as fuel, tires, taxes, and other items.  (Doc. 328-2, at 105).  Defendant then charged the customer a fuel surcharge, of which it passed 97% on to the driver.  (Doc. 349-4, at 97).  Drivers were responsible for certain other expenses—"detention expenses" and "accessorial services expenses"—except when defendant elected to bill the expenses to the customer, in which case defendant would pass along a percentage of the amount collected to the driver.  (*Id.*, at 34–35; Doc. 328-2, at 105).

Lease operators could also elect to have defendant deduct funds from the drivers' settlements to cover certain expenses the drivers would have otherwise had to pay, including expenses for base plates, certain permits, communication systems, and various forms of insurance.  (Doc. 359-4, at 36–37).  Drivers were responsible for purchasing their own health insurance.  (*Id.*, at 37).  Some drivers purchased or brought their own tools to use on the truck.  (*Id.*, at 37–38).

The ICOA provided that, when compensation is based on a percentage of revenue

---

[10] Plaintiffs note that defendant's employee drivers were generally paid by the mile.  (Doc. 349-4, at 37).  Defendant responds that "by the mile" is "vague and ambiguous," adding that the employee drivers "are paid on a split mile basis for the computerized miles associated with the delivery of the load."  (*Id.*).  Yet, in a statement of fact in support of its own motion for partial summary judgment, defendant states that "[c]ompany drivers . . . are paid on a cents-per-mile basis[.]"  (Doc. 333-1, at 2).  Thus, employee drivers were paid by the mile.

for a shipment—which, as noted above, appears to always be the case—at the time of settlement, defendant must provide the driver with certain documents. (Doc. 349-4, at 98–99). Specifically, the contract required defendant to provide the driver with "a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill." (*Id.*). Defendant was required to furnish to the drivers a settlement statement, including all credits and deductions made to the driver, at each weekly settlement. (*Id.*, at 99). The settlement statements detailed drivers' earnings for the loads moved. (*Id.*, at 99–100). Relatedly, defendant issued freight bills as invoices to its customers. (*Id.*, at 100). These freight bills contained various information, and the categories of information included on a freight bill may have differed slightly from one customer to the next. (*Id.*, at 100–01). Defendant did not provide freight bills to drivers at the time of settlement. (*Id.*, at 102). The ICOA required drivers to travel to defendant's headquarters in Cedar Rapids, Iowa during business hours if the driver wanted to examine freight bills, although there is testimony from defendant that it would have been able to provide a freight bill to a driver upon request. (*Id.*, at 102). The parties appear to agree that there was information contained in the freight bills that did not appear on drivers' settlement statements, though the specifics are contested, largely based on defendant's assertion that freight bills differed from customer to customer. (*Id.*, at 102–06). The parties agree, in particular, however, that the settlement statements did not include the full charge amount listed on the freight bill for fuel surcharges, but instead showed only the amount paid for fuel surcharges to the driver. (*Id.*, at 105). The parties' respective experts, after analyzing defendant's data, both concluded that defendant underpaid the drivers for linehaul, accessorial, and fuel surcharge charges. (*Id.*, at 105–06). The experts disagree, however, on the amount the drivers were underpaid. (*Id.*).

26

The ICOA included several other notable provisions. It states that drivers must operate the truck using two-driver teams with certain exceptions, which are generally temporary in nature. (*Id.*, at 22; Doc. 328-2, at 98).[11] The contract provides that drivers can either accept a student driver assigned by defendant—student drivers are generally relatively inexperienced drivers who are new company drivers for defendant—or hire their own driver subject to defendant's approval, and defendant has the right to disqualify any driver for various reasons (*e.g.*, driver is unsafe, unfit, or in violation of defendant's minimum qualification standards). (Docs. 349-4, at 22–23; 328-2, at 98, 104). Lease operators could also theoretically lease multiple trucks at a time to defendant and hire employees to drive the extra trucks, but none of the drivers here did that, in part due to the class and collective definitions, and possibly in part because of certain restrictions in the ICOA on hiring employees. (Doc. 359-4, at 23–25). There were some lease operators, although none involved in this litigation, who leased multiple trucks from Lincoln Sales and then leased the multiple trucks to defendant—the same relationship the drivers involved here had with defendant, but with multiple trucks instead of a single truck. (*Id.*, at 25–26). It appears that in October 2022, there were 17 lease operators who had multiple trucks leased to defendant. (Doc. 349-3, at 652–53). One such driver operated as many as eight trucks with defendant. (Doc. 359-4, at 26).

One of the options a lease operator had was to be certified by defendant as a "lead driver" who could then train defendant's "student drivers," who were relatively new truck drivers with little experience, and were employees of defendant. (Doc. 349-4, at 84–86). Defendant's employee drivers could also be lead drivers, and defendant required the same qualifications and training to be a lead driver for employees and lease operators.

---

[11] There is also some evidence that there is also a solo division within defendant's company, (Doc. 349-3, at 280), though it is not clear whether the drivers in that division are employees or lease operators, and whether any of the drivers that comprise the class here were in that group.

(*Id.*, at 86–87). In the lead driver program, defendant would assign student drivers to lease operators, although lease operators had the ability to refuse the student driver assigned to them. (*Id.*, at 87). The lead driver would train the student driver for about 21–28 days, training the student on defendant's policies, procedures, and preferred driving methods. (*Id.*, at 89). Generally, after the first few days of training, the two drivers—the lead driver and the student driver—would take turns driving the truck, similar to a normal pair of team drivers. (*Id.*, at 90–91). Under the contract for the lead driver program between the lead driver and defendant, the lead driver was required to ensure that their insurance coverage covered student drivers, and if the student driver caused damage while under the lead driver's supervision, the lead driver's insurance coverage was primary to defendant's insurance coverage. (*Id.*, at 89–90).[12] When a lease operator was a lead driver, defendant would pay the driver the same as normal— that is, the lease operator was paid the amount they normally would be paid for the load, no matter who drove—and defendant would charge the driver a per-mile charge. (Doc. 349-4, at 91). The parties disagree on whether becoming a lead driver allowed the lease operators to make more money or not. (Doc. 359-4, at 39–40).

Either party had the right to terminate the ICOA without cause upon 20 days written notice. (Doc. 349-4, at 26–27). The ICOA could also be terminated immediately upon a material breach of the agreement by either party. Also, defendant could terminate the ICOA immediately for multiple reasons, including a driver's failure to adhere to defendant's policies and procedures. (Doc. 328-2, at 112).

---

[12] Defendant denies that this language appears in the document plaintiffs cite. (Doc. 349-4, at 90). Technically, defendant is correct, plaintiffs take a slight liberty in changing the quote as it relates to insurance. The document cited to, however, includes the following: "In the event of any claim, loss, or expense arising out of the Student Driver's acts or omissions while driving or otherwise under Contractor's instructions or supervision, Contractor's insurance coverages shall be primary to any other insurance that may be available from Carrier." (Doc. 328-2, at 91).

28

Drivers were required to have an electronic communications and recorder system installed in the truck, and trucks rented from Lincoln Sales were already equipped with the system when the drivers received the trucks. (Docs. 349-4, at 24–25; 328-2, at 103).[13] Drivers were required to fund a $2,000 escrow fund which defendant could use to satisfy operating cost advances or other charges, and drivers were also required to fund a $250 maintenance reserve. (Doc. 349-4, at 25–26). Both of these funds were funded through deductions from settlements. (*Id.*). Defendant set the levels of insurance drivers were required to maintain and the companies the drivers could obtain insurance policies from. (*Id.*, at 36).

One of the main points of disagreement between the parties relates to the drivers' ability to turn down the loads defendant offered to them. Essentially, plaintiffs say that the drivers were compelled to haul as many loads as possible and not turn down the loads offered to them. (*Id.*, at 37–39). Defendant says that the drivers could refuse any loads offered to them. (*Id.*). Both parties are correct, depending on how one views the issue. The drivers were not technically forced to accept any load under the ICOA. Numerous drivers testified in their depositions, however, that they felt compelled to accept loads, because declining a load had negative consequences. The main negative consequence of turning down a load, it appears, was that the driver would not know when defendant would next offer the driver a load. (Doc. 349-4, at 43–45). Because of this, drivers

---

[13] Defendant replies to plaintiffs' statement of fact here by stating that "[n]one of the evidence [p]laintiffs cite supports the statement that vehicles leased by contractors from CRST Lincoln Sales already have electronic onboard recorder equipment installed." (Doc. 349-4, at 24). On one of the pages plaintiffs cite here, the ICOA provides the following: "*For units of Equipment Contractor chooses to lease from CRST Lincoln Sales, Inc.*, which will have the Omnitracs, LLC, Communication System/EOBR installed in them . . .." (Doc. 328-2, at 103) (emphasis in original). Defendant also admitted essentially the same statement of fact in the materials for defendant's motion for partial summary judgment. (Doc. 360-4, at 10–11). Also, of note here is that the communications system is sometimes called "EOBR" by the parties, as it is in the portion of the record quoted in this footnote.

29

would sometimes accept unprofitable loads in hopes of getting a more profitable load at the first load's destination. (Doc. 359-4, at 18–19). One reason defendant may not have offered a driver another load immediately after the driver turned down a load was that there may not have been other freight available near the driver. (*Id.*, at 8). Drivers also felt that, when they refused loads, they would go to the end of the line, or the bottom of the list, so to speak. (*See, e.g.*, Doc. 349-3, at 314, 498) (plaintiff Cervantes stating that "if you refused a load, you sat," and another driver stating that defendant's dispatcher told him "when you decline a load, you always go to the bottom of the – of the pile of the other drivers in front of you . . .."). But, on the other hand, drivers generally recognized that they ultimately had the option to accept or turn down loads. (Doc. 359-4, at 1–5). In one instance, a driver drove without a load—the parties call this "deadheading"—from Washington state to northern California after the dispatcher told the driver that he was not going to get out of Washington because it was hard to get freight there at that time. (*Id.*, at 19–20; Doc. 349-3, at 499–500). One of the factors drivers considered in deciding whether to accept a load was the likely profitability of the load as well as where the end point was. (Doc. 359-4, at 5–6). The parties also disagree on whether defendant generally offered drivers one load at a time, or multiple loads at a time. (Doc. 349-4, at 42–43). There is evidence in the summary judgment record standing for both parties' position on this. (Docs. 328-2, at 175; 349-3, at 889).

Another way drivers could obtain loads was to "broker" loads. That is, drivers could find loads from sources other than defendant and deliver them. (Doc. 349-4, at 49–53). Drivers could only carry brokered loads if defendant approved the load. If defendant approved the load, then it became defendant's load and was treated essentially the same as normal loads at that point. (*Id.*). Brokered loads consisted of a very small percentage of the drivers' total loads hauled during the period relevant here. (*Id.*, at 53). There is at least one example in the summary judgment record, however, of a driver

carrying a brokered load: one load Cervantes carried in 2018. (Doc. 359-4, at 12–13). The parties disagree about when and how often defendant accepted or rejected brokered loads, but it appears fair to say defendant preferred the loads they offered drivers and, comparably, had less interest in brokered loads. (Doc. 349-4, at 51–52).

In the summer of 2022, defendant rolled out a new technology available to certain drivers: a "load board." (*Id.*, at 55–56). The load board was a tool that allowed the drivers to see loads within defendant's network and make plans based on it. (*Id.*). The load board also listed the load's linehaul rate, fuel surcharge, and pick-up and delivery locations. (Doc. 359-4, at 10). As of the end of 2022, only drivers who worked as a team with other lease operators—not those who worked with student drivers—had access to the load board. (Doc. 349-4, at 55–56). Drivers who opted to use the load board generally planned their own trips rather than having defendant offer specific loads to the driver, though at times defendant recommended certain loads to drivers that the driver may have missed on the load board. (*Id.*, at 56–57). Drivers who used the load board could book multiple trips at once to make for a continuous trip from one place to another. (Doc. 359-4, at 10–11). Defendant controlled the load board and decided on the drivers who could use it, and defendant could terminate a driver's access to the load board if defendant was dissatisfied with the driver's performance. (Doc. 349-4, at 56–57). The record does not reveal when, or if, the load board was ever fully functional. As of December 2022, the load board was not yet fully in effect. (Doc. 359-4, at 9).

Once drivers took on a load, they were required to notify defendant when the driver picked it up, when the load was delivered, and any delays involved. (Doc. 349-4, at 60). Defendant had the authority to prohibit drivers from taking certain routes and exercised that authority. (*Id.*). In general, with the exception of certain prohibited areas, drivers could choose their own routes, although there is some evidence that defendant would provide a route to drivers, and some drivers used those routes. (Doc. 359-4, at

31

16). If a driver was late for pickup or delivery, or if a driver drove on a prohibited route, defendant could terminate the driver's lease. (Doc. 349-4, at 61). Defendant also had the right to change who took a load after a driver accepted it, which generally only happened when there was some other issue and another driver was able to take the load closest in time to the delivery window. (*Id.*, at 61–62).

Drivers could generally take breaks or "home time" at their convenience. (Doc. 359-4, at 14–15). In that sense, drivers could set their own schedules, although, as plaintiffs point out, practically, drivers generally had to continue driving to make money and keep up with their lease payments. (*Id.*, at 17–18).

Defendant monitored drivers by collecting data electronically, including the truck's location, speed, hard-breaking events, pick up and drop off times, fuel use information, drivers' electronic hours of service logs, and other data points. (Doc. 349-4, at 66–69). Much of this data that defendant had access to was collected by the electronic communications system, or EOBR, required by the ICOA to be installed in the drivers' trucks. (*Id.*). Lincoln Sales monitored the drivers' maintenance of the leased trucks. (*Id.*, at 71). The drivers were also required, under the ICOA, to make the truck available for inspection at defendant's request, and the drivers were required to have the truck inspected by defendant or a defendant-approved facility at least annually.[14] (Doc. 349-4, at 71–72). Defendant prohibited drivers from placing anything, other than defendant's identification, on the equipment without defendant's prior written consent— including things like paint, artwork, logos, or designs. (*Id.*, at 78–79).

Another aspect the parties disagree on—or, at least, the parties characterize in

---

[14] Defendant points out here that federal regulations require it to conduct periodic equipment inspections, and the regulations also prohibit defendant from operating equipment that does not pass inspection. (Doc. 349-4, at 72). Indeed, the section defendant cites appears to require that each truck pass an inspection at least annually. *See* 49 C.F.R. § 396.17.

different ways—is the drivers' ability to drive for other companies. The ICOA appears to allow drivers to carry loads for other carriers if certain conditions were present, including permission from defendant, as well as other conditions required by federal regulation, including a sublease agreement between defendant and the other carrier. (*Id.*, at 73–76). The drivers were told at orientation, however, that they could not work for other carriers during their contract with defendant.[15] (Doc. 349-4, at 73–76). If the driver got permission to drive for another carrier, the driver was required under the ICOA to pay defendant a fee of $150 to $250 for each trip made for the other carrier. (Doc. 349-4, at 76–77). In any event, there is apparently no proof of any of the drivers involved here, whether a named plaintiff or a class or collective member, driving for another carrier while under contract with defendant. (*Id.*, at 77–78).

The parties partly agree and partly disagree on certain aspects of their financial relationship. Both parties acknowledge their relationship included an opportunity for "cash advances" at times. Specifically, drivers could request cash advances when needed, and, if defendant advanced the cash, that amount would come out of the drivers' future earnings later through deductions in the drivers' settlements. (*Id.*, at 79–80). Drivers also had the option to purchase accounting and other business services from a third party that apparently had a relationship with defendant. (*Id.*, at 82–83). The drivers could sign up for these services in an attachment to the ICOA. Drivers would then pay

---

[15] Defendant denies this is the case. Plaintiffs' cited record excerpts appear to show that it was communicated to the drivers that they were not allowed to drive for anybody other than defendant. (*See* Doc. 349-4, at 73–74). Defendant pokes holes in certain aspects of plaintiffs' cited deposition testimony, but, considered together, plaintiffs' points stand, especially in light of the cited testimony of Mr. Klopp, which defendant does not respond to. (*See* Doc. 328-2, at 178–79) ("Q. Was it your understanding that [lease operators] were able to go and drive for another trucking company while they were working for [defendant]? A. I would say it was pretty explicit that they were not allowed to. . . . we specifically would tell them that if you do that you won't have a lease with us anymore.").

for those services through deductions from their settlement checks by defendant. (*Id.*).

The parties disagree on whether the drivers' lease payments to Lincoln Sales resulted in the drivers building equity in the trucks. Plaintiffs claim the payments did not result in equity in the trucks, and defendant claims that, depending on circumstances, the drivers may have some equity in the truck at the time the lease ends. (*Id.*, at 81–82). The record evidence cited by the parties does not clear things up on this front.

Some of the drivers testified in depositions about the skill required to be a truck driver. Specifically, one driver said that any person could drive a tractor-trailer, and another driver said that he did not believe that truck driving was a skill. (Doc. 359-4, at 40). Another driver, Cervantes, testified that he had to learn to control the truck when driving in the mountains, though he also said that driving a truck down a mountain does not take special knowledge, and that it is common sense. (*Id.*, at 40–41). Yet another driver testified that backing up a tractor-trailer requires some skill. (*Id.*, at 41). There is also evidence that drivers receive training during truck driving school to obtain a Commercial Driver's License ("CDL"), and some of the drivers obtained additional endorsements beyond a standard CDL for things like a double and triple trailers endorsement. (*Id.*, at 41–42).

### B.     *Summary Judgment Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. The plaintiff may not then simply point to allegations made in its complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

### C. Employees or Independent Contractors

Plaintiffs first move for summary judgment on the issue of whether they were employees or independent contractors for the purposes of their claims under the FLSA and the IMWL. (Doc. 337, at 9–34). Plaintiffs request the Court find that plaintiffs were employees of defendant. Defendant resists plaintiffs' motion. (Doc. 354).

#### 1. Applicable Law

The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). Because these definitions provide little guidance in this situation, courts have come up with further standards and tests to determine whether a worker is an employee or not. Generally, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). To determine whether a worker meets this standard, courts generally use the "economic realities test." *See Alpha & Omega*, 39 F.4th at 1082.[16] The Eighth Circuit's

---

[16] As noted above, in *Alpha & Omega*, the court "assume[d] without deciding that the economic realities test is appropriate in determining whether a worker is an employee or independent contractor under the FLSA." 39 F.4th at 1082. The parties here make their arguments under the economic realities test, so the Court will follow their lead and analyze the issue under this test.

version of this test examines six factors concerning the relationship between the alleged employer and alleged employee:

> (1) "the degree of control exercised by the alleged employer over the business operations;" (2) "the relative investments of the alleged employer and employee;" (3) "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer;" (4) "the skill and initiative required in performing the job;" (5) "the permanency of the relationship;" and (6) "the degree to which the alleged employee's tasks are integral to the employer's business."

*Id.* (quoting *Karlson*, 860 F.3d at 1093). When considering the factors, "[n]o one is controlling nor is the list complete." *Karlson*, 860 F.3d at 1092 (quoting *Silk*, 331 U.S. at 716). Also, a contract between the alleged employer and employee which labels the alleged employee as an independent contractor "may be relevant but is not controlling." *Id.* (citing *Rutherford Food Corp.*, 331 U.S. at 729).

### 2. Analysis

As noted above, the parties make their arguments under each of the six factors in the economic realities test individually. The Court will follow suit. In general, though, plaintiffs argue that, even if there are some disputes of fact within some of the factors, each of the factors ultimately weighs in favor of employee status, given the material facts which are not disputed. (Doc. 337, at 32–33). Plaintiffs argue that all six factors warrant a finding as a matter of law that the drivers were employees of defendant. (*Id.*). Defendant argues in response that there are "significant factual disputes" within the context of the six factors here. (Doc. 354, at 13–14). Defendant continues, arguing that, viewing the evidence in the light most favorable to defendant, as the Court must for the purposes of plaintiffs' motion for partial summary judgment, there are genuine issues of material fact here, and thus plaintiffs' motion should be denied on this issue. (*Id.*).

Although it is a close call, the Court agrees with defendant here. There are just enough disputes of material facts in the record making summary judgment inappropriate. Thus, plaintiffs' motion is **denied** on the issue of the drivers' status as employees or

independent contractors.

### a. Control

This factor generally considers "the alleged employer's right to control the way work is performed." *Alpha & Omega*, 39 F.4th at 1083. The *Alpha & Omega* court noted several "manifestations of control" other courts have found important under this factor, including: whether the alleged employer set hours for drivers, *Razak*, 951 F.3d at 146; whether the workers were free to reject projects, *Parrish*, 917 F.3d at 381; and "workers' ability to determine their own schedules, mandatory guidelines during working hours, ability to set fee for services, and ability to perform services at other establishments." *Alpha & Omega*, 39 F.4th at 1083 (citing *Off Duty Police Servs., Inc.*, 915 F.3d at 1060–61; *Paragon Contractors Corp.*, 884 F.3d at 1235; *McFeeley*, 825 F.3d at 241–42). This, of course, is not an exhaustive list of the subfactors to be considered within the control factor.

The parties make various detailed arguments under this factor, citing many cases and relevant facts. The most helpful case for the purposes of summary judgment, however, is the Eighth Circuit's most recent discussion of this factor. In *Alpha & Omega*, the court found that summary judgment was not appropriate, in part due to issues of material fact under the control factor. 39 F.4th at 1083–84. One aspect the court focused on was conflicting evidence concerning the plaintiff drivers' ability to decline trip assignments. There was evidence that the drivers felt pressured to accept assignments by the defendant and that the drivers felt defendant was "unhappy" when the drivers declined trips. *Id.* at 1083. There was also evidence, however, that the defendant allowed drivers to decline trip assignments, and there was testimony that drivers were allowed to turn down trips without penalty. *Id.* Also, a driver testified that he had declined multiple trips offered to him. *Id.* The court held that this conflicting evidence established an issue of material fact. In reversing the district court's grant of summary judgment for the plaintiff, the court noted that the "competing evidence requires the weighing of evidence

and ultimately making a credibility determination—a role reserved for the trier of fact." *Id*.

The evidence concerning the drivers' ability to turn down loads here is similar to the drivers in *Alpha & Omega*. The drivers here feel they were not practically allowed to turn down loads, or that the system was set up so that they could not, in reality, turn down loads often. The drivers testified, quite consistently, that they felt pressured to accept loads because defendant would not offer them another load for a while if they declined a load, in part because drivers felt defendant would send them to the end of the line if they rejected a load. Drivers also testified they felt compelled to accept loads to stay current on their lease payments. The drivers' reasons here appear to be rational, and may well be accepted at trial. Like in *Alpha & Omega*, however, there is also testimony that the drivers were allowed to turn down loads, that the drivers understood they had the right to turn down loads, and that the drivers in fact turned down loads at times. In light of the analysis in *Alpha & Omega*, the Court would be improperly weighing evidence and making credibility determinations if it determined the issue as a matter of law for plaintiffs here. Thus, although the Court believes it likely that plaintiffs will be able to establish this fact in their favor at trial, the conflicting evidence at this stage, especially in light of such similar considerations in *Alpha & Omega*, precludes summary judgment on the control factor.

Several other issues of fact under the control factor also serve to preclude summary judgment. Once drivers accepted a load, they needed to deliver it within a certain period of time. More specifically, however, drivers could choose what hours they drove and how to get to the destination with a few exceptions—or, at least, there is evidence allowing a fact finder to accept these facts. As discussed above, however, several courts have noted that "the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Brant*, 43 F.4th at 668 (quoting *Narayan*, 616 F.3d at 904). The Court agrees with this line of

39

thought, and thus the drivers' ability to choose their own routes hold little, if any, weight in this analysis. Drivers could also haul brokered loads. Although it appears that brokered loads made up the vast minority of total loads hauled, the drivers had the option to at least attempt to haul brokered loads, and there is at least some evidence of a driver hauling a brokered load. Plaintiffs generally respond to the brokered load issue by noting how hard it was to actually carry a brokered load because defendant had to approve it, and thus defendant was still, in reality, in control of those loads. Again, plaintiffs may well have the better argument on this issue at trial, but allowing defendant every inference here, as the Court must, the drivers' right to haul brokered loads is a disputed issue of fact, though it is likely of little importance relative to other facts. Finally, some of the facts plaintiffs rely on under this factor, as defendant points out, may only amount to defendant complying with federal regulations. Those facts, of course, generally should not be held against defendant in this analysis. The facts which implicate federal regulations are generally noted where discussed in the facts section above.

There are, of course, undisputed facts concerning the control factor which favor plaintiffs. For example, when the drivers were under contract with defendant, the drivers could not drive for other carriers. Technically there was a provision in the ICOA allowing the drivers to drive for somebody else if certain conditions were met, but, in reality, there is no proof of any of the drivers here doing so. Much of the evidence also shows that defendant controlled the drivers by essentially making them either drive with a co-driver, who defendant had to approve, or by making the drivers be a lead driver to one of defendant's student drivers. There is, however, some testimony that there are lease operators for defendant who drive solo, so this may also be an issue of fact for trial, though it again appears to lean plaintiffs' way. Defendant also collected data from the drivers' trucks, a fact that would point toward employee status under this factor.

Sometime in 2022, defendant implemented the load board system, at least for some drivers. The load board system appears to give drivers more freedom to plan their own

trips and give drivers more variety in choosing which loads to haul. It is not entirely clear from the summary judgment record when the system was fully operational, or if it has become fully operational yet. This could change the analysis and conclusion regarding the control factor at a certain point in time depending on the evidence at trial.

Because the Court finds genuine issues of material fact concerning some of the important facts under the control factor, it will not discuss every fact that could be included within the factor here. The issues of fact discussed here preclude the Court from determining this factor in plaintiffs' favor as a matter of law at this time. As noted above, although the major determinants of the control factor, including the drivers' ability to turn down loads, may be genuine issues of fact under a summary judgment standard, they appear to lean toward plaintiffs should the evidence at trial mirror the summary judgment record.

### b. Relative Investments

The second factor of the economic realities test concerns "the relative investments of the alleged employer and employee." *Alpha & Omega*, 39 F.4th at 1082. This factor considers "the amount the worker has invested in the business" which is "compared to that of the alleged employer." *Roeder*, 2017 WL 151401, at *16 (citing *Snell*, 875 F.2d at 810). Both parties cite to part of a rule promulgated by the department of labor discussing this factor, which provides: "[T]he focus should be on comparing the investments to determine whether the worker is making similar types of investments as the potential employer (even if on a smaller scale) to suggest that the worker is operating independently, which would indicate independent contractor status." 29 C.F.R. § 795.110(b)(2). (Docs. 337, at 20–21; 354, at 25).

Plaintiffs argue that defendant invested large sums in terminals, trailers, vehicles, distribution infrastructure, and marketing services. (Doc. 337, at 21–22). Plaintiffs also argue that defendant "subsidized" the drivers' investments through defendant's credit by allowing drivers to pay defendant back for most of the expenses involved here through

41

deductions to the drivers' settlement checks. (*Id.*). Defendant characterizes the relationship differently, arguing that it did not subsidize the drivers' expenses. (Doc. 354, at 24–28). Defendant's main argument is that the drivers "made a substantial capital investment into their trucking businesses by acquiring their own trucks." (*Id.*, at 24). Defendant notes that, although the drivers could lease trucks from Lincoln Sales for no money down, they still had to pay lease payments weekly, which, according to defendant, amounted to thousands of dollars per month. (*Id.*, at 24–25). Defendant also argues that the drivers paid for other expenses, and just because drivers decided to pay for certain expenses through deductions to their settlement checks does not mean defendant subsidized these expenses. (*Id.*).

In *Tobin v. Anthony-Williams Manufacturing Co.*, 196 F.2d 547 (8th Cir. 1952), the plaintiffs, truck drivers who hauled logs for the defendant, entered into independent contractor agreements with the defendant. The log drivers "purchased" trucks from the defendant, paying little or no money down. *Id.* at 548. As payment for the trucks, the defendant deducted a certain amount per mile the truckers drove and applied it towards the truck purchase price. *Id.* The trucks were only to be used in connection with the defendant's business. *Id.* at 549. The court held that the log truckers were employees of the defendant, holding that the relative investments factor weighed in favor of the plaintiff truckers. *See id.* at 550. The court specifically noted that the log truckers had "no substantial investment in their trucks, and their ownership is no more than nominal." *Id.*

The facts here show a similar financial structure. As defendant notes, the drivers made continuing lease payments for their trucks. Like in *Anthony-Williams*, however, the drivers here, in reality, had no "substantial investment" in the trucks, and the drivers' rights to their trucks were "no more than nominal." *Id.* The drivers here often paid little money down, and other expenses related to leasing the truck appear to have been put on hold at first, and later deducted from the drivers' periodic settlement checks. Also like

in *Anthony-Williams*, the drivers here could not, in reality, use the trucks to drive for another company.

More recently, in *Brant*, the court held that this factor weighed in favor of employee status on similar facts. 43 F.4th at 670–71. The *Brant* court noted that the defendant employer was correct that the alleged employee driver "spent large sums of money while hauling freight for [the defendant] on the truck lease, fuel, and equipment." *Id.* at 670. Although these investments made by the driver appear to point to independent contractor status at first, the court further explained that the driver's investment "was made with no up-front payment and depended entirely on [the defendant's] providing a truck, mobile computing platform, and other equipment by extending its own credit to" the driver. *Id.* The court noted that the driver was "totally dependent" on the defendant's credit to operate, and that "[t]his level of dependency on [the defendant's] credit and provision of equipment weighs in favor of employee status." *Id.*

Here, similarly, although the drivers made payments on the truck lease and other expenses, these investments included little to no up-front payment, and, as in *Brant*, plaintiffs here "depended entirely on [defendant's] providing a truck, mobile computing platform, and other equipment by extending its own credit" to the drivers. *See id.* Thus, like in *Brant*, this factor weighs in favor of employee status here.

The Court's reasoning under this factor also comports with the overarching considerations flowing through the employee verses independent contractor analysis. That is, when determining whether plaintiffs here were employees or independent contractors, the ultimate consideration is how dependent the plaintiffs were on defendant as a matter of economic reality. Here, even though plaintiffs technically had a certain level of investment, mainly through their lease payments, the financial structure—or, in the parlance of the economic realities test, the "relative investments of the parties"— shows a level of dependence on defendant. It appears that the drivers were dependent on defendant to be able to lease the trucks as a matter of economic reality. Thus, this factor

43

weighs in favor of employee status.[17]

### c. Opportunity for Profit and Loss

The third factor considers "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer." *Alpha & Omega*, 39 F.4th at 1082. For this factor, "courts generally consider whether workers had control over profits and losses depending on their 'managerial skill.'" *Id.* at 1084. "A worker exercising managerial skills such as setting his own hours and rates along with the ability for the worker to earn additional income through his own initiatives indicate control over profits and losses." *Id.* "Facts demonstrating that a worker can use his managerial skill to improve his efficiency such that he can complete more jobs weigh in favor of independent contractor status." *Id.* (cleaned up).

Plaintiffs argue that defendant controlled the major determinants of driver income by controlling the loads it offered drivers and by controlling the prices for the loads. (Doc. 337, at 22–24). Plaintiffs also argue that their lack of ability to drive for other carriers meant they were entirely dependent on defendant for loads, and in turn the drivers were not in control of the factors which determine profits or losses: amount of loads and price of the loads, because the drivers could not look to another source for different loads. (*Id.*). Plaintiffs' argument on this front is essentially that the drivers' financial success— or lack thereof—was determined by defendant's ability to generate business from its

---

[17] The Court notes that, although it would not tip the scales in defendant's favor on this factor, there is one issue of fact that could at least make the factor a closer call. There is evidence supporting both sides concerning the issue of whether the drivers built any equity in the trucks as they made lease payments. (*See* Doc. 349-4, at 81–82). If the drivers built up equity as they made payments, it could slightly shift the scales back towards defendant's position here. It appears, however, that drivers likely did not build up equity in the trucks as they made payments, and the "stipulated loss value" chart, which controlled how much the drivers could purchase the trucks for at different periods in time, was, in reality, a chart showing how much value the truck would likely lose over time—similar to an amortization schedule. (Doc. 328-4, at 40, 51). If this is the case, of course, the drivers built no equity in the trucks; instead, the trucks just lost value, and, in turn, the purchase price declined. There is testimony cited by defendant that this is not the case, however, and thus this is still an issue of fact for trial.

customers, both in terms of volume and profit margin. Plaintiffs then argue that certain rights the drivers had through the ICOA—including driving for other carriers, choosing what hours to work and routes, turning down loads, and hiring a co-driver—either were not truly rights the drivers had or did not in fact change the drivers' income in a material way. (*Id.*, at 24–28).

In response, defendant notes initially that many of the facts applicable to this factor are also the facts applicable to the control factor. (Doc. 354, at 28). Defendant emphasizes the drivers' ability to set their own hours and their ability to decline loads. (*Id.*, at 29). Defendant also emphasizes the drivers' choice in hiring a co-driver or being a lead driver as determining profits and losses. (*Id.*). Defendant also argues this factor weighs more in its favor once the load board was put into place. (*Id.*, at 30).

There are genuine issues of material fact precluding summary judgment under this factor. The Court agrees with defendant that many of the facts pertinent to this factor also weigh upon the control factor. This is especially true of the issue concerning the drivers' ability to reject loads. As the Court found in the control section, there is an issue of fact regarding the drivers' ability to reject loads, and whether they were pressured or coerced to accept loads—and to what degree they were pressured—versus the drivers' right, and exercising of the right at times, to turn down loads. As discussed in the control factor, there also is an issue of fact concerning whether drivers were able to drive solo, and to what degree the decision to hire a co-driver or be a lead driver was controlled by defendant (and whether those decisions made any material difference in the drivers' profits or losses). Also, drivers could determine the specifics of how to haul a load, including generally the times the drivers would drive, when to take breaks, and the like. Finally, once the load board was put into place, the analysis may well change. The load board appears to allow the drivers much more control in choosing routes, planning further ahead, and planning where to go. Each of these facts bear on the drivers' opportunity for profits and losses to a certain degree, and they are all in dispute. Thus, this factor

45

cannot be said, as a matter of law, to weigh in plaintiffs' favor at this stage.

Plaintiffs' arguments do hold water here, though. It appears defendant controlled many of the important determinants of driver profit or loss. This includes, especially before the existence of the load board, controlling what loads it offered drivers and the price for the loads, in large part because it was in control of all the information about loads and routes. The drivers also could not, in reality, drive for other carriers. Thus, they could not look for better loads somewhere else; instead, the drivers generally took what defendant offered them. Again, drivers had the right to turn down loads, and this precludes summary judgment, but the Court questions how much this ability truly impacted profits and losses. If drivers generally did not know when they would next get a load offered to them, and had no idea what the revenue of the next load would be, then does choosing to accept or turn down a load involve much, if any, managerial skill? Like the control factor, this factor cannot be determined to weigh in favor of plaintiffs as a matter of law, but the evidence may well weigh in plaintiffs' favor at trial. Again, though, the details of the load board—including which extra controls it gave drivers and when exactly it was fully operational, if it ever was—may change the analysis under this factor to a degree.

### d. Skill and Initiative

The fourth factor examines "the skill and initiative required in performing the job." *Alpha & Omega*, 39 F.4th at 1082. One aspect of this factor courts have found significant is whether "profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401, at *19 (quoting *Keller*, 781 F.3d at 809).

Plaintiffs argue that the lease operators had no more skill or qualifications than defendant's company drivers, who defendant recognizes as employees. (Doc. 337, at 28–30). Plaintiffs also argue that defendant treated the lease operators as though they did not know how to run a business, and the drivers did not have much business skill. (*Id.*).

46

Defendant responds by arguing that the drivers exercised business judgment in certain ways, including setting their own schedules, choosing how many miles to drive, and by hiring their own employees. (Doc. 354, at 31–32). Defendant also notes that, although some drivers testified that driving a truck was a simple skill, others testified that it was a more complicated skill and received extra training. (*Id.*).

In *Keller*, the court focused on whether the worker's profession was of a type "where success rises or falls on the worker's special skill." *Keller*, 781 F.3d at 809. That court contrasted the plaintiff worker, who was a satellite dish technician, with a carpenter, noting carpenters' "unique skill, craftsmanship, and artistic flourish." *Id.* In contrast, discussing the technician, the court noted that "a pole mount is a pole mount, a roof mount is a roof mount, and the record suggests that it is easy to learn how to decide which is more appropriate and how to install each type of dish." *Id.* The alleged employer in *Keller* also gave technicians assignments based on availability and location, and not skill. *Id.* The court held, analyzing the defendant's motion for summary judgment, that there was an issue of fact concerning the degree of skill factor. *Id.* at 810.

Driving a truck certainly takes some skill and training; otherwise, a special license would likely not be needed for it. Still, when considering the "skill and initiative required in performing the job," *Alpha & Omega*, 39 F.4th at 1082, driving a truck is not a high skill task. Even the driver whose testimony defendant cites here for the proposition that there are certain difficulties in driving a truck, particularly in the mountains, noted that driving down a mountain does not take special knowledge and is "common sense." (Doc. 359-4, at 40–41). Also, like in *Keller*, defendant here generally did not offer loads to drivers based on their skill level, but instead offered drivers loads based on "availability and location." 781 F.3d at 809.

Although the Court has been and is generally reluctant to place any weight on similarities or differences between defendant's company drivers and its lease operators,

this is one area where that relationship is relevant, at least to a degree. As plaintiffs note, being a lease operator for defendant and being a company driver for defendant require the same skills and basically the same qualifications, at least in performing the main job of driving the truck. *See also Northland Cas. Co. v. Meeks*, 540 F.3d 869, 873 (8th Cir. 2008) ("While Floyd needed some skill to drive a tractor-trailer, that skill was not unique and not more prevalent among independent contractors than employees."). Thus, regarding the main considerations under this factor, plaintiffs have the better argument.

The parties also make arguments about the drivers' level of skill in running a business. These arguments touch on whether the drivers had managerial skill as opposed to the skill required in driving trucks. These arguments are better suited for the opportunity for profit and loss factor, which includes considerations of whether drivers could change their profits through the use of managerial skill. To the extent these considerations are relevant to this factor, however, there are some issues of material fact for the same reasons as discussed under other factors. The main issue of fact regarding drivers' skill in running a business concerns the drivers' ability to turn down loads, and, as applied to this factor, whether it required skill. These issues are of less importance under this factor, however, than other factors.

The main issue for the purposes of this factor is whether driving the truck required special skills, and the Court concludes that it required no more special skill than employee drivers. Thus, this factor weighs in favor of plaintiffs. The Court again notes, however, that this is a place where the load board could have an impact on the analysis regarding the secondary issue of level of skill in being a lease operator and having more freedom to choose loads. It is possible that more freedom in choosing loads makes the skill of choosing the right loads more important.

### e. *Permanency of the Relationship*

The fifth consideration in the economic realities test is "the permanency of the relationship." *Alpha & Omega*, 39 F.4th at 1082. The question under this factor is

whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401, at *21. "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor." *Keller*, 781 F.3d at 807. Courts look to "the length and regularity of the working relationship between the parties, but even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship." *Id.* (internal citation omitted). Thus, although the factor is often labeled as the permanency of the relationship, courts clearly also consider exclusivity within this factor. *See, e.g.*, *Roeder*, 2017 WL 151401, at *22–23 (finding this factor weighed in favor of independent contractor status regarding a worker who also performed work for other companies, but finding this factor weighed in favor of employee status as to a different worker whose relationship with the company was shorter in duration, but exclusive).

Plaintiffs argue this factor weighs in favor of an employee-employer relationship because the drivers worked exclusively for defendant, and the one-year contracts were routinely extended or renewed on satisfactory performance. (Doc. 337, at 30–31). Defendant argues in response that the drivers entered into and terminated the contracts on a regular basis, and defendant points to the high turnover rate of lease operators as specific evidence supporting its position. (Doc. 354, at 32–34). Defendant argues that drivers terminating their contracts on a regular basis shows that they could, and in fact did, drive for other carriers. (*Id.*).

There is a genuine issue of material fact regarding whether the parties considered the work as permanent. While the drivers were under contract with defendant, the work was exclusive. This fact points heavily toward employee status here. Also, the contracts lasted a year in length, and were generally renewed as long as defendant was satisfied with the drivers' work. This fact points toward employee status as well. And the turnover rate for lease operators was not significantly higher than the turnover rate for company drivers, mitigating the importance of that fact in the analysis as favoring

49

defendant.[18]

Some of the relationships, however, lasted only a short period of time. Although the relationships generally lasted at least a few months at shortest, there is some evidence of relationships which lasted for a shorter period than that. This provides at least some evidence defendant can rest on under this factor.

Thus, there is a genuine issue of material fact under this factor. The Court notes, however, that this factor appears to again be tipped towards plaintiffs. The drivers could not, in reality, drive for a different carrier while driving for defendant. Courts have found this type of exclusive relationship, even when it is relatively short, to point toward an employment relationship. Also, entering into a working relationship with a listed term of one year is long enough to point to employee status when the relationship is exclusive.

### f. Integral to the Business

The final factor of the economic realities test asks "whether workers' services are a necessary component of the [defendant's] business." *Alpha & Omega*, 39 F.4th at 1085 (citation omitted). "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815.

Defendant sums up the considerations under this factor well here: "[Defendant] is a logistics company, and the nature of its business is the timely delivery of its customers' freight. The primary service the [drivers] offer is to haul loads for [defendant's] customers." (Doc. 354, at 34). Thus, defendant concedes that this factor weighs in favor of employee status, and the Court agrees.

Defendant argues, however, that this factor is "less relevant in the context of this case." (*Id.*). The Court disagrees. This factor is as relevant as the others, and will be weighed accordingly when determining whether plaintiffs are employees or independent

---

[18] In fact, it appears that in some months and years, turnover rates for company drivers have been higher than turnover rate for lease operators. (Doc. 349-3, at 268–68, 655–56).

contractors at trial. In fact, as plaintiffs point out, there is evidence which points to this factor holding extra weight in the context of this case. Not only did the drivers haul freight—precisely what defendant's business entails—but the drivers also, if they chose to be lead drivers, helped train defendant's student drivers, who were defendant's employees. Drivers participated in defendant's business not only by hauling defendant's customers' freight, but also by helping to train defendant's young employees.

Thus, this factor weighs in favor of employee status, and the only issue under this factor at trial will be what weight the factor holds in the overall analysis.

### 3. Conclusion

In weighing all the factors, the Court finds that, although it is close, there are enough issues of fact to preclude summary judgment for plaintiffs on the issue of whether the drivers were employees or independent contractors. Of course, the same analysis here is applicable to plaintiffs' FLSA claim and their Iowa Minimum Wage claim, and thus the Court's conclusion is the same for both claims.

Thus, plaintiffs' motion for summary judgment regarding the classification issue under both the FLSA and Iowa Minimum Wage Law is **denied**.

### D. Truth in Leasing Act

Plaintiffs next move for summary judgment regarding their TILA claim under 49 C.F.R. § 376.12(g). (Doc. 337, at 34–38). Plaintiffs seek summary judgment on defendant's liability under this claim, which, if granted, will leave only the issue of damages for trial. For the following reasons, plaintiffs' motion for summary judgment on defendant's liability under plaintiffs' TILA claim is **granted**.

### 1. Applicable Law

Federal leasing regulations require that certain leases contain specific provisions, and require that the provision be adhered to. *See* 49 C.F.R. § 376.12. One of the required provisions relates to disclosure by the carrier to the driver of certain documents, including copies of the freight bill or a similar document used by the carrier. *See* 49

51

C.F.R. § 376.12(g). When a carrier does not adhere to these provisions, drivers have a statutory cause of action under Title 49, United States Code, Section 14704(a)(2). Specifically, the statute provides: "A carrier or broker providing transportation or service . . . is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." 49 U.S.C. § 14704(a)(2). *See also Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 692 (8th Cir. 2009) (stating that there is "a private right of action in 49 U.S.C. § 14704(a)(2) for violations of the Truth-in-Leasing regulations."). Thus, to prove liability for this claim, plaintiffs must prove that (1) defendant violated 49 C.F.R. § 376.12(g), and (2) drivers were underpaid as a result of the violation.

### 2. Analysis

Plaintiffs argue that, as an initial matter, the settlement statements defendant gave drivers did not include the freight bill or other documentation containing the same information. (Doc. 337, at 35–38). Plaintiffs argue further that, although plaintiffs and defendant dispute the amount of damages resulting from this violation, the parties agree that drivers were underpaid as a result of the violation. (*Id.*). Plaintiffs reason they should be granted summary judgment on liability here because defendant's violation is undisputed, and the fact that there are actual damages as to at least some drivers is undisputed. (*Id.*). Defendant argues that plaintiffs have failed to put forth evidence of actual damages, and that plaintiffs must have evidence of each driver sustaining damages as a result of the violations. (Doc. 354, at 37–39).

The parties appear to agree that a violation of the regulation occurred here, as defendant does not make any argument under that issue. The parties also agree that, to some degree, drivers were underpaid as a result of defendant's violation. The only disputed issue is the amount of damages. The two elements plaintiffs must prove to establish defendant's liability here, violation and underpayment, are both satisfied. The only question is the level of the underpayment. Thus, plaintiffs have established

defendant's liability under this claim, and the only issue at trial for this claim will be damages.

Defendant points to *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1219 (10th Cir. 2016), in support of its argument. (Doc. 354, at 39). Defendant cites *Fox* as a court rejecting an "attempt to sidestep the requirement to offer evidence in support of damages as part of establishing liability for a leasing regulations violation." (*Id.*, at 39 n.50). The plaintiffs in *Fox* rested their argument on being able to establish damages in the future, asserting that they "can and will put on evidence regarding damages at time of trial." *Fox*, 839 F.3d at 1219. The court held that the plaintiffs had not met their burden of coming forward with some evidence of actual damages. *See id*. The defendant in *Fox* was challenging whether the plaintiffs had suffered any damages. Here, unlike *Fox*, defendant's expert opined that the drivers suffered damages as a result of defendant's violation. (Doc. 349-4, at 106). There is no dispute over whether there are damages here. Instead, the only dispute is what the amount of damages is. *Fox* is inapposite.

The Court also notes that, whether it grants plaintiffs' motion on this issue or not, the issue at trial will be the same. Both parties appear to agree that defendant violated the regulation and drivers suffered damages as a result. Thus, the only issue at trial is the amount of damages. Defendant interprets this as a liability issue, arguing that, so long as plaintiffs cannot prove that every driver suffered damages as a result of a violation of the regulation, the class cannot be granted summary judgment. If the Court agreed with defendant's interpretation, the issue at trial on this claim would still be the same: what were the damages resulting from defendant's violations? So long as the parties agree there were violations and damages resulted, the only issue at trial will be the level of damages.

### 3. Summation

Plaintiffs have shown there are no genuine issues of material fact as it relates to defendant's liability concerning plaintiffs' claim under 49 C.F.R. § 376.12(g), and

plaintiffs are entitled to judgment as a matter of law regarding defendant's liability. The only issue at trial under this claim will be amount of damages.

Thus, the Court **grants** plaintiffs' motion for summary judgment regarding defendant's liability under plaintiffs' TILA claim under Section 376.12(g).

### E.    Conclusion

For these reasons, plaintiffs' motion for partial summary judgment is **granted-in-part and denied-in-part**. Specifically, plaintiffs' motion, as it relates to the drivers' status as employees or independent contractors, is **denied**. Plaintiffs' motion, as it relates to defendant's liability under plaintiffs' TILA claim under Section 376.12(g), is **granted**.

## IV.    DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant seeks partial summary judgment on multiple grounds. First, defendant seeks summary judgment on plaintiffs' Iowa Minimum Wage claims to the extent the claims accrued after July 1, 2020, because of an amendment to Iowa law effective on that date. (Doc. 340, at 9–24). Defendant next seeks summary judgment on plaintiffs' unlawful deductions claims on multiple grounds. (*Id.*, at 24–26). Defendant also seeks summary judgment on the named plaintiffs' unjust enrichment and fraud claims. (*Id.*, at 26–30). Finally, defendant seeks summary judgment on plaintiffs' minimum wage claims under both the FLSA and IMWL to the extent they accrued after the applicable statutes of limitation. (*Id.*, at 30–31). Plaintiffs resist on all fronts. (Doc. 352).

Most of the facts pertinent to defendant's motion for partial summary judgment are the same as the facts discussed above concerning plaintiffs' motion for partial summary judgment. The Court will discuss additional facts relevant to defendant's motion within the analysis below rather than include an extra facts section here.

The standard for summary judgment is the same as discussed above in the Court's discussion of plaintiffs' motion for partial summary judgment. The issue is whether there is a genuine dispute of material fact precluding judgment as a matter of law. Fed. R. Civ. P. 56(a). Notably, regarding defendant's motion for partial summary judgment,

plaintiffs are the non-movants, and thus are entitled to "all justifiable inferences" in their favor, and the Court must view the evidence in the light most favorable to plaintiffs. *Tolan*, 572 U.S. at 651.

For the following reasons, defendant's motion for partial summary judgment is **granted-in-part and denied-in-part**.

### A.     *The Owner-Operator Exemption*

Plaintiffs bring one of their claims under the Iowa Minimum Wage Law ("IMWL"). *See* Iowa Code § 91D.1(1)(b). The Iowa statute provides that "[e]very employer, as defined in the [FLSA], shall pay to each of the employer's employees, as defined in the [FLSA], the state hourly wage . . . or the current federal minimum wage, . . . whichever is greater." *Id.* Plaintiffs claim they were employees of defendant and were paid an amount lower than minimum wage. As discussed above, the general analysis for determining whether plaintiffs were employees or independent contractors under the IMWL is controlled by the test under the FLSA, which is generally the economic realities test. This is because of the statutory language in the IMWL incorporating the FLSA's definition of "employer" and "employee."

The IMWL was amended to add an exception to the definition of "employee" effective July 1, 2020. Section 91D.1(4) was the added section, which provides that "'employee' does not include an independent contractor as described in section 85.61[(12)(c)(3)]." Section 85.61(12)(c)(3), in turn, provides:

> The following persons shall not be deemed "workers" or "employees":
> . . .
> (3) (a) For purposes of this subparagraph, "owns" includes but is not limited to holding legal title to a vehicle or being a party to an agreement for the conditional sale or lease of the vehicle that includes the party's right to purchase upon performance of conditions stated in the agreement with an immediate right of possession. . . .
> (b) An owner-operator who, as an individual or partner, or shareholder of a corporate owner-operator, owns a vehicle licensed and registered as a truck, road tractor, or truck tractor by a governmental agency, is an

55

independent contractor while performing services in the operation of the owner-operator's vehicle if all of the following conditions are substantially present:

(i) The owner-operator is responsible for the maintenance of the vehicle.

(ii) The owner-operator bears the principal burden of the vehicle's operating costs, including fuel, repairs, supplies, collision insurance, and personal expenses for the operator while on the road.

(iii) The owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees.

(iv) The owner-operator's compensation is based on factors related to the work performed, including a percentage of any schedule of rates or lawfully published tariff, and not on the basis of the hours or time expended.

(v) The owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper.

(vi) The owner-operator enters into a contract which specifies the relationship to be that of an independent contractor and not that of an employee.

Iowa Code § 85.61(12)(c)(3). This is the so-called "owner-operator exemption." If the exemption applies here, it would limit defendant's potentially liability under plaintiffs' IMWL claim to events which occurred before July 1, 2020.

Defendant argues that the drivers satisfy each of the elements of the owner-operator exemption. (Doc. 340, at 8–24). Plaintiffs resist on almost every front. (Doc. 352, at 8–22). This includes fairly straight-forward arguments by plaintiffs on most elements of the exemption. Plaintiffs also argue that the drivers did not own the trucks as defined in the statute, and that the ICOA was unconscionable and against public policy. Plaintiffs do not contest elements (ii)—that drivers bore "the principal burden of the vehicle's operating costs"—and (iv)—that drivers' compensation was "based on factors related to the work performed . . . and not on the basis of the hours or time expended." (*Id.*).

The first issue is whether the drivers owned the vehicles as defined in the owner-

56

operator exemption. Under the statute, owning "includes but is not limited to holding legal title to a vehicle or being a party to an agreement for the conditional sale or lease of the vehicle that includes the party's right to purchase upon performance of conditions stated in the agreement with an immediate right of possession." Iowa Code § 85.61(12)(c)(3)(a).

Defendant argues that the drivers owned their vehicles here. Specifically, defendant argues that the drivers were party to an agreement—the drivers' lease with Lincoln Sales—for the lease of the truck, and the lease included a right to purchase the truck upon certain conditions with an immediate right of possession. (Doc. 340, at 10). Plaintiffs argue that they did not own the trucks. Specifically, plaintiffs argue that the drivers did not have the right to purchase the vehicles "for the simple reason that the ICOA permitted CRST to terminate the ICOA 'for any reason upon twenty (20) days' prior written notice' . . . and termination immediately placed a Driver in default of his lease and precluded him from purchasing the truck." (Doc. 352, at 9). Plaintiffs reason that, because of this default provision in the lease, drivers had "no unconditional '*right* to purchase' the truck upon performance of the conditions" stated in the lease. (*Id.*) (emphasis added by plaintiffs). Plaintiffs ultimately argue that the fact that a driver's right to purchase a vehicle here is conditioned on defendant "permitting the [d]river to do so, on its face, fails to satisfy the definition of 'owns' in" section 85.61(12)(c)(3). (*Id.*).

Defendant has the better argument. The statutory language includes three requirements: (1) drivers were party to an agreement for the lease of the vehicle; (2) the lease included the drivers' right to purchase upon performance of conditions stated in the agreement; and (3) the purchase would confer an immediate right of possession to the drivers. Iowa Code § 85.61(12)(c)(3). The drivers were clearly party to a lease agreement for the vehicle—the lease agreement with Lincoln Sales. The agreement included a right to purchase the vehicle upon performance of conditions in the agreement,

Case 1:20-cv-00075-CJW-KEM   Document 368   Filed 05/28/24   Page 57 of 85

and the purchase would presumably confer an immediate right of possession.

Plaintiffs read the word "unconditional" into the statutory language here. They argue that drivers did not have the unconditional right to purchase the truck upon performance of conditions, because the lease being in default precluded a driver from purchasing the truck, and the lease would be in default if defendant terminated the drivers' ICOAs. The statutory language, however, only requires that the lease include a right to purchase upon performance of conditions stated in the agreement. The only conditions in the lease here for purchasing the vehicle are that the driver is not in default and that the lease term has expired. (Doc. 334-4, at 54). Thus, the lease included a right to purchase upon performance of conditions. Plaintiffs dislike of the specific conditions here does not change the fact that the lease included the required language. Thus, for the purposes of the owner-operator exemption, the drivers "owned" their vehicles.

The first element of the owner-operator exemption asks whether "[t]he owner-operator is responsible for the maintenance of the vehicle." Iowa Code § 85.61(12)(c)(3). Defendant argues that the drivers were responsible for the maintenance of the vehicles because the ICOAs state that it is the drivers' responsibility, and because drivers testified that they paid $0.15 per mile for a maintenance program, and several drivers also testified to covering certain small maintenance charges out of their own pocket. (Doc. 340, at 11–13). Plaintiffs argue that the drivers' leases with Lincoln Sales show that Lincoln Sales, and not the drivers, were responsible for maintenance. (Doc. 352, at 10–11).

Both parties make good arguments here. As defendant notes, the ICOA—the contract between driver and defendant—provides that the driver is responsible for maintenance. (Doc. 334-3, at 220–21). As plaintiffs note, however, the lease—between driver and Lincoln Sales—appears to put much of the responsibility for performing maintenance and repairs, at least in certain circumstances, on the shoulders of Lincoln Sales. (Doc. 328-4, at 44–47). Defendant responds by noting that the lease also required drivers to pay $0.15 per mile for Lincoln Sales' maintenance program. (*Id.*, at 39).

There appears to be driver testimony linking the maintenance program with the $0.15 per mile payment, further backing defendant's point here. (Doc. 334-4, at 162–63).

This issue presents a genuine issue of material fact for the maintenance element. Although it is fairly clear the drivers are responsible for maintenance as between driver and defendant, it is not clear that the drivers are responsible for maintenance as between driver and Lincoln Sales. The drivers appear to have been paying for the maintenance program through the $0.15 per mile payment, though that is not entirely clear in the lease. Even accepting that as true, it appears much of the responsibility for the details of the maintenance at certain times, at least as described in the lease, fell to Lincoln Sales.

Notably, the statutory language does not ask who was more responsible for maintenance as between driver and defendant company, but instead whether the driver was responsible for maintenance of the vehicle. Although it would appear that the drivers here were responsible for the maintenance, the Court cannot say, as a matter of law, that this is the case. The parties will have the opportunity at trial to prove who was ultimately responsible for the maintenance of the trucks.

The second element of the owner-operator exemption asks whether the driver bears the principal burden of the vehicle's operating costs and certain other expenses while the driver is on the road. Iowa Code § 85.61(12)(c)(3). Plaintiffs appear to concede this element by not making any argument in opposition. Thus, defendant satisfies this element.

The third element requires that "[t]he owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees." *Id.* There are issues of material fact under this element. There is a glaring issue of fact here for drivers who entered the lead driver program. These lead drivers were supplied by defendant with one of defendant's student drivers to drive with the lead driver. The student drivers were defendant's employees, not the drivers' employees. Thus, for the lease operators who were lead drivers, the personnel

59

operating the vehicle, at least when the lease operator was not driving, would have been defendant's employee, and not the lease operator's employee as required by this element. Thus, for drivers who were lead drivers, not only is there an issue of material fact, but it appears defendant will have a nearly impossible mountain to climb to establish this element at trial.

For lease operators who were not lead drivers, this element is a closer call. There are multiple issues of fact precluding a finding for defendant on this element as a matter of law regarding drivers who drove with co-drivers. Although the ICOA gives drivers the responsibility of supplying any co-drivers, it also gives defendant the opportunity to reject the hiring of specific co-drivers. As defendant points out, some of this is required by federal law; that is, if a driver is going to be driving with defendant as the carrier, defendant must ensure the driver is qualified. Still, enough lease operators here testified that they had to get permission from defendant to hire a specific co-driver, and the process largely ran through defendant. (Doc. 360-4, at 15–17). It is not clear from this record whether defendant's approval or rejection of drivers had anything to do necessarily with whether the drivers were qualified under federal law. Thus, there is an issue of fact regarding whether the lease operators were truly responsible for supplying the necessary personnel to operate the vehicle. *See Keller*, 781 F.3d at 812–13 ("[H]iring authority may be 'illusory' if the defendant-company maintains control over the technicians' hiring ability.").

The fourth element of the owner-operator exemption provides: "The owner-operator's compensation is based on factors related to the work performed, including a percentage of any schedule of rates or lawfully published tariff, and not on the basis of the hours or time expended." Iowa Code § 85.61(12)(c)(3). As defendant notes, the drivers here were generally paid based upon a percentage of the total amount defendant charged the customer to haul a load. (Doc. 340, at 16–17). Drivers were thus compensated based on a percentage of rates, and not on the basis of hours or time

expended driving. Plaintiffs concede this element by not making an opposing argument. Thus, defendant satisfies the fourth element.

The fifth element requires that the "owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper." Iowa Code § 85.61(12)(c)(3). The parties make relatively extensive arguments about this element, and for good reason: it overlaps to a large degree with the factors of the economic realities test and is much more open ended than the other elements of the owner-operator exemption. This element calls for consideration of many of the same facts considered within the "control" factor under the economic realities test, and it calls for a similar legal analysis. One difference here legally is that the condition under the owner-operator exemption must be "substantially present," as opposed to the control factor in the economic realities test, where it is a factor to be considered along with several others. In theory, the bar is lowered, to a degree, for defendant to establish this element under the exemption as compared to the economic realities test analysis.

Still, there are issues of fact precluding summary judgment on this element. One of the major issues, again, is the drivers' ability to turn down loads. As discussed above, there is competing evidence on the issue. Looking only at the ICOA, the drivers clearly had the right to turn down any and all loads offered to them. The drivers generally testified, however, that in reality they were pressured to accept loads many times and could not realistically turn down loads. Defendant again makes arguments concerning the drivers' processes in deciding to accept or reject loads, and how some drivers testified about analyzing profitability of a load before accepting or rejecting it. This evidence holds some weight, but there is an issue of whether the drivers' decisions in this context show any control, considering the fact that they did not know when the next load would be offered to them or whether the next load would be more or less profitable. Also, even though the drivers technically had the option to drive for other carriers in the ICOA,

61

there is no evidence of a driver doing so, likely because of the various hoops drivers had to jump through to do so. Thus, turning down a load simply meant waiting for the next offer from defendant, which the drivers had no knowledge whether it would be a better or worse load. Although the element under the test here appears to focus on the narrower details of the work, this issue of fact still weighs on the outcome to a degree.

The parties also make arguments about the drivers hiring co-drivers as employees and becoming lead drivers. There is an issue of fact here concerning how much control the drivers truly had in this process, as discussed fully under the third element of the owner-operator exemption above. In short, though, the Court cannot determine, as a matter of law, that the drivers exerted a majority of the control in choosing their co-drivers or student drivers.

There are also, of course, facts which support defendant's position on this element. Drivers could generally set their own schedules concerning when they drove, although the pickup and drop-off windows appear to have generally been worked out between defendant and the customer. The details of the driving appear to have been generally controlled by the drivers, although defendant appears to have exercised some control over that as well. To the extent it matters, the drivers were generally able to decide the route they drove, with some exceptions.[19]

Finally, as defendant argues, most of the language in the ICOA favors defendant's position here. This may carry more weight under this analysis because the only case cited to the Court analyzing this exemption relies on the contract between the parties fairly heavily. *See Finch v. Schneider Specialized Carriers, Inc.*, No. 03-1012, 2004 WL 2169392, at *3–5 (Iowa Ct. App. Sept. 29, 2004), *rev'd on other grounds*, 700

_____

[19] The Court notes here, as it has multiple times throughout this order, that the ability to choose a route carries little weight in the analysis. Other courts have called choosing a route "simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Brant*, 43 F.4th at 668 (quoting *Narayan*, 616 F.3d at 904). The Court concurs.

N.W.2d 328 (Iowa 2005).[20]  In *Finch*, the court upheld an agency decision, under somewhat similar facts as here, that the driver determined the details and means of performing the services, and thus this element was satisfied.  2004 WL 2169392, at *4–5.  In doing so, however, the court noted that "while a reasonable, neutral and detached person could view the record and find that [defendant company] determined some details and means of performance, such a person could also conclude [plaintiff driver] determined the details and means of his performance to the extent required by" the fifth element of the exemption.  *Id.* at *5.  Notably, the court's language—that a reasonable fact finder could have found for either party on the record—implies that summary judgment would have been inappropriate in *Finch*.  The court upheld the agency decision on a deferential standard of review, where the court accepted factual findings so long as they were "supported by substantial evidence in the record before the court when that record is viewed as a whole," and by "broadly and liberally apply[ing] the agency's findings to uphold rather than to defeat its decision."  *Id.* at *2–3 (internal quotations and citations omitted).  Thus, even if defendant's argument that the facts here are similar to those in *Finch* is accepted, summary judgment is still inappropriate.[21]

The sixth and final element of the owner-operator exemption requires that "[t]he owner-operator enters into a contract which specifies the relationship to be that of an independent contractor and not that of an employee."  Iowa Code § 85.61(12)(c)(3).  All drivers here entered into a contract with defendant—namely, the ICOAs.  To say that the

---

[20] The Iowa Supreme Court specifically stated, regarding the court of appeals' conclusion on the issue relevant here: "We agree with the court of appeals' resolution on this issue."  *Finch*, 700 N.W.2d at 331.

[21] As the Court has noted numerous times throughout this order, the analysis on this element may be impacted to a large degree from the time the load board became active and accessible to the drivers.  The summary judgment record does not include if, or when, the load board became active for the drivers in general.  Thus, this is still an open question to be decided at trial.

ICOAs specify that the relationship is that of an independent contractor and not that of an employee would be an understatement, to say the least. The ICOAs specify that the drivers are independent contractors on almost every page of the contract. Thus, at least taking the ICOAs at face value, they clearly satisfy this element.

Plaintiffs argue, however, that the ICOAs should not be taken at face value. That is, plaintiffs argue that the contracts are unenforceable as unconscionable and against public policy. (Doc. 352, at 17–22). Plaintiffs' argument here is that if the contract is unconscionable, then it cannot satisfy the "contract" requirement in this element.[22] Defendant argues that the contract is not unconscionable. (Doc. 364, at 13–17).

Under Iowa law, contracts are unconscionable when "no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 80 (Iowa 2011). When determining whether a contract is unconscionable, courts consider factors such as "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *Id.* (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 277 N.W.2d 169, 181 (Iowa 1975)). Unconscionability "includes both procedural and substantive elements." *In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008). The procedural element includes aspects such as "sharp practices, the use of fine print and convoluted language, as well as a lack of understanding and an inequality of bargaining power." *Id.* (quoting *Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992)) (cleaned up). The substantive element "focuses on the 'harsh, oppressive, and one-sided terms' of a contract." *Id.* (quoting *Rite Color Chem. Co.*, 411 S.E.2d at 648)). Courts determine whether a contract is unconscionable "at the time it was entered." *C & J Vantage Leasing Co.*, 795 N.W.2d at 81.

---

[22] The Court need not reach plaintiffs' argument on this front in light of the Court's holding regarding unconscionability. Thus, the Court assumes without deciding that plaintiffs' argument here is true, and an unconscionable contract cannot satisfy this element.

The Iowa Supreme Court has made clear that unconscionability generally "is not a means by which a party may escape the requirements of an unfavorable contract after experiencing buyer's remorse." *Shanks*, 758 N.W.2d at 515–16. The court has noted that an "imprudent bargain" alone does not rise to the level of unconscionability on the theory that parties "should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side of another from the effects of a bad bargain." *Id.* at 515 (quoting *Smith v. Harrison*, 325 N.W.2d 92, 94 (Iowa 1982)). The Iowa Supreme Court has also emphasized the following language from the Restatement (Second) of Contracts:

> A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. *But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.*

*Shanks*, 758 N.W.2d at 515 (quoting Restatement (Second) of Contracts § 208 cmt. d (1981)) (emphasis in original). Thus, under Iowa law, courts must hesitate to determine that a contract is unconscionable absent an unconscionable bargaining process. *See, e.g.*, *Shanks*, 758 N.W.2d at 516 ("Thus, absent an unconscionable bargaining process, a court should be hesitant to impose its own after-the-fact morality judgment on the terms of a voluntarily executed premarital agreement."). Then, even when the procedural aspect of the contract is unconscionable, the substantive terms of the agreement must be "so harsh or oppressive that no person in his or her right senses would make it" for a party to avoid the contract's enforcement. *C & J Vantage Leasing Co.*, 795 N.W.2d at 81.

Plaintiffs' main issue here is the procedural aspect of the unconscionability analysis. Plaintiffs argue that the contract was procedurally unconscionable for several reasons, including: defendant's marketing materials and recruiters convinced drivers to

attend orientation in person in Cedar Rapids; the contracts were pre-printed forms drafted by defendant "and presented to [d]rivers on a take-it-or leave it basis"; drivers did not have "adequate" time to review the documents before signing; drivers generally "did not complete a higher education degree beyond high school"; and defendant only offered one-way transportation for the drivers to the place of signing the contract. (Doc. 352, at 19). Defendant notes that the ICOAs were drafted in "readable font" and there were no hidden or fine print clauses. (Doc. 364, at 14). Defendant also notes there is some evidence showing that the drivers were walked through the ICOA during orientation, at least to some degree. (*Id.*). Perhaps most importantly, defendant points out that, although defendant drafted the ICOA document, drivers had options other than agreeing to the ICOA—namely, driving with another carrier, or choosing to become a company driver. (*Id.*).

Defendant has the better argument. As noted above, when analyzing procedural unconscionability, courts look to factors including "sharp practices," fine print issues, "an advantaged party's exploitation of a disadvantaged party's lack of understanding," and inequality of bargaining power between the parties. *Shanks*, 758 N.W.2d at 515; *C & J Vantage Leasing Co.*, 795 N.W.2d at 81. Plaintiffs do not point to any fine print issues with the ICOAs, and the Court agrees with defendant that there generally appear to be no fine print or hidden clause issues. There is some deposition testimony that defendant's employees would walk the drivers through what the contracts generally said, and then ask the drivers to sign if they agreed. (Doc. 360-4, at 54–55). Plaintiffs claim defendant did not permit drivers to seek legal advice before signing the contract, but the evidence does not support this claim—instead, the record plaintiffs cite includes a driver saying that he had a few minutes with the contract, and then defendant told him where to sign. (*Id.*, at 55). Plaintiffs point to nothing in the record standing for the idea that defendant did not permit drivers to seek legal advice. Notably, plaintiffs do not argue here that defendant misrepresented what was in the contract at orientation, or that

66

defendant somehow forced the drivers to sign the contract.

Defendant's argument that the drivers had other options goes a long way here. The ICOAs may have been "take-it-or-leave-it," but the drivers would have been free to "leave it" because of their other options—i.e., driving for a different carrier or becoming a company driver for defendant. Also, although drivers may not have had enough time to read the whole contract at orientation, there is no proof that drivers could not have requested more time to read it, or that drivers could not have taken the contract to an attorney. Further, failing to read or consider language in a contract "cannot relieve [a party] of its provisions," especially when the provision is "not hidden or obscured." *Bartlett Grain Co*. v. *Sheeder*, 829 N.W.2d 18, 28 (Iowa 2013) (quoting *Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486 (Iowa 1999)). A section of the Restatement (Second) of Contracts cited approvingly by the Iowa Supreme Court notes that courts should look in part to whether "the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." *Shanks*, 758 N.W.2d at 515 (quoting Restatement (Second) of Contracts § 208 cmt. d (1981)) (emphasis omitted). Plaintiffs point to no deception on the part of defendant. The drivers had a meaningful choice and real alternatives—driving for another carrier or as a company driver for defendant. By being walked through the general terms of the contract, the contract apparently not hiding the ball on any clauses, and signing the contract, the drivers in fact assented or appeared to assent to the terms of the contract. The only part of the Restatement section the plaintiffs might have some evidence of is the idea of compulsion, but even that is a stretch. Plaintiffs need more than defendant asking drivers to sign the contract during an orientation to show compulsion. Thus, plaintiffs cannot show that the ICOAs were procedurally unconscionable. Accordingly, plaintiffs' argument here that the ICOAs fail to meet the final element of the owner-operator exemption because they are unconscionable fails, and defendant has established this

67

element as a matter of law.[23]

In sum, there are genuine issues of material fact precluding summary judgment on several of the elements of the owner-operator exemption. Thus, defendant's motion for summary judgment under the owner-operator exemption is **denied**.

### B.     *Statutes of Limitation*

Defendant moves for summary judgment on plaintiffs' minimum wage claims under the IMWL and FLSA "to the extent those claims accrued more than two years prior to the filing of the Complaint or more than two years prior to the filing of each collective member's consent form in this case." (Doc. 333, at 3). Plaintiffs resist on two grounds. Plaintiffs argue that the statutes of limitation here should be equitably tolled, which would preclude defendant from raising a statute of limitations defense. (Doc. 352, at 26–30). Plaintiffs also argue that disputed issues of fact preclude summary judgment on the FLSA claim's statute of limitation regarding a third year of liability. (*Id.*, at 22–26). Defendant resists plaintiffs' arguments on both fronts. (Doc. 364, at

---

[23] The Court need not address whether the ICOAs were substantively unconscionable due to the conclusion regarding procedural unconscionability. Still, the Court notes that it would not find the contract substantively unconscionable. Substantive unconscionability is a high bar. The contract terms must be "so harsh or oppressive that no person in his or her right senses would make it" for the contract to be substantively unconscionable. *C & J Vantage Leasing Co.*, 795 N.W.2d at 81. Admittedly, a few clauses may be unconscionable, including paragraph 9(F), which the Court has previously found invalid under the FLSA. Plaintiffs, however, have not persuaded the Court that the ICOAs as a whole meet the high standard of oppression required by Iowa law to call the contracts substantively unconscionable. For example, plaintiffs point to the fact that the ICOAs do not promise drivers any minimum amount of work, but that is in line with what an independent contractor agreement could fairly include. Plaintiffs also point to the fact that defendant could terminate the contracts at will, generally on 20-days-notice—but plaintiffs ignore the fact that drivers could also terminate the contract on 20-days-notice. Finally, plaintiffs argue that termination of the contract would put a driver in default of their truck lease, which would in turn "impose all of the draconian financial consequences such default entails," (Doc. 352, at 20), but plaintiffs do not develop what those apparently "draconian" financial consequences entail. In sum, although plaintiffs have a small amount of evidence here, it is not enough, even accepting all evidence plaintiffs point to here as true, to rise to the level of substantive unconscionability.

18–20).

Defendant first points to Iowa Code section 614.1(8), which provides: "Actions may be brought within the times limited as follows, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared: . . . **8. Wages.** Those founded on claims for wages or for a liability or penalty for failure to pay wages, within two years." Iowa Code § 614.1(8). The parties agree that this section provides the statute of limitations for plaintiffs' IMWL claim. Plaintiffs do not make any argument specific to the IMWL statute of limitations other than the equitable tolling argument. Thus, if plaintiffs' equitable tolling argument fails, then plaintiffs' claim under the IMWL will only encompass conduct occurring as early as two years before the filing of plaintiffs' original complaint in this suit. In that case, plaintiffs would not be able to enforce any potential liability of defendant regarding events which occurred before that date.

### 1.    *Equitable Tolling*

Plaintiffs argue that two paragraphs in the ICOA caused the drivers to not pursue their claims in a timely manner because of the potential consequences of doing so. (Doc. 352, at 26–30). Plaintiffs point to paragraphs 7(E) and 9(F) as those that stopped drivers from asserting their rights. Paragraph 7(E) provides that the drivers agree to indemnify defendant of all reasonable attorney's fees and litigation expenses defendant incurs in defending against a suit by the driver if the driver is ultimately unsuccessful. (Doc. 334-3, at 280). Paragraph 9(F) provides that, if the driver is successful in proving that they are an employee in a legal action, the ICOA is rescinded and the driver owes defendant all gross compensation received under the ICOA less deductions and expenses. (Doc. 334-4, at 2). Defendant would then owe the driver the federal minimum wage for all hours worked by the driver during that period. (*Id.*). The Court previously found that paragraph 9(F) is "facially invalid under the FLSA" because it "seeks to invalidate any damages the [d]rivers could receive by rescinding their contracts and indeed, imposing damages by requiring them to pay back their gross earnings under the ICOA." (Doc.

69

147, at 14).

Plaintiffs also point to the following statement from an affidavit by Cervantes:

> I remember reading sections 7 and 9(F) of the Contract and thinking that these sections prevented me from bringing [defendant] to court. As a result of these paragraphs I did not think that it was possible for me to challenge my status as an independent contractor and it certainly would not have been worthwhile since I would have ended up owing [defendant] money whether I won or lost. It was only after contacting counsel on an issue unrelated to my status as an independent contractor that I became aware that these paragraphs were probably unenforceable and that I could challenge my classification as an independent contractor.

(Doc. 347-2, at 225–26). Another driver submitted an affidavit with the same language as well. (*Id.*, at 228).

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way." *Putman v. Galaxy 1 Mktg., Inc.*, 276 F.R.D. 264, 275 (S.D. Iowa 2011) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "The doctrine of equitable tolling does not apply to 'garden variety' claims of excusable neglect, and should be invoked only in exceptional circumstances truly beyond the plaintiff's control." *Jenkins v. Mabus*, 646 F.3d 1023, 1028–29 (8th Cir. 2011). The doctrine should be used only sparingly. *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990). The Supreme Court has allowed equitable tolling, for example, "in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id.* (footnotes omitted). The Supreme Court, however, has "generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Id.*

The doctrine of equitable tolling does not fit here. First, plaintiffs have no

70

evidence that, at least before they filed this lawsuit, they had been "pursuing [their] rights diligently." *Putman*, 276 F.R.D. at 275. This first element calls for some kind of affirmative act. The most plaintiffs have provided is a few drivers reading the contract and deciding that they should not sue. That does not amount to diligently pursuing rights.

The second element of equitable tolling is also missing. Plaintiffs must show that "some extraordinary circumstance stood in [their] way." *Id.* In the abstract, a few paragraphs in the ICOA which may have held the drivers back from filing a lawsuit could be seen as a circumstance which stood in the drivers' way. The second element here, however, relates back to the first element. That is, the circumstance must stand in the way of a plaintiff pursuing their rights. The provisions in the ICOA that plaintiffs point to did not stand in the way of plaintiffs pursuing their rights, as evidenced, at least in part, by the lawsuit at issue here.

Further, plaintiffs cite to no caselaw applying equitable tolling in this situation. Plaintiffs cite to cases where courts equitably tolled statutes of limitation for class members back to the time the legal proceeding commenced. *See, e.g., Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552–53 (1974) (holding that, under the circumstances, "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status"); *Clendenen v. Steak N Shake Operations, Inc.*, Case No. 4:17-cv-01506-JAR, 2018 WL 4679728, at *4 (E.D. Mo. Sept. 28, 2018) ("[G]ranting motions filed by named plaintiffs to equitably toll the statute of limitations for potential opt-in plaintiffs is not uncommon in this District, especially as to the period of time during which the motion to conditionally certify is pending."). Plaintiffs also cite to cases where the defendant deprived the potential plaintiff of notice of the plaintiff's rights. *See, e.g., Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977) (equitably tolling statute of limitations when defendant company failed to post signs—which were required by federal law to be posted on the

employer's premises—advising employees of certain rights, thus depriving the employees of their rights); *Cortez v. Medina's Landscaping, Inc.*, No. 00 C 6320, 2002 WL 31175471, at *5–6 (N.D. Ill. Sept. 30, 2002) (same).

As noted by the Supreme Court in *Irwin*, a statute of limitations may be equitably tolled when "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." 498 U.S. at 96. One example of this trickery can be found in *Wilson v. On the Rise Enterprises, LLC*, 305 F. Supp. 3d 5 (D.D.C. 2018), where a boyfriend allegedly told his girlfriend that she owned half of the restaurant that the couple ran together for ten years. *Id*. at 9–10. Later, when the girlfriend found out that she in fact did not own any part of the restaurant, she brought suit under the FLSA against the boyfriend. The court found that the statute of limitations could be equitably tolled because of the alleged fraudulent statements by the boyfriend-defendant. *See id*. at 13–15. As the *Wilson* court put it, "These allegations adequately explain that the plaintiff's failure to bring her FLSA claims within the period allowed by the statute of limitations was due not to the plaintiff's lack of 'diligence,' but to the defendants having 'induced or tricked' her 'into allowing the filing deadline to pass.'" *Id*. at 15 (quoting *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006)).

Plaintiffs' situations here do not involve the type of trickery found in *Wilson*. Plaintiffs argue that the statute of limitations should be tolled back to 2012, when the paragraphs at issue entered the ICOA. This is not a request for tolling back to the filing of the original complaint as applied to the class and collective members who opted in at a later date, like in *Clendenen*. Plaintiffs do not argue that defendant had a duty to advise the drivers of their rights, or that defendant failed to comply with such duty if it had one, like in *Bonham*.

The Court is not persuaded that plaintiffs have satisfied either of the elements required for equitable tolling here. Plaintiffs have not shown that they were diligent in pursuing their rights. Plaintiffs also have not put forward facts showing an extraordinary

circumstance stood in their way of pursuing said rights.

Thus, plaintiffs' argument fails on this front, and the statutes of limitation will not be equitably tolled back to 2012. Defendant's motion for summary judgment regarding equitable tolling is **granted**.

### 2. *FLSA Statute of Limitations*

The parties also disagree about the statute of limitations for plaintiffs' FLSA claim. Under the statute, plaintiffs' claim "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Plaintiffs argue the three-year provision applies. Defendant argues that it does not apply. The Court finds that plaintiffs have come forward with enough evidence that a fact finder could conclude the three-year provision applies, and thus defendant's motion for summary judgment on this point will be denied.

The issue is whether there are genuine issues of material fact precluding summary judgment regarding whether plaintiffs' claims arose out of a willful violation by defendant. A "willful" violation is "one where 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1082 (8th Cir. 2000) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Often times, "willfulness is an issue best left to the jury." *Roeder*, 2017 WL 151401, at *33.

Plaintiffs argue there is evidence "to create a fact issue as to whether [d]efendants showed reckless disregard in classifying [d]rivers as independent contractors." (Doc. 352, at 24). Plaintiffs' best argument supporting this claim is defendant's inclusion of paragraphs 7(E) and 9(F) in the ICOA as discussed above. Plaintiffs argue these paragraphs show defendant making efforts to "insulate itself from liability for FLSA violations" of misclassifying the drivers as independent contractors. (*Id.*).

73

The Court agrees with plaintiffs. The insertion of these paragraphs by defendant, which appear to be an effort to insulate defendant from liability to some degree if the drivers are determined to be employees, could be considered a sign of defendant's knowledge that the drivers may in fact be employees under the system set up by defendant. As the Court has found above, it is at least an issue of fact regarding whether the plaintiffs, and the class and collective members, are defendant's employees. A fact finder could find that defendant set up this system where it knew the determination was a close call regarding employee or independent contractor status, and, in light of that, attempted to insulate itself from liability to a degree with the insertion of paragraphs 7(E) and 9(F). This pattern of facts could amount to, at least, a "reckless disregard for the matter of whether [defendant's] conduct was prohibited by statute," as required under the "willfulness" inquiry here. *Richland Shoe Co.*, 486 U.S. at 133.

Thus, there is a genuine dispute of material fact on the issue of the FLSA statute of limitations—whether it is two years or three years—and defendant's motion for summary judgment regarding the FLSA statute of limitations is **denied**.

### C.  *Plaintiffs' Unlawful Deductions Claim*

Named plaintiffs Cervantes and Cross bring a claim under the Iowa Wage Payment Collection Law ("IWPCL"), which has been called plaintiffs' "unlawful deductions" claim throughout this litigation.[24]  (Doc. 108, at 26).  Iowa Code Section 91A.5 provides:

> 1. An employer shall not withhold or divert any portion of an employee's wages unless:
>     a. The employer is required or permitted to do so by state or federal law or by order of a court of competent jurisdiction; or
>     b. The employer has written authorization from the employee to so deduct for any lawful purpose accruing to the benefit of the employee.

Iowa Code § 91A.5(1).  The deductions plaintiffs claim were unlawful were the items

---

[24] The Court previously denied class certification on plaintiffs' unlawful deductions claim, so this claim is only brought by the two named plaintiffs.  (*See* Doc. 276, at 26–38).

defendant deducted from the plaintiffs' settlement checks—things like costs for operating expenses and maintenance.

Defendant moves for summary judgment on plaintiffs' unlawful deductions claim, making three separate arguments in support. Defendant argues that plaintiffs' claims "fall within the IWPCL's exceptions; the deductions [p]laintiffs challenge are authorized by the federal leasing regulations, the deductions benefitted [p]laintiffs, and they authorized the deductions in writing." (Doc. 340, at 25). Although defendant first states that the deductions were "authorized by the federal leasing regulations," defendant goes on to argue, in substance, that plaintiffs' unlawful deductions claims are preempted by the federal leasing regulations. (*Id.*). Defendant also argues that the owner-operator exemption, as discussed above, bars plaintiffs' claims here to the extent they accrued after July 1, 2020. (*Id.*, at 26).

In response, plaintiffs argue that the unlawful deductions claims are not preempted by federal law. (Doc. 352, at 31–32). Plaintiffs then argue that the ICOA is not an enforceable contract, and thus could not have been an enforceable "authorization" as used in the statute. (*Id.*, at 33). Plaintiffs also argue that the deductions were not for the benefit of the drivers. (*Id.*, at 33–35). Regarding defendant's argument under the owner-operator exemption, plaintiffs rest on their arguments made in the section concerning the IMWL claims. (*Id.*, at 31).

Defendant's argument under the owner-operator exemption, Iowa Code section 85.61(12)(c)(3), is the same as defendant's argument in support of its motion for summary judgment concerning the exemption under plaintiffs' IMWL claim. Plaintiffs' arguments in response are also the same. Thus, the Court's analysis and conclusion is the same. That is, there are, at least, genuine disputes of material fact precluding judgment as a matter of law regarding multiple elements of the owner-operator exemption. Thus, as above, the owner-operator exemption does not bar plaintiffs' unlawful deductions claim at this stage.

Defendant also argues that plaintiffs' unlawful deductions claim is preempted by the federal leasing regulations, citing specifically to 49 C.F.R. §§ 376.12(e) and 376.12(j)(1) as the preempting sections. (Docs. 340, at 25; 364, at 20). These sections are part of the federal truth-in-leasing regulations, which serve to "protect independent truckers from motor carriers' abusive leasing practices." *Fox*, 839 F.3d at 1211. The truth-in-leasing regulations require leases, like the one between plaintiffs and defendant here, to include certain mandatory terms. *Johnson v. Diakon Logistics*, No. 16-cv-06776, 2018 WL 1519157, at *5 (N.D. Ill. Mar. 28, 2018).

Section 376.12(e), the first section defendant relies upon, provides in relevant part: "The lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items." 49 C.F.R. § 376.12(e). Section 376.12(j)(1), the other section defendant cites, provides that "[t]he lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906. The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance." 49 C.F.R. § 376.12(j)(1).

Defendant argues that these regulations preempt plaintiffs' claim for unlawful deductions because "the leasing regulations *require* contractors and motor carriers to execute a written lease that *must* contain certain provisions." (Doc. 364, at 20) (emphasis defendant's). Defendant then notes that some of the required provisions are "provisions related to the allocation of expenses and insurance costs." (*Id.*) (internal citations omitted). From there, defendant reasons that it is "impossible" for defendant to comply with the federal leasing regulations while also complying with the IWPCL prohibition on deductions. (*Id.*). Thus, defendant is making a "conflict preemption" argument here, which "includes cases where compliance with both federal and state regulations is a

76

Case 1:20-cv-00075-CJW-KEM    Document 368    Filed 05/28/24    Page 76 of 85

physical impossibility." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotations omitted).[25]

Plaintiffs argue, and the Court agrees, that the federal regulations at issue "are not intended to dictate any particular allocation of expenses." (Doc. 352, at 31). That is, the regulations require what the lease must specify—for example, the lease must specify "the responsibility of each party with respect to" certain costs. 49 C.F.R. § 376.12(e). Defendant's argument fails because it assumes that a requirement to specify the responsibilities of each party means that the parties can negotiate said responsibilities freely. For example, defendant says that the regulations "provide that owner-operators and carriers may allocate costs for 'cost of fuel, fuel taxes, [etc.]' to the owner-operator," citing 49 C.F.R. § 376.12(e). (Doc. 340, at 25). The regulations require that the lease specifies who is responsible for such costs. Section 376.12(e) does not confer any affirmative right, however, to allocate the costs to a certain party—instead, it simply specifies that the answer to the question: "who is responsible for these costs?" is clearly specified in the lease. As one court put it, these regulations "[do] not say that such deductions are always proper—rather, it simply states that if such deductions are agreed to, the conditions for deductions should be specified in the lease." *Johnson*, 2018 WL 1519157, at *6; *see also Goyal v. CSX Intermodal Terminals, Inc.*, Case No. 17-cv-06081-EMC, 2018 WL 4649829, at *4 (N.D. Cal. Sept. 25, 2018) ("[T]he language [of the regulations] speaks in terms of *disclosure* of those allocations – disclosures which are to be made whether the allocation is the result of negotiations or state statutory mandate.") (emphasis in original).[26] Thus, it is not impossible, as defendant argues, for defendant

---

[25] Conflict preemption includes a second type of preemption as well: "those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal quotations omitted). Defendant did not make any argument under this second strand of conflict preemption doctrine, so the Court does not consider it here.

[26] There is authority standing for defendant's argument here as well. *See, e.g., Valadez v. CSX*

to comply with the regulations and with Iowa's unlawful deductions law. The regulations require the lease to specify who is responsible for certain costs, and the Iowa unlawful deductions law prohibits certain deductions from employees. Defendant can comply with both, for example, by specifying in the lease that defendant is responsible for the costs.[27] Thus, plaintiffs' unlawful deductions claim is not preempted by the federal truth-in-leasing regulations.

Defendant next contends that, even if the unlawful deductions claim is not preempted, plaintiffs' claim here fails because the statutory exception is satisfied. (Doc. 340, at 26). Specifically, Iowa Code Section 91A.5(1)(b) prohibits withholding or diverting an employee's wages, unless "[t]he employer has written authorization from the employee to so deduct for any lawful purpose accruing to the benefit of the employee." Here, plaintiffs authorized the deductions in writing through the ICOAs, so the only issue is whether the deductions accrued "to the benefit of the employee." Iowa Code § 91A.5(1)(b). Defendant argues that "the contested deductions accrued to the [p]laintiffs' benefit because the deductions related to the repair and operation of [p]laintiffs' trucks, which were used to perform transportation services under their ICOAs," and, further, "if [p]laintiffs did not repair their trucks, obtain necessary insurances, pay for fuel, tolls, trailers, and the like, then they would not have been able to successfully operate their businesses." (Doc. 340, at 26).

---

*Intermodal Terminals, Inc.*, Case No.15-cv-05433-EDL, 2017 WL 1416883, at *11 (N.D. Cal. Apr. 10, 2017). The cases defendant relies upon generally hold that the regulations here affirmatively permit certain things—for example, in the *Valadez* case, the court concluded that the plaintiff's claim for escrow fund deductions was "preempted by 49 C.F.R. Section 376.12(k), which permits carriers to make escrow fund deductions." *Id.* Section 376.12(k) does not appear to affirmatively permit carriers to make escrow fund deductions though—instead, it provides that "if escrow funds are required, the lease shall specify . . . ." Thus, like the *Johnson* and *Goyal* courts, this Court simply disagrees with the way courts like *Valadez* read the regulation at issue.

[27] The Court notes that plaintiffs' claims here are only available if plaintiffs are employees rather than independent contractors, which is an issue for trial.

78

As plaintiffs point out, defendant's argument here fails if plaintiffs are ultimately found to be employees. If plaintiffs are independent contractors, then this claim fails before it gets out of the starting blocks anyway, because the IWPCL only applies to employees. If plaintiffs are employees, then they did not have businesses to operate. The benefit to plaintiffs at that point would be the ability to keep their jobs. The exception here certainly requires more of a benefit than the ability to keep a job. There is, at least, a genuine issue of material fact on the issue of whether the deductions accrued to plaintiffs' benefit.

Thus, defendant's motion for summary judgment regarding the named plaintiffs' unlawful deductions claim is **denied**.

### D. Plaintiffs' Unjust Enrichment Claim

The named plaintiffs bring a claim against defendant for unjust enrichment based on defendant's deductions from plaintiffs' wages and "fees extracted by [defendant]" shifting the costs of "maintaining [defendant's] fleet and general business operations" to plaintiffs. (Doc. 108, at 27). Defendant moves for summary judgment on plaintiffs' unjust enrichment claim, arguing that it should be dismissed because plaintiffs have an adequate remedy at law. (Doc. 340, at 26–27). Plaintiffs resist, arguing that, even if they have an adequate remedy at law, the unjust enrichment claim is not precluded, and alternatively arguing that they do not have an adequate remedy at law because the ICOAs are unconscionable. (Doc. 352, at 36–38). The Court has already found that the ICOAs are not unconscionable, so plaintiffs' argument fails on that front. Thus, the only issue is whether plaintiffs' adequate remedy at law precludes the unjust enrichment claim.

"Unjust enrichment is an equitable claim that arises when the plaintiff proves that 'the defendant received a benefit that in equity belongs to the plaintiff.'" *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 577 (Iowa 2019) (quoting *Slade v. M.L.E. Inv. Co.*, 566 N.W.2d 503, 506 (Iowa 1997)). Unjust enrichment includes three elements of recovery: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was

79

at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001). "Generally the existence of a contract precludes the application of the doctrine of unjust enrichment." *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990); *see also CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, No. 16-CV-33-LRR, 2017 WL 6210920, at *14 (N.D. Iowa Dec. 8, 2017) ("Unjust enrichment claims require that no adequate remedy at law exists to provide relief to the complainant. Where a party seeks damages pursuant to both a statutory claim . . . and an equitable claim, such as the unjust enrichment claim, the existence of the statutory claims bars recovery on the equitable claim.").

In light of the ICOA and plaintiffs' statutory claim here, it would appear that their unjust enrichment claim would be precluded. Plaintiffs point to *Unisys Corp.*, however, where the Iowa Supreme Court stated that the "adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity, but no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Unisys Corp.*, 637 N.W.2d at 154 n.2. Plaintiffs argue this language means their unjust enrichment claim can go forward even though they have an adequate remedy at law. The Court disagrees.

First, the Court notes that the language cited by plaintiffs still points to the idea that their unjust enrichment claim is foreclosed here. The *Unisys Corp.* court begins the quote by noting that the "adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity[.]" *Id.* Later, the court noted that the claim at issue in the case was "actually one for equitable subrogation" instead of an unjust enrichment claim. *Id.* at 156. In the case, the state had contracted with Unisys to help the state determine how much to pay certain organizations, including an organization called Heritage. Unisys made a calculation mistake, leading the state to overpay Heritage by many millions of dollars. The state

80

sued Unisys for breach of contract for the overpayment, and then Unisys turned around and filed a claim against Heritage for unjust enrichment—which the Iowa Supreme Court noted was really one for "equitable subrogation." *Id*. The claim the court was discussing, which plaintiffs rely on here, was the claim by Unisys against Heritage. The basis of Unisys' claim was that it would be unjust for Heritage to keep the extra money the state had paid to Heritage, and Unisys had no cause of action against Heritage other than the unjust enrichment, or equitable subrogation, claim. *See id*. Unisys was able to maintain the equitable claim against Heritage on the theory that Unisys "would otherwise have no cause of action against the unjustly enriched party." *Id*.

Thus, the case plaintiffs rely on, *Unisys Corp.*, is analyzed under a slightly different type of claim as plaintiffs make here. Also, the party making the claim in the case, as noted by the court, did not have another remedy, and that is why the equitable claim was allowed. Given the differences between *Unisys Corp.* and the claim at issue here, and the other caselaw stating that an adequate remedy or presence of a contract precludes a claim for unjust enrichment, the Court agrees with defendant's argument.

Thus, defendant's motion for summary judgment regarding the named plaintiffs' unjust enrichment claim is **granted**.

### E.    *Plaintiffs' Fraud Claim*

The named plaintiffs bring a fraud claim against defendant. (Doc. 108, at 27–28). Plaintiffs generally allege that defendant's false representation, made before plaintiffs began driving with defendant, concerned the amount of money the plaintiffs would make as lease operators if they drove with defendant. (*Id.*). Defendant moves for summary judgment on plaintiffs' fraud claim, arguing that plaintiffs have failed to establish multiple elements. (Doc. 340, at 28–30).

Plaintiffs' claim here is one for fraudulent misrepresentation. Under Iowa law, the elements plaintiff must prove are:

(1) [the] defendant made a representation to the plaintiff, (2) the

81

representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . ., (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)) (alterations in original). "These elements must be established by 'a preponderance of clear, satisfactory, and convincing proof.'" *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (quoting *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)).

First, defendant contends that plaintiffs "have failed to establish that [defendant] made any affirmative representations to them concerning the amount of money they would make as independent contractors." (Doc. 340, at 28). Here, defendant is challenging plaintiffs' evidence under the first three elements of the claim, which are sometimes grouped together and referred to as "fraudulent misrepresentation." *See Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987) ("The three elements relevant to this appeal, frequently treated as a single element and referred to as fraudulent misrepresentation, are a (1) material (2) representation that is (3) false.").

Plaintiffs point to an "income chart" they were given by defendant as well as statements by defendant's representatives to support these elements of their fraud claim. (Doc. 352, at 38–39). The income chart is included in a document entitled "CRST Lease Purchase Information Packet" which was apparently provided to plaintiffs before they agreed to be drivers with defendant. (Doc. 334-4, at 95–101). The information packet introduces the income chart, in an accurate description, as giving "example Profit/Loss statements comparing the different driving positions vs. weekly miles." (*Id.*, at 99–100). The chart includes six potential weekly net income possibilities based on miles driven during the week and which position the driver is in—whether a team driver, lead driver,

or solo driver. (*Id.*, at 100). Plaintiffs claim the chart is false because in some weeks plaintiffs had "no income at all and that in most weeks they made nowhere close to those amounts." (Doc. 352, at 39). There is evidence supporting plaintiffs' claim here about having little to no earnings in some weeks. (Doc. 360-4, at 39). Plaintiffs also claim that defendant's recruiters told them that they could net certain amounts per week in income. (Doc. 360-4, at 37).

Defendant does not appear to challenge the assertion that the amounts in the chart may be false.[28] Instead, defendant argues that the chart does not amount to an affirmative representation of the amount of income plaintiffs would make because the chart was presented as an "example." (Doc. 340, at 28–29). The Court disagrees. The combination of the income chart and verbal representations concerning what plaintiffs could make in weekly income could be interpreted as materially false representations made by defendant to plaintiffs. There is a genuine issue of material fact on the first three elements of plaintiffs' fraud claim.

Defendant next challenges plaintiffs' evidence under the sixth element of the fraud claim, that plaintiffs justifiably relied on the truth of the representation. *See Spreitzer*, 779 N.W.2d at 735. Defendant notes that both Cervantes and Cross contracted with defendant multiple times. (Doc. 340, at 29). Defendant's argument here is that, even if plaintiffs relied on the false statements at first, they left and later returned under a materially similar agreement as the first time, meaning plaintiffs reliance would no longer have been justified. (*Id.*).

The nature of defendant's argument on this point precludes summary judgment on

---

[28] Defendant does cite to Cervantes' deposition, where defendant asserts that Cervantes "testified that the example weekly fixed costs and deductions listed in the packet were accurate." (Doc. 340, at 29 n.7). This is an accurate representation of Cervantes' testimony, (Doc. 334-4, at 161), but the chart included more than the costs and deductions, and thus Cervantes only testified that part of the chart looked accurate.

the justifiable reliance element. Defendant does not argue that plaintiffs could never have justifiably relied on the representations. Instead, defendant argues that, at some point, likely after each plaintiff terminated their contracts and later contracted with defendant again, plaintiffs would not have been relying on the initial representation anymore because they would have had more knowledge of the situation. This argument ignores the alleged initial reliance by plaintiffs on defendant's representations. Even if defendant has the better argument here, part of plaintiffs' claim survives, precluding summary judgment under this element.[29] Thus, there is a genuine issue of material fact on the justifiable reliance element of plaintiffs' fraud claim.

Defendant next argues that plaintiffs' fraud claim fails because it is precluded by the ICOAs. (Doc. 340, at 29–30). Defendant notes that the contracts contain an integration clause as well as a clause providing that defendant "does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, . . . or to guarantee any amount of revenue to" plaintiffs. (*Id.*, at 30). As plaintiffs note, the Court previously rejected this argument in its order on defendant's motion to dismiss, noting that "contract disclaimers do not wholly bar a claim under Iowa law," citing *Northwest Bank & Trust Co. v. First Illinois National Bank*, 354 F.3d 721, 726 (8th Cir. 2003). (Doc. 150, at 8). *See also Hall v. Crow*, 34 N.W.2d 195, 199 (Iowa 1948) ("[W]here there is evidence of fraudulent misrepresentations in the inception of a contract such misrepresentations can be the basis for either an action to rescind or for damages, despite the limiting provisions of a contract."). Thus, the Court again rejects defendant's argument on this front.

There are genuine issues of material fact concerning all of the elements of

---

[29] Plaintiffs also point to some evidence that defendant's representatives made additional misrepresentations to plaintiffs about net income after plaintiffs had terminated their ICOAs to recruit plaintiffs back to driving with defendant. (*See* Doc. 360-4, at 42–43). Thus, there are issues of material fact precluding summary judgment concerning plaintiffs' fraud claim even after they terminated their contracts and later re-upped.

plaintiffs' fraud claim that defendant challenges. Thus, defendant's motion for summary judgment on plaintiffs' fraud claim is **denied**.

## V. CONCLUSION

For these reasons, the Court **denies** defendant's motion to decertify plaintiffs' Rule 23 class and FLSA collective claims.

The Court **grants-in-part and denies-in-part** plaintiffs' motion for partial summary judgment.

The Court **grants-in-part and denies-in-part** defendant's motion for partial summary judgment.

**IT IS SO ORDERED** this 28th day of May, 2024.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

85