IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC.,<br><br>        Defendants. | Case No. 1:20-cv-00075-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DEFENDANTS' TRIAL BRIEF**

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

        A.      Class Definitions and Limitations Periods........................................... 2

        B.      Standard of Review for Misclassification.............................................. 3

II.     ARGUMENT ......................................................................................................... 6

        A.      The evidence will show that the Contractors are independent contractors under the economic realities test....................................... 6

                1.      Degree of Control ....................................................................... 6

                2.      Relative Investments................................................................... 9

                3.      Opportunity for Profit and Loss............................................... 10

                4.      Skill and Initiative..................................................................... 11

                5.      Permanency of the Relationship ............................................... 12

                6.      Integral to Employer's Business .............................................. 13

        B.      Implementation of CRST's internal load board................................. 13

        C.      Plaintiffs have no evidence that CRST willfully failed to pay the minimum wage. ..................................................................................... 14

        D.      The evidence will show that the Contractors are independent contractors under the IMWL's Owner-Operator Exemption................. 15

                1.      The owner-operator is responsible for the maintenance of the vehicle. ...................................................................................... 16

                2.      The owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees. ............................................. 18

                3.      The owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper. .................................................................................... 19

        E.      Certification of the Rule 23 Class should not continue. ...................... 21

        F.      Plaintiffs' damages calculations are methodologically flawed............ 24

1.    Unlike Dr. Kriegler's analysis, Dr. Song's methodology for calculating minimum wage damages properly matches hours worked to compensation paid for those hours. ........................................ 24

2.    The evidence will show that, when accounting for overpayments and offsets, Plaintiffs' TILA damages are substantially reduced. .................. 25

G.    The evidence will show that Plaintiffs' individual claims lack merit.................. 25

III.    CONCLUSION............................................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adrian Trucking, Inc. v. Navistar, Inc.*,
609 F. Supp. 3d 728 (N.D. Iowa 2022)................................................................................ 28

*Albers v. Gentry*,
715 N.W.2d 769, 2006 WL 782438 (Ct. App. Iowa Mar. 29, 2006)...................................... 19

*Arizona v. U.S.*,
567 U.S. 387 (2012).............................................................................................................. 26, 27

*Biggs v. Wilson*,
1 F.3d 1537 (9th Cir. 1993)................................................................................................. 24

*Caterpillar Tractor Co. v. Shook*,
313 N.W.2d 503 (Iowa 1981)............................................................................................... 19

*Chao v. Barbeque Ventures, LLC*,
547 F.3d 938 (8th Cir. 2008)............................................................................................... 15

*Chao v. Mid-Atlantic Installation Services, Inc.*,
16 Fed. App'x 104 (4th Cir. 2001)...................................................................................... 9

*Cody v. City of St. Louis for and on behalf of Medium Security Institution*,
103 F.4th 523 (8th Cir. 2024)............................................................................................. 23

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)............................................................................................................. 27

*Custom Hair Designs by Sandy v. Cent. Payment Co.*,
984 F.3d 595 (8th Cir. 2020)............................................................................................... 23

*Ferezy v. Wells Fargo Bank, N.A.*,
755 F. Supp. 2d 1010 (S.D. Iowa 2010) ............................................................................. 26

*Finch v. Schneider Specialized Carriers, Inc.*,
No. 03-1012, 2004 WL 2169392 (Iowa Ct. App. Sept. 29, 2004)...................................... 6, 17

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)............................................................................................................. 21

*Gustafson v. Full Serv. Maint. Corp.*,
No. 4:11CV00443AGF, 2012 WL 2117768 (E.D. Mo. June 11, 2012)................................. 3

*Herman v. RSR Sec. Servs.*,
172 F.3d 132 (2d Cir. 1999) ............................................................................................... 15

*Jarrett v. ERC Props., Inc.*,
211 F.3d 1078 (8th Cir. 2000) ............................................................................................ 14

*Keller v. Miri Microsystems LLC*,
781 F.3d 799 (6th Cir. 2015) .............................................................................................. 4

*Krupicki v. Eagle One, Inc.*,
2014 U.S. Dist. LEXIS 46038 (E.D. Ark. 2014) ............................................................... 9

iii

*Landstar Sys., Inc.*,
    622 F.3d 1307 (11th Cir. 2010) ........................................................................ 25

*Lease and Interchange of Vehicles*,
    131 M.C.C. 286 ................................................................................................ 27

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ......................................................................... 21

*Roeder v. DirectTV, Inc.*,
    No. C14-4091, 2017 WL 151401 (N.D. Iowa Jan. 13, 2017) ...................... passim

*Rozo v. Principal Life Ins. Co.*,
    No. 4:14-cv-00463, 2020 WL 12968438 (S.D. Iowa June 22, 2020) ................... 21

*Scruggs v. Skylink, Ltd.*,
    2011 WL 6026152 (S.D.W.V. 2011) ..................................................................... 9

*Shepard v. City of Waterloo*,
    No. 14-CV-2057, 2015 WL 9165915 (N.D. Iowa Dec. 16, 2015) ................ 14, 15

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .......................................................................................... 23

*Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*,
    783 N.W.2d. 684 (Iowa 2010) .......................................................................... 28

*Walsh v. Alpha & Omega USA, Inc.*,
    39 F.4th 1078 (8th Cir. 2022) ....................................................................... passim

*West v. Butikofer*,
    No. 19-CV-1039, 2020 WL 5245226 (N.D. Iowa Aug. 18, 2020) ..................... 15

## Statutes

28 U.S.C. § 1658(a) ................................................................................................. 3

29 U.S.C. § 203(e)(1), (g) ....................................................................................... 3

29 U.S.C. § 206(a) ................................................................................................... 3

29 U.S.C. § 216(b) ................................................................................................. 24

29 U.S.C. § 255(a) ............................................................................................... 3, 14

49 U.S.C. § 13901 ................................................................................................. 13

49 U.S.C. § 14704(a)(2) ........................................................................................... 3

Iowa Code Ann. § 85.61(12)(c)(3)(b) ................................................................. 5, 15

Iowa Code Ann. § 85.61(12)(c)(3)(b)(v) .......................................................... 20, 21

Iowa Code Ann. § 91A.2(3)(a)(c) .......................................................................... 27

Iowa Code Ann. § 91A.5(1) ................................................................................... 25

Iowa Code Ann. § 91D.1(1)(a)-(b) .......................................................................... 4

Iowa Code Ann. § 91D.1(1)(b) ................................................................................ 3

Iowa Code Ann. § 91D.1(4) ........................................................................................... 4

Iowa Code Ann. § 614.1(8) ........................................................................................... 3

**<u>Rules</u>**

Fed. R. Civ. Proc. 23(c)(1)(C) ..................................................................................... 22

**<u>Regulations</u>**

49 C.F.R. Part 365 ....................................................................................................... 13

49 C.F.R. § 376.12(e), (j)(1) ....................................................................................... 27

49 C.F.R. § 382.103, 382.601 ..................................................................................... 19

49 C.F.R. Part 391 ....................................................................................................... 19

# I. INTRODUCTION

Defendant CRST Expedited, Inc. (CRST)[1] respectfully submits this trial brief. The evidence at trial will demonstrate that CRST treated the class and collective members in this case (Contractors) fairly and provided them with a platform that would allow them to build a small business. Contractors availed themselves of the opportunities CRST's program provided to lease multiple trucks, hired drivers to drive those trucks, and profited off of the operations of the trucks they leased to CRST. The evidence will also show that even those Contractors who did not lease multiple trucks to CRST earned more compared to employee drivers. This fact is not surprising given that, unlike employee drivers who are paid cents per split dispatched mile, CRST paid Contractors the overwhelming majority of the revenue CRST received for the loads Contractors hauled.

In addition to these opportunities, the evidence will also highlight meaningful differences between Contractors and employee drivers, including Contractors' right to reject loads, limit their operations to certain areas of the country or certain types of freight, take time off whenever they wanted, and terminate their contracts with CRST at any time. Because the Contractors operated as business partners, and not CRST employees, their operations are not subject to the Fair Labor Standards Act (FLSA) or Iowa Minimum Wage Law (IMWL).

Although Plaintiffs will offer anecdotal evidence that some Contractors *felt* like they could not turn down loads, Plaintiffs will be unable to offer any basis on which this Court could reliably extrapolate those *subjective feelings* to any of the members of the absent class or collective who will not testify at trial. CRST believes that when the Court evaluates Plaintiffs' anecdotal evidence, it will find that the issues attending Plaintiffs' claims that they were misclassified as independent

---

[1] On January 2, 2021, CRST International, Inc. merged into CRST Expedited Inc. d/b/a CRST The Transportation Solution, Inc.

contractors are not suitable for classwide adjudication. Plaintiffs will present no witness, expert or otherwise, who will provide a basis on which to transform Plaintiffs' anecdotal evidence into evidence that can be reliably applied to all the Contractors.

Finally, the evidence will show that when CRST made mistakes in compensating Contractors, it endeavored to fix those mistakes on subsequent settlement statements. The evidence will show that Plaintiffs' expert artificially inflated Plaintiffs' damages under the federal leasing regulations by ignoring these subsequent payments. Indeed, the evidence will demonstrate that CRST paid Contractors over $1 million more than it was contractually obligated to over the course of the class period.

### A. Class Definitions and Limitations Periods

In January 2021, this Court conditionally certified the following collective under the FLSA:

> All drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an Independent Contractor Operating Agreement (ICOA) and who have not leased more than one truck at a time to CRST.

Doc. No. 147 at 10; Doc. No. 157 at 1. 607 individuals timely opted into the collective action.

In August 2022, the Court certified Plaintiffs' claims under the IMWL and the Truth-in-Leasing Act as a Rule 23 class action:

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST Expedited, Inc. during the applicable limitations period, subject to any equitable tolling and equitable estoppel.

Doc. No. 276; Doc. No. 296 at 22-23. There are approximately 3,500 Rule 23 class members.

The statute of limitations on Plaintiffs' FLSA claims is two years prior to the date that each Opt-in Plaintiff filed a consent form to join this action. 29 U.S.C. § 255(a); *id.* § 256.[2] Thus, the earliest possible date upon which any claim under the FLSA could accrue is two years prior to the filing of the original complaint, or January 17, 2018,[3] for the two named plaintiffs and two years prior to any date upon which a member of the collective filed his or her opt-in notice.

The statute of limitations period for Plaintiffs' IMWL claim is two years prior to the filing of the original complaint, or January 17, 2018. Iowa Code Ann. § 614.1(8).

The statute of limitations period for Plaintiffs' claims under the Truth-in-Leasing Act (TILA) is four years prior to the filing of the Third Amended complaint, or October 23, 2016. 49 U.S.C. § 14704(a)(2); 28 U.S.C. § 1658(a).[4]

### B.   Standard of Review for Misclassification

The minimum wage provisions of the FLSA and the IMWL only apply to "employees." *See* 29 U.S.C. § 206(a); Iowa Code Ann. § 91D.1(1)(b); *see also* 29 U.S.C. § 203(e)(1), (g). Under the economic realities test employed by the Eighth Circuit in FLSA cases, the Court considers the following factors:

1. The degree of control exercised by the alleged employer over the business operations;

2. The relative investments of the alleged employer and employee;

3. The degree to which the alleged employee's opportunity for profit and loss is determined by the employer;

---

[2] In the Court's May 28, 2024, summary judgment order, the Court held that Plaintiffs were not entitled to equitable tolling back to 2012 for either their FLSA or IMWL claims. Doc. No. 368 at 68-73.

[3] In its summary judgment order, the Court found that genuine disputes of material fact precluded a ruling as to whether CRST "willful[ly]" failed to pay the minimum wage under the FLSA. Doc. No. 368 at 73-74. However, the burden is on Plaintiffs to prove willfulness and CRST believes that the evidence at trial will show that, even if the FLSA applies, CRST did not willfully fail to compensate the Contractors at or above the minimum wage. *See* Doc. No. 299 at 1 n.1 ("Plaintiff bears the burden of demonstrating willfulness[.]") (quoting *Gustafson v. Full Serv. Maint. Corp.*, No. 4:11CV00443AGF, 2012 WL 2117768, at *2 (E.D. Mo. June 11, 2012)).

[4] Plaintiffs first asserted a claim under TILA in their Third Amended Complaint, filed on October 23, 2020. Doc. No. 108.

4. The skill and initiative required in performing the job;

5. The permanency of the relationship; and

6. The degree to which the alleged employee's tasks are integral to the employer's business.

*Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022). "No one factor is controlling and the court must base its decision on the totality of the circumstances." *Roeder v. DirectTV, Inc.*, No. C14-4091, 2017 WL 151401, at *9 (N.D. Iowa Jan. 13, 2017) (citations omitted). Further, "[w]hether a FLSA plaintiff is an employee is a mixed question of law and fact" and "the existence and degree of each [of the six] factor[s] is a question of fact." *Id.* at *10 (citations and quotation marks omitted). "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, . . . the question [of classification] is to be resolved by the finder of fact in accordance with the appropriate rules of law." *Id.* (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015)).

The IMWL requires that "[e]very employer, as defined in the federal Fair Labor Standards Act . . . shall pay to each of the employer's employees, as defined in the federal Fair Labor Standards Act[,] . . . the state hourly wage [of $7.25 per hour], or the current federal minimum wage[,] . . . whichever is greater." Iowa Code Ann. § 91D.1(1)(a)-(b). Thus, the IMWL tracks the definitions of "employer" and "employee" under the FLSA and the same economic realities test applies to determining misclassification under the IWML. *See* Doc. No. 296 at 9 ("Section 91D.1 expressly relies on the FLSA's definition of 'employee,' which federal courts interpret using the economic realities test.").

However, effective July 1, 2020, and unlike the FLSA, the IMWL also states that the term "employee" under the Act "does not include an independent contractor as described in section 85.61, subsection 12, paragraph 'c', subparagraph (3)." Iowa Code Ann. § 91D.1(4). Section 85.61(12)(c)(3) excludes "owner-operator[s]" from the definition of "employee," provided the

4

owner-operator owns a licensed and registered truck and six "conditions" are "substantially present." Iowa Code Ann. § 85.61(12)(c)(3)(b). The six conditions are:

(i)     The owner-operator is responsible for the maintenance of the vehicle.

(ii)    The owner-operator bears the principal burden of the vehicle's operating costs, including fuel, repairs, supplies, collision insurance, and personal expenses for the operator while on the road.

(iii)   The owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees.

(iv)    The owner-operator's compensation is based on factors related to the work performed, including a percentage of any schedule of rates or lawfully published tariff, and not on the basis of the hours or time expended.

(v)     The owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper.

(vi)    The owner-operator enters into a contract which specifies the relationship to be that of an independent contractor and not that of an employee.

*Id.* The Court has already held that each of the Contractors "owns a vehicle licensed and registered as a truck" under the Exemption. Doc. No. 356 at 56-58. The Court has also held that CRST satisfies elements (ii) (responsibility for vehicle expenses), (iv) (compensation is based on work performed, not time expended), and (vi) (parties entered into a contract which specified their relationship to be that of an independent contractor). Doc. No. 368 at 59, 60-61, 63-68; Doc. No. 376 at 5 (denying reconsideration on element (vi)).

Thus, only elements (i) (responsibility for maintenance), (iii) (responsibility for providing necessary personnel), and (v) (alleged employee determines details and means of performing services) remain in dispute. The Court has also recognized that the language of the parties' ICOAs "may carry more weight under [the Exemption] because the only case cited to the Court analyzing this exemption relies on the contract between the parties fairly heavily." Doc. No. 368 at 62-63

(citing *Finch v. Schneider Specialized Carriers, Inc.*, No. 03-1012, 2004 WL 2169392, at *3-5 (Iowa Ct. App. Sept. 29, 2004), *rev'd on other grounds*, 700 N.W.2d 328 (Iowa 2005)).

## II.  ARGUMENT

### A.  The evidence will show that the Contractors are independent contractors under the economic realities test.

The evidence at trial will show that the Contractors were not economically dependent on CRST. Contractors decided when they would work and what loads they would haul. Many of the drivers who will testify explained that they chose to become lease purchase operators in order to make more money and because of the "freedom" involved.

#### 1.  Degree of Control

In addressing this factor, the Eighth Circuit considers "the alleged employer's right to control the way work is performed." *Walsh*, 39 F.4th at 1083. "Such control can be demonstrated in several ways," including:

> [A]ssigning trips, pressuring drivers to accept trips offered by dispatch, regulating the times at which drivers could provide services, requiring the drivers to obtain permission to take a break, tracking drivers through GPS location monitoring, and requiring drivers to submit travel logs.

*Id.* (collecting cases). "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Roeder*, 2017 WL 151401 at *11 (internal citations omitted).

Against these standards. CRST believes the evidence will demonstrate that Contractors, not CRST, had the right to control the manner in which their work was performed. The language of the ICOAs uniformly grants Contractors the right to control their operations and businesses. CRST acknowledges that some Contractors will say that they *felt* that they could not exercise those rights in practice. But there is no uniformity to those *feelings* and, more importantly, there will be no evidence at trial that will link individual Contractor's subjective perceptions to a CRST policy

6

or practice.

Contractors who were deposed will, in large part, testify that they could set their own schedules, choose their own routes, and take home time at their convenience. CRST's witnesses will testify that Contractors often instructed their fleet managers not to offer loads from particular areas of the country in which they did not want to operate and that they would specify which types of loads and/or weights of loads that they would accept. These interactions are inconsistent with employee status. *See Walsh*, 39 F.4th at 1084 (the fact that "drivers were able to set their own schedule and could change their schedule daily" and "could tell dispatch their preferred start and end times for their shifts" demonstrated that "drivers exercised a level of autonomy in determining their work hours"); *Roeder*, 2017 WL 151401 at *22 (finding the fact that the alleged employee "took long breaks, which is not typical of an employment arrangement" and the fact that "Roeder did not have a permanent relationship with DIRECTV, but one where he could choose to receive work from DIRECTV as he saw fit" to weigh in favor of independent contractor status).

Although some Contractors *felt* like they needed to take loads they were offered, most will testify that they understood that they had the right to reject any load that was offered to them. Some Contractors will testify that they rejected loads, among other reasons, because the load offered was unprofitable, did not route them back home, took them to an area of the country that they did not want to go, and/or because they simply did not want to take the load. The evidence will demonstrate that employee drivers were subject to forced dispatch, which means they could not reject loads unless it was for a safety-related reason. *See Walsh*, 39 F.4th at 1084 (recognizing "evidence [that the putative employer] allowed drivers to decline trip assignments" as weighing in favor of independent contractor status). Unlike Contractors, employees do not evaluate the profitability of the loads that they haul because they do not have the freedom to refuse to work.

Some Contractors will testify that they hired their own co-drivers or that they chose to work

as lead drivers, working with subsidized student labor. Contractors who hired co-drivers employed those drivers independent of CRST; Contractors who worked with student drivers became co-employers of the student drivers by directing their day-to-day activities and by paying a portion of their wages. Contractors will explain that, operating as a team (whether with a co-driver or a student) allowed them to increase their revenues by hauling loads in a shorter amount of time. Contractors were able to do so because the co-driver or student drove while the Contractor took his or her U.S. Department of Transportation (DOT)-mandated break in the sleeper berth. In both instances, CRST paid Contractors 70% of the linehaul revenue despite the fact that they did not personally drive all of the miles required to haul the load. The evidence will establish that employee drivers had no opportunity to generate revenue off of the labor of others.

Contractors also had the opportunity to lease multiple trucks at a time to CRST, thereby increasing the size of their businesses and allowing them to profit from the labor of others. Plaintiffs knew that CRST's Lease Purchase Program provided Contractors with this opportunity and, because of its implications for their assertion that they were misclassified, artificially crafted their class definition to exclude Contractors who chose to build their businesses in this manner.

Finally, Contractors will testify that they were responsible for their own business expenses—including expenses for lease payments, truck maintenance and repairs, fuel, insurance, meals, and lodging, among others—and that they deducted those expenses on their federal tax returns. This evidence indicates that Contractors thought of themselves as "separate economic entit[ies]" and that they, in fact, controlled their own business operations by seeking to lower their business losses through tax deductions. *See Roeder*, 2017 WL 151401 at *11.[5]

---

[5] Contractors also controlled their business operations by using CRST's internal load board, which became fully operational in early 2024. The evidence concerning the internal load board is discussed in Part II(B) *infra*.

## 2. Relative Investments

"The second factor considers the amount the worker has invested in the business." *Roeder*, 2017 WL 151401 at *16 (internal citations omitted). Specifically, "the worker's investment must be compared to that of the alleged employer." *Id.*

As the evidence at trial will demonstrate, Contractors—not CRST—made the most substantial investment possible for a trucking business: they made payments to lease, with an option to purchase, a commercial motor vehicle with which to perform transportation services. Unlike company drivers, who drove trucks owned and provided by CRST, Contractors agreed to provide the necessary equipment to haul loads on behalf of CRST's customers. *ICOA* ¶ 5(B). That Contractors paid for their own trucks is significant. In *Roeder*, the court found that the investment factor did not support either employee or independent contractor status because the plaintiffs had only spent money on "tools and equipment" and distinguished that investment from other cases where contractors provided their own trucks. *Roeder*, 2017 WL 151401 at *16-*17 (citing *Krupicki v. Eagle One, Inc.*, 2014 U.S. Dist. LEXIS 46038 at *15-16 (E.D. Ark. 2014); *Scruggs v. Skylink, Ltd.*, 2011 WL 6026152 at *6 (S.D.W.V. 2011); *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed. App'x 104, 107-108 (4th Cir. 2001)).

In addition to lease payments, Contractors bore myriad business expenses, including expenses for International Registration Plan base plates, International Fuel Tax Agreement permits, on-board electronic communication systems, and various insurances required by federal law (cargo, physical damage, occupational accident, bobtail, etc.). Contractors will also testify that they were responsible for their own fuel, maintenance, and repair costs, and purchasing their own health insurance.

### 3.     Opportunity for Profit and Loss

The third factor considers the degree to which the alleged employee's opportunity for profit and loss is determined by the alleged employer. The Eighth Circuit "generally consider[s] whether workers had control over profits and losses depending on their 'managerial skill.'" *Walsh*, 39 F.4th at 1084 (internal citations omitted). A worker exercises managerial skill if the worker "set[s] his own hours and rates" and has "the ability . . . to earn additional income through his own initiatives." *Id.* "In other words, facts demonstrating that a worker can use 'his managerial skill to 'improve his efficiency such that he c[an] complete more' jobs' weigh in favor of independent contractor status." *Id.*

The evidence at trial will demonstrate that Contractors' opportunities for profit or loss were determined by decisions that the Contractors, not CRST, made. Contractors "set[] [their] own hours" by determining their own schedules and deciding when and where they wanted to work, when to take home time, and whether to accept any load. CRST was not involved in these decisions and could not force drivers to accept or reject particular loads, to work at any particular time, or to work at all, meaning that CRST did not exert significant control over the Contractors' generation of revenue. Contractors could also reject any and all loads, choosing to haul only the most profitable loads and rejecting unprofitable loads or loads that took them to areas of the country with lower-paying freight. CRST witnesses will also testify that some Contractors instructed their fleet managers not to offer loads from certain areas of the county, not to offer loads of a certain type, and/or not to offer loads of a certain weight.

Contractors had the ability to impact their efficiency by hiring their own co-drivers or choosing to work as lead drivers, which allowed them to complete more loads in the same amount of time. Indeed, the decision to enter CRST's lease purchase program itself was a decision made

by the Contractors to increase their profits; Contractors will testify that they became lease purchase operators because they wanted to make more money and start their own businesses.

### 4. Skill and Initiative

Under this factor, the Eighth Circuit considers "whether plaintiffs' profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401 at *19 (internal citations omitted). "[T]he relevant inquiry is whether [plaintiffs] could use their skills to increase their business." *Id.* at *21.

The evidence at trial will demonstrate that commercial truck driving requires skills beyond those required to operate a car and that commercial truck drivers are subject to unique and stringent hours of service requirements imposed by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the DOT. For example, to operate a commercial motor vehicle in excess of 26,000 pounds, a driver must obtain a Class A Commercial Driver's License (CDL) from his or her home state. In addition to the skills required to obtain a Class A CDL, some Contractors had to obtain specialized endorsements to allow them to haul hazardous materials or pull double trailers.

Contractors also used these skills "to increase their business." As discussed above, the Contractor' profits and losses turned entirely on their own initiative in managing their loads, miles, and work hours. Contractors will testify that they increased their profits (or incurred losses) by choosing which loads they would haul, which expenses they would incur, and when they would take time off. Contractors made these decisions for themselves, based on their own judgment and experience as business owners, which displays the "initiative, judgment or foresight of the typical independent contractor." *See Roeder*, 2017 WL 151401 at *18.

### 5. Permanency of the Relationship

The penultimate factor considers whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401 at *21. "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor" and "[t]he more permanent the relationship, the more likely the worker is to be an employee." *Id.* "Generally, independent contractors have variable or impermanent working relationships with the principal company because they often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Id.* (cleaned up).

The evidence at trial will establish that Contractors routinely contracted with CRST only to terminate their contracts a few short months later, contract with a different motor carrier, and then re-contract with CRST. As CRST's witnesses will testify, the competition for truck drivers, whether Contractors or employee drivers, is fierce. Contractors are frequently enticed to terminate a contract with one motor carrier in order to sign on with another carrier that, in the Contractor's judgment, is making a better offer. The evidence will establish that the annualized turnover rate for independent contractor drivers is approximately seventy percent (70%) each year. Thus, the evidence will show that the Contractors did not regard their relationship with CRST as anything other than impermanent.

Moreover, given the vastly varying lengths of time that Contractors hauled loads for CRST, this factor cannot be assessed on a class-wide or collective-wide basis. Allowing the class and collective to remain certified would effectively remove this factor from consideration when it provides necessary evidence of employee or independent contractor status.

### 6.     Integral to Employer's Business

The sixth and final factor turns on "whether [the] worker['s] services are a necessary component of the [alleged employer's] business." *Walsh*, 39 F.4th at 1085 (citations omitted). CRST concedes that Contractors are a necessary part of CRST's business. However, under the economic realities test "[n]o one factor is controlling and the court must base its decision on *the totality of the circumstances*." *Roeder*, 2017 WL 151401 at *9 (emphasis added).

### B.     Implementation of CRST's internal load board.

As will be explained through CRST's witnesses at trial, in July or August of 2022, CRST began rolling out an internal load board that was ultimately available to all Contractors. The internal load board displays all available loads in CRST's network that have not already been assigned to an employee driver or booked by another Contractor and allows Contractors to select whichever load they would like to haul. Contractors who use the load board serve as their own load planners. The load board also permits drivers to book multiple loads at a time.

In addition to the CRST internal load board, the evidence will establish that CRST has entered into pre-approved brokerage relationships with third party property brokers and freight agents. These pre-approved brokers and agents allow Contractors to view and select loads that those brokers and agents have available to haul. Any load a Contractor selects from this tool is then entered into CRST's system because the Contractor will haul it under CRST's federal interstate operating authority.[6] CRST provides Contractors with four different options for identifying and hauling freight under CRST's motor carrier authority: (i) the Contractor can be offered loads by his or her fleet manager, any of which the Contractor is free to accept or reject; (ii) the Contractor can use CRST's internal load board to book any load(s) listed in CRST's

---

[6] Of course, Contractors are only required to book loads through CRST *because* they chose to operate under CRST's interstate motor carrier authority. *See* 49 U.S.C. § 13901 *et seq.*; 49 C.F.R. Part 365 *et seq.* If the Contractors chose to obtain their own motor carrier authority, they could book any load on any load board they wanted and would not be required to enter loads into CRST's system.

network; (iii) the Contractor can use the load boards sponsored by pre-approved brokers or agents to book any load(s) those brokers or agents have available; or (iv) the Contractor can broker a load he or she located on another third-party load board or through another third-party broker or agent (that is not among the pre-approved brokers or agents). Only Contractors can use load boards and pre-approved property brokers and agents; employee drivers cannot use these tools.

Contractors make extensive use of the internal load board. At the present time (October 2024), approximately 40% of the loads in CRST's network are booked by Contractors using the internal load board (and not via load tender by fleet managers).

## C. Plaintiffs have no evidence that CRST willfully failed to pay the minimum wage.

Despite the enormous amount of discovery that Plaintiffs have completed in this case, there is no evidence that CRST willfully violated the FLSA or did not act in good faith. Even if the Court ultimately determines that Contractors are entitled to the protections of the FLSA and IMWL, there is no evidence that the compensation CRST paid Contractors systemically fell below the minimum wage. In other words, even if the Court finds that Contractors were misclassified, there is no evidence that CRST willfully failed to pay them the minimum wage.

The statute of limitations for minimum wage claims under the FLSA is two years from the date that each collective member filed his or her consent form to join the collective action, except that the limitations period may be extended to three years for "willful" violations. 29 U.S.C. § 255(a); *id.* § 256. Furthermore, the Court may decline to award liquidated damages under the FLSA if the employer acted in "good faith" and "had reasonable grounds for believing that [the employer's] act or omission was not a violation of" the FLSA. *Id.* § 260. Plaintiffs bear the burden to prove willfulness while CRST bears the burden to demonstrate that it acted in good faith. *Shepard v. City of Waterloo*, No. 14-CV-2057, 2015 WL 9165915, at *23 (N.D. Iowa Dec. 16, 2015) (citing *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1082-83 (8th Cir. 2000)) ("The burden

14

of demonstrating that an employer's violation was wilful [sic] [under the FLSA] rests with the plaintiff."); *see also West v. Butikofer*, No. 19-CV-1039, 2020 WL 5245226, at *5 (N.D. Iowa Aug. 18, 2020) (quoting *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 142 (2d Cir. 1999)) ("The employer bears the burden of proving good faith and reasonableness" under the FLSA to avoid liquidated damages).

To show willfulness, Plaintiffs must prove that CRST "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Shepard*, 2015 WL 9165915 at *23 (citations omitted). "A finding of willfulness requires behavior on the part of the employer that exceeds negligence." *Id.* (citations omitted). Demonstrating good faith, on the other hand, is a "subjective standard" where the employer must establish "an honest intention to ascertain and follow the dictates of the FLSA." *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (citations and internal quotation marks omitted).

There is no evidence that CRST willfully failed to comply with the FLSA. Similarly, there is ample evidence that CRST operated in the good faith belief that it had properly treated Contractors as independent contractors under the federally-regulated requirements for transporting freight in equipment the Contractors owned.

**D.    The evidence will show that the Contractors are independent contractors under the IMWL's Owner-Operator Exemption.**

To the extent that the Court finds that Contractors were improperly classified prior to July 1, 2020, CRST believes the evidence will establish that Contractors satisfied Iowa's Owner-Operator exemption, thereby cutting off their claims as of July 1, 2020. The Exemption applies if six "conditions" are "substantially present." Iowa Code Ann. § 85.61(12)(c)(3)(b). The Court has also observed that the burden for establishing the conditions of the Exemption may be lower than the burden for establishing the elements of the economic realities test. *See* Doc. No. 368 at 61 ("One difference here legally is that the [fifth] condition under the owner-operator exemption must

be 'substantially present,' as opposed to the control factor in the economic realities test, where it is a factor to be considered along with several others. In theory, the bar is lowered, to a degree, for defendant to establish this element under the exemption as compared to the economic realities test analysis."). The Court has also already held that the Contractors "own[] a vehicle licensed and registered as a truck" under the Exemption, Doc. No. 356 at 56-58, and that CRST satisfies elements (ii) (responsibility for vehicle expenses), (iv) (compensation is based on work performed, not time expended), and (vi) (parties entered into a contract which specified their relationship to be that of an independent contractor). Doc. No. 368 at 59, 60-61, 63-68; *see also* Doc. No. 376 at 5. Thus, only elements (i) (responsibility for maintenance), (iii) (responsibility for providing necessary personnel), and (v) (alleged employee determined details and means of performing services) remain in dispute for trial. The evidence will show that each of these conditions is substantially present.

### 1. The owner-operator is responsible for the maintenance of the vehicle.

Contractors were responsible for all maintenance associated with their vehicles. In their ICOAs, Contractors were specifically responsible for any and all maintenance on the vehicles leased to CRST. *ICOA* ¶¶ 5(B) (Contractors are responsible for "deciding when, where, and how maintenance and repairs are to be performed on the Equipment"), 5(F) (Contractors are responsible for "[p]aying all operating expenses, including, but not limited to, all expenses for fuel, oil, tires and other spare parts, supplies, and equipment necessary for the safe, efficient, and lawful operation and maintenance of the Equipment."), 9(C) ("[I]t shall be the sole financial responsibility of Contractor to select, purchase or lease, and finance the Equipment [and] to decide when, where, and how maintenance and repairs are to be performed on the Equipment[.]"). Further, as the Court has observed, the language of the ICOA "may carry more weight under [the Exemption] because the only case cited to the Court analyzing this exemption relies on the contract between the parties

fairly heavily." Doc. No. 368 at 62-63 (citing *Finch*, 2004 WL 2169392 at *3-5).

In *Finch*, "[t]he agency and the district court found, and the parties do not dispute, that the first . . . condition[] w[as] adequately established." *Finch*, 2004 WL 2169392 at *3. In that case, which involved independent contractor drivers, "[t]he ICOA expressly provided that Finch retained . . . the responsibility for . . . the operation and maintenance of the tractor, route selection, and all operating expenses." *Id.* at *1. Thus, the Iowa Court of Appeals found that the language of the ICOA alone was sufficient to find that the contractor was responsible for maintenance under the first element. Given that the ICOAs in this case also make the Contractors responsible for any and all maintenance, the Court should reach the same result at trial.[7]

Further, Contractors will testify that they, in fact, paid for all maintenance and repairs on their trucks and that the funds for those expenses came from one of three sources: (i) the 15¢ per mile maintenance program provided for in their Equipment Leases with Lincoln Sales, (ii) the $250 Maintenance and Other Reserve Fund escrow account established by the ICOA, or (iii) their own cash. All three of these sources were funded by the Contractors, not CRST.

In its summary judgment order, the Court found that "[a]lthough it is fairly clear the drivers are responsible for maintenance as between driver and defendant, it is not clear that the drivers are responsible for maintenance as between driver and Lincoln Sales." Doc. No. 368 at 59. The Court also expressed confusion as to whether the Equipment Lease obligated drivers to pay for maintenance in the first instance. *Id.* The Equipment Lease provides for two periods of maintenance; the length of these periods varies depending on the period of the Equipment Lease

---

[7] While misclassification under the IMWL relies upon the same economic realities test applicable to the FLSA, the Owner-Operator Exemption only requires that the conditions discussed in this brief be "substantially present." There is no overriding requirement to determine the "economic realities" or the totality of the circumstances of the parties' relationship. Instead, if the elements are substantially present, then the worker is an independent contractor full stop. This likely explains why the Court in *Finch* relied so heavily on the terms of the parties' contract. Indeed, in stark contrast to the economic realities test, the language of the parties' contract is an entire element under the Exemption (sixth factor).

agreed upon by the Contractors and Lincoln Sales. *Equipment Lease* at 1 (showing dates and cost of First Period and Second Period). During the First Period (approximately the first one to two years of the lease), Contractors pay 15¢ per mile and Lincoln Sales provides comprehensive maintenance on the vehicle. *Id.* ¶ 6(b)(1), (3). During the Second Period (the last year of the lease), Contractors pay 13¢ per mile and Lincoln Sales provides only routine maintenance on the vehicle. *Id.* ¶ 6(b)(2), (3). During the Second Period, Contractors must pay for any major repairs and/or maintenance (examples of which are listed in paragraph 6(b)(2)(B) of the Equipment Lease). *Id.* ¶ 6(b)(2). Thus, at all times, the Contractors remained entirely responsible for maintenance, whether by paying for it through the Equipment Lease, or paying for it directly.

> **2.      The owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees.**

Contractors were also responsible for providing a qualified driver to operate the trucks they leased to CRST. *ICOA* ¶ 4(D) ("Contractor shall provide competent professional drivers who meet [CRST's] minimum driver qualification standards (part of Carrier's Policies and Procedures) and all Applicable Law."); *see also id.* ¶ 5(A) ("[I]t shall be the sole responsibility of Contractor to determine the manner and means of performing all of Contractor's services under this Agreement, including . . . [s]electing, setting the compensation, hours, and working conditions, adjusting any grievances, and supervising, training, disciplining, and firing all drivers, drivers' helpers, and other workers[.]").

Some Contractors, including the named Plaintiffs, will also testify to separately hiring their own co-drivers to drive their trucks. In its summary judgment order, the Court expressed concern over the degree to which CRST's contractual right to reject a particular co-driver was motivated by the requirements of federal law. *See* Doc. No. 368 at 60. CRST's witnesses will confirm that CRST primarily assessed drivers for safe driving practices and criminal background checks, which

are largely informed and motivated by the DOT's safety, drug and alcohol testing, and medical examination requirements. *See* 49 C.F.R. Part 391; *see also* 49 C.F.R. § 382.103, 382.601.

The Court also expressed concern as to whether Contractors who served as lead drivers could satisfy the Exemption's third element. *See* Doc. No. 368 at 59-60. While student drivers were employees of CRST, Contractors paid approximately 9¢-12¢ per loaded mile during the class period to "help cover [CRST's] wage and related costs for" student drivers. *Lead Driver Program Addendum*, ¶ 2(B). During training, Contractors controlled all aspects of the student's driving and operations, including setting the work schedule, selecting which loads to haul, deciding when to take home time, and training the student on how to drive, among others. *Id.* ¶ 1(C). Thus, student drivers were jointly employed by the Contractors and CRST and, therefore, Contractors who served as lead drivers still satisfy the third element of the Exemption. *See Albers v. Gentry*, 715 N.W.2d 769, 2006 WL 782438, at *2 (Ct. App. Iowa Mar. 29, 2006) (unpublished table decision) (affirming finding of joint employment based on factors outlined in *Caterpillar Tractor Co. v. Shook*, 313 N.W.2d 503, 505 (Iowa 1981)); *Caterpillar Tractor*, 313 N.W.2d at 505.

### 3. The owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper.

The fifth element of the Exemption overlaps, to some degree, with the factors of the economic realities test. However, the inquiries under the fifth element and the economic realities test are different. The FLSA focuses on the control exercised by the alleged employer over a worker's business operations generally and the degree to which the alleged employer determined the worker's opportunities for profits or losses. The fifth element of the Exemption is much narrower, asking whether the worker determines the "details" and "means" of "performing the services" for the alleged employer; the fifth element also specifically carves out regulatory requirements, operating procedures of the carrier, and customer requirements as not indicative of

control. Iowa Code Ann. § 85.61(12)(c)(3)(b)(v); *see also* Doc. No. 368 at 61 ("One difference here legally is that the [fifth] condition under the owner-operator exemption must be 'substantially present,' as opposed to the control factor in the economic realities test, where it is a factor to be considered along with several others. In theory, the bar is lowered, to a degree, for defendant to establish this element under the exemption as compared to the economic realities test analysis.").

As detailed throughout this brief, the Contractors determined the details and means of performing services for CRST. They determined the *details* and *means* of providing *those services* by selecting their own routes,[8] setting their own schedules, rejecting loads, hiring co-drivers, and using CRST's load board. The plain language of the parties' contract confirms Contractors' responsibilities in this regard: "it shall be the sole responsibility of Contractor to determine the manner and means of performing all of Contractor's services under this Agreement." *ICOA* ¶ 5; *see also id.* ¶¶ 5(A)-(H) (Contractors are responsible for selecting and providing a truck; selecting, hiring, and managing drivers; selecting routes; loading and unloading their trucks; and paying any necessary operating expenses), 1(C) (right to reject any and all loads and to haul for other motor carriers); 9(C) (right to select all routes and all meal, rest, and refueling stops and Contractors are responsible to provide transportation equipment and perform maintenance and repairs on that equipment).

In its summary judgment order, the Court expressed concern over whether Contractors felt pressured to accept loads offered by CRST and whether Contractors could truly exercise control over their business operations when they did not know when the next load would be offered (after a rejection). Doc. No. 368 at 61-62. There is no evidence that CRST refused to offer Contractors

---

[8] While some out-of-circuit courts have held that the ability to determine routes is not indicative of independent contractor status under the FLSA, see Doc. No. 368 at 12-13 (citing out-of-circuit authorities), those authorities are inapposite to whether the right to determine one's routes is indicative of independent contractor status under the Exemption, especially when the fifth element need only be "substantially present."

loads because Contractors previously refused a load they were offered. Nor is there any basis on which to infer that CRST did so. CRST is in the business of fulfilling the promises it makes to its customers to haul freight; declining to offer Contractors freight that is available to haul runs directly contrary to CRST's interests and its promises to its customers. Further, CRST's witnesses will testify that any delay in offering a load or delay in offering a load after a rejection was almost always due to the availability of freight in the Contractor's area.

In addition, unlike the economic realities test, the fifth element also states that regulatory requirements, operating procedures of the carrier, and customer requirements as not indicative of control. Iowa Code Ann. § 85.61(12)(c)(3)(b)(v). As CRST's witnesses will testify, CRST has contractual obligations to its customers that require that loads be hauled and/or delivered in a specified manner and on a certain timetable. CRST is also subject to the same DOT regulatory requirements as the Contractors themselves, which include qualification requirements for drivers of commercial motor vehicles and limitations on the number of hours that drivers can operate a truck, among other requirements. To comply with these customer and regulatory requirements, CRST has instituted some operational procedures for all of its drivers; most of those operational procedures, however, are applicable to employee drivers and inapplicable to Contractors. Regardless, as the fifth element recognizes, none of these requirements are indicative of control over the Contractors' operations under the Exemption.

### E. Certification of the Rule 23 Class should not continue.

District courts have "a duty to assure that a class once certified continues to be certifiable under Fed. R. Civ. P. 23(a)." *Rozo v. Principal Life Ins. Co.*, No. 4:14-cv-00463, 2020 WL 12968438, at *3 (S.D. Iowa June 22, 2020) (*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent

developments in the litigation."). Indeed, Rule 23 itself provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. Proc. 23(c)(1)(C).

The evidence at trial will demonstrate that the Rule 23 class and FLSA collective should not remain certified. As Plaintiffs will no doubt adduce at trial, at least as to the first (control) and third (opportunity for profit and loss) factors of the economic realities test, the facts attending each Contractor's operations varied from class member to class member. For example, some Contractors accepted virtually every load offered by their fleet managers, others routinely rejected loads. Some Contractors took significant amounts of home time, others did not. Some Contractors placed restrictions on the areas of the country in which they would operate and the types and/or weights of freight that they would haul, while others placed no such restrictions on their fleet managers. Some Contractors, such as named Plaintiffs Anthony Cervantes and Michael Cross, hired co-drivers while others did not. Some Contractors elected to use CRST's internal load board and broker almost all of their own freight, while others elected to continue receiving load offers from fleet managers. Collectively, these variations in experience demonstrate that the degree of CRST's involvement in the Contractors' business operations varied based on the degree to which each Contractor *wanted* CRST to be involved. The revenue of each Contractor also depended on that Contractor's particular business decisions, which were not the same as and different from other Contractors' decisions.

Furthermore, Plaintiffs' decision to limit the scope of the collective and class definitions to individuals who elected not to lease multiple trucks to CRST artificially excludes Contractors whose experiences are relevant to the question of misclassification. That some Contractors leased multiple trucks to CRST (and some Contractors leased trucks to CRST and other motor carriers simultaneously) weighs against the idea that CRST controlled the Contractors' operations or

opportunities for profit and loss. Yet, Plaintiffs seek to exclude this evidence from the record by crafting the collective and class definitions to exclude multi-truck operators. This, along with the other varied testimony in the record concerning Contractors' business operations, further demonstrates that continued class certification is not appropriate in this case.

The touchtone of the misclassification inquiry under the FLSA and IMWL is whether Contractors were economically dependent on CRST. *Roeder*, 2017 WL 151401 at *9 ("No one factor is controlling and the court must base its decision on *the totality of the circumstances*.") (emphasis added). Where, as here, the evidence attending that determination is varied, it can no longer be said that classwide adjudication is appropriate. "Commonality is subsumed within the predominance requirement, which requires [courts] to ask 'whether proposed classes are *sufficiently cohesive* to warrant adjudication by representation.'" *Cody v. City of St. Louis for and on behalf of Medium Security Institution*, 103 F.4th 523, 530 (8th Cir. 2024) (quoting *Custom Hair Designs by Sandy v. Cent. Payment Co.*, 984 F.3d 595, 601 (8th Cir. 2020); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (emphasis added). Courts are "require[d] . . . 'to give careful scrutiny to the relation between common and individual questions in a case.'" *Id.* (citations omitted). "Individual questions are those where class members 'will need to present evidence that varies from member to member.'" *Id.* (citations omitted). "Common questions are those where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof." *Id.* (cleaned up) (brackets in original).

There is no common evidence that would establish that CRST controlled Contractors' operations or their opportunities for profit and loss. When Plaintiffs fail to establish an evidentiary bridge from the testimony and experiences of the individuals who testify at trial to the experiences of those who will not, there is no foundationally firm basis on which to attribute the trial testimony to the absent members of the collective or class.

**F. Plaintiffs' damages calculations are methodologically flawed.**

      **1. Unlike Dr. Kriegler's analysis, Dr. Song's methodology for calculating minimum wage damages properly matches hours worked to compensation paid for those hours.**

Should the Court reach a minimum wage damages analysis at trial, the Court should adopt the methodology of CRST's expert, Dr. Chen Song, when analyzing possible minimum wage damages. Dr. Song will explain that she compared the compensation CRST paid Contractors for each load they delivered to the hours those Contractors spent delivering each load. In other words, Dr. Song's analysis reveals to the Court whether CRST paid Contractors at least the minimum wage for every hour they spent delivering each load. Dr. Kriegler's analysis, on the other hand, artificially manufactures the appearance of minimum wage violations by severing the parties' compensation agreement. Dr. Kriegler, without a factual basis for doing so, treats compensation paid in week two as compensation for hours worked in week one. No witness will attest that CRST or Contractors agreed on that method of compensation.

CRST acknowledges that certain trips resulted in pay that fell below the minimum wage. Dr. Song calculated that, if the IWML and FLSA apply to Contractors' work, CRST may owe Contractors $2,001,919 in minimum wage damages. That CRST, as a courtesy, chose to pay Contractors weekly or bi-weekly did nothing to abrogate the parties' agreement that CRST would pay Contractors within the contractually required 15 days of delivering each load. *ICOA* ¶ 3(A). To the extent that Plaintiffs demonstrate that CRST paid a contractor *beyond* 15 days, that Contractor would only be entitled to the amount of unpaid minimum wages, if any, and liquidated damages. *See, e.g.*, *Biggs v. Wilson*, 1 F.3d 1537, 1539, 1540 (9th Cir. 1993); 29 U.S.C. § 216(b) (employers who violate the FLSA "shall be liable to the employee or employees affected in the amount of their *unpaid* minimum wages . . . and in an additional equal amount as liquidated damages.") (emphasis added). No case has ever held that an employee who is paid at least the

minimum wage for the hours they worked is entitled to recover anything more than liquidated damages.

### 2. The evidence will show that, when accounting for overpayments and offsets, Plaintiffs' TILA damages are substantially reduced.

The Court should also adopt Dr. Song's methodology for computing damages for Plaintiffs' TILA claims. The central dispute between the parties as to this claim relates to off-setting overpayments, i.e., whether Plaintiffs are entitled to damages for underpayments without offsets to account for instances in which CRST *overpaid* Contractors, sometimes even on the same load. Over the entire class period, Dr. Song calculated that CRST paid Contractors *$1.8 million* more than it was contractually obligated to under the ICOA. TILA does not provide for statutory damages or civil penalties; instead, claimants are only entitled to "damages *sustained*" as a result of a violation of the federal leasing regulations. *See OOIDA v. Landstar Sys., Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010). Thus, any TILA damages the Contractors experienced must be offset to the extent of any overpayments.

### G. The evidence will show that Plaintiffs' individual claims lack merit.

The evidence at trial will demonstrate that the named Plaintiffs' remaining individual claims under Iowa law for unlawful deductions and fraud will fail.[9] The Iowa Wage Payment Collection Law (IWPCL) prohibits an employer from deducting any portion of an employee's wages unless certain exceptions apply. Iowa Code Ann. § 91A.5(1). As relevant here, the IWPCL permits deductions that "[t]he employer is required or permitted to [make] by state or federal law" and deductions "[t]he employer has written authorization from the employee to so deduct for any lawful purpose accruing to the benefit of the employee." *Id.* § 91A.5(1)(a), (b). Plaintiffs attack deductions that they authorized CRST to make from their compensation for operating expenses

---

[9] The Court granted summary judgment in favor of CRST on Plaintiffs' individual claims for unjust enrichment. Doc. No. 368 at 79-81.

related to the trucks they leased. *See Plaintiffs' Brief in Support of Motion to Certify Rule 23 Class Actions*, Doc. No. 244; *accord Third Amended Complaint*, Doc. No. 108, ¶ 109.

"When reading § 91A.5 as a whole, it is apparent that the statute was aimed at prohibiting employers from deducting wages for purposes that benefit the employer or are otherwise illegal under federal or state law." *Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 2d 1010, 1017 (S.D. Iowa 2010) (holding that employee-authorized deductions for charitable contributions were not unlawful because "[a] voluntary charitable contribution simply does not parallel any of the enumerated prohibited payroll deductions" in the IWPCL). The deductions Plaintiffs authorized in writing for lease payments are unlike any of the other prohibited deductions in the statute. *See id.* ("Section 91A.5(2) includes a list of prohibited deductions, . . . including cash shortages from a money till, losses for bounced checks, damage, and stolen property. It also prohibits the employer from capturing gratuities given to employees, costs of personal protective equipment, and costs of relocation."). The Contractors chose to operate as lease purchase operators and agreed under their ICOAs to provide a truck. The Contractors also voluntarily signed up for lease payments under their Equipment Leases with Lincoln Sales. Even if the Contractors were employees, that would not absolve them of their commitments under the ICOAs and Equipment Leases. Because they agreed to provide a qualified driver and a truck in exchange for loads offered by CRST, any deductions that the Contractors authorized for their truck expenses were for the Contractors' benefit.

Furthermore, Plaintiffs' IWPCL claims are preempted. As the Court observed in its summary judgment order, "a second type of preemption" exists in "those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Doc. No. 368 at 77 n.25 (quoting *Arizona v. U.S.*, 567 U.S. 387, 399-400 (2012)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining

the federal statute as a whole and identifying its purpose and intended effects." *Arizona*, 567 U.S. at 399-400 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Congress has evidenced an intent to regulate the contractual relationships between independent contractors and regulated motor carriers; in so regulating, Congress permitted contractors and motor carriers to agree upon the allocation of expenses between the parties, a fact that this Court has already recognized. *See* 49 C.F.R. § 376.12(e), (j)(1); *see also* Doc. No. 368 at 77 ("The regulations require that the lease specifies who is responsible for such costs."). State legislation mandating that a particular party bear certain costs is contrary to this federal scheme, which was specifically constructed so that "the parties to the lease . . . would decide what party is to bear various costs[] and any items subject to being charged back to the lessor would have to be so identified [in the lease]." *Lease and Interchange of Vehicles*, 131 M.C.C. 286, 315 (Interstate Commerce Commission 1978) (discussing promulgation of the federal leasing regulations) ("This topic [requiring disclosure of charge-backs in contracts between independent contractors and motor carriers] did not receive much substantive comment, other than carriers generally stating that these items are properly the subject of individual negotiations between the parties"). If the IWPCL is construed as prohibiting deductions that the parties were intended by Congress to freely negotiate under the leasing regulations, then the IWPCL "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" the leasing regulations and is preempted.[10]

The evidence at trial will also demonstrate that there is no merit to Plaintiffs' fraud claims. Plaintiffs allege that CRST made false representations to them regarding the amount of money they would make as lease operators based on statements made by recruiters and the Lease Purchase

---

[10] The IWPCL only applies to employees; thus, Plaintiffs' IWPCL claims will also fail if the Court determines that Plaintiffs were properly classified as independent contractors. In addition, like the IMWL, the Owner-Operator Exemption also applies to the IWPCL. *See* Iowa Code Ann. § 91A.2(3)(a)(c). Thus, if the Court holds that the Exemption applies, it bars Plaintiffs' claims under the IWPCL to the extent they accrued after July 1, 2020.

Information Packet that was provided to them. *Third Amended Complaint*, Doc. No. 108, ¶ 185; *Declaration of Anthony Cervantes*, Doc. No. 245-30, ¶ 5; *Declaration of Mike Cross*, Doc. No. 245-31, ¶ 9. To establish a claim for fraud under Iowa law, Plaintiffs must prove by "a preponderance of clear, satisfactory, and convincing proof" the following seven elements: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d. 684, 687 (Iowa 2010) (internal citations and quotation marks omitted); *Adrian Trucking, Inc. v. Navistar, Inc.*, 609 F. Supp. 3d 728, 745 (N.D. Iowa 2022) (quoting *Van Sickle*, 783 N.W.2d. at 687).

At trial, CRST's witnesses will testify that the income figures discussed by recruiters and the income estimates contained in the Lease Purchase Information Packet were accurate representations as to the amounts that lease operators *could* make *if* they drove a sufficient number of miles. Indeed, the Lease Purchase Information Packet itself states that the income chart merely provides "example[s]" of what operators could expect to make. *See Lease Purchase Information Packet* at 5. That Plaintiffs were themselves unsuccessful at generating a profit does not demonstrate that CRST lied to them about how much money they could make; as CRST's witnesses will testify, the amount of revenue that each Contractor could generate—including the named Plaintiffs—depended on how much each Contractor chose to work.

## III.   CONCLUSION

CRST believes that the testimony and other evidence at trial will demonstrate that the class and collective in this case should be decertified, that the Contractors were properly classified as independent contractors, and that the named Plaintiffs' individual claims will fail.

Dated: October 21, 2024

Respectfully submitted,

/s/ James H. Hanson
James H. Hanson (admitted *pro hac vice*)
James T. Spolyar (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-492-9205
F: 317-684-2414
jhanson@scopelitis.com
jspolyar@scopelitis.com

Adam C. Smedstad (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
5470 Shilshole Avenue NW, Suite 520
Seattle, WA 98107
P: 206-288-6192
F: 206-299-9375
asmedstad@scopelitis.com

/s/ Kevin J. Visser
Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
P: 319-366-7641
F: 319-366-1917
kvisser@spmblaw.com

Attorneys for Defendants,
CRST International, Inc. and CRST Expedited, Inc.

4878-1829-7069, v. 19