# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated, | Case No. 1:20-cv-00075-CJW-KEM |
| | Honorable Judge C.J. Williams |
| Plaintiffs, | |
| v. | |
| CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC., | |
| Defendants. | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| ANTHONY CERVANTES and MIKE CROSS, on behalf of themselves and all others similarly situated, | Case No. 1:20-cv-00075-CJW-KEM |
| | Honorable Judge C.J. Williams |
| Plaintiffs, | |
| v. | |
| CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC., | |
| Defendants. | |

On November 4-14, 2024, this Court conducted a bench trial on Plaintiffs' claims. Based on Court filings, the testimony and exhibits received into evidence at trial, and having considered the post-trial briefs and proposed findings of fact and conclusions of law subsequently submitted by the parties, the Court makes the following Findings of Fact, Conclusions of Law, and Order:

## FINDINGS OF FACT

### I. The Parties

1. CRST provides interstate transportation services to customers throughout the United States under for-hire motor carrier operating authority issued by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the U.S. Department of Transportation (DOT). *Trial Exhibit* (Tr. Ex.) 2 at 4.

2. CRST engages two types of drivers to operate trucks hauling its customers' freight: drivers it employs directly and classifies as employees, sometimes referred to as "company drivers," and drivers who sign Independent Contractor Operating Agreements (ICOAs) through which they lease one or more trucks to CRST that they or others will operate and who CRST classifies as independent contractors (Contractors). *Official Transcript of Bench Trial*, Doc. Nos.

435 to 442, (Tr.) at 1023:9-1024:1; 1551:12-21.

3.     Plaintiff, Anthony Cervantes (Cervantes), was a Contractor who signed two separate ICOAs with CRST, one in January 2018 and a second in March 2018. *Tr. Ex.* 2; *Tr.* at 114:1-115:6; 130:13-23.

4.     Plaintiff, Michael Cross (Cross), was a Contractor who signed multiple ICOAs with CRST over a period of approximately two years from late 2018 to early 2021. *Tr. Ex.* 146 ¶ 3; *Tr.* at 305:11-306:2.

5.     With respect to Plaintiffs' Iowa Minimum Wage Law (IMWL) and Truth in Leasing Act (TILA) claims, the Court certified a class under Fed. R. Civ. P. 23(b)(3) consisting of "[a]ll Lease Operators who drove for CRST Expedited, Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an [ICOA] with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST Expedited, Inc. during the applicable limitations period." Doc. No. 296 at 23. The class period for these claims is from January 17, 2018, to November 3, 2023, for Plaintiffs' IMWL claim and October 23, 2016, to November 3, 2023, for Plaintiffs' TILA claim. There are approximately 3,692 individuals in the class.

6.     The Court conditionally certified Plaintiffs' Fair Labor Standards Act (FLSA) minimum wage claim as a collective action. The collective is defined as "[a]ll drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an [ICOA] and who have not leased more than one truck at a time to CRST." Doc. No. 157. There are approximately 629 individuals who opted into the collective. The class period for these claims varies depending on when each Opt-in Plaintiff filed his or her consent to join form. 29 U.S.C. § 256.

## II.    CRST's Operations

7.    CRST offers its customers expedited transportation services, which utilizes teams of two drivers operating a truck to deliver freight more quickly while adhering to the federal hours-of-service regulations set out in 49 C.F.R. Part 395.

8.    For a portion of the statutory period at issue in this case, CRST operated or contracted with various truck driving schools at which a prospective driver could earn his Class A commercial driver's license (CDL). *Tr.* at 1026:24-1027:4; 1028:24-1029:6.

9.    Upon successfully obtaining their CDL, a student driver could drive as an employee of CRST for a period of eight to ten months as repayment of the tuition for his driver training or elect to pay their tuition and leave CRST. *Tr.* 273:23-274:2.

10.    Student drivers who elected to become employees of and drive for CRST were paired with experienced drivers, like Plaintiffs, for on-the-job training that lasted for approximately one month. *See Tr.* at 217:7-16; 232:11-233:3; 1341:16-1342:6.

11.    The on-the-job training program was sometimes referred to as the lead driver program. *See Tr.* at 895:21-896:10.

12.    CRST recruiters do not make any promises to prospective lease purchase operators concerning the number of miles they would run or the amount of money they would make. *Tr.* at 1041:13-25; 1064:23-1068:24.

13.    CRST provided prospective lease purchase operators with a Lease Purchase Information Packet that contained information about CRST's lease purchase program and provided examples of what lease purchase operators could make if they drove a given number of miles. *Tr. Ex.* 97.

14.    CRST's Lease Purchase Information Packet is updated quarterly for accuracy and contains only examples of what lease purchase operators could make if they ran a sufficient

number of miles. *Tr.* at 1002:1-11; 1041:13-25; 1067:24-1068:1; 1064:23-1068:24; *see also Lease Purchase Information Packet* at 5.

15.    Under the ICOAs they signed, Contractors earned 70% of the linehaul revenue customers paid to CRST for hauling the freight plus 97% of fuel surcharges customers paid and between 70-100% of other accessorial charges customers paid. *Tr.* at 661:6-18; 886:14-19; *Tr. Ex.* 100 at CRST001145-1146.

16.    Company drivers are paid a cents-per-mile for each mile associated with a load and are not paid based on a percentage of load revenue. *Tr.* at 1034:11-1035:17.

17.    Many Contractors served as lead drivers, where they trained student drivers. *Tr.* at 70:12-15 (Cervantes); *Tr.* at 233:1-3 (Cross); *Tr.* at 1338:21-24 (Meeks); *Tr.* at 1521:3-13 (Gess); *see also Tr.* at 637:5-18.

18.    When Contractors operated with student drivers, Contractors received all of the revenue associated with the loads they and their student hauled and paid CRST an amount that ranged from 9¢-12¢ per mile to subsidize the wages CRST paid to the student driver. *Tr.* at 1251:6-21; 1468:6-1469:5; 1559:2-15; *Tr. Ex.* 155 ¶ 2(B).

19.    The per-mile charge for operating with a student was well below the market rate for an experienced team driver. *See Tr.* at 1251:1-21; 1251:22-1252:7; 1559:19-21.

20.    CRST placed restrictions on the amount and times of day students could drive for the initial portion of the students' 28-day on-the-job training period. *Tr.* 173:24-174:21; 897:19-898:13; 1560:5-9.

21.    Contractors set students' work schedules, managed their available hours-of-service, selected which loads the team would haul, and, of course, trained students how to drive. *Tr.* 173:24-174:21; *Tr.* at 1452:23-1453:5; *Tr.* at 1559:22-24; *Tr.* at 1560:21-1561:15; *see also Tr. Ex.* 2 ¶ 1(C).

22.     Instead of operating with students, Contractors could hire their own, more experienced, team drivers or elect to drive alone (so called "solo" driving). *See Tr.* at 272:13-273:21; _628:11-12; 900:10-21; 1249:2-5. Contractors could elect to operate as a team or as a solo driver. *Tr.* at 629:25-630:6. Between 2017 and 2023, some Contractors elected to run solo. *Tr.* at 1248:24-1249:5.

23.     CRST was required to ensure the drivers Contractors hired were qualified under the federal regulations set out in 49 C.F.R. Part 391 because Contractors and any team drivers they hired were hauling freight under CRST's interstate operating authority. *Tr.* at 632:13-21, 1052:15-1053:3.

24.     Approximately 5% to 10% of Contractors have hired a person other than themselves to drive their trucks. *Tr.* at 886:5-13.

25.     Contractors were paid within 15 calendar days of when they submitted the paperwork required by federal law and paperwork which was necessary for CRST to collect from its customers. *Tr. Ex.* 2 ¶ 3(A); *Tr.* at 151:20-152:8.

26.     Prior to 2019, CRST settled with Contractors twice per week: for all load paperwork submitted through Friday, CRST settled with Contractors on the following Tuesday, and for all load paperwork submitted through Tuesday, CRST settled with Contractors on Thursday. *Tr.* at 738:19-739:1. In 2019, CRST began settling with Contractors once per week on Fridays for paperwork submitted through Tuesday. *Id.*

27.     On each settlement statement, Contractors were paid for all loads for which they had submitted the required paperwork. *Tr.* at 302:16-303:13; *see also Tr. Ex.* 99.

28.     CRST paid Contractors $1.8 million more than it was contractually obligated to pay them. *Tr.* at 530:11-20.

## III. Classification of Plaintiffs as Independent Contractors

### A. Control

29.     When prospective lease purchase operators contact CRST, they inquire about completely different topics than prospective company drivers, with lease purchase operators inquiring about customer rates, percentage of revenue under the ICOA, types of freight, areas of operation, the age and mileage of trucks available for lease, and CRST's freight network. *Tr.* at 988:6-989:22; 1021:8-1022:11; 1032:22-1034:17. Prospective company drivers, by contrast, inquire about how often they will be permitted to go home, how many miles they can expect to drive, and what their career path at CRST will look like. *Id.*

30.     Prospective lease purchase operators inquire about the expenses that they can expect to incur while under contract with CRST. *Tr.* at 1071:25-1072:6.

31.     Jennifer Abernathy (Abernathy), the Chief People Officer of CRST and previous head of all driver recruiting for the company, testified that "some of our independent contractors want to stick to a certain part of the country" and so inquire during recruitment whether "[CRST] ha[s] freight in those markets . . . because, again, they'll get to pick and choose that -- what they run and what they do." Tr. at 1032:22-1034:17.

32.     Approximately 100 to 150 company drivers per year transfer from being a company driver to being a lease purchase operator. *Tr.* at 1056:1-14.

33.     Save for the restrictions imposed by the Federal Motor Carrier Safety Regulations (FMCSRs), Contractors set their own work schedules, including the days and hours they, their students, and their team drivers drove. *Tr.* at 173:24-174:21; 897:8-18; 905:15-25; 906:1-3; 907:16-18; 908:8-11.

34.     Many Contractors served as lead drivers, where they trained student drivers. *Tr.* at 70:12-15 (Cervantes); *Tr.* at 233:1-3 (Cross); *Tr.* at 1338:21-24 (Meeks); *Tr.* at 1521:3-13 (Gess);

*see also Tr.* at 637:5-18.

35. Contractors set students' work schedules, managed their available hours-of-service, selected which loads the team would haul, and, of course, trained students how to drive. *Tr.* 173:24-174:21; *Tr.* at 1452:23-1453:5; *Tr.* at 1559:22-24; *Tr.* at 1560:21-1561:15; *see also Tr. Ex.* 2 ¶ 1(C).

36. Approximately 5% to 10% of Contractors have hired a person other than themselves to drive their trucks. *Tr.* at 886:5-13.

37. Contractors were not obligated to haul any of the loads that CRST offered them. *Tr.* at 1422:2-15.

38. CRST did not force Contractors to take loads it offered to them. *Tr.* at 877:9-11.

39. Under their ICOAs, Contractors had the right to and did in fact reject loads offered to them by CRST. *Tr.* at 1552:7-9.

40. Plaintiffs and two other Contractors who testified at trial could and did reject loads offered to them by CRST. *Tr.* at 287:5-10 (Cervantes); 306:14-21 (Cross); 1422:2-15 (Meeks); 1602:4-16 (Tromp).

41. Meeks rejected a load going to Denver, Colorado because she could not locate a suitable backhaul. *Tr.* at 1353:10-1355:14.

42. Contractors were not punished for rejecting loads. *Tr.* at 688:17-689:6; 1497:20-1498:15; 1422:9-11; 1513:17-1514:2.

43. Cervantes felt internal pressure to take loads in order to keep generating revenue. *Tr.* at 171:12-22.

44. Contractors would assess the profitability of the loads they were offered when deciding whether to accept or reject those loads. *Tr.* at 287:5-10; 302:13-15; 1125:3-1126:9.

45. Assessing the profitability of a load involved more than just how much the load

paid. *Tr.* at 96:1-7.

46.    Contractors identified many different factors that impacted a load's profitability, including, the amount the load paid, the miles associated with the load, the downtime associated with the load, when the load needed to be delivered, the routes required to deliver the load, and the availability of loads coming out of the destination of the load. *Tr.* at 173:3-11; 302:13-15; 1598:20-1599:1; 1556:17-1557:8; 1560:21-1561:15; 1623:3-18.

47.    Contractors also considered a variety of other factors in deciding whether to accept or reject a load and in maintaining the profitability of their businesses, including the rate offered for the load, the miles required to deliver the load, the transit time to haul the load, the deadhead miles associated with the load, the wait time between loads (dwell time), and the potential for layovers. *Tr.* at 1275:15-1281:13; *Tr. Ex.* 45 at 6; *Tr. Ex.* 60 at 5.

48.    To the extent that CRST had discussions with Contractors about available loads, it was only to ensure that Contractors made decisions with as much information as possible. *Tr.* at 450:6-451:17; 1054:25-1056:25; 1308:14-1310:13.

49.    In deciding whether to accept or reject a load, Cervantes considered such things as "[t]he area, as far as terrain, the cost, the stress of the vehicle going over mountains, passes, the weight of the load, that were stressful on the fuel." *Tr.* at 96:1-7.

50.    In deciding whether to accept or reject a load, David Tromp (Tromp) tried to "keep deadhead to a minimum," to "pick loads that paid, you know, enough revenue to justify hauling them," and would broker loads if freight was slow. *Tr.* at 1598:20-1599:1. Tromp also considered the amount the load was paying and the "weight and the transit time." *Tr.* at 1623:3-22; 1626:7-12.

51.    In deciding whether to accept or reject a load, both Cervantes and Tromp also considered whether a backhaul (i.e., a return load) was available. *Tr.* at 173:3-7; 1623:3-18.

52.     Company drivers were under forced dispatch, i.e., they had no discretion regarding the loads they hauled; company drivers were obligated to haul every load CRST assigned to them. *Tr.* at 664:2-19.

53.     Contractors determined when they took time off, or home time. *Tr.* at 663:2-5.

54.     Company drivers had to request time off and home time from CRST and CRST, not the company drivers, decided when company drivers could take time off. *Tr.* 662:11-663:1.

55.     Contractors determined when company drivers took breaks from working or driving. *Tr.* 906:24-907:6.

56.     CRST could not force Contractors to work a certain numbers of hours in a day. *Tr.* 907:16:18.

57.     When Contractors decided that they did not want to work on a given day or days, they made that decision without the need to provide advance notice to CRST. *Tr.* at 908:8-11.

58.     Once Contractors accepted a dispatched load, they chose the route they drove to get from the pickup point to the delivery point. *Tr.* at 159:8-14; 950:1-951:6

59.     In contrast, company drivers had to take the routes CRST dictated to them. *Tr.* at 979:11-18.

60.     Contractors decided when and where to fuel their trucks; both decisions impacted the profitability of the loads Contractors hauled. *Tr.* at 1597:25-1598:10.

61.     Tabitha Meeks (Meeks) paid $4 per week to CRST for routing and fuel optimization services, which she used to train her student drivers. *Tr.* at 1461:5-23.

62.     CRST dictated the times and places that company drivers fueled the trucks they operated. *Tr.* at 950:13-25.

63.     CRST did not dictate where Contractors purchased fuel or how much fuel they bought. *Tr.* at 866:1-11.

64.     Contractors were free to choose any fuel station in the United States to purchase fuel. *Tr.* at 985:13-987:3.

65.     If a fueling station does not accept Comdata cards, the Contractor had to pay for that fuel out of his pocket. *Tr.* at 982:2-10.

66.     Meeks elected to use a Comdata card to purchase fuel because it was more convenient than paying cash; the transaction was more efficient and her purchases were automatically reported to her tax return preparation service, ATBS. *Tr.* at 1499:10-20.

67.     Contractors purchase fuel at locations company drivers cannot use. *Tr.* at 979:19-22.

68.     By contrast, CRST dictated the routes company drivers take to deliver their loads, where they purchased fuel, and the amount of fuel they purchased. *Tr.* at 950:13-25.

69.     CRST made suggested routing available to Contractors, but Contractors decided whether to follow those suggestions or choose alternative routes. *Tr.* at 219:18-220:2; 349:12-17.

70.     Some Contractors took routes different than those suggested by CRST. *Tr.* at 979:11-18.

71.     One Contractor, Meeks, followed the route CRST suggested the vast majority of the time. *Tr.* at 1359:2-18.

72.     Meeks would sometimes ignore the fuel routing recommendations she paid for through CRST, instead choosing to either fuel where it was cheaper or to reduce the number of fuel stops. *Tr.* at 1462:12-1463:9.

73.     CRST did not take any adverse action against Contractors who used alternate routes, even if the Contractor was involved in an accident while driving on a route other than the one suggested by CRST. *Tr.* at 1465:17-20.

74.     Joseph Gess (Gess), another Contractor, deviated from CRST's suggested routing

if he knew a route that was shorter. *Tr.* at 1556:17-1557:1.

75.     Many Contractors told CRST that there were routes required and types of cargo that they would not even consider hauling. *Tr.* at 901:6-902:4; 1258: 1-1259:3; 1622:12-14.

76.     For example, many Contractors told CRST that they would not drive in the northeast, where traffic congestion and low bridges are common. *Id.*; *Tr.* at 1033:21-1034:5.

77.     Similarly, Contractors told CRST that they would not drive in the Pacific Northwest during winter months because of snow and high winds. Those Contractors would only agree to haul loads in the southern portion of the United States during the winter months. *Id.*; *Tr.* at 440:12-441:6.

78.     Some Contractors would refuse to haul loads for certain customers because of the customer's requirements. *Tr.* at 901:10-902:1.

79.     Approximately 30% of Contractors place limits on the types of loads they will haul. *Tr.* at 1259:4-8.

80.     CRST discussed with Contractors the impact of placing restrictions on the loads they would accept and refusing loads on revenue and overall profitability, but CRST has no policy or practice of training fleet managers to advise Contractors to accept all loads it offers the Contractors. *Tr.* at 955:18-956:11; 1113:20-1114:9.

81.     Contractors who participated in the lead driver program had the discretion to decide whether to accept the students they were offered. Cervantes refused to accept a student CRST provided him to train. *Tr.* at 177:18-20.

82.     Plaintiffs each hired co-drivers to operate with them as a team. Cervantes hired his son-in-law, and Cross hired a former student driver named Jessica. *Tr.* at 178:9-11; 317:15-21.

83.     When Cross hired Jessica, he paid a fee to CRST because Jessica had not yet completed her initial employment contract with CRST. Cross made this decision on his own; no

one from CRST pressured Cross to hire her. *Tr.* at 317:15-21.

84. Meeks likewise hired a co-driver named Justin Bates. *Tr.* at 1411:21-1412:22; 1416:8-14.

85. CRST's independent contractor program afforded Contractors with the opportunity to lease multiple trucks to CRST at the same time. *Tr.* at 1293:17-1294:4; 1610:9-12.

86. If a Contractor leased more than one truck to CRST, the Contractor hired drivers to operate those trucks. *Tr.* at 1247:18-1248:7; 1610:9-12; 1611:18-1612:5.

87. CRST paid the Contractors who leased the trucks to CRST for every load those trucks delivered, regardless of whether the Contractor personally hauled any of those loads. *Tr.* at 1248:8-15; 178:19-179:1.

88. Contractors decided whether to avail themselves of the opportunity to lease multiple trucks to CRST. *Tr.* at 1247:18-1248:7; 1611:18-1612:5.

89. Tromp leased as many as eight trucks to CRST at one time. *Tr.* 1591:23-1592:1.

90. Tromp explained that he hired drivers to operate the trucks he leased to CRST. *Tr.* at 1610:9-12.

91. If Contractors did not like particular loads, Contractors negotiated with CRST over the terms under which they would accept the loads. *Tr.* at 1253:22-1254:2.

92. Company drivers, on the other hand, were subject to forced dispatch and could not reject loads CRST assigned to them except for safety-related reasons. *Tr.* at 662:11-663:1.

93. A company driver who refuses a load without a safety or legal reason faced discipline up to and including termination of employment, whereas Contractors faced no similar adverse actions. *Tr.* at 664:2-19; 979:23-25.

94. Aside from certain safety policies, the rules and policies in CRST's driver handbook did not, as a general rule, apply to Contractors. *Tr.* at 908:12-909:6.

95.     Cervantes was never disciplined or punished under any policies set out in CRST's driver handbook. *Tr.* at 219:13-17.

96.     CRST disciplines company drivers for failing to follow CRST's policies and guidelines. *Tr.* at 860:21-862:14; 1706:20-1707:6; *see also Tr.* at 664:2-19; 979:23-25.

97.     CRST did not force Contractors to purchase anything from it. *Tr.* at 164:5-8.

98.     Contractors could purchase fuel wherever they so desired. *Tr.* at 986:8-987:3.

99.     Contractors could obtain the trucks they operated from anywhere they chose, including leasing trucks from CRST Lincoln Sales, Inc. (Lincoln Sales). *Tr.* at 1594:9-1595:12.

100.     Every Contractor was responsible for the costs associated with operating the trucks they leased to CRST. *Tr.* at 1553:20-1555:3.

101.     Contractors who entered into lease purchase agreements with Lincoln Sales were responsible for the maintenance and repairs on those trucks and paid a weekly fee for warranty coverage on certain maintenance and repair items. *Tr.* at 1267:17-24; 1620:20-1621:6.

102.     Contractors paid out-of-pocket for maintenance and repairs on their trucks that were not covered by the warranty with Lincoln Sales. *Tr.* at 1642:14-1643:13.

103.     In addition to the weekly fee to cover warranty maintenance and repairs, Contractors could elect to have an additional escrow account, funded by an amount of their choice from which they could withdraw funds for any purpose they chose, including personal expenses. *Tr.* at 1272:15-24; 1273:3-9.

104.     Cervantes elected to have CRST deduct $0.08 per mile and place it in an escrow account that he could use towards paying off the vehicle he leased from Lincoln Sales. *Tr.* at 144:18-145:18.

105.     Maintenance and repairs covered under the warranty in the lease purchase agreements with Lincoln Sales were performed without additional payment by the Contractors. *Tr.*

at 1512:2-6 (Meeks repairs covered); 1523:23-1524:11 (Gess repairs covered).

106. CRST promised no minimum amount of freight under the ICOA. *Tr.* at 300:20-301:11.

107. CRST sometimes terminated the ICOAs of Contractors who defaulted on their obligations. *Tr.* at 625:20-626:8.

108. If a Contractor elected to take time off from delivering loads, business expenses the Contractor agreed to pay continued to accrue during the time off. *Tr.* at 1173:23-1174:5.

109. CRST did not monitor Contractors, unless it was required to do so to comply with federal regulations. *Tr.* at 672:16-673:18.

110. Unlike company drivers, CRST did not monitor Contractors' schedules, speed, fuel consumption, hard-breaking events, or routes. *Tr.* at 671:22-673:18.

111. CRST did not monitor Contractors' fuel consumption or the routes Contractors elected to take to deliver loads. *Tr.* at 682:16-21.

112. Even though CRST requested Contractors not travel on portions of I-70 west of Denver, Colorado, because of the lack of available repair services in that area, Contractors used that route anyway. *Tr.* at 685:6-17.

113. CRST does not dictate the details of how Contractors deliver loads. *Tr.* at 909:11-14.

114. CRST monitors the location of Contractors' trucks only for purposes of customer service. *Tr.* at 1708:23-1709:17.

115. CRST monitors company drivers via an inward and outward-facing dashcam. *Tr.* at 672:3-22. Contractors do not have those cameras in their trucks. *Id.*

116. When CRST had customer loads available for pickup and delivery, Contractors could elect to obtain their own freight and book it into CRST's system. *Tr.* at 1299:12-21

117.	Contractors planned ahead based on the hours-of-service regulations as they pertained to the Contractor and the Contractor's students or co-drivers to determine whether they could accept loads and communicated their legal limitations to their fleet managers. *Tr.* at 946:7-17; 1514:3-17.

118.	Cross had no personal knowledge whether other Contractors falsified their hours-of-service logs. *Tr.* at 328:21-329:8.

119.	Contractors made their own decisions regarding whether to sign ICOAs or enter into a lease-purchase agreement with Lincoln Sales. *Tr.* at 977:21-25.

120.	If Cross decided that working under his ICOA with CRST was not paying him enough, he could have terminated the agreement and gone to another motor carrier where he would have been a qualified driver. *Tr.* at 296:9-15.

121.	The elections Contractors made in their ICOAs, for example, with respect to vehicle license plates, fuel taxes, highway use taxes, and insurance, were voluntary and not mandated by CRST. *Tr.* at 143:3-20; 161:2-14 (Cervantes); 1332:23-1333:4; 1448:21-1449:1; 1449:13-1451:9 (Meeks); 1614:14-21 (Tromp).

122.	Gess preferred being a Contractor to being a company driver because he could pick his own loads and was not subject to forced dispatch. *Tr.* at 1543:13-19.

123.	CRST was responsible for compliance with the DOT regulations for both the company drivers and Contractors operating under its authority. *Tr.* at 1151:6-20.

124.	With the exception of hours-of-service data, CRST did not download information from the telematics system devices on trucks operated by Contractors, which are currently Maven devices and were previously Omnitracs devices. *Tr.* at 1666:4-14; 1667:19-25.

125.	Unless a Contractor had a significant accident, CRST did not examine information from the Omnitracs or Maven systems. *Tr.* at 1670:21-1671:18.

126. In the event of a significant accident, on a case-by-case basis, CRST decided whether to access information from the Contractor's Omnitracs or Maven systems to preserve the information in case of litigation. *Tr.* at 1670:21-1671:18.

127. CRST had a list of approved carriers from which Contractors could accept loads at any time. *Tr.* at 1263:10-1264:18. At the time of trial, CRST had also implemented a load board that allowed Contractors to select which loads the wanted to accept. *Tr.* at 867:8-11.

128. CRST implemented its internal load board in 2024, which further expanded the Contractors' ability to pick and choose loads. *Tr. Ex.* 249 at 1.

129. Contractors who elect to participate in the load board (which is most) have visibility to all loads available within CRST's network. *Tr.* at 1223:22-1225:10; 1228:4-1229:1; *see also Tr.* at 1147:2-9. Contractors may book any available load and may book multiple loads at once (i.e., "stack" loads) so that they can plan entire trips. *Tr.* at 1230:4-1231:20; *Plaintiffs' Trial Exhibit* 249 at 2.

130. Prior to the implementation of the load board, CRST had negotiated agreements with several of the most popular third-party freight brokers and agents in the transportation industry (e.g., C.H. Robinson, Echo, Coyote); Contractors could more easily broker their own freight through CRST using these pre-approved brokers even before the load board. *Tr.* at 1263:10-1264:18.

131. Some Contractors have chosen not to use the load board or pre-approved brokers/agents, instead choosing to continue receiving load offers from their fleet managers. *Tr.* at 1147:2-9, 1223:3-8.

132. Company drivers cannot use the load board or pre-approved brokers/agents. *Tr.* at 1264:19-1265:1; 1266:7-14.

133. Contractors who operated multiple trucks simultaneously had discretion to make

load selections for their trucks or to give access to the load board to their employees and allow those employees to select loads. *Tr.* at 1293:17-1294:4.

### B. Relative Investments

134. Contractors made numerous investments into their businesses, including investments into International Registration Plan base plates, International Fuel Tax Agreement (IFTA) permits, an electronic on-board recorder (i.e., Qualcomm) device, physical damage insurance, occupational accident insurance, bobtail insurance, cargo insurance, and health insurance and, if applicable, workers' compensation insurance. *Tr.* at 130:13-143:20 (Cervantes); *Tr.* at 315:11-316:20 (Cross); *see also Tr. Ex.* 2 at App'x A.

135. All Contractors who testified at trial testified that they were responsible for maintenance on their trucks. *Tr.* at 124:22-25 (Cervantes); *Tr.* at 314:12-14 (Cross); *Tr.* at 1334:21-1335:5, 1386:10-13 (Meeks); *Tr.* at 1554:15-21 (Gess); *Tr.* at 1620:20-1621:6 (Tromp).

136. Meeks renewed her ICOA three times because she was invested in her truck and wanted to own it outright. *Tr.* at 1503:11-17.

137. Meeks paid $4 per week to CRST for routing and fuel optimization services, which she used to train her student drivers. *Tr.* at 1461:5-23.

138. In addition to investing in her truck, Meeks made the business decision to invest in a printer so that she could accept trailer registration documents by email instead of depending on fax machines. *Tr.* at 1373:16-25; 1491:20-1492:4..

139. Cervantes leased a 2015 Freightliner truck with approximately 400,000 miles on it, and it would not be unusual for a truck like that to have a lifespan of over 1,000,000 miles if it was properly maintained. *Tr.* at 145:19-146:5

140. Cross leased a truck from CRST Lincoln Sales. *Tr.* at 311: 13-25; *Tr. Ex.* 101, 106.

141. Meeks leased a truck from CRST Lincoln Sales. *Tr.* at 1413:19-21; 1503:11-17; *Tr.*

*Ex.* 118.

142. Joseph Gess leased a truck from CRST Lincoln Sales. *Tr.* 1551:19-23.

143. Contractors who leased their trucks from Lincoln Sales could pay their trucks off prior to the scheduled end of the lease. *Tr.* at 658:15-659:2;965:2-9.

144. Contractors testified to becoming lease purchase operators specifically for the purpose of purchasing a truck. *Tr.* at 43:12-44:8; *Tr.* at 1561:22-1562:8.

145. Between 2016 and 2023, approximately five to ten Contractors per quarter paid off their leases to Lincoln Sales and took title to their trucks. *Tr.* at 980:1-981:1

146. Meeks paid off the truck she leased from Lincoln Sales by making a final payment of $5,000. *Tr.* at 1478:15-1479:22.

147. At the time she paid off her lease, Meeks estimated that her truck was worth more than $5,000. *Tr.* at 1478:15-1479:22.

148. After taking title to her truck, Meeks could have used it to drive for another motor carrier. *Tr.* at 1481:8-13.

149. Meeks formed Running Rabbit Express, LLC in 2019 with the intention of taking the truck she leased to another motor carrier after she received title to the truck. *Tr.* at 1482:8-1483:10.

150. Cervantes invested in his business, Integrity Transport, by obtaining his own motor carrier operating authority from the DOT. *Tr.* at 39:4-13.

151. Gess contracted with CRST during two periods of time: 2008 to 2011 and 2019 to 2020. *Tr.* at 1543:20-1544:11; 1546:10-19.

152. Gess invested in his business by obtaining his own motor carrier operating authority from the DOT. *Tr.* at 1548:12-20.

153. During his first contract period, Gess paid off his lease with Lincoln Sales, took

18

title to his truck, terminated his ICOA with CRST, and leased his truck to another motor carrier. *Tr.* at 1521:23-1522:8.

154. Tromp signed his first ICOA with CRST and entered into a lease purchase agreement with Lincoln Sales in 2004. *Tr.* at 1594:9-12.

155. Tromp trained his wife as a student driver in the first truck he leased from Lincoln Sales, and thereafter they operated as a team for approximately a year. *Tr.* at 1591:4-1592:11.

156. Tromp employed his wife when they drove as a team. *Tr.* at 1592:17-19.

157. Tromp paid off the first truck he leased and then leased a second truck from Lincoln Sales. *Tr.* at 1594:24-1595:5. Tromp's wife then began driving the second truck with another student driver. *Tr.* at 1591:20-1592:16.

158. Until a few years prior to trial, Tromp leased the trucks he drove under ICOAs with CRST from Lincoln Sales. *Tr.* at 1594:24-1595:9.

159. Thereafter, Tromp began buying trucks from Ryder by either paying for the trucks or financing them himself. *Tr.* at 1595:6-12.

160. In all, Tromp purchased approximately 10 trucks through Lincoln Sales. *Tr.* at 1596:15-1597:4.

161. Many Contractors served as lead drivers. *Tr.* at 70:12-15 (Cervantes); *Tr.* at 233:1-3 (Cross); *Tr.* at 1338:21-24 (Meeks); *Tr.* at 1521:3-13 (Gess); *see also Tr.* at 637:5-18.

162. When Contractors operated with student drivers, Contractors received all of the revenue associated with the loads they and their students hauled and paid CRST an amount that ranged from 9¢-12¢ per mile to subsidize the wages CRST paid to the student driver. *Tr.* at 1251:6-21; 1468:6-1469:5; 1559:2-15; *Tr. Ex.* 155 ¶ 2(B).

163. The per-mile charge for operating with a student was well below the market rate for an experienced team driver. *See Tr.* at 1251:1-21; 1251:22-1252:7; 1559:19-21.

164.     Instead of operating with students, Contractors could hire their own, more experienced, team drivers or elect to drive alone (so called "solo" driving). *See Tr.* at 272:13-273:21; _628:11-12; 900:10-21; 1249:2-5. Contractors could elect to operate in a team or as a solo driver. *Tr.* at 629:25-630:6. Between 2017 and 2023, some Contractors elected to run solo. *Tr.* at 1248:24-1249:5.

165.     Approximately 5% to 10% of Contractors have hired a person other than themselves to drive their trucks. *Tr.* at 886:5-13. Company drivers cannot do this.

166.     All Contractors who testified at trial testified that they were responsible for maintenance on their trucks. *Tr.* at 124:22-25 (Cervantes); *Tr.* at 314:12-14 (Cross); *Tr.* at 1334:21-1335:5, 1386:10-13 (Meeks); *Tr.* at 1554:15-21 (Gess); *Tr.* at 1620:20-1621:6 (Tromp).

167.     Company drivers do not lease vehicles and are provided trucks by CRST. *Tr.* at 373:22-374:20.

### C.     Opportunity for Profit and Loss

168.     When he leased his second truck from Lincoln Sales, Tromp probably could have afforded the down payment to buy a truck, but he took advantage of the fact that Lincoln Sales did not require a down payment and kept that money. *Tr.* at 1636:11-22.

169.     Tromp operated leased trucks under ICOAs with CRST for 17 years, and is still a Contractor with CRST. *Tr.* at 1591:14-22.

170.     During his time under contract with CRST, Tromp operated as many as eight leased trucks at one time. *Tr.* at 1591:23-1592:3.

171.     Contractors like Tromp operate multiple trucks simultaneously by recruiting and hiring drivers they employ. *Tr.* at 1247:18-1248:7.

172.     Meeks understood that she could have hired someone else to drive her truck for her while she drove for another motor carrier. *Tr.* at 1410:9-1411:8.

173.    Gess understood he was responsible for all business expenses associated with the operation of his truck, including fuel, lease payments, registrations, fuel tax permits and reporting, and maintenance. *Tr.* at 1553:20-1555:3.

174.    Gess had a goal of becoming a multi-truck operator because he wanted to earn income off of others driving his trucks. *Tr.* at 1561:22-1562:8.

175.    Tromp expanded his business by placing himself in geographic area with outbound freight, hiring someone to drive with him as a team driver, and when he was confident his employee could train students on that route, he would lease another truck, take it to a geographic area with outbound freight, and repeated the cycle. *Tr.* at 1603:16-1604:19; 1611:18-1612:5.

176.    Cervantes decided whether to accept a load based on considerations that included the location of the delivery and its impact on the profitability of his operation. *Tr.* at 173:3-11.

177.    On a regular basis, Cervantes made decisions to accept or reject loads based on the amounts the loads paid. *Tr.* at 106:21-25.

178.    In addition to considering the location of the load delivery, Cervantes factored in the terrain, the cost, the stress of the vehicle going over mountains, passes, and the weight of the load. *Tr.* at 96:1-7.

179.    Notwithstanding his consideration of profitability for his operation, Cervantes would rather sit and wait in a geographic area that had no profitable loads outbound than take a load he believed would fail to generate income for him. *Tr.* at 81:21-82:25.

180.    Cross tracked profitability on a load-by-load basis only. *Tr.* at 302:13-15.

181.    Cross turned down loads because of weight because those loads were less profitable. *Tr.* at 320:20-25.

182.    Other Contractors elected to deadhead, or travel without freight in a trailer, to position themselves in areas that contained more favorable rates for outbound freight. *Tr.* at 411:1-

10.

183. Gess believed that it was better to haul loads in order to generate revenue, which made him more profitable, but he did not calculate a per-mile rate for the loads he accepted. *Tr.* at 1552:21-1553:13.

184. Instead of per-load profitability, Tromp's primary consideration was "backhaul capability," or the ability to obtain a subsequent load at or near the destination that was profitable. *Tr.* at 1623:3-18.

185. For example, Tromp testified that loads coming out of New Jersey "tend to overcompensate," so he would usually accept loads bound for New Jersey. *Tr.* at 1652:4-11.

186. Notwithstanding her later testimony that she preferred to fuel at locations that accepted Comdata cards, Meeks tried to save money on fuel and considered paying out-of-pocket for fuel if doing so would save her money when compared to stations that accepted Comdata cards. *Tr.* at 1442:22-1443:8; 1444:7-21.

187. In addition to trying to save money on fuel, Meeks also looked for the best route to her destination and avoided toll roads to minimize her expenses. *Tr.* at 1444:22-1445:9.

188. Meeks also managed her business expenses by ignoring CRST's fuel location recommendations when she believed they called for too many stops. *Tr.* at 1504:7-18.

189. Similarly, although he used CRST's recommended fuel stops, Gess based his decision of how much fuel to purchase at those stops on how it would affect his profitability on the load. *Tr.* at 1555:4-20.

190. Tromp identified several cost-control measures he observed to boost his profitability, including driving at lower speeds, taking care of his trucks, limiting idle time, fueling at stations other than the CRST discount stations and instead using an application called Mudflap to pay for the fuel himself, planning his own routes, and purchasing insurance through CRST. *Tr.*

at 1597:5-14; 1597:25-1598:10; 1614:2-13; 1621:7-1622:11.

191.    Taking advantage of discounted fuel offered at certain stations for CRST helped Contractor profitability and route selection affected fuel costs for a load. *Tr.* at 146:13-22; 176:20-23.

192.    Cervantes hired his son-in-law as a co-driver and decided the amount he would pay his son-in-law. *Tr.* at 178:19-179:1.

193.    Cross elected to buy out the contract of the co-driver he hired, and the two of them negotiated what he would pay her without any input from CRST. *Tr.* at 294:3-17.

194.    CRST did not tell Contractors what to pay the co-drivers the Contractors hired; Contractors set the pay for the drivers they hired. *Tr.* at 1252:8-17.

195.    Meeks hired Justin Bates as a co-driver and believed their agreement was Justin would be paid between 25% and 30% of the load revenue. *Tr.* at 1416:8-14.

196.    Tromp, on the other hand, preferred training students because he found it more profitable to pay the training fee and keep his portion of the load revenue for himself. *Tr.* at 1614:22-1615:17.

197.    Cross negotiated with CRST to make loads he was going to turn down more attractive. *Tr.* at 308:25-309:10.

198.    CRST also negotiated increased load compensation with Contractors when, for example, the Contractor had difficulty finding a trailer to haul the load. *Tr.* at 1098:19-1099:22; 1273:18-1274:11.

199.    Contractors engaged in negotiations with CRST about compensation for loads over the Qualcomm system. For example, a Contractor told CRST, "Deadhead 50 miles for that, nah. 150, take it or leave it . . . I'm a third-generation trucker, so you know." *Tr.* at 1255:20-1256:9.

200.    Negotiations like the one over the Qualcomm system occurred multiple times per

week. *Tr.* at 1256:21-24.

201.    When he refused loads, CRST would sometimes offer to pay Cross for the fuel required for the deadhead miles associated with the load. *Tr.* at 287:16-288:1.

202.    Cross would deviate from CRST's suggested routes if he thought he could save on mileage and improve profitability for the loads. *Tr.* at 321:14-20.

203.    Gess likewise took the routes he thought were best to improve his mileage and increase profitability for the loads. *Tr.* at 1556:17-1557:8.

204.    Tromp minimized deadhead miles and increased profitability by seeking loads in the locations to which he delivered. *Tr.* at 1605:4-1606:8.

205.    Since 2016, Contractors have been able to obtain loads via third-party load boards. *Tr.* at 690:25-691:3; 1260:19-1264:18.

206.    Contractors negotiated loads they located with third-party brokers and then submitted the loads to CRST for input into CRST's system. *Tr.* at 1261:11-1264:18; 1599:2-19.

207.    This process usually took between one and three hours to complete. *Tr.* at 1262:23-1263:8.

208.    Both Cervantes and Tromp successfully brokered loads from third parties while under contract with CRST. *Tr.* at 170:6-19 (Cervantes); 1599:2-19 (Tromp).

209.    Beginning in 2022, CRST implemented a new system that Contractors used to submit loads to they found into CRST's system, and the total time to complete the process shrank to 30 minutes or less. Tr. at 1263:9-1264:18.

210.    Contractors managed their hours of service and those of their students to maximize the number of loads they could haul and increase their profitability. *Tr.* at 1452:23-1453:5; 1560:21-1561:15.

**D. Skill and Initiative**

211. Without training, nobody can just get into a tractor-trailer and start driving, and not everyone can meet the qualification standards of the FMCSRs. *Tr.* at154:17-155:1.

212. Tromp found that at least 50% of the time he submitted a driver for qualification under CRST's operating authority, the driver was denied because of factors such as a failed drug test. *Tr.* at 1653:19-1654:11.

**E. Permanency of the Relationship**

213. The annualized turnover rate in CRST's lease purchase program from 2020 to 2023 was between 90% and 130%. *Tr.* at 1286:5-24.

214. The market for qualified drivers is competitive. It was easy for a driver to leave one motor carrier and go to work for another. *Tr.* at 329:20-25.

215. CRST experiences significant competition, especially from smaller carriers, and Contractors regularly terminate and re-contract with whichever carrier makes the best offer. *Tr.* at 1025:14-1026:10; *see also Tr.* at 329:16-25.

216. It is common in the trucking industry for lease purchase operators to "hop" from one motor carrier to another motor carrier as they pursue the most financially attractive business arrangement. *Tr.* at 330:12-14; *see also Tr.* at 329:16-25; *Tr.* 305:11-306:2; *Tr.* at 114:1-115:6; *Tr.* at 1398:12-18, 1400:24-1401:7; *Tr.* at 1543:20-1544:11; 1546:10-19; *Tr.* at 1025:14-1026:10.

217. The time periods Contractors remained under ICOAs with CRST varied from days to an average of approximately nine to twelve months. *Tr.* at 904:21-905:4.

218. Cervantes' first stint as a Contractor lasted five or six weeks, after which he terminated his ICOA only to return approximately 30 days later and drive under a second ICOA for approximately 17 months. *Tr.* at 114:1-115:6.

219. Cross started at CRST as a company driver, became a Contractor and then left

shortly after that, and returned a second time for a period of nine days. *Tr.* at 305:16-21.

220. Meeks worked as a lease purchase operator for CRST for over three years. *Tr.* at 1398:12-18, 1400:24-1401:7.

221. Gess contracted with CRST on two occasions, once between 2008 and 2011, and a second time for approximately five months between December 2019 and April 2020. *Tr.* at 1520:19-20; 1522:9-17; 1543:20-1544:11; 1546:10-19.

## F.    Integral to the Business

222. The evidence at trial established a symbiotic relationship between CRST and the Contractors. If Contractors are not generating revenue, then CRST is likewise not earning revenue. *Tr.* at 1309:19-1310:13.

223. If a Contractor refused a load, CRST had no incentive to withhold offering other available loads to the Contractor because CRST does not earn its portion of the load revenue unless Contractors are moving loads. *Tr.* at 1315:13-24.

## G.    Contractors Jointly Employed Student Drivers

224. Student drivers who elected to become employees of and drive for CRST were paired with experienced drivers, like Plaintiffs, for on-the-job training that lasted for approximately one month. *See Tr.* at 217:7-16; 232:11-233:3; 1341:16-1342:6.

225. The on-the-job training program was sometimes referred to as the lead driver program. *See Tr.* at 895:21-896:10.

226. Tromp trained his wife as a student driver in the first truck he leased from Lincoln Sales, and thereafter they operated as a team for approximately a year. *Tr.* at 1591:4-1592:11.

227. When Contractors operated with student drivers, Contractors received all of the revenue associated with the loads they and their student hauled and paid CRST an amount that ranged from $0.08 to $0.15 per mile to subsidize the student driver's pay. *Tr.* at 1468:6-1469:5;

1251:6-21.

228.     Save for the restrictions imposed by the FMCSRs, Contractors set their own work schedules, including the days and hours they, their students, and their team drivers drove. *Tr.* at 173:24-174:21; 897:8-18; 905:15-25; 906:1-3; 907:16-18; 908:8-11.

229.     Contractors set students' work schedules, managed their available hours-of-service, selected which loads the team would haul, and, of course, trained students how to drive. *Tr.* 173:24-174:21; *Tr.* at 1452:23-1453:5; *Tr.* at 1559:22-24; *Tr.* at 1560:21-1561:15; *see also Tr. Ex.* 2 ¶ 1(C).

230.     Contractors who participated in the lead driver program had the discretion to decide whether to accept the students they were offered. Cervantes refused to accept a student CRST provided him to train. *Tr.* at 177:18-20.

231.     Contractors planned ahead based on the hours-of-service regulations as they pertained to the Contractor and the Contractor's students or co-drivers to determine whether they could accept loads and communicated their legal limitations to their fleet managers. *Tr.* at 946:7-17; 1514:3-17.

232.     Contractors managed their hours of service and those of their students to maximize the number of loads they could haul and increase their profitability. *Tr.* at 1452:23-1453:5; 1560:21-1561:15.

233.     Work performed by student drivers was both for the benefit of CRST and the benefit of the Contractors. *Tr.* at 1251:1-4.

## IV.     Certification of the Class and Collective

234.     Plaintiffs did not adduce evidence at trial from which the Court could determine who among the class or collective suffered a minimum wage or TILA injury.

235.     Plaintiffs' expert witness, Dr. Brian Kriegler, did not prepare a methodology for

calculating damages for an individual class member in the case. *Tr.* at 719:10-720:1; 712:10-788:4; 807:22-808:7.

236. Dr. Kriegler did not offer an opinion as to the damages incurred by each class and collective member, but, instead, only offered an opinion as to the damages incurred on a class- and collective-wide basis. *Tr.* at 764:3-765:10; 808:4-7.

237. It was conceded at trial by the parties' counsel that there are class members with no damages under either party's expert's methodology. *Tr.* at 1583:23-1584:6; 1725:14-1726:9.

238. Cross was not aware of any evaluation system pertaining to Contractors, and he did not know whether other Contractors had knowledge of such a system. *Tr.* at 309:14-310:4.

239. Cross had no personal knowledge of what loads other Contractors accepted or how long other Contractors waited between loads. *Tr.* at 292:24-293:14.

240. Chad Brueck, the president of CRST, testified that it would be abnormal for a Contractor to wait for days between loads. *Tr.* at 869:7-17.

241. CRST began testing an internal load board for its Contractors in or about July 2022. Phased testing, refinement, and implementation of CRST's load board continued until March 2024, when CRST launched the mobile application for its entire fleet of Contractors to access the load board. *Tr. Ex.* 249 at 1.

242. Use of the load board by Contractors was not mandatory, and they could choose to continue working with their fleet managers to obtain loads. *Tr.* at 1147:2-9; 1222:20-1223:2.

243. Prior to the implementation of the load board, CRST had negotiated agreements with several of the most popular third-party freight brokers and agents in the transportation industry (e.g., C.H. Robinson, Echo, Coyote); Contractors could more easily broker their own freight through CRST using these pre-approved brokers even before the load board. *Tr.* at 1263:10-1264:18.

244.     Some Contractors have chosen not to use the load board or pre-approved brokers/agents, instead choosing to continue receiving load offers from their fleet managers. *Tr.* at 1147:2-9, 1223:3-8.

245.     Individual Contractors had no knowledge of how other Contractors interacted with their fleet managers, if they rejected loads, how they conducted their day to day business, how they selected their routes, what their expenses were, whether his or her experience as a Contractor was anything like that experienced by other Contractors, or how other Contractors decided to take a load or reject a load and deadhead to another area. *Tr.* at 1489:5-1490:19.

246.     Contractors had no basis to attribute their feelings that they were punished for rejecting loads to any other Contractors. *Tr.* at 1513:17-1514:2.

247.     Gess had no personal knowledge regarding how other Contractors interacted with their fleet managers, how much money they made compared to him, how often other Contractors rejected loads, how other Contractors decided to reject loads, how often other Contractors decided to take home time, which routes other Contractors chose to make their deliveries, or what other Contractor's expenses were. *Tr.* at 1565:16-1566:15.

248.     Gess did not know if his experience as a Contractor was anything like those of other Contractors or how his experience compares with other Contractors. *Tr.* at 1566:25-1567:3.

249.     Gess did not know how many other Contractors completed their leases with Lincoln Sales. *Tr.* at 1566:22-24.

250.     Cervantes had no knowledge of how the experiences of other Contractors compared to his experience with CRST. *Tr.* at 161:24-162:4.

251.     Some Contractors who completed their lease payments and purchased their trucks terminated their ICOAs with CRST and took their trucks to work for other motor carriers while others remained under contract with CRST. *Tr.* at 984:14-985:8.

252.    Some Contractors who completed their lease payments and purchased their trucks decided to lease a newer truck from Lincoln Sales. *Tr.* at 984:14-985:8.

253.    Applicants seeking to enter ICOAs with CRST each had their own aspirations. Some wanted to own the truck they leased or multiple trucks, some wanted to continue leasing newer trucks as part of their business strategy. *Tr.* at 997:15-25.

254.    Some Contractors came to CRST with trucks they were financing with third parties, and some who sign ICOAs lease more than one truck at a time. *Tr.* at 1247:5-11.

255.    Meeks knew Contractors that obtained their trucks through vendors other than Lincoln Sales and some that bought their trucks outright before signing ICOAs with CRST. *Tr.* at 1489:19-1490:2.

256.    The way Contractors analyzed profitability varied. Some considered profitability on a load-by-load basis and others considered profitability over a longer period of time. *Tr.* at 302:13-15 (Cervantes considered load-by-load); 1125:3-1126:9 (during orientation, prospective Contractors were split on their method of analysis).

257.    Contractors sometimes negotiated deferments of their truck payments when they were not hauling freight for a period of time. *Tr.* at 1170:12-1172:23.

258.    Contractors who elected to hire co-drivers used various means to recruit those drivers, including buying out the contracts of CRST student drivers, running online advertisements, and contacting individuals they knew in the industry. *Tr.* at 1249:6-20.

## V.    Plaintiffs' Individual Claims

259.    Cervantes believed that CRST lied to him about how much money he would make as a lease purchase operator and claimed he relied upon his belief in that lie when contracting with the company. *Tr.* at 110:15-111:16, 228:25-229:4; *see also Tr.* at 129:23-130:12. Cross believed that a CRST recruiter promised him that he would make $2,500 per week. *Tr.* 290:4-9.

260. Cervantes and Cross authorized in writing the deductions taken from their settlement compensation in their signed ICOAs. *Tr. Ex.* 2 at App'x ; *Tr. Ex.* 100 at App'x A.

261. Any deductions that Cervantes and/or Cross authorized to be taken from their settlement compensation for expenses related to their businesses were for their benefit so that they could operate independent trucking businesses. *Tr.* at 129:2-5.

## CONCLUSIONS OF LAW

## I. Classification of the Plaintiffs as Independent Contractors

### A. Background

1. The minimum wage provisions of the FLSA and the IMWL only apply to "employees." 29 U.S.C. § 206(a); Iowa Code Ann. § 91D.1(1)(b); *see also* 29 U.S.C. § 203(e)(1), (g).

2. The Contractors were not classified as CRST's employees.

3. Plaintiffs bore the burden of proving, by a preponderance of the evidence, that they were misclassified as independent contractors. *See E.M.D. Sales, Inc. v. Carrera*, 145 S.Ct. 34, 37 (2025); *Cornick v. Southwest Iowa Broadcasting Co.*, 107 N.W.2d 920, 922 (Iowa 1961).

4. The Eight Circuit uses the economic realities test to assess whether independent contractors are misclassified under the FLSA, which examines the following factors:

   a. The degree of control exercised by the alleged employer over the business operations;

   b. The relative investments of the alleged employer and employee;

   c. The degree to which the alleged employee's opportunity for profit and loss is determined by the employer;

   d. The skill and initiative required in performing the job;

   e. The permanency of the relationship; and

   f. The degree to which the alleged employee's tasks are integral to the employer's business.

*Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022). "No one factor is controlling and the court must base its decision on the totality of the circumstances." *Roeder v. DirectTV, Inc.*, Case No. C14-4091, 2017 WL 151401, at *9 (N.D. Iowa Jan. 13, 2017) (citations omitted).

5. The IMWL uses the same economic realities test as the FLSA. Iowa Code Ann. § 91D.1(1)(a)-(b); Doc. No. 296 at 9.

6. The Court finds that each of the six elements are substantially present and the Contractors fall within the Owner-Operator Exemption to the IMWL.

**B. Control**

7. In assessing the control factor, the inquiry focuses on "the alleged employer's right to control *the way work is performed*." *Walsh*, 39 F.4th at 1083 (emphasis added). "Such control can be demonstrated in several ways," including:

> [A]ssigning trips, pressuring drivers to accept trips offered by dispatch, regulating the times at which drivers could provide services, requiring the drivers to obtain permission to take a break, tracking drivers through GPS location monitoring, and requiring drivers to submit travel logs.

*Id.* (collecting cases).

8. CRST did not control the way the Contractors performed their work.

9. CRST did not assign trips to Contractors or pressure them to accept loads.

10. CRST did not dictate the times the Contractors could provide services or limit the Contractors' ability to refrain from providing services at all.

11. Contractors made the important decisions regarding how they would perform their work, including whether to accept or reject loads, what routes to take when delivering a load, when and where to fuel, and when and whether to run at all.

## C. Relative Investments

12. "The second factor considers the amount the worker has invested in the business." *Roeder*, 2017 WL 151401 at *16 (internal citations omitted). Specifically, "the worker's investment must be compared to that of the alleged employer." *Id.*

13. Contractors made significant investments in their businesses, including truck lease payments and purchasing International Registration Plan base plates, International Fuel Tax Agreement (IFTA) permits, an electronic on-board recorder (i.e., Qualcomm) device, physical damage insurance, occupational accident insurance, bobtail insurance, cargo insurance, and health insurance and, if applicable, workers' compensation insurance.

## D. Profit and Loss

14. In assessing the opportunity for profit and loss, the Court "generally consider[s] whether workers had control over profits and losses depending on their 'managerial skill.'" *Walsh*, 39 F.4th at 1084 (internal citations omitted). A worker exercises managerial skill if the worker "set[s] his own hours and rates" and has "the ability . . . to earn additional income through his own initiatives." *Id.* "In other words, facts demonstrating that a worker can use 'his managerial skill to 'improve his efficiency such that he c[an] complete more' jobs' weigh in favor of independent contractor status." *Id.*

15. Contractors controlled whether their businesses made a profit or suffered a loss based on managerial decisions that they made which directly impacted the profitability of their businesses.

16. Contractors assessed whether to accept or reject a load based on the associated compensation, miles required, routes to be taken, fuel required, transit time, dwell time, potential for a layover, stress on their trucks, as well as the availability of freight coming out of the location where the load would be delivered.

17.     Contractors also developed profitable lanes and had the ability to lease multiple trucks to CRST at the same time.

18.     Nearly one-third of Contractors placed restrictions on which loads they would haul.

19.     Contractors negotiated with CRST for additional compensation when they determined that a load was not attractive enough as offered.

20.     Contractors found their own loads at times and booked those loads into CRST's system.

### E.     Skill and Initiative

21.     The skill and initiative factor considers "whether plaintiffs' profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401 at *19 (internal citations omitted). "[T]he relevant inquiry is whether [plaintiffs] could use their skills to increase their business." *Id.* at *21.

22.     The analysis resembles the profit and loss factor, where "courts generally consider whether workers had control over profits and losses depending on their 'managerial skill.'" *Walsh*, 39 F.4th at 1084 (internal citations omitted).

23.     Contractors hired their own co-drivers, paid off their trucks, developed dedicated lanes of business, and set geographic or other limitations on the types of loads they would accept or customers they would haul loads for.

24.     Contractors also possessed specialized training and licensure, including endorsements for hazmat, double trailers, and triple trailers.

### F.     Permanency of the Relationship

25.     The permanency factor considers whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401 at *21. "If a worker has multiple jobs for

different companies, then that weighs in favor of finding that the worker is an independent contractor" and "[t]he more permanent the relationship, the more likely the worker is to be an employee." *Id.* "Generally, independent contractors have variable or impermanent working relationships with the principal company because they often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Id.* (cleaned up).

26. Contractors regularly contracted, terminated, and re-contracted with CRST (and other motor carriers) based on their own assessment of the opportunities available to them at the time.

27. The annualized turnover rate in CRST's lease purchase program during the class period was between 90% and 130%.

### G. Integral to the Business

28. The sixth factor considers "whether [the] worker['s] services are a necessary component of the [alleged employer's] business." *Walsh*, 39 F.4th at 1085 (citations omitted).

29. CRST conceded that Contractors are a necessary part of its business.

30. Considering the weight of the evidence in favor of independent contractor status under the other five factors, this sixth factor is of diminished relevance in this case.

### H. Conclusion on Status as Independent Contractors

31. Plaintiffs failed to carry their burden of proof that they were misclassified as independent contractors under the FLSA or IMWL.

## II. Iowa's Owner-Operator Exemption

32. From July 1, 2020, forward, the IMWL contains an exception to the definition of "employee" for certain independent contractors, provided the following six "conditions" are

"substantially present":

> (i) The owner-operator is responsible for the maintenance of the vehicle.

> (ii) The owner-operator bears the principal burden of the vehicle's operating costs, including fuel, repairs, supplies, collision insurance, and personal expenses for the operator while on the road.

> (iii) The owner-operator is responsible for supplying the necessary personnel to operate the vehicle, and the personnel are considered the owner-operator's employees.

> (iv) The owner-operator's compensation is based on factors related to the work performed, including a percentage of any schedule of rates or lawfully published tariff, and not on the basis of the hours or time expended.

> (v) The owner-operator determines the details and means of performing the services, in conformance with regulatory requirements, operating procedures of the carrier, and specifications of the shipper.

> (vi) The owner-operator enters into a contract which specifies the relationship to be that of an independent contractor and not that of an employee.

Iowa Code Ann. § 85.61(12)(c)(3)(b).

33.     The Court notes that the burden for establishing the conditions of the Exemption is lower than the burden for establishing the elements of the economic realities test. Section 85.61(12)(c)(3)(b) does not define the phrase "substantially present." If a statutory term is not defined, Iowa courts "look to prior decisions of this court, similar statutes, dictionary definitions, and common usage." *Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 714-15 (Iowa 2005) (quoting *Worth County Friends of Agric. v. Worth County*, 688 N.W.2d 257, 263 (Iowa 2004)) (cleaned up). The definition of "substantial" is "considerable in quantity", "significantly great", and "being largely but not wholly that which is specified." Substantial, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/substantially (last visited Feb. 11, 2025). The definition of "present" is "now existing or in progress." Present, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/present (last visited Feb. 11, 2025).

34.     The only prior decision to analyze the language of the Exemption is the Iowa Court

of Appeals' decision in *Finch v. Schneider Specialized Carriers, Inc.*, 700 N.W.2d 328, Case No. 03-1012, 2004 WL 2169392, at *1 (Iowa Ct. App. Sept. 29, 2004) (unpublished table decision) *rev'd on other grounds* 700 N.W.2d 328 (Iowa 2005). The court in *Finch* concluded that a driver was an independent contractor under Section 85.61(12)(c)(3), relying heavily on the terms of the parties' independent contractor operating agreement (which was very similar to the ICOA that was signed by the Contractors in this case). *Id.* at *3-*4.[1]

35.     The Court finds that all six conditions of the Exemption are substantially present.

36.     Contractors were responsible for the maintenance of their vehicles and bore all of the expenses associated with operating those vehicles.

37.     Contractors were responsible for supplying the necessary personnel to operate their trucks and employed or co-employed their second drivers.

38.     Contractors were paid on the basis of a percentage of the revenue of every load they hauled; they were not paid on an hourly basis for their work.

39.     Contractors determined the details and means by which they performed their services.

40.     Contractors entered into contracts with CRST that specified the relationship between the Contractors and CRST as an independent contractor relationship.

41.     The Court therefore enters judgment in favor of CRST and against Plaintiffs, the IMWL Rule 23 class, and members of the FLSA collective on their claims for unpaid minimum wages.

---

[1] *Finch* is additional authority for the proposition that control over routes is indicative of independent contractor status. *Finch*, 2004 WL 2169392, at *4 (concluding that the driver was an independent contractor, among other reasons, because he "chose his own routes and hours of operation").

37

## III. Willfulness Under the FLSA

42. Even if the Court had found that Plaintiffs had carried their burden of proving that they were misclassified, there was no evidence presented at trial that CRST willfully violated the FLSA.

43. Plaintiffs bore the burden to prove willfulness while CRST bore the burden to prove that it acted in good faith. *Shepard v. City of Waterloo*, No. 14-CV-2057, 2015 WL 9165915, at *23 (N.D. Iowa Dec. 16, 2015) (citing *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1082-83 (8th Cir. 2000)) ("The burden of demonstrating that an employer's violation was wilful [sic] [under the FLSA] rests with the plaintiff."); *West v. Butikofer*, No. 19-CV-1039, 2020 WL 5245226, at *5 (N.D. Iowa Aug. 18, 2020) (quoting *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 142 (2d Cir. 1999)) ("The employer bears the burden of proving good faith and reasonableness" under the FLSA to avoid liquidated damages).

44. Plaintiffs' burden was to prove that CRST "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Shepard*, 2015 WL 9165915 at *23 (citations omitted). "A finding of willfulness requires behavior on the part of the employer that exceeds negligence." *Id.* (citations omitted). Demonstrating good faith, on the other hand, is a "subjective standard" where the employer must establish "an honest intention to ascertain and follow the dictates of the FLSA." *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (citations and internal quotation marks omitted).

45. The FLSA can only be violated by failing to pay an employee at least the minimum wage for the hours he or she worked. Neither misclassification nor "willful misclassification" is a violation of the FLSA. *See* 29 U.S.C. § 206; *see also Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986) ("A violation of [the FLSA] occurs when an employee is paid at a rate that is below the minimum rate."); *Altare v. Vertical Reality MFG, Inc.*, Case No.

19-cv-21496, 2020 WL 209272, at *2 (S.D. Fla. Jan. 14, 2020) ("The Court agrees that Plaintiff cannot bring a cause of action under the FLSA for misclassification. As relevant here, the FLSA allows two types of claims: claims for unpaid overtime and minimum wage violations.").

46. Plaintiffs adduced no evidence at trial from which the Court could conclude that CRST willfully failed to pay Contractors at least the minimum wage.

47. CRST, on the other hand, proved that it acted in good faith to pay the Contractors correctly. It did so, and the evidence shows it overpaid them by approximately $1.8 million.

## IV. Plaintiffs Did Not Demonstrate Who in the Class and Collective Suffered Damages

48. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion,* 594 U.S. at 431 (quoting *Bouaphakeo*, 577 U.S. at 466).

49. Some members of the IMWL Rule 23 class and FLSA collective suffered no damages.

50. Some members of the TILA Rule 23 class suffered no damages.

51. Plaintiffs put on evidence of aggregate damages calculations for both their federal and state minimum wage claims and TILA claims.

52. Plaintiffs did not provide the Court with any evidence of who among the class or collective sustained an injury.

53. Plaintiffs did not provide the Court with any method for differentiating between class and/or collective members who sustained an injury and those who did not.

54. The class action procedure is a procedural device for claims aggregation; neither the collective action procedures of the FLSA nor Rule 23 create substantive rights. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the

parties' legal rights and duties intact and the rules of decision unchanged.") (plurality opinion).

55.     Each and every class member is held to the same standard of proof as the named Plaintiffs and each and every class member must prove his or her claims at trial. *Id.*; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

56.     Having failed to adduce evidence at trial of who among the class and collective was injured, the Court cannot issue a judgment redressing the claims of those class and collective members who were injured.

57.     In failing to prove who among the class and collective has been injured and in failing to give the Court a method to identify uninjured Contractors, the Contractors have failed to prove an essential element of their claims. *Otto v. Imperial Cas. & Indem. Co.*, 277 F.2d 889, 895 (8th Cir. 1960) ("The trial court's sustaining of defendant's motion for a directed verdict must be affirmed for an additional reason. Plaintiff has utterly failed to prove by competent evidence the value of the allegedly purloined business and, hence, has established no damages."); *Pozeck v. Menards, Inc.*, Case No. 20-CV-77 CJW-MAR, 2022 WL 577913, at *5 (N.D. Iowa Jan. 13, 2022) ("Defendant urges the Court to grant a directed verdict on the ground that, even if plaintiff proved the other elements by a preponderance of the evidence, she failed to prove she suffered damages. The Court agrees with defendant, except for plaintiff's claim for past pain and suffering.") (granting motion for directed verdict).

58.     Based on the failure to prove an essential element of their IMWL, FLSA, and TILA claims, the Court chooses to enter judgment against the Rule 23 class and FLSA collective.

59.     The Court could have elected not to do so and, instead, could have decertified the IMWL, FLSA, and TILA Rule 23 class and FLSA collective and dismissed the class and collective claims without prejudice. *See, e.g.*, *Merrill v. Pathway Leasing LLC*, Case No. 16-cv-02242-KLM, 2019 WL 5078655, at *2-*5 (D. Colo. Oct. 9, 2019). The Court elects not to do so because

Plaintiffs made a strategic decision to only offer alleged damages on an aggregate basis rather than on an individual class or collective member basis.

60.     The Court also declines Plaintiffs' request to reopen expert discovery and conduct a second trial on minimum wage and TILA damages. "Courts have broad discretion to determine whether to sever, or bifurcate, claims" but "bifurcation is a procedural tool that should be used sparingly . . . it is the exception, not the rule." *McGlohon v. Am. Family Mutual Ins. Co.,* Case No. 22-CV-4063-CJW-KEM, 2023 WL 11916747, at *1 (N.D. Iowa July 12, 2023) (internal citations omitted) (cleaned up). Courts consider a variety of factors in exercising this discretion, but "the key issue is whether a party will be prejudiced absent bifurcation." *McGlohon,* 2023 WL 11916747 at *1 (internal citations omitted). In light of all the circumstances, bifurcation would work a great prejudice on CRST.

## V.     Plaintiffs' Individual State Law Claims

61.     Plaintiffs Cervantes and Cross failed to prove their unlawful deductions and fraud claims.

62.     The Iowa Wage Payment Collection Law (IWPCL) only applies to employees and not independent contractors. But unlike the IMWL—which relies on the FLSA's test for determining employee status—the test for determining employee status under the IWPCL relies on Iowa common law. Iowa Code § 91A.2(3)(a), (4).

63.     The central inquiry is whether an alleged employer has the right to control the alleged employee's work and, to assess the right to control, Iowa courts apply a 12-factor test. *Fesler v. Whelen Engineering Co., Inc.*, 794 F. Supp. 2d 994, 1008-09 (S.D. Iowa July 5, 2011) (summarizing 12 factors based on *Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542-43 (Iowa 1997)).

64.     For the reasons stated above, the Court concludes that neither of the named

Plaintiffs is an "employee" under the IWPCL.

65.     With respect to their fraud claims, the Court finds no evidence supporting the allegation that CRST made an actionable misrepresentation to Plaintiffs.

66.     To prove a claim for fraud under Iowa law, Plaintiffs were required to prove the following seven elements: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d. 684, 687 (Iowa 2010) (internal citations and quotation marks omitted); *Adrian Trucking, Inc. v. Navistar, Inc.*, 609 F. Supp. 3d 728, 745 (N.D. Iowa 2022) (quoting *Van Sickle*, 783 N.W.2d. at 687); *see also Par v. Wolfe Clinic, P.C.*, Case No. 4:21-cv-00290-RGE-SBJ, 2022 WL 2187858, at *12-*14 (S.D. Iowa May 10, 2022) ("The first three elements [of fraud] are 'frequently treated as a single element and referred to as fraudulent misrepresentation.'") (quoting *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987)).

67.     Plaintiffs were required to prove these elements by "a preponderance of clear, satisfactory, and convincing proof" which is "higher than the typical preponderance of the evidence standard and less than the beyond a reasonable doubt standard." *State ex rel. Miller v. Rahmani*, 472 N.W.2d 254, 257 (Iowa 1991) (citing *Mills County State Bank v. Fisher*, 282 N.W.2d 712, 716 (Iowa 1979)). "The burden of proof in fraud cases is qualitatively, rather than quantitatively, distinguishable from a mere preponderance of the evidence." *Id.*

68.     Cervantes and Cross failed to prove that CRST made any false statements about how much money they would earn as Contractors.

69.     The Court therefore enters judgment in favor of CRST and against the named Plaintiffs on their individual fraud and unlawful deductions claims.

Dated: February 21, 2025

Respectfully submitted,

/s/ James H. Hanson
James H. Hanson (admitted *pro hac vice*)
James T. Spolyar (admitted *pro hac vice*)
Robert A. Rowlett
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-492-9205; F: 317-684-2414
jhanson@scopelitis.com
jspolyar@scopelitis.com
rrowlett@scopelitis.com

Adam C. Smedstad (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
5470 Shilshole Avenue, NW, Suite 520
Seattle, WA 98107
P: 206-288-6192; F: 206-299-9375
asmedstad@scopelitis.com

Charles Andrewscavage (admitted *pro hac vice*)
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 W. Monroe Street, Suite 600
Chicago, IL 60603
P: 312-255-7200; F: 312-422-1224
candrewscavage@scopelitis.com

/s/ Kevin J. Visser
Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
P: 319-366-7641; F: 319-366-1917
kvisser@spmblaw.com

Attorneys for Defendants,
*CRST International, Inc. and CRST Expedited, Inc.*

4916-4971-9828, v. 19