**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| ANTHONY CERVANTES, and MIKE CROSS, Individually, and on behalf of all other similarly situated persons, | No. 20-CV-75-CJW-KEM |
| Plaintiffs, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| CRST INTERNATIONAL, INC. and CRST EXPEDITED, INC., | |
| Defendants. | |

_____

## TABLE OF CONTENTS

I.      INTRODUCTION .............................................................................. 3

II.     PROCEDURAL HISTORY ............................................................... 5

III.    OBJECTIONS TO WITNESSES, TESTIMONY, AND EXHIBITS.............. 8

IV.     FINDINGS OF FACT.......................................................................10

V.      CONCLUSIONS OF LAW.................................................................23

        A.      Fair Labor Standards Act Claim................................................23

                1.      Control.................................................................25

                2.      Relative Investments ...............................................29

                3.      Opportunity for Profit and Loss.....................................32

4. Skill and Initiative ...................................................34

5. Permanency of the Relationship .......................................36

6. Integral to the Business ...............................................37

7. Conclusion ............................................................38

B. Iowa Minimum Wage Law Claim ..............................................38

C. Iowa Wage Payment Collection Law Claims ...............................39

D. Fraud Claim...............................................................40

E. Truth-in-Leasing Act Claim ..............................................41

VI. CONCLUSION ...............................................................45

# I.    INTRODUCTION

This matter is before the Court after a bench trial on plaintiffs' Fair Labor Standards Act ("FLSA") collective action, and on plaintiffs' Iowa Minimum Wage Law ("IMWL") and Truth-in-Leasing Act ("TILA") class action. Also before the Court and related to the bench trial is defendant's[1] motion to strike plaintiffs' witness Scott Workman and Exhibits 159 and 160 (Doc. 406) and defendant's motion to strike the declaration of Rebecca King and accompanying exhibits (Doc. 452).

From November 5 through November 14, 2024, the Court held a bench trial. (Docs. 411–416, 418–419). During trial, the Court took under advisement its ruling on the admissibility of multiple exhibits plaintiffs offered into evidence over defense objections. The Court will rule on the admissibility of those exhibits as part of this order. Following trial, the Court granted the parties' request that the due-date for post-trial briefs be 21 days from the completion of the trial transcript, with another 14 days granted the parties to file briefs in response to opposing post-trial briefs. The trial transcript was completed on January 24, 2025, and since that time both parties have fully and timely submitted post-trial briefs. (Docs. 448, 449, 450, 451). The Court now deems this case ready for decision.

Having now heard all the testimony and seen all the evidence, the Court has a much better understanding of what happened and the relationship between the parties than it did when previously ruling on the parties' motions for summary judgment. For the following reasons, the Court: (1) **denies** defendant's motion to strike Scott Workman as a witness (Doc. 406); (2) **grants** defendant's motion to strike the declaration of Rebecca King (Doc. 452); (3) **finds in favor of defendant** on plaintiffs' FLSA, IMWL, IWPCL,

---

[1] Throughout this litigation, the parties generally have discussed and treated defendants CRST International, Inc. and CRST Expedited, Inc. as though they are the same. The Court follows the parties' lead and discusses the two defendants as though they are one throughout this order.

and fraud claims; and (4) **finds in favor of plaintiffs** on their TILA claims. Though the Court has determined the aggregate amount of TILA damages, the Court finds further proceedings necessary to quantify individual damages on plaintiffs' TILA claims.

In a nutshell, the Court finds the lease operator drivers[2] were independent contractors and not employees. The business model they voluntarily chose to accept was attractive, but success required significant management skills and diligence. That it failed to work out for many drivers, or that it didn't turn out to be as profitable as they had hoped, did not mean they became employees. It means, instead, that they failed as independent business operators in a highly complex and difficult industry.

The drivers knowingly and voluntarily chose to drive as lease operators for CRST because of the freedom it provided them and the opportunity it presented to make good money and, for no money down, to eventually own their own trucks. They could have driven as company employees—indeed, many had previously done so—but they chose to take a chance at driving as independent contractors because of the freedom and possibility for greater income it provided. When and how the drivers exercised their freedom to turn down loads, choose their own routes, take breaks when they wanted, and to restrict the routes or geographic areas of the country where they would agree to drive, significantly impacted their ability to be profitable. When other variables beyond either party's direct control, like weather, poor student drivers, customer-caused delays at pick-up or drop off, wait times for new loads, and mechanical problems, were added to the mix, it made making a profit very difficult for the drivers. Be that as it may, the evidence shows that lease operators were independent contractors with the ability to control their

---

[2] Throughout this litigation, defendant has referred to these drivers as "contractors," and plaintiffs have referred to the drivers as "lease operators." The Court has and will refer to this group of drivers as either "drivers" or "lease operators." The label does not dictate the legal conclusion about whether plaintiffs are independent contractors or employees, but referring to the drivers as "contractors" or "employees" could suggest otherwise and confuse the reader.

operations and make a profit if they were careful, skilled, and lucky. Defendant did not so control the lease operators' choices or impair their freedom to operate independent of defendant in a manner so as to convert them into employees for purposes of the FLSA or IMWL. And to be clear, the evidence did not support claims that defendant intentionally misled or committed any type of fraud on the lease operators. Defendant provided lease operators with realistic estimates, couched in terms of contingent factors easy for drivers to understand, about what lease operators might expect to earn, but defendant made no false representations or promises to induce drivers to become lease operators.

As for plaintiffs' TILA claims, defendant conceded in summary judgment litigation—and the Court found—liability; the question at trial on the TILA claims was the amount of damages. Although the parties presented some evidence in TILA damages at trial, and the Court can make a finding about the damage calculation in the aggregate, the Court finds the evidence insufficient for the Court to calculate damages on a plaintiff-by-plaintiff basis. Thus, the Court will convene a bifurcated bench trial on this issue if the parties are unable to reach an agreement as to the amount of individual damage calculations.

## II.    PROCEDURAL HISTORY

On January 17, 2020, plaintiffs filed a class and collective action complaint against defendant in the District of Massachusetts asserting an FLSA claim. (Doc. 1). On March 20, 2020, plaintiffs filed an amended complaint that made some changes to the original complaint, but did not add claims. (Doc. 27). On April 20, 2020, defendant moved to dismiss the complaint and to transfer the case to the Northern District of Iowa. (Docs. 36, 38). On August 5, 2020, the District of Massachusetts granted defendant's motion to transfer and denied as moot its motion to dismiss. (Doc. 73).

On September 18, 2020, plaintiffs filed a Second Amended Complaint, in which they added causes of action for Iowa Minimum Wage Law violation (Count 2), an Iowa

state law claim for unlawful deductions (Count 3), unjust enrichment (Count 4), and fraud (Count 5). (Doc. 102).

On October 23, 2020, plaintiffs filed a Third Amended Complaint in which they added a TILA claim (Count 6). (Doc. 108). On the same day, plaintiffs moved to conditionally certify a class and collective action. (Doc. 109).

On December 4, 2020, defendant filed a partial motion to dismiss, seeking to dismiss CRST International as a defendant and to dismiss Counts 4, 5 and 6 of the Third Amended Complaint. (Doc. 125).

On January 25, 2021, the Court granted plaintiffs' motion to conditionally certify a collective action and, in part, plaintiffs' motion for issuance of notice. (Doc. 147).

On February 4, 2021, the Court granted-in-part and denied-in-part defendant's partial motion to dismiss. (Doc. 150). The Court granted defendant's motion to dismiss a portion of plaintiffs' TILA claim, but denied the motion in all other respects. (*Id.*).

On December 15, 2021, plaintiffs filed a motion to certify a class as to Counts 2 through 6. (Doc. 244). On June 14, 2022, the Court entered an order finding Count 2 appropriate for certification (subject to the parties modifying the class definition), but found Counts 3-6 inappropriate for class certification under Federal Rule of Civil Procedure 23. (Doc. 276). On August 16, 2022, the Court granted a motion to reconsider and certified plaintiffs' Iowa minimum wage claim (Count 2) and certified plaintiffs' TILA claim (Count 6) as class actions. (Doc. 296).

In January 2024, plaintiffs filed a motion for partial summary judgment (Doc. 328) and defendant filed a motion to decertify the FLSA collective action and Class Action (Doc. 331), and its own motion for partial summary judgment (Doc. 333). On May 28, 2024, the Court granted-in-part and denied-in-part each party's motion for partial summary judgment and denied defendant's motion to decertify the collective and class actions. (Doc. 368). As for the motions for partial summary judgment, the Court found

6

defendant liable on plaintiffs' TILA claim, leaving the amount of damages to be awarded to be decided at trial, but denied plaintiffs' motion for partial summary judgment finding a genuine issue of material fact existed as to defendant's liability on the remaining claims, which turned on the question of whether plaintiffs were employees or independent contractors. (*Id.*, at 53–54). As for defendant's motion for partial summary judgment, the Court: (1) granted defendant's motion as to plaintiffs' failure to equitably toll the statute of limitations back to 2012 on plaintiffs' FLSA and IMWL claims (*Id.*, at 72–73); (2) denied defendant's motion as to whether a two or three year term of supervised release applies to plaintiffs' FLSA claim (which turned on whether the violation was willful) (*Id.*, at 74); (3) denied defendant's motion as to plaintiffs' unlawful deductions claim (*Id.*, at 74–79); (4) granted defendant's motion and dismissed plaintiffs' unjust enrichment claim (Count 4) (*Id.*, at 79–81); and (5) denied defendant's motion as to plaintiffs' fraud claim (Count 5) (*Id.*, at 81–85). On August 8, 2024, the Court denied plaintiffs' motion to reconsider. (Doc. 376). Left to be decided at trial, then, were the merits of Counts 1 through 4, and damages on Count 6.

As the case proceeded toward trial, plaintiffs filed a motion to strike defendant's expert, Dr. Chen Song. (Doc. 378). On October 7, 2024, the Court denied that motion. (Doc. 397). In the order, the Court found that because this was a bench trial, the Court could determine at trial whether it found Dr. Song's opinion met the requirements of the Federal Rules of Evidence; that is, whether she was qualified to render the opinion, it was supported by sufficient data, and her methodology was sound and trustworthy. (*Id.*, at 8–9).

Then, only a few days before trial, defendant filed a motion to strike two of plaintiffs' witnesses, Lee Coblentz and Scott Workman. (Docs. 405 & 406). On November 1, 2024, the Court granted defendant's motion to strike witness Coblentz, and held in abeyance defendant's motion to strike witness Workman. (Doc. 409).

7

As noted, the matter came on for bench trial November 5 through 14, 2024. (Docs. 411–16, 418–19). Plaintiffs called eight witnesses, and the defense three. In addition, the parties called another 28 witnesses by deposition.[3] The Court also admitted almost 200 exhibits into evidence. (Doc. 419-3).

### III. OBJECTIONS TO WITNESSES, TESTIMONY, AND EXHIBITS

As summarized above, before trial plaintiffs moved to strike defendant's expert witness, Dr. Chen Song, and defendant moved to strike plaintiffs' witness Scott Workman, along with exhibits he created. The Court denied plaintiffs' motion as to Dr. Song, stating that the Court would determine at trial whether her opinions were admissible and what weight, if any, to give them, and held in abeyance defendant's motion to strike witness Workman. As mentioned, during trial the Court also held in abeyance its ruling on the admissibility of a few other exhibits. Before turning to the Court's findings of fact, then, it is appropriate for the Court to first address the expert opinions.

To the extent plaintiffs have maintained their objection to the admission of Dr. Song's testimony and opinion, it is overruled. The Court finds based on her education and experience, she was eminently qualified to render an opinion in this case. The Court found her opinion solidly based on sufficient reliable data, and that her methodology was sound and her opinion trustworthy. Indeed, Dr. Song was able to easily describe her methodology at each stage, explain the reasoning behind her choice of methodology, and the reasons for her opinion. The Court found Dr. Song's testimony credible and her opinion trustworthy. The Court gives great weight to Dr. Song's expert opinions as to damages.

---

[3] Some deposition witnesses, like the named plaintiffs, also testified live.

Defendant sought to bar plaintiffs' witness, Scott Workman, and exhibits 159 and 160, on the grounds that the witness and exhibits were not timely disclosed and the exhibits were not proper summaries under Federal Rule of Evidence 1006. (Doc. 406). The motion is **denied as moot** because plaintiffs did not call Workman as a witness at trial, nor did they offer exhibits 159 and 160 into evidence.

At trial, the Court held in abeyance its ruling on the admissibility of plaintiffs' exhibits 131, 140, 202, 202A, and 250. (Docs. 418, at 1; 419, at 1). The Court now **admits** all those exhibits over defendant's objections and will afford them such weight as the Court deems appropriate.

To the extent there were objections within the designated portions of deposition transcripts submitted in lieu of live testimony, those objections are **overruled** unless otherwise specifically mentioned in this order.[4]

After the trial, in their post-trial reply brief, plaintiffs submitted a declaration by Rebecca King, along with Exhibits 1-6. (Docs. 450-1 through 450-7). King's declaration purports to lay a foundation for Dr. Kriegler's work papers, Trial Exhibits 202 and 202A. The exhibits attached to her declaration were never offered nor admitted into evidence during the trial. Defendant moves to strike the declaration and exhibits on the grounds that: "(1) Ms. King cannot lay an evidentiary foundation for Dr. Kriegler's work papers or Exhibit 202A because she lacks personal knowledge and her statements are hearsay without exception, (2) Ms. King is an undisclosed witness under Rules 37(c)(1) and 26(a)

---

[4] To be sure, there was much in the depositions which one or the other party objected to as irrelevant, or not based on personal knowledge, that the Court found irrelevant and speculative. The Court either disregarded such evidence, or gave it such little weight as the Court found it deserved. Likewise, some objections as to form, such as leading, the Court found valid, but again, in a bench trial a judge can consider the fact a question is leading, for example, and afford the answer less weight if the Court finds it appropriate. Thus, the Court finds no need to address each objection in these many transcripts.

and (e) of the Federal Rules of Civil Procedure, (3) evidence not offered or admitted at trial cannot be raised or argued in a post-trial reply brief and evidence and argument offered for the first time in a reply brief violates Local Rule 7(g), and (4) plaintiffs filing the King Declaration with their Post-Trial Reply Brief prejudices CRST by denying it the opportunity to respond to the new evidence and arguments contained therein." (Doc. 452, at 1). Plaintiffs argue that the declaration was necessary to correct "a series of misrepresentations" defendant allegedly made in its post-trial brief about Dr. Kriegler's work papers. (Doc. 453, at 1).

The Court finds plaintiffs' submission of King's declaration and exhibits improperly attempts to supplement the evidentiary record at trial. Plaintiffs had the opportunity at trial to have Dr. Kriegler, or whoever else they thought necessary, lay the foundation for and present evidence of damages. Plaintiffs cannot, without leave of Court, submit new evidence not subject to cross examination in an effort to supplement the trial record. Thus, the Court **grants** defendant's motion to strike King's declaration and the attached exhibits. (Doc. 452). As noted above, however, the Court nevertheless finds that further proceedings will be necessary for the Court to arrive at individualized damages on plaintiffs' TILA claim. To that extent, the parties will have an opportunity in the future to properly disclose experts and documents and present evidence limited to that one remaining issue.

## IV.    FINDINGS OF FACT

Plaintiffs drove trucks for defendant. Defendant provides transportation services to customers throughout the United States by delivering the customers' freight. Defendant engages two types of drivers to deliver its freight: "company drivers," drivers who are considered employees, and other drivers, who defendant classifies as independent contractors, sometimes called "lease operators." Plaintiffs are a group of drivers who fall into the second category—that is, lease operators. Plaintiffs, however,

10

claim they were employees of defendant, and not independent contractors. Plaintiffs argue they were misclassified, leading to underpayment in violation of various laws. Thus, the central issue throughout this litigation is whether plaintiffs were employees or independent contractors.

The Court previously conditionally certified plaintiffs' Fair Labor Standards Act ("FLSA") claim as a collective action. (Doc. 147). The class definition for the collective action is:

> All drivers who drove for CRST Expedited, Inc. at any time on or after October 23, 2017 pursuant to an Independent Contractor Operating Agreement (ICOA) and who have not leased more than one truck at a time to CRST.

(Doc. 157).

The Court also previously certified two of plaintiffs' claims—a claim under the Iowa Minimum Wage Law ("IMWL") and a claim under the Truth in Leasing Act ("TILA")—as class actions under Federal Rule of Civil Procedure 23. (Doc. 296). The class definition for these claims is:

> All Lease Operators who drove for CRST Expedited Inc. as a Team Driver, Lead Driver, or Solo Driver pursuant to an Equipment Lease to lease a truck from CRST Lincoln Sales, Inc. and an Independent Contractor Operating Agreement ("ICOAs") with CRST Expedited, Inc. and who have not leased more than one truck at a time to CRST Expedited, Inc. during the applicable limitations period, subject to any equitable tolling and equitable estoppel.

(*Id.*, at 23) (footnote omitted).

Defendant facilitates delivery of its customers' freight. Defendant's primary service is the dependable and speedy delivery of freight. Another entity, CRST Lincoln Sales, Inc. ("Lincoln Sales"), leases trucks to defendant for defendant's employee drivers to use, as well as to the lease operators. CRST International Holdings, LLC is the parent company to Lincoln Sales. Lease operators had the option to lease a truck from Lincoln

Sales without paying any money up front; instead, defendant would deduct the amount of the lease payments from the drivers' pay each time defendant paid the driver. These periodic payments to the drivers, minus expenses, are known as "settlements." Lease operators were not obligated to lease trucks from Lincoln Sales, but the financial realities made it difficult for an independent contractor to afford the downpayment on a truck, so the option to lease from Lincoln sales with no money down was sufficiently attractive that lease operators routinely did so.

To accomplish the goal of delivering customers' freight, defendant hires employee drivers, who it calls "company drivers," as well as contracting with drivers who defendant classifies as independent contractors. The lease operators, including plaintiffs and the members of the class and collective, enter into an "Independent Contractor Operating Agreement" ("ICOA") with defendant. Many of the lease operators began as company drivers and later switched to lease operators.

Defendant generally controlled price negotiations and pick-up and delivery schedules with the customers. Communications with the customers generally went through defendant's "Customer Service Team," though sometimes drivers communicated directly with customers for things like letting the customer know when the drivers would arrive or when asking for directions. Defendant was also responsible for customer billing.

Defendant would "assign" loads to company drivers, who could not turn the assignment down, and would "offer" loads to lease operators, who had the right to turn the offered loads down under the ICOA. Defendant's planners took into account multiple factors when deciding who should be assigned or offered a load, but the planners did not consider whether a driver was a company driver or a lease operator for the purposes of doling out loads. That is, defendant treated company drivers and lease operators the same for purposes of choosing who should take a specific load. One of the factors

12

defendant's planners could take into account before 2019 was a driver rating, which managers would enter, effectively scoring the drivers mostly based on the drivers' ability to be on time.

Defendant generally had the same qualification requirements to be an employee driver and a lease operator—the only difference was that defendant required lease operators to have six months' prior driving experience, while employee drivers did not need to have any driving experience. Federal law dictated some of the qualification requirements for all drivers, be they company drivers or lease operators. Defendant did not require lease operators to show an ability to run a business, no did defendant check the lease operators' credit ratings or the like. Once defendant accepted a lease operator's application, the driver was required to attend an orientation where defendant trained the drivers on defendant's policies, practices, and procedures. The lease operator drivers were generally required to follow defendant's policies and procedures as to safety as required under federal law, but were not bound by all the other company policies applicable to company drivers. At the orientation, defendant also trained the lease operators separately from company drivers on operating a trucking business as independent contractors, such as on how to maximize revenue and profits, minimize fuel and other expenses, and other business management decision-making that would make the difference between success and failure as an independent contractor.

At the drivers' orientation, defendant gave the lease operators a packet which included the ICOA as well as the lease paperwork from Lincoln Sales. The ICOA and the lease were materially the same for all lease operators. The documents were drafted by defendant and Lincoln Sales, and, though they may not have technically been "non-negotiable," it appears none of the lease operators successfully negotiated a change in any of the terms in the ICOA or lease, though some of them attempted to.

13

Generally, the lease operators would lease a truck from Lincoln Sales, then, in the ICOA, lease the truck to defendant. In the ICOA, lease operators gave defendant "the exclusive possession, control, and use of the [drivers] Equipment" for the duration of the agreement.[5] Although some leases varied in duration, they generally provided a lease for a term of a year or more. That is, the term on the lease agreement document appears to generally have been a year or more; that does not mean, however, that the leases often lasted that long in reality. The ICOAs expired on October 1 of each year and were routinely renewed on satisfactory performance. Thus, the ICOAs were generally agreed to for at least a year in length. In reality, the length of the relationship between defendant and lease operators varied significantly. Sometimes lease operators terminated the contract after short periods, and sometimes lease operators stayed for longer periods. Some lease operators drove as lease operators for a period of time, stopped and drove as company drivers or for another company, and then came back for additional periods driving as a lease operator with defendant. Plaintiff Cervantes, for example, drove with defendant in two stints; one for six weeks, and one for almost a year and a half. Other lease operators appear to have driven with defendant for time frames spanning a few months to several years.

The truck lease was considered to be in default if, among other things, the lease operator's ICOA was terminated. Upon default, the lease gave Lincoln Sales the right

---

[5] Federal regulations require that a lease provide that the carrier lessee must "have exclusive possession, control, and use of the equipment for the duration of the lease," and that the carrier lessee must "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). The regulation also provides that the language required by section (c)(1) is not "intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." *Id.* § 376.12(c)(4).

to terminate the lease, immediately repossess the truck, and accelerate the remaining lease payments, among other things.

The ICOA provided that the lease operators were responsible for all costs of operating the truck, including things like fuel, insurance, and maintenance. Defendant would then pay a percentage of load revenue to the lease operator. The payouts came through settlements, which were essentially comprised of a percentage of revenue the customer paid defendant for the load, plus other expenses, with deductions for lease payments and advances defendant had made to lease operators for various operational expenses. Specifically, under the ICOA, defendant generally paid the lease operator 70% of the adjusted gross revenue for a load—sometimes called "linehaul" by the parties— which was billed to the customer, so long as defendant provided the trailer, which defendant provided most of the time. The adjusted gross revenue was equal to the amount of gross revenue billed to the customer reduced by certain specified amounts. So, generally, defendant paid drivers 70% of the adjusted gross revenue for a load.[6] When lease operators only hauled loads for a portion of the shipment instead of the entire way, their payment would be reduced consistent with the pro rata amount of the total trip the driver hauled. Defendant set the prices it charged customers for delivery of the load and negotiated things like handling requirements and pick-up and delivery times with the customers.

The ICOA also included terms relating to the expenses lease operators were responsible for. Under the contract, lease operators were responsible for "all operating expenses," including categories such as fuel, tires, taxes, and other items. Defendant then charged the customer a fuel surcharge, of which it passed 97% on to the lease operators. Lease operators were also responsible for certain other expenses—"detention

---

[6] In contrast, employee drivers were generally paid by the mile.

expenses" and "accessorial services expenses"—except when defendant elected to bill the expenses to the customer, in which case defendant would pass along a percentage of the amount collected to the lease operator.

Lease operators could also elect to have defendant deduct funds from their settlements to cover certain expenses the lease operators would have otherwise had to pay, including expenses for base plates, certain permits, communication systems, and various forms of insurance. Lease operators were responsible for purchasing their own health insurance. Some lease operators purchased or brought their own tools to use on their trucks. Lease operators were required to fund a $2,000 escrow fund which defendant could use to satisfy operating cost advances or other charges, and lease operators were also required to fund a $250 maintenance reserve. Both of these funds were funded through deductions from settlements.

The ICOA provided that, when compensation was based on a percentage of revenue for a shipment, at the time of settlement defendant must provide the lease operator with certain documents. Specifically, the contract required defendant to provide the lease operator with "a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill."

Defendant was required to furnish to the lease operators a settlement statement, including all credits and deductions made to the lease operator, at each weekly settlement. The settlement statements detailed lease operators' earnings for the loads moved. Relatedly, defendant issued freight bills as invoices to its customers. These freight bills contained various information, and the categories of information included on a freight bill may have differed slightly from one customer to the next. Defendant did not provide freight bills to lease operators at the time of settlement. The ICOA required lease

16

operators to travel to defendant's headquarters in Cedar Rapids, Iowa during business hours if the lease operator wanted to examine freight bills, although there is testimony from defendant that it would have been able to provide a freight bill to a lease operator upon request. The settlement statements did not include the full charge amount listed on the freight bill for fuel surcharges, but instead showed only the amount paid for fuel surcharges to the lease operator. In its ruling on the parties' motions for summary judgment, the Court found defendant underpaid the drivers for linehaul, accessorial, and fuel surcharge charges, but found there was a genuine issue of material facts as to the precise amount and left that to be decided at trial.

The ICOA included several other notable provisions. It states that lease operators must operate the truck using two-driver teams with certain exceptions, which are generally temporary in nature. The contract provides that lease operators could either accept a student driver assigned by defendant or hire their own driver subject to defendant's approval. Defendant had the right to disqualify any driver for various reasons (*e.g.*, driver is unsafe, unfit, or in violation of defendant's minimum qualification standards). Lease operators could also lease multiple trucks at a time to defendant. Some lease operators leased multiple trucks from Lincoln Sales and then leased the multiple trucks to defendant—the same relationship individual lease operators had with defendant, but with multiple trucks instead of a single truck.

One of the options a lease operator had was to be certified by defendant as a "lead driver" who could then train defendant's "student drivers," who were relatively new truck drivers with little experience, and were employees of defendant. Defendant's employee drivers could also be lead drivers, and defendant required the same qualifications and training to be a lead driver for employees and lease operators. In the lead driver program, defendant would assign student drivers to lease operators. The lead driver would train the student driver for about 21–28 days, training the student on

17

defendant's policies, procedures, and preferred driving methods. Lease operators had the ability to refuse the student driver assigned to them, and did so not infrequently. It was not uncommon for lease operators to reject student drivers for various reasons, such as the driver finding the student lacked skills or was an unpleasant person to drive with. When a lease operator rejected a student, there would inevitably be some delay in assigning and getting a new student to the driver. In contrast, company drivers could not reject student drivers.

Generally, after the first few days of training, the two drivers—the lead driver and the student driver—would take turns driving the truck, similar to a normal pair of team drivers. Under the contract for the lead driver program between the lead driver and defendant, the lead driver was required to ensure that their insurance coverage covered student drivers, and if the student driver caused damage while under the lead driver's supervision, the lead driver's insurance coverage was primary to defendant's insurance coverage. When a lease operator was a lead driver, defendant would pay the lease operator the same as normal—that is, the lease operator was paid the amount they normally would be paid for the load, no matter who drove—and defendant would charge the lease operator a per-mile charge.

Either party—defendant or the lease operator—had the right to terminate the ICOA without cause upon 20 days written notice. The ICOA could also be terminated immediately upon a material breach of the agreement by either party. Also, defendant could terminate the ICOA immediately for multiple reasons, including a lease operator's failure to adhere to defendant's policies and procedures to the extent they pertained to the lease operators (that is, those policies and procedures dealing with safety as required by federal law).

Lease operators were required to have an electronic communications and recorder system installed in their trucks, and trucks rented from Lincoln Sales were already

18

equipped with the system when the lease operators received the trucks. Defendant set the levels of insurance lease operators were required to maintain and the companies the drivers could obtain insurance policies from when lease operators elected to obtain insurance through defendant, as most did.

Lease operators could refuse any loads offered to them, and in practice often did so. But lease operators accepted most loads offered because it made economic sense to do so. When a lease operator turn down a load, defendant would have to find another load to offer the lease operator. This would inevitably cause some delay, and sometimes the delay before the next load was available could, on rare occasions, last days. During that time, the lease operator sat idle. Because of this, lease operators would sometimes accept an unprofitable load in hope of getting a more profitable load at the first load's destination. Indeed, this was some of the advice defendant provided lease operators during training, emphasizing that to be profitable overall it was important for lease operators not to sit idle. Factors lease operators considered in deciding whether to accept a load was not just the likely profitability of the individual load, but also the end point for the load because that would impact the availability and profitability of the next load. Another option for lease operators to obtain attractive loads was to simply deadhead or bobtail (drive without a load or trailer) to another area where more profitable loads were available.

Many lease operators testified that they felt that, when they refused loads, they would go to the end of the line, or the bottom of the list, so to speak, before being offered another load. That is, they accused defendant of retaliating against them for turning down loads by making them wait longer than normal before offering a different load. At trial, however, there was no evidence to support the drivers' perception. Testimony at trial and in depositions by these lease operators amounted to nothing more than suspicion or conjecture, with no material evidence to support it. No evidence existed showing the

19

defendant "punished" lease operators for turning down loads, or intentionally delayed finding alternative loads for lease operators. That makes sense because it was in defendant's best interest to get loads hauled as quickly as possible and it would not benefit defendant to keep drivers idle any longer than necessary.

Lease operators also had, and in practice often exercised, the right to restrict locations or routes they would drive (in addition to declining individual loads). Company drivers were required to drive the routes assigned them, in any region of the country defendant assigned them. In contrast, lease operators often placed restrictions on portions of the country or states where they would refuse to drive from a perception that it was not profitable for them or because driving in particular areas of the country was difficult and often caused delays. For example, many lease operators disliked driving on the Eastern Seaboard for various reasons, and many disliked hauling loads in the pacific northwest. Some of these lease operators would inform defendant that they would never take loads to or from such locations. Lease operators were free to place such limitations on the loads they would take by restricting the areas of the country they would drive, but by doing so they inevitably restricted the number of loads available to them. At least one skillful lease operator learned that by restricting the area he would drive, he ensured that he only drove in an area that consistently had profitable loads.

Another way lease operators could obtain loads was to "broker" loads. That is, lease operators could find loads from sources other than defendant. Lease operators could only carry brokered loads if defendant approved the load. This was necessary because the load would be carried under defendant's DOT authorization, even if it was carried for another entity. If defendant approved the load, then it became defendant's load and was treated essentially the same as normal loads at that point. Brokered loads consisted of a very small percentage of the lease operators' total loads hauled during the period relevant here. At least some lease operators were told at orientation that they

20

could not work for other carriers during their contract with defendant. If a lease operator received permission to drive for another carrier, the lease operator was required under the ICOA to pay defendant a fee of $150 to $250 for each trip made for the other carrier. In any event, there was no evidence presented of any of the lease operators involved here, whether a named plaintiff or a class or collective member, driving for another carrier while under contract with defendant.

In the summer of 2022, defendant rolled out a new technology available to certain lease operators: a "load board." The load board was a tool that allowed the drivers to see loads within defendant's network and make plans based on it. The load board also listed the load's linehaul rate, fuel surcharge, and pick-up and delivery locations. As of the end of 2022, only lease operators who worked as a team with other lease operators—not those who worked with student drivers—had access to the load board. Lease operators who opted to use the load board generally planned their own trips rather than having defendant offer specific loads to the lease operator, though at times defendant recommended certain loads to lease operators that they may have missed on the load board. Lease operators who used the load board could book multiple trips at once to make for a continuous trip from one place to another. Defendant controls the load board and decides which lease operators can use it, and defendant can terminate a lease operator's access to the load board if defendant is dissatisfied with the lease operator's performance (though there was no evidence at trial that this has occurred).

Both before and after introduction of the load board, the manner of driving and delivery for lease operators remained the same. Once a lease operator took on a load, they would notify defendant when the lease operator picked it up, when the load was delivered, and any delays involved. Defendant in theory had the authority to prohibit lease operators from taking certain routes, but the only restriction defendant ever imposed on routes was to prohibit driving on Interstate 70 west of Denver in the mountains because

21

of the safety issues involved. Otherwise, lease operators chose their own routes. Defendant provided lease operators with recommended routes, but lease operators were not bound to take them. Some did, while others chose not to. Company drivers, by contrast, had to drive the route defendant assigned.

Lease operators could choose to take breaks or "home time" when they wanted to do so. In that sense, lease operators could set their own schedules. Of course, the more and longer breaks and home time lease operators took, the less loads they could carry, and the less income they could earn. Thus, lease operators were motivated to drive as much as possible to keep up with their lease payments and other fixed costs.

Defendant collected some data electronically, including the truck's location, speed, hard-breaking events, pick up and drop off times, fuel use information, electronic hours of service logs, and other data points. Much of this data defendant had access to was collected by the electronic communications system, or EOBR, required by the ICOA to be installed in the lease operators' trucks. Lincoln Sales monitored the lease operators' maintenance of the leased trucks. The lease operators were also required under federal regulations, and under the ICOA, to make the truck available for inspection at defendant's request, and the lease operators were required to have the truck inspected by defendant or a defendant-approved facility at least annually. Defendant prohibited lease operators from placing anything, other than defendant's identification, on the equipment without defendant's prior written consent—including things like paint, artwork, logos, or designs.

Lease operators could request cash advances when needed, and, if defendant advanced the cash, that amount would come out of the lease operators' future earnings through deductions in the lease operators' settlements. Lease operators also had the option to purchase accounting and other business services from a third party that apparently had a relationship with defendant. The lease operators could sign up for these

22

services in an attachment to the ICOA. Lease operators would then pay for those services through deductions from their settlement checks by defendant.

The evidence was unclear at trial whether the lease operators' lease payments to Lincoln Sales resulted in them building equity in the trucks. It was possible, depending on the value of a truck at the time lease payments were completed, that a lease operator had some equity in the truck, that is, that the truck still had market value at the end of the lease. Little or no evidence was presented on this issue and in the end, the Court finds it immaterial to the analysis.

Some lease operators testified about the skills required to be truck drivers. Some lease operators believed any person could drive a tractor-trailer, while others said truck driving took skill and required special training and knowledge, particularly to earn a Commercial Driver's License ("CDL"). Of more relevance to the Court's analysis of whether a driver was an employee or independent contractor, though, is the skill it took drivers to determine the most cost-effective and profitable route to drive a load, which requires considering multiple factors such as weather, road conditions, fuel stops, the price of fuel, rest-stop opportunities, and other practicalities. The other relevant skills at issue were management skills; the ability to evaluate and analyze the multitude of factors in deciding whether and how to drive which loads, in what locations, at what times, and for how long, with which refueling stops, and what breaks. Those skills made a difference as to whether a lease operator's business was profitable or unprofitable.

## V. CONCLUSIONS OF LAW

### A. Fair Labor Standards Act Claim

The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). Because these definitions provide little guidance in this situation, courts have come up with further standards and tests to determine whether a worker is an employee or not.

23

Generally, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). To determine whether a worker meets this standard, courts generally use the "economic realities test." *See Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022).[7] The Eighth Circuit's version of this test examines six factors concerning the relationship between the alleged employer and alleged employee:

> (1) "the degree of control exercised by the alleged employer over the business operations;" (2) "the relative investments of the alleged employer and employee;" (3) "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer;" (4) "the skill and initiative required in performing the job;" (5) "the permanency of the relationship;" and (6) "the degree to which the alleged employee's tasks are integral to the employer's business."

*Id.* (quoting *Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089, 1093 (8th Cir. 2017)). When considering the factors, "[n]o one is controlling nor is the list complete." *Karlson*, 860 F.3d at 1092 (quoting *United States v. Silk*, 331 U.S. 704, 716 (1947)). Also, a contract between the alleged employer and employee which labels the alleged employee as an independent contractor "may be relevant but is not controlling." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)).

For plaintiffs' Iowa Minimum Wage Law claim (Count 2), the Court will also use the economic realities test because there is no material difference between the tests used to determine whether plaintiffs are employees or independent contractors under the two claims.

---

[7] In *Alpha & Omega*, the court "assume[d] without deciding that the economic realities test is appropriate in determining whether a worker is an employee or independent contractor under the FLSA." 39 F.4th at 1082. The parties here make their arguments under the economic realities test, so the Court will follow their lead and analyze the issue under this test.

24

### 1. Control

Under the control factor, courts generally consider "the alleged employer's right to control the way work is performed." *Alpha & Omega*, 39 F.4th at 1083. The *Alpha & Omega* court noted several "manifestations of control" other courts have found important under this factor, including: whether the alleged employer set hours for drivers, *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 146 (3d Cir. 2020); whether the workers were free to reject projects, *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019); and "workers' ability to determine their own schedules, mandatory guidelines during working hours, ability to set fee for services, and ability to perform services at other establishments." *Alpha & Omega*, 39 F.4th at 1083 (citing *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1060–61 (6th Cir. 2019); *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241–42 (4th Cir. 2016)). This is not an exhaustive list of the subfactors to be considered within the control factor.

The Court finds the control factor weighs against finding plaintiffs were employees. One of the key facts on this issue is the lease operators' clear ability, and repeated exercise of that ability, to turn down loads. Almost without exception, lease operators frequently turned down loads they did not like for various reasons, whether they did not want to drive in a particular area of the country, or did not want to drive a load because they believed it would be unprofitable. Evidence at trial showed that approximately a third of all lease operators placed limits on the types and locations of loads they would take. (Tr. 1259). Some lease operators refused to drive for certain customers for various reasons. (Tr. 901–02).

Many lease operators stated at trial or in deposition testimony they "felt" as if or "believed" defendant would retaliate against them if they turned down loads by putting the driver at the back of the line for new loads or intentionally delay offering the driver

25

a new load. If true, this could show defendant exerted control over the lease operators' theoretical ability to turn down loads. The trial evidence, however, failed to provide any basis in fact for this perception. The evidence showed that lease operators often turned down loads, but there was no evidence whatsoever at trial showing that defendant did anything to control drivers by denying or delaying new loads, or by moving lease operators to the end of the line for new loads, or any such thing. Indeed, it was against defendant's best interest to do so. Defendant was in the business of delivering loads. It was in its best interest to have lease operators driving loads as often and as quickly as possible. The evidence presented at trial showed that some fleet managers—defendant's employees who offered loads to the drivers—were better than others at finding and coordinating loads for lease operators. So, some managers were better and quicker at finding alternative loads than were other managers. But all the evidence showed that defendant tried to provide loads to lease operators as quickly as possible without any consideration as to whether the lease operator had turned down an offered load. Or, at least, there was no evidence showing that defendant affirmatively retaliated against lease operators for turning down loads.

Lease operators were also free to choose the routes they drove. As the Court noted in its summary judgment ruling, several courts have noted that "the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 668 (7th Cir. 2022) (quoting *Narayan v. EGL, Inc.*, 616 F.3d 895, 904 (9th Cir. 2010)). The Court initially agreed with this line of thought in its summary judgment ruling, finding the lease operators' ability to choose their own routes held little, if any, weight in its analysis. After hearing the trial evidence, however, and gaining a deeper understanding of the industry, the Court's views have changed. Choosing a route is intertwined, in part, with choosing to take or reject a load. Some lease operators chose

26

not to take loads because they did not wish to drive the route the load entailed. Even when accepting a load, however, lease operators were free to choose the route they drove, while employee drivers were strictly limited to the route defendant dictated. This freedom lease operators had to drive the route of their own making allowed them to plot out routes best for them. What was best for them may include routes that took them to gas stations where prices were lower. It allowed drivers to plot routes they believed would make for easier driving, or could result in shorter driving distances. Plaintiff Cervantes, for example, testified that in choosing the routes he drove, he considered such things as "[t]he area as far as terrain, the cost, the stress of the vehicle going over mountains, passes, the weight of the load that were stressful on the fuel." (Tr. 96). Lease operators, as a result, often ignored defendant's suggested routes to choose ones of their own. (Tr. 321, 879, 889, 1556–57, 1621–22). All this differed significantly from employee drivers who were told the route they must drive, and the stations where they must obtain gas.

Lease operators could also haul brokered loads. Although it appears that brokered loads made up few of total loads hauled, the lease operators had the option to at least attempt to haul brokered loads, and there is at least some evidence of drivers hauling a brokered load. Plaintiff Cervantes himself hauled a brokered load. (TR. 170; Exhibit I). Plaintiffs generally respond to the brokered load issue by noting how hard it was to actually carry a brokered load because defendant had to approve it, and thus defendant was still, in reality, in control of those loads. The practical difficulty of hauling brokered loads does not eliminate the fact lease operators had the right—and in some cases exercised that right—to carry brokered loads, whereas employee drivers never could. Around 2022, defendant also negotiated contracts with some third-party freight brokers and agents to make brokering loads easier by working with these pre-approved brokers. (TR. 1263–64).

As to other factors, the evidence showed the lease operators set their own hours and determined their own schedules. To be sure, deadlines set by customers for picking up and delivering loads constrained lease operators' ability to control their schedules. Those constraints were a product of the load and the customer, however. They were not, as plaintiffs allege, "set by CRST." (Doc. 448, at 18). They were not constraints imposed by defendant in a manner designed to exercise control over lease operators. Of course, if lease operators believed the pick up and delivery times were unreasonable or unfavorable, they were free to reject the loads.

Finally, some of the facts plaintiffs rely on under this factor, as defendant points out, reflect defendant complying with federal regulations. Lease operators were not monitored in the manner defendant monitored and controlled employee drivers. Defendant monitored employee drivers via inward and outward-facing dash cameras, and by monitoring their schedules, speed, fuel consumption, hard-breaking events, and routes. Defendant was able to monitor the location of lease operators to the extent necessary to keep customers informed as to the progress of delivery, and for the ability to collect some other data, such as hard-breaking events, in the event of accidents or the like. But defendant did not access and monitor this data on an ongoing basis, or use any information from this data to discipline, sanction, or control lease operators.

As noted, sometime in 2022, defendant implemented the load board system, at least for some lease operators. It became fully operational in 2024. The load board system gave lease operators more freedom to plan their own trips and gave them more options in choosing which loads to haul. This gave lease operators even more control than they had before because they had greater knowledge and less dependence on fleet managers alerting them to available loads. Plaintiffs argue in their post-trial brief that the load board somehow increased defendant's control over lease operators because defendant assigned loads to employee drivers first. (*Id.*, at 18–19). The Court is

28

unpersuaded. Nothing about the load board reduces lease operators' control over their operations. At most, it may have reduced available loads, but it did not lead to defendant exerting increased control over lease operators with respect to their own operation as independent contractors free to choose or reject loads from the load board.

## 2. *Relative Investments*

The second factor of the economic realities test concerns "the relative investments of the alleged employer and employee." *Alpha & Omega*, 39 F.4th at 1082. Under this factor, courts consider "the amount the worker has invested in the business" which is "compared to that of the alleged employer." *Roeder v. Directv, Inc.*, No. C14-4091-LTS, 2017 WL 151401, at *16 (N.D. Iowa Jan. 13, 2017) (citing *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989)). "[T]he focus should be on comparing the investments to determine whether the worker is making similar types of investments as the potential employer (even if on a smaller scale) to suggest that the worker is operating independently, which would indicate independent contractor status." 29 C.F.R. § 795.110(b)(2).

Plaintiffs argue that defendant invested large sums in terminals, trailers, vehicles, and distribution infrastructure. (Doc. 448, at 15–16). Plaintiffs argue that defendant's "investment in its equipment and infrastructure were enormous while [lease operators] literally had no need to make any investment at all." (*Id.*, at 16). Plaintiffs point out that lease operators had no investment in their leased trucks until and unless they made a balloon payment at the end of the lease period, at which time the truck may or may not have value. (*Id.*). Defendant takes a different view. Defendant emphasizes that many lease operators chose to work as lease operators precisely so they could end up with their own truck in the end; a means of buying a truck with no money down. (Doc. 449, at 17–18). At least one lease operator ended up with his own truck at the end of the lease period. (Tr. 1594–95). Defendant also argues that lease operators invested in other

29

assets and tools, such as paying for base plates, tax permits, on-board recorder devices, and insurance. (Doc. 449, at 18).

In *Tobin v. Anthony-Williams Manufacturing Co.*, 196 F.2d 547 (8th Cir. 1952), the plaintiffs, truck drivers who hauled logs for the defendant, entered into independent contractor agreements with the defendant. The log drivers "purchased" trucks from the defendant, paying little or no money down. *Id.* at 548. As payment for the trucks, the defendant deducted a certain amount per mile the truckers drove and applied it towards the truck purchase price. *Id.* The trucks were only to be used in connection with the defendant's business. *Id.* at 549. The court held that the log truckers were employees of the defendant, holding that the relative investments factor weighed in favor of the plaintiff truckers. *See id.* at 549–50. The court specifically noted that the log truckers had "no substantial investment in their trucks, and their ownership is no more than nominal." *Id.* at 550.

The facts here show a similar financial structure. As defendant notes, the lease operators had continuing lease payments for their trucks. Like in *Anthony-Williams*, however, the lease operators here, in reality, had no "substantial investment" in the trucks, and the lease operators' rights to their trucks were "no more than nominal." *Id.* The lease operators here paid little or no money down, and other expenses related to leasing the truck (such as base plates, tax permits, on-board recorder devices, and insurance) were put on hold at first, and later deducted from the lease operators' periodic settlement checks.

More recently, in *Brant*, the court held that this factor weighed in favor of employee status on similar facts. 43 F.4th at 670–71. The *Brant* court noted that the defendant employer was correct that the alleged employee driver "spent large sums of money while hauling freight for [the defendant] on the truck lease, fuel, and equipment." *Id.* at 670. Although these investments made by the driver appear to point to independent

30

contractor status at first, the court further explained that the driver's investment "was made with no up-front payment and depended entirely on [the defendant's] providing a truck, mobile computing platform, and other equipment by extending its own credit to" the driver. *Id.* The court noted that the driver was "totally dependent" on the defendant's credit to operate, and that "[t]his level of dependency on [the defendant's] credit and provision of equipment weighs in favor of employee status." *Id.*

Here, similarly, although the lease operators made payments on the truck lease and other expenses, these investments included little to no up-front payment, and, as in *Brant*, plaintiffs here "depended entirely on [defendant's] providing a truck, mobile computing platform, and other equipment by extending its own credit" to the drivers. *See id.* Thus, like in *Brant*, this factor weighs in favor of employee status here.

Defendant's reliance on other cases where courts found this factor weighed in favor of finding drivers were independent contractors (Doc. 449, at 17–18) are easily distinguishable because in those cases the drivers were required to provide their own trucks. Here, defendant provided the trucks, or at least facilitated their provision through an affiliated third party, to lease operators without the lease operators having to make any up-front investment.

The Court's reasoning under this factor also comports with the overarching considerations of the employee verses independent contractor analysis. That is, when determining whether plaintiffs here were employees or independent contractors, the ultimate consideration is how dependent the plaintiffs were on defendant as a matter of economic reality. Here, even though plaintiffs technically had a certain level of investment, mainly through their lease payments, the financial structure—or, in the parlance of the economic realities test, the "relative investments of the parties"—shows a level of dependence on defendant. The lease operators were dependent on defendant

to be able to lease the trucks as a matter of economic reality. Thus, this factor weighs in favor of employee status.

It does not weigh heavily in favor of employee status, however, because the system allowed lease operators to ultimately end up with a truck—a very important and the most valuable asset involved in trucking—at the end of the lease period, and some did. Defendant subsidized lease operators by covering the upfront costs, allowing more drivers to become independent contractors when they could not afford to buy and supply their own trucks up front. But as time went on in each lease, and the lease operator paid more and more toward the ultimate purchase of the truck, the level of investment shifted slowly in favor of the lease operator.

Thus, although the "relative investments" factor weighs in favor of employee status, it does not weigh heavily under these circumstances.

### 3. *Opportunity for Profit and Loss*

The third factor concerns "the degree to which the alleged employee's opportunity for profit and loss is determined by the employer." *Alpha & Omega*, 39 F.4th at 1082. For this factor, "courts generally consider whether workers had control over profits and losses depending on their 'managerial skill.'" *Id.* at 1084. "A worker exercising managerial skills such as setting his own hours and rates along with the ability for the worker to earn additional income through his own initiatives indicate control over profits and losses." *Id.* "Facts demonstrating that a worker can use his managerial skill to improve his efficiency such that he can complete more jobs weigh in favor of independent contractor status." *Id.* (citation modified).

Plaintiffs argue that "their income was entirely dependent on the number and price of the loads that [defendant] chose to offer them" and on the amount of time they had to wait for loads. (Doc. 448, at 17). Plaintiffs also assert, without citation to the record, that defendant "directly controlled the income of individual [lease operators] by assigning

32

more or better loads to particular [lease operators] and by bending its rules to provide additional income to particular [lease operators] when it suited [defendant] to do so." (*Id.*). It appears plaintiffs are referencing trial testimony that reflected that in some cases when lease operators turned down loads, defendant would sometimes negotiate with them on things like fuel rates to entice the lease operator to take a load. (Tr. 308–09, 1253–56). Plaintiffs argue that their ability to control their own profits by choosing routes and fuel stops was limited by the delivery times and other factors, such as DOT limits on drive time. (Doc. 448, at 18). Plaintiffs argue that the choice of hiring a co-driver or serving as a lead driver did not increase the lease operators' control over profits because defendant "manipulated" that choice "for its own benefit." (*Id.*, at 20). In short, plaintiffs argue that "[t]heir income was wholly dependent on [defendant's] ability to manage its business well—something over which the [lease operators] had no control." (*Id.*, at 21).

In response, defendant notes initially that many of the facts applicable to this factor are also the facts applicable to the control factor. (Doc. 449, at 9).

The Court agrees with defendant that the opportunity for profit and loss is generally inextricably intertwined with the control factor. And here, plaintiffs attempt to foist on defendant responsibility over their ability to make a profit by noting the factors defendant controlled while ignoring factors lease operators controlled. True, if defendant's business did poorly and defendant had few loads to offer lease operators, it would affect lease operators' ability to make a profit. But the trial evidence showed that there were plenty of loads to be hauled and that it was the lease operators' decisions to limit the routes they would take, the loads they would accept, and the other details over the timing and paths they chose. These details are what made the difference between lease operators being able to realize a profit, or operate at a loss. When lease operators limited their own opportunities to take loads, they directly impacted their ability to realize

33

profits. When they followed the advice defendant proffered to accept as many loads offered to them that they could, it increased their ability overall to make a profit even if an individual load may not have appeared itself to be profitable, or as profitable as what the lease operator hoped would be offered with the next load. Similarly, when lease operators rejected student drivers for various reasons, it necessarily meant they had to wait for a new student driver, during which time they could make no profit. There may have been good reasons for rejecting these student drivers, but lease operators knew that when they rejected one, it would affect their ability to make a profit until such time that a new student driver could join them. When lease operators chose to take breaks or have home time, their decisions affected their ability to make a profit. These were all decisions exclusively within the control of the lease operators. That they were difficult and challenging decisions to make within the complexities of being a truck driver, and that the profit margins were thin, does not change that whether a lease operator made a profit or operated at a loss was highly dependent upon choices they made.

Thus, the Court finds this factor weighs in favor of finding plaintiffs were independent contractors.

### 4. Skill and Initiative

The fourth factor examines "the skill and initiative required in performing the job." *Alpha & Omega*, 39 F.4th at 1082. One aspect of this factor courts have found significant is whether "profits increased because of the 'initiative, judgment or foresight of the typical independent contractor,' or whether their work 'was more like piecework.'" *Roeder*, 2017 WL 151401, at *19 (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 809 (6th Cir. 2015)).

Plaintiffs argue the Court found in ruling on the summary judgment motions this factor favored them at least until adoption of the load board, and then go on to argue that adoption of the load board really did not change anything. (Doc. 448, at 22–23).

34

Defendant argues that the evidence showed that lease operators exercised business judgment and skill having to do with running a business, and not focused on the skill of driving a truck. (Doc. 449, at 19–20). The Court finds defendant's focus is the correct one.

Driving a truck certainly takes some skill and training; otherwise, a commercial license would be unnecessary. Still, when considering the "skill and initiative required in performing the job," *Alpha & Omega*, 39 F.4th at 1082, driving a truck is not the skill that matters in deciding whether a driver is an employee or an independent contractor. Being a lease operator for defendant and being a company driver for defendant require the same driving skills and basically the same qualifications, at least in performing the main job of driving the truck. *See Northland Cas. Co. v. Meeks*, 540 F.3d 869, 873 (8th Cir. 2008) ("While Floyd needed some skill to drive a tractor-trailer, that skill was not unique and not more prevalent among independent contractors than employees."). The Eighth Circuit "generally consider[s] whether workers had control over profits and losses depending on their 'managerial skill.'" *Alpha & Omega*, 39 F.4th at 1084. Thus, in determining whether a driver is an employee or an independent contractor, the focus should be on whether being a driver as a lease operator requires the use of skills that an employee driver does not exercise.

Here, the evidence showed that lease operators were required to exercise management skills which would not be expected from an employee driver. With employee drivers, defendant made all the complex decisions of what routes to take, what loads it would accept from customers that could be profitable, what refueling stops its drivers should make, and all the other myriad of decisions that would impact profitability for the company. Employee drivers never exercised those management skills because they did not have to. They just did what they were told. With lease operators, however, managerial skills and business skills were necessary because defendant left those complex

choices to the lease operators. Those skillful at making complex calculations with a thin profit margin could do well. As the Court has noted, wise exercise of those decisions left to the discretion of lease operators made all the difference on whether a lease operator would be profitable.

Thus, the Court finds this factor weighs in favor of finding plaintiffs were independent contractors.

### 5. *Permanency of the Relationship*

The fifth consideration of the economic realities test is "the permanency of the relationship." *Alpha & Omega*, 39 F.4th at 1082. The question under this factor is whether "the worker and alleged employer regard the work as permanent." *Roeder*, 2017 WL 151401, at *21. "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor." *Keller*, 781 F.3d at 807. Courts look to "the length and regularity of the working relationship between the parties, but even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship." *Id.* (internal citation omitted). Thus, although the factor is often labeled as the permanency of the relationship, courts clearly also consider exclusivity within this factor. *See, e.g.*, *Roeder*, 2017 WL 151401, at *22–23 (finding this factor weighed in favor of independent contractor status regarding a worker who also performed work for other companies, but finding this factor weighed in favor of employee status as to a different worker whose relationship with the company was shorter in duration, but exclusive).

Plaintiffs argue this factor weighs in favor of an employee-employer relationship because the drivers worked exclusively for defendant, and the one-year contracts were routinely extended or renewed on satisfactory performance. (Doc. 448, at 24). Defendant argues in response that the drivers entered into and terminated the contracts

36

on a regular basis, and defendant points to the high turnover rate of lease operators as specific evidence supporting its position. (Doc. 449, at 21).

Here, the Court finds the permanency factor weighs slightly in favor of plaintiffs. While the drivers were under contract with defendant, the work was exclusive. Also, the contracts lasted a year in length, and were generally renewed. What detracts from the strength of this factor for plaintiffs is that the evidence showed that some lease operators left defendant, drove for others, rejoined as lease operators, left again and so on, while other lease operators kept driving loads for defendant for extended periods. The variation among lease operators itself shows that this was not a permanent relationship between defendant and the lease operators. Rather, the permanency of the relationship appears to have been left in the hands of the lease operators and whether they chose to keep driving loads for defendant. Defendant is correct to point out (*see* Doc. 449, at 21–22), that to the extent plaintiffs are arguing that all lease operators, as a class, considered they had a permanent relationship with defendant (which indeed is what plaintiffs are arguing), their argument falls short when the evidence shows such variation among drivers. The reality is that neither party considered the relationship to be permanent. Lease operators not infrequently came, left, and returned for various periods of time.

### 6. *Integral to the Business*

The final factor of the economic realities test asks "whether workers' services are a necessary component of the [defendant's] business." *Alpha & Omega*, 39 F.4th at 1085 (citation omitted). "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815. Plaintiffs argue that having lease operators drive defendant's loads was integral to its business operations. (Doc. 448, at 25). Plaintiffs emphasize that lease operators were "integrated" into defendant's business, driving the same loads on the same

37

routes in the same trucks as employee drivers. (*Id.*). Defendant "concedes that Contractors are a necessary part of its business," but emphasizes that this is only one factor that must be considered in the totality of the evidence. (Doc. 449, at 22).

Because defendant concedes this issue, the Court finds if favors plaintiffs.

### 7.    *Conclusion*

In weighing all the factors, the Court finds that, although it is close, the lease operators were not employees; they were independent contractors. The Court gives great weight to the degree of control drivers had over the performance of their work, given the degree to which the exercise of that control dictated the degree to which lease operators could realize profits. The evidence convinced the Court that the reality was that lease operators could and did act as independent contractors, free to operate their own business as they pleased, in hauling loads for defendant. To the extent other factors weighed in favor of plaintiffs as employees, the Court gave these factors much less weight for the reasons stated above. Thus, the Court finds plaintiffs were independent contractors and not employees. As such, the Court finds in favor of defendant on plaintiffs' FLSA claims.

### B.    *Iowa Minimum Wage Law Claim*

Plaintiffs bring a claim under the Iowa Minimum Wage Law ("IMWL"), asserting that they were employees of defendant and so were entitled to Iowa minimum wage. *See* Iowa Code § 91D.1(1)(b). The Iowa statute provides that "[e]very employer, as defined in the [FLSA], shall pay to each of the employer's employees, as defined in the [FLSA], the state hourly wage . . . or the current federal minimum wage, . . . whichever is greater." *Id.* Plaintiffs claim they were employees of defendant and were paid an amount lower than minimum wage. As discussed above, the general analysis for determining whether plaintiffs were employees or independent contractors under the IMWL is controlled by the test under the FLSA, which is generally the economic realities test.

This is because of the statutory language in the IMWL incorporating the FLSA's definition of "employer" and "employee."

As noted above, the Court applies the same economic reality test, as do the parties, to this claim as it did to plaintiffs' FLSA claim. As such, the Court's conclusion is the same. The Court finds defendant did not violate the IMWL because plaintiffs were independent contractors. As such, the Court finds in defendant's favor on plaintiffs' IMWL claim.

### C.    *Iowa Wage Payment Collection Law Claims*

In Count 3 of their complaint, plaintiffs Cervantes and Cross made claims under the Iowa Wage Payment Collection Law ("IWPCL") for unlawful deductions. Unlike the IMWL—which applies the FLSA's test for determining employee status, *see* Iowa Code § 91A.2(3)(a), (4)—the IWPCL relies on Iowa common law. Nevertheless, the IWPCL has the same Owner-Operator Exemption as the IMWL, which provides that "'employee' does not include an independent contractor as described in section 85.61[(12)(c)(3)]." Iowa Code § 91A.2(3)(c). Iowa courts apply a twelve-factor test. *Fesler v. Whelen Eng'g Co.*, 794 F. Supp. 2d 994, 1008–09 (S.D. Iowa 2011) (summarizing 12 factors based on *Iowa Mutual Insurance Co. v. McCarthy*, 572 N.W.2d 537, 542–43 (Iowa 1997)). The central inquiry is whether an alleged employer has the right and exercises the right to control the alleged employee's work. *Id.* In ruling on the parties' motions for summary judgment, the Court found that if it found at trial that plaintiffs were employees, then certain deductions made from their settlements may violate the IWPCL.

The evidence at trial showed that Cervantes and Cross were not employees of defendant but were instead independent contractors. As noted above, the evidence showed that defendant did not control Cervantes and Cross in their operation as lease operators. Each plaintiff exercised control over their own operations, making decisions

39

that impacted their own profitability in ways that defendant was not responsible for. Moreover, plaintiffs failed to show that they were on defendant's payroll, as employees, or that the parties intended plaintiffs to constitute employees.

Given the Court's conclusion, it need not address defendant's alternative arguments that certain deductions are exempted and that the IWPCL claim is preempted.

Thus, the Court finds in favor of defendant on plaintiffs' IWPCL claim.

### D.    Fraud Claim

In Count 5 of their complaint, the named plaintiffs also assert a state law fraud claim against defendant, arguing that defendant misrepresented to them their ability to operate profitably as lease operators. To state a claim for fraud under Iowa law, plaintiffs were required to prove the following seven elements: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (internal quotation marks omitted). The evidence at trial fell far short of proving this claim. Defendant did not make promises of profitability. It provided lease operators with estimates of potential profitability, stating that the ability to earn a profit depended on many factors, some of which were out of control of both parties. The Court places significant weight on the testimony of Jennifer Abernathy, whom the Court found credible. She explained at length the nature of the documentation and representations provided to lease operators. In contrast, plaintiffs' evidence constituted nothing more than conclusory assertions that they believed the estimates provided to them were concrete promises, which was in direct conflict with the express language of the documentation and the representations made to lease operators. So, here, the Court finds the proof failed to establish falsity, scienter, and intent to deceive.

Thus, the Court finds plaintiffs have failed to prove their fraud claim and finds in favor of defendant on this claim.

40

### E.      Truth-in-Leasing Act Claim

In Count 6 of their complaint, plaintiffs brought a cause of action for a violation of the Truth-in-Leasing Act ("TILA"), found at Title 49, United States Code, Section 14102 et seq.  The federal Truth-in-Leasing regulations, 49 C.F.R. Part 376 govern the "lease and interchange of vehicles." The objectives of the regulations are:

> to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank (In re Arctic Express Inc.)*, 636 F.3d 781, 795 (6th Cir. 2011) (citation modified).

To advance these objectives, federal regulations require that certain leases contain specific provisions, and require that lessors adhere to the requirements of those provisions.  *See* 49 C.F.R. § 376.12.  One of the required provisions relates to disclosure by the carrier to the driver of certain documents, including copies of the freight bill or a similar document used by the carrier.  *See id.* § 376.12(g).  When a carrier does not adhere to these provisions, drivers have a statutory cause of action under Title 49, United States Code, Section 14704(a)(2).  Specifically, the statute provides: "A carrier or broker providing transportation or service . . . is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part."  49 U.S.C. § 14704(a)(2).  *See also Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 692 (8th Cir. 2009) (stating that there is "a private right of action in 49 U.S.C. § 14704(a)(2) for violations of the Truth-in-Leasing regulations").  Thus, to prove liability for this claim, plaintiffs must prove that (1) defendant violated 49 C.F.R. § 376.12(g), and (2) drivers were underpaid as a result of the violation.  In ruling on the

41

parties' motion for summary judgment, the Court found the two elements plaintiffs must prove to establish defendant's liability here, violation and underpayment, were both satisfied. Thus, in ruling on the parties' motions for summary judgment, the Court found plaintiffs established defendant's liability under the TILA claim, and the only issue left for trial was the amount of damages.

Plaintiffs have the burden to establish that the TILA violation caused them "actual damages." *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010) (collecting cases and noting that plaintiffs must "show how they sustained damages because of the violations"). Here, both parties presented expert testimony on TILA damages. Plaintiffs' expert, Dr. Kriegler, testified about how he calculated the amount of TILA damages and arrived at the figure $5,572,403.47. (Tr. 772). Dr. Kriegler's calculations established that defendant's TILA violations caused actual damages. The problem, however, is in the accuracy and specificity of Dr. Kriegler's calculations. Dr. Kriegler further testified that only about 80% of the lease operators had "some sort of TILA damage[s]," (*Id.*, at 773–74), but his calculations did not identify which drivers suffered what damages.

Defendant's expert, Dr. Song, critiqued plaintiffs' expert's report and identified multiple errors in his methodology and calculations. She reached a different opinion as to the aggregate TILA damages and explained her reasoning and methodology and how she arrived at that amount in great detail. She found, for example, that Dr. Kriegler overstated TILA damages by almost $338,000 by omitting settlement overpayments, missed other payments to the tune of $282,000, and made a series of other mistakes that would reduce the TILA damages by $315,000. (Tr. 517, 518, 520). Indeed, Dr. Song calculated TILA damages at $1,794,000. (Tr. 528). In response to Dr. Song's criticisms (Tr. 762), Dr. Kriegler produced a revised report in which he acknowledged some of the errors the defense expert identified and purported to arrive at a new aggregate damage

figure of $5,140,008.85. (Tr. 772, 832). Still, Dr. Kriegler reached different figures than Dr. Song, but was completely unable to explain how, adopting Dr. Song's criticism of his methodology, he still arrived at a different figure. (See, e.g., Tr. 823-832). Nor did his work papers show how he reached this new number or how he accounted for the errors the defense expert identified. When pressed during his trial testimony to explain his calculations, he could not.[8] And Dr. Kriegler could not and did not identify which class members suffered what TILA damages in what amount.

The Court finds Dr. Kriegler's calculations unreliable. He acknowledged errors in his original calculation, purported to amend his original calculation fully accounting for those errors, but arrived at a figure different from Dr. Song without adequate explanation for how he arrived at his calculations. He was unable to explain the difference or show how he reached that figure. It is the plaintiffs' burden of proof here. The Court finds it cannot credit the testimony of Dr. Kriegler on the TILA damages, and thus finds the reliable evidence shows plaintiffs' TILA aggregate damages are as calculated by defendant's expert.

Thus, the Court is left in an unfortunate quandary. Plaintiffs have shown that many of the lease operators suffered TILA damages, and defendant conceded as much. Plaintiffs chose to gamble on having their expert calculate only aggregate damages for all their claims, assuming the Court would adopt their suggestion to allow an allocation method similar to what another judge used in another case. Defendant would have the Court rely upon strict application of discovery disclosure rules and find that plaintiffs have thus forfeited their right to any damages because they have not individualized the damage calculations. The Court finds such a solution inequitable. Plaintiffs have been

---

[8] For example, when asked how much trailer detention damages he removed from his TILA calculations in light of Dr. Song's criticism, Dr. Kriegler could not answer the question—he did not know the answer. (Tr. 827).

wronged and have suffered damages, though the Court credits Dr. Song's opinion that those TILA damages are far less in the aggregate that what Dr. Kriegler has calculated. Indeed, the Court adopts Dr. Song's conclusion that TILA damages are, in the aggregate, equal to $1,794,000.00.

Federal Rule of Civil Procedure 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). "Courts have broad discretion to determine whether to sever, or bifurcate, claims" but "bifurcation is a procedural tool that should be used sparingly . . . it is the exception, not the rule." *McGlohon v. Am. Fam. Mut. Ins. Co.*, Case No. 22-CV-4063-CJW-KEM, 2023 WL 11916747, at *1 (N.D. Iowa July 12, 2023) (citation modified). The Court finds bifurcation of the trial necessary to avoid prejudice to those plaintiffs who clearly suffered TILA damages and deserve to be compensated for their losses.

The Court finds the proper solution here is to reopen discovery for the limited purpose of allowing the parties to identify, by plaintiff, the amount of TILA damage each class member suffered, if any, so that the Court can enter a proper order awarding TILA damages to those lease operators who suffered the damages, in the proper amount. The Court directs the parties to meet and confer and, within 30 days of the date of this order, submit to the Court proposed deadlines for conducting damages discovery limited to the TILA damages. The calculation of individual damages should also address pre- and post-judgment interest as well, under Title 26, United States Code, Section 6621(a)(2), and Title 28, United States Code, Section 1961. If the parties are unable to agree to the amount owed to each class member, the Court will hold further trial proceedings to resolve any conflict. To be clear, though, the Court credits Dr. Song's testimony, and the total TILA damages are $1,794,000.00.

44

To the extent plaintiffs assert a claim for attorneys' fees, costs and expenses as prevailing parties under their TILA claims, they may make a separate application for such an award with proper documentation supporting their claims, taking particular care to separate out fees and costs borne in connection with claims on which they were unsuccessful.

## VI.    CONCLUSION

For the reasons stated, the Court:

(1) **denies** defendant's motion to strike Scott Workman as a witness (Doc. 406);

(2) **grants** defendant's motion to strike the declaration of Rebecca King (Doc. 452);

(3) **finds in favor of defendant** on plaintiffs' FLSA, IMWL, IWPCL, and fraud claims; and,

(4) **finds in favor of plaintiffs** on their TILA claims.  The Court finds, however, that the total amount of damages on plaintiffs' TILA claim is $1,794,00.00.  The Court finds further proceedings necessary to quantify individual damages on plaintiffs' TILA claims, as set out above.

**IT IS SO ORDERED** this 25th day of July, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa